PROPOSED PRETRIAL ORDER

# EXHIBIT 17.5

## FINCH AND UMN'S MOTION *IN LIMINE* NO. 5 TO PRECLUDE USE OF OR RELIANCE ON LATE-PRODUCED DOCUMENTS AND TESTIMONY FROM FINCH'S TRIAL COUNSEL

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., REBIOTIX INC., | ) )  |
| Plaintiffs, | ) ) C.A. No. 21-1694-JLH |
| v. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC, | ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and REGENTS OF THE UNIVERSITY OF MINNESOTA, | ) **CONFIDENTIAL –** ) **FILED UNDER SEAL** ) ) ) ) |
| Counterclaim Plaintiffs/Reply Defendants, | ) ) |
| v. | ) ) |
| FERRING PHARMACEUTICALS INC., and REBIOTIX, INC., | ) ) ) |
| Counterclaim Defendants/Reply Plaintiffs. | ) ) |

**FINCH AND UMN'S MOTION *IN LIMINE* NO. 5 TO PRECLUDE USE OF OR RELIANCE ON LATE-PRODUCED DOCUMENTS AND TESTIMONY FROM FINCH'S TRIAL COUNSEL**

Pursuant to Federal Rules of Evidence 402 and 403[1] Finch/UMN ("Finch") respectfully request that the Court exclude: (1) testimony or documents produced two months before trial, including post-litigation communications; and (2) any testimony sought from Finch's trial counsel.

Dr. Borody, an inventor on certain of the asserted patents owned by Finch, formally assigned the patents to Finch in 2015. During the litigation, he was initially cooperating with Finch and was represented by Kirland & Ellis ("K&E"). Just days before his deposition, however, Dr. Borody cancelled his deposition and advised Finch he would not appear absent payment of ████████████████████████████. D.I. 221 at 6. In light of these demands, K&E withdrew as his counsel. Shortly after, Ferring for the first time raised a concern about Finch's standing to assert the Borody Patents. Ex. 1. Though the deposition did not go forward as scheduled, Finch expressed its view that Dr. Borody should sit for deposition and offered several options to Ferring to compel a deposition if necessary. Ex. 2. Rather than work with Finch to secure discovery from Dr. Borody, Ferring began working in secret with Dr. Borody. ██ ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████. After a year of silence[2], Ferring made a document production on June 5, 2024 consisting entirely of documents from Dr. Borody (including post-litigation communications with his former counsel at K&E) and which Ferring has placed on its exhibit list as TX 3178, 3452, 3453, 3458, 3459, 3579, 3581, 3583, 4209, 4236, 4237, 4241, 4246, 4248, 4251. Along with these documents, Ferring also disclosed that it intends to call

---

[1] All other objections, including hearsay, are preserved depending on how Ferring attempts to use the documents at trial.

[2] During the meet and confer, Ferring would not disclose whether it is in contact with Dr. Borody, whether he is coming to trial, or when/how it got these documents.

as a trial witness a partner at K&E who has worked on this case since the outset and who was involved in representing Dr. Borody. There is no basis for this last-minute evidence or Ferring's sideshow about Dr. Borody's prior attorney-client relationship with K&E.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████.[3] This Court routinely precludes late produced evidence. *See, e.g.*, *3G Licensing, S.A. v. HTC Corp.*, 2023 WL 6442140, at *1 (D. Del. Oct. 3, 2023) (precluding the use of eight new website printouts at trial because the "Court is concerned that the prejudice to Plaintiffs of this late disclosure cannot be remedied."); *Philips Elecs. N. Am. Corp. v. Contec Corp.*, 2004 WL 769371, at *1 (D. Del. Apr. 5, 2004) ("Since CMT has not shown that its failure to properly and timely produce the evidence in question is harmless, the evidence will not be permitted at trial."). The Court should reach the same result here.

Moreover, the *Pennypack* factors support exclusion. Finch and UMN were surprised by the production and prejudiced by the contents as there is no time for them to seek further discovery on the standing issue; thus the prejudice cannot be cured. Ferring declared a year ago that discovery was closed and there would be no deposition of Dr. Borody. Dr. Borody's ████████ demand came out of nowhere, is not grounded in reality, and has never been tested by Finch on cross examination. Further, there is no excuse for Ferring's late production of these documents. Although Ferring has in some form been in contact with Dr. Borody for a year, Ferring did not produce these documents until now. Finally, and as explained in more detail below, this evidence

---

[3]  The production also includes communications between Dr. Borody and K&E as his counsel. These communications are not relevant to the issues to be decide by the jury in this case. Those documents (TX 4209, 4236, 4237, 4241, 4246, 4248, and 4251) are attached hereto as Exhibit 4.

is not important to Ferring's defenses.

In addition, there is no relevance to many of the documents or the relevance is outweighed by unfair prejudice, confusion and a waste of time. During the parties' meet and confer, Ferring indicated that the documents at issue are relevant to the issue of standing and to its motion for an adverse inference based on Dr. Borody's failure to sit for deposition. The late-produced documents do not meaningfully add to that and the communications between Dr. Borody and K&E while the litigation was pending in particular have no relevance to ownership. It was also a year ago that Ferring agreed, declaring that it was "not 'relying on' Borody's allegations to prove its arguments." Ex. 3 at 1. Taking Ferring at its word, the post-litigation threats and communications could only serve to prejudice Finch and its counsel at K&E. Dr. Borody's position in those e-mails regarding the assignment of the patents-in-suit reflects a post-litigation position that carries little weight as compared to the contemporaneous agreements related to the assignment of the patents. *Cf. Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *2 (Del. Ch. July 30, 2021) (court will afford more weight to "contemporaneous documents and disinterested witness testimony"). And, as will be explained in more detail in Finch's opposition, there is no basis for an adverse inference here, where Ferring is complaining of the lack of deposition of Dr. Borody after rejecting all efforts at a deposition at a time when it was in communication with Dr. Borody.

Moreover, post-litigation communications between Dr. Borody and K&E and the testimony of a K&E partner would be prejudicial, confusing, and a waste of time. Ferring seeks to put Finch's trial counsel on trial where the communications have no relevance to ownership. The patents were either properly assigned to Finch in 2015 or they weren't; nothing Dr. Borody said, including his his $50 million demand can change that. It would be confusing and a waste of the jury's time to put testimony from Finch's trial counsel and her communications into evidence.

# EXHIBITS TO FINCH AND UMN'S MOTION *IN LIMINE* NO. 5 REDACTED IN THEIR ENTIRETY

PROPOSED PRETRIAL ORDER

# EXHIBIT 17.5

## FERRING/REBIOTIX'S OPPOSITION TO UMN/FINCH'S MOTION *IN LIMINE* NO. 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., REBIOTIX INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC. | )   C.A. No. 21-1694-JLH |
| | ) |
| Defendants. | ) |
| | ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and REGENTS OF THE UNIVERSITY OF MINNESOTA | ) |
| | ) |
| Counterclaim-Plaintiffs/Reply Defendants, | ) |
| | ) |
| v. | ) |
| | ) |
| FERRING PHARMACEUTICALS INC., and REBIOTIX, INC. | ) |
| | ) |
| Counterclaim-Defendants/Reply Plaintiffs. | ) |

**FERRING/REBIOTIX'S OPPOSITION TO UMN/FINCH'S MOTION IN LIMINE NO. 5**

## I.   INTRODUCTION

The Court should deny Finch's motion.[1] Finch previously represented Dr. Borody and Finch collected and should have produced the documents it is seeking to exclude during fact discovery. Ferring produced the documents it received from Dr. Borody promptly, and regardless, Ferring produced the documents promptly after receiving them from Dr. Borody and Finch already had access to them. Finally, Ferring sought the testimony of Ashley Ross solely to authenticate certain documents she authored. Ferring offered to stipulate to authenticity, which would eliminate the need for her trial testimony. Finch failed to respond.

## II.   ARGUMENT

*First,* Ferring's production was timely. Federal Rule of Civil Procedure 26(e) allows for supplementation of discovery where a party learns of new information, so long as disclosure is "in a timely matter." FED. R. CIV. P. 26(e). Here, Ferring produced 34 documents promptly after receiving them from Dr. Borody.[2] As detailed in Ferring's MIL No. 5, Finch repeatedly delayed Dr. Borody's deposition, which was ultimately canceled just two days after Dr. Borody informed Finch that his deposition testimony would be contrary to Finch's interests. (PTO Ex. 18-5 at 1-2.) Finch insinuates that Ferring improperly withheld documents received from Dr. Borody for a year. Not so. The documents provided by Dr. Borody to Ferring's Australian counsel in July 2023 were subject to confidentiality terms that precluded access by Ferring's litigation counsel or use in this litigation. (Ex. 1.) Ferring's litigation counsel had no contact with Dr. Borody

---

[1] Despite the Court's scheduling order—which limits the parties to five Motion *in Limines* (D.I. 17 (as amended) ¶ 14.)—Finch raises two distinct issues: (1) documents recently received from Dr. Borody and produced by Ferring (2) testimony of Finch's trial counsel. Ferring addresses both issues here regardless.

[2] One of the documents Finch is seeking to exclude (Ex. 4 to PTO Ex. 17.5 at TX-4251) was produced by Finch.

during that time period and did not receive the documents provided by Dr. Borody to Ferring's Australian counsel. Ferring's litigation counsel received them from Dr. Borody on April 15, 2024.

*Second,* there is no basis for exclusion where Ferring's production was "substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Finch's "surprise" at Ferring's production is disingenuous where the vast majority (over 75%) of the documents had already been produced by Finch and/or involved communications with Finch's counsel. Moreover, Finch's counsel represented Dr. Borody from October 2022 to June 2023. During this time, Finch could have (and should have, given that the documents were responsive to Ferring's discovery requests) secured the same documents from their client. The other *Pennypack* factors similarly weigh against exclusion. There is no likelihood that Ferring's production will disrupt trial given that Finch already had access to the documents and received the 34 documents at-issue two months before trial. *Cf. Novartis Pharms. Corp. v. Actavis, Inc.,* No. CV 12-366-RGA-CJB, 2013 WL 7045056, at *2, *11 (D. Del. Dec. 23, 2013) (no disruption from disclosure of supplemental expert report 1 month before trial). Any limitation on further discovery, including the inability to cross-examine Dr. Borody, is a result of Finch's own misconduct. And, as explained above, there has been no bad faith on Ferring's part. *See id.* at *11 ("Courts have tended to reserve a finding that a party acted… in bad faith for clear, extreme examples of such conduct.") (citation excluded). Exclusion of "evidence is an 'extreme' sanction not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order[.]" *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994). Where, as here, there were only a few documents produced and Finch already had possession of the documents there is no prejudice and courts have routinely declined to exclude such documents. *See Tasco v. Int'l Bhd. of Elec.*

2

*Workers*, 634 F. App'x 94, 96 (3d Cir. 2015); *Kelly v. Atl. Cape Fisheries, Inc.*, No. CV 15-6926 (NLH/JS), 2017 WL 4927665, at *1 (D.N.J. Oct. 30, 2017).

*Third,* the documents which Finch seeks to exclude are relevant to standing. This Court acknowledged, "the resolution of the ownership dispute turns on a dispute of fact" and explicitly authorized presentation of evidence on this issue. (D.I. 341.) These documents wherein Dr. Borody—the patent inventor and purported assignor—and his Australian counsel explain Dr. Borody's ownership dispute are thus highly relevant to a key issue in the case. That such evidence reflects post-litigation positions goes to its weight, not admissibility. *Stone & Paper Invs., LLC v. Blanch*, C.A. No. 2018-0394-PAF, 2021 WL 3240373, at *2 (Del. Ch. July 30, 2021). Although Ferring has repeatedly explained that its standing argument is not dependent upon Dr. Borody's assertions—and for example, also relies on statements made by Finch and Finch's counsel—these documents remain relevant. (*See, e.g.,* D.I. 232 at 3.) Further, Dr. Borody's deposition was canceled at the last minute and only after Dr. Borody contested Finch's ownership. Thus, communications related to Dr. Borody's deposition provide important context for the ownership dispute. The Court has expressly delegated the issue of ownership to the jury and therefore Finch is incorrect that such evidence would mislead or confuse jurors.

*Finally,* as Ferring has explained to Finch, the sole purpose for which Ferring intends to call Ashely Ross is to authenticate communications between Finch's counsel and Dr. Borody. Finch's actions foreclosed Ferring's ability to depose Dr. Borody. If Dr. Borody does not willingly testify at trial, Ms. Ross is the only percipient witness available to authenticate these documents.[3] To avoid calling Ms. Ross at trial, Ferring asked Finch to stipulate to the authenticity of these communications. Finch did not respond to Ferring's proposal.

