## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FERRING PHARMACEUTICALS INC. and REBIOTIX INC. <br><br> Plaintiffs, <br><br> v. <br><br> FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC. <br><br> Defendants. <br><br><br> FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and THE REGENTS OF THE UNIVERSITY OF MINNESOTA, <br><br> Counterclaim-Plaintiffs/Reply Defendants, <br><br> v. <br><br> FERRING PHARMACEUTICALS INC., and REBIOTIX, INC. <br><br> Counterclaim-Defendants/Reply Plaintiffs. | C.A. No. 21-1694-JLH |

## UMN AND FINCH'S BRIEF IN SUPPORT OF POST-TRIAL MOTION FOR ENHANCED DAMAGES, SUPPLEMENTAL DAMAGES, ONGOING ROYALTY, AND PRE- AND POST-JUDGMENT INTEREST PURSUANT TO ORDER ON D.I. 490

## TABLE OF CONTENTS

I.    **Background** ................................................................................................ **4**

    A.    Ferring's Willful Infringement ........................................................ 5

    B.    Ferring's Litigation Conduct ........................................................... 6

II.    **Legal Standards** ...................................................................................... **6**

    A.    Enhanced Damages Under 35 U.S.C. § 284 .................................... 6

    B.    Supplemental Damages and Ongoing Royalty ................................ 8

    C.    Pre- And Post-Judgment Interest ................................................... 8

III.    **Argument** ................................................................................................ **9**

    A.    Ferring's Egregious Infringement Warrants Enhanced Damages Under *Halo* And All Nine *Read* Factors ........................................ 10

        1.    *Read* Factor No. 1: Defendants deliberately copied UMN's and Finch's technology ......................................................... 10

        2.    *Read* Factor No. 2: Ferring was aware of UMN's and Finch's patent protection but did next to nothing to investigate those patents. ...................................................... 15

        3.    *Read* Factor No. 3: Ferring's behavior at every stage of this litigation warrants enhancement. ...................................... 16

        4.    *Read* Factor No. 4: Ferring has worldwide operations and earns billions of dollars in revenue ........................................ 27

        5.    *Read* Factor No. 5: This case was not close ........................ 29

        6.    *Read* Factor No. 6: Ferring's misconduct has continued unabated for years. .................................................................. 31

        7.    *Read* Factor No. 7: Ferring took no remedial action. .............. 32

        8.    *Read* Factor No. 8: Ferring deliberately set out to cause irreparable harm to UMN and Finch. ...................................... 33

        9.    *Read* Factor No. 9: Ferring tried to conceal its infringement from UMN and Finch. ........................................................ 34

    B.    The Court Should Award Supplemental Damages from August 6 through August 15, 2024 (Final Judgment) ........................................ 36

C.    The Court Should Impose An Ongoing Royalty Through The Life Of The Patents ................................................................................................. 36

D.    The Court Should Award Plaintiffs Prejudgment Interest On The Jury's Damages Award ................................................................................ 42

E.    The Court Should Award UMN & Finch Post-Judgment Interest On The Judgment Amount ............................................................................... 44

IV.    **Conclusion** ............................................................................................. **45**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Tex., LLC v. BMW N. Am., LLC*,
     783 F. Supp. 2d 891 (E.D. Tex. 2011) ...................................................................38

*Air Separation, Inc. v. Underwriters at Lloyd's of London*,
     45 F.3d 288 (9th Cir. 1995) .........................................................................9, 44

*Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*,
     2018 WL 6190604 (C.D. Cal. Nov. 4, 2018) ..........................................................33

*Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*,
     798 F. App'x 643 (Fed. Cir. 2020) ......................................................................33

*Amado v. Microsoft Corp.*,
     517 F.3d 1353 (Fed. Cir. 2008)...........................................................................38

*Amgen Inc. v. Hospira, Inc.*,
     336 F. Supp. 3d 333 (D. Del. 2018).....................................................................44

*Amgen Inc. v. Hospira, Inc.*,
     944 F.3d 1327 (Fed. Cir. 2019).............................................................................44

*Amstar Corp. v. Envirotech Corp.*,
     730 F.2d 1476 (Fed. Cir. 1984)...........................................................................26

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
     258 F. Supp. 3d 1013 (N.D. Cal. 2017) ..................................................................7

*Apple, Inc. v. Samsung Elecs. Co.*,
     2014 WL 6687122 (N.D. Cal. Nov. 25, 2014) .......................................................37

*ArcherDX, LLC v. Qiagen Scis., LLC*,
     2022 WL 4597877 (D. Del. Sept. 30, 2022).................................................9, 43, 44

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
     2017 WL 7732873 (S.D. Fla. Jan. 3, 2017) ....................................................37, 39

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
     876 F.3d 1350 (Fed. Cir. 2017)......................................................................37, 42

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
     476 F. App'x. 747 (Fed. Cir. 2012) ......................................................................42

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
  670 F.3d 1171 (Fed. Cir. 2012)..................................................................42

*Barry v. Medtronic, Inc.*,
  250 F. Supp. 3d 107 (E.D. Tex. 2017) .....................................................10

*Baxter Healthcare Corp. v. Spectramed, Inc.*,
  49 F.3d 1575 (Fed. Cir. 1995)..................................................................26

*Bayer Healthcare LLC v. Baxalta Inc.*,
  2019 WL 4016235 (D. Del. Aug. 26, 2019) ......................................43, 44

*Bayer Healthcare LLC v. Baxalta Inc.*,
  989 F.3d 964 (Fed. Cir. 2021)..................................................................43

*Bos. Sci. Corp. v. Cordis Corp.*,
  838 F. Supp. 2d 259 (D. Del. 2012)............................................29, 38, 39

*Broadcom Corp. v. Qualcomm Inc.*,
  2007 WL 2326838 (C.D. Cal. Aug. 10, 2007)..........................................32

*Broadcom Corp. v. Qualcomm Inc.*,
  2007 WL 8030058 (C.D. Cal. Nov. 21, 2007)..........................................32

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
  315 F. Supp. 3d 977, 1014 (N.D. Ill. 2018) .............................................31

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
  935 F.3d 1341 (Fed. Cir. 2019).................................................................31

*Church & Dwight Co. v. Abbott Lab'ys*,
  2009 WL 2230941 (D.N.J. July 23, 2009).................................................44

*Comcast IP Holdings I LLC v. Sprint Commc'ns Co.*,
  850 F.3d 1302 (Fed. Cir. 2017).................................................................43

*Dasso Int'l, Inc. v. Moso N. Am., Inc.*,
  2023 WL 5349374 (D. Del. Aug. 21, 2023) ..........................................7, 36

*EagleView Techs., Inc. v. Xactware Sols., Inc.*,
  522 F. Supp. 3d 40 (D.N.J. 2021) ...............................................16, 36, 45

*Energy Transp. Grp., Inc. v. William Demant Holding A/S*,
  697 F.3d 1342 (Fed. Cir. 2012).................................................................43

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
  2017 WL 3034655 (E.D. Tex. July 18, 2017) ...........................................42

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
   2018 WL 2149736 (E.D. Tex. May 10, 2018)........................................................31

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
   955 F.3d 1317 (Fed. Cir. 2020)..........................................................................31

*Finjan Software, Ltd. v. Secure Computing Corp.*,
   2009 WL 2524495 (D. Del. Aug. 18, 2009) ..........................................................33

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010)..........................................................................33

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
   582 F.3d 1288 (Fed. Cir. 2009)......................................................................8, 37

*Gen. Motors Corp. v. Devex Corp.*,
   461 U.S. 648 (1983).....................................................................................9, 43

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*,
   2019 WL 1877189 (D. Del. Apr. 26, 2019)......................................................36, 37

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   136 S. Ct. 1923 (2016)......................................................................................7

*Halo. WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016)......................................................................7, 10

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010).....................................................................23, 25

*IMX, Inc. v. LendingTree, LLC*,
   469 F. Supp. 2d 203 (D. Del. 2007).....................................................................27

*Innovention Toys, LLC v. MGA Entm't, Inc.*,
   667 F. App'x 992 (Fed. Cir. 2016) .................................................................7, 10

*Johns Hopkins Univ. v. CellPro*,
   978 F. Supp. 184 (D. Del. 1997).........................................................................32

*Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*,
   2009 WL 512156 (D.N.J. Feb. 27, 2009) ................................................... *passim*

*Jurgens v. CBK, Ltd.*,
   80 F.3d 1566 (Fed. Cir. 1996).......................................................................7, 10

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
   2019 WL 6840353 (D. Del. Dec. 16, 2019)............................................................35

*Mathis v. Spears,*
    857 F.2d 749 (Fed. Cir. 1988)................................................................................44

*Metabolite Labs., Inc. v. Lab'y Corp. of Am. Holdings,*
    370 F.3d 1354 (Fed. Cir. 2004)............................................................................27

*nCUBE Corp. v. SeaChange Int'l, Inc.,*
    313 F. Supp. 2d 361 (D. Del. 2004).....................................................................29

*Nickson Indus., Inc. v. Rol Mfg. Co.,*
    847 F.2d 795 (Fed. Cir. 1988)................................................................................44

*Nox Med. Ehf v. Natus Neurology Inc.,*
    2018 WL 4062626 (D. Del. Aug. 27, 2018) ..........................................................32

*Oiness v. Walgreen Co.,*
    88 F.3d 1025 (Fed. Cir. 1996)...........................................................................9, 44

*Olaplex, Inc. v. L'Oreal USA, Inc.,*
    855 F. App'x 701 (Fed. Cir. 2021) ........................................................................35

*Paice LLC v. Toyota Motor Corp.,*
    609 F. Supp. 2d 620 (E.D. Tex. 2009)...................................................................38

*Philip Morris Prods. S.A. v. R.J. Reynolds Vapor Co.,*
    2023 WL 2843796 (E.D. Va. Mar. 30, 2023) ........................................................38

*PPC Broadband, Inc. v. Corning Optical Commc'n RF, LLC,*
    2016 WL 6537977 (N.D.N.Y. Nov. 3, 2016) .........................................................35

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,*
    875 F.3d 1369 (Fed. Cir. 2017)..............................................................................7

*Prism Techs. LLC v. Sprint Spectrum L.P.,*
    849 F.3d 1360 (Fed. Cir. 2017)..............................................................................8

*Purewick Corp. v. Sage Prod., LLC,*
    666 F. Supp. 3d 419 (D. Del. 2023)...................................................................9, 36

*Read Corporation v. Portec, Inc.,*
    970 F.2d 816 (Fed. Cir. 1992).................................................................... *passim*

*Rocheux Int'l of New Jersey v. U.S. Merchants Fin. Grp., Inc.,*
    2009 WL 3246837 (D.N.J. Oct. 5, 2009)..................................................................3

*Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.,*
    707 F. Supp. 2d 737 (N.D. Ohio 2010)..............................................................16, 27

*Sanofi-Aventis v. Apotex, Inc.*,
  659 F.3d 1171 (Fed. Cir. 2011)...........................................................................43

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*,
  127 F.3d 1462 (Fed. Cir. 1997).............................................................................8

*St. Regis Paper Co. v. Winchester Carton Corp.*,
  410 F. Supp. 1304 (D. Mass. 1976) .....................................................................28

*Stryker Corp. v. Zimmer, Inc.*,
  2017 WL 4286412 (W.D. Mich. July 12, 2017)............................................ *passim*

*Stryker Corp. v. Zimmer, Inc.*,
  745 F. App'x 167 (Fed. Cir. 2018) .........................................................................7

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
  2014 WL 1457797 (D. Del. Apr. 14, 2014).....................................................38, 42

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
  612 F.3d 1365 (Fed. Cir. 2010)............................................................................37

*Tinnus Enters., LLC v. Telebrands Corp.*,
  369 F. Supp. 3d 704 (E.D. Tex. 2019).............................................................25, 31

*Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*,
  609 F.3d 143 (3d Cir. 2010)..................................................................................45

*Trs. of Columbia Univ. City of New York v. Gen Digit. Inc.*,
  2023 WL 8699435 (E.D. Va. Sept. 30, 2023).......................................................10

*TruePosition Inc. v. Andrew Corp.*,
  568 F. Supp. 2d 500 (D. Del. 2008).....................................................................27

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
  138 S. Ct. 2129 (2018)...........................................................................................7

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
  837 F.3d 1358(Fed. Cir. 2016)...............................................................................7

*Whirlpool Corp. v. TST Water, LLC*,
  2018 WL 1536874 (E.D. Tex. Mar. 29, 2018) ......................................................31

*Whitserve, LLC v. Comput. Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012)...................................................................8, 9, 36, 37

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
  2009 WL 113771 (E.D. Cal. Jan. 15, 2009) .........................................................31

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010)..................................................................31

*XY, LLC v. Trans Ova Genetics, L.C.*,
    890 F.3d 1282 (Fed. Cir. 2018).............................................................37, 38

**Statutes**

28 U.S.C. § 1961 ..........................................................................................9, 44

35 U.S.C.
    § 101........................................................................................................30
    § 103........................................................................................................30
    § 112........................................................................................................30
    § 284................................................................................................*passim*
    § 285..................................................................................................44, 45

**Rules**

Fed. R. Civ. P.
    16...............................................................................................................3
    26...............................................................................................................3
    37...............................................................................................................3

Fed. R. Evid.
    402.............................................................................................................3
    403.............................................................................................................3
    701.............................................................................................................3
    802.............................................................................................................3

Ferring Pharmaceuticals Inc. and Rebiotix Inc. (collectively, "Ferring") long recognized UMN's and Finch's patented technology as pioneering breakthroughs but instead of doing the right thing and licensing that technology, Rebiotix, and then Ferring, instead undertook extensive efforts to conceal their infringement and reliance on UMN's and Finch's patents while simultaneously pursuing an approach to this litigation that can only fairly be described as improper.[1] Despite knowing that REBYOTA infringes, Ferring launched this litigation against Finch, and then launched REBYOTA into the market, a one-two tactic designed to push a competitor out of the marketplace. Ferring's plan succeeded—the lawsuit combined with Ferring's infringing product meant Finch had to give up on seeking FDA approval for its own *C. difficile* treatment. But the jury held Ferring to account, finding that its infringement was willful and awarding $25.8 million in damages through the date of trial. This motion respectfully asks the Court to award relief based on that jury verdict as provided for by the law and as required to fully address Ferring's unlawful conduct.

