```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE




FERRING PHARMACEUTICALS)
INC., et al.,          )
                       )
        Plaintiffs,    )   C.A. No. 21-1694-JLH
                       )
v.                     )
                       )
FINCH THERAPEUTICS     )
GROUP, INC.,           )
                       )
         Defendant.    )



                    Tuesday, July 23, 2024
                    10:00 a.m.
                    Pretrial Conference

                    844 King Street
                    Wilmington, Delaware




BEFORE:  THE HONORABLE JENNIFER L. HALL
     United States District Court Judge




APPEARANCES:

        WOMBLE, BOND, DICKENSON, LLP
        BY:  MARY W. BOURKE, ESQ.
        BY:  DANIEL ATTAWAY, ESQ.

        -and-

        MORRISON & FOERSTER, LLP
        BY:  DARALYN DURIE, ESQ.
        BY:  MATTHEW A. CHIVVIS, ESQ.
        BY:  DANA SEVERANCE, ESQ.

                         Counsel for the Plaintiff
```

APPEARANCES CONTINUED:


        RICHARDS, LAYTON & FINGER, P.A.
        BY:  KELLY E. FARNAN, ESQ.
        BY:  SARA M. METZLER, ESQ.
        BY:  JEFF MOYER, ESQ.

                    -and-

        KIRKLAND & ELLIS, LLP
        BY:  MICHAEL DEVRIES, ESQ.
        BY:  LESLIE M. SCHMIDT, ESQ.
        BY:  ADAM R. ALPER, ESQ.
        BY:  PATRICIA A. CARSON, ESQ.
        BY:  ASHLEY ROSS, ESQ.
        BY:  SHARRE LOFFOLLAHI, ESQ.
        BY:  INGRID PETERSON, ESQ.
        BY:  ASHLEY CADE, ESQ.
        BY:  ALINA AFINOGENOVA, ESQ.

                        Counsel for the Defendant



                -----------------------------


                COURT CLERK:  All rise.  Court is now in

session.  The The Honorable Jennifer L. Hall presiding.

                THE COURT:  Please be seated.  Good morning,

everybody.

                We're here for a hearing in Ferring versus

Finch.  It's civil action number 21-1694.  Let's go ahead

and put our appearances on the record.

                MS. BOURKE:  Good morning, Your Honor.  Mary

Bourke from Womble Bond Dickenson on behalf of Ferring and

with me I have Daralyn Durie and Matthew Chivvis from

Morrison Foerster and also Daniel Attaway from Womble Bond Dickenson.

THE COURT:  Good to see everybody.

MS. FARNAN:  Good morning, Your Honor.  Kelly Farnan from Richards, Layton & Finger on behalf of Finch and UMN.  And I'm joined by, from my office, Jeff Moyer and Sara Metzler.  And then my co-counsel from Kirkland & Ellis, Mike DeVries, Ashley Ross, Alina Afinogenova, Adam Alper, Patricia Carson, Leslie Schmidt, Sharre Loffollahi, Ingrid Peterson and Ashley Cade.

THE COURT:  Great.  Good to see everybody. Welcome.

So we have a lot to cover today.  As some of you who were here yesterday, so this kind of feels like deja vu, a couple things I wanted to say just before we got started. We've read everything that's been filed so far.  A spoiler alert is that I won't be prepared to issue rulings on everything today.  Some of the issues that are in dispute I want to hear argument on and I may need to take under advisement.  I recognize that some of these motions have been pending for some time.

Some of you heard this spiel yesterday, but I'll repeat it for the ones that weren't here.  When we inherited a bunch of knew cases in January, by the time Ms. Garfinkel got everything docketed and put on the calendar, the list of

pending motions that we had as of March 1st was 271 pending motions. And so all of those motions are important and a lot of work went into filing them and we want to ensure that all of them get the attention they deserve.

That said, the wheels of justice need to keep on turning and so we have tried as best we can to keep everybody's trial on calendar and keep it moving and get the motions resolved so that we can get the cases to trial. And we've tried to do that without disrupting, as much as we could, the trials that have been set by other judges, because of course if we start moving those then we've got new cases coming in that we're not able to handle. So that's where we're coming from. Most of these pending motions were filed before we got the case. As I mentioned, we have looked at them all.

It's 10 a.m. today. We counted at least 37 disputes that we need to resolve today, so we all may need to just dig in and see how much we can get done. We're not going to get everything done today in terms of rulings. As many of you know, we're also in trial next week, so to the extent that additional papers are coming in next week, we probably won't be in a position to be looking at them as they come in, so just so everybody knows where things stand.

Before we get started, were there any disputes that have been resolved?

MR. DEVRIES:  Good morning, Your Honor.  I'm Mike DeVries.  I'm one of the lawyers for the counterclaim defendants in this case.  I'm pleased to report that I think at least three of the disputes have been resolved and let me just identify those in order.

So Your Honor may have seen there was a letter that came in yesterday from Ferring about claim reduction and to be very clear, we are intending to and will, as we agreed, perform an additional material reduction in the number of asserted claims today.  Ferring asked us to do that in advance of the pretrial conference and in response to that, we were able to drop the '702 Patent in advance.  I trust Your Honor has seen that in Ferring's letter.  We didn't feel like it would help the Court to file something else saying the same thing.  But that resolves what I think is item 7 in the MSJ and Daubert motion that was filed by Ferring.

THE COURT:  Ah.  Stand by.

MR. DEVRIES:  And that relates to substantially entire microbiota, all claims with regard to that limitation are no longer in the case.

THE COURT:  Great.  I'm going to take that off my list.  Thank you.

MR. DEVRIES:  And then, Your Honor, we reached a stipulation that resolved, I think, two more of the primary

contested issues.  And one is the order of who presents first at trial and the second is the motion in limine no. 1 filed by Ferring.

The parties reached a stipulation that in short, this is written out more fully, but that we would go first at trial, the University and Finch as the patent owners and that we would not reference the declaratory judgment filing unless something unexpected happened at trial that opened the door, like a statement that we sued -- our client sued first or something.  So that stipulation, which is written out in a more formal written form resolves both of those issues as well.

So that was motion in limine no. 1 that Ferring filed and then that particular dispute is sort of all over the pretrial order about the order of who goes first.

THE COURT:  All right.  Okay.  Let me just find it on my list.  Got it.  Okay.

And that actually brings up a good point, which is that I can't promise you that at certain points throughout the hearing I won't get confused and look at the wrong side, especially because you're now sitting on the wrong sides for how things are going to get presented at trial.  So please have some grace for me as I try to keep all of this in my head about which side is which.

MR. DEVRIES:  And in case it's helpful, I think

that the way that we're sitting now is the way we will be.

THE COURT:  Now we're good.  Ok.  That's why I got confused when I immediately came out.  Understood.

MR. DEVRIES:  Sorry for not explaining that.

THE COURT:  That's all right.  Thank you.

MR. DEVRIES:  So I think those were the issues we were able to resolve that were in dispute.

THE COURT:  Perfect.  Thank you very much.

MR. DEVRIES:  Your welcome, Your Honor.

THE COURT:  Does Ferring have anything to add?

MS. DURIE:  No, Your Honor, that's exactly right.

THE COURT:  All right.  Great.  So let's talk about the pending dispositive motions.  I have a lot of notes on them, but I'm not prepared to rule.  As I mentioned, some of them I may need to hear argument.  The first motion on my list is Ferring's motion for partial summary judgment of no copying.  And so I'll hear some argument on this if there's anything anyone wants to add.

MS. BOURKE:  Sure.  Mary Bourke, Your Honor.  So let's just, so there was -- the copying was used for two reasons; one as a secondary consideration of obviousness and also as evidence of the intent of the alleged infringer, here Ferring, for willfulness.

As to the secondary consideration of obviousness

for the UMN patents, we are no longer asserting obviousness as a defense.  So that eliminates that issue.

As to the Borody patents, it is our position that there has been no evidence of copying of anything.  At best there have been allegations of awareness of Dr. Borody as a pioneer, awareness of his applications, but no evidence tying to any copying, so we believe that that should be dismissed as a matter of law both as a secondary consideration and as evidence of intent for willfulness.

THE COURT:  So I guess -- so copying is not a discrete issue that we're asking the jury to decide, so what are you asking me to do, tell the jury that there's no evidence of copying?

MS. BOURKE:  Well, two things.  One, we have a related motion in limine to exclude the evidence of copying in front of the jury because of how prejudicial and inflammatory it is.  That's the first thing.

The second thing is as to the copying as it goes to willfulness, the case law is pretty clear and what I should back up and say is the evidence of copying is all pre-issuance of the patents both as it applies to the UMN patents and the Borody patents.  And so there is case law from this district and that's the *Sonos* case that we cite in our briefs with Judge Bryson sitting by designation following cases from this district where they have held that

if it is pre-issuance copying evidence, that the copying evidence must be particularly egregious behavior and we submit here that they have not demonstrated particularly egregious behavior.  At best their allegations of copying show awareness of certain confidential UMN information, but not use.

So what the Court did in the *Sonos* case is the Court said that before any evidence or arguments were presented to the jury, that *Sonos*, in this situation, had to advise the Court of its intention to do so and provide the Court with a detailed account of the evidence, so that the Court could determine whether that was egregious conduct or not such that it could go to the jury.

The Court:  Okay.  Thank you very much.

MS. BOURKE:  You're welcome.

MR. ALPER:  Good morning, Your Honor.  Adam Alper for I guess plaintiffs on our side.  So just a couple of things.  We disagree factually.  We think that what defendants or Ferring's motion presents is a clear factual dispute.  They're asking Your Honor to summarily adjudicate willfulness.  That's what their motion asks for and we don't think that would be appropriate given the facts and the clear factual disputes.  We don't think that we agree that copying is not a discrete aspect that's being submitted to the jury, so it wouldn't be procedurally appropriate to take

some of the willfulness evidence, I think artificially designated as copying evidence, and then summarily adjudicate that aspect of this.

And we disagree with them on what the legal requirements are here in this context. So I'd just like to at least at some level walk you through some of that because I think this is very important in terms of the issues in this case, the relationship between the parties and so forth.

So counsel is correct that they dropped the invalidity case on the UMN patents, so secondary considerations of non-obviousness are no longer in the case for that. On the UMN side, this evidence is relevant to a number of things. It's certainly relevant to damages before we even get to intent issues. It goes to use of the invention, it goes to the value of the invention and so forth. This is evidence that shows that Ferring and Rebiotix were actually looking at the patent literally, the patented material and recognizing its value very early on and then using it. And I'll show you that. But then of course it also goes to inducement and willfulness in particular, knowledge and intent.

When it comes to the facts here, what we see -- and I'm going to show you a couple of examples, Your Honor, what we see is that very early on, it is undisputed that

Ferring became aware of the patented invention in a number of forms. What happens is the the founders of Rebiotix became involved with the UMN inventors and then there's separately a similar situation that happened on the Finch/Borody side of things. But they became involved with the UMN inventors who were then provided the patent application while it was pending, provided materials almost verbatim describing examples of the claimed protocol as set forth in the patents and analyses of those, of those items that they then took, they then turned right around, formed Rebiotix and then started circulating those materials internally, including to their engineers who were creating REBYOTA, the accused product and then REBYOTA was finalized not too long after that.

So we totally agree that, A, we have evidence specifically that the patented material -- this isn't like a situation where their product kind of just looks like ours and we're saying, oh, they must have copied it. They had access to essentially verbatim the embodiments in the specification of the patents that were in suit. They were provided the patent application, they were provided analysis of those items. They then circulate them, they form Rebiotix, they then circulate them internally and -- amongst the people who are creating the accused products and then they shortly thereafter actually finalize the formula for

the accused products.

And so we disagree, we absolutely believe that that is evidence that they, in fact, did copy. But more importantly, this is a totality of the circumstances test when it comes to willfulness and it's certainly evidence that they were aware of the patented invention. So that then brings us to okay, this is pre-issuance material and so how does that all fit into willful infringement if the patents issued later. So we also have evidence that they were all the while aware that there was a patent application pending, saw risk of that, were monitoring the patent docket to see when this would get issued. And not only that, but were so concerned about the issuance of these patents that when Ferring purchased Rebiotix, they specifically agreed to a cost sharing when it came to dealing with any litigation arising out of any patents that issued, based on the applications on both the UMN and Borody side that they were aware of, including all that material that they copied and internally based their product off of, that they agreed to cost sharing and then specifically identified the parent applications for the UMN patents-in-suit and the Borody patents-in-suit. And that was pre-issuance.

Then the patents issued, they admit they became immediately aware of them. That of course makes sense, because they were tracking all of this. They knew that they

had copied all this material.  Not only that, they were aware of it and the risks associated with it.  And the most important think is they did nothing about it, which is the sine qua non of willful conduct.

And so what we have, Your Honor, in total is actually an incredibly robust record here of awareness have the patented features and the patented invention beyond most cases where you just have like copying of an embodiment or something.  Here we have actual access to and copying of patent materials.

And then after that internal circulation of it amongst people who are creating REBYOTA and use, we have then monitoring of the patent docket, concern over that risk and then ultimately patent issues, they admit that they are aware of it immediately, of the patents, and then they don't do anything about it.

And so I think -- now this is just a couple of legal points I'd like to make and then I can, Your Honor, show you specific evidence that supports everything that I'm saying, if you'd like.  But here's the couple legal points.  One, when it comes -- first have all, just at is the highest level this is all evidence of willful conduct.  It's a totality of the circumstances test.  You need to show for willfulness, and the *SRI* case mid this quite clear in 2021, the standard is intentional and deliberate infringement.

It's not bad faith, wanton misconduct.  There's no particularly egregious standard when it comes to willfulness and it's a totality of the circumstances test, which I think is undisputed.  And all have these facts certainly go to whether they had intent to infringe, the requisite intent for willfulness and actually quite a strong case for it.  That's number one.

Number two, even if we were to call this copying evidence, which I think is an artificial label in this context, even if we were to call it copying, what the case law says is a number of things.  First of all, when it comes to copying, you don't need to go and show that someone -- you don't need a photograph of someone sitting at their workstation typing in something from someone else's stuff.  What the cases say is that access and substantial similarity is evidence of copying.  You can have other forms of copying, but access combined with substantial similarity is sufficient for copying.

I can give you multiple cites for that, but one is *Medtronic v. Teleflex*.  That's the Fed Circuit 75th 4 1331.  And so there isn't some requirement that we go in and find -- I think the implication is that we actually need to have like someone sitting there typing something into something else, although we do have internal use, without a doubt, that is way more than we need to show in order for

this evidence to be relevant.

Then comes the question have pre-issuance willfulness evidence, Your Honor.  And the cases are absolutely uniform on this.  Pre-issuance willfulness evidence, including copying evidence, is admissible, it is relevant, it can be used to show willfulness.  The cases all say that, even the cases that counsel identified on this issue.

And so then that brings us to simply is there a greater standard for pre-issuance evidence of copying and does it require a showing of particularly egregious conduct? And here's what I would say about that, Your Honor, a couple of things.  Number one, we don't -- there are a handful of cases that suggest that there's no controlling authority that says that, and I believe they're all before the *SRI* case came out and made it very clear that willfulness is shown through intentional and deliberate misconduct or infringement, not something like bad faith, wanton -- so forth.  So I don't think that's the controlling standard here.  But secondly, we can show that, we can show this was particularly egregious.  This was a plan that was in the works for years and years and years.  They knew it was a problem.  They had a fee shifting provision with Ferring/Rebiotix specifically because they knew this was a huge risk because they had a big problem because they based

their product off of the patented materials from UMN and Finch. And so there again, it just comes down to a factual issue.

And I can speak more to that, because we do agree -- disagree that that's the actual standard, but it's easily met in these circumstances. I'm happy to show you evidence and/or anything else you may want --

THE COURT: No. That's fine. I understand your position. Thank you.

MR. ALPER: Thank you.

MS. BOURKE: May I take two minutes to respond?

THE COURT: Yes, of course.

MS. BOURKE: Thank you. First off, I heard a comment that we dropped our invalidity defenses of UMN patents. That's not true. What I said was we dropped our invalidity defense of obviousness, but we did not drop our invalidity defenses of the UMN patents.

Secondly, I still -- we heard about what Ferring individuals had access to, but there is no evidence whatsoever that any have that information was used by any of the people that were responsible for the development of our product, REBYOTA.

And I also heard an allegation that information was circulated to certain people that were involved in the creation of REBYOTA, and that is simply not true. The only

evidence is that it was circulated to a person called Barbara Nelson who was a consultant and was not the person responsible for developing REBYOTA.

Let me make it clear that there was no product to copy. And the examples in the -- it was a provisional application. The applications that led to the patents-in-suit were not even filed until sometime in 2017, 2018. And the examples in those patents describe a process that it is undisputed that Ferring/Rebiotix does not use to manufacturer REBYOTA.

So again, I mean, all I hear is information about access. There's no evidence of use. And the fact that we were aware of their patent applications, we were monitoring them, that's common for competitors to do, that's just common activity.

In terms of the cost sharing provision and the merger document, that was just, you can think of that as an insurance policy, that's all that was. That's no evidence of any use or any copying of any confidential information.

THE COURT:  Thank you.

MS. BOURKE:  Thank you.

THE COURT:  I had some notes on this before I heard argument and I made some additional notes during argument.  I am ready to rule on this portion of the summary judgment motion today.

And so the request for partial summary judgment of no copying will be denied.

Even if I thought that the underlying fact of copying was the type of issue that was contemplated by the rule as appropriate for summary judgment or partial summary judgment, and I don't, I agree with Finch's counsel that this is sort of an artificial label in this context. I would still not grant summary judgment.

Under the particular circumstances of this case, which include an allegation that an individual associated with Ferring's side had access to a confidential patent application and other information, there is a dispute of fact about whether Ferring's side copied aspects of the technology claimed by the UMN patents before those patents issued. If it did, it might have some bearing on whether infringement that occurred after the patents issued was willful.

To the extent I understand it, the argument with respect to the Borody patents is that Ferring's side copied what was in the patent application. If the evidence shows that Ferring's side knew that the patent issued and continued to infringe after the patent issued, the copying of that is relevant to whether the later infringement was willful.

I understand that Ferring disputes the fact of

copying.  That's a fact we'll let the jury decide.  So that takes care of summary judgment motion no. 1.

Summary judgment motion no. 2 has to do with Ferring's argument that the Markush group is improper and indefinite.  I don't need to hear argument on that.  A patent is invalid for indefiniteness if its claims, read in light of the specification, delineating the patent and the prosecution history, failed to perform with reasonable certainly those skilled in the art about the scope of the invention.  It's Ferring's burden to show indefiniteness by clear and convincing evidence.  Ferring's sole argument is that the Markush group doesn't meet the requirements set out by the NPEP.  That's not the standard as laid out in the *Nautilus* case.  The motion for summary judgment is denied.

The third motion for summary judgment has to do with an alleged lack of written description relating to the percent change limitations.  I will hear argument on that because I'm not sure I completely understand the issue.

MS. BOURKE:  So this defense pertains to two limitations that are in the UMN patents.

THE COURT:  It's very strange of me to hear UMN. The Minnesotans in the room, we call it the U of M, but I guess we'll -- if that's how everybody's been calling it, that's fine with me.

MS. BOURKE:  I can call it the U of M.  If we

can put up on the screen one of the claims of U of M's patents, I can point out where these --

THE COURT:  Or the U, but you guess for --

MS. BOURKE:  Whatever you prefer, Your Honor.

THE COURT:  Yeah.

MS. BOURKE:  So the claim's directed to "a method of decreasing the relevant abundance of one or more members of the phylum Proteobacteria" and it concludes where that relevant abundance of one or members of the phylum Proteobacteria is reduced by at least 10% following administration of the pharmaceutical composition.  So that is the percent change limitation in that patent.

In the '112 Patent it reads similarly, but it is talking about an increase in the relevant abundance of the members of the phylum Firmicutes by at least 20%.  So those are the percentage change limitations as we call them.

The other limitation that this defense goes to is the Markush group, which is the "comprising at least six different classes of bacteria selected from the group consisting of" and then the 10 classes of bacteria that are listed there.  So that's the Markush group limitation.

The only taxonomic data for these limitations that can support these limitations comes from Example 1 in the U of M patent and we can go to the text of Example 1, which is on slide 16, if I can have that, please.  But the

text, which is, this comes from the results in the discussion. It's in column 17, lines 22 to 43, does not provide you with any information about percentage change in limitations. In other words, percentage increase in Firmicutes or percent decrease in Proteobacteria. And it also doesn't give you any information about the Markush groups 6 of 10 different classes of bacteria. The only -- the Example 1 is supported by two figures. And if we can have that, there's Fig. 1 from the patent and that is supposed to show you what the changes in the percentage of the various bacteria are and what the starting composition, what would be the composition, the 6 of the 10 different classes were the donor's material. And no one can read those bar charts. We have another one on Fig. 2. None of the inventors could read it. Our experts couldn't read it and so that information provides no written description support. Even when people tried to look at it in color, they still couldn't discern the percent change in Proteobacteria and Firmicutes.

The other thing to note about Example 1 is it is a single donor and a single patient. So N of 1. N of 1 from both a legal and scientific standpoint is simply insufficient, particularly where we have a claim here that is to a broad functional genus, and that this field at the time of the invention was indisputably unpredictable. So

this case is very similar to the case of *Allergan vs. MSN* that Judge Andrews had where there was only one example.

Let's go -- if we can go back to the claims, one thing I want to point out is the way -- Finch argues around this argument by saying it is not a functional genus and ignores the percentage change limitations and parses the claim into just the pharmaceutical composition and says therefore it is only structural features, but that is not the way to read the claim. You have to read the claim as a whole, and it clearly is a functional limitation to increase the relevant abundance of the Firmicutes or decrease the relevant abundance of the Proteobacteria.

There are some other places in the specification that Finch points to for support and they're simply broad laundry lists of things that provide no guide posts, if you will.

We can look at slide 13, please. The first comes from column 5 where you can see it says the composition may include at least four different phyla of bacteria and wherein they include a member of Bacteraidetes, phylum member of Firmicutes, phylum member of Proteobacteria and then it goes on to say the phyla is chosen from Bacteraidetes, Firmicutes, Proteobacteria and I'm going to mispronounce this, Tenericutes. And in one embodiment the composition further includes at least five, six, seven,

eight, nine or 10 different classes. That does not provide written support for their specifically claimed six of 10 different classes of bacteria in the Markush group.

They also point to a portion in the specification in column 7 for support of this. And again, I'm not going to read all of this, but just reading it, you can see it's very broad, very general, doesn't provide any guideposts in terms of the six of the 10 different classes for the Markush group.

And finally, they point to a section in 15 for support of the percentage change limitations, but you can see again that this is just talking about -- well, at first it's talking about Clostridia, which is not mentioned in the claims but then sort of three quarters of the way down it says in one embodiment the relevant abundance of the members of the phylum Firmicutes in a recipient's colon after administration may be increased by at least 5, 10, 20 50, so again, no guideposts as to the particular 10% that is claimed in the patent.

So unless you have any questions for me, I'll sit down.

THE COURT: That was very helpful. Thank you.

MS. BOURKE: Okay. Thank you.

MS. CARSON: Good morning, Your Honor. Pat Carson representing UMN and Finch. What Ferring is doing is

they're really ignoring the entire context of this invention. All right. I think that the best analogy that I can give you is that what these inventors from UMN discovered is that the microbiota in the intestine is actually a new organ. And it, when it's healthy it has certain classes of bacteria there. And when it's diseased, it gets disrupted. So what the invention is about is taking the microbiota from a healthy donor and they give you all sorts of -- and I would direct Your Honor to the patent itself where they have a great deal of screening information about what your donor is going to look like and how you're going to select this healthy organ. And what the inventors tell you is that if you have at least six of 10 classes in that organ and they tell you how to determine that, that if you put that organ into a diseased patient, it will repopulate the gut. So what Ferring is doing, is they're trying to parse this down to -- they're focusing on the Markush group and the different -- various different organisms that might be in there, but all of the experts agree, and the inventors, that if you go to the healthy human and you take their microbiota and process it like the patent tells you, you're going to get those classes of bacteria. And what these inventors tell you is that when you take those classes of bacteria and you put them into a diseased patient, how do you know -- they tell you there's

going to be an increase or a decrease.  And that's not claiming always achieving a result, it's just describing what happens when you treat the patient with this new organ, which is the healthy microbiota.