---

[3] Dr. Borody lives in Australia and is thus unavailable via trial subpoena. Fed. R. Civ. P. 45.

Dated: July 9, 2024

*Of Counsel:*

Daralyn J. Durie
Matthew Chivvis
Rachel Dolphin
Ramsey Fisher
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415-268-6055
ddurie@mofo.com
mchivvis@mofo.com
rdophin@mofo.com
ramseyfisher@mofo.com

Whitney O'Byrne
Sara Doudar
MORRISON & FOERSTER LLP
701 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: 213-892-4345
wobyrne@mofo.com
sdoudar@mofo.com

WOMBLE BOND DICKINSON (US) LLP

*/s/ Mary W. Bourke*
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
Zachary Murphy (#6881)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Mary.Bourke@wbd-us.com
Dana.Severance@wbd-us.com
Daniel.Attaway@wbd-us.com
Zachary.Murphy@wbd-us.com

John B. Bourke (#6534)
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, CA 94111
Telephone: (415) 765-6267
Ben.Bourke@wbd-us.com

*Attorneys for Ferring Pharmaceuticals Inc.*
*and Rebiotix Inc.*

**PROPOSED PRETRIAL ORDER**

**EXHIBIT 17.5.1**

**Exhibit 1 to Ferring/Rebiotix's Opposition to UMN/Finch's Motion in Limine No.  5**

## Boots, Kimberly P.

| | |
|---|---|
| **From:** | Farnan, Kelly E. <Farnan@RLF.com> |
| **Sent:** | Tuesday, August 1, 2023 9:52 AM |
| **To:** | Bourke, Mary; Attaway, Daniel; Severance, Dana; rebyota; Mammen, Chris |
| **Cc:** | Finch_Rebiotix@kirkland.com; Moyer, Jeffrey L; Pedi, Nicole K. |
| **Subject:** | RE: Ferring/Finch - Borody Communications |

External (farnan@rlf.com)

Report This Email  FAQ

Mary,

You can say that you didn't rely on Dr. Borody's allegations but that does not make it so.  As just one example, see page 16 of your Opening Brief where you state "Borody now asserts that he never received those payments, so the assignment is, according to Borody's contentions, void."  This, at a minimum, puts Dr. Borody's credibility at issue and communications he is having with Ferring now bear on that issue.  You also failed to address your communications with his counsel concerning the motion Ferring filed.

Given that you are also taking the position that discovery is closed, what is the basis then for your questions concerning our communications with parties to the 2013 and 2015 transactions?  Discovery is either closed or it isn't.

Finally, we will assume that you are no longer pursuing Dr. Borody's deposition based on your statement below.

Kelly


Kelly Farnan
Richards, Layton & Finger, P.A.
(302) 651-7705 | farnan@rlf.com


The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.


**From:** Bourke, Mary <Mary.Bourke@wbd-us.com>
**Sent:** Monday, July 31, 2023 3:49 PM
**To:** Farnan, Kelly E. <Farnan@RLF.com>; Attaway, Daniel <Daniel.Attaway@wbd-us.com>; Severance, Dana <Dana.Severance@wbd-us.com>; rebyota <rebyota@wbd-us.com>; Mammen, Chris <Chris.Mammen@wbd-us.com>
**Cc:** Finch_Rebiotix@kirkland.com; Moyer, Jeffrey L. <moyer@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>
**Subject:** RE: Ferring/Finch - Borody Communications

Dear Kelly,

Thank you for your e-mails.

First, the premise of your request on Friday July 28 is not correct.  As I stated at the July 17 hearing and as Ferring stated in its reply brief, Ferring is not "relying on" Borody's allegations to prove its arguments.  Rather, the dispute between Finch and Borody that came into full view over the past several months served to bring to Ferring's attention the problems with Finch's standing to assert the Borody patents, as shown by the documents that have been produced.  Moreover, none of the communications identified in my July 27 email are relevant to any claim or defense at issue in the case, and discovery has closed.  Concerning any materials provided to Australian counsel, we do not have those materials, and do not know what they are.  Presumably, they are selections from the materials that Borody provided to K&E in connection with producing documents in response to the subpoena to Borody.  Whether they were already produced in the litigation, or were  among the other documents held back by K&E, we do not know.  Moreover, Ferring is under no obligation to accept-and-re-produce a selection of documents from Borody that have doubtless been cherry-picked to support Borody's agenda and that in all likelihood should have been (and, for all we know, were) collected and produced as part of Borody's earlier production.

Concerning your question about Borody's deposition, Ferring received repeated assurances from Finch's counsel that Borody would be produced for a deposition, and in reliance on those promises, did not pursue discovery under the Hague convention before the close of discovery.  We were even willing to travel to Australia to take the deposition.  Now it's too late, discovery is closed, and K&E's representation of Borody has ended.

Finally, please explain your assertion that "We have not had any non-privileged communications with parties to the 2013 and 2015 transactions." First , who is the "we"? Does it include Kirkland and Ellis and Finch as well as RLF?  Second, do any of  you now represent some or all of the parties to the 2013 and 2015 transactions?  If so, please inform us which of those parties you represent.  Any communications between counsel and a party you don't represent, or communications directly between Finch or its principals and any of the parties to the 2013 or 2015 transactions, are not privileged and should be produced.

Regards
Mary

---

**From:** Farnan, Kelly E. <Farnan@RLF.com>
**Sent:** Monday, July 31, 2023 3:41 PM
**To:** Bourke, Mary <Mary.Bourke@wbd-us.com>; Attaway, Daniel <Daniel.Attaway@wbd-us.com>; Severance, Dana <Dana.Severance@wbd-us.com>; rebyota <rebyota@wbd-us.com>
**Cc:** Finch_Rebiotix@kirkland.com; Moyer, Jeffrey L. <moyer@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>
**Subject:** RE: Ferring/Finch - Borody Communications

Mary,

Please let us know if Ferring will produce the requested communications and, if not, when you are available to meet and confer.

Thanks,
Kelly

Kelly Farnan
Richards, Layton & Finger, P.A.
(302) 651-7705 | farnan@rlf.com

The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

**From:** Farnan, Kelly E.
**Sent:** Friday, July 28, 2023 8:26 AM
**To:** Bourke, Mary <Mary.Bourke@wbd-us.com>; Attaway, Daniel <Daniel.Attaway@wbd-us.com>; Severance, Dana <Dana.Severance@wbd-us.com>; rebyota <rebyota@wbd-us.com>
**Cc:** Finch_Rebiotix@kirkland.com; Moyer, Jeffrey L. <moyer@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>
**Subject:** RE: Ferring/Finch - Borody Communications

Mary,

Given Ferring's reliance on Dr. Borody's misplaced allegations, all of the communications below should be produced immediately.  The communications related to the motion, including sending the motion papers, are also relevant and should be produced.  If you are still refusing to produce these, please let us know your availability for a meet and confer as this issue needs to be raise with the Court promptly.

Relatedly, since Ferring appears to be in contact with Dr. Borody but does not appear to have discussed a deposition, is Ferring withdrawing its request for Dr. Borody's deposition?

We have not had any non-privileged communications with parties to the 2013 and 2015 transactions.

Kelly

Kelly Farnan
Richards, Layton & Finger, P.A.
(302) 651-7705 | farnan@rlf.com

**From:** Bourke, Mary <Mary.Bourke@wbd-us.com>
**Sent:** Thursday, July 27, 2023 2:03 PM
**To:** Farnan, Kelly E. <Farnan@RLF.com>; Attaway, Daniel <Daniel.Attaway@wbd-us.com>; Severance, Dana <Dana.Severance@wbd-us.com>; rebyota <rebyota@wbd-us.com>
**Cc:** Finch_Rebiotix@kirkland.com; Moyer, Jeffrey L. <moyer@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>
**Subject:** RE: Ferring/Finch - Borody Communications

**\* EXTERNAL EMAIL \***

Dear Kelly,

We have not been in contact with Dr. Borody.  However, we are aware that Dr. Borody and his counsel have contacted Ferring with a business proposal which is unrelated to the litigation or to standing and we will not be producing that

correspondence.  Further, after we filed our motion to dismiss we received a request from Dr. Borody's counsel for Ferring's motion papers, which we sent under para. 13(c) of the Protective Order.  We also were informed today that Dr. Borody's counsel provided Australian counsel for Ferring with some documents under terms of confidentiality that preclude their use in this litigation or even our access to them.

Besides Dr. Borody , have you or your client had any contact with any of the individuals involved in the 2013 and 2015 transactions which are the subject of the standing motion?  If so , please confirm that you will immediately produce copies of those communications.

Kind regards
Mary

**Mary Bourke**
Partner
Womble Bond Dickinson (US) LLP

**d:**  302-252-4333                      1313 North Market Street
**m:** 610-212-6685                       Suite 1200
**e:**  Mary.Bourke@wbd-us.com            Wilmington, DE 19801



**womblebonddickinson.com**



This email is sent for and on behalf of Womble Bond Dickinson (US) LLP. Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.

**From:** Farnan, Kelly E. <Farnan@RLF.com>
**Sent:** Wednesday, July 26, 2023 5:18 PM
**To:** Bourke, Mary <Mary.Bourke@wbd-us.com>; Attaway, Daniel <Daniel.Attaway@wbd-us.com>; Severance, Dana <Dana.Severance@wbd-us.com>; rebyota <rebyota@wbd-us.com>
**Cc:** Finch_Rebiotix@kirkland.com; Moyer, Jeffrey L. <moyer@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>
**Subject:** Ferring/Finch - Borody Communications

Counsel,

As we noted during the July 17 hearing, Finch has not heard from Dr. Borody since the June 16 letter.  We assume that Ferring has not either.  However, to the extent you and/or your clients are communicating with Dr. Borody, please confirm those communications will be produced to Finch.

Kelly

Kelly E. Farnan
Richards, Layton & Finger, P.A.

920 North King St.
Wilmington, DE 19801
Direct Dial:   (302) 651-7705
E-Mail:       farnan@rlf.com

The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

**CAUTION RLF:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**PROPOSED PRETRIAL ORDER**

# EXHIBIT 17.5

**FINCH AND UMN'S REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 5 TO PRECLUDE USE OF OR RELIANCE ON LATE-PRODUCED DOCUMENTS AND TESTIMONY FROM FINCH'S TRIAL COUNSEL**

EXHIBIT 15 (REDAX)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FERRING PHARMACEUTICALS INC., REBIOTIX INC., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 21-1694-JLH |
| v. | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC, | ) ) ) ) | |
| Defendants. | ) | |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and REGENTS OF THE UNIVERSITY OF MINNESOTA, | ) ) ) ) ) ) | |
| Counterclaim Plaintiffs/Reply Defendants, | ) ) | |
| v. | ) ) | |
| FERRING PHARMACEUTICALS INC., and REBIOTIX, INC., | ) ) ) | |
| Counterclaim Defendants/Reply Plaintiffs. | ) ) | |

## FINCH AND UMN'S REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 5 TO PRECLUDE USE OF OR RELIANCE ON LATE-PRODUCED DOCUMENTS AND TESTIMONY FROM FINCH'S TRIAL COUNSEL

Ferring's opposition hinges on its assertions that it acted timely and that Finch acted in bad faith. Neither conclusion is supported by the record. Finch consistently offered to cooperate in securing Dr. Borody's deposition. Ex. 2. Ferring, on the other hand, still has not been forthcoming about its interactions with Dr. Borody, including how it got the late-produced documents and communications about potential trial testimony. Ferring's opposition discloses for the first time that its litigation counsel received documents on April 15, 2024[1] (Opp. at 2), but it does not explain any further details or address the 7-week delay in producing them to Finch on June 5. Nor does Ferring address its admissions a year ago that Ferring was in discussions with Borody and that its Australian counsel had received documents. Ferring (not counsel) is the party here and those undisclosed communications refute Ferring's alleged timeliness. There is also no support for the notion that Ferring could use admittedly new late-disclosed documents (25% of the production (Opp. at 2)) just because it contends Finch had seen some of the documents.