The jury's damages award should be enhanced to the maximum degree possible. This is no typical case for enhancement; it is replete with a decade-long conspiracy among multiple Rebiotix founders—and Ferring—to knowingly copy UMN's and Finch's patented technologies, use them to obtain "first mover advantage" to put Finch off the market, then abuse the court system to assert baseless defenses (most of which it never presented to the jury), while making numerous, material misrepresentations to the Court, UMN, and Finch in connection with a gambit to obtain potentially case-ending sanctions—made possible through improper payment of a key fact witness to secure testimony he later disagreed with—and never once even attempting to do the right thing.

---

[1]    "UMN" refers to the Regents of the University of Minnesota and "Finch" refers to Finch Therapeutics Group, Inc., Finch Therapeutics, Inc., and Finch Therapeutics Holdings, LLC.

Every one of the *Read* enhancement factors weighs in favor of maximum enhancement here. For example, years before this case was filed, Rebiotix founders copied ideas from the UMN inventors, knew about UMN's and Finch's patents, and failed to demonstrate a good-faith belief that UMN's and Finch's patents were not infringed. As another example, at trial, Ferring presented no non-infringement defenses for the '080 patent and the defenses raised for the '309 and '914 patents were clearly generated for litigation purposes, as they were contradicted by their own documents and testimony. As a further example, Ferring forced Finch and UMN to expend substantial resources responding to meritless assertions and vexatious tactics at nearly every turn: Ferring pressed numerous defenses throughout the case—had six summary judgment motions denied—and presented only some of at trial. As another example, Ferring's attempt to use the Finch inventor—Dr. Borody—against Finch was egregious and is itself a basis for enhancement.

Ferring was unabashed and shameless about its misrepresentations regarding Dr. Borody. For example, at the pretrial conference, Ferring's counsel argued that Finch and UMN should be sanctioned because Dr. Borody did not sit for his deposition. But at the same time, Ferring's counsel failed to tell the Court that they had (i) met with Dr. Borody in Australia in April 2024 and obtained his documents; (ii) signed a consulting agreement with Dr. Borody in June 2024 that compensated him 30,000 AUD/day for his testimony; (iii) obtained a declaration from Dr. Borody in July 2024 regarding the ownership of his patents and their validity; and (iv) met with him in Delaware weeks before the pretrial conference and obtained a declaration concerning invalidity of his own patents that Dr. Borody, which he later contradicted. *See infra* III.A.3.a. This information only came to light after Ferring was ordered by the Court to produce all communications with Dr. Borody. When the Court confronted Ferring's counsel about this activity, Ferring's counsel was defiant and only admitted it was mistaken about failing to advise the Court about the consulting

agreement, and nothing more. Indeed, Ferring maintained its request for sanctions despite admitting at the July 31 hearing that it never bothered to ask Dr. Borody, whom counsel had access to months before moving for sanctions, if Finch's counsel or Finch's CEO told him not to sit for his deposition. (July 31, 2024 Hr'g Tr. at 114:4-24.) There was no reason to ask because Ferring had known the answer for over a year. In a recorded Zoom meeting between Dr. Borody, his Australian lawyer, and a Ferring representative dated July 5, 2023 (produced minutes before the July 31, 2024 hearing), Dr. Borody's lawyer admitted that he said Dr. Borody would not sit for the deposition. (D.I. 466 (Ferring-Borody Video) at 5:30-6:00.) Dr. Borody's lawyer also said he reached out to Ferring's counsel, they had "a number of discussions," and Dr. Borody would help Ferring should Ferring enter into an agreement with Dr. Borody. (*Id.* at 6:08-7:58, 12:12-13:26; *see also* D.I. 431, Ex. A (July 2023 email with Dr. Borody and Ferring counsel).)

Despite its misrepresentations and excessive payment to Dr. Borody,[2] Ferring only relented on its Borody plan at the last possible moment, and after the Court issued an order stating:

> [The Court is] actively considering whether some or all of the testimony of Dr. Borody should be excluded pursuant to one or more of the following: the Court's inherent power to manage its own affairs so as to achieve the orderly and expeditious disposition of cases and protect the integrity of the proceedings; the Court's inherent power to sanction bad faith litigation conduct; the Court's inherent power to address violations of Delaware Rules of Professional Conduct 3.3, 3.4, and 4.1; the Court's inherent power to exclude fact witnesses as a sanction for the wrongful payment of fact witnesses, *see, e.g.*, *Rocheux Int'l of New Jersey v. U.S. Merchants Fin. Grp., Inc.*, No. 06-6147, 2009 WL 3246837, at *4 (D.N.J. Oct. 5, 2009); the Federal Rules of Evidence (including but not limited to FRE 402, 403, 701, and 802); and the Court's case management orders and the Federal Rules of Civil Procedure (including but not limited to FRCP 16, 26, and 37)."

---

[2]    Dr. Borody originally charged Ferring over 300,000 AUD. (D.I. 431, Ex. H at FER_RBX03012763.) Although he subsequently issued a reduced invoice for 111,319.58 AUD (D.I. 431, Ex. I at FER_RBX03012761), Dr. Borody insisted at the hearing that he would fight the reductions (July 31, 2024 Hr'g Tr. at 60:20-62:6). Notably the reduced invoice came only at Ferring's request, *after* the pre-trial conference on July 23, 2024, and *after* Finch raised concerns about Dr. Borody's compensation. (D.I. 431, Ex. I (invoice dated July 26, 2024).)

(D.I. 440.)

All of Ferring's misconduct only came to light after extensive efforts by UMN, Finch, and the Court (D.I. 440), which had a significant impact on UMN's and Finch's trial preparations. But even then, Ferring still did not play by the rules. For example, the Court concluded that at trial Ferring "came very, very close to the line" of violating the parties' agreement that it would not suggest Finch sued first. (Trial Tr. at 308:21-309:11.) And, despite representing to the Court that it would not rely on its own patents to argue against willful infringement, Ferring did just that in closing arguments. (D.I. 492 (PTC Tr.) at 123:7-124:1; Trial Tr. at 1232:6-1234:25.)

Ferring engaged in this improper conduct to obscure the weakness of its actual defenses and to drive up costs in the hopes that UMN and Finch would give up (or in Finch's case, go out of business). The jury, however, saw through Ferring's defenses, finding that Ferring willfully infringed all Asserted Patents[3] and that claims from every one of those patents were not invalid. (D.I. 480.) The jury awarded UMN and Finch $25,815,061 to compensate UMN and Finch for Ferring's infringement through the date of trial. (*Id.* at 5.)

These facts, and the jury's finding of willful infringement, establish that this is precisely the type of case where the jury's verdict should be enhanced under 35 U.S.C. § 284. Moreover, an ongoing royalty and supplemental damages, to address Ferring's ongoing willful infringement (there is no indication that Ferring stopped its infringement following the verdict), prejudgment interest, and post-judgment interest should also be awarded, as explained in detail below.

## I.    BACKGROUND

On December 1, 2021, Ferring brought this suit against Finch, seeking declaratory judgment of noninfringement and invalidity of several Finch patents, including U.S. Patent No.

---

[3]    U.S. Patent Nos. 10,675,309, 10,251,914, 11,541,080.

10,675,309 (the "'309 patent"). (D.I. 1.) On March 7, 2022, UMN asserted infringement of its patents, including U.S. Patent No. 10,251,914 (the "'914 patent"), to which Finch had an exclusive license. (D.I. 19.) On January 23, 2023, Finch asserted newly issued patents against Ferring, including U.S. Patent No. 11,541,080 (the "'080 patent"). (D.I. 98.)

### A.     Ferring's Willful Infringement

As shown at trial, Ferring's behavior in connection with this case was an egregious example of willful patent infringement. Rebiotix's founder and CEO, Lee Jones, used a position of trust as a CEO in Residence at UMN to access confidential information about the UMN inventions, including the UMN provisional patent application. (Trial Tr. at 627:3-628:11, 688:15-690:10, 691:22-692:1; PTX-42; PTX-402; PTX-403; PTX-406; PTX-420; PTX-418.0002.) But Ms. Jones was not the only one. Rebiotix founder Michael Berman and Rebiotix consultant Edwin Hlavka also sought out the work of UMN inventors. (Trial Tr. at 554:21–555:21, 559:1-6, 559:15–561:22; PTX-52.0001; PTX-82.0001-2; TX-3166.0001-2; PTX-170.0001.) Ferring was aware of UMN's and Finch's patents while acquiring Rebiotix, and Rebiotix knew UMN's and Finch's patents would be "key." (PTX-56.0248; PTX-208.0001.) Ferring recognized the risk UMN's and Finch's patents posed, naming asserted patent families in its 2018 merger agreement with Rebiotix and requiring Rebiotix shareholders (e.g., Ms. Jones and Mr. Berman) to pay half of any infringement award. (PTX-757.0001, 24; PTX-56.0020-21, 248.) During litigation, Ferring amended the agreement, removing obligations for the damages award. (Trial Tr. at 714:13-715:17.)

Despite Ferring's and Rebiotix's awareness of these issues, neither ever licensed the patents. (Trial Tr. at 237:11-15, 574:18-20, 718:23-719:2, 965:25-966:2.) Ferring also never attempted to change its product or process to avoid infringement. (Trial Tr. at 717:23-718:13, 573:15-24.) Instead, Ferring tried to avoid what it characterized as "patent infringement issues" by making wording changes. (PTX-298.0001-2; PTX-142.0074-75; PTX-1632 at 1:25:55-1:26:16;

PTX-604.0001, 3, 6; PTX-325.0003-4; Trial Tr. at 322:5-16, 322:25-325:5.) The jury rejected all of Ferring's word games and found infringement of claims of all Asserted Patents. (D.I. 480, 488.)

While Ferring worked on REBYOTA, Finch was a direct competitor, developing its own product in which it invested over $92 million to develop and obtain regulatory approval. (Trial Tr. at 177:21-178:1, 429:24-431:10.) Yet, Ferring's approval of REBYOTA (and litigation initiated by Ferring) sealed its first-mover advantage, making it difficult for Finch to raise money necessary to compete its clinical studies and leading to Finch losing funding, and ultimately, its ability to launch a product at all. (Trial Tr. at 178:17-23, 431:17-432:5.)

## B.  Ferring's Litigation Conduct

Ferring's approach to litigation unduly burdened the Court, unnecessarily diverted Finch's and UMN's resources, and attempted to distract the jury. Ferring resorted to "bullying" and "threatening" UMN during litigation (D.I. 319, ¶¶ 3-4; Trial Tr. at 165:9-16, 166:4-12), listed Finch and UMN litigation counsel on its witness list (Ex. 1 (June 3, 2024 Ferring Witness List) at 1), withheld information about its contact with Finch patent inventor Dr. Borody (including Ferring's agreement to pay him) as well as his documents (D.I. 492 (PTC Tr.) at 140:11-13, 141:8-15, 141:17-25, 144:5-8; D.I. 407; D.I. 467 at 1; D.I. 415 at 1; D.I. 467 at 1-2, Ex. B), and raised previously undisclosed theories while flouting the Court's rulings (*infra* §§ III.A.3.c, III.A.3.d). Despite Ferring's tactics, UMN and Finch prevailed on nearly every substantive issue in this litigation, with the jury finding Ferring willfully infringed all asserted claims, claims from every asserted patent valid, and awarding over $25 million in damages. (D.I. 480; D.I. 488; D.I. 421.)