Now, Ferring's very myopically focused on Example 1, but that's not the test.  There's a number of examples in this patent and you can't just myopically look at Example 1.  They make the point that the inventors said that they couldn't read the filing.  What Ferring is asking you to do is take away the UMN inventors' patent because the patent office does not allow you to put color figures in your patent.  But our expert, Dr. Schloss, will testify at trial, not only how he can read the results from that figure, but he will also point to other support in the specification that tells you that they had possession of this invention, because there is a great deal of description in the written -- in the specification that Ferring just wants Your Honor to ignore and you can't do that.  That's not the test.  Because we have one of skill in the art, Dr. Schloss, who will testify that when he reads this patent, he sees that the inventors were in possession of this transplantation of the healthy microbiota consisting of six to 10 classes into a diseased patient to get the desired increase or decrease and how to test whether or not you're getting the results that you want.  Does the patient get

better, because what our inventors discovered is that the patient gets better because they either have this increase or decrease. So you can't myopically look at this. And this is nothing like *Allergan* where it was purely a functional. We have structure, we have six classes of bacteria. Bacteria have very defined structure. See we are in no way analogous to any of the cases that look at well, it's purely functional claiming. We're not claiming functionally. We are claiming a structure that's made out have six to 10 classes, which is actually an organ. It's a healthy organ. And now you're going to put that into a sick patient and you're going to get the patient better. And how do you know that? You're going to get an increase or you're going to get a decrease. And that is in no way analogous to the cases that Ferring has cited.

THE COURT: Thank you very much. Can I ask you, Ms. Bourke, the *Allergan vs. MSN* case, that was a factual finding by the Court after a bench trial?

MS. BOURKE: That was, but there was another case cited in our reply brief called Lipozene, I believe. It was Judge Bryson again sitting by destination and that was on summary judgment.

THE COURT: Okay.

MS. BOURKE: And in that case they had something like on the order of 49 examples which he still found to be

insufficient written description support.

THE COURT:  Okay.

MS. BOURKE:  Let me respond to a couple have of things.  It's undisputed by both experts that there is no such thing as a healthy human gut microbiome.  Everybody's gut microbiome is different.  What I'm allergic to, you may not be allergic too.  What may cause you gas may not cause me gas.  Everybody has a different makeup of their gut microbiome.

I will also say that if you look at what my colleague pointed you to, Ms. Carson, is Example 2 is donor screening for pathogens.  That's screening the stool prior to transplantation for pathogens.  That doesn't necessarily tell you that you're screening for a healthy human gut microbiome that contains these six of 10 different classes of bacteria.

You were also directed to look at the entire patent.  And I welcome the Court to do that.  There are four examples.  Example 1 is the only example that has taxonomic data.  The problem with Example 1 is, as I pointed out, it simply doesn't support the percentage change limitations, which undisputedly is a functional limitation.  And the figures are illegible.  And you will -- our expert has testified that if you want -- those types of figures are used, but they are generally used with a table so that you

can read it and you can determine what the composition of the fecal microbiome was pre and post transplantation. Those tables are not here.  They could have put those tables in, but those tables were destroyed, as I understand it.

And their expert, Dr. Schloss, who we heard mentioned, testified that he couldn't read the figure and the only way he did that was to read Examples 2, 3 and 4 into the claims.  Example 2, I said is donor screening for pathogens.  Example 3 is -- and I'll direct the Court to it, is a -- the process that is used to manufacture the fecal microbiome preparation.  And Example 4 is a further description of that process with no data whatsoever.  So the only written support that could be there is from Example 1, and it's simply very deficient.

THE COURT:  Thank you.

MS. CARSON:  Your Honor, if I could just --

THE COURT:  I don't need to hear further argument.  I actually -- I had made some notes on this dispute before we came out today and I made some notes during the argument.  This is a motion for summary judgment of invalidity for lack of written description.  Whether a claim satisfies the written description requirement is a question of fact.  The Federal Circuit tells us that the requirement is met when the disclosure allows one of skill in the art to visualize or recognize the identity of the

subject matter purportedly described. The proper inquiry is whether the patentee has provided an adequate written description in a definite way, identifies the claimed invention in sufficient detail such that a person of ordinary skill would understand that the inventor had made the invention at the time of filing and that the test requires an objective inquiry into the four corners of the specification.

I've reviewed the briefing, the exhibits cited by the parties and I do think that there is a genuine dispute of fact as to whether the written description requirement is met, so the motion for summary judgment will be denied.

The next motion for summary judgment has to do with prosecution history estoppel. It has to do with particle size limitations. We've reviewed the briefing. It would be very helpful for me to hear from the parties, if you're prepared, to walk me through the prosecution history and explain why you think it's prosecution history estoppel and the other side can tell me why they don't. We do have stacks and stacks of paper, we managed to review some of it, but if you could walk us through it, it would be greatly appreciated.

MR. CHIVVIS: Thank you, Your Honor. Matthew Chivvis for Ferring. Just to start Your Honor, to the issue

of prosecution history estoppel, that is an issue of law for Your Honor to decide. It would be helpful to decide it before trial in this case, because it will impact the presentation of the evidence.

We've just put forward the two limitations here that are at issue and shown what claims they are in. You have the fecal extract comprises no particle having a size greater than .5 millimeters, put in brackets there, as shown by sieving, because that's the Court's construction that was added to that limitation. And then essentially the concept captured by another limitations, fecal extract or preparation capable of passing through a .5 millimeter sieve. So both these limitations were added to the claims at issue here by amendment, which triggers the presumption under *Festo* that equivalence has been relinquished. And that presumption is Finch's burden to rebut. They can't rebut it.

I'm going to walk through how it became a part of the claims here and then I'll talk about why it can't be rebutted by showing tangentiality. So here is part of the prosecution history of the '914 Patent.

This limitation -- there are two different limitations that appear in the '914 Patent. There is the "no particle size" limitation and the "capable of passing through limitation."

I'm going to start with the "no particle size" limitation.  That claim was added by amendment.  The claims were rejected as obvious over the prior art.  You'll be interested to know, perhaps, that one of the prior art references that the examiner found was relevant to the validity of the claims that were then pending is the Borody patent application that is also kind of the source of other claims that have been asserted against us.  It comes before the UMN patents.  It also describes fecal microbiota transplantation.  It's undisputed that UMN didn't invent or U of M did not invent fecal transplant.  That was discussed in Borody, that was discussed in Poff, it's discussed in the prior art for ages and that prior art was cited against these claims.  And the examiner found that adding this concept of the different classes of bacteria wasn't enough.  There was an interview with the examiner and the examiner required both limitations to be added.  First, the classes of bacteria and then the "no particle size" limitation to be added to allow the claims and said that claims would be placed in allowable form thereafter.

That means that these amendments were directly relevant to whether the claims would be allowed.  And for that reason, not only is the presumption triggered, but it can't be rebutted just on that record alone.

Go to next.  This is the other claim limitation

that appears in the '914 Patent.  It was added to the claims in a little bit different fashion, but still in a way that, Your Honor, triggers the presumption.

The limitation was originally added by preliminary amendment as a dependent claim.  You can see in dependent claim 54 as filed, the limitation "capable of passing through a .5 millimeter sieve."  Then again, following a rejection over the prior art, the applicant canceled that claim 54 and added a new independent claim and that new independent claim, which I've abbreviated here just so it fits on the screen for Your Honor, was claim 71.  And that new independent claim now included what had previously been in a dependent claim.  And the law is clear that where a limitation was previously existing in a dependent claim and now has been added to an independent claim that the presumption is triggered.  And we cite the *Bio Grow* case to Your Honor on that point.

So that's how these limitations got added by amendment to the '914 Patent.  If we look at the '012 Patent, next slide, again, you see that the relevant limitation was added by amendment.  In this instance the examiner added it by amendment.  But the record is clear, if you look at the exhibit, there's a long colloquy, including an e-mail exchange with the examiner where the examiner made clear, the examiner was only going to allow these claims if

these limitations were added and had gotten the applicant's permission to add these claims, these claim limitations, excuse me, by amendment.

So in each of these cases you have amendments that were the source of these limitations going into the claims. That triggers the presumption under *Festo*. And because of these limitations being added in each case, because of issues over the prior art and in certain instances because the examiner is telling them they have to add these limitations to get the claims, I think we've already overcome any possible argument that the presumption wouldn't rule the day. They can't rebut the presumption with the record we have there.

But there's more. There's more. If we go into the examination history of the parent application for both of these filings, so there was an earlier application, a set of continuations and continuations were filed that arrived at both the '914 and '012. They trace back to the '628 Patent, if we go to the next.

And the examiner was aware of the prosecution record for the '628 Patent. It had been decided not that long before the issue of the '914 and '012 were before the examiner. And there the applicant had made argument over and over again that the limitation about the .5 millimeter particle size was important to allowance over the prior art.

And in fact, you can see the argument is again over some of that Borody prior art that is one of the patent families at issue in this case.

So U of M is going to the patent office, it's saying we overcome the prior art because of .5, because of the particle size limitation.  And the examiner accepted that in that prosecution and allowed claims with that limitation.  Then you have later examination with new claims that are broader, that lack the .5.  And the examiner says, I'm not going to allow those claims.  I'm not going to allow those claims until interviews happen, until amendments happen where the examiner says we'll add the .5 back in and then the examiner is satisfied, allows the claims.

So we have a record here where the specific limitations at issue were entirely relevant to whether the claims were going to be allowed.  They were added by amendment triggering a presumption.  Because of the colloquy with the examiner, that presumption can't be rebutted on that ground.  And then if we look at the prosecution record for the parent application, you can see why.

This prosecution record here independently we put forward establishes argument-based estoppel.  It's well established that argument in a parent application can bind claims in a later application and essentially make equivalents not available.

THE COURT: Is that in your brief by the way? I don't remember that.

MR. CHIVVIS: Okay. Yes.

THE COURT: Okay.

MR. CHIVVIS: We did argue both --

THE COURT: Okay.

MR. CHIVVIS: -- amendment and argument, but amendment so much is easier here given the presumption.

THE COURT: I understand.

MR. CHIVVIS: That's the issue with the prosecution history estoppel. Your Honor, we think amendment-based estoppel applies in both instances and that the presumption can't be rebutted given the record before the examiner for the specific claims and given the prosecution history of the parent and the disclaimers made there.

THE COURT: But you take that the next step and then you argue that, so therefore I should grant summary judgment of no infringement. They say they have a literal infringement case. But would you still, assuming I agree with them on that, and I'm not saying I do, you would still want me to make a decision about whether the doctrine of equivalents is available before trial?

MR. CHIVVIS: Yes, Your Honor, we would. We would. I do want to point to one piece of evidence that I

do think is pretty clear on the literal infringement case. If we go to the last slide here.

This is in the record, Exhibit 11.  It's the deposition of Finch's expert, Dr. Benson, page 178, lines 1 through 11.  Here he is agreeing and admitting that in our product we don't have four sizes of the -- it's called the stomach or bag that's used in the manufacture.  They are limited to .5.  They go up to .6 and in fact they're pliable and allow particles greater than even .6 to go through.  But he said that given the range just even in the product specification of .5 to .6, he would expect to have particles of that size range finding their way through into the product.  It's an admission that the particle size is going to go beyond .5 and we do think that that warrants summary judgment in this case.

THE COURT:  Understood.

MR. CHIVVIS:  Thank you, Your Honor.

THE COURT:  Is there anything else you wanted to add on this.  I know I fully understand your vitiation argument and your argument about Dr. Benson's doctrine of equivalents analysis.  Is there anything you wanted to say about that?

MR. CHIVVIS:  Nothing to add over our briefing, Your Honor.

THE COURT:  All right.  Thank you.

MR. DEVRIES:  Good morning again, Your Honor. Mike DeVries.  I'd like to answer Your Honor's question very directly about the file history.  We have a different view of the file history and I personally went through and I personally created a set of I think six slides that help elucidate this issue.  I do want to mention at the outset, I do want to quickly move to Your Honor's specific question and that there is clear evidence of literal infringement of all of these claims and what they're asking Your Honor to do is to resolve a heavily disputed factual issue on summary judgment.  And that's inappropriate.

There are two different species of claims as we mentioned.  One says that the fecal extract is capable of passing through a .5 millimeter sieve.  No one asked the Court to construe that claim and hence its given its plain and ordinary meaning.  Both of their experts said that to them the plain and ordinary meaning of this claim is that the fecal suspension has minimal material larger than .5 millimeters.  That's what both of their experts said.

And then for the other types of claims that refer to the fecal extract comprising no particle having a size of greater than .5 millimeters, there was a construction.  That construction was agreed to by the parties.  I've shown it here and highlighted I think the important part.  And that is that no particle greater -- the

limitation, I'm sorry, means no particle greater than .5 millimeter as shown by sieving.  And what Dr. Benson, our expert, explains in Exhibit 78 and Exhibit 96 that we submitted to Your Honor at paragraphs 356, 57 and 382 of paragraph -- I'm sorry, Exhibit 78 and paragraphs 97 to 128 of Exhibit 96 is that as shown by sieving, the REBYOTA extract does not contain particle sizes greater than .5 millimeters.  One of the pieces of evidence that he uses in reaching that conclusion is the actual strainer bag that is used by Ferring in the manufacture of REBYOTA, which has a pore size of .5 millimeter.  And the testimony that they're referring to refers to the fact that as recognized in the patent, we explained this in our brief, a filter or a sieve has a pore size and there will be some degree small of tolerance within the exact number.  So when you're talking about a construction that says .5 millimeters as measured by sieving, he went to the actual best evidence, which is the size of the sieve that they use and that along with other evidence that he describes in detail is clearly sufficient to show both of those limitations are literally met.

So now let me move to the question Your Honor has, because it's clear from our perspective that finding no summary judgment -- summary judgment of no literal infringement would be improper and would be resolving factual disputes against us that are clearly supported by

the evidence.  And so they're asking Your Honor, aside from that, to bar us as a matter of of law from asserting doctrine of equivalents under their view of the facts, under prosecution history estoppel, claim vitiation and that we are looking at the claim as a whole as opposed to the individual limitation.  I'm going to focus on the first.  We agree that that's a question that's a matter of law.  This is an internal e-mail from Ferring where they say, these are in order, the person says, "Hi, the pore size of the strainer bag filter is .5 millimeters."  Then the same person writes back to Ferring and says, "here's some language.  The flexible strainer bag has a pore size of approximately .5 millimeter through which the product is strained."  And then says that consistent with what the patent talks about, "the pore size during mixing is not absolute due to the flexibility of the filter material."  And then says, "Hi all, one additional point that Lee," she was one of the cofounders of Rebiotix, "reminded me of is that use of this terminology highlighted below in yellow is important to avoid potential patent infringement issues."  So we understand that they're going to argue to the jury that there's a patent infringement defense around this .5 millimeter and their disputed characterization of the word approximately.

So should there be a file history or a

prosecution history estoppel under the supreme court's *Festo* decision, we think the answer is very clearly no.  This case is very analogous.  And to me the most instructive case, if I may, Your Honor is the *Eli Lilly* federal circuit decision in 2019 where the Court there determined that the claimed equivalent was merely tangential to the amendments that had been made and so that therefore, as a matter of law, there was no file history estoppel.  And I know -- this is the meat 2have Your Honor's questions.  Where counsel started was with the prosecution history of the '914 and '012 patents, and then worked back to the '628 file history.  I think it is very important to start with the '628 because what you'll see in *Eli Lilly* is determining whether or not the claimed equivalent was or was not tangential to patentability, requires looking at the file history, of course.  Sometimes there's an absence of a record, but here we have a very clear record that I think answers this question, because what you'll note is that the description of the later prosecutions was that there were multiple limitations added by amendment of the examiner and that those multiple limitations were required.  But the claimed equivalent here applies only to one limitation, that the examiner conclusively determined was not material to patentability.  And that's the key.  And *Eli Lilly* talks about this multiple limitations concept.

And so to -- so that I am starting at the very beginning, this is the initial amendment that gave rise to what happened. There was an obviousness rejection over prior art, including a patent to Borody. And there was an amendment made. And this is it. There was language in the claim, this is claim 65, that says "comprises no particle having a size of greater than .25 millimeters." And that was amended to .5. And that's the limitation that we're talking about today. This is all in Exhibit 98 to our papers. What the examiner then did in Exhibit 98 -- also the cites are in our brief and I'm happy -- they're also on the slides. I'm happy to hand those up. The examiner says "regarding amended claim 65" and others, "Borody teaches the limitations in the amended claims." The examiner discusses that there is are progressively decreasing sieve sizes to pass through a .5 millimeter, it says size, but it should be sieve. And then the examiner says, "each of these dimensions are respectively smaller, which are not greater than .5 millimeters." Unless there be any confusion in the subsequent interview with the examiner, the examiner said, again, this is in Exhibit 98, very clearly, "furthermore, there are incidences in the prior art literature regarding the fecal extract composition filtered through the .5 millimeter sieve." And so critically, Your Honor, the examine examiner said that does not get you patentability.

What happens next is that there were additional amendments that were made in the parent application, the Markush group was added, as you can see, Your Honor, and then a limitation regarding particles of non-living material critically and particles of biological material was added. And the limitation that is in dispute here comprises no particle having a size of greater than .5 millimeters was not amended.

There was an argument that was made. This is found in exhibit 37 to our papers, that was submitted by the applicant at the same time by the U of M and the applicant explained the amendments that had been made and said the examiner has not shown where the cited references, alone or combined, provide for particles of non-living material, let alone particles of non-living material having a size of greater than .5 millimeters. So having been told that .5 millimeters did not distinguish over the prior art, additional amendments were made to add the Markush group and also the non-living material and it was explained that that, that those limitations distinguished over the prior art.

Ultimately the claims were allowed and then in the '914 and '012 file history that counsel just showed, the examiners ultimately said to get over the prior art in those applications, the amendments that were approved here should be made, including the Markush limitation. And I think this

is undisputed, if you can look at the record, the multitude of limitations that includes .5 millimeters, but in conjunction with the other limitations that the file history definitively concludes were required for patentability.

And so here, where the claimed equivalent is not an equivalent that fails to satisfy the Markush limitation or a claimed equivalent that fails to satisfy having non-living material, here the premise of their argument is that it contains some non-living material that is larger. While we disagree with that, just like in *Eli Lilly*, the amendment regarding .5 millimeter on the clear record of the prosecution establishes that there is no -- that that is tangential to patentability.

So for that reason, the amendment-based estoppel under *Festo*, while we agree there is a presumption, the presumption has been rebutted because the record of the file history is crystal clear that the .5 millimeter itself is not the reason for patentability.  It's tangential to patentability because the examiner said -- and I'm flipping back now -- -there are incidences in the prior art where the fecal extract is filtered through .5.

And so then that's the amendment-based estoppel. In terms of the argument-based estoppel, they're relying on this statement and statements like it, I think, but this is a key statement that they're relying on.  And there is no

clear disavowal of here, an extract that comprises non-living material that's greater than .5 millimeters.  The argument being made here is actually the opposite.  It says there are no particles of non-living material, period, let alone ones that are larger.

And so for that reason, we think that it would be inappropriate to find that prosecution history estoppel based on either amendment-based or argument-based estoppel applies.

The final thing I'll say is that they asked Your Honor to determine as a matter of law that the prosecution history -- I'm sorry, the doctrine of equivalents argument that we're actually making vitiates the claim limitation or treats the claim as a whole.  That is clearly wrong and I just would mention two things, if I may.  One is that it -- it's based on a mischaracterization of what our expert is actually going to come to testify at trial.  Our expert is not going to come to trial and say, this limitation is irrelevant, anything goes, nothing matters.  That is not what's going to happen.  I've shown one of the items from our expert's, I think the cite here is wrong, Your Honor, but in our expert's reply report, which is Exhibit 96 at paragraph 152.  And what our expert is saying is that if they are right, which we factually disagree with, that there is a small amount of particles having a size slightly

greater than .5 millimeters, that that is equivalent. And as the Federal Circuit in *Bio-Rad*, in the 2020 *Bio-Rad* case held that is a perfectly appropriate type of argument that does not vitiate the claim limitation, which was the specific issue there. In that case there was a limitation that said non-fluorinated microchannel. And the equivalents argument was that that, that the equivalent which was a negligibly fluorinated microchannel is an appropriate doctrine of equivalents theory and it doesn't vitiate the claim limitation. And I think, although this is implied by the discussion in this particular case, doesn't treat the limitation as a whole -- the claim as a whole, it's focused on that limitation.

So for a few different reasons we think that prosecution history estoppel doesn't bar a doctrine of equivalents claim and neither do those other vitiation and claim limitation arguments.

THE COURT: Thank you.

MR. DEVRIES: Thank you very much, Your Honor.

MR. CHIVVIS: Your Honor, if I may.

THE COURT: Of course.

MR. CHIVVIS: Just like to start with what I think was an important concession by Mr. DeVries. He said we are in a circumstance where the presumption applies to all the claim limitations that we're talking about. They

didn't truly concede that in their briefs and I think that's an important concession for the conversation we're having right now.

So we are in a position where the presumption applies and they are arguing for an exception to the presumption and they're arguing tangentiality. Now everything that Mr. DeVries shows you was not from the prosecution of the '914 or the '012 patents, it was from the prosecution of the parent application. And when he was marching through the amendments there and saying the amendment adding .5 wasn't enough for the examiner there, that was in the parent. Okay. The examiner said in that, as Mr. DeVries showed you, I think .5 is still obvious over the prior art. But the applicant did not relinquish that argument. He showed you, even after the examiner said, that which the examiner is inclined to do in a rejection or later in an interview, they didn't give up the argument. They said over and over again, .5 is important. They added other limitations, but they said over and over again, .5 is important. That claim was ultimately allowed.

Now we go to the prosecution of the '914 and '012. And the examiner there says I'm not going to allow these claims over the prior art. There there was a choice. If applicant truly believed .5 wasn't the thing that got them those claims and could convince the examiner of that,

they could have amended the claim and left out .5. They didn't have to add .5. The examiner there made it clear that they agreed to add all those limitations to the claim. They amended in both of those applications to add .5 and that's the issue. There are in the '914 and '012, even if they had ostensibly preserved the argument of tangentiality in the parent, they conceded it in the two child applications that resulted in the patents we actually have in this case, because when the examiner rejected those claims, they didn't say, nope, we're going to leave out .5. They amended to add the .5 as well as the other limitations and they did it to overcome the prior art. They did it to overcome a rejection. This is not the *Eli Lilly* case.

That's all I have, Your Honor.

THE COURT: Thank you.

MR. DEVRIES: May I just make one statement about the concession only? I'm not going to argue anything more, but just to clarify.

THE COURT: That's fine.

MR. DEVRIES: To be clear, when I was talking about that, the issue that was characterized as a concession, I was talking about the no particle size greater than .5 millimeters. There is a separate claim with different language. Again, that is the one that refers to capable of passing through a .5 millimeter sieve and we

think that the record is not a record that shows that that is material to patentability given what occurred, which was there was a withdrawal due to an election requirement, a new claim and the new claim contained a variety of different limitations. So to be clear, we don't concede that *Festo* applies to every claim here. We do agree that it applies to some and for reasons I won't repeat, we believe that the presumption has been rebutted. Thank you, Your Honor.

THE COURT: Thank you.

All right. Here's what I'm going to say about this dispute.

To the extent that Ferring is requesting summary judgment of no literal infringement, that request is going to be denied because I do think there's a dispute of material fact with respect to the particle size limitations.

It was very helpful hearing from the parties about the estoppel question. I'm not prepared to rule on that today. I do want to get it right and I think that will require us digging into the prosecution history and seeing exactly what happened. But understanding the parties' arguments was helpful to us. I want to make sure that we get a copy of the slides used by both slides. If you could give those to our courtroom deputy, that would be great. We'll take a look at the cases that were cited.

With respect to the vitiation argument and the

argument that Dr. Benson's Doctrine of Equivalents analysis was improper, I'm not persuaded by either of those arguments, so what we will -- if we determine that prosecution history estoppel does not apply, we will allow the testimony from Dr. Benson on Doctrine of Equivalents. If we determine that it does apply, we won't.

One question I had for the parties to think about is this. We'll certainly get you an answer before trial on this issue of prosecution history estoppel. But of course there's a possibility that we might be persuaded by one side or the other, but we might be wrong. Do the parties think it might be appropriate to have the literal and Doctrine of Equivalents questions broken up in the verdict form so that at least we've got a good record if the Federal Circuit disagrees with whatever I decide about prosecution history estoppel?

MR. DEVRIES: We'll discuss for sure, Your Honor. That sounds like a prudent thing to avoid a waste of time where there's a difference of opinion, but we'll talk with the other side for sure.