Ferring also does not have a viable argument for why these documents, in particular post-litigation communications with K&E, are relevant. Ferring cites one case (*Stone & Paper*, Opp. at 3) but that case does not address relevance at all. There is no basis to introduce post-litigation communications with K&E or related testimony to prove whether Finch took ownership of the patents in 2015. This is particularly so where Ferring admits (again) that "its standing argument is not dependent upon Dr. Borody's assertions." (Opp. at 3). Authentication is also not the issue; Finch agreed to that but Ferring insisted that Finch stipulate to admissibility.[2] Late-produced and post-litigation documents should not be admitted at trial.[3]

---

[1] Ferring's standing motion was still pending and it did not alert the Court of these documents.

[2] These documents are also inadmissible on hearsay grounds, which objections are reserved.

[3] As noted in the PTO, Finch disagrees that the ownership issue was "delegated" to the jury.

**PROPOSED PRETRIAL ORDER**

# EXHIBIT 18.1

**FERRING/REBIOTIX'S MOTION I*N LIMINE* TO
EXCLUDE EVIDENCE OF FERRING'S DECLARATORY
JUDGMENT COMPLAINT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., REBIOTIX INC. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC. | ) ) ) ) |
| | C.A. No. 21-1694-JLH |
| Defendants. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and REGENTS OF THE UNIVERSITY OF MINNESOTA | ) ) ) ) ) ) |
| Counterclaim-Plaintiffs/Reply Defendants, | ) ) |
| v. | ) ) |
| FERRING PHARMACEUTICALS INC., and REBIOTIX, INC. | ) ) ) |
| Counterclaim-Defendants/Reply Plaintiffs. | ) ) |

**FERRING/REBIOTIX'S MOTION IN LIMINE TO**
**EXCLUDE EVIDENCE OF FERRING'S DECLARATORY JUDGMENT COMPLAINT**

## I.   INTRODUCTION

Finch has indicated that it intends to ask the Court to allow it to present its case-in-chief first and be referred to as the "plaintiff" at trial. Should the Court allow Finch to do so, Finch should be precluded from introducing evidence that Ferring filed a declaratory judgment action prior to Finch filing its counterclaims. Such evidence is not relevant and would be confusing to the jury.

## II.   ARGUMENT

Which party initiated litigation is irrelevant under Federal Rules of Evidence 401 and 402. It does not make any issue related to invalidity or infringement of the patents-in-suit more or less likely and should be excluded on this basis alone. *See Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1309-10 (Fed. Cir. 2001) (affirming the district court's decision to exclude presenting details of the procedural history to the jury because the facts were irrelevant and not dispositive); *Guidetech, Inc. v. Brilliant Instruments, Inc.*, No. C 09-5517 CW, 2014 WL 12643007, at *1 (N.D. Cal. Mar. 25, 2014) (granting motion to exclude evidence of pending or prior legal proceedings because the "[p]roceedings in the state court action involving the same parties [were] not relevant to the patent infringement issues in [the] case."); *Lucent Techs., Inc. v. Microsoft Corp.*, No. 07-CV-2000 H (CAB), 2011 WL 13100710, at *3, (S.D. Cal. Feb. 4, 2011) (granting motion to exclude evidence or argument regarding any litigation between the parties on other patents from the prior legal proceedings).

Furthermore, should the Court permit party realignment and allow Finch to refer to itself as the plaintiff, evidence that Ferring filed a lawsuit first would only cause jury confusion. Jurors are likely to understand that the party that filed a lawsuit is referred to as the plaintiff and are likely to be confused by evidence that Ferring sued Finch in the first instance. Especially here,

where there is no evidence that Ferring pursued declaratory judgment as part of a pattern of bad faith litigation, evidence of such should be excluded under Federal Rule of Evidence 403.

## III.   CONCLUSION

For the foregoing reasons, Ferring respectfully requests that the Court preclude Finch from presenting evidence or argument regarding Ferring's declaratory judgment complaint should the Court allow Finch to otherwise be referred to as the plaintiff.

Dated: June 27, 2024

WOMBLE BOND DICKINSON (US) LLP

*Of Counsel:*

Daralyn J. Durie
Matthew Chivvis
Rachel Dolphin
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415-268-6055
ddurie@mofo.com
mchivvis@mofo.com
rdophin@mofo.com

Sara Doudar
MORRISON & FOERSTER LLP
701 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: 213-892-4345
sdoudar@mofo.com

*/s/ Mary W. Bourke*
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
Zachary Murphy (#6881)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Mary.Bourke@wbd-us.com
Dana.Severance@wbd-us.com
Daniel.Attaway@wbd-us.com
Zachary.Murphy@wbd-us.com

John B. Bourke (#6534)
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, CA 94111
Telephone: (415) 765-6267
Ben.Bourke@wbd-us.com

*Attorneys for Ferring Pharmaceuticals Inc. and Rebiotix Inc.*

**PROPOSED PRETRIAL ORDER**

# EXHIBIT 18.1

**UMN/FINCH'S OPPOSITION TO FERRING/REBIOTIX'S
MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE OF
FERRING'S DECLARATORY JUDGMENT COMPLAINT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| FERRING PHARMACEUTICALS INC., REBIOTIX INC. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC. | ) ) ) C.A. No. 21-1694-JLH ) |
| Defendants. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and REGENTS OF THE UNIVERSITY OF MINNESOTA | ) ) ) ) ) ) |
| Counterclaim-Plaintiffs/Reply Defendants, | ) ) |
| v. | ) ) |
| FERRING PHARMACEUTICALS INC., and REBIOTIX, INC. | ) ) ) |
| Counterclaim-Defendants/Reply Plaintiffs. | ) ) |

**UMN/FINCH'S OPPOSITION TO FERRING/REBIOTIX'S MOTION *IN LIMINE* NO. 1
TO EXCLUDE EVIDENCE OF
FERRING'S DECLARATORY JUDGMENT COMPLAINT**

EXHIBIT 18-1—OPPOSITION

Evidence that Ferring initiated this lawsuit by filing a declaratory judgment action against Finch the day after Ferring completed its submissions for FDA approval for the accused product REBYOTA is relevant to willfulness, as well as in countering any narrative from Ferring that Finch or UMN is a "patent assertion entity" or "shell company." Further, evidence of this fact would not be confusing to the jury. Ferring's MIL #1, therefore, should be denied.

There is no per se rule, as Ferring contends, that "[w]hich party initiated litigation is irrelevant under Federal Rules of Evidence 401 and 402." Ex. 18-1 at 1. To the contrary, when courts realign parties in declaratory-judgment cases, so the patent holder presents its case first (which should happen here), courts have instructed the jury that the case was instigated by the accused infringer. *Linear Grp. Servs., LLC v. Attica Automation, Inc.*, No. 13-10108, 2014 WL 4206871, at *11 (E.D. Mich. Aug. 25, 2014); Ex. A, *Pavemetrics Sys., Inc. v. Tetra Tech, Inc.*, No. 2-21-cv-01289, D.I. 287, at 6–7 (C.D. Cal. Aug. 07, 2022).

Ferring's complaint is particularly relevant here because Finch contends that Ferring willfully infringes Finch's patents, including U.S. Patent Nos. 10,675,309 (the "'309 Patent") and 10,463,702 (the "'702 Patent"). An accused infringer is liable for willful infringement if the accused infringer knew or should have known of the patent and nevertheless engaged in infringing conduct without regard for the consequences. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 100–08 (2016). Ferring's initiation of this case, seeking judgment of invalidity and noninfringement of Finch's patents, including the '309 and '702 Patents currently at issue, is directly relevant to willfulness. Not only does it demonstrate Ferring's awareness of Finch's patents and that the '309 and '702 Patents included claims to enema products like REBYOTA (RBX2660), but it also shows Ferring's intent to market REBYOTA upon FDA approval despite knowledge of Finch's patents. D.I. 1 at ¶¶ 37–39, 55–56, 68–71, 84, 91, 97, 104.

Ferring also plainly intends to portray itself as a victim of Finch and UMN's supposed litigiousness and to portray Finch as a failed company, including by describing it as a "patent assertion entity" or "shell company."  Finch/UMN must be permitted to counter that inaccurate narrative, which is not relevant in any event, and present the actual sequence of events to the jury. Finch was founded to develop a novel class of biological drugs to address unmet medical needs but discontinued development of its product during Phase 3 clinical trials due to Ferring's infringement and other factors. PTX-815.  Indeed, in forming their opinions, both parties' damages experts referenced this lawsuit's effects on Finch's business.  *E.g.*, Ex. B (Putnam Reb. Rep. Ex. 13) at Fig. 3, Schedule A; Ex. C (Malackowski Reply Rep.) at 31.

Tellingly, Ferring does not cite a single case supporting its desired relief (exclusion of reference to the fact that it initiated this lawsuit).  Instead, the cases Ferring cites relate to the distinct and inapposite circumstances where the parties were engaged in *prior* litigation and those references were excluded, *Guidetech, Inc. v. Brilliant Instruments, Inc.*, No. C 09-5517 CW, 2014 WL 12643007, at *1 (N.D. Cal. Mar. 25, 2014); *Lucent Techs., Inc. v. Microsoft Corp.*, No. 07-CV-2000 H (CAB), 2011 WL 13100710, at *3 (S.D. Cal. Feb. 4, 2011), or where the court excluded references to dropped claims or defenses (which the parties have agreed not to reference here) or the timing of a willfulness assertion, *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1309–10 (Fed. Cir. 2001).  Here, there is a single lawsuit between these parties (this one), and the jury should be informed that Ferring initiated it because it is relevant to contested issues and the narrative.

Ferring also improperly seeks to "preclude Finch from presenting evidence or argument regarding Ferring's declaratory judgment complaint" at all (Ex. 18-1 at 2), even though a party's factual statements in pleadings, like a complaint, normally bind that party throughout the

EXHIBIT 18-1—OPPOSITION

proceeding. *Donald M. Durkin Contracting, Inc. v. City of Newark*, No. CVIA 04-163 GMS, No. CVIA 04-163 GMS, 2006 WL 2724882, at *6 (D. Del. Sept. 22, 2006) (precluding defendant from arguing or presenting evidence at trial contradicting factual contentions in pleading). Thus, there should not be a wholesale ban on presenting evidence or argument regarding Ferring's complaint.

Finally, allowing evidence that Ferring initiated this lawsuit is unlikely to cause jury confusion. There is no indication that "[j]urors are likely to understand that the party that filed a lawsuit is referred to as the plaintiff," nor is it clear why that would matter.[1] Ex. 18-1 at 1. The jury will hear that Ferring initiated the lawsuit, and UMN and Finch are presenting their case-in-chief first as patent owners. That can all be done without referring to any party as "plaintiff," alleviating the one potential point of confusion Ferring identified. Ex. 18-1 at 1. Moreover, even if there were any danger of juror confusion (there is not), this danger does not substantially outweigh the probative value of the evidence. FRE 403. As explained above, that Ferring initiated this lawsuit is directly probative of Ferring's knowledge of Finch's patents. If Ferring is concerned about jury inference from referring to Finch as "plaintiff," an instruction to the jury can be provided. Ferring's motion should be denied.

---

[1] Ferring does not argue that allowing such evidence would be unfairly prejudicial or a waste of time.

EXHIBIT 18-1—OPPOSITION

# EXHIBIT A

EXHIBIT 18 – OPPOSITION
Case 1:21-cv-01694-JLH   Document 424-5   Filed 07/30/24   Page 32 of 72 PageID #: 26842
Case 2:21-cv-01289-MCS-MAA   Document 287   Filed 08/07/22   Page 1 of 15   Page ID
#:14518

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC., | Case No. 2:21-cv-01289-MCS-MAA |
| Plaintiff, | **ORDER RE: MOTIONS IN LIMINE (ECF NOS. 225, 227, 229, 240, 241, 242, 243, 244)** |
| v. | |
| TETRA TECH, INC., | **PROVISIONALLY FILED UNDER SEAL** |
| Defendant. | |
| AND RELATED COUNTERCLAIMS. | |

Plaintiff and Counterclaim Defendant Pavemetrics Systems, Inc. filed three motions in limine. Pl.'s MIL No. 1, ECF No. 225; Pl.'s MIL No. 2, ECF No. 227; Pl.'s MIL No. 3, ECF No. 229. Defendant and Counterclaimant Tetra Tech, Inc. opposed the motions. Pl.'s MIL No. 1 Opp'n, ECF No. 265; Pl.'s MIL No. 2 Opp'n, ECF No. 266; Pl.'s MIL No. 3 Opp'n, ECF No. 268. Defendant filed five motions in limine. Def.'s MIL No. 1, ECF No 240-1; Def.'s MIL No. 2, ECF No. 241-1; Def.'s MIL No. 3, ECF No. 242-1; Def.'s MIL No. 4, ECF No. 243-1; Def.'s MIL No. 5, ECF No. 244-1. Plaintiff opposed the motions. Def.'s MIL No. 1 Opp'n, ECF No. 269; Def.'s MIL No. 2 Opp'n, ECF No. 270; Def.'s MIL No.3 Opp'n, ECF No. 271; Def.'s MIL No. 4 Opp'n, ECF No. 272; Def.'s MIL No. 5 Opp'n, ECF No. 273. The Court heard argument on

Case 1:21-cv-01694-JLH   Document 424-5   Filed 07/30/24   Page 33 of 72 PageID #: 26843
Case 2:21-cv-01289-MCS-MAA   Document 287   Filed 08/07/22   Page 2 of 15   Page ID #:14519

EXHIBIT 18 - 1 - OPPOSITION

1    the motions at the August 1, 2022 final pretrial conference.