## II.  LEGAL STANDARDS

### A.  Enhanced Damages Under 35 U.S.C. § 284

Pursuant to 35 U.S.C. § 284, this Court "may increase the damages up to three times the amount found or assessed." Enhanced damages are appropriate as a "sanction for egregious

infringement behavior," meaning conduct that is "willful," "deliberate," or in "bad faith." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). A jury's finding of willful infringement "is a sufficient predicate, under *Halo*, to allow the district court to exercise its discretion to decide whether punishment is warranted in the form of enhanced damages." *Innovention Toys, LLC v. MGA Entm't, Inc.*, 667 F. App'x 992, 994 (Fed. Cir. 2016); *accord Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996) ("An act of willful infringement . . . is, without doubt, sufficient . . . to increase a compensatory damages award."). Indeed, where a jury has found willful infringement, a district court "should provide reasons for ***not*** increasing a damages award." *Jurgens*, 80 F.3d at 1572 (emphasis added); *accord Stryker Corp. v. Zimmer, Inc.*, 2017 WL 4286412, at *3 n.2 (W.D. Mich. July 12, 2017) (citing *Jurgens* for this proposition post-*Halo*), *aff'd*, 745 F. App'x 167 (Fed. Cir. 2018). Likewise, after *Halo*, "subjective willfulness alone . . . can support an award of enhanced damages." *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016), *rev'd on other grounds by* 138 S. Ct. 2129 (2018).

Prior to *Halo*, courts relied on factors articulated in *Read Corporation v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), to determine if an infringer's behavior warranted enhanced damages. *Halo* itself, however, "merely requires the district court to consider the particular circumstances of the case to determine whether it is egregious." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1383 (Fed. Cir. 2017). Courts still rely on the *Read* factors as "useful guideposts even though they are no longer the sole set of criteria that can be considered." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 258 F. Supp. 3d 1013, 1030 (N.D. Cal. 2017) (internal quotation marks omitted); *see also Dasso Int'l, Inc. v. Moso N. Am., Inc.*, 2023 WL 5349374, at *25 (D. Del. Aug. 21, 2023). The Federal Circuit confirmed that courts may rely on the *Read* factors to guide their discretion post-*Halo*. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1325, 1342 (Fed. Cir. 2016).

When evaluating enhanced damages, *Read* holds that "[t]he paramount determination . . . is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read*, 970 F.2d at 826. To guide this inquiry, *Read* identified several factors: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent, investigated the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior in the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the misconduct; (7) the remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its conduct. *Id.* at 826-27. "An award need not rest on any particular factor, and not all relevant factors need to weigh in favor of an enhanced award." *Stryker*, 2017 WL 4286412, at *3 (citation omitted). Rather, the Court has a "broad range of discretion . . . to weigh and balance multiple factors in determining a just remedy." *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997).

## B.    Supplemental Damages and Ongoing Royalty

"A damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales. . . ." *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009). Thus, "[d]istrict courts have discretion to award damages for periods of infringement not considered by the jury." *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 38 (Fed. Cir. 2012); *see also* 35 U.S.C. § 284 ("When the damages are not found by a jury, the court shall assess them."). This discretion includes supplemental damages and an ongoing royalty. *See Whitserve*, 694 F.3d at 35; *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1377 (Fed. Cir. 2017) (ongoing royalty permitted under § 283).

## C.    Pre- And Post-Judgment Interest

"As a rule, prejudgment interest should be awarded under 35 U.S.C. § 284 absent some

justification for withholding such an award." *Whitserve*, 694 F.3d at 36 (internal quotation marks and brackets omitted). That is because "prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer had entered into a reasonable royalty agreement." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983). "Prejudgment interest has no punitive, but only compensatory, purposes. Interest compensates the patent owner for the use of its money between the date of injury and the date of judgment." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996).

Likewise, 28 U.S.C. § 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," which is to be computed daily through date of payment and compounded annually. 28 U.S.C. § 1961(a), (b). "Under the provisions of 28 U.S.C. § 1961, postjudgment interest on a district court judgment is mandatory." *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290 (9th Cir. 1995); *accord ArcherDX, LLC v. Qiagen Scis., LLC*, 2022 WL 4597877, at *19 (D. Del. Sept. 30, 2022) (post-judgment interest runs "starting from the date judgment on the jury verdict was entered"). "Post-judgment interest shall be awarded for the entire amount included in the judgment, including prejudgment interest." *Purewick Corp. v. Sage Prod., LLC*, 666 F. Supp. 3d 419, 452 (D. Del. 2023).

## III.    ARGUMENT

Ferring's willful infringement was egregious—it based its product on patented technology at issue in this case and then embarked on a coordinated campaign to push Finch out of the market and drive up litigation expenses through meritless arguments and vexatious and deceptive litigation tactics. The jury considered the strength of Ferring's many theories and counterarguments to justify its behavior, and concluded that Ferring willfully infringed all Asserted Patents. Viewing Ferring's bad faith conduct and willfulness as a whole, the Court should significantly enhance the jury verdict and future ongoing royalty, in addition to awarding the pre-

and post- judgment interest that UMN and Finch are rightfully owed.

### A.    Ferring's Egregious Infringement Warrants Enhanced Damages Under *Halo* And All Nine *Read* Factors

Ferring's conduct easily clears the bar to award enhanced damages under *Halo*. The jury unanimously found their infringement "willful" (D.I. 480 at 3), which "is, without doubt, sufficient . . . to increase a compensatory damages award" under § 284. *Jurgens*, 80 F.3d at 1570; *accord Innovention Toys,* 667 F. App'x at 994. As detailed below, each *Read* factor weighs heavily in favor of sanctioning Ferring for egregious infringement. Respectfully, the Court should exercise its discretion and treble the jury's damages award.

### 1.    *Read* Factor No. 1: Defendants deliberately copied UMN's and Finch's technology.

The first *Read* factor asks "whether the infringer deliberately copied the ideas or design of another." *Read*, 970 F.2d at 827. Here, there is substantial evidence that Ferring deliberately copied UMN's patented methods of FMT treatment and Finch's patented FMT products. This factor favors enhancement. *See, e.g.*, *Trs. of Columbia Univ. City of New York v. Gen Digit. Inc.*, 2023 WL 8699435, at *10-11 (E.D. Va. Sept. 30, 2023) (finding copying supported enhancement where defendant was aware of provisional patent application and copied ideas behind the patent); *see also Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 114 (E.D. Tex. 2017) ("A patent need not have issued before the ideas of that inventor can be copied in bad faith.").

From the very beginning, Rebiotix closely studied UMN's technology and was aware of UMN's and Finch's patents and patent applications. For example, Rebiotix was aware of the parent application for the '080 and '309 patents "at least as early as November 19, 2012." (Trial Tr. at 344:18-22.) Rebiotix's Chief Business Officer, Greg Fluet, admitted that as part of his work for Rebiotix he reviewed patents assigned to Crestovo and UMN and that listed Dr. Khoruts or Dr. Borody as inventors. (*Id.* at 288:7-15, 289:3–6.) Mr. Berman admitted that "Rebiotix was aware

10

of the patents and patent applications from Finch and the University of Minnesota when it was going through the process of forming itself as a company and developing its products." (*Id.* at 572:15-19.) Ferring tracked the prosecution of the Asserted Patents, and was aware of the patents as of their dates of issuance. (Trial Tr. at 344:16-17, 344:23-24, 344:25-345:2.)

This was no accident. Rebiotix founder and CEO Lee Jones admitted that "Rebiotix got its original inspiration from the University of Minnesota." (Trial Tr. at 691:22-692:1.) Michael Berman, one of Rebiotix's co-founders, learned early on about Dr. Khoruts' work from his wife, Judy Berman, a professor at UMN. (PTX-52.0001.) Dr. Khoruts' work was relevant to technology that a company Mr. Berman had founded with Edwin Hlavka, was trying to develop. (Trial Tr. at 546:2-16.) Dr. Berman told Mr. Berman and Edwin Hlavka—Rebiotix's supposed "inventor"— about the UMN inventors to "discuss [their] research," related to what became the '914 patent. (TX-3166.0001-2.) Just "[t]wo weeks after Mr. Hlavka said to Dr. Khoruts that you have the first objective evidence for the mode of action for fecal transplant, Mr. Hlavka went out and filed his patent application." (Trial Tr. at 559:1-6.) Mr. Hlavka had no prior experience with FMT, is not a gastroenterologist, and is not a biologist. (Trial Tr. at 568:3-18.)

Around the same time, Ms. Jones found herself in a position of trust with UMN, signing an NDA "[t]o assist the University in reviewing and evaluating technologies and business opportunities" in early April 2011 as she became a CEO-in-residence for UMN. (PTX-397.0001; Trial Tr. at 646:15-17, 686:12-687:1.) As a result, Ms. Jones gained access to UMN's confidential information, including the provisional application for the '914 patent and a "Stage Gate" document, which includes technical information describing the invention to be patented, and used by UMN to evaluate the research that went into the '914 Patent. (Trial Tr. at 381:23-383:16, 689:6-20, 689:24-690:10; PTX-402.0001; PTX-403; PTX-406.) Ms. Jones did not use this information

to "assist the University," but instead saved these materials to her personal file folders for her own company, titled "LeeJones UDrive\Documents\Lee's documents\***newco ideas***\Cdif info" and "\User Shares\ljones\Documents\Lee's documents\***newco ideas***\***mikrobex***\clinical." (PTX-422.0023, PTX-423.0002, PTX-420.0010, PTX-421.0030 (metadata showing file paths with "newco ideas" and "mikrobex"). MikrobEX was a prior name for Rebiotix. (Trial Tr. at 697:15-20.) Ms. Jones took these files with her to Ferring. (Trial Tr. at 707:20-708:1 (Ms. Jones admitting that these documents were produced "out of Ferring's files in this litigation").)

Ms. Jones disseminated the information she obtained from UMN related to the '914 patent to other Rebiotix founders, consultants, and researchers to copy and implement into Rebiotix's product REBYOTA. On September 12, 2011, Ms. Jones sent Dr. Barbara Nelson—Rebiotix's Chief Technology and Commercialization Officer—a UMN presentation on "Intestinal Microbial Flora for Treatment of *Clostridium difficile* (C. diff)," explaining to Dr. Nelson that she "ha[s] a ton of things like this." (PTX-40.0001; PTX-42.0001.) This presentation described the ideas in the UMN invention and explained that UMN had a "Provisional Patent filed on 3/2/11"—the same provisional patent that led to the '914 patent. (PTX-42.0010.) Ms. Jones could not deny that she was "sending these confidential University materials to Dr. Nelson in connection with the work she was doing related to C. diff for MikrobEX." (Trial. Tr. at 712:20-25.)

In February 2012, Ms. Jones sent around the Hamilton paper to the other Rebiotix founders, Mr. Berman and Erwin Kelen, explaining that the paper was "[v]ery helpful to us." (PTX-47.0001; PTX-48; Trial Tr. at 268:14-269:12, 704:1-18, 705:8-15.) Rebiotix was aware that the Hamilton paper related to UMN's provisional application. Indeed, Mr. Berman forwarded the Hamilton paper to his wife Dr. Berman, who asked, "Do they have a patent application in?" (PTX-170.0001.) Mr. Berman responded, "Yes. I have not seen it. Lee has and thought it was very sciency." (*Id.*)

12

Less than two weeks later, Dr. Berman forwarded Mr. Berman information for an upcoming conference to be hosted by Dr. Khoruts with the subject line: "for Lee." (PTX-172.0001-2.) Rebiotix also advertised in its proposal to support a government contract with Advanced BioScience Laboratories that the "manufacturing process for RBX2660 ... was derived from the Hamilton procedure" (PTX-266.0005)—the same Hamilton procedure described in "Example 4 of the '914 patent" (Trial Tr. at 193:5-15, 384:22-385:4; PTX-1717; JTX-1.0027-32). Rebiotix's accompanying technical proposal  stated that Rebiotix's preparation for REBYOTA was adapted from Hamilton. (PTX-268.0002, 0026-27; Trial Tr. at 747:10-750:24.)

Although Ms. Jones initially gave the UMN inventors credit for their work, she eventually took steps to conceal Rebiotix's connection to the UMN inventors and their patented technology. For example, in an early business plan (Trial Tr. at 694:13-17), Ms. Jones stated that she "was *inspired by the work of Drs. Alexander Khoruts and Mike Sadowsky, researchers at the University of Minnesota*." (PTX-37.0001) (emphasis added.) She rightly noted that Drs. Khoruts and Sadowsky "created a simple solution to the horrible patient problem of debilitating diarrhea and colitis caused by an infectious, intestinal bacteria *Clostridium difficile* (*C diff*)." (*Id.*) But Ms. Jones subsequently modified that business plan to remove reference to UMN's invention. (PTX-38; PTX-39.0002.) Ms. Jones did the same in a public interview. While admitting that she "was working at the University of Minnesota" when "[a] couple of scientists came in and were talking about fecal transplants" (PTX-156.0001), Ms. Jones claimed she was "not concerned about" what the UMN inventors were doing because Rebiotix was "so far ahead of everybody else" (*Id.* at 3).