MS. DURIE: I agree with both of those sentences.

THE COURT: Okay. Great. Thank you. I think everybody understands where we stand on this. So the motion is partially denied, motion is partially taken under

advisement.

The next motion for summary judgment is Ferring's argument that the U of M patents are invalid because, quote, "the extract terms lack written description support" or in the alternative, for the Court to reconsider its construction of the term "extract."

I've reviewed the transcript of the Markman hearing conducted by Judge Andrews. I agree with his construction, so I'm not going to revisit the claim construction of the term "extract."

There also appears to be a genuine dispute of fact about what a person of skill in the art would understand to be in the possession of the inventor based on the disclosure, so this motion is going to be denied. I don't need to hear argument on it.

The next one is Ferring's motion for summary judgment of non-infringement of the '702, '309 and '193 patents because the FDA approved use is not treatment.

We've looked at all the briefing in the record on this, and we think the record demonstrates a genuine dispute of fact about whether REBYOTA is effective for treating recurrence of C. diff. style infection as the claims require in various ways.

Of course, the FDA doesn't determine infringement. The Court does. There's evidence in the

record that the accused product is effective to treat CDI so the motion for summary judgment on that is denied.

The next motion has to do with substantially the entire microbiota.  We heard at the beginning of the hearing today that that issue had been resolved so that motion is dismissed as moot.

The next motion, Summary Judgment Motion 8 is that the Borody patents are unpatentable under 35 United States Code, Section 101.  The motion argues that those patents' claims that are being asserted are directed to a natural phenomenon.  Both sides agree that the Court should make this determination so I will advance the Alice two-step.  Ferring argues that Step 1, that the patents are all directed to a natural product, which is a fecal microbiome.  Federal Circuit instructs us, and the Supreme Court, that laws of nature, natural phenomena and abstract ideas are the basic tools of scientific and technological work and the building blocks of human ingenuity.  In laws of nature, natural phenomena and abstract ideas are unpatentable subject matter but, yet, they're incorporated into every patent at some level.

The asserted claims, we have looked at of the '702, '309 and '080 patent, they're all product claims, and the '193 patent are method of manufacture claims.  The Federal Circuit tells us that a claim to a manufacturer or

composition of matter made from a natural product not directed to the natural product where it has different characteristics and potential for significant utility, that's the -- I abbreviated the case. It's the *Nat. Alt. International Inc. v. Creative Compounds* case from the federal circuit in 2019, and it cites *Diamond v. Chakrabarty* from the Supreme Court.

The asserted claims here are directed to compositions and methods of manufacturing compositions that incorporate fecal bacteria or microbiota which are a natural product, but the claims also require the addition of a cryoprotectant and/or an antioxidant and an enema container with specific physical characteristics, and I conclude that they're not directed to ineligible subject matter as determined by this -- the Alice test at Step 1.

So I will cut the dance short, and we won't advance to Step 2, and that motion for summary judgment is denied.

All right. We've been going for about an hour and a half, and we're on to the *Daubert* motions. I can tell you that I will want to hear argument on all of Ferring's motions, and then we'll hear the summary judgment on the affirmative defense and equitable estoppel. I wanted to talk to the parties about that as well. I'm not going to need argument on Finch's *Daubert* motion. And we'll take a

break.  We'll be back in 15.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  Please be seated.

Okay.  All right.  Next on the list is the Ferring's *Daubert* Number 1.  $50 million up front access fee is impermissible because it's not tied to infringement and not based on a comparable license.

MS. DURIE:  Thank you.  Good morning, Your Honor.  Daralyn Durie for Ferring, and there are actually, I think, two related issues here that it makes sense to address together in the context of the *Daubert* and Mr. Melakowski.   One is the $50 million up-front fee, and the other is his failure to apportion.

With respect to the $50 million up-front fee, that is an amount that is roughly twice as much as total sales of the accused product to date.  Now, the way that Mr. Melakowski justifies that up-front fee is obviously untethered to the scope of infringement because with the scope of infringement at most being in the neighborhood of $20 million and change, that couldn't get you to an up-front fee of $50 million as damages for that infringement.  And indeed he admits that that $50 million fee in his view is for what he calls an access fee rather than a fee specifically tethered to the infringing uses, which is what

is required.

Now, what he relies on as ostensible support are collaboration agreements, specifically a collaboration agreement involving Nestle and Seres and Ferring's acquisition of Rebiotix.  Both of those deals involved the acquisition of products and deals to commercialize existing products.

Embedded within those deals was an IP license, but there were a number of other things embedded within those deals as well.  And he has nothing here to support the proposition that for a naked patent license, when one is looking at that as a proxy for damages, there could be an up-front fee, I would say, at all, let alone one that is 2X the total amount of sales of product in question.

Now --

THE COURT:  Can I ask you -- I just want to make sure that we're talking about the same thing.  You're not arguing -- or are you arguing that -- you're not saying that an expert can't opine that a reasonable royalty would be a lump sum.

MS. DURIE:  Absolutely not.  That is completely appropriate.  Significantly, that is not what Mr. Melakowski is doing there and, in fact, there's a bit of a bait and switch here in terms of what he's doing on that precise point.  Because Mr. Melakowski justifies the $50 million

up-front fee on the premise that in a hypothetical negotiation, the parties would have agreed to that as an access fee for rights on the patent for the entire term of the patent.  In other words, that it would be a fully paid-up lump as part of an overall royalty structure. However, Mr. Melakowski then turned around and said that the license in question in substance is only through the date of trial, because he was not suggesting that that was compensation for post-trial infringement and indeed said in his deposition that he understood that Finch was seeking an injunction that would enjoin post-trial sales in the event of an adverse judgment.

He can't have it both ways.  He can't have a damages methodology that is in substance a fully paid-up lump, if that's how you want to think about what the $50 million is, but then say that the scope of infringement to which it applies is only pretrial infringement, which is, as I said, to this point is $20 million and change.

THE COURT:  So you wouldn't say -- is there a case, or is it your argument that you can never have a reasonable royalty that's a lump sum that's more than the sales to date or that -- may be you can sometimes do that, but you can't do it here because they're also asking for a post-trial injunction.

MS. DURIE:  That's right.  You could have a lump

that was more than sales to date if the term of the license extended through patent expiry, and if this was compensation for infringement past and future.  And certainly that is the plaintiff's election.  They could ask the jury to award a damages number for all infringement, past and projected through patent expiry and they could ask for that in the form of a lump, and that could be a number larger than past infringement, but that is not what they are doing here.

They are only asking for -- and Mr. Melakowski was very clear about this, that his analysis was intended to be only damages for the infringement through trial.  And there he is mixing apples and oranges.  And I do think it's telling that that is why he characterize his $50 million fee as an access fee, not a fee for the infringement.

But because it is untethered from the actual scope of infringing use, it is impermissible as part of damages for the infringement, which is what we are attempting to measure here.

Relatedly, Mr. Melakowski has failed to apportion.  And what he has done is take these two, I'm going to call them collaboration agreements or acquisition agreements and attempted to extrapolate from those actually much higher numbers and then apply them to the situation here.  In order to do that, he would need to have some analysis of technical comparability with respect to the

intellectual property that was being licensed in those other agreements, or he would need to have some other apportionment methodology.  I think it is undisputed that there is no other apportionment methodology and Finch's argument, if there papers, is that Mr. Melakowski relied on technical comparability and that that was sufficient.

There are two fundamental problems with that.  Thing Number 1, he had no idea and Finch's technical experts had no idea what intellectual property was licensed in those other agreements.  They didn't look at that question.  In the case of Seres, it's redacted, so there's no way to know.  In the case of Rebiotix, they acknowledge that they did not undertake to analyze the scope of the intellectual property rights at issue and how they compare to the scope of the intellectual property rights at issue here.

Now, Finch tried to side step this by saying, oh, these agreements were all technology related to fecal microbiota transfer -- to F and T.  So it's in the same technical field.  That's not the question.  The question is technical comparability of the actual intellectual property that was licensed, because the point of this is determining whether the royalty rates for the license of the intellectual property are sufficiently tethered to the license of the intellectual property here to be able to use them as benchmarks.

And, you know, I tend to go to baking analogies, but, you know, the fact that you had intellectual property pertaining to the making of a cookie doesn't mean that a patent directed to the fact that a patent needs to be -- a cookie needs to be egg, sugar, flour is technically comparable to one that says you can add crystalized ginger if you would like. Those would be very different inventions of very different scope. They're both in the field of making cookies so here in order to avoid the need further to apportion, Mr. Melakowski would have needed to look at the license to the intellectual property at issue, understand the scope of those claims and their technical footprint and compare them to the technical footprint of the claims at issue in this case.

I said there were two problems. One is that he didn't do it with respect to the licensed intellectual property in the Nestle agreement or in the Rebiotix acquisition. He also didn't do it with respect to the Finch patents because he admitted he had no idea what the inventive increment of those patents was over the prior art. That was not something that he had considered in his analysis. So there was no way for him to undertake that comparison on either side.

And I would suggest this is similar to the situation in the *Bio-Rad* case where Mr. Melakowski's opinion

was excluded for his failure to apportion because there was no effort here in looking to those other agreements, which are not comparable, because they are collaboration agreements, but even if they were, no effort to compare the scope of the intellectual property rights that were being licensed.

THE COURT:  Thank you very much.

MS. DURIE:  Thank you.

THE COURT:  That covers your argument.  There was another argument about asserting that the hypothetical license would include exclusive --

MS. DURIE:  That's right.  And I'm happy to address that.  One of Mr. Melakowski's assumptions is that in the hypothetical negotiation Ferring would be getting an exclusive license to the rights at issue, and he used that to try to justify goosing up the royalty rate.  The problem is that the hypothetical negotiation is a construct that we use in order to try to evaluate appropriate damages for the infringement and the value of the rights that were at issue.

What Ferring actually had during the period of infringement was nonexclusive rights.  Finch retained the patents.  They retained the rights to practice the patents, retained the right to license the patents to others.  Nothing about what happened impinged on that, and, therefore, to the extent that the purpose of this inquiry is

to figure out what are the damages from what Ferring got, what Ferring got were nonexclusive rights and, therefore, the damages at issue have to be nonexclusive rights.

Now, it is true that one of the Georgia-Pacific factors talks about whether the license at issue is an exclusive or nonexclusive license. I think that has to be understood to mean, if you're comparing the rights at issue in this case with other benchmark license agreements, you need to look at whether those other license agreements were exclusive or nonexclusive in order to understand how they compare.

And indeed in the collaboration agreement between Nestlé and Seres, and in the Rebiotix acquisition, those were exclusive deals because you were selling a product, all of the know how, everything that went into developing a product and the intellectual property rights to a company that was buying that whole set have things to turn around and commercialize the product. So the way that Mr. Malkowski justifies his failure to account for that disparity in this case is to say, well, the hypothetical negotiation deal would have been the same. And we think that is legal error because the point is not what the parties might have agreed to in the abstract. They could have agreed that, you know, Ferring would buy Finch or Finch would buy Ferring, but that's not the point. The point is

what is the deal specifically they would have been made with respect to the rights at issue, which are nonexclusive rights during the term of infringement.

THE COURT:  Can I ask you, is it or is it not your argument that -- that it can be appropriate for an expert to opine that in the hypothetical negotiation the parties would have negotiated an exclusive license?  That's okay, it's just not here because -- because of some other circumstances?

MS. DURIE:  So not -- not quite.  I would say the parties in a hypothetical negotiation theory could have negotiated, I suppose, to, like, sell the Brooklyn Bridge.  I mean, they could have negotiated for any one of a number of things.  But that's not the question.

The question isn't what other things might the parties have agreed to buy or sell.  The question is what would the parties have agreed to specifically as a reasonable royalty for the infringing use.  And here, the infringing use is nonexclusive.  So that is the thing that has to be valued.

And so it doesn't matter what else the parties might have agreed to transfer.  In assessing a reasonable royalty for the infringing use, Mr. Malkowski was required to come up with a number of compensation that would compensate Finch for what Ferring got, which was

nonexclusive rights.

THE COURT:  Thank you very much.

MS. DURIE:  Thank you.

MS. SCHMIDT:  Good morning, Your Honor.  Leslie Schmidt on behalf of Finch and UMN.

Your Honor, Mr. Malkowski, like -- like Ferring's expert, Mr. Kidder, relies on licenses he believes are comparable, analyzes those licenses, and arrives at what he believes is a reasonable royalty in this case.

Now, Mr. Kidder looked at the same license agreements.  He came up -- he came to a different conclusion.  Mr. Malkowski is more focused on the Seres-Nestlé agreement.  Mr. Kidder is more focused on the Takeda agreement.  Both of the products that were being developed and are under those agreements were oral formulations.  So the idea that there's some great difference in the technologies that the experts are looking at with respect to the two licenses, that's just not correct.  Both -- both of those agreements related to products that were oral formulations.

And so then what this comes down to is whether or not, you know, Mr. Malkowski is correct in his conclusions or Mr. Kidder, and that's a question for the jury.  The baseline comparability of these licenses is more than established.  They are in the field, they include

patent rights, Finch is a party to some of the agreements, it's not a party to others.  Mr. Malkowski explains why he focused on the Seres-Nestlé agreement, compared to the at the Takeda agreement.  In the Seres-Nestlé agreement, the parties were more similarly positioned to Finch and Ferring than in the Finch-Takeda agreement, based on the timing of how far along the product was developed.  And for that reason, he focused on -- more so on the Nestlé-Seres agreement.  And he didn't just stop there, he apportioned and I'll explain how he did that.

But first, to address this upfront fee -- fee issue that was raised.  Now, the reason Mr. Malkowski included an upfront fee in his opinion is because there are upfront fees in these types of pharmaceutical agreements, including -- including the Seres-Nestlé agreement and the at the Takeda-Finch agreement.  And those upfront fees -- the way the license agreements are written, the upfront fees are not just for, you know, mere access or R&D support.  They are partial consideration -- that's what both of the licenses say -- they're partial consideration for the rights that are granted that includes the patent rights.  And so in his view, it is appropriate to include an upfront payment in those circumstances.  And I would -- I would point Your Honor to the *Transocean* case, which we cite in our -- in our opposition brief where in that case it was industry

practice, and in particular a practice of the patentee, to require an upfront fee in their licenses and a running royalty. And in that case, the jury awarded an upfront fee based solely on an offer to sell what was an infringing drill rig. Now, when that drill rig was actually sold, there was no requirement to pay an additional royalty in that case because they redesigned -- by the time they implemented the drill rig, it had been redesigned; there was no need for an additional royalty.

Here, based on the structure of the comparable license agreements, an upfront fee is appropriate, in addition to a running royalty. And those two components, an upfront fee and a running royalty are included in both the Takeda and the Seres-Nestlé agreement.

Now, in the Seres-Nestlé agreement, the -- the upfront fee was significant. It was $175 million. Mr. Malkowski apportioned that down to 50 million based on needing to apportion out things that aren't related to the patents and further apportioning to account for what Ferring claims its constructions are. Now, we disagree with that, however, we gave them credit for that.

Now, with respect to the running royalty component, he apportioned the 50% down to 30%, again taking into account -- you know, giving Ferring credit for what they claim to be are their contribution. And he

testified -- he explained this at his deposition, which is Exhibit 128 to our brief, at page 157, lines 11 through 25.

And so -- and what Ferring's expert does, he disagrees that there should be an upfront payment at all. He focuses on the Takeda agreement.  So despite the fact that there's an upfront payment in that agreement, in partial consideration for rights of the patent, he excises that out and he says the running royalty should be 5%, and he gets there by -- he starts at 6%, he goes down, then he goes back up.

And it's our view, Your Honor, that it is for the jury to decide which of those damages theories is appropriate based on facts presented to them, and we think that that view is supported by the active video case and also the *Bio-Rad* case.  When that case went up to the Federal Circuit, the Federal Circuit said that the licenses were sufficiently met, the baseline comparability, such that Mr. Malkowski could talk about those licenses to the jury and the jury could decide what damages should be in.

And if Your Honor has questions about the exclusive license part, I can --

THE COURT:  If there's anything you want to say, why don't we have you address it now.

MS. SCHMIDT:  Thank you, Your Honor.

I think what I would say on that piece is that's

a consideration for the jury.  If the jury disagrees with Mr. Malkowski's assumption or conclusion regarding the nature of the particular license, they can take that into account.  Certainly Ferring's expert, I'm sure, will criticize that and they can decide how that should affect, if at all, the reasonable royalty.

THE COURT:  Thank you very much.

MS. SCHMIDT:  Thank you, Your Honor.

MS. DURIE:  The only thing that I would reinforce, Your Honor, is what you just heard was an explanation that the other two agreements on which Mr. Malkowski principally relies are in the same technological area, but nothing about the intellectual property that was licensed in them.  And I think the case law is clear that for purposes of technical comparability for apportionment, what matter is comparing as a technical matter the scope of the licensed rights in order to determine the compensation for those licensed rights and whether that is a fair comparison.

What we heard is that upfront fees are common in these types have agreements.  But the types of agreements to which counsel was referring are not a naked patent license as is what is at issue here, but -- and Mr. Malkowski does not dispute that.  I mean, the hypothetical negotiation results in a naked patent license.  But instead these

collaboration agreements where there are rights to a product to work that was done to get FDA regulatory approval, manufacture, everything else that goes into the development of a product and no effort here, specifically to pull out the intellectual property rights that were licensed, determine there technical footprint or their value and compare that to the value of the intellectual property at issue here.

THE COURT:  Thank you very much.

All right.  For this one we're going to take under advisement.  I should say for these three because there were three related issues.  I did have some notes here, but I do want to take a look at the cases mentioned during the argument today and I also want to take a little bit more time to review the expert report of Mr. Malkowski. And we'll get you a decision on these as soon as we can.

Now, let's switch to Finch's motions.  The first summary judgment motion asked the Court to grant summary judgment of no equitable estoppel.  I guess we can cut to what I think we might do with respect to this one, which is this:  After reviewing the pretrial order we saw that both sides think that this issue should be tried to the bench. And so since we've got this dispute between the parties about whether or not there's a dispute of fact, normally what we do in this situation in Delaware is that we'd

actually just go ahead and hear the testimony, and then make a decision as opposed to try to write a summary judgment motion on that.  So we'll hear it at night after we let the jury go, if that's really something that the parties want to put forward as an issue.

And we'll talk about trial time later, but we'll deduct it from the trial time as well, the time spent.

So the motion for summary judgment will be denied and of course if there's evidence that's relevant to this defense, as well as other issues in the case, we'll hear the evidence during the day.  And then any additional evidence that's only relevant to this equitable estoppel defense, we'll here at night.

Any questions about that?

MS. DURIE:  No, Your Honor.

MS. SCHMIDT:  No, Your Honor.

THE COURT:  All right.  And then we have Finch's *Daubert* motion that relates to Mr. Karr's opinion.  That motion is going to be denied.

Here's what I'll say about that.  It seems to me that what the FDA didn't approve is an indication of circumstantial evidence about whether the product meets that indication.  There might be different standards, but the experts can get crossed on those.

I don't understand, though, that we're going to

have hours of testimony about FDA guidelines and standards. I did understand, having reviewed the report, that that was just mostly background information. I do think it could be confusing to the jury to hear a lot about that and I'm receptive to Finch's argument that some of that discussion could cause jury or confusion.

So I'm receptive, if we're going to let Mr. Karr testify in accordance with his report, that we could have a curative instruction to be read, either at the time he testifies or in the final jury instructions that makes clear that the jury is supposed to apply the law on infringement as I give it to them and not the FDA standards. I'll ask the parties to meet and confer about that.

Does anybody have any questions?

MS. DURIE:  No, Your Honor.

MS. ROSS:  No Your Honor.  Thank you.

THE COURT:  All right.  Great.

Okay.  And then we have the Ferring motion for leave to file first amended reply and counterclaims in reply.

I'll hear argument on that, I guess, if there is argument to present.

MS. DURIE:  I certainly don't want to present any argument that is not welcome.  So let me try to be brief.

There is a recently issued patent, as the Court knows, that traces its priority back to the patent that is already at issue that we are relying on as prior art.  As soon as the patent issued, we raised this issue because we believe that the University of Minnesota is infringing that patent.

We understand that they are asserting sovereign immunity with respect to an infringement claim.  The problem is that they are attempting to rely on that product as evidence of commercial success and the product that is made by the University of Minnesota was then, at least for a period of time, transferred to OpenBiome, which is an affiliate of Finch in substance -- I'm not saying that as a matter of corporate form, but in substance -- and they're relying on that product as evidence of commercial success.

One of the problems here as a nexus matter is that in order to be able to rely on that for commercial success, they need to show a relationship between that and the infringement of their patent rights.  Our view is to the extent it's commercially successful is because it's infringing our earlier patent rights and we think that it would be misleading to allow them to make that argument to the jury.

So the reason that we would like to assert an unclean hands defense is we think in the specific factual

context of this case, where the University of Minnesota is a plaintiff, where they have put at issue their product, but they are then asserting sovereign immunity in an effort to foreclose us from being able to show the jury that their product infringes, and that there is infringement here on both sides of the house, to the extent that one were to accept that we infringe, that is an inequitable assertion of sovereign immunity.

Now, obviously unclean hands is ultimately an issue for the Court, but I will just note that that is the sort of fundamental premise of the unclean hands defense that we seek to plead.  We don't think it requires additional proof.  We think the evidence has been fully developed and could be presented to the Court on the existing record.

THE COURT:  You're not being prevented from telling the jury that they shouldn't rely on or they should disregard Finch's commercial success evidence because -- for the reasons that you just said, right?  Has anyone said you can't do that?

MS. DURIE:  Well, we certainly think we should be allowed to.

THE COURT:  This case --

MS. DURIE:  No decision has been made that would preclude us from making that argument and we think we

absolutely should be able to make that argument.  And our point from an unclean hands point of view is that the assertion of sovereign immunity that essentially tries to take off the table their infringement with respect to that product and the fact that absent sovereign immunity that is something for which we would be able to get relief, while asserting that we are willful infringers for allegedly infringing their leader's issued patent rights is an inequitable assertion of the defense of sovereign immunity in the context of this case.

Let me just back up and say one thing as context.  If these were compulsory counterclaims, sovereign immunity would have been waived.  So the reason we find ourselves in this position is because they are not compulsory counterclaims.  They could, in the normal course, be counterclaims.  And we think that here, in view of the fact that they've affirmatively put that product in issue it is inequitable for them to be resting on that sovereign immunity defense.

THE COURT:  Okay.  Let me ask you this.  The unfairness here really seems to come from the fact of sovereign immunity, which is just what it is as opposed to anything else.  And I guess my question for you is, you know, one of your best arguments is that, well, they shouldn't be able to enjoin us if we can't enjoin them.  And

that's a great argument, but it seems to me to come in more to the balance of the equities when I actually would be determining an injunction.

MS. DURIE:  I think that's fair, Your Honor. And that's why I said it's an issue for the Court.  And I do think at the end of the today, to the extent that there were a request for equitable relief on the table, the Court absolutely could take that into consideration as a matter of equity.  That's absolutely right.

THE COURT:  Let me ask you this.  Since I'm hearing from you that this doesn't require any additional evidence, I recognize that it's a -- that it's a motion to amend the pleadings and generally we want the pleadings to be closed before we go to the jury trial.  Would it be legal error for me to say why don't we see how things shake out and then we'll decide later if this is something that could or should be still in the case.  I'm just trying to figure out what the minimum amount of disputes is I need to decide because we have limited amount of time.

MS. DURIE:  Fair enough.  And there are a lot of disputes.  That seems reasonable to me.

THE COURT:  Okay.  Thank you very much.

MS. DURIE:  Yep.

MS. LOFFOLLAHI:  Good afternoon, Your Honor. Sharre Laffollahi on behalf if Finch.  I'll start off first

by just making a couple of basic points.  One is that the UMN patents for which, you know, they want to assert unclean hand against UMN for asserting sovereign immunity, the *Hlavka* prior art or *Hlavka* patent is not being asserted against these UMN patents.  So we're talking about a totally -- in connection with UMN a totally unrelated patent that they now want to bring into the case after discovery is closed and say that this patent is both valid, something that there's been no discovery on but that we dispute based on the information we know about so far, and it's infringed, again, something there's been no discovery on, no claim construction and there's been no finding of infringement. So essentially what they want to say is at the close of the case we want to add an unclean hands defense that's premised on UMN's product infringing a patent that has nothing to do with the patents that are being asserted in this case.  And then thinking about the unclean hands defense itself, that defense should go to something that has to do with UMN's patents, either inequitable conduct associated with the prosecution of the patents or something related to the assertion of their patent rights in this case.  Again, this Hlavka patent, totally unrelated, not being asserted as prior art to the UMN patents.