2    **I.    BACKGROUND**

3         This is a patent infringement dispute involving computer vision patents covering
4    Defendant's 3DTAS system. Plaintiff initially brought this action against Defendant
5    seeking a declaratory judgment that Plaintiff's LRAIL system did not infringe Patent
6    No. 10,362,293 ("the '293 Patent"). Defendant filed two counterclaims alleging
7    Plaintiff infringed various claims of the '293 Patent and Patent No. 10,616,557 ("the
8    '557 Patent"). Plaintiff added counterclaims seeking declaratory judgment that its
9    LRAIL product does not infringe the '557 Patent and that the '293 and '557 Patents are
10   invalid.

11        Plaintiff's LRAIL system uses laser triangulation technology to collect data on
12   railway tracks and uses software to process that data and evaluate the conditions of
13   railway track components, such as rails, ties, ballasts, and fasteners. The Court
14   previously construed several terms in the '293 Patent. Claim Construction Order, ECF
15   No. 103. The Court has also previously resolved summary judgment motions relating
16   to several different infringement issues. First Order Re: MSJ, ECF No. 189; Second
17   Order Re: MSJs, ECF No. 209.

18   **II.   DISCUSSION**

19        **A.    Plaintiff's MIL No. 1 (ECF No. 225)**

20        Plaintiff moves to exclude as hearsay a string of emails between Bill Larson, an
21   employee of Defendant, and Brad Spencer, a CSX employee. CSX is a customer of
22   Plaintiff. In this email thread, Bill Larson stated that Spencer "asked Pavemetrics if
23   there would be any claims by Tetra Tech against Pavemetrics for [patent] infringement."
24   Laquer Decl. Ex. A, ECF No. 234-1 (under seal). The context of this email seems to be
25   that Spencer was concerned about being a customer of Plaintiff when Plaintiff was
26   previously sued for infringement. *Id.* Plaintiff argues the emails by Larson and the
27   embedded statements by Spencer are both inadmissible hearsay.

28        Defendant argues three hearsay exceptions permit admission of this email. None

EXHIBIT 18-1 OPPOSITION

1   apply. As a preliminary matter, Defendant must show that hearsay exceptions permit

2   admission of both the Larson and Spencer statements to defeat Plaintiff's motion. Fed.

3   R. Evid. 805. Defendant argues that the business record exception allows admission of

4   Larson's statement, that the statement against interest exception allows admission of

5   Spencer's statement, and that the residual exception allows admission of both.

6        The business record exception does not apply to Larson's email. Defendant

7   would need to show that sending an email to memorialize a conversation with the

8   customer of a competitor was done "in the course of a regularly conducted activity" of

9   Defendant and that memorialization by email "was a regular practice of that activity."

10  Fed. R. Evid. 803(6)(B)–(C). Defendant can show neither. Defendant offers no

11  indication that this type of memorialization email was a regular practice of its

12  employees, and the context of the email, which includes Bill Larson strategizing about

13  how to secure a customer from a competitor, indicates it was not sent in the course of a

14  regularly conducted activity but instead was sent in response to novel information.

15  Thus, Bill Larson's emails are not admissible as business records.

16       Brad Spencer's statement is not a statement against interest. To be a statement

17  against interest, "a reasonable person in the declarant's position would have made [the

18  statement] only if the person believed it to be true because, when made, it . . . had so

19  great a tendency . . . to expose the declarant to civil or criminal liability." Fed. R. Evid.

20  804(b)(3)(A). Bill Spencer's statement does not meet the standard. Defendant argued at

21  the hearing that Spencer's statement is against his interest because it demonstrates the

22  knowledge necessary for induced infringement. A more nuanced reading of the email

23  supports the opposite conclusion. Brad Spencer's statement appears to have been made

24  with the intent of avoiding liability and with the intent of not buying a product that

25  potentially infringed patents. Rather than admitting liability, Spencer went out of his

26  way to avoid it. Thus, the statement against interest exception does not support

27  admission of Spencer's embedded statement.

28       Finally, the residual exception does not support admission of this evidence. The

EXHIBIT 18-1 – OPPOSITION

1   residual exception supports admission when "(1) the statement is supported by

2   sufficient guarantees of trustworthiness—after considering the totality of circumstances

3   under which it was made and evidence, if any, corroborating the statement; and (2) it is

4   more probative on the point for which it is offered than any other evidence that the

5   proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). The Ninth

6   Circuit looks at guarantees of trustworthiness similar to those in Rules 803 and 804 to

7   determine whether sufficient guarantees of trustworthiness exist to admit the evidence.

8   *United States v. Leal-Del Carmen*, 697 F.3d 964, 974 (9th Cir. 2012). The Ninth Circuit

9   considers the context of all other evidence presented to determine whether the evidence

10  is more probative than any other evidence that can be obtained through reasonable

11  effort. *Draper v. Rosario*, 836 F.3d 1072, 1082 (9th Cir. 2016). Defendant cannot

12  establish the second prong. Defendant already presented two pieces of evidence that are

13  more probative of the intent element of induced infringement in the second round of

14  summary judgment briefing—that Plaintiff was aware of the patents of Darel Mesher,

15  the inventor of the '293 and '557 Patents, and that Plaintiff searched the United States

16  Patent and Trademark Office website in 2020 for Defendant's filings. The residual

17  exception thus does not support admission of this email.

18      The Court **GRANTS** the motion.

19      **B.    Plaintiff's MIL No. 2 (ECF No. 227)**

20      Plaintiff moves to prevent Defendant from eliciting information at trial regarding

21  the alleged unavailability of certain tools at Vassilios Morellas's source code

22  examination. Plaintiff argues this evidence is not relevant to any of the claims and

23  defenses in the case and that it would be unduly prejudicial. Defendant does not dispute

24  that this evidence is not itself relevant to any of the claims and defenses in this case. *See*

25  *generally* Pl.'s MIL No. 2 Opp'n. Defendant argues that this evidence would be relevant

26  should Plaintiff seek to argue Morellas did not fully review the LRAIL source code.

27  Plaintiff argued at the hearing that the opportunities it gave Morellas to review the

28  source code supports allowing it to claim Morellas did not fully review the source code

4

1    without allowing Defendant to provide an explanation why. The Court agrees with

2    Plaintiff that this evidence has little relevance and would be a distracting issue that

3    would mandate exclusion under Rule 403 on direct examination. The Court will not

4    permit Plaintiff to impeach Morellas with the fact that he allegedly did not fully examine

5    the LRAIL source code without allowing Defendant an opportunity to rebut that

6    impeachment with an explanation of the circumstances. Prohibiting Defendant from

7    rehabilitating Morellas would amount to a court decision that Plaintiff provided

8    sufficient opportunities for Morellas to examine the source code and that Morellas's

9    explanation is baseless. Determining these facts would effectively grant partial

10   summary judgment. Plaintiff's time to bring such a motion passed months ago. *See*

11   Order Re: Jury Trial § I, ECF No. 56. Moreover, "[m]otions in limine should not be

12   disguised motions for summary adjudication of issues." *Id.* § II(A)(1).

13       The Court **GRANTS** the motion. Should Plaintiff elicit testimony that Morellas

14   did not completely review the source code, the Court will permit Defendant to elicit

15   evidence surrounding the circumstances of this source code dispute.

16       ## C.    Plaintiff's MIL No. 3 (ECF No. 229)

17       Plaintiff moves to exclude various paragraphs from the infringement report of

18   Vassilios Morellas because these statements allegedly contradict the Court's

19   construction of the claim term 3D map. An expert may not testify contrary to the Court's

20   claim construction. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed.

21   Cir. 2009). As part of this motion, Plaintiff asks the Court to conclude that several

22   algorithms do not infringe claim 1: the detect rail algorithm, the fine tuning with rail

23   mask algorithm, the rail head removal during tie detection algorithm, the rail head

24   removal during fastener detection algorithm, and the joint bar algorithm. Plaintiff

25   argues that these rulings are a logical consequence of the Court's ruling that the Fake3D

26   Image with Overlay portion of the LRAIL does not infringe claim 1 of the '293 Patent.

27   *See* First MSJ Order 9. The Court declines Plaintiff's invitation to conclude that these

28   algorithms do not infringe claim 1 or any of the dependent claims. The Court did not

1   address these specific algorithms in any earlier order. This motion amounts to an

2   improper motion for summary judgment. *See* Order Re: Jury Trial § II(A)(1). The Court

3   thus **DENIES** Plaintiff's third motion in limine. The Court cautions the parties that it

4   will not permit testimony from any experts that contradicts any of the Court's prior

5   rulings.

6       **D.    Defendant's MIL No. 1 (ECF No. 240)**

7       Defendant moves to reverse the order of proof at trial. Defendant argues that it is

8   the natural plaintiff in a patent infringement action, that realigning the parties would

9   make the presentation of evidence clearer for the jury, and that realignment would not

10  undermine the purposes of the Declaratory Judgment Act. *See* Def.'s MIL No. 1.

11  Plaintiff argues that it should receive the advantage of presenting first because it filed a

12  declaratory judgment action, because presenting first will not confuse the jury, because

13  the parties have taken the lead on their respective issues, and because it should proceed

14  first to avoid undermining the Declaratory Judgment Act and to prevent forum

15  shopping. *See generally* Def.'s MIL No. 1 Opp'n.

16      As the parties agree, the Court has broad discretion to realign the order of proof

17  at trial. *See Anheuser-Busch, Inc. v. John Labatt Ltd.*, 89 F.3d 1339, 1344 (9th Cir.

18  1996). District courts in the Ninth Circuit determine whether realignment of the parties

19  and of proof is appropriate based on the primary purpose test, which examines the

20  natural alignment of the parties based on the underlying dispute. *See Plumtree Software,*

21  *Inc. v. Datamize, LLC*, No. C 02-5693 VRW, 2003 WL 25841157, at *3 (N.D. Cal. Oct.

22  6, 2003). Ninth Circuit district courts examine several factors, including which party

23  was the first to sue, which party asserts the primary claim of patent infringement, the

24  burdens of proof of the parties, whether realignment would aid in the logical

25  presentation of evidence at trial, whether realignment would undermine the purposes of

26  the Declaratory Judgment Act, and whether realignment of the parties would promote

27  forum shopping. *Id.* at *3–5.

28      These factors ultimately support realignment. While Plaintiff does bear the

EXHIBIT 18-1—OPPOSITION

1    burden on its various invalidity counterclaims, these are more akin to affirmative
2    defenses than freestanding claims. *See id.* at *3. Here, the primary dispute is whether
3    Plaintiff infringed Defendant's patents. Thus, allowing Defendant to proceed first at
4    trial would result in a more natural presentation of the case to the jury. This would also
5    aid in the logical presentation of evidence at trial and minimize juror confusion. Patent
6    cases are already complex, and having Plaintiff present its non-infringement case first
7    would potentially confuse the jury even more. It is important to simplify the case as
8    much as possible to avoid the risk of a legally inconsistent or incorrect verdict, and
9    realignment supports this aim. The Court finds that the forum shopping factor neither
10   supports nor weighs against realigning the order of proof at trial. Realignment would
11   weakly undermine the purposes of the Declaratory Judgment Act because it would
12   deprive Plaintiff of the natural advantage it gained by filing its case first. As Plaintiff
13   stated at the hearing, however, an instruction from the Court explaining how the action
14   arose and why Defendant is proceeding first would cure the negative impact of
15   realignment on Plaintiff.

16       The Court thus **GRANTS** Defendant's first motion in limine. The Court orders
17   the parties to propose an instruction the Court will read to the jury before opening
18   argument explaining the nature and context of this declaratory judgment action.