In private, however, Ms. Jones recognized the need for UMN's and what became Finch's patents. Ms. Jones emailed other Rebiotix founders about an opportunity to "pick up some IP and perhaps a relationship with Khorutz (*sic*) et al." (PTX-208.0001.) The opportunity related to a

potential investment in CIPAC, the Crestovo predecessor, which merged with Finch in 2017. (Trial Tr. at 243:6-11, 428:7-429:6.) CIPAC owned Dr. Borody's patents, including the family with the '080 and '309 patents, and Ms. Jones recognized him as "the pioneer of FMT who is from Australia." (PTX-208.0001.) Mr. Berman replied, agreeing "that the key issue will be IP." (*Id.*)

Despite that, Rebiotix, and later Ferring, never took a license to that IP and never paid Finch or UMN anything for copying their inventions. (Trial Tr. at 237:11-15, 574:18-20, 718:23-719:2, 965:25-966:2.) In March 2018, Rebiotix merged with Ferring. (Trial Tr. 569:23-570:4.) Although Ferring suggested—without providing aspects of that analysis over which it claimed privilege—that its pre-merger analysis showed non-infringement (this is wrong, as discussed below with Factor 2), Ferring's own actions belie that assertion. Despite its analysis, Ferring specifically called out the Finch and UMN patents in the merger agreement and acknowledging the significant patent infringement risks required the Rebiotix founders to be personally liable for any licensing or litigation fees associated with "patents owned or controlled by Crestovo, LLC and/or Finch Therapeutics Group, Inc., or their affiliates."[4] (PTX-757.0001, 24.) Assuming that risk was worth it to Rebiotix and Ferring. Rebiotix's shareholders received $175 million for the sale of Rebiotix to Ferring. (Trial Tr. at 574:11-17.) Ferring projected peak-year revenue for sales of REBYOTA to reach over $300 million with $2.1 billion in expected revenue by 2031. (PTX-241.) Only after initiating this litigation did Ferring remove the founders' obligation to contribute toward litigation, in exchange for which Rebiotix shareholders agreed to substantially reduce their payouts, itself a clear indication that Ferring and Rebiotix knew full well of the materiality of the risk that a jury would ultimately find them liable. (Trial Tr. at 714:13-715:17.)

---

[4] Ferring and Rebiotix described those patents in their merger agreement as the "Identified Patents," which included both the parent patent applications to the asserted UMN patent and the asserted Finch patents. (PTX-757.0001, 24; PTX-56.0248.)

After the merger, Ferring was "reminded" of these "patent infringement issues," but opted to engage in tactics to conceal its infringement (*see* Factor 9) while forging ahead with REBYOTA without a license. (PTX-298.0001.) Weighing this evidence, the jury found that not only that Ferring infringed claims of patents it knew about, but that it had done so willfully with respect to every patent, confirming that Ferring copied the work claimed in the UMN and Finch patents.

###### 2. *Read* Factor No. 2: Ferring was aware of UMN's and Finch's patent protection but did next to nothing to investigate those patents.

The second *Read* factor looks at "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." *Read*, 970 F.2d at 827. Ferring was well aware of the Asserted Patents, as explained in Factor 1. Despite its awareness of the Borody patents, and the parent applications to the UMN patents, Ferring presented no evidence of any belief it did not infringe those claims, and does not have an advice of counsel defense. (Ex. 2 (June 16, 2023 Ferring Resp. to Plaintiffs' Interrog. Nos. 1-7) at 16; July 17, 2023 Discovery Conf. Tr. at 14:5-6.) Solely for the '914 patent, Ferring relies on a pre-merger analysis that it claims supports non-infringement of the UMN patents, but this analysis merely confirms it had no good faith belief in noninfringement.

Ferring's "analysis" consists of testing related to the claim limitation that the "fecal extract or preparation is capable of passing through a 0.5 mm sieve"[5] which relates to claim 7 of the '914 patent. (TX-3768 at 3.)  This was just optics, and Ms. Jones confirmed as much, after the merger, when she advised her employees that terminology using "approximately" in front of "0.5 mm" was important in documentation to avoid "patent infringement issues." (PTX-298.0001; Trial Tr. at 716:8-717:15.). Ferring also knowingly used a 0.5 mm pore size for manufacture. (Trial Tr. at

---

[5]   The '914 Patent is a continuation of U.S. Patent Application No. 15/173,134 (JTX-1.0001), which is the patent application described in Ferring's analysis (TX-3768 at 3).

756:8-17, 757:9-12, 758:10-22.) And, as discussed above, Ferring recognized the weakness of this analysis, insisting that Rebiotix be on the hook personally for any future licensing and litigation costs associated with the asserted patents. (PTX-757.0001, 24; PTX-56.0020-21, 248.) Critically, despite the mountain of evidence confirming that Ferring itself believed its product is capable of passing through a 0.5mm sieve, its sole non-infringement argument at trial for the '914 patent was directed to that requirement. (Trial Tr. at 792:22-793:19, 1231:10-24.) The jury rightly rejected that argument, and found Ferring not only infringed but willfully infringed the '914 Patent.

Overall, this factor favors enhancement. *EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 51 (D.N.J. 2021) (weighing this factor in favor of enhancement where infringer "appeared less than confident that they did not infringe [patent holder's] patents").

### 3. *Read* Factor No. 3: Ferring's behavior at every stage of this litigation warrants enhancement.

The third *Read* factor evaluates "the infringer's behavior as a party to the litigation." *Read*, 970 F.2d at 827. Ferring took a scorched earth, indefensible approach to litigating this case. In fact, "the record is replete with instances where Defendants pursued a course of conduct that had the effect of unduly burdening the Court with unnecessary matters and prolonging the litigation." *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 752 (N.D. Ohio 2010). This factor also favors enhancement.

### a. Ferring concealed its relationship with Dr. Borody while seeking sanctions against Finch based on allegations it knew were false.

Dr. Borody was a central figure to Ferring's case. K&E originally represented Dr. Borody, an inventor of two asserted patents, in connection with responding to Ferring's subpoena. But after Dr. Borody claimed "Finch hasn't reimbursed [him] for [his] patent development costs," he sent K&E a letter demanding "USD$18 million" and "27 million fully paid ordinary shares" in Finch,

lest his testimony would "not assist Finch." (TX-4241.9 (not admitted); TX-4239.2 (not admitted); TX-4246 (not admitted); TX-4248 (not admitted).) K&E withdrew as his counsel. (TX-4239.2; TX-4250.1 (not admitted).) Because Finch and UMN were fully transparent about disclosing these developments, Ferring, and the Court, knew all of this in June and July 2023. At the time, Ferring did not pursue a deposition of Dr. Borody and falsely claimed they were not talking to him. (D.I. 431, Ex. A; TX-4249.3; (D.I. 466 (Ferring-Borody Video from July 5, 2023) at 6:09-49; D.I. 377, Ex. 17.5 at Ex. 3 (stating "[w]e have not been in contact with Dr. Borody" on July 27, 2023).)

Ferring then launched its wholly-improper Borody strategy. It first moved to dismiss the Borody patents for lack of standing, arguing that documents that expressly stated "[e]ach of the Parties," including Dr. Borody, "does hereby irrevocably convey, transfer, assign and deliver unto Crestovo all right, title and interest in and to the Assets," which was defined to include Dr. Borody's patents, did not mean what they said. (D.I. 209 at 12; D.I. 210, Ex. 16.) After losing that motion (D.I. 341), Ferring produced documents in June 2024 that it obtained from Dr. Borody, yet Ferring would not say how or when they came into possession of those documents (and did not reveal that it had been meeting with Dr. Borody for purposes of defeating his own patents). Ferring also put a K&E attorney (and Dr. Borody) on its witness list, claiming the K&E attorney's testimony was required to authenticate certain of these newly produced documents. The final piece to Ferring's Borody strategy was its motion *in limine*, which argued that Finch and UMN "deprived Ferring the opportunity to depose Dr. Thomas Borody" because "Finch allowed Dr. Borody to unilaterally cancel his deposition." (D.I. 377, Ex. 18.5 at 1.) Based on Ferring's theory, it sought the sanction of an adverse inference that "Dr. Borody's testimony would have been unfavorable to Finch and the admission of documents that could have been authenticated through Dr. Borody's deposition testimony." (*Id.*) Ferring knew the premise of its motion, *i.e.*, that K&E and Finch were

complicit in Dr. Borody's cancellation of his deposition, was false but pursued sanctions nonetheless while hiding key facts from this Court.

Ferring's plan began to unravel at the pretrial conference, when Ferring's counsel was forced to admit that it had "spoken to Dr. Borody and gotten his version of events." (D.I. 492 (PTC Tr.) at 141:17-25.) The Court ordered Ferring to make Dr. Borody available for a deposition if he was, in fact, coming to trial. (*Id.* at 149:4-150:15.) Three days after the pretrial conference, Ferring advised UMN and Finch that Dr. Borody would sit for a deposition the Saturday before trial started. (D.I. 407.) Ferring also began producing documents, which laid bare the extent of its entanglement with Dr. Borody, all of which it had consciously concealed from UMN, Finch, and the Court for as long as it possibly could. Those documents included:

- an April 2024 in-person meeting among Dr. Borody, his Australian counsel, and Ferring's counsel in Australia at or after which Ferring came into possession of certain of Dr. Borody's documents;[6]

- an April 2024 consulting agreement between Dr. Borody and Ferring, signed by Ferring's counsel, that agreed to pay Dr. Borody 30,000 AUD/day for his testimony and indemnifying Dr. Borody for any breach of his obligations to UMN and Finch;

- a declaration from Dr. Borody signed in July 2024 in Delaware, claiming his patents were invalid and that he had never assigned them, that was apparently force-fed to him by Ferring;[7] and

---

[6]  Amongst the electronic documents, there are two handwritten notes that supposedly relate to Dr. Borody's payment (or alleged lack thereof) from Finch. Ferring has never explained when or how it came into possession of those documents, or provided any basis to establish their authenticity, despite plainly intending to rely on them at trial. (TX-3453 (not admitted); Ex. 3 (BORODY_FER00000186); July 31, 2024 Hr'g Tr. at 116:3-119:14.) Nor did Ferring ever produce the originals of those documents Ferring claimed were found late in the process, despite multiple requests by Finch and UMN that it do so. Ferring's attempt to ignore that issue draws further concern, and Ferring should be ordered to provide those originals now, so they can be examined by Finch/UMN and this Court in connection with this motion.

[7]  Although Dr. Borody's sworn declaration, written with assistance from Ferring's counsel, suggests that he believes his patents were invalid, Dr. Borody testified to the opposite. (Ex. 4

- an invoice from Dr. Borody to Ferring's counsel for over 300,000 AUD.

Ferring's counsel inexcusably did not disclose any of this information to the Court during the pretrial conference.

After further briefing by the parties, the Court ordered a hearing the afternoon of July 31, at which Dr. Borody testified. Just before the hearing, Ferring produced a Zoom recording of a July 2023 meeting between Dr. Borody, his Australian counsel, and a Ferring representative. The video revealed that Ferring knew in at least by July 2023 that Dr. Borody's counsel is the one who advised him to cancel his deposition—*i.e.*, not K&E, even though Ferring alleged that in support of it motion for an adverse inference. (D.I. 466 (Ferring-Borody Video) at 5:28-45 ("I simply said look we're not going to cooperate until this issue is resolved").) If Ferring and Dr. Borody could enter a deal regarding Ferring's purchase of Dr. Borody's IP, Dr. Borody also promised to help Ferring in any way he could in this litigation. (D.I. 466 (Ferring-Borody Video) at 7:45-58 ("we would like to do a deal with Ferring and Rebiotix that sees Ferring own all of the IP in the fecal microbiota transplant space"), 13:13-18 (the deal would "help[] Ferring effectively collapse Finch's case"), 17:10-22 ("Finch actually has the intellectual property to have Ferring suffer in the courts. They're gonna lose, if I was to help them or if they used my IP").) Ferring was willing to oblige, with Ferring's counsel subsequently identifying several of Dr. Borody's patents that Ferring was interested in licensing. (D.I. 431, Ex. F.)

The extent of Ferring's misrepresentations—almost exclusively statements by Ferring's co-lead counsel—were exposed at the July 31 hearing and through Ferring's document production. At that hearing, Ferring's counsel was forced to admit that, while Ferring sought sanctions based on allegations that Finch and its counsel had caused Dr. Borody to cancel his deposition (D.I. 377,

---

(Borody Dep. Tr.) at 17:18-24, 95:17-20, 97:10-17, 146:13-17, 158:20-23, 159:19-160:1.)

Ex. 18.5 at 1-2), it had not even asked Dr. Borody why he did not sit for his deposition—a claim that itself is dubious given the many meetings Ferring had with him while he was on Ferring's payroll as a consultant. (July 31, 2024 Hr'g Tr. at 114:4-115:5.) This was not hard information to come by: when asked by the Court, Dr. Borody openly stated that, while he "do[es] not recall that very well," **none of "Finch's attorneys or any attorneys from K&E t[old] [him] to cancel [his] deposition."** (*Id.* at 48:6-49:1, 53:8-14) (emphasis added.)