Now, just going to this defense itself, which, as the Court recognized, is it's unclean hands for you to

assert your patent rights for any patent and then assert your sovereign immunity rights against infringement of another patent by that party.  No case, neither party has cited any case where that unclean hands defense has been successfully asserted or litigated.  The one case that we found and we cited it in our briefing says that that defense is bogus.  We quoted that.  And that's the *Magnus Systems* case.

So just -- I mean, to go to the Court's question about can we decide this later, I think the big issue from our perspective is we dispute that there are no additional fact findings or discovery that would need to be done in order to say that this unrelated patent now reads upon this product.

THE COURT:  But is there anything that needs to be decided -- would it change how anything is presented at trial?  I'm hearing from them, no.  Can we get to the jury trial without deciding this?

MS. LOFFOLLAHI:  Yes.  We would need more discovery later as to this defense if they were able to litigate it, but it would not impact the trial.

THE COURT:  Just to be clear, it would not be legal error for us to move forward with the jury trial on this?

MS. LOFFOLLAHI:  That's right.

THE COURT:  Or we're going to move forward on and it's not going to include this unclean hands defense and you'll reserve your right to make an argument later that it's too late, that it's a bogus defense.

MS. LOFFOLLAHI:  Or that we would need discovery, yes.

THE COURT:  All right.  In light of that, that has pretty much decided what we're going to do on this, which is we're going to reserve on it and we're not -- no one should stay up late waiting for a decision on this before the trial.  Thank you.

MS. LOFFOLLAHI:  Thank you.

THE COURT:  Okay.

Discovery dispute about subbing out a corporate witness.

MS. SCHMIDT:  Leslie Schmidt again, Your Honor. Your Honor, our request is straightforward.  We are requesting to be permitted to bring Susan Graff, who was a former member of Finch's board, to trial as our corporate representative.  The reason for this is because the -- you know, we have limited options.  Mark Smith, who we had intended to be our corporate representative, is not available.  And we are not able to request that he come. And so we -- as soon as we became aware this might be an issue, we advised Ferring.  This was back in May.  And it

was at the time that Ferring was actually seeking to amend their initial disclosures to bring a different corporate representative to trial.  So we proposed, why don't we both just agree to amend and bring new corporate representatives and their response was no, we're just withdrawing the request fully and we oppose yours.

At that time we also advised them that, that Mr. Smith may not be available for trial.  We continued to try to, you know, work with Mr. Smith and see if we could get him to come.  We were unsuccessful.  And as soon as we confirmed that he was not going to come, we advised Ferring and said we would like to move to amend our initial disclosures, we need to bring Ms. Graff now.  They opposed. We -- and I know they mention in their papers they raised this at the June 28th hearing that we had.  We met and conferred with them about it that day.  We said what can we do so we can potentially reach agreement on this?  And the two issues they raised were a deposition and document production.  And we got back to them on July 3rd and said we would do that consistent with how we produced documents for other witnesses.  They then said no, that's still not enough and so therefore we filed the motion with Your Honor.

And our view, Your Honor, we think that, you know, they claim there's prejudice based on needing to depose Ms. Graff and not having her documents, but we think

that's inconsistent with what Ferring has done, which is in the midst of all this, after we advised them that we might need to call Ms. Graff at trial in May, they issued a trial subpoena to Finch's current CEO, Mr. Blischak, who has been at the company just over a year.  He was not on our initial disclosures, he has not been deposed and we haven't produced documents from him, yet they are more than happy -- they would like to call him at trial.  And so we think that the idea that if we are offering to let them depose Ms. Graff, produce her documents, we don't think that compared to what they are apparently willing to do with Mr. Blischak, they don't have a basis to oppose our request to allow us to substitute Ms. Graff when we're offering them more than what they are happy to accept with respect to Mr. Blischak, so we therefore request that we be permitted to amend our disclosures to include Ms. Graff and to bring her to trial.

THE COURT:  So we always have corporate representatives testify at trial.  It's just what we do and nobody usually challenges that because everybody wants somebody to sit at the table to smile to the jury.  What's she going to testify about?

MS. SCHMIDT:  So Ms. Graff, she joined the board in April 2021 and was there through March 2024, and so was there before the litigation started.  So she can talk about Finch's, you know, product development, their business and

also the shift in their business that has happened, you know, as a result of Ferring's infringement.  And so she can provide a face to the company.

THE COURT:  But so what issue is that relevant to that the jury has to decide?

MS. SCHMIDT:  Your Honor, it's relevant to damages certainly.  I think in general company background is relevant in general at a high level, but I think it's absolutely relevant -- absolutely relevant to damages.  She can also introduce patents, a little bit about the company, how it relates to UMN, you know, all of that.  And how, you know, there has been a change and I do think that this is something Ferring wants to talk about.  There was a change at Finch from focusing on product development and now they don't have a product anymore.  And so she can provide an explanation to that, which I think is going to be one of Ferring's central themes.  So we think we should be able to provide testimony and evidence on that to present our view of those facts and how they relate to the issues the jury will decide.

THE COURT:  Do you need her to get in any documents that your experts have relied on ?  I mean, you have an expert for damages, right?  He relied on some stuff.  One of the things he didn't rely on was her testimony.  I just am trying to understand what happens if she's not

there.

MS. SCHMIDT:  Your Honor, if she's not there, there may be nobody from Finch who testifies.

THE COURT:  All right.

MS. SCHMIDT:  Is the issue.  We have -- and who was there for, you know, an extended period of time.  You know, as we mentioned, Mr. Smith is not coming.  There's another may-call witness on our list, Mr. Burgess, who we're also not sure if he's willing to come.  And you know, there's, you know, Mr. Blischak, but he does not have the time at the company and the foundation to testify about things that happened many years before he joined, whereas Ms. Graff has that.  So without her, we may well be left with no one.

THE COURT: All right.  Thanks very much.

MS. SCHMIDT:  Thank you.

MS. DURIE:  Thank you, Your Honor.  Point number one, we understand that Mr. Blischak will be there.  He is the company's CEO, capable of serving as the corporate representative to the extent that there are documents that need to be put in.  Not clear they need him at all, but if they need somebody, he's capable of doing it.  And to the extent that there are concerns about whether he's got personal knowledge, we're willing to work with them in order to address those concerns so the documents get in.

THE COURT:  But I also want to make sure the cross-examination of him isn't going to be like, well, you don't know because you weren't there.

MS. DURIE:  Exactly my point.  We're willing to work with them on that.  That's fine.  I'm willing to forego that line of cross in order to move that issue.  Notably, Mr. Burgess, the other individual they mentioned, is, as I understand, the company's current CFP.  He is not technically an employee, he is a consultant serving in the role of chief financial officer, but he's on their may-call list, he's also available to them.

I will note that Mark Smith, although we have heard repeatedly that he's not available, we have asked repeatedly what that means.  He's their client, as we understand it, he has a cooperation agreement with them, as we understand, that requires him to cooperate.  We haven't heard anything with respect to why he is purportedly unavailable.

I will note with respect to Ms. Graff, we don't have any of her documents.  She was not a document custodian.  They probably -- Finch probably doesn't have her documents because she was a board member.  She was not a Finch employee.  Her e-mail address was not a Finch e-mail address, it was an e-mail address for her and whatever other job she had.  So they would have to go to her as a third

party in order to get her documents.  That hasn't happened. Obviously we would need to depose her.  And this issue has been brewing for a long time.  I mean, they raised this possibility a long time ago, then it went silent, then it popped up, then it went silent, then they filed the motion. We're a week and change out from trial and there's no reason that Mr. Blischak, as noted, can't provide whatever testimony they need.

And I will agree, Your Honor, as the person intending to examine Mr. Blischak, that I will not cross examine him on the basis that he doesn't have personal knowledge.

THE COURT:  All right.  Thank you very much.

MS. DURIE:  Thank you.

MS. SCHMIDT:  Your Honor, may I respond briefly?

THE COURT:  Yeah, absolutely.

MS. SCHMIDT:  Thank you.  So Your Honor, while Ferring has agreed not to cross Mr. Blischak on his, you know, shorter tenure at the company, they will cross him on the fact that he's a lawyer and a patent lawyer and that that's the person that Finch brought to this trial and that's the type of company that Finch is.  And that's, you know, that's their case, that's how, you know, based on some of the motions in limine, we expect that's what they'll do. We think we should be able to present our side of the story

and present the company as we think it is, and that person to do that is Ms. Graff.

Now, to respond --

THE COURT:  Does she have personal knowledge about what she's going to talk about or is she being educated for purposes of the trial?

MS. SCHMIDT:  She has personal knowledge.  She was a board member who was involved in running the company, so she has personal knowledge of this -- of those facts.  I mean, certainly -- she joined in 2021, so anything before, that she would not necessarily have personal knowledge of, but neither would Mr. Blischak.  So but based on what she is going to talk about, based on her time at the company will be based on her knowledge.

Now, with respect to Mr. Smith, while we represented him I believe at his deposition, we are not representing him now.  He does not have a cooperation agreement with the company.  We cannot bring him to trial.  And the same thing with, I think with respect to -- and the last point I'll make with respect to Ms. Graff's documents, we have collected her documents, as we told them, and so we have her documents, we can produce them consistent and with the way that they have been produced for other witnesses in the case with the same search terms and the same date restrictions.

THE COURT:  What are they?  I mean, what documents do you have of hers?  Is it garbage or is it stuff that's relevant to stuff she's going testify about about?

MS. SCHMIDT:  May I confer with my colleague?

THE COURT:  Yes.

MS. SCHMIDT:  Thank you, Your Honor.  It's a combination of board materials and materials about Finch trying to go out and raise money to support the company.

THE COURT:  Are these documents that they have not seen before?

MS. SCHMIDT:  Correct.  That's correct.

THE COURT:  They don't have these board materials you're about to produce to them?

MS. SCHMIDT:  No, they do not.  And I believe based on the way that ESI was produced in the case, which I believe the date cutoff was December 21st, 2021, it's about 50 documents, which we think is, based on the amount of documents produced in this case, not a large amount, particularly given that we just got an new expert report yesterday and we'll be deposing that expert.

THE COURT:  None of these documents are going to get submitted into evidence, right, because they're not on your exhibit list if you haven't produced them, right?  You're not going to attempt to have her introduce any of these newly produced documents into evidence.

MS. SCHMIDT:  No.  We do not.  We will not, no.

THE COURT:  Okay.  I'll here from Ms. Durie again.

MS. DURIE:  Your Honor, we haven't heard any reason why Mr. Blischak can't provide the testimony at issue.  I do think it is fundamentally unfair to be now producing new materials that were not produced in discovery the week before trial.  I think what is going on here is they are trying to curate a witness who is immune from cross-examination, because we don't have the materials that we need we to need to be able to effectively cross examine her.  I don't think they should be able to do that, particularly when they've go their current CEO.

And to be clear, she's a former employee.  Right?  She's not even a former employee.  She's formally affiliated with Finch.  She's not even on the board of directors now.  They're not even presenting a current board member.  They are presenting a past board member.  So and -- so I think it is untimely, I don't think there is good cause because there's no showing for why they could not call one of the two people who is currently affiliated with the company, whose documents we actually got.  Not that Mr. Blischak was a document custodian, I want to be clear, but he's at least a current employee of the company as opposed to trying to inject this really at the 11.5 million hour.

THE COURT:  All right.  Thanks very much.  Anything else you wanted to add?

Can you just put on the record just very clear the reason why Mr. Smith is unavailable is because he won't come?

MS. SCHMIDT:  Correct, Your Honor.

THE COURT:  Okay.

MS. SCHMIDT:  We requested -- Kirkland, you know, Finch requested that he come and he declined.

THE COURT:  Okay.

MS. SCHMIDT:  And I'll say, Your Honor, on the documents point, the only reason that we -- we don't think these documents are, you know, these aren't key to the case.  We agreed to do it because that is what they asked us to do on the meet and confer.  And so now this is now being twisted against us, where -- and I believe Ferring acknowledged that, you know, in saying that they have no ability to cross Ms. Graff, you know, because they don't have her documents.  They don't have Mr. Blischak's either.  So that argument, it's just essentially using our attempt to resolve this issue against us.

THE COURT:  Understood.  All right.

I think this is a close call.  I think the decision is within the discretion of the Court.  I've considered the fact that this was brought up a couple of

months ago.  I've taken as true Finch's assertion that they want Mr. Smith to come and that he won't come.  I've taken into account the fact of what this witness is, which is a corporate representative, which I understand why they want one for the jury, but are not uncommonly swapped out.  And so I am going to allow the witness to testify, Ms. Graff.

I am going to require that Finch produce the documents by this evening.  I also am going to require that Finch be very specific about the topics to which Ms. Graff will testify so that there's no surprises.  Yes.

MS. DURIE:  May we take her deposition?

THE COURT:  Of course.  Of course.  I hadn't gotten to that, but you may take a full seven-hour deposition.  I'm also going to require that Finch disclose to the other side all of the documents it intends to introduce through Ms. Graff in her direct testimony at trial because I do think given the late stage of this, that's the fair thing to do in exchange for me allowing this.  I don't want there to be any surprises or new stories here.

Are there any questions about the Court's ruling?

She needs to be made available as soon as Ferring is ready to take that deposition.

MS. SCHMIDT:  Thank you.  Understood, Your Honor.

THE COURT:  All right.  And now we're on to the nine motions in limine, some of which I understand and some of which admittedly I don't.

So let's start with Finch no. 1.  And this is one of the ones, I think I understand what the argument is, but I need somebody to walk through with me exactly what it is we're talking about in the documents.

MS. CADE:  Good morning, or I guess good afternoon, Your Honor.  Ashley Cade on behalf of the University and Finch.

So I'm happy to answer any questions on what our position is, but I think Your Honor wants to walk through the documents, so I can do that first if that's where you would like to start.

THE COURT:  That's fine.

MS. CADE:  So this first e-mail is cited in our motion papers as one of the exhibits we're concerned about. As I'm showing here, we have an e-mail from Rebiotix's lawyer to Ferring's lawyer and it includes outside counsel that is setting forth a vague statement about patent applications that are the parent applications to the patents at issue in this case.  What we have here is basic statement, for instance, for the *Sadowsky* patents, there is the application for the UMN patents, example art references to establish invalidity.  What they have for the Finch

patents is non-infringement positions, but we don't know what those non-infringement positions are. It is just a basic vague statement and what they're going to do is put this in front of the jury, say, hey, look jury, we're good, state of mind, we had a subjective belief while we were doing this diligence that we didn't infringe the patents-in-suit. What the jury is going to see is one, a vague statement, probably could assume that it's similar to the positions they're raising now in this case. We don't know that. But they also have lawyer names on them, right. We have a lawyer from Rebiotix telling a lawyer from Ferring non-infringement positions as discussed, along with outside counsel. You can't really unring the bell on this as soon as it's showed to the jury that this is effectively, I think the Court and the hearing we had on this last summer called it a sub rosa advice of counsel defense. I completely agree. You can't really take out the attorney advice aspect of it once this is shown to the jury. And I think that's the concern with this document in particular.

So if Your Honor has any questions on this one, I'm happy to move to the next document.

THE COURT: So this is -- and I'm thinking out loud here, so this has got Rebiotix's lawyer on it and they're going to admit this and they're going to say -- or you're worried the jury's going to think, see, we had a

lawyer tell us we were in good shape with respect to invalidity and non-infringement, but they're shielding from the jury other things the lawyer might have said to them about validity and infringement.

MS. CADE:  I think it's a little more nuanced than that.  And I guess just to take a step back, the documents we have from Ferring/Rebiotix on this issue are what were premerger discussions between the two companies, arm's length discussions, where they were exchanging non-infringement invalidity positions.  So what we don't have is any internal analysis from either Rebiotix or from Ferring discussing the underlying positions, whether Rebiotix pointed to them, had a subjective belief that these were legitimate positions or whether Ferring had a subjective belief that these were legitimate positions. What they're going to do is take this and say, look, we had this diligence discussion, Ferring ended up buying Rebiotix, therefore, jury, you should believe that there was -- we had a subjective belief that we didn't infringe.  Obviously since Ferring purchased us, it was a non issue.  That's the concern we have, because we don't actually know what Ferring thought, because I think in their motion papers, they said, yes, we haven't produced that.

THE COURT:  Right.  That's the problem with attorney/client privilege, right, is that it shields

relevant evidence.  But is it so wrong for them to say we don't have to tell you what our counsel told us, but here's what somebody else's attorney told us, and here's what we believe and yeah, there might have been other things going into what they believe that you can't test, but that's what it is, because that's what the attorney/client -- I mean, you're not saying that because they put their state of mind at issue that they've waived privilege.  You're not saying that?

MS. CADE:  I think we're past that.  The Court did rule on that issue last summer and I think we disagree with whether or not there was a waiver of privilege here, but I think we're past that.  We're now at the exclusion stage.  Since we didn't get that additional discovery, I do think that there should have been additional discovery warranted or that it should be excluded all together because we don't know what that -- what the basis was.

And it, I think -- I don't want to go too far on this if unnecessary, Your Honor, but the problem we have here is this isn't like you got a random fact witness talking to a different fact witness at Ferring saying, look at our non-infringement positions, we think we're fine.  I think mixed in with that is also attorney advice and you probably can't like disentangle a fact witness saying we have a non-infringement position, here it is, but I think

this goes a lot further.  It's not a fact witness to a fact witness, it's lawyer-to-lawyer communications and that I think is the biggest problem with this document in particular is you can't really unring the bell and say, hey, bunch of lawyers got together, agreed it was fine, therefore our subjective belief or what the jury should take away from this is there's no willful infringement.  That's really the problem with this document.

THE COURT:  All right.  So that's the first one. How many are there, by the way?

MS. CADE:  I think just two.  There's a few cited in the briefing.  There's one that, I don't want to say innocuous, but not worth necessarily walking through.

THE COURT:  Okay.

MS. CADE:  So the second document here -- actually if Your Honor, if I may just one point on this.  I think the questioning of Finch's expert on this document in particular is pretty telling what it is they're going to tell the jury.  You can see that the question here is not even a question, says, "I'm not going to ask you about the substance of this document, just the fact that it's there, the fact that there's discussion of non-infringement and invalidity positions."  I think that just showcases how we expect them to use this in front of the jury.

The second document here is another one filled

with lawyer communications and this one in particular, if I can direct Your Honor, it's from Steve McCauley, it's early on in the document, is a Rebiotix lawyer at the time.  I believe it's at page 4 of TX 3768.  And he's sending an initial e-mail to other lawyers, says Carl, Charlie, Jesse" -- and I believe Jesse is the Ferring Lawyer.  "We have reviewed the Cristobo patents in view of the prior art and our composition related to 2660."  2660 is the code for REBYOTA, the product code that is used internally or was at the time of Ferring.  "What we have here is we looked at these patents, looked at it compared to our process, we're going to provide you a summary."  Direct Fluid then provides that summary.  Says, and it's just not on Cristobo patents, it's related to other patents as well and said, "we just did get a bag of that REBYOTA, we ran it through a sieve for you to confirm about the particle sizes."  And I think Your Honor just heard a lot about the particle size issue today, so this is going to be directly relevant to their state of mind on whether they willfully infringed the UMN patents, because their non-infringement position is in fact we don't have this particle size issue.  So they're going to get up and put this document in front of the jury and if I'll go to the next slide and show them this testing that they did in response to a request from a lawyer from Ferring during diligence.  So again, baked into this document is the exact

same issue as the last one.  It's filled with lawyers all over the document asking, saying hey, we all discussed this, here's our results of the testing, not the underlying testing, not the underlying methodology, not whether we tested other samples, here's our best foot forward, only the results of what happened when we ran that sieve.  And they're going to use this to say, again, Ferring bought the company, therefore they must have believed there was no infringement or no willful infringement.

It's hard to take out the lawyer aspect of this, because the lawyers were all involved in these discussions.

THE COURT:  All right.  And there's one more?

MS. CADE:  This was the one last document.  I just wanted to talk through the two with you, but I'm happy to answer any other questions if there's any issue.

THE COURT:  No.  That was extremely helpful.  Thank you.

MR. CHIVVIS:  Thank you, Your Honor.  Matt Chivvis again.  I just want to be really clear.  These documents are not privileged documents.  That has already been decided by Judge Andrews and also not the issue before the Court now.  These are documents that came from Rebiotix before Ferring purchased Rebiotix in the context of discussing an acquisition while, as Ms. Cade said, there was arm's length negotiations going on where Rebiotix was giving

information to Ferring so Ferring could make its decision about whether it wanted to proceed with the acquisition.

We're not seeking to introduce these documents for the state of mind of Rebiotix or the underlying analysis that might have preceded some of these communications. These documents go to a specific issue and we only would introduce them if Finch opens the door. And we offered that to take this MIL off the table.

You heard earlier today from Mr. Alper that in the context of their copying story that they want to introduce a piece of evidence and that piece of evidence is the finalized merger agreement where there was an insurance provision broadly stated. That insurance provision was as a result of Ferring wanting something in the merger agreement reflecting what had go on in diligence. And Ferring's state have mind as to that, if they're going to put that in, if that is allowed into evidence, and Your Honor we would submit it should be excluded for 403 reasons if not others, but if it does come in, then obviously we need to explain what Ferring's state of mind was with respect to the inclusion of that provision and Ferring had information that was provided to it from Rebiotix when they were not the same company. It's not privileged information in which it was informed by Rebiotix that there were substantial non-infringement and invalidity basis for these claims. And

so if that insurance issue comes into play in this case, then these documents that explain the state of mind of Ferring who didn't generate them, is fair game.  That's our position.

And Your Honor, again, we proposed, when we were discussing MILs in this case, a door-opening agreement, if you don't introduce the insurance provision and say it's relevant to willfulness, then we'll keep this issue out of the case because it would be potentially confusing then.

THE COURT:  And that's still on the table, that offer?

MR. CHIVVIS:  That door-opening agreement is still on the table.  So if they don't want to bring up the issue of the insurance provision in the agreement, we actually think it should be excluded for separate reasons and I'll get into that later potentially, then this evidence isn't an issue.  Because this evidence just informs the basis for what, what Ferring was thinking when that provision was included.  And it would be fundamentally unfair for them to be able to introduce this evidence that they say shows our willfulness and then essentially hamstring us from being able to present the other side of the story on that same issue.  And that's the key issue as far as this group of evidence as far as we're concerned. There were some other documents they had cited in their MIL.

I think we've resolved all that. It's just an offhand mention of FTO a couple of times. We're fine redacting that from the slides that we would enter, so I think that takes the rest of the MIL off the table. We're really just focused on these arm's length exchanges that explain what eventually the merger agreement looked like. And if they want to introduce the merger agreement with respect to that provision, then we should be able to explain.

THE COURT: Understood.

MR. CHIVVIS: Thank you.

MS. CADE: So just to -- I'm cautious to say a few points, because I know that never ends up actually being the case. So Mr. Chivvis mentioned 403 prejudice of us introducing this merger agreement. He calls them insurance provisions. We've referred to them as risk provisions. We can quibble over wording, but that was a properly disclosed theory during discovery. They were on notice that we were going to do that. And what they did instead was produce this select handful of documents that they then relied on as willfulness fraud while shielding all of the underlying information. That's a 403 issue for us. So I disagree with him on whether us introducing this merger agreement is a 403 problem. There's no door-opening on our part, properly disclosed. The 403 problem is it's going to risk the jury substituting this lawyer analysis for what they should be

analyzing on infringement.

And I would just make one other point, Your Honor. And I believe this is Exhibit B to our motion in limine. I'm going to direct you, it's the deposition transcript of Ms. Jones, who is the former Rebiotix founder. And I this just showcases the amount of discovery that we're missing. If I can direct your attention to transcript page 376 starting at line 4, Ms. Jones was asked, "the reason that this adjustment provision" -- that's the insurance provision, as Mr. Chivvis put it -- "was included in the merger agreement is that Ferring was concerned that after the merger it would be sued for infringement of the Dr. Sadowsky and Dr. Tords and Dr. Borody patents, right?" There's some back and forth on some privilege instructions, Ms. Jones refuses, says I can't answer your question. Go to 377, line 7 to 9, question, "is that because of the privilege instruction from your counsel?" Answer, "yes." That's the problem here.