19       **E.    Defendant's MIL No. 2 (ECF No. 241)**

20       Defendant moves to prevent Plaintiff from introducing evidence that the Court
21   denied Defendant's motion for a preliminary injunction to support Plaintiff's argument
22   that it did not indirectly infringe Defendant's patents. Defendant argues the Court
23   should exclude this evidence because the probative value would be "substantially
24   outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Defendant argues
25   that the jury would be unduly influenced if it heard that the Court already decided issues
26   related to this case. Plaintiff argues that this evidence is directly relevant to willfulness
27   and to the intent element for induced infringement.

28       The Court agrees with Defendant. First, Plaintiff overreads the permanent

injunction. While the Court did find there was a substantial question of infringement that precluded a finding that Plaintiff likely infringed Defendant's patents, Prelim. Inj. Order 16–17, ECF No. 61, the Court also denied the motion based on likely successful prior use and anticipation defenses, *id.* at 17–19. These defenses are not relevant to the question of induced infringement. *See Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 645 (2015) ("[A] belief as to invalidity cannot negate the scienter requirement for induced infringement."). While invalidity is probably relevant to the willfulness analysis, *see Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245 n.6 (Fed. Cir. 2017) (citing, among other things, "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed" as a factor relevant to the willfulness determination (internal quotation marks omitted)), the Court finds that allowing the jury to hear that the Court already opined on infringement and invalidity would impermissibly sway the jury. The Court intends to have the jury decide this case based on the facts before it rather than the tentative opinion of the Court at earlier stages in the proceeding.

The Court thus **GRANTS** Defendant's second motion in limine under Rule 403.

### F.    Defendant's MIL No. 3 (ECF No. 242)

Defendant moves to exclude three portions of the expert report of Plaintiff's damages expert, Christian Tregillis.

First, Defendant moves to exclude the portion of the report where Tregillis discussed the cost of implementing a non-infringing alternative. Tregillis states that he "spoke with Dr. Frakes about this scenario." Tregillis Report ¶ 142, ECF No. 235-4 (under seal). Both parties agree that Tregillis does not have the technical background necessary to reach this conclusion without relying on Dr. Frakes. Defendant argues that Dr. Frakes never disclosed any opinion about the cost of implementing a non-infringing alternative and thus that this portion of the Tregillis report should be excluded. Plaintiff cites a portion of the Frakes report discussing non-infringing alternatives as a basis for

EXHIBIT 18-1 - OPPOSITION

1   Tregillis's conclusion. *See* Frakes Report ¶¶ 401–06, ECF No. 235-12 (under seal). This

2   portion of the report only discusses the existence of non-infringing alternatives, not the

3   cost of implementing them.

4         While it is proper to allow experts to rely on discussions with other experts, *see*

5   *Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-cv-02848-WHO, 2021 WL 1222622, at

6   *34 (N.D. Cal. Feb. 11, 2021), one expert cannot rely on the undisclosed opinion of

7   another expert to reach a conclusion. This violates both Federal Rule of Civil Procedure

8   26(a)(2) and Federal Rule of Evidence 702. *GPNE Corp. v. Apple, Inc.*, No. 12-CV-

9   02885-LHK, 2014 WL 3870256, at *7 (N.D. Cal. Aug. 6, 2014); *see also Sound View*

10  *Innovations, LLC v. Hulu, LLC*, No. LA CV17-04146 JAK (PLAx), 2019 WL 9047211,

11  at *14 (C.D. Cal. Nov. 18, 2019) ("Because Jeffords cannot rely on the undisclosed

12  opinion of another expert to support his analysis, his lack of benefit opinion is

13  excluded."). Here, Dr. Frakes did not disclose an opinion about the cost of implementing

14  non-infringing alternatives. Because Tregillis's conclusion is based on an undisclosed

15  expert opinion, Rule of Civil Procedure 26(a)(2) and Rule of Evidence 702 mandate

16  exclusion.

17        Second, Defendant seeks to exclude the portion of the cost opinion where

18  Tregillis assumes that Plaintiff would hire an outside service to implement a non-

19  infringing alternative. Tregillis Report ¶ 142. Defendant argues this is baseless

20  speculation, while Plaintiff argues that the Frakes opinion supports this. Because the

21  Frakes opinion provides no basis for concluding Plaintiff would hire an outside service

22  to implement a non-infringing alternative, the Court excludes this conclusion as

23  insufficiently tied to the facts of the case. *See Sound View*, 2019 WL 9047211, at *14;

24  *Bakst v. Cmty. Mem'l Health Sys., Inc.*, No. CV 09-08241 MMM (FFMx), 2011 WL

25  13214315, at *20 (C.D. Cal. Mar. 7, 2011) (collecting cases for the proposition that an

26  expert's "damages calculation . . . based entirely on factual assumptions that are

27  entirely unsupported in the record" may be excluded).

28        Third, Defendant seeks to exclude a portion of the Tregillis report that discusses

EXHIBIT 18-1 - OPPOSITION

1    the benefit that Plaintiff would derive from being able to use the same marketing
2    materials if it implemented a non-infringing alternative. Tregillis Report ¶¶ 144–45.
3    Defendant argues the existence and quantity of this benefit is baseless speculation, while
4    Plaintiff argues that Tregillis used his own industry experience to reach this conclusion.
5    In his deposition, Tregillis stated that he quantified this amount "[b]ased on [his] own
6    experience in negotiating licensing agreements." Tregillis Dep. 201:8–14, ECF No.
7    235-5 (under seal). Tregillis also stated that he relied on his experience of a previous
8    client implementing a non-infringing alternative in a way that minimized changes to
9    marketing materials. *Id.* at 205:4–206:21. The Court finds that Tregillis's experience
10   and disclosures support his opinion that Plaintiff would save money by implementing a
11   non-infringing alternative in a way that would avoid the need to change marketing
12   materials. The Court also finds, however, that Tregillis did not disclose any basis for
13   how he arrived at the exact value Plaintiff would derive from not changing its marketing
14   materials. The Court thus excludes the portion of the Tregillis report identifying the
15   value Plaintiff would derive from using its current marketing materials with a non-
16   infringing alternative.

17       The Court **GRANTS IN PART** and **DENIES IN PART** Defendant's third
18   motion in limine. Tregillis may opine that Plaintiff would save money if it did not
19   change marketing materials, but Tregillis may not offer an opinion regarding the
20   specific amount of money Plaintiff would save. Tregillis may not opine about the costs
21   of non-infringing alternatives.

22       **G.    Defendant's MIL No. 4 (ECF No. 243)**

23       Defendant moves to preclude Plaintiff from introducing materials produced on
24   June 17 and 20, 2022, after close of discovery. Defendant identifies four items: excerpts
25   of a purported new version of LRAIL source code from January 2022, an amendment
26   to a goods agreement between Plaintiff and a customer from February 2022, second
27   supplemental objections and responses to Defendant's Interrogatory No. 15, and the
28   first supplement to the rebuttal expert report on non-infringement of David Frakes. Fact

1   discovery closed on January 20, 2022, and expert discovery closed on March 25, 2022.
2   Under Federal Rule of Procedure 26(e)(1)(A), a party has a duty to supplement
3   responses to discovery requests with new information "in a timely manner." This
4   supplementation rule "does not permit a party to make an end-run around the normal
5   timetable for conducting discovery." *Disney Enters., Inc. v. Kappos*, 923 F. Supp. 2d
6   788, 795 (E.D. Va. 2013) (internal quotation marks omitted). Late-disclosed evidence
7   should be excluded from trial "unless the failure was substantially justified or is
8   harmless." Fed. R. Civ. P. 37(c)(1). Courts consider several factors under Rule 37(c)(1):
9   "(1) the surprise to the party against whom the evidence would be offered; (2) the ability
10  of that party to cure the surprise; (3) the extent to which allowing the evidence would
11  disrupt the trial; (4) the importance of the evidence[;] and (5) the nondisclosing party's
12  explanation for it[s] failure to disclose the evidence." *Dey L.P. v. Ivax Pharms., Inc.*,
13  233 F.R.D. 567, 571 (C.D. Cal. 2005) (citing *S. States Rack & Fixture, Inc. v. Sherwin-*
14  *Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). The party facing sanctions bears the
15  burden to prove harmlessness. *Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 741 (9th
16  Cir. 2021).

17       Here, the surprise is significant. Plaintiff disclosed this information well after
18  discovery was completed and only half a month before the parties had to file pretrial
19  documents. Defendant has no ability to cure that surprise without a change in schedule
20  because the time for discovery has passed. Allowing Defendant to conduct new
21  discovery would completely disrupt the trial. The evidence here is also not important
22  enough to excuse the late disclosure. This evidence appears to support claims and
23  defenses for which Plaintiff has produced other evidence in its pretrial or summary
24  judgment briefing. Finally, Plaintiff provides a poor explanation for how this was
25  substantially justified or harmless. Plaintiff alleges that Defendant "hardly show[ed]
26  any desire to learn the facts in a timely manner" and blames Defendant for improperly
27  investigating the facts newly disclosed in June 2022. Def.'s MIL No. 4 Opp'n 7; *see id.*
28  at 6–8. Plaintiff gets things backward. The discovery rules place the responsibility of

Case 1:21-cv-01694-JLH   Document 424-5   Filed 07/30/24   Page 43 of 72 PageID #: 26853
EXHIBIT 18-1 - OPPOSITION
Case 2:21-cv-01289-MCS-MAA   Document 287   Filed 08/07/22   Page 12 of 15   Page ID #:14529

1    timely supplementation on the discloser. Rather than an attempt by Defendant to "bury

2    its head in the sand," *id.* at 7, the circumstances imply that Plaintiff was the wrongful

3    party here. All factors support exclusion of this late-produced evidence.

4        The Court **GRANTS** Defendant's fourth motion in limine.

5        **H.**    **Defendant's MIL No. 5 (ECF No. 244)**

6        Defendant moves to preclude Plaintiff from using undisclosed legal advice and

7    lay opinion to support its good-faith belief of non-infringement. Plaintiff states that it

8    will not use advice-of-counsel evidence to support this argument. Def.'s MIL No. 5

9    Opp'n 1. The Court grants this portion of the motion as unopposed. Plaintiff also

10    simultaneously asserts that it "will properly rely on its own founders [sic] reading of the

11    claims and comparison to their own LRAIL system for purposes of showing their own

12    subjective beliefs about non-infringement and invalidity" and that it "does not seek to

13    offer opinion testimony by lay witnesses under Federal Rule of Evidence 701." *Id.*

14    Federal Rule of Evidence 701 requires an expert to offer any opinion testimony "based

15    on scientific, technical, or other specialized knowledge within the scope of Rule 702."

16    Another court in the Central District of California has concluded that testimony

17    "comparing any prior art products to the asserted claims, considering how or why a third

18    party company embarked on a particular product development path,

19    discussing/analyzing a third party's patent, or comparing [a putative infringer's]

20    products to asserted claims" elicits opinion testimony that must be procured by an

21    expert. *Nat'l Prods., Inc. v. Arkon Res., Inc.*, Nos. 18-cv-02936 AB (SSx), 18-cv-03505

22    AB (SSx), 2019 U.S. Dist. LEXIS 238979, at *25–26 (C.D. Cal. Mar. 25, 2019). The

23    Court agrees. Product comparison requires technical expertise that is outside of the

24    domain of the personal knowledge of a lay witness. Thus, the Court agrees with

25    Defendant that Richard Habel should not testify that Plaintiff's products did not infringe

26    the accused product or that the asserted claims are invalid because Habel was not

27    disclosed as an expert. The Court will permit Habel to testify to matters only within his

28    personal knowledge.

Case 1:21-cv-01694-JLH    Document 424-5    Filed 07/30/24    Page 44 of 72 PageID #: 26854
EXHIBIT 18-1 - OPPOSITION
Case 2:21-cv-01289-MCS-MAA    Document 287    Filed 08/07/22    Page 13 of 15    Page ID
#:14530

1    The Court **GRANTS** Defendant's fifth motion in limine.

2    **III.    OTHER PRETRIAL MATTERS**

3    The Court addresses several other pretrial matters unrelated to the motions in
4    limine.

5    First, the Court addresses the several issues Plaintiff raised in the "Other Issues"
6    section of the Proposed Final Pretrial Conference Order. *See* Proposed FPTCO § 14,
7    ECF No. 267-1. The Court denies these improperly presented motions for summary
8    judgment. The Court also recognizes that its April 27, 2022 summary judgment ruling
9    did not address all claims on which Plaintiff moved. The Court at this point will not
10    issue an amended order to correct this clerical error. Instead, the Court will make the
11    axiomatic observation that any algorithm the Court already determined does not
12    infringe an independent claim cannot infringe a dependent claim. For efficiency of trial
13    presentation, the Court warns the parties that they should not present evidence and
14    argument contrary to the Court's summary judgment rulings. Should either party do so,
15    that party will be vulnerable to an objection or to a Rule 50 ruling.