Ferring's vexatious and prejudicial conduct does not end there. A table summarizing Ferring's representations and the evidence demonstrating those representations were, at best, substantially lacking in candor is below:

| Ferring's Statement | Documents Contradicting Ferring's Statement |
|---|---|
| Ferring's counsel via email to Finch on July 27, 2023: "We have not been in contact with Dr. Borody." (D.I. 377, Ex. 17.5 at Ex. 3.) | Ferring's counsel via email to Dr. Borody's lawyer on July 17, 2023: "we suspect we will need more corroboration around the May 2015 transaction" (D.I. 431, Ex. A.)<br><br>Dr. Borody's lawyer to Ferring on July 5, 2023: "I reached out to Ferring/Rebiotix lead counsel, … and *we've had a number of discussions on an open basis*, which means anything I tell her she can use in the proceedings. … We'd like to do a deal with Ferring/Rebiotix, and I explained that to [Ferring's counsel]." (D.I. 466 (Ferring-Borody Video) at 6:09-49.) |
| Ferring's counsel at July 23, 2024 pretrial conference: "[I]s Dr. Borody going to show up at trial? I have no idea. He's in Australia." (D.I. 492 (PTC Tr.) at 140:11-13.)<br><br>Ferring's counsel at July 23, 2024 pretrial conference: "[Dr. Borody] knows when trial is. I'm not aware of him having a ticket. He knows when the trial is. I think there is a decent chance that he will show up, but I don't control him. I don't - we don't represent him, we don't control him." (*Id.* at 141:11-15.) | Dr. Borody's Australian Lawyer on July 21, 2024: "Apart from wanting to discuss the payment of Tom's actual and/or anticipated expenses, I would like to find out what assistance (if any) you need from me before Tom travels to Delaware for the trial." (D.I. 431, Ex. H at FER_RBX03012762.)<br><br>Dr. Borody at July 31, 2024 hearing: "Q. when did you know you were coming to the US for purposes of the trial? A. I mean, I can't give you a specific date, time and second, but it would've been a couple of three weeks, four weeks ago." (July 31, 2024 Hr'g Tr. at 71:23-72:4.) "Q. But you knew you were coming before the ticket was booked? A. Yes, yes. I wouldn't be booking a ticket without knowing." (*Id.* at 73:20-23.) |

| | |
|---|---|
| Ferring's counsel at July 23, 2024 pretrial conference: "I would not say that we have prepped him for trial. We have - in a strong sense, we have spoken to him about the subject matter that he might be able to testify to and we have obtained his version of events with respect to this question. So I don't want to parse words with the Court, I just want to be clear about what happened. But yes, we have spoken with him and we have gotten his version of events." (*Id.* at 141:18-25.) | Dr. Borody's invoice for expenses June 30-July 12, 2024: "Meeting Day with [Ferring's counsel] – discussion regarding testimony on day of hearing." (D.I. 431, Ex. H at FER_RBX03012763.) <br><br> Ferring's counsel via email to Dr. Borody's lawyer on June 27, 2024 setting up a meeting for "trial prep discussion." (D.I. 431, Ex. G.) <br><br> July 10, 2024 declaration from Dr. Borody (D.I. 467, Ex. C.) |
| Ferring's counsel at July 23, 2024 pretrial conference: "I do want to take up the issue of Ms. Ross' deposition. … the only witness who we possibly could call to authenticate them was Ms. Ross. We repeatedly and consistently said as long as they would stipulate to authenticity we had no interest of putting her on the witness stand in front of the jury and then ultimately they agreed to that deal." (*Id.* at 139:18-140:4.) | Ferring Counsel Email on June 4, 2024: "Ashley Ross is a percipient witness **on a number of issues**. . . . Nevertheless, we may consider withdrawing her as a witness if you confirm you will accept service of the subpoena for Mr. Blischak, and stipulate to the **admissibility** of emails as to which she is a custodian on the issues recited above.") (Ex. 5 (June 4, 2024 M. Chivvis Email) (emphasis added).) <br><br> July 15, 2024 Email from Finch and UMN: "Regarding authenticity of the Borody documents, UMN/Finch's position has been and continues to be that it would stipulate to authenticity of the documents in question but not admissibility and that it reserves all rights to challenge admissibility on any other grounds, including at least hearsay (among others), as we explained on the parties' meet and confer some weeks ago and as Adam explained to Daralyn back in June. That position has not changed." (Ex. 6 (July 15, 2024 A. Cade Email).) |

This not only improperly threatened Finch's case, but also caused Finch and UMN to continue expending resources on this issue on the eve of trial, and materially diverted numerous members of Finch's trial team from their trial preparations. It was only after the Court issued an order the morning of August 1, 2024 indicating a ruling was imminent that Ferring agreed it would not call Dr. Borody or pursue its standing defense. In other words, Ferring waited until the last possible minute to pull the plug on its Borody strategy, and only did so when it was clear that the

Court was considering "whether some or all of the testimony of Dr. Borody should be excluded pursuant to" various means of exclusion including the "Court's inherent power to sanction bad faith litigation conduct," "to address violations of Delaware Rules of Professional Conduct," and "to exclude fact witnesses as a sanction for the wrongful payment of fact witnesses." (D.I. 440.) Ferring's conduct put the burden on UMN, Finch, and the Court to catch its misrepresentations, omissions, and lack of candor in the face of aggressive—and false—attempts to impugn Finch and its counsel's behavior to obtain a litigation advantage. That is not how litigation is supposed to work, and allowing Ferring to walk away with the only consequence being not calling a witness it did not even want to call in the first place (since its first order relief was sanctions against Finch and an adverse inference regarding Dr. Borody) will only encourage Ferring's counsel and others to engage in the very same egregious conduct time and again before this Court and other courts throughout the country. Quite simply, that outcome cannot be countenanced.

**b.    Ferring raised meritless infringement allegations and sought to misuse its patent.**

Ferring also sought to obtain leverage over UMN and Finch with baseless threats based on Ferring's own patents, and it further attempted to inject its patents into the trial in this case to distract the jury from the relevant issues. Around March 14, 2024, Ferring threatened UMN with its own patent infringement accusations, and sought to add infringement claims and an unclean hands defense to this case. (D.I. 319, ¶¶ 3-4.) Ferring knew its infringement claims were meritless. As a public state university, UMN is afforded sovereign immunity under the Eleventh Amendment, and Ferring agreed to drop its infringement claims on that basis. (D.I. 324 at 17-18.) But the purpose of Ferring's threats were already served—Ferring's "bullying" and "threatening" "sen[t] jitters through the institution." (Trial Tr. at 166:4-12.) Ferring's unclean hands defense was likewise based on its own patents, claiming that if UMN "assert[s] sovereign immunity as a defense

22

to an infringement action," "the only way for Ferring to obtain at least partial relief for UMN's infringement is via an equitable defense in this action." (D.I. 317 at 2.) The only court to consider such a request previously rejected it as "bogus." (D.I. 324 at 2.) And while Ferring had a window at trial to attempt to make this sovereign-immunity argument (D.I. 492 (PTC Tr.) at 75:15-76:11), Ferring never pursued the outlandish argument further. Recognizing that its infringement claim and unclean hands would go nowhere, nevertheless Ferring tried to inject its patents into the case a third way, through its technical and damages experts. That, too, was unsuccessful. The Court denied Ferring's attempt to serve supplemental reports, which "represent[ed] a backdoor attempt to raise a claim for Finch/UMN's infringement of Ferring/Rebiotix's patent." (D.I. 342.)

Although Ferring's assertions regarding its patent were focused on UMN, its strategy was intended to negatively impact Finch, too. Ferring is, and has been, well aware of Finch's precarious financial circumstances throughout this case, *see, e.g.*, D.I. 213 at 3; D.I. 285 at 1; D.I. 324 at 13-14; D.I. 352 at 2, 9, and repeatedly tried to exploit that fact by seeking to delay and to unnecessarily add to the scope of this case, *see, e.g.*, D.I. 212 (seeking to stay the case); D.I. 317 at 5-6 (seeking late addition of a counterclaim and unclean hands defense that would require "additional discovery"); D.I. 337 at 2-4 (seeking leave for late supplementation of its expert reports); D.I. 348 at 1, 4-5 (seeking continuance of the trial date); D.I. 358 (seeking delay of the trial date). Maintaining the trial date was paramount to Finch's ability to stay in business. Ferring knew this and did everything it could to push Finch to the brink of extinction prior having a jury hear of its willful infringement of Finch's patents.

### c.    Ferring repeatedly flouted the Court's rulings.

Ferring's "failure to obey orders of the court" by itself constitutes "litigation misconduct" under the third *Read* factor. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010). Ferring violated, or came very close to violating, the Court's rulings on the parties' motions *in*

*limine* and the parties' agreements regarding the same. As discussed at the pretrial conference, with respect to Ferring's motion *in limine* number 1, the parties agreed that UMN and Finch "would not reference the declaratory judgment filing unless something unexpected happened at trial" such as a statement that UMN/Finch "sued first." (D.I. 492 (PTC Tr.) at 6:4-12.) But Ferring chose to do precisely that, multiple times. During Ferring's opening statement, Ferring's counsel described Finch's business as being "to sue us and make money." (Trial Tr. at 78:8-10.) During cross-examination of Kevin Anderson, Ferring's counsel asked whether "the University amended its license with Finch to say that Finch could meet its milestones, like these, if it proved that it was pursuing an infringement lawsuit ... like this lawsuit." (*Id.* at 245:23-246:5.) The Court stated that these statements "came very, very close" to violating the parties' agreement. (*Id.* at 308:21-309:9.)

With respect to Finch's motion *in limine* number 4, the Court noted "concessions from Ferring that we're not going to use [Lee Jones and Hlavka] patents to say we don't infringe or that we were practicing the prior art or that we weren't willfully infringing." (D.I. 492 (PTC Tr.) at 123:18-124:1.) But during closing argument, Ferring did exactly that. In describing how Rebiotix and REBYOTA were developed, Ferring's counsel stated that Ms. Jones "moved forward, using as a foundation, that intellectual property from Hlavka, ***which resulted in this issued patent***, as well as making additional innovations ***that resulted in additional patents***, including ***this patent that was issued to Lee Jones***." (Trial Tr. at 1186:9-14 (emphasis added).) And when discussing the "question of willfulness, of willful infringement," Ferring's counsel argued that "Ms. Jones filed her provisional application in June of 2013" and so "storing the REBYOTA at minus 80 for more than 12 months and that it was stable during this long-term storage ... became public." (*Id.* at 1230:16-17, 1232:6-1233:12.) Not only was Ferring's counsel arguing that the jury should not find willful infringement because Ms. Jones had her own patent(s), Ferring's counsel was arguing

24

that REBYOTA practiced the prior art, *i.e.*, what was public from Ms. Jones' patent publication. Ferring's willingness to disregard or otherwise skirt this Court's orders and authority is beyond clear, and these facts too favor enhancement. *i4i Ltd. P'ship*, 598 F.3d at 859; *Tinnus Enters., LLC v. Telebrands Corp.*, 369 F. Supp. 3d 704, 721-22 (E.D. Tex. 2019) (finding *Read* factor 3 favored enhancement where defendants "ignored the Court's repeated ruling" on a motion *in limine*).

### d. Ferring tried to sandbag UMN and Finch at trial with new, undisclosed non-infringement and invalidity arguments.

Ferring engaged in hide-the-ball tactics regarding the defenses it would actually present at trial. Since this case's infancy, Ferring asserted a wide variety of non-infringement and invalidity defenses. But Ferring did not drop its obviousness argument with respect to the UMN patent until June 27, 2024, less than two months before trial. (D.I. 377, Ex. 18.4 at 1.) Ferring never disclosed which prior art combinations Dr. Britton would present regarding the Finch patents. (*See* D.I. 298.) Ferring never told UMN/Finch it would not contest infringement of the "treatment" element of the '309 patent. And Ferring failed to inform UMN/Finch that it had no intention of presenting any non-infringement argument with respect to the '080 patent. As explained above, Ferring only relented on its standing defense after facing potential sanctions. Ferring was also not forthcoming regarding the witnesses it intended to call at trial—during trial itself. Ferring claimed it was calling Kurt Karst (one of its infringement experts) and Matthew P. Blischak (Finch's CEO) and waited until Tuesday at 7:23 pm—14 hours before they were expected to take the stand—to confirm it did not plan to call either of them. (Ex. 7 (Aug. 6, 2024 S. Blake Email).) In an attempt to avoid prejudice associated with this conduct, Finch explicitly requested, during trial, that Ferring clarify which witnesses it would actually call (Ex. 8 (Aug. 2, 2024 M. Chivvis Email)), Ferring refused, thereby causing Finch to unnecessarily spend trial time to address defenses that would never be presented. This led to a highly prejudicial imbalance in trial time: for example, it afforded Ferring

nearly two hours of time for its lengthy closing argument, compared to just over an hour for Finch.