So what I heard Mr. Chivvis say, and maybe I'm misconstruing it, but what I understood him to say was if they put in that merger agreement we should be able to get up and put these documents in front of the jury and say Ferring believes that it was not infringing. Seems to be taking Rebiotix out of the mix, just focusing on Ferring. This is the exact information that was shielded had during

discovery from us and I don't think it's proper for them to be able to introduce these documents for that premise.

THE COURT: All right. Thanks very much. Counsel, I don't need to hear any more. This was very helpful to understand what's going on here.

So this Finch motion in limine is going to be denied with respect to the documents we saw up on the screen today. I think these documents are absolutely relevant. I see them as the person selling the company to say, look, you should have no problems because we don't infringe. And that absolutely goes to the state of the mind of the defendant here.

I think we already covered this in my colloquy with counsel, but I agree that what else Ferring's attorneys might have been saying is relevant, but that's not the test here. I've looked at this under 403. And again, I think it's absolutely relevant. I don't think there's a risk of unfair prejudice. In fact, I think it would be prejudicial if we weren't able to have these documents admitted. So that one is denied.

That said, it sounds like there's still an offer on the table to try to keep all of this out of the jury, so I'll ask the parties to work with each other on that.

We have Finch motion in limine no. 2. This one I didn't quite get. It's to preclude evidence testimony or

argument that U of M spoliated evidence.

So no one has asked for a spoliation instruction, so that's not going to happen.  Is this motion really just to keep them from from introducing evidence that you've got missing lab notebooks?

MR. DEVRIES:  So Mike DeVries again, Your Honor. So there's some ambiguity about that, so let me tell you where things stand.  So this is proposed final instructions from Ferring.  There are two separate notes that we see as requesting a spoliation instruction.

THE COURT:  Yeah.  So I haven't read those yet. And that may be part of the source of my confusion.

MR. DEVRIES:  But, if despite in those two notes there being a request for a spoliation instruction as I read it, if they're saying whatever is there, we're not asking for spoliation any more, then the direct answer to your question, Your Honor is, yes, we think then in that case that evidence of Dr. Sadowksy cleaning out his lab, including certain lab notebooks at a time when there was no evidence that the University reasonably foresaw this litigation is not relevant to any issue in the case.

They noted three bases for relevance.  It was credibility, which we think is code for spoliation, frankly. Copying, which doesn't make sense to us because these are not lab notebooks that were being maintained by the

defendant that was doing the copying but someone else, and there was no basis to include that they would include that copying evidence. And then the last was why certain evidence is missing, I don't see any relevance to that issue in the case.

And so for those reasons, we think that there is no relevance to these materials. And if they bring them in, along with the implication of spoliation that I think will attach, it's going to require us to put on evidence explaining why that implications is unjustified, which is confusing to the jury and wastes time.

THE COURT: All right. Thanks very much.

MR. DEVRIES: Thank you.

MR. CHIVVIS: Thank you, Your Honor. Matthew Chivvis again.

On the issue of the instruction, we are not affirmatively asking for an instruction at this point, just for preservation purposes we put one in the final jury instructions in case new evidence comes to light in the course of the trial that would justify one --

THE COURT: Oh, gosh. That would be exciting.

MR. CHIVVIS: -- so that we are not -- so that we are not precluded. Okay.

THE COURT: Yes.

MR. CHIVVIS: But we are not affirmatively

asking for one at this point in time.

THE COURT:  Okay.  So -- all right.

MR. CHIVVIS:  So that's what we said in the -- in the course of the briefing on the MIL, and -- and that is our position.  However, this evidence is absolutely relevant to many different issues in the case.  You've heard they want to put on this copying story.  You denied our MSJ on that and said at least aspects of it are going to be at issue in this case.

This -- this evidence is about the who came up with certain ideas first and we have a continuous chain of evidence that goes back to 2009 with one of the inventors on our patents and our technology, including notebooks, including board decks, including all kinds of information showing we go back further than UMN even got started on their IP.  And there's an exchange, and we put it in our MIL response, where the individuals that are associated with what eventually becomes Finch says if you have evidence you were first, you should assemble that.  You should assemble that because there's going to be this question about who was first on all these issues.

And they were fully on notice that this type of evidence should have been preserved and yet what we learned, and we learned it very late in the depositions, is that all the lab notebooks that would have shown part of the

underpinning for those bar charts you saw earlier when we were talking about the patent disclosure, when we -- all the evidence that relates to the patient that was tested there, all the evidence that underpins the University of Minnesota patents as far as experimental evidence it's gone.  It's gone.  It was all destroyed and it was all destroyed literally in the month before this lawsuit was filed after Finch had already been shaking -- month before, month after the lawsuit was filed, when Finch was already intimating that it was going to file suit against us, before we took the preemptive action of heading that off.

So there was a reasonable apprehension of suit, clearly if you look back through Finch's own disclosures to the SEC, et cetera.  If you look at this exchange, which happened back in -- very early on, 2012, 2013, where the internal people at what became Finch are saying keep a hold of this information.  And it's gone.  We don't have it.

And we think the fact that it doesn't exist is relevant.  We think that there is going to be a contested evolution story here and we should be free to ask witnesses do you have the backup for that.  And if they say no, that's in evidence and then we have our own witnesses come in and say we do have the backup for our evolution story that predates yours.

One important fact here, we're not just talking

about Dr. Sadowsky's notebooks.  He's the one individual that retired, but apparently he had the lab notebooks not just for himself, but Dr. Corris, who is still at the University of Minnesota we understand, Dr. Hamilton who was also a co-inventor, and others, and apparently all of the lab notebooks were destroyed for all of the inventors when just one of the inventors retired.

I mean, we have a lot of questions about that and it -- it came to light, really, right at the end of fact discovery.  It came to light in a deposition and we asked for follow up about it and we got what essentially is almost a rog response in the form of a letter trying to explain what happened.

And we still have questions about it today, that's why I said we wanted to preserve the issue of spoliation because we didn't get to ask all the questions that we wanted to in fact discovery about this issue and we do think it's absolutely relevant to this competing narrative invention story that we have here.

THE COURT:  So you want to be able to at least leave the jury with the impression that these don't exist because there's something relevant that the other side doesn't want you to see, but you're not going to be suggesting to the jury that there's something illegal about what they did in destroying them, right?

MR. CHIVVIS:  No.

THE COURT:  Or unethical or, you know, against the rules of --

MR. CHIVVIS:  That's right.  I mean, unless the witness said that in response to a question, which would give us the basis.  But we're not going to argue that on the current record that we have from the depositions and the like, and we are not going to pursue that instruction on spoliation unless something new comes to light.  But we do think the absence of evidence that would corroborate their theory of the case is a relevant fact for the jury to consider here, especially given the very severe accusations they're making to us about copying their technology when, in fact, we think our entire genesis of our product predates theirs.

THE COURT:  Understood.  Thank you.

MR. DEVRIES:  Your Honor, just three brief points.

One is that what counsel just said is factually inaccurate in an important respect, so I'd like to correct the record.  The suggestion was that they didn't know until the end of deposition discovery about this issue.  That is not accurate.  In April of 2022, as we put in our papers, we served initial disclosures where we stated that certain lab notebooks of at least two of the named inventors are no

longer accessible as these lab notebooks were among materials discarded when Dr. Sadowsky retired from his position at UMN as part of the regular course of removal of such material upon the retirement of a researcher.  So the notion that this came up late and that they were deprived of discovery is wrong, and I think it's a response to what we cited in our -- in our brief.

And this is the second point, that when there is a spoliation accusation such as is being implied, I think, and I'm going to come back to that because that was my third point, there is an obligation on their part to do something about it, to do it quickly, to not wait until the end of the process, which is what happened here.

Over two years later in June of 2024, they suggested spoliation.  They say now that there is a different relevance for this, that it's about who came up with the ideas first.  There's no priority dispute in this case, Your Honor.  And so the issue that they say it's relevant to is actually not going to be litigated before the jury.  And my feeling is, from everything I've heard, that this will become a spoliation sideshow and the facts do not support it.

The University was not a party to this litigation until months after this occurred.  There was absolutely no evidence to suggest that U of M was -- knew

about or reasonably should have known about becoming a party to a lawsuit that was filed against a different party at the same time this is happening.

So for those reasons, while we understand that there is a claimed basis of relevance, we don't think that's right.  We think there's a huge risk that this turns into a spoliation sideshow.

THE COURT:  All right.  Thank you very much.

All right.  That was very, very helpful.  I do think that the -- well, let me start by saying that I understand that Ferring has withdrawn its request for a spoliation instruction.  I also understand that Ferring is not going to be asking witnesses questions using the word "spoliation."  Is that right?

MR. CHIVVIS:  That's correct, Your Honor.

THE COURT:  Yeah.  And I think that the fact that these lab notebooks no longer exists is important for the jury to here and it has some relevance.  Might be minimal relevance to issues in the case and I don't think that the risk of prejudice substantially outweighs relevance.

And we've also had representations from Ferring about what they're not going to do with this evidence and they're going to be held to those.

That said -- so the motion is denied.

That said, if this does get out of hand, I will be amenable to a curative instruction to give to the jury and the parties should meet and confer about that.

Okay.  Finch motion in limine number 3.  I think we can make this short.  We're not going to have references to patent troll, pirates, bounty hunters, bandits, playing the lawsuit lottery, shakedown artists.  I think that it could go either way, but shell company and patent assertion agency are also out.  That's a discretionary call and that's the way it's going to come down here.  I think those were the two terms.  Neutral terms, like nonpracticing entity, I think is fine.  Patent assertion entity is not fine.

I think this one -- let's see here.  Was there another issue in this one?

MS. AFINOGENOVA:  Thank you, Your Honor.  Alina Afinogenova on behalf of CU and Finch.

So the second portion of this motion in limine deals with evidence of other threatened or actual litigation.  And in the motion and briefing itself was identified two specific exhibits.  The motion is not -- those are exemplary, the motion is not quite so limited and I'll touch on that in just a moment.

But to start with, at least those two exhibits.  I mean, this is a classic example of a highly prejudicial bell that cannot be unrung.  Both of those exhibits -- I'll

just pull up the numbers -- 4039 and 4045, two of Ferring's exhibit, they both relate to investigations into potential securities claims.  There's no actual substance in terms of -- and if Your Honor needs a copy, I'm happy to hand those up if that would be helpful.

THE COURT:  Give me one second.  I think I probably have it.

MS. AFINOGENOVA:  Sure.  No problem.

THE COURT:  All right.  I've got 4039.

MS. AFINOGENOVA:  Perfect.  And 4045 is the second one, but they're very similar.

THE COURT:  Give me a second.

MS. AFINOGENOVA:  Uh-huh.

THE COURT:  Okay.  Go ahead.

MS. AFINOGENOVA:  So both of these exhibits, as I mentioned, are very similar, just generally referring to the fact that a firm or litigation team is investigating potential claims.  It doesn't provide any sort of substance and there's no sort of resolution, and really the only basis that Ferring could have in its rebuttal to our motion is that these are relevant to why Finch's business struggled, yet there's no explanation of that in either of these documents.  And, you know, there's no finding of wrongdoing, there's not even a reference to any -- what any alleged wrongdoing would be.  Just that, again, a certain

investigation had been opened.

And this was really, as I mentioned, the opinion of unduly prejudicial evidence, not only does it not provide any relevant information, but it purely invites the jury to speculate as to what these referenced investigations might be and how they were resolved, and really into the details of it without providing any useful information to the jury.

THE COURT:  So you plan to argue, as your theory of the case, that part of the reason that Finch's business was struggling was because of Ferring's infringement.

MS. AFINOGENOVA:  That's correct.

THE COURT:  And so they should be able to say that you've had other problems that caused you to lose money, right?

I mean -- so maybe I agree with you on these documents, but let's see what other evidence -- they should be allowed to say that they were sued, right?  Or no?  You don't want any mention of that at all, putting -- even aside these documents?

MS. AFINOGENOVA:  Can I have a moment, please?

THE COURT:  Yes.

MR. DEVRIES:  I think I can answer this very clearly.

There is no problem with them positing that there are other reasons that Finch struggled.  I think the

problem that we have is an -- a reference like this to an unsubstantiated, undescribed investigation.

THE COURT:  By a plaintiff's firm.

MR. DEVRIES:  By a plaintiff's firm that's going to cause the jury to speculate and believe that there was something that was wrong, even though there was no basis for that.  So I think this is really a very unique and special type of evidence.  We are not seeking to preclude them generally from coming in and saying there were other reasons, other than our infringement, that caused you to have business problems.

THE COURT:  Okay.  I guess what I'm struggling with is -- I agree with you, I can't tell from these documents what they're about, but they might be related to other reasons you were having problems, which -- so let me hear from the other side and then we'll see if we can hash some of this out.

MS. DURIE:  Yeah.  I think I can short circuit this, Your Honor, because it seems to me this is an issue on which the Court should just reserve and see how the evidence comes in.

I don't know that we're going to seek to admit these particular documents.  I do think the general issue that there were other reasons that Finch failed, including the fact that it was aware that it was under investigation

and that it had problems with its product, and that's the reason it stopped its product development, having nothing to do with us.

And I -- to the extent this is a concern about what we're going to say in opening, I'm not going to reference these documents in opening.  And to the extent that, at some point in time, we seek to admit these documents, which I think is probably unlikely, the Court could rule on an objection at that point.

I think the Court is going to need to take it question by question in terms of whether we are being fair in asking Finch's corporate representative, in all likelihood, if she is the one who testifies that Finch's desire to advance its product development was ^ to us the other things that were actually going on with the company.

THE COURT:  Right.  I guess what I would -- I do think it does make sense to reserve on some of this, but can we have some assurance that we're not going to have a line of questioning that's going to use the word "fraud" in a way that suggests that the other side is fraudsters and, therefore, you should find against them.

MS. DURIE:  No.  I'm not -- I don't -- I'm going to use the word fraud.  No, that's fine.

THE COURT:  All right.  Let me here from Finch.

MS. AFINOGENOVA:  Just one point, Your Honor.

We heard from Ferring's counsel that they don't plan to introduce this.  It sounds like it will be coming up on cross.  So if Ferring will be planning to use it on cross, we would appreciate some notice so that we can have that discussion outside of the presence of the jury before it is shown.

THE COURT:  Counsel.

MS. DURIE:  I mean, I -- probably would depend a bit on what happens during Ms. Graff's deposition, but I don't have a problem -- we can address this before the testimony of whoever the relevant Finch witness winds up being.

THE COURT:  I think that does make sense.  I did hear you say you didn't want to admit it.  I don't want to be flashing up to the jury on cross something that has to do with investigations about fraud without any context.

MS. DURIE:  I completely understand.

THE COURT:  All right.  Very good.

All right.  We'll reserve on this one and we're going to hold the parties to their representations.

All right.  Let's take another break because I'm looking at the next one and I want a couple minutes here before we get into it.  It 1:20.  We'll come back at 1:40.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  Please be seated.

All right.  Now, we're on to Finch's motion in limine no. 4.  This was all done under another judge's scheduling order, which allows more than three on each side.  So as they kept going, I was a little surprised.  But it is nobody's fault.

So number 4 has to do with precluding evidence of Finch infringing the Ferring patents or that Ferring patents mean that -- Ferring having its own patents means that they don't infringe and we have an agreement from Ferring that it doesn't plan to use evidence of its patents as evidence of noninfringement of Finch's patents, but there's still an assertion that Ferring having its own patents is relevant to issues, including damages.

So let's hear argument, if we could from -- actually, can would hear from Ferring first just to walk me through exactly what the proffer of what the theory is going to be and then we can talk about what Finch doesn't like about it?

MR. CHIVVIS:  Thank you, Your Honor.  There are two groups of patents that they've lumped together for purposes of their MIL.  There are the Hlavka patents.  These are the patents that all trace back to the original patent application, inventors, Hlavka, that's some of the

foundation IP on which Rebiotix and Ferring built this product. That IP, as you'll see in a footnote at the start of their brief, is already at issue in the case. The experts have analyzed it. It's used in priority determinations, it's used for secondary indicia and it's cited throughout the reports. So I really think we should separate off that issue. That's already been well vetted in expert reports. They didn't move to Daubert it or strike it out of the expert reports. In fact, they conceded same. And then we're just really talking about can it be used for other issues in the case. And we absolutely think it is relevant to multiple issues in the case. And this is going to be somewhat interrelated between the two groups of patents.

The work that was done at Rebiotix, the inventive work that resulted in IP being issued is absolutely relevant to contest this copying story I have. There's a story of independent development here that is reflected in various facets of the testimony that we will be presenting, but part have it is is, look, we were working hard, we were generating our own IP, we were developing a product, there was a lot of blood, sweat and tears that went into this, so we think it's absolutely relevant to that issue, this independent development.

I mean, for instance, they're going to be -- I

don't know whether they'll do it on cross or how they plan to do it, but essentially eluding to one of our key witnesses, the CEO, former CEO for Rebiotix, Lee Jones, and say that she did something wrong, that all of her, all of the work that is reflected in what Rebiotix is, what the product REBYOTA is is somehow just derivative of theirs and we should be able to respond to that to say, no, there were a lot of independent developments that went into this product that are reflected in this product, and it is the sum of a lot of hard work by the Rebiotix/Ferring scientists and other people involved in that product, so we think both sets are relevant to that issue.

Both sets are also relevant to damages. And in fact, it's interesting, these patents all originally were on Finch's exhibit list and I think even the citations are to PTX numbers still. Their own damages expert analyzed these as part of the compliment of what came before because whatever the value of the patented technology they're asserting against us needs to be taken in light of what contribution it represents over the prior art. So he looked at it, he later claimed it's not that relevant in his view, but we absolutely do think it's relevant to that very issue. There's a backdrop of a lot of intellectual property in this field, some of it's our IP, some of it's other peoples IP that predates, there's other IP being developed on the side.

It's a crowded field.  So when you look at the specifying IP that's being asserted against us, the UMN patents, the Borody patents, you have to understand it within the greater landscape and understand that these patents that they're asserting against us do not represent the foundational IP, the first invention of fecal transplant in the United States or the world.  They are incremental inventions, if anything, over prior art and the landscape in general when you do it on a comparative basis.

So we think it's relevant to damages, we think it's relevant to combatting this narrative that they appear to want to put on that suggests that everything we did was derivative when, in fact, it was separately inventive and for those reasons as well we think that this evidence is relevant and their motion in limine should be denied.

THE COURT:  All right.  Thanks very much.

MS. CARSON:  Good afternoon, Your Honor.  Pat Carson again.  Your Honor, I would actually group the patent into three different buckets because you have the Hlavka '927 Patent and its -- some related applications, earlier applications that have been in the case all along.

THE COURT:  And you're okay with that?

MS. CARSON:  And we're okay with that.  We're okay as long as they don't use them to assert that they're practicing the prior art, which clearly is not the law,

you're not allowed to do that. We cite several cases including *Tate*. And they say they're not going to do that. So that's fine. Then there are two recently issued Hlavka patents which were added to their exhibit list.

And Your Honor, before I go further, I did want to make some corrections to the exhibits that we're talking about. Two of the numbers were were off in our opening brief. 3903 should be 3902. And 4290 should be 4291. And I apologize for that.

So the second bucket of patents is these more recently issued Hlavka patents.

THE COURT: When were they issued?

MS. CARSON: One issued I think about in April of 2024 and one just issued like a couple weeks ago.

THE COURT: Okay.

MS. CARSON: And those have the same disclosure as Hlavka, so they don't add anything to the case. And we know that Ferring has been trying to make some mischief with these more recently issued patents because they tried to assert them against UMN. That's the patent, at least one of them was the patent that they were trying to do a counterclaim of infringement and Magistrate Fallon shut them down on that. So there's no reason -- they don't need those patents in this case, except to try to make implications that are improper. They have the Hlavka basic patents that

we do not object to.  Their experts have relied on those as being the independent development story, what REBYOTA was based on.  All of that is in their expert reports and what their experts have had subject to them going outside of their reports and we reserve the right to object, we're fine with that.

Let me talk about the third category of patents, because also on their exhibit list is a whole series of patents to Lee Jones.  They have never identified these as a defense to willfulness.  They've never identified them, timely identified them as being a basis for their independent development.  And those are patents that have tremendous potential to just confuse the jury.  And the Supreme Court has recognized that it could mislead the jury by withdrawing their attention from the real subject matter in controversy.  They can be confused into thinking that or not even being sure who is suing whom, who has the patents on what.  And that's really where we're objecting.  They never identified these patents with respect to any have the issues in this case.  Now they log them onto their exhibit list and it's clear that they're going to try to use these to confuse the jury about what it is that they did.

Now, they say these patents are only our exhibit -- only identified by us, or produced by us.  Yes, that just makes my point.  They never relied on these.  As a

matter of fact, we tried to get discovery into their patents. We served a 30(b)(6) topic and we also served a discovery request for information about their patents. And for both of those they shut us down. They're told they're not relevant to any issue in this case. Now they're coming into this court and saying that they should be able to rely on them because suddenly they became relevant after shutting us down on discovery. And that just is -- that's trial by ambush.

THE COURT: All right. Thank you very much. All right. Let's walk through -- let's start with the Lee Jones patents. How are those going to come in and what is the relevance? So I understand your point about that you want evidence of inventive work that resulted in IP being issued, but what is the relevance of the IP being issued?

MR. CHIVVIS: Yes. So I'll focus on the Lee Jones patents first per Your Honor's request, just starting with the backdrop of the discovery in this case. They point to a letter that says we shut them down. There's a lot of letter writing that goes on in cases. There's not a discovery response that they point to where we supposedly shut them down on this discovery. And in fact, Lee Jones was deposed about these patents and about her inventions and her contributions and they're just interwoven in her story of the work that she did at Rebiotix to develop the product

that's accused of infringement here.  The patents represent the development work that went into that product or corroborative of how much work it took to get the product from an initial stage product in the early 2010s through the FDA process and then beyond.  There were a lot of incremental inventions that are reflected in these patents that are part of the full compliment of what that product is and that's relevant to two things.  That's relevant to the development work that Lee Jones would testify about.  And we would have her testify about and she testified about in her deposition, she mentioned these patents in her deposition.  And it's also relevant to what is the compliment of value that is represented in this product, REBYOTA, that they are seeking a 30% royalty on.  I mean, the significance of the royalties they're seeking here when you compare the work that went into the development, I mean, to suggest that just the two sets of patents that they have represent 30% of the value that's generated by that product when we went through so much development work, we pushed it through FDA, we got clinical trials that actually reached their end point.  I mean, this was a product that was subject to a biologic license application with significant data.

The issue there, what work went into this, is their other IP that is represented by that work that we think is really important to be a counterbalance given

especially the extreme nature of the royalty that they're

seeking in this case, which doesn't properly apportion for

those other contributions that are represented in the

product itself.

THE COURT:  Let me ask you this, though.  Do

your experts take into account these Lee Jones patents as

part of their analysis?  I'm trying to understand how -- you

say it's relevant to damages, but you have an expert that's

going to testify about damages.

MR. CHIVVIS:  Yeah.  They do, Your Honor.  Their

expert made clear that he considered them.  He didn't

discount them because he would have to to come with as

extreme a royalty rate as they're proposing in this case.

And then in response our expert responds to that and says

no, they are important and you need to apportion and you

need to account for this other work that is represented in

this accused product, so it is in the expert reports.

THE COURT:  Okay.  All right.  In light of

that --

MS. CARSON:  May I just make one point?

THE COURT:  Yes.

MS. CARSON:  Their experts don't mention these

patents anywhere in their expert reports.

THE COURT:  But your experts considered it.

MS. CARSON:  Our expert considered it and

discounted it, but their experts never took these patents on or made any type of consideration of these specific patents. And all the development and stuff that they're talking about, they don't need patents to show that.

THE COURT:  Right.

MS. CARSON:  They can do it without the patents.

THE COURT:  I understand.  So here's what we're going to do on this one.  I think this is a discretionary call.  This is a call under rule 403.

With respect to the Lee Jones patents, I'm not going to exclude evidence that these patents exist.  The witness can be asked if there are patents that exist.  We're not going to admit them into evidence, though.  I do think that the potential for prejudice greatly outweighs the probative value of actually having the patents in evidence. I don't know what the jury is going to do with all of these patents.  So that's with respect to Lee Jones.

I will say, though, with respect to all of these patents, we've got concessions from Ferring that we're not going to use these patents to say we don't infringe or that we were practicing the prior art or that we weren't willfully infringing because you can't willfully infringe if you've got your own patent.  None of that is going to be argued.  And I will also be amenable to a request from Finch for a curative instruction should anything like that or

something similar to that happen, yes.