16    The Court also concludes, contrary to what Defendant claimed, that Plaintiff's
17    indefiniteness defense is not abandoned. Defendant claimed that Plaintiff should have
18    presented this defense at claim construction or at summary judgment. Plaintiff did not
19    need to do so, however. The Court has addressed many issues in this case, but the Court
20    still has not addressed many of Plaintiff's defenses, including Plaintiff's invalidity
21    defenses. The Court will permit Plaintiff to address indefiniteness in appropriate post-
22    trial motions.

23    The Court orders the parties to submit new proposed jury instructions and a new
24    proposed verdict form consistent with this order by August 12, 2022. The Court orders
25    the parties to make every effort to narrow their disputes, including avoiding disputes
26    over immaterial language differences. As part of these instructions, the parties shall
27    submit a proposed instruction regarding the declaratory judgment posture of this case
28    and shall submit an instruction regarding playing the Federal Judicial Center video

EXHIBIT 18 - OPPOSITION

1 covering patent law for the jury.

2      The Court also orders the parties to submit a plan for the remote testimony of

3 Richard Habel by August 12, 2022. This plan shall include where Habel will testify,

4 how Habel will use the exhibits of both parties, the estimated length of testimony from

5 Habel, and when the parties expect Habel to testify.

6      Finally, the parties shall submit a statement regarding a bench trial on the

7 remaining issues by August 12, 2022. If the parties need to elicit any evidence at a bench

8 trial, the parties shall submit declarations of direct testimony by August 17, 2022. The

9 Court will hear any such evidence after closing argument while the jury deliberates. If

10 the parties do not wish to elicit evidence at a bench trial, the Court will set a post-trial

11 briefing schedule at the conclusion of trial.

## IV.   CONCLUSION

13      The Court:

14   • **GRANTS** Plaintiff's MIL No. 1 (ECF No. 225);

15   • **GRANTS** Plaintiff's MIL No. 2 (ECF No. 227);

16   • **DENIES** Plaintiff's MIL No. 3 (ECF No. 229);

17   • **GRANTS** Defendant's MIL No. 1 (ECF No. 240);

18   • **GRANTS** Defendant's MIL No. 2 (ECF No. 241);

19   • **GRANTS IN PART** and **DENIES IN PART** Defendant's MIL No. 3 (ECF

20     No. 242);

21   • **GRANTS** Defendant's MIL No. 4 (ECF No. 243); and

22   • **GRANTS** Defendant's MIL No. 5 (ECF No. 244).

23      The parties shall caution, warn, and instruct their witnesses not to make any

24 references to any evidence excluded by this Order.

25      All decisions on motions in limine are subject to reevaluation at trial. *See* Fed. R.

26 Evid. 103, advisory committee's note to 2000 amendment ("Even where the court's

27 ruling is definitive, nothing . . . prohibits the court from revisiting its decision when the

28 evidence is to be offered."); *Luce v. United States*, 469 U.S. 38, 41–42 (1984) ("[E]ven

Case 1:21-cv-01694-JLH   Document 424-5   Filed 07/30/24   Page 46 of 72 PageID #: 26856
Case 2:21-cv-01289-MCS-MAA   Document 287   Filed 08/07/22   Page 15 of 15   Page ID
#:14532

EXHIBIT 18 – IN OPPOSITION

1  if nothing unexpected happens at trial, the district judge is free, in the exercise of sound

2  judicial discretion, to alter a previous *in limine* ruling.").

3         The Court provisionally seals this Order. Within seven days of the issuance of

4  this Order, the parties shall file a joint statement as to whether any matter stated in this

5  Order is information that should remain under seal. Thereafter, the Court will determine

6  whether any portions of this Order should be redacted in the version filed on the public

7  docket.

8

9  **IT IS SO ORDERED.**

10

11  Dated: August 7, 2022

12                                              _____
                                                MARK C. SCARSI
13                                              UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 18-1—OPPOSITION

# EXHIBIT B

EXHIBIT 18-1 - OPPOSITION
HIGHLY CONFIDENTIAL INFORMATION

**Exhibit 13**
**Incremental cost regressions**

| | Dependent variable | |
| --- | --- | --- |
| | **Levels** | **First differences** |
| | **SG&A + R&D** | **SG&A + R&D** |
| **Independent variable** | | |
| Constant term | 106.44 | 2.14 |
| | (10.88) | (6.89) |
| Revenue | 0.16 | 0.04 |
| | (0.08) | (0.05) |
| Corcept | -89.45 | -1.04 |
| | (4.50) | (2.84) |
| Halozyme | -91.32 | -2.41 |
| | (4.42) | (2.84) |
| Pacira | -77.61 | -1.38 |
| | (4.92) | (2.84) |
| *N* | 149 | 145 |
| *Adj. $R^2$* | 0.84 | -0.04 |

*Notes and sources:*

All financial data for Corcept Therapeutics, Halozyme and Pacira Biosciences were collected from FactSet on the quarterly basis for the time period from 2013Q3 - 2023Q2.  Financial data for Acadia Pharmaceuticals were collected for the time period from 2016Q2 - 2023Q2, as costs were not available prior to 2016Q2.

I control for the impact of macroeconomic shocks by including quarterly indicators in the model.

For the first-differences model, I regress the quarterly change in the dependent variable on the quarterly change in revenue. I include firm indicators and quarterly indicators in this regression as well.

**EXHIBIT 18-1 - OPPOSITION**

HIGHLY CONFIDENTIAL INFORMATION



**Figure 3**
**Finch Therapeutics daily closing price and returns**

EXHIBIT 18-1 - OPPOSITION

HIGHLY CONFIDENTIAL INFORMATION

**Figure 3, Schedule A**
**Negative events associated with unusual share price changes**

| | Date of price change | Label in chart | Possibly related event | Change in share price (%) | Risk type [1] |
|---|---|---|---|---|---|
| [a] | 7/22/2021 | A | SER-287 (Seres ulcerative colitis treatment) reports unfavorable results in Phase 2B studies. | -17.33% | Our product candidates are based on microbiome therapeutics, which is an unproven approach to therapeutic intervention. |
| [b] | 12/2/2021 | B | Ferring complaint against Finch filed on 12/01/2022. | -14.04% | Third parties may initiate legal proceedings […], the outcome of which would be uncertain and could have a negative impact on the success of our business. We may be involved in lawsuits to protect or enforce our patents, which could be expensive, time consuming and unsuccessful. |
| [c] | 3/2/2022 | C | FDA clinical hold placed on CP101 on 03/01/2022.  Law firms begin investigation for violation of federal securities laws. | -12.50% | We are currently subject to a clinical hold on our IND for CP101. We need to resolve the FDA clinical hold issues in order to proceed with enrollment in our PRISM4 clinical trial and initiate our Phase 1b clinical trial in ASD [Autism Spectrum Disorder]. Our business may be adversely affected if the clinical hold is not resolved in a timely manner or if regulatory concerns lead to additional delays and/or FDA enforcement actions. |
| [d] | 4/19/2022 | N/A | Finch reduces workforce by approximately 20%. | -2.92% | We expect to expand our organization, and we may experience difficulties in managing this growth, which could disrupt our operations. |
| [e] | 8/31/2022 | D | Finch reduces workforce by 37% and suspends FIN-211 trials on 9/1/2022. | -13.60% | We are heavily dependent on the success of our product candidates, which are in clinical development. If we are unable to advance our current or future product candidates through clinical trials, obtain marketing approval and ultimately commercialize any product candidates we develop, or experience significant delays in doing so, our business will be materially harmed. We expect to expand our organization, and we may experience difficulties in managing this growth, which could disrupt our operations. |
| [f] | 11/16/2022 | E | Termination of Takeda collaboration becomes effective on 11/17/2022. | -11.87% | Our current and future collaborations will be important to our business. If we are unable to enter into new collaborations, or if these collaborations are not successful, our business could be adversely affected. |

EXHIBIT 18-1 - OPPOSITION
HIGHLY CONFIDENTIAL INFORMATION

**Figure 3, Schedule A**
**Negative events associated with unusual share price changes**

| Date of price change | Label in chart | Possibly related event | Change in share price (%) | Risk type |
|---|---|---|---|---|
| | | | | [1] |

*Notes and sources*:

I retrieve historical share price data from Refinitiv and compute the day-over-day percent change based on the closing price.
Consistent with event study literature, I only correlate price changes with events that occurred within three days of the change.  Where significant price changes occurred that did not appear in this schedule, no related event was identified.

[1] Finch Therapeutics Group, Inc., Form 10-K for the fiscal year ended December 31, 2021.

[a] Seres.  "Seres Therapeutics Announces Topline Results for SER-287 Phase 2B Study in Mild-to-Moderate Ulcerative Colitis."  Available at https://ir.serestherapeutics.com/news-releases/news-release-details/seres-therapeutics-announces-topline-results-ser-287-phase-2b.  Last accessed on August 28, 2023. Gerberry, J., et al.  BofA Global Research.  "Competitor setback to UC has minimal read-across to our FNCH valuation."  Published on July 22, 2021.  *Also* Mirchandaney, M., et al.  Evercore ISI.  "2Q Update - Twists and Turns of the Microbiome."  Published on August 10, 2021.

[b] *Ferring Pharmaceuticals, et al. v. Finch Therapeutics Group, Inc., et al.*, Complaint.  December 1, 2021.

[c] Finch.  "Finch Therapeutics Provides an Update on its Phase 3 Trial of CP101 in Recurrent C. difficile Infection."  Available at https://ir.finchtherapeutics.com/news-releases/news-release-details/finch-therapeutics-provides-update-its-phase-3-trial-cp101. Last accessed on August 21, 2023.  *Also* Accesswire.  "Bronstein, Gewirtz & Grossman, LLC Announces Investigation of Finch Therapeutics Group, Inc. (FNCH)."  Available at https://www.accesswire.com/691286/Bronstein-Gewirtz-Grossman-LLC-Announces-Investigation-of-Finch-Therapeutics-Group-Inc-FNCH.  Last accessed on August 21, 2023.  *Also* PR Newswire.  "SHAREHOLDER ALERT: Pomerantz Law Firm Investigates Claims On Behalf of Investors of Finch Therapeutics Group, Inc. - FNCH."  Available at https://www.prnewswire.com/news-releases/shareholder-alert-pomerantz-law-firm-investigates-claims-on-behalf-of-investors-of-finch-therapeutics-group-inc---fnch-301499551.html.  Last accessed on August 21, 2023.

[d] Finch.  "Finch Therapeutics Announces Workforce Restructuring to Focus Resources on Key Development Programs."  Available at https://ir.finchtherapeutics.com/news-releases/news-release-details/finch-therapeutics-announces-workforce-restructuring-focus.  Last accessed on August 21, 2023.

[e] Finch.  "Finch Therapeutics Regains Full Rights to FIN-524 and FIN-525 Targeted Microbiome Product Candidates in Development for IBD."  Available at https://ir.finchtherapeutics.com/news-releases/news-release-details/finch-therapeutics-regains-full-rights-fin-524-and-fin-525.  Last accessed on August 21, 2023.  *Also* Finch.  "Finch Therapeutics Provides Business Update."  Available at https://ir.finchtherapeutics.com/news-releases/news-release-details/finch-therapeutics-provides-business-update.  Last accessed on August 21, 2023.

[f] Finch.  "Finch Therapeutics Regains Full Rights to FIN-524 and FIN-525 Targeted Microbiome Product Candidates in Development for IBD."  Available at https://ir.finchtherapeutics.com/news-releases/news-release-details/finch-therapeutics-regains-full-rights-fin-524-and-fin-525.  Last accessed on August 21, 2023.