Ferring also attempted to raise new arguments for the first time at trial. For example, Ferring repeatedly tried to encourage the jury to compare irrelevant aspects of REBYOTA to the products developed by UMN/Finch to suggest that that those alleged differences meant REBYOTA did not infringe. That is, of course, not the proper comparison. *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1583 (Fed. Cir. 1995) ("Literal infringement exists if each of the limitations of the asserted claim(s) read on, that is, are found in, the accused device."); *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481-82 (Fed. Cir. 1984) ("Infringement is not determined by comparison between … commercial products sold by the parties."). Yet, in its opening statements, Ferring laid out an extensive comparison between the UMN/Finch process for manufacturing CP101 and the process for manufacturing REBYOTA, stating "[t]hat's not what we do," "[i]t's a very different process." (Trial Tr. at 64:20-66:19 (showing the jury a demonstrative comparing UMN's manufacturing process to Ferring's).) Ferring repeatedly came back to this argument, asking Lee Jones, Courtney Jones, and Dr. Johnson whether the manufacturing process for REBYOTA uses a "centrifuge," (*Id.* at 658:11-13, 760:15-17, 793:20-22), or a "series of four sieves," (*id.* at 657:12-17, 760:12-14, 793:23-794:5), or a "blender," (*id.* at 655:20-23, 760:10-11, 794:19-20). But the asserted claim of the '914 patent does not require use of a centrifuge, metal sieves, or a blender. (JTX-1.0032-33.) And worst of all, Dr. Johnson argued that because prune baby food did not pass through a 0.5 mm sieve in his live demonstration, that likewise means REBYOTA would not pass through and would not infringe—despite representations from Ferring's counsel that he would do no such thing. (Trial Tr. at 778:13-780:14; Ex. 9 (Aug. 6, 2024 Email from R. Fisher).)

Ferring's invalidity expert, Dr. Britton, also raised arguments he never disclosed in his

expert reports. Nowhere in any of Dr. Britton's expert reports does he ever argue that the Hlavka patent applications disclosed an antioxidant, or that PEG is an example of an antioxidant. In fact, during his deposition, Dr. Britton specifically confirmed that "Hlavka did not disclose an antioxidant." (Trial Tr. at 897:7-20.) Yet during his testimony, Dr. Britton argued that PEG is an antioxidant and so Hlavka disclosed an antioxidant. (*Id.* at 884:4-12, 896:21-897:2.) This is improper and had a material impact on the case given that the only two claims the jury invalidated were those reciting an antioxidant. (D.I. 480.)

Ferring's injection of these undisclosed defenses at trial "had the effect of unnecessarily clouding the true issues at trial." *Saint-Gobain*, 707 F. Supp. 2d at 752-53 (holding that defendants who raised a new defense in opening statements, dropped the defense "without explanation," and then continued to reference to the defense until the court prohibited them from doing so engaged in misconduct weighing in favor of enhancement).

### 4. *Read* Factor No. 4: Ferring has worldwide operations and earns billions of dollars in revenue.

The fourth *Read* factor focuses on the infringer's "size and financial condition." *Read*, 970 F.2d at 827. There is little question that Ferring is a "large company with extensive financial means." *Metabolite Labs., Inc. v. Lab'y Corp. of Am. Holdings*, 370 F.3d 1354, 1371 (Fed. Cir. 2004). This factor favors enhancement. *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 528 (D. Del. 2008) (where defendant is a large company that generates billions per year in revenue, "[a]n enhanced damages award will not jeopardize defendant's financial well-being; this factor favors enhancing damages"); *IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 222 (D. Del. 2007) ("It appears that defendant is a large company and in good financial condition sufficient that defendant would not be materially impacted by an enhanced damages verdict.")

Ferring is an international conglomerate "employ[ing] more than 7,000 people worldwide,"

"has operating subsidiaries in more than 50 countries and market[s] its medicines in over 100 countries." (Ex. 10 (Ferring's 2023 Annual Rpt.) at 16.) This Court has recognized that Ferring is a "large multi-national pharmaceutical company." (July 17, 2023 Hr'g Tr. at 39:17-20.) In connection with the release of its 2023 annual report, Ferring announced that "the company's annual revenues were €2.2 billion" for 2023 and highlighted that the "[l]aunch[] of Rebyota ... provide[s] major mid- to -long-term opportunities for the company to diversify into new therapeutic areas." (Ex. 11 (Apr. 9, 2024 Ferring Press Release).) Ferring's public recognition of the commercial "opportunities" associated with the "[l]aunch[] of Rebyota" stem from the fact it expected revenues from sales of REBYOTA to reach $2.1 billion by 2031 and has seen steady increase in sales of REBYOTA since it launched in early 2023. (PTX-241; PTX-1730; PTX-1732.)

Conversely, Finch is a much smaller company whose "cash flow w[ill] only last into 2025" and had to "discontinue development of its competing drug ... due to factors including the unauthorized use of its intellectual property." (D.I. 285 at 1; D.I. 324 at 14.) This Court recognized that "Finch is a much smaller, possibly even in the category of start up, but certainly a much smaller company." (July 17, 2023 Hr'g Tr. at 39:21-23.) And UMN is a public state university whose mission is trifold: (1) "research;" (2) "education;" and (3) "service." (Trial Tr. at 215:3-9.)

In this case, Ferring deliberately leveraged its size—including by launching REBYOTA despite identifying infringement issues associated with the asserted patents, *see* PTX-757.0024; PTX-56.0248, PTX-298.0001—to harm UMN/Finch. *See St. Regis Paper Co. v. Winchester Carton Corp.*, 410 F. Supp. 1304, 1309 (D. Mass. 1976) ("If defendant were the giant and plaintiff the small independent, I would make [the enhancement] treble."). As other courts have noted, a multi-million verdict "may sound large in the abstract, but in context it may not be enough, without enhancement, to deter infringing conduct" for a "multi-billion dollar company with reported

annual profits" of hundreds of millions of dollars. *Stryker*, 2017 WL 4286412, at *5. The same is unquestionably true here. Tripling the jury's award would amount to just over 3% of one year of Ferring's revenues, and is necessary here to deter Ferring's infringing conduct.

### 5. *Read* Factor No. 5: This case was not close.

The fifth *Read* factor weighs the "[c]loseness of the case." *Read*, 970 F.2d at 827. This case was not close. UMN and Finch prevailed on nearly every substantive issue in this litigation. UMN and Finch prevailed while contending with Ferring's attempted distractions from weak substantive defenses with baseless arguments premised on serious misrepresentations, as explained above in Factor 3. This factor also favors enhancement. *See, e.g.*, *nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 390 (D. Del. 2004) ("the Court finds that the case for literal infringement was not a close one where the jury found literal infringement on each of the asserted claims").

In addition to pretrial, claim construction, and Daubert rulings favorable to Finch, the jury found infringement of every asserted claim. Ferring offered no evidence that it did not infringe the '080 patent. *See Bos. Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 279 (D. Del. 2012) (awarding enhanced damages where Defendant "did not contest infringement"). Ferring's only non-infringement arguments for the '309 patent was that REBYOTA is not a treatment, which it never presented evidence for,[8] and that the fecal bacteria in REBYOTA are not separated from rough particulate matter, which even Dr. Johnson's testimony demonstrated was inaccurate. (Trial

---

[8] The asserted claims of the '309 patent require that "the pharmaceutical composition is in an amount effective for **treating** recurrence of *C. difficile* infection." (JTX-4.0031 (emphasis added).) Ferring's only technical expert on infringement admitted during trial that "the point of REBYOTA is to treat C. diff." (Trial Tr. at 807:7-9.) Ferring explicitly told the FDA when seeking approval for REBYOTA that REBYOTA "demonstrated efficacy for the treatment of recurrent *C. difficile* infection." (PTX-142.0074-75; PTX-1632 at 1:25:55-1:26:16; Trial Tr. at 322:5-16.) Ferring's clinical trials both were intended to demonstrate and did indeed demonstrate that REBYOTA is effective "for the Treatment of Recurrent *Clostridium difficile* Infection." (PTX-118.0003; PTX-1690.0002; Trial Tr. at 318:21-319:7, 320:19-321:10.)

Tr. at 807:7-9.) As explained above, Ferring believed there was a significant risk that it infringed based on the same argument it presented to the jury for the '914 patent. Ferring insisted on pursuing this argument at trial despite admissions from its employees and FDA documentation that REBYOTA was, in fact, capable of passing through a 0.5 millimeter sieve. (Trial Tr. at 736:10-15, 755:17-25 ("the pore size of the filter bags" is "0.5 millimeters"); PTX-217.0026 (FDA documentation stating REBYOTA process requires "500 micron pore size"); PTX-940.0001 (Seward specifications for its strainer bags, describing "pore size 0.5mm"); PTX-298.0002 (Ferring employee acknowledged that "the pore size of the strainer bag filter is 0.5 mm.").)

The jury also agreed that Ferring's infringement was willful, a finding there was ample evidence to support, as described in Factors 1 and 2. (D.I. 480 at 3.) Ferring's primary response was to claim that Mr. Hlavka was first, even though his patent was only prior art to the '914 patent. Ferring also argued in closing that it was not a willful infringer because it had its own patent—but that argument violated a motion *in limine*. (Trial Tr. at 1186:9-1187:20; D.I. 492 (PTC Tr.) at 114:11-15, 123:10-124:1.) This is all the more egregious given Mr. Hlavka's reliance on the UMN inventors for the basis of his patent. *See supra* § III.A.1.

With respect to invalidity, Ferring lost its § 101 summary judgment motion under *Alice* Step 1. (D.I. 421 at 2; D.I. 492 (PTC Tr.) at 51:7-52:18.) Leading up to trial, Ferring claimed it would raise defenses of non-infringement and validity based on 35 U.S.C. §§ 101, 103, and 112. That, however, was merely a continuation of Ferring's hide-the-ball tactics, and once trial was upon it, Ferring dropped all of its invalidity defenses for the Finch patents except obviousness and all of its invalidity defenses for the UMN patents except written description. And Ferring similarly dropped its equitable defenses and standing arguments at the very last minute. Although the jury concluded that two claims were invalid, that does not mean the case was close, particularly given

that Finch succeeded on the remainder of Ferring's invalidity defenses and nearly every other issue. *Stryker*, 2017 WL 4286412, at *5 ("The objective reasonableness the Federal Circuit found for a handful of Zimmer's litigation positions in no way detracts from the lopsided victory Stryker garnered on the core issues of liability, damages, and willfulness; indeed, on the whole course of the case in general."); *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, 2018 WL 2149736, at *11 (E.D. Tex. May 10, 2018) (finding *Read* factor 5 favored enhancement because "[a]lthough the case as a whole may have been close of light of TCL's success in convincing the Patent Office that all but one of Ericsson's asserted patents are invalid … the case presented at trial … was not close"), *vacated on other grounds*, 955 F.3d 1317 (Fed. Cir. 2020).

As to damages the jury awarded UMN/Finch $25,815,061, which is $25 million more than Ferring argued was warranted. (D.I. 480 at 5); *Stryker*, 2017 WL 4286412, at *5 (noting *Read* factor 5 favored enhancement where plaintiff won a "lopsided victory" on "damages"); *Whirlpool Corp. v. TST Water, LLC*, 2018 WL 1536874, at *7 (E.D. Tex. Mar. 29, 2018) ("The Court does not view this as a particularly close case" where "the jury awarded … far more than [defendant's] proposed damages."). Finally, the trial evidence "overwhelmingly favored a finding for Plaintiff, as is evidenced by the relatively short deliberations required for the jury to reach a unanimous verdict on all causes of action." *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 2009 WL 113771, at *2 (E.D. Cal. Jan. 15, 2009), *rev'd in part on other grounds*, 609 F.3d 1308 (Fed. Cir. 2010); *Tinnus Enters.*, 369 F. Supp. 3d at 723 (enhancement where "jury deliberated for just two-and-a-half hours"); *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 315 F. Supp. 3d 977, 1014 (N.D. Ill. 2018) (enhancement where defendant "lost on every issue at trial after less than two hours of jury deliberation"), *aff'd in part, vacated in part*, 935 F.3d 1341 (Fed. Cir. 2019).

6.   ***Read* Factor No. 6: Ferring's misconduct has continued unabated for years.**

31

The sixth *Read* factor addresses the "[d]uration of [infringers'] misconduct." *Read*, 970 F.2d at 827. Here, Ferring's misconduct directly underlies its infringement—beginning with its surreptitious acquisition and copying of the patented technologies—and goes back over a decade. Ferring "began willfully infringing the [asserted patents] ... they day the[y] issued, and continued doing so for" years. *Nox Med. Ehf v. Natus Neurology Inc.*, 2018 WL 4062626, at *6 (D. Del. Aug. 27, 2018) (finding three years of infringement supported enhancement). This factor favors enhancement. *Broadcom Corp. v. Qualcomm Inc.*, 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) ("The length of [the infringer's] infringement (approximately two years), coupled with the fact that infringement continued after [the patentee] filed its suit, supports an increase in damages."), *vacated on other grounds*, 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007). As detailed above for *Read* factor 1, Defendants gained access to the UMN inventors' work as far back as 2010 and 2011 through positions of trust with the University, and copied those inventions to develop REBYOTA. Instead of taking a license, Ferring chose to sue Finch and launched REBYOTA while this case was pending. Ferring did this despite a lack of good faith belief in non-infringement, as explained in Factor 2. And during this litigation, Ferring doubled down, raising a meritless defenses and arguments, as explained in Factor 3. This strongly favors enhancement. *See Johns Hopkins Univ. v. CellPro*, 978 F. Supp. 184, 195 (D. Del. 1997) (awarding enhanced damages noting that Defendant "started the battle by filing an action ... seeking a declaration [it] did not infringe the patents, at a time when they well knew they were infringing them").