MS. CARSON:  Thank you, Your Honor.

THE COURT:  So that's Lee Jones.

Let's talk about the Hlavka patents.  No expert has relied on these patents, right?

MR. CHIVVIS:  So there's the two categories of Hlavka patents.  They're all related.

THE COURT:  The new ones I meant.

MR. CHIVVIS:  The new once, the only reason that our technical experts didn't rely on these patents is that they're recently issued.  They came after the technical expert reports were in.  I will note, however, that they are quite relevant to the priority issues in this case because the patent office has allowed claims over the prior art that trace back to the original application with the specific limitations that are in dispute for priority purposes.  And we did a similar analysis, when we were able to, of the other issued Hlavka patents that were out at the time.  The newer patents have claims that are the type of foundational broad claims that kind of clear the field and have the specific limitations at issue as opposed to being what had earlier been discounted as more nuanced or narrower claims and respond to some of the arguments that have been made in their expert's report about the value of looking at the way that the prosecution history has come in.  And so we

actually think that these are relevant to challenging their expert on his view about the priority determination with respect to whether certain limitations trace back to the original filings given the patent office's allowances over the prior art including the Borody prior art that is at issue in this case.

THE COURT:  So you're saying you want to cross examine their expert with the newly issued Hlavka patents?

MR. CHIVVIS:  Yes, Your Honor.

THE COURT:  Okay.  What's you are response to that?

MS. CARSON:  Your Honor, I mean, discovery is over.  Their expert did not put in an expert report on this.  Their expert tried and Magistrate Fallon shut them down.  Now they're saying, well, we want to do it here.  It's a back door to try to get around the magistrate's decision.  And what they're telling you, Your Honor, is they want to use them improperly.  They should be kept out.

THE COURT:  All right.  So I'm not going to allow Ferring's expert to talk about these newly issued patents.  They are not addressed in the expert report.  With respect to being able to cross examine the other side's expert, gosh, I'm not going to allow them to be admitted into evidence during the cross.  I'm not sure what that cross-examination would be.  I think I would have to hear

what the question was. And so I'll entertain objections to that at trial. We'll cut into trial time. This sounds like something that could take a while to work out. I'm hoping this isn't going to be an issue, not because I've prejudged it, because I'm hoping for my own self that it's not going to be an issue that I have to decide. All right. So that's that one.

All right. This one is Finch's motion in limine no. 5 and this is confounding. I take it -- let's go ahead. Sounds like there's a lot of back story here.

MS. FARNAN: There is, Your Honor. And I guess unfortunately you weren't involved in it. Maybe I'll try to give you a little bit of the factual background in how we got here.

So obviously Dr. Borody is an inventor on some of the patents here, as is fairly typical in a case. He lives in Australia, he's not currently affiliated with Finch. As is the case in many instances, he was cooperating with Finch and in that circumstance Kirkland & Ellis began representing him and he has some health issues, which had, you know, be disclosed all along. And Ferring served a subpoena on him and we accepted service of that subpoena, we being Finch and Kirkland & Ellis. And then Kirkland & Ellis produced documents on Dr. Borody's behalf and was working to schedule his deposition. He ran into some health issues.

He was originally scheduled to be in the United States in March of 2023.  That ended up being canceled and so it was agreed that he would be deposed on June 6th, 2023, in Australia.

And all along, you know, Finch had cooperated with that effort and Kirkland & Ellis was representing him. And actually, if Your Honor, if I could just grab my timeline, I can give you some better -- so then what happens is -- and I have this because I had the timeline really more for the adverse inference motion, but I think it's just better to get all of the factual issues out there.  What happens then is that on March -- I'm sorry, on May 12th, 2023, Dr. Borody mentioned to Kirkland & Ellis that he's pushing off the deposition.  He e-mails one of the lawyers -- and this is Exhibit A to Ferring's -- to our opposition to the Ferring's motion in limine on the adverse inference.  He did not disclose the real reason why he was pushing it off.  In fact, he said I cannot disclose that at this time.

So six days later, on May 18th of 2023, Dr. Borody reaches out to Finch directly.  He asks -- he has a lawyer in Australia.  He asks the lawyer to be connected to Matt Blischak, who is Finch's CEO.  And that is Exhibit J to the motion for adverse inference.  So that's six days later.

A call then occurs between Finch and Dr. Borody's Australian lawyer where Dr. Borody says for the first time, this is not something anybody heard before, that there was apparently some issue in his mind as to whether or not Finch actually, you know, had ownership of the patents because of some claim he had that he had, he had not been paid. And it was really unclear as to what that was, but then in a follow up e-mail to that call, which is Exhibit J to the adverse inference motion, his Australian counsel almost threatens Finch and he says, you know, Dr. Borody needs to be paid, otherwise his testimony won't be good for you.

Now, this happens on May 18th. Obviously this is the first that anybody at Finch or Kirkland & Ellis is hearing of this issue. You understand probably we need to investigate, what is it that he's saying and why is he saying this. And still to this day our view is that the documents that he signed in May 2015 transferred ownership to Finch without question. Right. And so the fact that he's making these allegations really makes no sense.

So before even Finch had an opportunity to do anything, on May 20th, Dr. Borody takes it upon himself to e-mail Ms. Bourke, he says he found that she represents Ferring on a legal website and that he's canceling his deposition. So on May 20th, he declares that his deposition

is not being taken.  We don't really know why, although I guess you could, you know, suspect based on what he said so far.  And that's Exhibit K to the adverse inference motion.

So obviously there's a lot going on at that time, but about 10 days later Kirkland & Ellis reached out to Dr. Borody again and says we're really confused.  And this appears as Exhibit B to our opposition, again on the adverse inference.  And they say, you need to get your deposition scheduled and we're not really sure what you're saying about we don't have these patents, because this all seems very clear from the documents.

The next thing that happens is that on June 5th Dr. Borody responds to Kirkland & Ellis asking him to sit for a deposition and he attaches an invoice for $18 million and 27 million shares in Finch and says, quote, "once I'm paid, I'll be happy to help."  That's Exhibit B to our opposition on the adverse inference.  At that point, as of June 5th, Kirkland & Ellis had no choice but to withdraw from representing Dr. Borody.  Obviously -- and that was all -- nobody has ever really questioned that because it was clear in Dr. Borody's engagement letter that Kirkland & Ellis could do that.  Obviously when Dr. Borody is effectively trying to extort Finch, which is also their client, that's not something where they can continue to represent him.

All of this was very quickly disclosed to Ferring. And, in fact, Ferring had received this e-mail from Dr. Borody directly. His deposition didn't go forward.

At that point Ferring then raises this standing issue. And so in July -- and then they filed a motion to dismiss in July of 2023, we were in front have Judge Andrews because Ferring had asked to stay the case while this issue was resolved. At that hearing, which is I believe Exhibit D to our opposition, and I was the one that argued at that hearing, Judge Andrews and I had a colloquy where he said what's going on with Dr. Borody. And I said we haven't been in touch with him since all of this happened, but you know, we have no problem with the deposition going forward, we'll be happy to facilitate it in any way we can. And we had said that in writing prior to that and obviously I made that representation in open court.

At that point, obviously, though, we didn't control Dr. Borody. So all that we could do is, you know, use the Hague Convention. And, you know, Ferring has said in their opposition, well, that would have taken six months. Well, we're now a year from the time I made that representation to Judge Andrews.

Following up on that hearing, we -- and, you know, certainly I had had no contact with Dr. Borody, nor has Kirkland & Ellis, nor the Finch. So as of July of 2023

we have no communication.  Well, really as of June 5th when the attorney/client relationship was terminated.  We have no relationship with Dr. Borody.

Following up on the hearing, I e-mailed Ms. Bourke.  And this is Exhibit 3 now to our motion in limine no. 5.  And I said, you know, as we disclosed at the hearing, we haven't been talking to Dr. Borody, but if you have, you should be producing those communications.  And, in fact, they had asked for and received redacted versions of all of the communications between Kirkland & Ellis and Dr. Borody about the standing issue that, you know, after approximately June 5th and because there had been -- there had been a further letter between Dr. Borody and Kirkland & Ellis where Kirkland & Ellis explained the whole history and how this had all been properly assigned to Finch.

In those e-mail communications, in fact, Ms. Bourke disclosed that Dr. Borody had reached out to Ferring about a business deal.  She also disclosed that Dr. Borody had provided documents to Ferring's Australian counsel under some kind of confidentiality that prohibited them being used in this litigation.

But of course there's a lot now, starting in July 2023, going on on the Ferring side between them and Dr. Borody.  And we still haven't gotten the full story.  They haven't disclosed it.  We asked for those

communications, they haven't produced them.  We've had meet and confers where we've asked them about it.  We don't even know if Dr. Borody is coming to trial.  We've asked them repeatedly on meet and confers and they won't tell us.  But we know, and it's in writing in July 2023, that they're in communication with him and they declined to produce those communications, he declined to give us any further information and they took the position -- we said -- and this is now -- this is still in Exhibit 3.  I wrote an e-mail on July 28th.  I said, "relatedly, since Ferring appears to be in contact with Dr. Borody but does not appear to have discussed the depositions, is Ferring withdrawing its request for Dr. Borody's deposition?"  Because at that point, if they had convinced Dr. Borody to sit for a deposition we would have no issue with it.  Ms. Bourke responded on July 31st and effectively told me discovery is closed, it's too late, it's never going to happen.  And that was really where the communications between the parties ended with respect to Dr. Borody at least at that time.  And that's about a year ago on July 21, 2023.

We don't hear anything until we get their witness list and Dr. Borody is a may-call on there, which doesn't really raise any red flags because they want to /TPHAOEU to Australia we don't know what they're doing.  But then on June 5th they produce 34 documents that came from

Dr. Borody and they consist of admittedly some documents that we had seen before and that we had produced when Kirkland & Ellis was representing Dr. Borody.  There are additional documents, about 25% of the production, that we had not seen, including some handwritten letters that Dr. Borody purports to have had in his files.  And then they produced additional communications that were between Kirkland & Ellis and Dr. Borody during the litigation during the time frame in which they were representing him.  So we received those on June 5th.  We immediately reached out and said what's going on?  We really haven't gotten any more information through the meet and confer process.  We met and conferred after June 5th.  We met and conferred in connection with the motions in limine.  We really have no further information.

What we learned in their opposition to our motion in limine no. 5 is that they got these documents on April 15th and all they say is that Ferring got them from Dr. Borody.  And a little bit of what we see in the documentation is they keep saying, like there's apparently different buckets of Ferring.  There's Ferring, there's Ferring's Australian counsel, there's Ferring's litigation counsel, but Ferring had business discussions apparently with Dr. Borody a year ago.  Ferring's Australian counsel had documents from Dr. Borody a year ago and now Ferring's

U.S. litigation counsel apparently gets these documents on April 15th.

Now, at that time their motion to dismiss for lack of standing was still pending before Your Honor. Your Honor had issued an oral order resolving that on May 17th. So if these documents were of such critical importance when they received them on April 15th, you would have thought they would have brought them to Your Honor's attention at that time or to our attention.

So it wasn't until seven weeks later that we get this production of documents.

And so to come around to our motion, I know that's a very long way, but I think Your Honor hasn't been involved. We've unfortunately been involved for a while and I think it's important because Ferring tries to paint the pick that somehow we were trying to prevent Dr. Borody sitting for deposition. That's not correct. That, you know, we somehow to tried to prevent them from taking his deposition. That's not correct. We haven't had any communications with Dr. Borody in a year and they have. So we don't think there's any basis for these 34 documents -- you know, this issue may have resolve if Dr. Borody is not coming to trial, because I don't think there's another witness that could get them in, but they haven't been willing to tell us that so we have to operate on the

assumption he's still on their may-call list.  And we've objected to that because now we haven't deposed him.  We have new documents we haven't seen, you know, where he's going to challenge standing, but these came too late. There's really no justification for why we received these on June 5th.  I don't think there's been any valid excuse for Ferring's delay.

I went through Exhibit 3 of our motion, you know, where we outline what they knew a year ago.  And we really don't know.  For all we know these communications have been going on for an entire year.  Maybe they have, maybe they haven't.  None of that has been disclosed.  They refused to disclose it to us a year ago.  We don't have it now.  We think just on that basis alone, the delay, the lateness in which they're coming into this case, all 34, the production we received on June 5th should be out.

But we also did -- we certainly will have, again, if Dr. Borody is actually a witness, we will certainly have some challenges based on hearsay and other reasons, but we didn't raise all those in the motion.

But we also did raise a subset on relevance grounds.  So part of the -- in fact, at the time have the motion, it was actually not until the day that the pretrial order was filed that Ferring removed Ashley Ross of Kirkland & Ellis as a witness from their exhibit list.  And you know,

they did it based on an offer we had made the month prior. So as of the time these motions were filed, she was still on Ferring's witness list. There's just no relevance to the communications between Kirkland & Ellis and Dr. Borody, some of which were privileged at the time, during this litigation when they were representing him.

The issue here is does -- you know, the issue that's still live for Your Honor's order is does Finch have ownership of the patents where Dr. Borody is an inventor. That's going to be determined based on assignments that are on file at the Patent and Trademark Office and based on transaction documents that were signed by Dr. Borody in May of 2015. So what Dr. Borody was saying to Kirkland & Ellis in 2023 when he was telling them I won't participate unless you pay me $18 million and 27 million shares has no relevance to what happened in 2015.

And so on that basis, I guess I don't -- unless Your Honor wants me to get into the adverse inference, there's a little bit of overlap, but in terms of our motion in limine what we're asking is those 34 documents be kept out primarily on the grounds that they were provided way too late with no explanation for the delay. But even if Your Honor were to not agree with that, there's a subset we've addressed that we think are not relevant and then obviously the remainder we will certainly have objections to if

Dr. Borody is actually coming to trial and if Your Honor permits him to testify.

THE COURT:  All right.  Thanks very much.

MS. DURIE:  So I'm going to try to go through what happened here in chronological order.  So we said that we wanted to take Dr. Borody's deposition.  We were told that he was sick.  The deposition got rescheduled.  We are now in May of 2023.  And this is Exhibit J to 18-5, our motion in limine for adverse inference.  That is to which it's appended, but it is relevant to this issue.

So Marcus Connor is Dr. Borody's personal lawyer.  He reaches out to Matthew Blischak, the CEO of Finch.  And what he says with respect to the evidence as it pertains to standing, is "Tom has instructed me" -- that's Mr. Borody, Dr. Borody -- "that the attached agreement was never consummated" and essentially that he was never paid for the rights to his intellectual property, which informs part of the thesis of the standing factual question around standing.  And then he says, "while Tom will cooperate with the requested deposition, clearly it will not assist Finch if he truthfully deposes matters which are contrary to its interests."  A telephone conversation then takes place among Dr. Borody and Kirkland after which time Dr. Borody tells us that he is too sick to be able to sit for his deposition and his deposition is canceled.  No further disclosure is made

to us at that time as to why Dr. Borody's deposition has been canceled.

We then learn that Kirkland is no longer representing Dr. Borody.  Now, it is true that Ferring's Australian counsel received an outreach from Dr. Borody about the business deal and the documents that he sent to them, as I understand it, and this is a proffer based on my understand, because I want to be clear because I wasn't involved in this, that they could not be further shown to anyone.  We're not aware of that outreach.  We're not aware of the documents that were in the possession of the Australian counsel.

Fast forward to May of this year, we are put in communication directly with Dr. Borody and we get copies of these documents from him that in some instances had already been produced by Finch.  In some instances, in our view, should have been produced by Finch at the point in time when Kirkland represented him because they are clearly responsive to discovery requests, and in some instances, as we understand it, had been in Finch's possession and then got shipped back to Dr. Borody.  We followed up with Dr. Borody regarding our ability to produce those documents in this litigation.  We got that consent and we immediately produced them.

Now, point number one with respect to the

documents, there's no wrongdoing on our part. And certainly no prejudice to Finch. As noted, they produced some of the documents. They have other documents, they should have produced them. The only things that arguably they should not have produced are communications that at the time were attorney/client privileged communications between Kirkland and Dr. Borody, so obviously they come as no surprise because they were on them. Dr. Borody then later elected to waive privilege, which is why we now find ourselves in possession of them. That's the documents. And they are relevant to the standing question in some cases directly as substantive evidence; in other cases, with respect to what the requested deposition testimony would have been.

Now, there's been a hearsay objection. I don't think we need to resolve hearsay objections right now. I think this is just a threshold question about whether or not these documents ought to be fair game and they are.

I do want to take up the issue of Ms. Ross' deposition. What we said at the very outset was we've gotten these documents from Dr. Borody, he's in Australia, we should have gotten them in production in this case and we should have had an opportunity to go forward with Dr. Borody's deposition when his lawyer said Tom will cooperate with the requested deposition, but then after a phone call decided not to go forward with it, and that the remedy for

that is that we should get a stipulation as to the authenticity of the documents. Absent that, the only witness who we possibly could call to authenticate them was Ms. Ross. We repeatedly and consistently said as long as they would stipulate to authenticity we had no interest of putting her on the witness stand in front of the jury and then ultimately they agreed to that deal.

And we now, as I understand it, have an agreement with respect to authenticity and we have no intention of calling her as a witness.

Now, with respect to Dr. Borody, is Dr. Borody going to show up at trial? I have no idea. He's in Australia. He's their inventor, but I think one of the few things I think everybody in this room can agree on, he's an unusual guy. I don't know if he's going to show up. He might, he might not.

THE COURT: Are you going to call him if he does show up?

MS. DURIE: If he does show up, I think we might well call him because he clearly has -- one, he's got relevant on a standing question. And although there are ways for us to make our case without him, it would sure be a lot easier to have the guy on the stand to make that -- to tell that story to the jury himself about how his IP rights did not transfer to Finch. He's also the inventor on some

of the patents at issue and so he might well have testimony that is relevant to his invention.

THE COURT:  Is he on your 26(A) disclosures?

MS. DURIE:  He was -- he was on their initial disclosures and then he's on our witness list and our initial disclosures -- and I'm told our initial disclosures, too.

THE COURT:  Okay.  You say you don't know if he's going to show up.  Does he have a ticket?  Does he know when the trial is?

MS. DURIE:  He knows when the trial is.  I'm not aware of him having a ticket.  He knows when the trial is. I think there is a decent chance that he will show up, but I don't control him.  I don't -- we don't represent him, we don't control him.  I don't know that anybody controls him, to be candid, but certainly we do not.

THE COURT:  Have you prepped him for trial?

MS. DURIE:  We have -- I would not say that we have prepped him for trial.  We have -- in a strong sense, we have spoken to him about the subject matter that he might be able to testify to and we have obtained his version of events with respect to this question.  So I don't want to parse words with the Court, I just want to be clear about what happened.  But, yes, we have spoken with him and we have gotten his version of events.

THE COURT:  So what we're talking about here are a stack have documents.  Do I have them in these binders?

MS. FARNAN:  Your Honor, we didn't submit all 34.  We submitted as Exhibit 4 to our motion the ones that we were challenging simply on relevance, but...

MS. DURIE:  We can get you that set, that seems easy enough.

MS. FARNAN:  And we could -- as I said before, some of them we had seen.  There's a couple handwritten notes and things of the like that we have not seen before.  So if Your Honor or wants to see that subset, we could -- we could get that together for you.

THE COURT:  Yeah.  This is -- this is a new one.

MS. DURIE:  I know.  I've been doing this for a long time, it's new to me.  But I mean, here is ^ this, like we were set to take his deposition, we should have taken his deposition.  He pulled out after saying that he would cooperate with us, but it would not helpful to Finch if he testified truthfully.  And then after a phone call, he pulled out.  And we were told he was sick and couldn't go forward, contrary to what is said in his e-mail to Finch.

Now -- so I think that sort of takes off the table any question about his deposition.  The documents, the vast majority of them -- as I said, there is no -- there may be a handful of handwritten notes, those should have been

produced in connection with the standing motion because they're relevant to it.

THE COURT: I think -- I mean, so some of it you said K&E sent back to him.

MS. DURIE: Right.

THE COURT: But are you suggesting that they saw them and said, no, we're not going to produce these.

MS. DURIE: So I'm not suggesting that there was discovery misconduct, that is not the point that I'm trying to make, but they had these documents in their possession. We think they should have been produced, but set that to one surprise, they since claim prejudice from being newly surprised by these documents because they have them in those -- in many -- not as to every document. I take the point there were a couple of handwritten notes, I don't know whether they had those or not. But as to the vast mortgage of these documents, they have them. And then there's communications with them which obviously they have because they were a party to those communications.

So he's their inventor. His testimony is plainly relevant, potentially to his invention, certainly to the question of whether he actually assigned his rights to Finch or not. If we can get him here and he shows up, I think odds are we're going to put him on the stand.

THE COURT: Right.

MS. DURIE:  And have him testify to that.

THE COURT:  So what accounts for the delay between April 15 and the production to the other side in June?

MS. DURIE:  So we -- we initially got a set of documents from him, but at that point in time we did not have his permission to produce them.  We worked that out with him and we promptly produced them.  I don't see how there could be any prejudice from that delay, given these are documents that by and large they had, but we were trying -- we wanted to make sure that we did not get crossways with Dr. Borody in -- in terms of producing them in the litigation, putting them in the record of this case so we could move on.

And note, some of them are privileged, facially privileged.  And, you know, he waived privilege to permit that production.

THE COURT:  Okay.  I'm not going to make any ruling on this today, partially because I just don't have a sense of what's going on here.  I need to see what documents you would plan on introducing, how you intend to get those into evidence because -- because it's all interrelated and some of it depends on whether or not he's going to show up or not.

MS. DURIE:  That's correct.  A lot -- I think a

lot of it does depend. I think -- it doesn't all depend, but I think much of it depends on whether he shows up. There's a set of documents, even if he doesn't show up, we think ought to be able to come in and are germane to the standing issue. I mean, the Court has found there is a factual question here. We would have taken his deposition and gotten his testimony on the standing issue, we were precluded from being able to do that.

THE COURT: I'm just not seeing that anything that the other side did as a but for cause of you not being able to take his deposition, and that's what I'm -- that's what I'm struggling with.

MS. DURIE: Well, so to be clear --

THE COURT: I get that there may be a dispute about what he told them and the depo being canceled l,but it doesn't really seem to me that he was going to show up for that deposition any ways.

MS. DURIE: Well, with he says, to be clear, he's willing to cooperate with us. I mean, like I am reading -- I am reading the written record. But he says, while Tom -- his lawyer says, "While Tom will cooperate with the requested deposition, clearly it will not assist Finch if he truthfully deposes matters which are contrary to its interests.

THE COURT: Thank you very much. Let me hear

from from Ms. Farnan about that last point.

MS. FARNAN:  Your Honor, I want to respond to a few points, and in particular that one factually because I think it's really unfair.

I think there was a suggestion that Mr. Blischak got on the phone with Dr. Borody and told him not to show up for his deposition; that is not true and it is not what the document says.  If you look at Exhibit J -- and I thought what Ms. Durie said is there was this e-mail, then a phone call and he doesn't show up.  It's the other way around. The e-mail being with, "Thank you for your call earlier today," then he makes -- this is the first of the threats Dr. Borody makes in this e-mail, it is not going to be favorable to you, you need to pay me, this one through his lawyer.  The next thing that happens -- and again this is the first time that Finch is hearing of this, that Dr. Borody has any issue, we've been representing him for sometime, this is the first time we're hearing this issue.

Two days later he e-mails Ms. Bourke directly and cancels the deposition, and then 10 days later on May 30th, which I pointed out before, and I believe that's Exhibit B to our opposition on the adverse inference, Ms. Ross e-mails Dr. Borody again and, again, you know, encourages him to sit for the deposition.

So the notion that this was anything that Finch

or Kirkland & Ellis or Mr. Bischak did is really incorrect. And it's at that point that Dr. Borody responds with his $18 million invoice and 27 million shares of Finch, which we've -- there's no basis for that demand whatsoever that he's making of almost $50 million of Finch to sit for a deposition. So -- but I think it's really unfair to suggest that we did something in that regard because we certainly didn't.

I also want to address the document issue. So I think you heard a few times that we had these documents. They know that we had them because we produced them. So I think Ms. Durie acknowledged -- and I acknowledged that before, there is a subset that we had, many of them had already been produced. And, in fact, when this issue came up, I think that Ferring had pointed out to us that some of them already had production from when Kirkland & Ellis represented Dr. Borody. So when they're saying we had the documents, they know that because we produced them.