EXHIBIT 18-1 - OPPOSITION

HIGHLY CONFIDENTIAL INFORMATION

**Figure 3, Schedule B**
**Positive events associated with unusual share price changes**

| | Date of price change | Label in chart | Possibly related event | Change in share price (%) | Risk type |
|---|---|---|---|---|---|
| | | | | | [1] |
| [a] | 4/29/2022 | 1 | FDA clinical hold on CP101 lifted on 04/28/2022. | 20.48% | We are currently subject to a clinical hold on our IND for CP101. We need to resolve the FDA clinical hold issues in order to proceed with enrollment in our PRISM4 clinical trial and initiate our Phase 1b clinical trial in ASD. Our business may be adversely affected if the clinical hold is not resolved in a timely manner or if regulatory concerns lead to additional delays and/or FDA enforcement actions. |
| [b] | 10/24/2022 | 2 | Finch announces positive topline data for PRISM-EXT, and moves forward with PRISM4. | 14.07% | Interim, topline and preliminary data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data. |
| [c] | 11/30/2022 | 3 | FDA approval of Rebyota announced. | 13.95% | We face substantial competition, which may result in others developing or commercializing drugs before or more successfully than us. |

*Notes and sources*:

I retrieve historical share price data from Refinitiv and compute the day-over-day percent change based on the closing price.
Consistent with event study literature, I only correlate price changes with events that occurred within three days of the change.  Where significant price changes occurred that do not appear in this schedule, no related event was identified.
[1] Finch Therapeutics Group, Inc., Form 10-K for the fiscal year ended December 31, 2021.
[a] Finch.  "Finch Therapeutics Announces Removal of FDA Clinical Hold on CP101 IND."  Available at https://ir.finchtherapeutics.com/news-releases/news-release-details/finch-therapeutics-announces-removal-fda-clinical-hold-cp101-ind.  Last accessed on August 21, 2023.
[b] Finch.  "Finch Therapeutics Presents PRISM-EXT Biomarker Data at ACG 2022 and Proceeds with Patient Dosing in Phase 3 Trial of CP101 in Recurrent C. Difficile Infection."  Available at https://ir.finchtherapeutics.com/news-releases/news-release-details/finch-therapeutics-presents-prism-ext-biomarker-data-acg-2022.  Last accessed
[c] U.S. Food and Drug Administration.  "FDA Approves First Fecal Microbiota Product."  Available at https://www.fda.gov/news-events/press-announcements/fda-approves-first-fecal-microbiota-product.  Last accessed on August 18, 2023.

EXHIBIT 18-1—OPPOSITION

# EXHIBIT C



# FERRING PHARMACEUTICALS INC., REBIOTIX INC.

## v.

# FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., AND FINCH THERAPEUTIC HOLDINGS, LLC.

Civil Action No. 21-01694-RGA

United States District Court for the District of Delaware

---

# REPLY REPORT OF JAMES E. MALACKOWSKI

## October 10, 2023

HIGHLY CONFIDENTIAL INFORMATION

EXHIBIT 18-1 – OPPOSITION



INTELLECTUAL CAPITAL EQUITY

### 7.3.2.3 Finch's Need for Additional Funding

According to Finch, "the principal risks that could adversely affect our business, financial condition, operating results, cash flows or stock price" include the "substantial additional funding to finance our operations.  If we are unable to raise capital when needed, we could be forced to delay, reduce, or terminate certain of our project development programs or other operations."[197]  Finch also disclosed in its 2021 Form 10-K  that:

> Raising additional capital will cause dilution to our stockholders . . . . To the extent that we raise additional capital through the sale of equity or convertible debt securities, your ownership interest will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect your rights as a stockholder.[198]

Dr. Putnam recognizes Finch's need for funding.  According to the Putnam Report, he "understand[s] that Finch turned down the Ironwood proposal because Finch needed more R&D funding for further development of CP101 than Ironwood was willing to provide."[199]

### 7.3.2.4 Finch's Workforce Reductions

On April 19, 2022 and September 1, 2022, Finch announced the implementation of certain expense reduction measures, including reductions in its workforce.[200]  The April 19, 2022 announcement concerned the reduction of approximately 20 percent of Finch's workforce.[201]  At about the time of this announcement, the share price of Finch's stock declined by 15.8 percent,[202] from about $109.80 on April 19, 2022 to $92.40 on April 21, 2022.[203]  Dr. Putnam recognizes the influence of this announcement on the share price of Finch's stock.[204]  According to Dr. Putnam, Finch experienced a share price decline of 2.9 percent[205] associated with Finch's September 1, 2022 announcement.[206]

The September 1, 2022 announcement related to the suspension of clinical trials for Finch's FIN-211 product candidate and a workforce reduction of approximately 37 percent.[207]  According to Finch, its FIN-211 product candidate was "designed to address the gastrointestinal and behavioral symptoms of autism spectrum

---

[197] Finch 2021 Form 10-K, p. 1.

[198] Finch 2021 Form 10-K, p. 49.

[199] Putnam Report, September 8, 2023, p. 61.

[200] Finch 2022 Form 10-K, p. 4.

[201] https://ir.finchtherapeutics.com/news-releases/news-release-details/finch-therapeutics-announces-workforce-restructuring-focus.

[202] (4/21/22 share price $92.40 – 4/19/22 share price $109.80)/$109.80 = -15.8 percent.

[203] https://finance.yahoo.com/quote/FNCH/history?p=FNCH.

[204] Putnam Report, September 8, 2023, Figure 3, Schedule A.

[205] (4/19/22 share price $109.80 – 4/18/22 share price $113.10)/$113.10 = -2.9 percent.

[206] Putnam Report, September 8, 2023, Figure 3, Schedule A.

[207] https://ir.finchtherapeutics.com/news-releases/news-release-details/finch-therapeutics-provides-business-update.

HIGHLY CONFIDENTIAL INFORMATION

EXHIBIT 18-1—OPPOSITION



INTELLECTUAL CAPITAL EQUITY

disorder, or ASD."[208]  At about the time of this announcement, the share price of Finch's stock declined by 16.0 percent,[209] from $75.00 on August 30, 2022 to $63.00 on September 1, 2022.[210]  Dr. Putnam recognizes the influence of this announcement on the price share of Finch's stock.[211]  According to Dr. Putnam, Finch experienced a share price decline of 13.6 percent[212] associated with Finch's September 1, 2022 announcement.[213]

Dr. Putnam's failure to incorporate the influence of these factors – not specific to CP101 – in his "Market Uncertainty of CP101 Success" analysis render his opinions defective and unreliable.

### 7.4    Dr. Putnam's Opinions Re: Impact of REBYOTA™ Approval on Finch are Erroneous

#### 7.4.1    Evidence of Impact of REBYOTA™ Approval on Finch

The Putnam Report contains various assertions which attempt to minimize the impact of the anticipated market introduction of REBYOTA™ on Finch's decision to discontinue their clinical trials of its CP101 product candidate and change Finch's monetization strategy.  For example, according to Dr. Putnam:

> Finch's decision to discontinue CP101 followed its consideration of multiple, previously known, factors, including difficulties raising capital and enrolling patients in clinical trials.  These and other risks contributed to Finch's current position.  At most, Ferring contributed little incremental risk, and I am aware of no evidence that any such contribution, if it existed, was material, must less decisive.[214]

Figure 3 of the Putnam Report charts the daily closing prices and returns of Finch's common stock for the period March 19, 2021 (the date of Finch's IPO) through January 2023.  It also contains references to several dates described by Dr. Putnam as "negative events associated with unusual share price changes."[215]  The negative events identified by Dr. Putnam include, for example, the December 2, 2021 filing of Ferring's Complaint against Finch challenging the validity of certain Finch patents, and the March 2, 2022 clinical hold placed on CP101 by the FDA.[216]

Figure 3 of the Putnam Report also contains references to dates described by Dr. Putnam as "positive events associated with unusual share price changes."[217]  The positive events identified by Dr. Putnam include the

---

[208] Finch 2022 Form 10-K, p. 4.

[209] (9/1/22 share price $63.00 − 8/30/22 share price $75.00)/$75.00 = -16.0 percent.

[210] https://finance.yahoo.com/quote/FNCH/history?p=FNCH.

[211] Putnam Report, September 8, 2023, Figure 3, Schedule A.

[212] (8/31/22 share price $64.80 − 8/30/22 share price $75.00)/$75.00 = -13.6 percent.

[213] Putnam Report, September 8, 2023, Figure 3, Schedule A.

[214] Putnam Report, September 8, 2023, pp. 34 – 35.

[215] Putnam Report, September 8, 2023, Figure 3, Schedule A.

[216] Putnam Report, September 8, 2023, Figure 3, Schedule A.

[217] Putnam Report, September 8, 2023, Figure 3, Schedule B.

HIGHLY CONFIDENTIAL INFORMATION

April 29, 2022 lifting by the FDA of the clinical hold on CP101, and the November 30, 2022 FDA approval of REBYOTA™.[218]  According to Dr. Putnam, Finch experienced a 13.95 percent increase of its share price associated with the FDA approval of REBYOTA™.[219]

Dr. Putnam's assertions are contradicted by the record evidence and are otherwise erroneous.  Contrary to Dr. Putnam's contentions, Finch did not experience an increase in share pricing associated with the approval of REBYOTA™.  In fact, Finch experienced a substantial decline in share pricing during the four weeks following the FDA's approval.  **Figure 9** illustrates Finch's closing share prices during the period November 30, 2022 to September 2023.

**Figure 9**
**Finch Share Price Following FDA Approval of REBYOTA™[220]**



As **Figure 9** illustrates, Finch's share price declined from $29.40 as of November 30, 2022 to $11.25 as of December 28, 2022, equating to a decline of 61.7 percent.[221]

Dr. Putnam's asserted 13.95 percent increase is incorrectly based on the change in the closing price of Finch shares during the one-day period: November 29 to November 30, 2022.  Investors were likely unable to trade on the news of the FDA's approval on November 30, 2022, given the time needed for press releases and other publications to disseminate this information.  This is illustrated by the Bloomberg announcement that

---

[218] Putnam Report, September 8, 2023, Figure 3, Schedule B.

[219] Putnam Report, September 8, 2023, Figure 3, Schedule B.

[220] **Appendix 9.1**; https://finance.yahoo.com/quote/FNCH/history?p=FNCH.

[221] (12/28/22 share price $11.25 – 11/30/22 share price $29.40)/$29.40 = -61.7 percent.

HIGHLY CONFIDENTIAL INFORMATION

EXHIBIT 18-1 – OPPOSITION


**INTELLECTUAL CAPITAL EQUITY**

license, and divid[ing] that by 2 to account for the value of non-patent IP."[395]  Dr. Putnam offers no evaluation or rationale as to why dividing by two is proper, and Dr. Putnam fails to rely on a technical opinion in support of his calculation.

### 8.3.5   Dr. Putnam Fails to Properly Consider *Georgia-Pacific* Factor No. 14

As set forth in my Initial Report, *Georgia-Pacific* Factor No. 14 concerns the opinion testimony of qualified experts.  My Initial Report contains a dozen or so references to the Benson Report and discussions with Dr. Benson.  I also had a discussion with Dr. Stollman in connection with my September 7th Report.

As reflected in Section 3 above, five expert reports were put forth on behalf of Ferring/Rebiotix between July 25, 2023 and July 28, 2023.  The Putnam Report fails to identify any one of these reports as considered by Dr. Putnam.[396]  In addition, the Putnam Report fails to identify the Benson Report among the materials Dr. Putnam considered.[397]  Dr. Putnam's failure to properly consider this *Georgia-Pacific* factor rendered his opinions defective and unreliable.

## 9.   SIGNATURE

Respectfully submitted,

James E. Malackowski                                    Date: October 10, 2023

---

[395] Putnam Report, September 8, 2023, Exhibit 3.

[396] Putnam Report, September 8, 2023, Exhibit 2.

[397] Putnam Report, September 8, 2023, Exhibit 2, p. 1.

HIGHLY CONFIDENTIAL INFORMATION

EXHIBIT 18-1 – OPPOSITION

# PTX-815

EXHIBIT 18-1—OPPOSITION



PTX-815

Ferring Pharmaceuticals Inc.
v. Finch Therapeutics Grp.,
Inc., C.A. No. 21-1694 (JLH)



**Finch Therapeutics, Inc.**
200 Inner Belt Road
Somerville, Massachusetts 02143
USA

Tel (Fax): +1 617 229 6499
www.finchtherapeutics.com
info@finchtherapeutics.com

## Memorandum

TO: Per Falk, President Ferring Pharmaceuticals

FROM: Mark Smith, CEO Finch Therapeutics

DATE: January 27, 2023

SUBJECT: Ferring's Ongoing Use of Finch Intellectual Property Without Authorization

---

Dear Per,

As I am sure you have seen by now, Finch Therapeutics Group, Inc. announced that it has been forced to discontinue the Phase 3 clinical trial of its orally-administered microbiome treatment for recurrent *C. difficile* infection, CP101.