### 7. *Read* Factor No. 7: Ferring took no remedial action.

The seventh *Read* factor examines the "[r]emedial action by the [infringer]." *Read*, 970 F.2d at 827. Here, Ferring took zero remedial action. Rebiotix founder and former CEO Lee Jones admitted they did not "chang[e] anything about the Rebiotix process or product to avoid infringing the University of Minnesota's or Dr. Borody's patents at issue in this case." (Trial Tr. at 717:23-

718:2.) Another Rebiotix founder Michael Berman admitted that "[a]fter Rebiotix learned of Dr. Borody's patents," Rebiotix did not "make any changes to its processes or product formulations in response to those patents." (*Id.* at 573:15-24.) And "despite the pendency of this litigation," Ferring "continued to manufacture and sell its accused [REBYOTA] product[] in the marketplace." *Finjan Software, Ltd. v. Secure Computing Corp.,* 2009 WL 2524495, at *16 (D. Del. Aug. 18, 2009) *aff'd in part, rev'd in part sub nom.*, *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010). Ferring knew it infringed and did it anyway. This strongly favors enhancement.

### 8.    *Read* Factor No. 8: Ferring deliberately set out to cause irreparable harm to UMN and Finch.

The eighth *Read* factor analyzes "[the infringer]'s motivation for harm." *Read*, 970 F.2d at 827. Where the parties are "direct competitors" and "an infringer engages in infringing conduct to gain an edge over the patentee in a competitive market, this factor favors an award of enhanced damages." *Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*, 2018 WL 6190604, at *32 (C.D. Cal. Nov. 4, 2018), *aff'd*, 798 F. App'x 643 (Fed. Cir. 2020). That is the case here, and this factor favors enhancement.

As explained above in Factor 1, although Ms. Jones was supposed to "[t]o assist the University in reviewing and evaluating technologies and business opportunities," she leveraged her position of trust to obtain information about UMN's inventions and use it in her business. Nothing changed when Ferring entered the picture. Both Ferring and Rebiotix recognized there was a significant infringement risk, but cast those concerns aside in service of greed, *i.e.,* to obtain what it internally referred to as "first mover advantage": "[T]he first product to market in a category ... gets some inherent advantages, kind of first-mover advantages, more likely to be prescribed, higher sales," etc. (Trial Tr. at 431:23-432:3.) If Ferring were first to market, UMN and Finch would "have a tougher row to hoe in terms of commercial sales." (*Id.* at 432:3-5.) Ferring

knew that the "first to market will certainly enjoy some exclusivity benefits" and would be able to "block others." (PTX-341.0006; Trial Tr. at 263:11-13, 499:10-19, 544:2-12.) None of these goals justify willfully copying patented technology and infringing UMN's and Finch's patents.

And Ferring's willful infringement did, in fact, give it that first-mover advantage and proved to be devastating for UMN/Finch. Although Finch spent over $100 million to develop a treatment for *C. diff.* and was one trial away from FDA approval, it ultimately had to stop all its R&D efforts because it ran out of money necessary to continue those efforts. (Trial Tr. at 430:4-431:16.) A major factor in Finch's inability to continue was Ferring's infringement and launch of REBYOTA. (*Id.* at 431:17-432:5.) Indeed, Ferring considered Finch to be amongst its closest competitors. (PTX-780.0024; Trial Tr. at 288:25-289:2; 499:10-19.) Ferring was not paying a royalty for its use of Finch's and UMN's patents, and REBYOTA's launch made it impeded Finch and UMN in obtaining additional funding. (*Id.* at 431:17-22, 178:17-23.)

Because Ferring's actions caused significant and irreparable harm to UMN and Finch, and because Ferring and Finch were would-be competitors, Ferring's "infringement of [UMN/Finch's] patents could only have been motivated by a desire to harm [UMN/Finch] by depriving it of market share." *Stryker*, 2017 WL 4286412, at *6; *see also Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*, 2009 WL 512156, at *8 (D.N.J. Feb. 27, 2009) (explaining this factor has "more significance in situations where the parties have a competitive relationship ... because one competitor could potentially benefit from harm done to another").

### 9. *Read* Factor No. 9: Ferring tried to conceal its infringement from UMN and Finch.

The ninth *Read* factor considers "[w]hether the [infringer] attempted to conceal its misconduct." *Read*, 970 F.2d at 827. Here, Ferring consistently tried to conceal its infringement of the UMN and Finch patents, favoring enhancement. *Liqwd, Inc. v. L'Oreal USA, Inc.*, 2019 WL

6840353, at *7 (D. Del. Dec. 16, 2019) (favoring enhancement where "defendants concealed their misconduct in gathering information from the plaintiffs so as to create the infringing products"), *rev'd in part on other grds.*, *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 F. App'x 701 (Fed. Cir. 2021).

As explained in Factor 1, Rebiotix sought to conceal its use and knowledge of the UMN technology that was ultimately claimed in the '914 patent. Moreover, Ms. Jones instructed employees to conceal REBYOTA's infringement by using "approximately" to describe the 0.5mm pore size. (PTX-298.0001-2.) With respect to the '309 patent, Ferring's primary defense (until mid-trial) was to argue that REBYOTA was not a treatment for recurrent *C. diff.* Yet, the REBYOTA website for healthcare providers explained, even after FDA approval of REBYOTA, that REBYOTA is used "to treat recurrent *C. difficile* infection" and for all "APPROPRIATE rCDI PATIENTS." (PTX-604.0001, 3, 6; Trial Tr. at 322:25-323:14, 324:6-15.) But then, ***during this litigation***, Ferring changed its website to read instead that REBYOTA is used "for the ***prevention of recurrence*** of *C. difficile* infection" and is for all "APPROPRIATE PATIENTS ***TO PREVENT*** rCDI." (PTX-325.0003-4; Trial Tr. at 323:15-324:5, 324:16-325:5) (emphasis added).)

Defendants' repeated attempts to conceal infringement of both the UMN and Finch patents, including its attempts to mislead its customers, favors enhancement. *See PPC Broadband, Inc. v. Corning Optical Commc'n RF, LLC*, 2016 WL 6537977, at *6-9 (N.D.N.Y. Nov. 3, 2016) (hiding features in catalogue and marketing materials "strongly support[ed] enhancement").

\* \* \* \* \*

All nine *Read* factors and the jury's unanimous finding of willful infringement heavily favor a significant enhancement. Under these facts, Finch and UMN respectfully urge that the most appropriate sanction is to treble the jury's award. *See, e.g.*, *EagleView*, 522 F. Supp. 3d at 56 (trebling where all factors favored); *Stryker*, 2017 WL 4286412, at *3 (same).

**B.    The Court Should Award Supplemental Damages from August 6 through August 15, 2024 (Final Judgment)**

Section 284 directs courts to award prevailing patent owners "no … less than a reasonable royalty," 35 U.S.C. § 284, "for periods of infringement not considered by the jury," *WhitServe*, 694 F.3d at 38. Both damages experts calculated damages through August 5, 2024, the date of trial. (Malackowski Decl. ¶¶ 6, 7; Ex. 12 (Kidder R.) ¶¶ 341, 355.) The jury likewise awarded damages through the date of trial. (D.I. 488 at 2.) The Court entered final judgment on August 15, 2024. Ferring has provided no evidence that it ceased infringing sales between August 5 and August 15. Courts in this district have awarded supplemental damages for pre-verdict sales when, as here, the relevant financial data had not been produced by the defendant prior to trial. *Purewick Corp.*, 666 F. Supp. 3d at 450; *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, 2019 WL 1877189, at *5 (D. Del. Apr. 26, 2019). Accordingly, Ferring should be required to pay supplemental damages on those sales, which are estimated to be $329,840. Applying the estimated royalty rate of 5.5% from the jury's award to those sales results in supplemental damages of $18,190. As with the jury's award, these supplemental damages should be enhanced by three times, to $54,570, based on a finding of willful infringement and an award of enhanced damages. *See Dasso Int'l*, 2023 WL 5349374, at *26.

**C.    The Court Should Impose An Ongoing Royalty Through The Life Of The Patents**

As explained above, the jury awarded damages only through the date of trial, and there is no indication that Ferring has stopped its willful infringement, despite the jury's verdict. Where, as here, "the parties limited their damages arguments to past infringement rather than projected future infringement," the jury's instruction on damages addressed past damages only. *See Whitserve*, 694 F.3d at 35; *see also Godo Kaisha*, 2019 WL 1877189, at *6 (in light of the evidence presented and jury's award, it was clear the jury did not intend to award a "lump-sum, paid-

through-expiration license"). "A damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales." *Fresenius*, 582 F.3d at 1303. Because the jury's verdict does not compensate Plaintiffs for future infringement (*see* D.I. 488 at 2), the circumstances warrant an ongoing royalty for all REBYOTA sales post verdict, *see Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1379 (Fed. Cir. 2010), where as here the patent owners do not seek a permanent injunction barring the infringer's continued infringement despite the verdict. Ongoing royalties are also necessary to reduce incentive to continue infringing. *See Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 2017 WL 7732873, at *3 (S.D. Fla. Jan. 3, 2017) ("The purpose of an ongoing royalty is precisely to reduce the incentive to infringe.").

Here, the jury's damages award—a $25 million upfront payment and a running royalty with a rate of 5.5% (D.I. 488 at 2; Trial Tr. at 932:4-934:18)—"is ***a starting point*** for evaluating ongoing royalties." *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 6687122, at *14 (N.D. Cal. Nov. 25, 2014) (emphasis added). Ongoing royalties may be based on a post-judgment hypothetical negotiation using the *Georgia-Pacific* factors, which should include accounting for the fact that Ferring has now been found liable for patent infringement. *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017). Thus, courts generally consider: (1) the "change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability," *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1297 (Fed. Cir. 2018); (2) "changed economic circumstances, such as changes related to the market for the patented products," *id.*; and (3) any other "post-verdict factor" that would impact "what a hypothetical negotiation would look like after the prior infringement verdict." *Id.* (emphasis omitted). As such, "courts frequently impose a post-verdict ongoing royalty

rate that is higher than the reasonable royalty found at trial." *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 2014 WL 1457797, at *4, *4 n.8 (D. Del. Apr. 14, 2014) (collecting cases). "Once a judgment of validity and infringement has been entered … [the royalty] calculus is markedly different because different economic factors are involved." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 (Fed. Cir. 2008); *see also Philip Morris Prods. S.A. v. R.J. Reynolds Vapor Co.*, 2023 WL 2843796, at *9 (E.D. Va. Mar. 30, 2023*)* ("[u]nder the Federal Circuit's guidance in *ActiveVideo* and *XY*, an upward variance is justified to account for the change in the parties' bargaining positions"). Courts also set ongoing royalties to minimize the incentive to infringe; "[w]ithout the risk of a post-judgment enhancement, a defendant would be encouraged to bitterly contest every claim of patent infringement, because in the end, only a reasonable royalty would be imposed and there would essentially be no downside to losing." *Affinity Labs of Tex., LLC v. BMW N. Am., LLC*, 783 F. Supp. 2d 891, 898 (E.D. Tex. 2011); *see also, e.g.*, *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 626 (E.D. Tex. 2009) (continued willful infringement further supports grant of an ongoing royalty).  For example, an ongoing royalty rate of 26% was awarded based on the infringer's net operating profit rate in a case where the jury awarded an 8% royalty rate for damages through trial because, among other reasons, "it would not allow [the infringer] to profit from any further willful infringement." *Joyal*, 2009 WL 512156, at *13-*14.

Under this law, the Court should award an ongoing royalty of up to 16.5% of revenues on ongoing sales of REBYOTA. While the jury awarded an estimated 5.5% royalty rate for past infringement, that rate does not account for the willful nature of Ferring's continuing post-verdict infringement, or the other changes in circumstances that must be considered when setting a royalty post-verdict. *See, e.g., Bos. Sci. Corp.*, 838 F. Supp. 2d at 275-76 ("The court declines to allow Cordis, an adjudicated willful infringer, to effectively owe less for its post-verdict infringement

than the jury found for its pre-verdict infringement under the circumstances."). Ferring should not be able to enjoy a 5.5% royalty on post-verdict sales when the jury's award was limited to prejudgment infringement and the jury was specifically instructed it could not increase damages based on the willful nature of the infringement. (D.I. 482 at 26.)  Setting a royalty that does not account for these circumstances would encourage willful infringement, and would not adequately compensate Finch and UMN for such ongoing infringement.