The other documents, the handwritten notes, we had never seen before and Kirkland & Ellis did when the representation ended, to the extent they had anything, they did return it. And so, you know, we're a little bit -- it's a little bit unfair because if by chance, I guess, it was in the review set and someone didn't produce it, we don't believe that happened, we don't believe we've ever seen

these, but there's certainly no intentional misconduct here.

The other thing I think, to address just the point about Ms. Ross, because I just want to be clear, because when this came up I went back and looked at the e-mails. The agreement that the parties eventually reached about authenticity was one that we made back in the middle of June. I think it was June 14th. And it wasn't until the day the pretrial order was due that they accepted it. Up until that time, they had been demanding additional concessions on admissibility.

And I think the final point is, you know, we're obviously hearing for the first time their current communications with Dr. Borody. It sounds like they had sort of an informal deposition of him on the phone, they understand what he would say if he came to trial, they probably gave him, you know, some suggestions and some pointers as to what's been going on. If he really is going to show up at trial and he's going to put on testimony that's going to attack Finch's ownership of these patents, we should be able to have a deposition in advance.

We think, you know, given the way this has gone on, given how long Ferring has been in contact with him, that that should not happen. But should it, we should have an opportunity because, again, we've never had that chance to talk to him. This all came up for the first time on

May 18th.  And June 5th, Kirkland & Ellis terminates its representation, there is one further letter, and then we've had no further communication with Dr. Borody.

THE COURT:  All right.  Thanks very much.

All right.  You can have a seat.

We have got a lot of moving parts here, one of which is whether Dr. Borody is going to come, one of which is that I haven't seen what the documents are and for what purpose they're being offered.  It seems to me very likely that some of these are inadmissible hearsay, but I haven't seen what they are.  We've got the issue about the late production and who had what and when.

And so how I think we're going to resolve this is by having Ferring tell Finch as soon as they have any indication or communication with Dr. Borody -- any communication with Dr. Borody what's going on and about his likelihood of coming to trial, and that communication has to be in good faith.  And you need to advise them of oral communications as well as e-mail communications about anything touching on whether or not he's coming to trial.

I mean, Australia is pretty far away, right?  So if he's going to show up, he's got -- he's got to get on the plane pretty soon.  I've never been there, so I don't know.  But isn't that right?

MS. DURIE:  I mean, it's a long flight, but I

understand.  I mean, I will represent that we have reason to think he's going to come, but I don't know if he's going to come.  And I will promptly advise counsel as soon as -- whatever we learn from him, but he's got to buy his plane ticket, that's clearly true.  I don't know that he has to get on a plane, you know, more than a week from now, but he has to buy a plane ticket and we will promptly advise you if and when we learn that that is a thing that has happened.

THE COURT:  Okay.

MS. DURIE:  And advise Finch's counsel.

THE COURT:  Very good.  And I say -- I know it's not a week long flight, but I also know that it -- to the extent he's an elderly gentleman, you probably don't want to have somebody on the stand who hasn't slept the night before.

MS. DURIE:  100 percent, yes.  I mean, that is -- that is true.  If he's going to come, we would prefer that he come sooner rather than later.  That's true.

THE COURT:  If he does take the stand, based on what I've heard today, I am inclined to allow Finch the opportunity to depose him and I understand there's finger pointing on both sides.  I do think under the totality of the circumstances, that's what's fair.  I would put the same rules in that I put when I allowed Finch to substitute its corporate witness, which is that you would have to tell the

other side what documents you intend to use with him and the topics on which he will testify. And then I guess we'll do the deposition at night during the trial or at night next week, but I need the parties to stay in constant communication.

I also want the parties to work together so that by Friday at noon we have a complete set of what documents Ferring might attempt to introduce and a chart that demonstrates to us who they were received by what and when and whether or not Finch also had them, just so we can see what they are. And a brief statement of what their relevance is. So ownership, copying, whatever.

Is there anything else anybody wants to say about this? Okay.

MS. FARNAN: I don't think anything at this time, Your Honor.

THE COURT: Thank you.

All right. Then we had a MIL that had to do with evidence of the declaratory judgment complaint. I understand that's been resolved. I can't remember if your proposed instructions talked about plaintiff and defendant, but you all should work out a way that it refers to the parties as plaintiff and defendant.

Ferring's motion in limine no. 2, this is to preclude evidence of Lee Jones and Michael Berman's personal

wealth, including their compensation from the merger.

I'm inclined -- well, Finch says they're not going to intend to present evidence on personal wealth, just compensation for mergers.  So let me hear what is left of this dispute.

MR. CHIVVIS:  Thank you, Your Honor.

So the issue here is the compensation from the merger is pretty much inexorably intertwined with their personal wealth because that is the -- the large sum of their personal wealth for each of them.

Finch, if they were to put on this evidence, would -- would put on evidence that each of them received tens of millions of dollars and, I mean, that is the vast sum of their wealth.  So when -- when you try and disentangle the two, you can't.  And this -- this evidence is prejudicial for a few different reasons.  One, it just -- the amount of money we're talking about could cause jurors to look very differently at these two individuals.  Two, we suspect that this will be used to kind of benchmark what will be their damages ask, which is a completely improper purpose for this evidence.  In essence, see, Lee Jones got X amount of dollars, so giving us 50 million as an upfront payment is no big deal, right.  That -- that would be completely improper.  They've been cagey about saying whether they'll make any connection between the two, but

even implanting in the jurors minds a high magnitude payment to these individuals could cause them to reach conclusions that, for instance, a $50 million upfront payment is proper given what these individuals received, which was compensation not for a patent, but for the purchase of a whole company on which they were the two key founders. Lee Jones was CEO. Mike Berman was chairman of the board, he's the one who owned the original Hlavka IP that was foundational to the company.

There's just a huge risk of prejudice with this evidence, given the magnitude of the payments that were made. The payments are not contingent. The payments are completed, there's no pending income. If Your Honor is inclined to admit anything about it, it could be the fact that they received a payment, that it was significant, but putting a dollar number on it would be extremely prejudical for us for at least those reasons, and I'd be happy to talk about it more if Your Honor wants.

THE COURT: Is there some requirement in their agreement that requires them to cooperate with ongoing litigation or anything like that?

MR. CHIVVIS: They are not required to cooperate with ongoing litigation.

THE COURT: All right. Thank you very much.

MR. CHIVVIS: I do want to clarify just

slightly.  With respect to Lee Jones, does she have -- no.

THE COURT:  All right.  Thank you.

MS. PETERSON:  Good afternoon, Your Honor. Ingrid Peterson on behalf have Finch and UMN.

I first want to address the point about whether Finch is going to be using this number to benchmark damages. We are not using that number to benchmark damages.  The only purpose of discussing or presenting the amount that was paid by Ferring to Ms. Jones and Mr. Berman is in order to do on cross-examination a showing of bias.  There is a lot of case law that we cited in our brief going to -- showing that this is a consideration of bias that is normally allowed by the courts.  It's also particularly relevant because Ferring made a payment and settlement agreement with these individuals during the course of this litigation.  And in addition, the payments that they have been receiving from Finch are tied to this indemnity provision that was in the merger agreement.

So this goes to bias of the individuals and is in line with the ruling in *In re: Tylenol*, which is 181 F. Supp 3d 278; it's an Eastern District of Pennsylvania case. And in that case, the Court decided that employment alone was not enough to show bias and that compensation was relevant for former employees in order to show that their decision making may have been impacted and biased in some

ways and important for the jury to consider and that a 403 objection was overruled because it was found that this was not unduly prejudicial when balanced with the relevance.

THE COURT:  All right.  Thank you very much.

MR. CHIVVIS:  Just one point to respond to this payment that was made in the context of litigation.  It actually shows why this evidence shouldn't come in.  Prior to the litigation, the payment structure had milestones to some contingent payments that were potentially due to Ms. Jones and Mr. Berman, and what happened is in return for a focus on REBYOTA, the product at issue, and not other indications which were the potential for milestones and the like and to simplify the structure of the deal, Ferring bought them out of the contingencies on that deal.

So, in fact, as a result of that agreement, there are no contingent payments which would have been contingent on reaching milestones and the like, which again goes towards, you know, the 403 nature of this here.

This isn't some money that they are not going to get paid if they don't testify in the way we like.  They've already been paid.  They're not obligated to come.  They -- they have agreed to come.  And to the extent Your Honor is willing to let the other side even probe this issue, it should be did you receive compensation, was it a significant amount, yes, yes, and then move on.

The number is what is going to be prejudicial here given the damages issues in the case and -- and given the fact that it is pretty much the sum total of each of their personal wealth.  Thank you.

THE COURT:  Thank you.

Okay.  Here's what I'll say.  I agree with Finch that -- that the fact that witnesses on the other side received payments, including payments during the course of the litigation from the other side, is relevant to bias.  I agree with Ferring that there is the potential for prejudice.  Rule 403 requires me to determine whether the potential for prejudice substantially outweighs the probative value.  I can't find that here.  I don't think that it substantially outweighs the probative value and so this motion is going to be denied.

Of course, Ferring made the point that the contingent payments are not dependent -- there are no contingent payments, so their payments are not dependent on the testimony.  The jury can hear all that and make its decision.  That's my ruling on that one.

So let's turn to MIL No. 3, which we didn't see.  It just skipped to number 4.  Am I missing one?  The next one on my list is purported evidence of copying, which we've already discussed a little bit.

MR. CHIVVIS:  MIL no. 3 has been resolved,

Your Honor.

THE COURT:  Okay.  Great.  No wonder.

All right.  And then 4 talks about copying, and I think that's pretty much resolved by a ruling we already gave.  Or am I mixing it up?

MR. CHIVVIS:  It's partially addressed, Your Honor.

THE COURT:  Okay.

MR. CHIVVIS:  I mean, Your Honor has ruled on -- on some of the legal issues whether it's going to be potentially relevant to willfulness.  There is still two issues that we'd like to address with the Court.

First, there's a particular item of evidence that we think, even to the extent it's marginally relevant to this overall copying narrative that they want to tell, its 403 potential outweighs any relevance.  And that is the fact that Lee Jones had an NDA with the University of Minnesota.

Now, just to give a little bit of a backdrop to this, Lee Jones was asked by the University of Minnesota to take on a role as the CEO in residence to help guide various individuals at the University on an entrepreneurship and the like.  As part have that, she was required to sign a general NDA, which was a two-way NDA, it also also covered her providing confidential information to others.

There has been no claim raised in this case, whether at the beginning or through amendments, or even when we were taking the depositions of witnesses at the University of Minnesota that were in a managerial role and overseeing decisions about whether you would file a charge like this.  There's been no allegation that Lee Jones breached that NDA.  There is this allegation of exposure to confidential information, but she was allowed to have access to certain information that had a confidential title on it as part have her role at the University.  And in order for there to be a breach, there needs to be a showing of proof that, hey, she used something and that it was something that was demonstratively, even though it may have had a confidential label on it, nonpublic.  And so if the thing that is the core of one of the allegations they want to make is, in fact, did demonstratively public, it can't be the basis for a claim.

There's been no assertion of a breach here at the beginning of this case or subsequently by amendment.  No allegations under a discovery rule or the like that they learned of a breach, which -- no allegation that statute of limitations is the reason they haven't asserted that.

And so here we have their desire to put this issue of potential breach of an NDA before a jury to -- to be part of their theme of copying and we think it's

inappropriate for several reasons.  One, highly prejudicial to suggest that she breached an agreement that even the University hasn't said she breached.  Two, it's very confusing.  There's no claim in this case for breach of contract or breach of that NDA.  And there are a number of other 403-related issues with it.

We think that the NDA breach issue should be set aside, that should not be an issue in this case.  It -- they shouldn't be able to put in evidence on that in support of copying more generally or other issues in the case.  So that's one piece of it.

The other piece I wanted to discuss with Your Honor is how to deal with other copying evidence.  Your Honor has suggested that you're inclined to let that be one of the issues that would potentially go to the jury in ruling on the summary judgment motions earlier.  And we heard about the kind of gatekeeping role with that evidence that Judge Bryson proposed when he was sitting by designation and we think it's appropriate here.

We think that when this type of evidence is going to be potentially used with the witness, that there should be a proffer and an opportunity to ventilate the issues with the Court the morning before so we can get the scope of that evidence set before the witness goes on and not have, you know, a disruptive process in front of the

jury because the case law is clear that in order to use that evidence for purposes of willfulness pre-issuance, that it needs to rise above a certain level.  It can't just be a vague assertion, it needs to be something concrete that reaches a bar, which would be an issue for Your Honor to decide, but we think it should be decided outside the presence of the jury before the witness goes on.

THE COURT:  All right.  Thank you very much.

MR. CHIVVIS:  Thanks.

MR. ALPER:  Good afternoon, Your Honor.  Adam Alper again for Finch and UMN.  So I'll just specifically focus on the two points that counsel raised.  First, we have one specific document, it's the NDA that Ms. Jones signed in order to get access to the patented material that we talked about earlier this morning.  So just to be clear, counsel is correct, we do not have a trade secret misappropriation claim in the case, we do not have a breach of NDA in the case.

I think I can resolve this issue very simply. We will not suggest that they breached an NDA and that is the basis for liability in this case.  So then the question is, why is this important to the claims that we do have? And the answer is, it's very simple, that's how Ms. Jones got access to the patented material.  At the time the patented material was still non-public.  It became public,

but some of it was not public at that time.  And so that was how she actually gained access to the information that she then, I was explaining it this morning, got access to like the patent application, the specific embodiments.

THE COURT:  Can I ask you.  I know I'm going to regret asking this.  But when I read the U of M patents, the whole last part of it seems like, starting with example one, somebody cut and pasted an academic paper.  Is that not the case?

MR. ALPER:  So the answer is some of those examples do come from papers absolutely, so that is exactly right.  Ms. Jones was provided that material as well.  And she was also provided material that was at the time not public, but put into the patent application that then became public.  So it comes from various sources.  And she was given all of that information.

THE COURT:  But can I just ask, and I don't understand the timeline and maybe you've already told me and for that I apologize, how does this work between what she had access to -- some of this stuff became public at some point in time and when does that relate to when she did whatever she did?

MR. ALPER:  Yes.  So the answer is that -- so the answer is, I think it depends.  Some of it was published in -- I'm sorry.  Let me just orient myself, Your Honor.  So

here's how it kind of comes together. So she gets access to UMN's information in Spring of 2011 and that's when she is the CEO in residence and gets access via this nondisclosure agreement. She then, after getting all that material in the summer of 2011, forms Rebiotix or what became Rebiotix.

THE COURT: When was that?

MR. ALPER: In the summer of 2011.

THE COURT: Oh, in the summer of 201. Okay.

MR. ALPER: From 2011 through 2012 she starts disseminating this information, various forms of the information of the information she had collected from UMN --

THE COURT: And you believe some of that information was still confidential at the time?

MR. ALPER: I believe some of it was still internal at the time. There is a 2012 paper that she also got access to that relates to the inventors on the UMN side that she also is circulating internally.

THE COURT: That's public?

MR. ALPER: Public. That's public, yes. So I don't want to say -- like I said, it's all coming from UMN, but some of it is public and some of it was not. And the 2012 paper, for instance, does have in it one of the examples that is then put in the UMN patents, like a claimed an embodiment. Basically it's an exemplary embodiment, but then other examples come from internal stuff that she got

access to, so it's a mix.

And then shortly after all of that internal dissemination, Ms. Jones and Rebiotix finalize their formulation of the accused product.  So in a very short period of time she gets access to all this stuff, turns around, forms Rebiotix, they circulate it internally and then they finalize the formulation for REBYOTA and then we go on with the rest of the timeline that I was explaining earlier.  So that's what happened.

So where does this NDA fit in?  I don't think it's the biggest deal in the world, by the way Your Honor.

THE COURT:  Doesn't seem like it.

MR. ALPER:  But it's the part of the story at the beginning where it's how she got access to the material in the first place.  In terms of, you know, the 402/403 weighing analysis, is the prejudice associated with that, does it substantially outweigh the relevance?  Of course it doesn't.  It's just part of everything, the facts that happened here and it is relevant to how she actually gained access to the material that we say was she used, the patented material that we say was used, that they used in order to come up with REBYOTA, which is the accused product.

THE COURT:  There wouldn't be anything inappropriate if I thought -- during the course of your questioning if I thought you were crossing the line and

suggesting she had done something improper with the information that I could give an instruction to the jury?

MR. ALPER: Exactly. So that is always available to Your Honor and we understand that and that's why we are going to focus on the intentional and willful patent infringement. And we don't have a claim for misappropriation like we can all acknowledge.

THE COURT: Okay. And what about counsel's second argument?

MR. ALPER: So the second argument I think is just -- it's taking another -- attempting to take yet another bite at an apple which would create a, I think a very major impediment in this case, particularly when we have made disclosure after disclosure. We're not hiding anything about this aspect of our case. It's quite clear in many disclosures, both in interrogatory responses and expert reports and so forth. And there's this evidence that I described this morning and we've walked through it a little bit more here. And it's all highly relevant. It's all certainly, you know, not a 403/402 issue with any of it. We're not trying to overextend it as you can see from my comments about the NDA. And so to require us then to make some sort of proffer that would be subject to some sort of voir dire process, it's uncalled for and there's no distinction between this evidence and every other type of

evidence in the case. It's like we have -- there's many other things that we're talking about, and this is -- this does not rise to any level above that. And frankly, especially given the relevance to many, many issues, we're talking about not just intent for willfulness purposes, is but there are business plans that are relevant to damages issues. There's the secondary considerations is still a factor for the Dr. Borody patents and then some of these materials talk about unfelt -- long unsolved, you know, long-felt need that was unsolved and praise and all of that other stuff, which goes to secondary considerations for the Borody patents where they do have an obviousness case. So I don't see any basis whatsoever for that in this case. And that if they have an objection, when there's something that's happening on the stand, I don't think they will have a valid objection, but if they do, they can make it and that's how you would deal with evidence of this in every other case.

THE COURT: All right. Thank you very much.

MR. CHIVVIS: Your Honor, brief response?

THE COURT: Yes.

MR. CHIVVIS: Thank you. Three points. So one, you heard the NDA is part of the story. But the NDA wasn't part and parcel with the access to documents were provided separate from the NDA. The issue is that she had this

material, was provided this material.  That can be adduced without the need to bring the NDA into evidence itself.  And so we do think it's inappropriate to get into the NDA.

Two, we factually disagree with pretty much everything that Mr. Alper just said, that this allegation of use or that something was confidential and spread around or was part of the basis for the development of the formulation of the accused product, there's just frankly no evidence for.  There's one forwarded e-mail that was to a consultant of public information that wasn't -- it didn't end up that that person was involved with the product development that eventually took place.

But putting aside that issue, I think that's the reason, that because this issue is clearly something that they seek to make central to their case rather than the patent infringement and the expert walking through the elements, that we do need to have a little bit of a preview process so that we're not having just a free for all in front of the jury on this type of evidence.  We should have some process where if they're going to be using information that insinuates copying or some other willful infringement occurred, literally five or more years before the patents were even filed for that are at issue in this case, there needs to be some sort of gate keeping there so that it doesn't just syphon out into a huge issue and become, you

know, the focus of the case when we should be talking about patent infringement instead. So we do think that that is important. So --

THE COURT: Thank you very much.

MR. CHIVVIS: Thank you, Your Honor.

THE COURT: All right. So we've got two requests on the table for a discussion. The first has to do with the NDA.

I do think the NDA has some relevance. I think it's minimal. I'm going to allow it with the caution that I can and will give a curative instruction that you may not like if I feel in any way that it crosses the line into suggesting that she improperly accessed these materials, but I do think it explains the story and is relevant to your theory of copying.

With respect to the other copying evidence, I'm not going to institute some process for a proffer, but I will entertain objections during trial. Those objections will be charged and if I do think that this is turning into a sideshow, we will excuse the jury and walk through a proffer and time will be charged.

So that's my rulings on those.

And we have then have the final MIL, which is numbered MIL no. 5, which has to do with adverse interest. I think this relates to the things we've discussed earlier

with respect to Dr. Borody.  I'm not prepared make any decision on this until I see what the documents are and who had them and when.  So we'll wait until we get the letters from the parties this week.

All right.  Now let's turn to the disputes in the pretrial order.  I appreciate the color coding.  Is there really a dispute on page 1 here?  I'm not making any factual findings.

MS. ROSS:  Your Honor, Ashley Ross for Finch and UMN.  I think, you know, we can probably move on from that one, from our perspective, from that one and the second, provided that Your Honor has just said --

THE COURT:  I understand your point about that. Clearly by signing the pretrial order I'm not making a factual finding about what the products are indicated for.

What's the issue here in footnote 4?

MS. ROSS:  Your Honor, if I may.

THE COURT:  Yes.

MS. ROSS:  So, you know, its been our experience at least, you know, talked to Ms. Farnan before this as well, in this district where experts need not lay personal foundation for certain exhibits, so long as they've otherwise been properly disclosed in their expert report and don't have other objections on them, you know, relevance it is.  But as to foundation objections, our own experience has

been that, you know, it's much more efficient for the jury if we're not up there playing minutes upon minutes, if not hours of deposition designations just to introduce exhibits, things like, for instance, with respect to a damages expert, financial documents, with respect to the technical expert, maybe some of the, you know, the more technical documents on the manufacturing processes, that sort of thing. So it's been our own experience that this is a streamlining methodology to not require personal foundation for -- and I think the federal rule with respect to experts allows them to consider evidence that they might not have personal knowledge on, but also consider it's part of their opinions.

THE COURT: But doesn't require them to be admitted under that rule?

MS. ROSS: No. But I do think, you know, again, given the short time that the parties have at trial and I think, you know, today has shown that there's going to be a lot of issues here, our proposal was just that in order -- other than having, you know, depo designations to play or something like that, we should be able to just introduce evidence through the expert for the first time.

THE COURT: Is there some reason -- the problem with this again is we're talking in the abstract and not in the concrete, that we could deal with this on a case-by-case basis.

Can I hear from the other side?  I don't know what we're talking about here.  If this is something like a hearsay thing that I wouldn't admit anyway.  It seems unlikely that I'm going to say today that everything experts rely on in their expert report is going to get admitted into the case.  That said, surely you'll work with the other side at some if it's something that they have, they could put a witness on to admit, but it just -- the only purpose would be to admit it.

MR. CHIVVIS:  Right, Your Honor.  If you look further in the footnote, we agreed to work with the other side and try to remove as many issues here as possible.  But we do have the significant foundation and hearsay issues with some of the documents in their expert reports and we do not agree to kind of a back door process where if they can't have a witness that could lay the foundation or establish the non hearsay status for those documents, all of a sudden they just come in through the expert.  And so we envision exactly what Your Honor is suggesting.

The are the 35 meet and confers in good faith. We tried to resolve as many issues as we can, but we're not going to agree to some sort of blanket rules where documents can come in through an expert report when there was no witness that could kind of explain that was going on there. There's a lot of documents.  Just to give a little

information, shadowing here in their expert reports, they may claim there are some in ours, that, you know, go to some of the disputed issues in the case, aren't the core technical documents, they're not like, you know, the prior art, they're not some technical documents on the accused product.  They're this atmospheric evidence about the story, which if we're going to use that evidence, they should put it on through a witness and we should have the ability to tell the full story about that evidence.  It's inappropriate for that type of evidence to come in through an expert.

So we maintain that all objections here should be preserved, there should be no blanket catch all rule, the documents can come in through an expert absent the foundation and non-hearsay showing.  You would ordinarily need to make, but we will, absolutely Your Honor, work in good faith for the typical types of documents that are non-controversial, the financials, the prior art, the technical documents about our product.  Those types of things, you know, we will work with them to get those into evidence without the need for them to be introduced through an expert.

And it may be, we even proposed this, by agreement, certain documents could just come into evidence and we could move them in and then the experts would refer to them later for efficiency purposes.  So we would propose

to work with the other side on those core documents that aren't really going to be in dispute, but we do reserve our objections to other documents.

THE COURT:  All right.  So what I'll say is I just can't decide this without seeing what they are.  So that's the ruling.  Work with them.  It doesn't sound like they're going to give you trouble about stuff that is not in dispute.

MS. ROSS:  Thank you, Your Honor.  Be back as we need to.

THE COURT:  Okay.  This one is confusing to me too.  So normally we would require documents to be on the exhibit list to get admitted.  You don't have to put documents on the list if you're just going to use them for cross-examination.  But I guess there's an issue here, because there's some witnesses that are adverse.