This is a deeply disappointing turn of events for Finch, its employees (including the many who will be affected by layoffs as a result of this decision), shareholders, and most importantly the patients who might have benefited from Finch's innovative treatments. The Phase 3 clinical trial that Finch was forced to discontinue was the final pivotal trial required to support FDA approval of CP101 for use in recurrent *C. difficile* infections (CDI), and follows multiple promising clinical trials, including both a Phase 2 placebo-controlled trial and a Phase 2 open-label trial that produced promising data for CDI with CP101.

There is no question that Ferring's unauthorized use of Finch's intellectual property in Ferring's REBYOTA microbiota treatment for CDI was a highly detrimental factor forcing Finch to discontinue its CP101 Phase 3 clinical trial. Although REBYOTA uses Finch's pioneering patents and the pioneering patents of the University of Minnesota (which Finch licenses and is authorized to sub-license), Ferring has not received Finch's authorization to use Finch's pioneering patents in REBYOTA or agreed to pay Finch or the University of Minnesota for the right to do so.

As a direct result of the unauthorized use of Finch's intellectual property rights, including as noted in our press release, Finch's outlook for securing additional capital or partnerships to help fund the CP101 program through important milestones has darkened, anticipated enrollment in the ongoing Phase 3 trial for CP101 has slowed, and Finch has been left with no meaningful choice but to discontinue its Phase 3 clinical trial for CP101. Instead, Finch is now forced to focus on realizing the value of its intellectual property estate to benefit patients and maximize shareholder value.

I had hoped that Ferring would respect our patent rights and that it would not come to this. Unfortunately, it has. The harm to Finch continues as well. Finch has been left no choice but to ensure that its intellectual

1

FINCH_0462376

PTX-815.0001

EXHIBIT 18-1 – OPPOSITION

property rights are protected and demands that Ferring immediately stop using those pioneering technologies in REBYOTA and pay fair compensation to the innovators whose inventions it has used to bring REBYOTA to market.

Sincerely,

Mark Smith

Mark Smith
CEO
Finch Therapeutics

2

FINCH_0462377
PTX-815.0002

**PROPOSED PRETRIAL ORDER**

# EXHIBIT 18.1

**FERRING/REBIOTIX'S REPLY IN SUPPORT OF ITS
MOTION *IN LIMINE* NO. 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., REBIOTIX INC. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC. | ) ) ) ) ) ) |
| Defendants. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and REGENTS OF THE UNIVERSITY OF MINNESOTA | ) ) ) ) ) ) ) |
| Counterclaim-Plaintiffs/Reply Defendants, | ) ) |
| v. | ) ) |
| FERRING PHARMACEUTICALS INC., and REBIOTIX, INC. | ) ) ) |
| Counterclaim-Defendants/Reply Plaintiffs. | ) ) |

C.A. No. 21-1694-JLH

**FERRING/REBIOTIX'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE NO. 1**

Finch's opposition provides no reason to deny Ferring's motion to exclude evidence of who initiated the lawsuit. Finch relies on cases that do not support its position and fails to establish that this evidence would be probative of any material fact.

***First,*** Finch leaves out a critical fact when summarizing cases where courts instructed the jury that the case was commenced by the accused infringer—the instruction was ***sought by the accused infringer***. *Linear Grp. Servs., LLC v. Attica Automation, Inc.*, No. 13-10108, 2014 WL 4206871, at *11 (E.D. Mich. Aug. 25, 2014) ("Linear and ND have no objections to the realignment of the parties, as long as the jury is informed that Linear commenced this action for a declaration of noninfringement"); *Pavemetrics Sys., Inc. v. Tetra Tech, Inc.*, No. 2:21-cv-01289, D.I. 287 at 7 (C.D. Cal. Aug. 7, 2022) (same) (Ex. A to PTO Ex. 18-1-Opp'n.) Finch has failed to provide a single case in which such an instruction was allowed ***against*** the commencing party's wishes.

***Second,*** Finch's opposition rests on several false premises. Contrary to Finch's claims, Ferring is not seeking a "wholesale ban" on evidence regarding Ferring's complaint. (PTO Ex. 18-1-Opp'n at 3.) Ferring seeks to exclude evidence and argument regarding which party initially commenced the action, which is not relevant and would only serve to distract from the present issues and confuse the jury. Ferring does not intend to use this suit as evidence of Finch/UMN's "litigiousness." (*Id.* at 2.) Additionally, the declaratory judgment is irrelevant to Finch's willfulness claims. Ferring's response to Interrogatory No. 2 identifies exactly when Ferring learned of the patents-in-suit. (Ex. 1 at 13-14.) Finch can make its timing arguments without needlessly confusing the jury. Finch fails to explain how Ferring's steps to bring this action voluntarily are in any way relevant to Finch's theory that Ferring "engaged in infringing conduct without regard for the consequences." (PTO Ex. 18-1-Opp'n. at 1.)

Dated: July 15, 2024

*Of Counsel:*

Daralyn J. Durie
Matthew Chivvis
Rachel Dolphin
Ramsey Fisher
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415-268-6055
ddurie@mofo.com
mchivvis@mofo.com
rdophin@mofo.com
rfisher@mofo.com

Whitney O'Byrne
Sara Doudar
MORRISON & FOERSTER LLP
701 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: 213-892-4345
wobyrne@mofo.com
sdoudar@mofo.com

WOMBLE BOND DICKINSON (US) LLP

*/s/ Mary W. Bourke*
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
Zachary Murphy (#6881)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Mary.Bourke@wbd-us.com
Dana.Severance@wbd-us.com
Daniel.Attaway@wbd-us.com
Zachary.Murphy@wbd-us.com

John B. Bourke (#6534)
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, CA 94111
Telephone: (415) 765-6267
Ben.Bourke@wbd-us.com

*Attorneys for Ferring Pharmaceuticals Inc.*
*and Rebiotix Inc.*

**PROPOSED PRETRIAL ORDER**

**EXHIBIT 18-1-REPLY**

**Exhibit 1 to Ferring/Rebiotix's Reply in Support of Motion in Limine No. 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FERRING PHARMACEUTICALS INC. and REBIOTIX INC. <br><br> Plaintiffs, <br><br> v. <br><br> FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) C.A. No. 21-1694-RGA <br><br> **CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER** |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and THE REGENTS OF THE UNIVERSITY OF MINNESOTA, <br><br> Counterclaim Plaintiffs/Reply Defendants, <br><br> v. <br><br> FERRING PHARMACEUTICALS INC., and REBIOTIX, INC., <br><br> Counterclaim Defendants/Reply Plaintiffs. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## FERRING/REBIOTIX'S FINAL OBJECTIONS AND RESPONSES TO FINCH AND UMN'S FIRST SET OF INTERROGATORIES (NOS. 1-7)

As allowed under Federal Rule of Civil Procedure 33 and the applicable rules of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware ("Local Rules"), and the Scheduling Order in this case (D.I. 17, as amended), Plaintiffs / counterclaim defendants / reply plaintiffs Ferring Pharmaceuticals Inc. ("Ferring") and Rebiotix Inc. ("Rebiotix") (collectively, "Ferring/Rebiotix") provide these final responses to interrogatory numbers 2 through 7 in defendants / counterclaim plaintiffs / reply defendants Finch

Therapeutics Group, Inc., Finch Therapeutics Inc., and Finch Therapeutics Holdings, LLC's (collectively, "Finch") and counterclaim plaintiff / reply defendants the Regents of the University of Minnesota ("UMN," and collectively with Finch, "Finch/UMN") First Set of Interrogatories (Nos. 1-7) ("Interrogatories").

The following objections and responses to Finch/UMN's Interrogatories are based upon Ferring/Rebiotix's current knowledge, information, and belief as well as on information presently available to and located by Ferring/Rebiotix after a reasonable search consistent with the provisions of the Stipulation and Order regarding Discovery, Including Discovery of Electronically Stored Information ("ESI") ("Discovery Order") and the parties' various meet and confers regarding discovery.

**INTERROGATORY NO. 2:**          Describe the circumstances under which Rebiotix first became aware of each Patent-in-Suit and its Related Patent Applications and Related Patents, including the dates, the manner in which Rebiotix became aware, the identity of all Persons with knowledge related to such circumstances, and the identity of all Documents related to such circumstances.

**FINAL RESPONSE:**

Ferring/Rebiotix incorporate by reference their General Responses to Finch/UMN's Interrogatories, their Specific Objections to Finch/UMN's Definitions, and their Specific Objections to Finch/UMN's Instructions.

Ferring/Rebiotix object to this Interrogatory as overly broad, unduly burdensome, vague, confusing, and not proportional to the needs of the case at least because Finch/UMN's request seeks information for each Patent-in-Suit and its related Patent Applications and Related Patents." Even Finch/UMN's definitions recognize that Finch/UMN have not asserted that REBYOTA will infringe each of the Patents-in-Suit. Further, certain of the patents in suit are no longer asserted by Finch/UMN. Ferring/Rebiotix interpret this Interrogatory to seek information limited to United States Patent Numbers 10,022,406, 9,962,413, 10,328,107, 10,463,702, 10,675,309, 10,286,011, 10,286,012, and 10,251,914, or applications to which those patents claim priority.

Ferring/Rebiotix object to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks the identity of "all Persons" and "all Documents," when less than "all" such information is sufficient to provide the requested information.

Ferring/Rebiotix object to this Interrogatory because it seeks information protected from discovery by the attorney-client privilege, the work product doctrine, or another applicable privilege or immunity in the United States or a foreign country.

12

Subject to and without waiving the above, based on the information currently available to Ferring/Rebiotix, Ferring/Rebiotix respond as follows:

Rebiotix was incorporated in Delaware on July 13, 2011. Rebiotix could not have knowledge of the Patents in Suit, the Related Patent Applications, or the Related Patents prior to its existence. None of the asserted patents had issued as of July 13, 2011.

On March 26, 2018, Ferring and Rebiotix completed their merger. None of the asserted patents had issued as of March 26, 2018, and most of the asserted patents had either not been filed or had not had their applications published as of this date.

Responding further, Rebiotix was aware of PCT/AU2011/000987, which published as WO 2012/016287 on February 9, 2012 and to which each of the patents in suit naming Dr. Thomas Borody as an inventor claims priority, as least as early as November 19, 2012.

Ferring/Rebiotix were aware of United States Patent Numbers 10,022,406, 10,463,702, and 10,675,309 (collectively, the "previously asserted Borody patents") at least by their respective dates of issuance. Ferring/Rebiotix were aware of the application that would issue as United States Patent Number 10,022,406 on approximately March 9, 2018. *See, e.g.*, June 2, 2023 Fluet Dep. Ex. 3.

Rebiotix was made aware of United States Patent Number 11,491,193 on December 5, 2022, when counsel for Finch/UMN indicated they intended to seek leave to amend the counterclaims in this litigation to add the patent.

Rebiotix was made aware of the application that would eventually issue as United States Patent Number 11,541,080 on December 5, 2022, when counsel for Finch/UMN indicated that the patent application had been allowed and they intended to seek leave to amend the

13

counterclaims in this litigation to add the patent. Rebiotix was aware of United States Patent Number 11,541,080, as issued, on January 3, 2023.

Rebiotix was aware of United States Patent Numbers 10,251,914, 10,286,011, and 10,286,012 (collectively, "the UMN patents") at least by their respective dates of issuance. Rebiotix was aware of the application to which the UMN patents claim priority as of the founding date of Rebiotix.

Responding further, Ferring/Rebiotix state that further information relevant to this Interrogatory is found in the deposition testimony of Lee Jones, Michael Berman, Gregory Fluet, Kristin Wannerberger, and Kenneth Blount, and the exhibits used therein, all of which are incorporated by reference herein.

Ferring/Rebiotix may supplement or amend this response in accordance with the Scheduling Order in this case (D.I. 17, as amended) or further order of the Court, and as circumstances warrant in compliance with Federal Rule of Civil Procedure 26(e)(1).

Dated: June 16, 2023

Womble Bond Dickinson (US) LLP

/s/ Mary W. Bourke
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
John B. Bourke (#6534)
Zachary Murphy (#6881)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Mary.Bourke@wbd-us.com
Dana.Severance@wbd-us.com
Daniel.Attaway@wbd-us.com
Ben.Bourke@wbd-us.com
Zachary.Murphy@wbd-us.com

*Of Counsel:*

Joshua P. Davis
Womble Bond Dickinson (US) LLP
811 Main Street
Suite 3130
Houston, TX 77002
Telephone: (346) 998-7801
Joshua.P.Davis@wbd-us.com

*Attorneys for Ferring Pharmaceuticals Inc.*
*and Rebiotix Inc.*

42