Ferring's ongoing willful infringement, in the face of a resounding jury verdict condemning Ferring's misconduct, is reason enough to set the ongoing royalty rate at an amount up to 16.5%, which tracks the ability to enhance damages up to three times under 35 U.S.C. Section 284. *See, e.g.*, *Joyal*, 2009 WL 512156, at *13-*14 (setting an ongoing royalty more than 3 times the amount of the jury's reasonable royalty award); *Bos. Sci. Corp.*, 838 F. Supp. 2d at 275-76 (awarding 32% royalty rate where jury awarded a 2.95% royalty rate plus lost profits, explaining "[t]he court declines to allow… an adjudicated willful infringer… to effectively owe less for its post-verdict infringement than the jury found for its pre-verdict infringement"); *Arctic Cat*, 2017 WL 7732873, at *1-4 (relying on jury award as a starting point and doubling the ongoing royalty for willfulness). Other reasons for setting the ongoing royalty at up to 16.5% exist as well. The 2022 hypothetical negotiation underlying the jury's 5.5% royalty rate took place on the eve of first infringement and does not account for the significant time and costs Plaintiffs incurred to pursue this patent infringement lawsuit and see it through to a jury verdict, or the ways the market have changed since that time. A higher ongoing royalty rate will compensate Plaintiffs for their enforcement expenditures and Ferring's continued and unauthorized use of Plaintiffs' technology. An ongoing royalty equal to the pre-verdict royalty rate would not deter others from infringement—others may see Ferring's continued infringement as a low-cost option where a royalty would be required only

if and when Plaintiffs were to enforce their patents.

Moreover, there is no longer any uncertainty about Defendants' use, value, profitability, and commercial success of the inventions like there was in 2022 (the time of the original hypothetical negotiation). REBYOTA has an 80% average profit margin, a large profit margin for each unit of REBYOTA that is sold at $7,500. (Trial Tr. at 498:9-17, 954:23-25.) This evidence also supports setting an ongoing royalty of up to 16.5%, which is a fraction of Ferring's profit margin on its sales of REBYOTA. *Joyal*, 2009 WL 512156, at *13-*14 (awarding royalty rate of 26% based on the infringer's net operating profit rate where the jury awarded an 8% royalty rate).

The license agreements in the record also support setting an ongoing royalty of up to 16.5%, and provide guideposts for the proper scope of the rate include because they provide a tiered structure to account for increased value in the licensed patents based on the licensee's use. (*See* PTX-805.0012-13 (OpenBiome-Finch license providing a running royalty ranging up to 20%, with the running royalty increasing when the licensee's sales increase occurring when the licensee increases sales); PTX-365.0038 (Takeda-Finch license providing a running royalty ranging up to 8%, with the running royalty increasing when the licensee's sales increase); PTX-817.0002 (Ironwood offer letter providing a running royalty ranging up to 11%, with the running royalty increasing when the licensee's sales increase).) And even the CIPAC-UMN agreement—on which Ferring's damages expert Mr. Kidder relied—states that the 3% royalty will increase by approximately 16.7% if sales increase; and even Mr. Kidder recognized the royalty in this is agreement is too low to account for the circumstances between the parties, so he adjusted the royalty upward to 5.5%. (Trial Tr. at 929:13-19.) Mr. Kidder further supported his theory when he noted regarding the 5.5% running royalty that "this royalty might have ***additional tiers***—as sales milestones are passed the rate might increase." (Ex. 12 (Kidder R.) ¶ 362.) Accordingly, even the

licenses recognize that there needs to be an increase (ranging up to 20%) to account for changed circumstances as a licensee makes further use of licensed patents.

Based on the changed circumstances between the parties since the hypothetical negotiation in November 2022, UMN and Finch request that an ongoing royalty rate of up to 16.5% be set here. (Malackowski Decl. ¶¶ 15-19.) This amount accounts for the various factors discussed above, including UMN's and Finch's stronger bargaining position (*Georgia-Pacific* factor 5). (*Id.*) Moreover, the willfulness finding supports that these patents were central to the infringing products (*Georgia-Pacific* factor 11), and Ferring has enjoyed and continues to enjoy— particularly due to the fact that Finch is now out of the market—significant profit margins of 80% (*Georgia-Pacific* factor 8). (*Id.*) At the time of the hypothetical negotiation in November 2022, Ferring had not yet sold any products, but the profitability of REBYOTA became certain after several months of sales showing large profit margins. And Ferring has stated that REBYOTA is a launching point for additional products and Ferring is "evaluating how best to build on this innovative treatment by exploring further approaches to microbiome therapy in areas of high unmet clinical need," including beginning additional clinical studies with REBYOTA (*Georgia-Pacific* factor 6). (Ex. 10 (Ferring's 2023 Annual Rpt.) at 27, 29.) Moreover, Ferring admitted that it has no noninfringing alternative (*Georgia-Pacific* factors 9 and 10). (Trial Tr. at 718:14-22.) This figure is also in line with the Ironwood Letter, where the offer was a $25 million upfront payment (which the jury awarded) and an 11% running royalty for higher sales (*Georgia-Pacific* factor 1). (Malackowski Decl. ¶ 19; PTX-817.0002.)

This ongoing royalty is well within the range of post-judgment royalty rates awarded by courts. *See, e.g.*, *Joyal*, 2009 WL 512156, at *14 (granting a royalty rate of more than three times the jury award because "is equitable in this case in that it would not allow Johnson to profit from

any further willful infringement"); *Arctic Cat*, 876 F.3d at 1357, 1370 (affirming award of an ongoing royalty at twice the royalty rate found by the jury and noting that the Federal Circuit has "affirmed rates at or near the infringer's alleged profit margin"); *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1192-93 (Fed. Cir. 2012) (affirming award of an ongoing royalty at a rate of 12.5% to 20%, which was increased from the jury's rate of 10%), *vacated in part on other grounds*, 476 F. App'x. 747 (Fed. Cir. 2012) (en banc); *Telcordia Techs.*, 2014 WL 1457797, at *1, *5 (awarding ongoing royalty for one patent at nearly double the jury's award because "interests of justice would not be served" where infringer did not provide any evidence that it "actually implemented" non-infringing alternative and, instead, continued to "willfully infringe[] for the duration of the [] patent life"), *4 n.8 (collecting cases imposing increased post-judgment royalty); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 2017 WL 3034655, at *10, *13 (E.D. Tex. July 18, 2017) (doubling ongoing royalty based on increase in infringer's profits after trial despite there being no pretrial willful infringement).

In addition to awarding ongoing royalties, UMN and Finch also respectfully request that the Court specifically order Ferring to (1) make payments of ongoing royalties to Finch and UMN quarterly, within 14 days after the end of each quarter, commencing immediately upon entry of the order, (2) provide a detailed accounting of the calculation of royalties, including quarterly financial reports of sales revenues and unit sales, and (3) allow an audit Ferring's financial reports and royalty payments once per year, at Ferring's expense, if UMN and Finch deem it necessary.

### D.    The Court Should Award Plaintiffs Prejudgment Interest On The Jury's Damages Award

Under § 284, prejudgment interest "shall" be "fixed by the court" when infringement is found. 35 U.S.C. § 284. "In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer

entered into a reasonable royalty agreement." *Gen. Motors*, 461 U.S. at 655. In other words, prejudgment interest "from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment." *Id.* at 655-56. "The award of pre-judgment interest is 'the rule, not the exception.'" *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1358 (Fed. Cir. 2012) (quoting *Sanofi-Aventis v. Apotex, Inc.*, 659 F.3d 1171, 1177 (Fed. Cir. 2011)). Here, there is no "justification for withholding such an award." *Gen. Motors*, 461 U.S. at 657. There is no reason to deviate from that default rule here. *See Comcast IP Holdings I LLC v. Sprint Commc'ns Co.*, 850 F.3d 1302, 1315 (Fed. Cir. 2017) (rejecting that there was "basis for the district court to apportion prejudgment interest nor a need for the district court to undertake such apportionment," instead affirming prejudgment interest from "the earliest date of infringement for any patent issued at the time of the hypothetical negotiation").

Courts in this District typically award prejudgment interest in patent cases at the prime rate, compounded quarterly. *ArcherDX*, 2022 WL 4597877, at *18 ("The prime rate is by far the most common practice in the District of Delaware."). "[T]he prime rate best compensate[s] a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is a better measure of the harm suffered as a result of the loss of the use of money over time." *Bayer Healthcare LLC v. Baxalta Inc.*, 2019 WL 4016235, at *7 (D. Del. Aug. 26, 2019), *aff'd*, 989 F.3d 964 (Fed. Cir. 2021). Finch presented substantial evidence at trial of the financial duress caused, in part, by Ferring's willful infringement and refusal to take a license. (Trial Tr. at 431:11-432:5, 499:23-500:9.) The prime rate should therefore apply here.

Consistent with the compensatory purposes of prejudgment interest, *Oiness*, 88 F.3d at

1033, UMN and Finch seek prejudgment interest charged from the earliest date of infringement. *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800 (Fed. Cir. 1988) ("Generally, prejudgment interest should be awarded from the date of infringement to the date of judgment."); *Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 366 (D. Del. 2018), *aff'd,* 944 F.3d 1327 (Fed. Cir. 2019) (awarding prejudgment interest until judgment was entered on jury award). Here, the date of first infringement is December 1, 2022, the day after FDA approval for REBYOTA. (Trial Tr. at 663:24-664:4, 941:7-12). The jury's award includes a one-time, upfront payment of $25 million and a running royalty with an estimated 5.5% royalty rate. Prejudgment interest should therefore be calculated on the full amount of the upfront payment as of December 1, 2022, and on the running royalty as sales accrue on a quarterly basis. *See Bayer Healthcare*, 2019 WL 4016235, at *7. Using the prime rate compounded quarterly results in prejudgment interest of $3,798,219 through August 15, 2024, when final judgment was entered.[9] (Malackowski Decl. ¶ 13.)

### E.    The Court Should Award UMN & Finch Post-Judgment Interest On The Judgment Amount

Under 28 U.S.C. § 1961, UMN and Finch are also entitled to mandatory post-judgment interest. *See, e.g.*, *Air Separation*, 45 F.3d at 290. Post-judgment interest should apply to "not only the actual damages for harm done to a plaintiff, but also the prejudgment interest that is assessed on that reward as well as any enhanced portion of a damage award made for willful wrongdoing and any award of attorney fees." *See, e.g.*, *Church & Dwight Co. v. Abbott Lab'ys*, 2009 WL 2230941, at *13 (D.N.J. July 23, 2009) (collecting cases); *ArcherDX*, 2022 WL 4597877, at *19 (awarding post-judgment interest "for the entire amount included in the judgment"); *see also*

---

[9]    Should the Court award enhancements or later conclude this an "exceptional" case under 35 U.S.C. § 285, UMN and Finch respectfully request leave to submit a supplemental declaration calculating appropriate interest, as enhancements will increase prejudgment interest and are not included in current calculations. *See Mathis v. Spear*s, 857 F.2d 749, 761 (Fed. Cir. 1988).

*EagleView*, 522 F. Supp. 3d at 72 (awarding post-judgment interest on the jury's damage award and "all other damages awards," including prejudgment interest, enhanced damages, and attorneys' fees). Accordingly, UMN and Finch respectfully request that the Court award post-judgment interest on UMN and Finch's full award, including the jury's $25,815,061 damages award, supplemental damages, any enhanced damages, any reasonable attorneys' fees,[10] and prejudgment interest. Post-judgment interest for each monetary award should run from the date "when a judgment quantifying that award has been entered." *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 175 (3d Cir. 2010). Thus, post-judgment interest on the jury's award should run from August 15, 2024. (D.I. 488.) The daily rate of post-judgment interest is $3,613, which is based on the $25,815,061 jury award, the additional $18,190 royalty from August 6, 2024 to August 15, 2024, plus the $3,798,219 in prejudgment interest. (*See* Malackowski Decl. ¶ 13.)

## IV.    CONCLUSION

UMN and Finch respectfully request that the Court (1) enhance UMN and Finch's damages by trebling the jury's award; (2) award supplemental damages, (3) award an ongoing royalty of 16.5% for REBYOTA sales from the date after judgment entering the jury's verdict until the expiration of the patents and an accounting of REBYOTA for sales after the verdict; (4) award prejudgment interest of $3,798,219; and (5) award post-judgment interest at the statutory rate for the full award (a daily rate of $3,613), including any enhancement, and prejudgment interest.

---

[10] UMN and Finch will file any motion and briefing for costs and attorney's fees (including under 35 U.S.C. § 285) according to the deadline set by the Court. (D.I. 488 at 3.)

OF COUNSEL:

KIRKLAND & ELLIS LLP

Michael W. De Vries
Ingrid Petersen
555 South Flower Street, Suite 3700
Los Angeles, CA 90071

Adam R. Alper
555 California Street, 27th Floor
San Francisco, CA 94104

Patricia A. Carson
Ashley L.B. Ross
Leslie M. Schmidt
N. Kaye Horstman
601 Lexington Avenue
New York, NY 10022

Alina Afinogenova
200 Clarendon Street, 47th floor
Boston, MA 02116

Ashley Cade
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

Sharre Lotfollahi, P.C.
Kirkland & Ellis LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067

Dated: September 26, 2024

_/s/ Kelly E. Farnan_____
Jeffrey L. Moyer (#3309)
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
farnan@rlf.com
metzler@rlf.com

*Attorneys for Defendants Finch Therapeutics Group, Inc., Finch Therapeutics, Inc., and Finch Therapeutics Holdings, LLC, and Counterclaim Plaintiff the Regents of the University of Minnesota*