MS. ROSS:  Your Honor, I'm sorry, you're at paragraph 45 right now?

THE COURT:  I'm sorry, yes, 45.

MS. ROSS:  So I think this one is exchange of exhibits in advance not so much whether it's on the exhibit list or not.

THE COURT:  Okay.

MS. ROSS:  And so I think the issue here is what sort of exchanges we need to do in advance of a witness

testifying. And so the typical rule, again, and I did go back and look at Your Honor's pretrial order in *Sight Sciences v. Ivantis* and *CAP-XX v. Maxwell* and in both of those cases the rule was that the parties stipulate that they would not have to exchange cross exhibits in advance. Yeah. Or demonstratives either, cross-examination. So we're just asking that Your Honor kind of proceeds with the norm and just has the requirement that the parties only exchange exhibits that are needed for direct.

THE COURT: And is there -- is there a wrinkle here because we've got adverse witnesses? So what are you asking me about adverse witnesses?

MS. ROSS: I think they'd like that, but I'm happy to respond to it.

MR. CHIVVIS: Our issue, Your Honor, and you have identified a wrinkle. The wrinkle is they plan to call, potentially, some witnesses adverse direct, we plan to all at least one. We're willing to live by the rule we proposed here. But given the amount of evidence that might be moved in through a witness on adverse direct, we think that those documents should be disclosed as if it were a direct witness according to the pretrial exchange deadlines so that we can resolve objections before those witnesses go up, and address the issues in advance and not have kind of this free for all where potentially you're calling a witness

for adverse direct which could be a very long adverse direct on issues and none of the issues have been previewed for the Court.  We draw a distinction between a cross where we agree the witnesses would not need to have their exhibits disclosed for that cross in advance.  They need to be on the exhibit list, but they don't need to be disclosed in advance.  We agree that if it's for impeachment only, it doesn't even need to be on the exhibit list.

What we're really talking about here and the only issue between the parties is adverse direct and whether we should get those issues in front of Your Honor in advance of those witnesses testifying.  And we think we should, according to a reasonable disclosure and exchange process.

THE COURT:  Okay.  If it's an exhibit they want -- let me ask you this.  What if they want to use the exhibit with a witness, but they don't want to admit it?  Those don't have to be --

MR. CHIVVIS:  That's fine, Your Honor.  If they're not seeking to admit it, that's fine.  The issue here is really that the potential for a large amount of -- let's use the example of one of our witnesses, right.  So if they were just doing a cross, it would be within the scope of our direct, so we would have some reasonable anticipation about exactly what's going to be in play there.  But if they're going to call one of our witnesses on an adverse

direct, you have no idea what to prepare for as far as what to object to, what issues that need to be raised before the Court, et cetera, and they could very well be seeking to admit exhibits. Now, if the exhibits are just being used for impeachment and not admitted into evidence, we agree they don't need to be disclosed. We're talking about exhibits they would be seeking to use as evidence in this case. We think if they're going to be seeking to use exhibits as evidence, they should be disclosed according to the same procedures that the parties would use for other exhibits that are going to be used as evidence.

THE COURT: Understood. Counsel?

MS. ROSS: I think -- I don't see how the volume is what matters here. We were to have a cross-examination of one of their witnesses or they were to cross one of our witnesses that we brought on direct, both parties seem to agree that no one would get prior disclosure and there's reasons for that. I think the same exact reasons apply here. So an adverse witnesses, it's in the name, is adverse to us. So I think it's the same rule applies throughout. So I don't see how the volume matters here. Again, I think, you know, it's kind of at the parties risks, right, if there's a lot of volume and there's a lot of objections, then we have to deal with that. But I don't think the volume or number of exhibits is what should make the

difference here.  I think it's the fact that it's effectively a cross-examination that we may be forced to have in our case in chief.

THE COURT:  Do you agree that this is a discretionary call by the Court?

MS. ROSS:  I believe so, yes, Your Honor.

THE COURT:  Counsel, do you agree it's discretionary?

MR. CHIVVIS:  Yes, Your Honor.

THE COURT:  So I'll make a discretionary call on this.  Given how I think things are going to play out, I do think it's important for the efficient progression of the trial that adverse witnesses called in a party's case in chief get disclosed the documents so that we can resolve evidentiary objections.

And I'm sure I'll see the transcript of this ruling in another trial, but this is based on the particular circumstances of this case and what I've seen so far and what I think is likely to happen especially considering we have a guy coming in that I don't know who he's adverse to. I guess we'll find out.

MS. DURIE:  Good question.

THE COURT:  Okay.  Let's move on to the next one.

We resolved these issues -- or not resolved, but

at least we've hashed out these issues with respect to Ms. Borody and Ms. Graff on page 12.

MS. ROSS:  Your Honor, on the next one, which is at paragraph 67, I believe the parties reached agreement yesterday evening and just to read it, you can correct me if I'm wrong, I'm sure my colleague from the across the aisle will.  Subject to the Court's approval, we propose that each side shall have up to 45 minutes for opening statements and must reserve one hour for its closing argument.

THE COURT:  Okay.  If the parties agree on that, that's perfectly fine with me.  You have to reserve an hour for closing, but you're not saying that each party gets a maximum of one hour for closing, you get whatever time you have left, right?

MR. CHIVVIS:  That's correct, Your Honor.

MS. ROSS:  Your Honor, yes.

MR. DEVRIES:  Yes, Your Honor.

THE COURT:  Great.  And each side gets 12 hours is what the parties proposed.  That's fine with me.  Again, we're going to cut out any time we spend doing a bench trial at night from that time.

I think we've resolved the issue on page 23.

MR. CHIVVIS:  That's correct, Your Honor.

THE COURT:  And I don't think there's much more to talk about what's going to the Court versus what's going

to the jury.  We resolved the 101 issue.  The equitable estoppel issue we talked about.  The prosecution history estoppel issue, everybody agrees the Court should rule on and I'm going to.  The permanent injunction we're obviously not going to hear evidence.  That's relevant only to that and not to another issue in the case during the course of the trial.  And then the ongoing royalty everybody agrees that's going to be for the Court.

And then is there an issue here about ownership?  We're going to try ownership?

MS. FARNAN:  Yes, Your Honor, there is a dispute here.  I know that Your Honor's oral order said that you know the issue would be for trial, but it's our view that that should be a bench trial and that should be part of the things that are heard in the evening.  And we cited in there two Federal Circuit cases, one is *Core Optical v. Nokia* and there the Court had decided the usual on summary judgment.  It was being reversed.  And the Federal Circuit said because the ownership question is a threshold jurisdictional issue of standing, separate from the merits of Core Optical's patent infringement suit, the district court has the authority to act as the fact finder to resolve the jurisdictional issue.

In this matter, shifting from summary judgment to fact finding does not involve the shift from judge to

jury and that case cites another Federal Circuit case *DDB Technologies v. MLB Advanced Media,* also cited in the pretrial order. And there the Court, the Federal Circuit adopted a view that so long as the facts that are at issue on the standing or ownership issue are not so intertwined with the other issues, there is no right to a jury. And here the issue is really going to be surrounding the May 2015 transaction and whether Dr. Borody in fact assigned his patents to Finch at that time. And there's no overlap in that inquiry and anything else that's going on in the case.

And I think also, Your Honor, given what we've heard today that Dr. Borody is a bit of a mystery witness, even though it's more sort of suggested by the Federal Circuit that this was an issue for the Court, we think in these circumstances and given how this has come up and if Your Honor is allowing Dr. Borody to testify on those issues that it should be to the Court and not the jury.

THE COURT: Let me ask you this. And I haven't looked at these cases and maybe I'll need to. My first question is there's a difference between having a right to a jury and -- is there any case that said it would be legal error to have the jury weigh in on this?

MS. FARNAN: The cases don't address that specifically, but they say there's no right to a jury. They say obviously this is a legal issue which typically is

addressed by the Court.  I do think in this circumstance, given the facts, given what the Federal Circuit has said, I think it would be error to submit this to the jury in this circumstance given again it's a legal issue the Court needs to decide.  A lot of it is going to surround contract interpretation, which also is an issue of law.  And generally, unless the Court determines that there's two reasonable interpretations of the contract, and there's an ambiguity, there's something to resolve.  So I think given the actual issues that are in dispute here, given what the Federal Circuit has said about it and given the unique circumstance we have here, it's our position I think it would be error to let it go to the jury.

THE COURT:  Now there's a lot more going on.  Okay.  Well, if there's something I need to instruct the jury about how they should interpret a contract, I haven't seen that yet, but I would if it was a proper request for a jury instruction.

And do these cases that talk about it being an issue for the Court, are these cases more about whether or not somebody owns all substantial rights, which is a really complicated question.  There's a lot of people on the Court of Appeals that may disagree with that versus like whether or not somebody was assigned something in a contract.

MS. FARNAN:  They're actually more akin to the

situation here.

THE COURT:  Okay.

MS. FARNAN:  The DDB TECHNOLOGIES case involves it was two brothers who had an invention, one of whom was employed by a company at the time and the question was whether the activity that he was doing fell within the scope of his employment agreement such that the invention was not his own, but owned by the company that he worked for. Similar in the *Core Optical* case, again, it was really, somebody was working at a company and also at a university as part of a fellowship program, and again, whether the activities that were done there constitute an assignment at that time.  So I think they actually are -- these cases are more akin to the situation we have here than the situations Your Honor is thinking of in terms of all substantial rights.  And in both of those cases the Federal Circuit said that the Court should decide these issues, not a jury.

THE COURT:  All right.  Thanks very much.

MR. CHIVVIS:  Thank you, Your Honor.  I do think there's an important distinction in the cases that Finch has cited to Your Honor and that is whether as an issue of standing the Court can decide that issue without a jury. And because it's an issue of subject matter jurisdiction and even Article 3, there is cases that say the Court can decide that without a jury.

But here we're talking about an issue that overlaps with something the jury is supposed to decide and that Your Honor has found there's a factual dispute about. It is an element of Finch's case to prove it has ownership of the patents. That's a necessary element of a patent infringement case. It's usually undisputed. You'll see it in every complaint, we own the patents by assignment, et cetera. Right. That's an element of their case. That's something they need to prove. They need to prove they have ownership. They suggest we can rely on a presumption. We have competing jury instructions about that. But it is an element of their case. And there's intertwining evidence here with other issues in the case. Your Honor has found there's a dispute of fact on a contract. If this -- analogizing to contract, if there's a dispute of fact about a contract, it's not an issue of interpretation but a dispute of fact, that ordinarily in a contract case would go to a jury.

So we think Your Honor found that there is an issue to be decided by the jury. We think it's an element of Finch's infringement case that they need to prove affirmatively and so we think this should be tried to a jury and we think that that was Your Honor's intent behind her order. We did not brief this extensively in the footnotes to the pretrial order. If Your Honor is inclined to even

entertain argument otherwise, we would request the opportunity to actually fully ventilate the issue, but we do think Your Honor has already made her views clear and we do think they're are right that this is an issue for the jury should decide, and appropriately so. And there's no bar in those other cases from putting this issue of fact to a jury.

THE COURT: All right. Thank you very much.

Here's what I'm going to say about this one. It certainly was my understanding and intent that this was going to be an issue that was tried to the jury. My gut tells me it should be based on something. I'm sure -- I'm sure it's based on something that it is an element of the patent infringement case, but I don't have enough briefing in front of me, so I'll give everybody a fair chance to raise it. I'll take two-page letters by close of business on Friday if you want to tell me that this is something that must be tried to the bench. You may not get a ruling from me right away. Everyone should plan on this going to the jury and this not being a bench issue, but I will consider whatever is submitted.

Is there an issue here on footnote 13?

MS. ROSS: Yes, Your Honor. So as to the first Roman numerette that UMN owns the patents, I guess both of the issues that are in that Finch will otherwise have to prove up, but that Ferring has said they don't dispute. And

as to the first one that UMN owns the UMN patents, Ferring actually affirmatively rescinded any dispute they had on this. So we've tried to reach agreement on a stipulation. What happened was we made a proposal, we actually gave the concessions that didn't deal with whole issues we have here with ownership and infringement of entire claims, but kind of minor points that they asked for and they kept changing the language back such that it didn't actually address the full issue.

So what we're asking for here is if we're going to have to spend time and again, in a timed trial, time matters, proving up something that's not in dispute and wasting the jury's and the Court's time, we want that counted against Ferring. Goes for the second issue as well that Ferring has never disputed in their expert reports, we don't expect to see any expert -- we shouldn't see anything from their experts or their witnesses disputing infringement of claims 2 and 5 of the '080 Patent. We sent them a stipulation of infringement six months ago and followed up repeatedly with Ferring and never heard back from them on this. You know, have resent it recently. The most that we could get Ferring to say is -- and I don't think this is a stipulation at all really, is that the claims are broad enough to cover REBYOTA. And I mean I think that characterization is inflammatory, it's also not really like,

it's just not a stipulation of infringement, which is really what they should be providing here given they're not going to present evidence on this.

THE COURT:  All right.  Thank you very much.

MR. CHIVVIS:  Thank you, Your Honor.  This issue came up in the context of uncontested facts that would be listed in one of the sub exhibits to the pretrial order, the general practice in this district is parties have to agree that something is uncontested for it to go in there.  We were willing to agree that UMN owns the UMN patents.  We used the language out of an interrogatory response that we had.  We thought there were other issues in the case that were undisputed, which they agreed to, for instance, what are the original filing dates of the Hlavka provisionals, what are the original filing dates of the Dr. Borody patents at issue in this case.  They provisionally agreed as part of an exchange that we would list all of that as uncontested facts and we were fine with that.  The whole negotiation broke down because they wanted us to stipulate to infringement of the '080 Patent, but they didn't move for summary judgment on the '080 Patent.  They have the burden of proof on the '080 Patent.  We're not required to stipulate to infringement of that patent.  We think when they put on the evidence that's in their case that they will establish the breadth of that patent and our core defense is

prior art invalidity, but we're not going to stipulate to infringement in a way that removes our ability to demonstrate the breadth of that patent that they're asserting and which would fold into our validity case.

So we were willing to stipulate that it's broad enough to cover our product, but our view is it's very broad. And that's our view in the case. So it was kind of take it or leave it. We don't have a rog or an admission that we're bound to at this point in the case and so I just don't see how they can force us to stipulate to infringement. And then they called off the whole deal when we refused to stipulate to infringement of that patent when we already had a number of other uncontested fact stipulations that both sides were fine with.

If there's any charging times or gamesmanship that comes out of this, it's why don't we take the deal on the other issues where everybody has agreed if they don't like our position, which we have held that position consistently throughout the case on how broad the '080 patent is, then they don't -- we don't have to list it as an uncontested fact, that's fine.

THE COURT: Okay. I understand what's going on here.

MR. CHIVVIS: Yes.

THE COURT: So sounds like everybody is going to

be able to work out everything except for the '080 Patent. The request on the table is to charge time for them having to prove it up. I don't think it's going to take that much more time for the '080 if you want to keep it in the case, which you don't have to. But if you want to keep it in the case, it's not going to take that much more time and I'm not going to force them to stipulate. Obviously I'm not going to force them by charging time against them. So that's how we'll deal with that one.

MR. CHIVVIS: That's everything on the pretrial order.

THE COURT: I've got some more on my list. Let's see here. The dispute about claim narrowing has been resolved.

MR. DEVRIES: What we explained is as we have previously agreed, we are going to be sending over a materially reduced set of claims tonight.

THE COURT: Okay. Perfect. Oh, there was a dispute about whether or not we were going to refer to the patents as the Dr. Borody patents or the Finch patents. Was that a dispute?

MR. CHIVVIS: Your Honor, I'll address this one. I think the issue is really just how the Court refers to the patents. We don't think calling them the Finch patents is appropriate given ownership is at issue. We did think

Dr. Borody was more neutral, but if there's a contest about that, the Court could refer to the patents neutrally across the board. The parties in closing arguments may make arguments about them being the Finch or Borody patents and we're not addressing that here. I think the issue is really how the Court prefers to --

THE COURT: You don't want me to say anything besides the patent owners?

MR. CHIVVIS: To tip the balance.

THE COURT: That's fine. I won't.

MR. CHIVVIS: Thank you.

THE COURT: Yep. I appreciate that.

I don't think I'm going to have an issue with this group. Sometimes when things get heated during trial it seems like in every trial things fall off the rails with respect to impeachment by a prior inconsistent statement and so we've tried different ways to make sure that that comes to the jury properly. And the way that we've settled on that seems to be working out okay is to tell each side that you get one shot to do it right. You can throw something up on the screen and try to impeach him. If it turns out that it's not inconsistent, your credibility with the Court is lost at that time. And it happens to me in every trial, but to the extent we have younger attorneys doing impeachment, everybody should review a video on how to do it correctly.

I'll give the parties a little leeway at the beginning of the trial, but if we start showing the jury statements that aren't inconsistent, I'm going to institute a protocol that requires people to state page and line numbers and ask me for permission to proceed before they are allowed to impeach.  So that's what I'll say about that.

We need copies of the trial exhibits in digital form by noon on the Friday before trial.  I don't care how you get those to us.  It could be by a shared link or by a thumb drive, either one is fine, but it should have all the PTX, DTX and J T X.

If there's -- if there are evidentiary disputes that you need the Court to resolve the day those exhibits are going to be introduced, we need to have it brought to our attention by 7 a.m. in the morning the day of trial by e-mail to the Court's civil address.

MR. CHIVVIS:  Your Honor, one housekeeping item.

THE COURT:  Yes.

MR. CHIVVIS:  Because the issue of who was going first remained unresolved leading into this hearing and we only reached an agreement on it that resolved our MIL that was related last night, we had labeled our exhibits neutrally TX, but we have different exhibit numbers in place than the PTX exhibits.  It would be fairly burdensome for our team to go relabel them, but if it's helpful for

Your Honor and you'd like us to do that, we will.

THE COURT: I don't think anyone should relabel anything this close to trial. I think that's a huge recipe for disaster.

MR. CHIVVIS: We appreciate that.

THE COURT: Work it out amongst yourselves. It doesn't bother me, but I'm not going to require anybody to do anything. And if you guys can't agree, it's going to stay like it is

MS. ROSS: Your Honor, I think we're fine. We even had labeled them PTX, which is consistent with where we are now. TX should be fine.

THE COURT: Okay. Great.

We talked about disputes about exhibits. The same thing goes for demonstratives. With respect to deposition designations, if there is a dispute, we need that to come up to 6 p.m. the night before and we'll try to get you a ruling on it the next morning. If you need a ruling on it in sufficient time so that you can put the video together with the designations, counter designations, work it out so you get your disputes resolved such that you're not going to get a ruling before the next morning. So change your time to exchange if we need it sooner than that.

And give us a time for how the deposition designation time should be split up between the parties.

That can be provided to the courtroom deputy.  We'll need to move the exhibits for any of the deposition testimony in immediately after the deposition is played.

What would be very, very helpful to us is to the extent the exhibits that are referenced in the deposition are different exhibit numbers from what you need enter, that needs to be read in as well.  And we found that's a great job for an associate that may not have had some stand up time to do.

Jury selection is going to be done the Friday before trial by Magistrate Judge Fallon.  You should speak to her if you have any questions about how she intends to conduct that.  She has full discretion.

MS. DURIE:  I am sorry --

THE COURT:  She has full discretion within the confines of the rules on how she intends to do the jury selection.

MS. DURIE:  I actually had just some mechanical questions about jury selection, when we were going to get the list of jurors.  Would that be more appropriate addressed to her?

THE COURT:  That might be something that our jury coordinator might be the best person to answer.

MS. DURIE:  We will sort that out.

MS. FARNAN:  Yeah, I think we can -- for Friday

selection we can get it on Tuesday.

THE COURT:  Okay.  Perfect.

I think you all know we're going to be having a trial in here next week, so to the extent you need to do some courtroom set up, that's going to be a little bit challenging, but I'll ask you to work with the courtroom deputy to get something figured out.

Do any of you anticipate that we're going to be requesting to seal the courtroom?

MR. DEVRIES:  I don't believe so on our side, Your Honor.

MR. CHIVVIS:  We're going to make every effort to have open court to the extent possible, but we do reserve.  There's some potential if we're getting into certain Ferring information regarding its BLA or the like, there might be some limited sealing required, but we will try to make it as open as possible and limit our request to the extent possible.

THE COURT:  So I'm generally disinclined to seal the courtroom.  If you do anticipate a need to seal the courtroom, it really does need to be kept to the absolute bare minimum and I need to know the morning that we think that's going to happen.  I don't just want a request to seal the courtroom out of the blue.  I would prefer if we could keep the courtroom open and to the extent certain exhibits

need to get admitted under seal, we could do that and then get redacted copies later or if you want to hand out, you know, copies to the jury and have them read along if it's a demonstrative, but we really need to keep it to the bare minimum.

Are we going to be playing the patent video?

MS. DURIE:  Yes.  In our view we should.

MS. ROSS:  I agree.

THE COURT:  All right.  So well, I guess Judge Fallon is conducting the jury selection, but there's a part in the patent video where it says you've all been provided a copy of the patent and then when the jurors don't have it, they look at the judge and it's embarrassing, so --

MS. DURIE:  We can get it.  It's actually a sample patent.  We can make copies.

THE COURT:  If you both agree to give that to the jury or just let Judge Fallon, if you don't want the jury to have that and she can at least make some statement about it.

MS. DURIE:  Yep.

THE COURT:  Okay.  We have your proposed voir dire and preliminary jury instructions.  We're going to take a look at those as soon as we can.  I understand from my clerk there might be a number of disputes.  Hopefully some of those were resolved today.  Does it make sense for the

parties to take another cut before we work on them?

MS. ROSS:  I think at most of it -- I think with respect to the voir dire, I think it was just the listing of witnesses and I think we probably can work that out and then with respect to the jury instructions, I think there were just maybe one or two, but I think we can probably take another look a well.

THE COURT:  Why don't the parties take another look and get us by Friday updated proposed voir dire and preliminary jury instructions.  And it seems like probably it will make sense for you all to look at the final jury instructions again as well.  I don't need that until another week, because I can tell you right now I'm not going to look at it until a week before Friday.  So that's the 26th for the updated preliminary and voir dire and August 2nd for the updated final jury instructions and verdict form.  And hopefully that will take into account everything that's still in the case as of August 2nd and then we can work from those.

With respect to moving for judgment as a matter of law, we don't want you doing that in front of the jury. You should do it at the next break after the appropriate time to move.  You're not required to submit written JMOL motions, but you should be prepared to at least state all of the bases on which you're moving so that we can understand

what they are.

It's possible that I'll request further written briefing, but you're not required to preserve the issue.

I need a list in the form of a letter filed on the docket of technical terms and witness names.  That needs to be filed by Thursday July 25th because our court reporter is in trial next week and she wants to get all of the names uploaded.

Have the parties had any further settlement discussions?

MR. DEVRIES:  So Your Honor, approximately a little bit over a year ago or so the parties had had some settlement discussions.  At the time we had suggested a mediation and I believe there was not an interest on the other side.  The parties, as of last Friday, got together and talked about settlement again and my general understanding, I didn't participate personally, is that they've agreed to continue discussing the possibility of settlement.

THE COURT:  Would it be helpful for me to order the decision makers for each side to appear in a room together here at the court?  We'd be happy to provide our lovely government facilities for their meeting.

MR. DEVRIES:  We certainly have no objection to that, would just need to work out the logistics.

MS. DURIE:  I think likewise.  The parties are in communication.  I think we can discuss amongst ourselves when it would be helpful to have us use the venue.

THE COURT:  I know you'll be spending some time with Judge Fallon next Friday.  I haven't checked with her availability, but I could ask her if you think it would be beneficial after the jury selection is completed to have her assistance.  I don't know what she'll say, but I could at least ask.

MS. DURIE:  Understood.  We'll take that advice.  Thank you, Your Honor.

THE COURT:  Is there anything else?

MS. DURIE:  Not for us, Your Honor.

MR. DEVRIES:  Your Honor had asked for a copy of the slides about the prosecution history.  I'm prepared to pass it up with Your Honor's permission or I could do it after we conclude.

THE COURT:  Why don't you -- both sides can give it, after we conclude, to my clerk and we will take them from you.

All right.  Thank you very much.  We'll see everybody in a couple weeks.

COURT CLERK:  All rise.

(Court adjourned at 3:49 p.m.)

----------------------------------

          I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.


                              /s/ Stacy M. Ingram, RPR
                              Official Court Reporter
                                U.S. District Court