**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., REBIOTIX INC. | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC. | ) ) ) ) |
| Defendants. | ) ) C.A. No. 21-1694-JLH ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and REGENTS OF THE UNIVERSITY OF MINNESOTA | ) ) **REDACTED VERSION OF D.I. 511** ) ) ) ) |
| Counterclaim-Plaintiffs/Reply Defendants, | ) ) |
| v. | ) ) |
| FERRING PHARMACEUTICALS INC., and REBIOTIX, INC. | ) ) ) |
| Counterclaim-Defendants/Reply Plaintiffs. | ) ) ) |

**FERRING'S RESPONSIVE BRIEF IN OPPOSITION TO FINCH/UMN'S POST-TRIAL
MOTION FOR ENHANCED DAMAGES, SUPPLEMENTAL DAMAGES,
ONGOING ROYALTY, AND PRE- AND POST-JUDGMENT INTEREST**

TABLE OF CONTENTS

I.    SUMMARY OF THE ARGUMENT .......................................................................... 1

II.   ENHANCED DAMAGES UNDER 35 U.S.C. § 284 ARE NOT WARRANTED IN THIS
      CASE. ............................................................................................................ 3

      A.   If the Court grants Ferring's Rule 50(b) motion on willfulness,
           Finch/UMN's motion for enhanced damages must be denied. ......................... 3

      B.   Enhanced damages are inappropriate under *Halo.* ........................................... 3

      C.   The *Read* factors confirm that enhanced damages are inappropriate............. 5

           1.   *Read* factor 1: Copying .............................................................. 5

                a)   The Borody patents ......................................................... 6

                b)   The UMN patent .............................................................. 7

           2.   *Read* factor 2: Diligence and good-faith belief of invalidity or
                noninfringement...................................................................... 10

           3.   *Read* factor 3: Ferring's behavior as a party to this litigation................... 13

                a)   Ferring's conduct with respect to Dr. Borody did not rise to
                     the level of malicious behavior required to support an
                     award of enhanced damages. ........................................... 14

                     (1)   Ferring's standing motion was not unreasonable.............. 14

                     (2)   The terms upon which Ferring agreed to
                           compensate Dr. Borody for his lost income
                           opportunity were not excessive........................................ 18

                     (3)   Ferring's motion in limine for an adverse inference
                           was not inappropriate, nor was there any bad faith
                           with respect to the Borody issues generally..................... 19

                     (4)   Ferring's conduct in securing a contingent
                           declaration from Dr. Borody was not malicious or
                           in bad faith. ...................................................................... 20

                b)   Ferring's attempt to amend its Reply was not meritless. .............. 20

                c)   Ferring did not attempt to exploit Finch's financial
                     circumstances. ............................................................... 22

d)  Ferring did not flout the Court's orders and rulings. .................. 23

e)  Ferring did not introduce new arguments or theories at trial or otherwise try to sandbag Finch/UMN. .................................... 25

4.  *Read* factor 4: Size and financial condition ............................... 27

5.  *Read* factor 5: Closeness of the case........................................ 28

6.  *Read* factors 6 and 7: Duration of the alleged infringement and remedial action........................................................................ 30

7.  *Read* factor 8: Ferring's motivation to harm Finch/UMN ...................... 31

8.  *Read* factor 9: Attempts to conceal misconduct ....................................... 32

III.  SUPPLEMENTAL DAMAGES THROUGH AUGUST 15, IF AWARDED, SHOULD BE BASED ON ACTUAL SALES. ................................................. 34

IV.  ENHANCING THE ONGOING ROYALTY RATE IS NOT WARRANTED.................................... 34

A.  The jury's willfulness determination is insufficient to treble ongoing royalties. ................................................................. 35

B.  Finch/UMN fails to identify any post-verdict changes in the parties' bargaining positions that would justify increasing the ongoing royalty rate. ........................................................................ 38

C.  Changed economic circumstances favor lowering the ongoing royalty rate. ....................................................................... 40

D.  Other post-verdict factors favor lowering the ongoing royalty rate. ............. 41

V.  PRE- AND POST-JUDGMENT INTEREST ............................................................. 42

TABLE OF AUTHORITIES

**Cases**

*Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*,
No. 07-cv-8108-FMO, 2018 WL 6190604 (C.D. Cal. Nov. 4, 2018) ...................... 31, 32

*ArcherDX, LLC v. Qiagen Scis., LLC*,
No. 18-cv-1009-MN, 2022 WL 4597877 (D. Del. Sept. 30, 2022)................... 4, 7, 10, 28

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
No. 14-62369, 2017 WL 7732873 (S.D. Fl. Jan. 3, 2017)............................................... 37

*Barry v. Medtronic, Inc.*,
250 F.Supp.3d 107 (E.D. Tex. 2017) ............................................................................. 14

*Beatrice Foods Co. v. New England Printing & Lithographing Co.*,
923 F.2d 1576 (Fed. Cir. 1991)...................................................................................... 43

*Bioverativ Inc. v. CSL Behring LLC*,
No. 17-cv-914-RGA, 2020 WL 1332921 (D. Del. Mar. 23, 2020) .................................. 7

*Boston Sci. Corp. v. Cordis Corp.*,
838 F. Supp. 2d 259 (D. Del. 2012)............................................................................... 37

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009)........................................................................................ 5

*EMC Corp. v. Zerto, Inc.*,
No. 12-cv-956-GMS, 2017 WL 3434212 (D. Del. Aug. 10, 2017)................................. 35

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
No. 2:15-cv-1202-WCB, 2017 WL 3034655 (E.D. Tex. July 18, 2017)................... 36, 37

*Gen. Motors Corp. v. Deevez Corp.*,
461 U.S. 648 (1983) ...................................................................................................... 43

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016)..................................................................................................... 4, 34

*Humanscale Corp. v. CompX Int'l, Inc.*,
No. 3:09-cv-86, 2010 WL 3397455 (E.D. Va. Aug. 23, 2010) ...................................... 43

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ............................................. 25

*i4i Ltd. P'ship v. Microsoft Corp.*,
670 F. Supp. 2d 568 (E.D. Tex.), *aff'd as modified*, 589 F.3d 1246 (Fed. Cir.
2009), *opinion withdrawn and superseded on reh'g*, 598 F.3d 831 (Fed. Cir.
2010), *aff'd*, 564 U.S. 91 (2011) .................................................................................. 24

*IMX, Inc. v. LendingTree, LLC*, 469 F.Supp.2d 203 (D. Del. Jan. 10, 2007)............................. 28

*Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*,
No. 04-cv-5172-JAP, 2009 WL 512156 (D.N.J. Feb. 27, 2009) ......................... 32, 37, 38

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
494 U.S. 827 (1990) ................................................................................ 44

*Lam, Inc. v. Johns-Manville Corp.*,
718 F.2d 1056 (Fed. Cir. 1983) ................................................................ 43

*Med-El Elektromedizinische Gerate Ges.M.B.H. v. Advanced Bionics, LLC*,
No. 18-cv-1530-JDW, 2024 WL 4371292 (D. Del. Oct. 2, 2024) ............... 4, 29

*MHL Custom, Inc. v. Waydoo USA, Inc.*,
No. 21-cv-0091-RGA, 2023 WL 5805889 (D. Del. Sept. 7, 2023) ............... 3, 6

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*,
288 F. Supp. 3d 872 (E.D. Wis. 2017) ..................................................... 6

*Nox Med. Ehf v. Natus Neurology Inc.*,
No. 15-cv-709-RGA, 2018 WL 4062626 (D. Del. Aug. 27, 2018), *on
reconsideration*, No. 1:15-cv-00709-RGA, 2018 WL 6427686 (D. Del. Dec. 7,
2018) ............................................................................................... 23, 27

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
875 F.3d 1369 (Fed. Cir. 2017) ................................................................. 3

*Provisur Techs. Inc. v. Weber, Inc.*,
No. 23-1438, --- F.4th ----, 2024 WL 4363502 (Fed. Cir. Oct. 2, 2024) ......... 10

*Purewick Corp. v. Sage Prod., LLC*,
666 F. Supp. 3d 419 (D. Del. 2023) .............................................. passim

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992) ................................................................. 5

*Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am.*,
707 F.Supp.2d 737 (N.D. Ohio 2010) ...................................................... 13

*SiOnyx LLC v. Hamamatsu Photonics K.K.*,
981 F.3d 1339 (Fed. Cir. 2020) ................................................................ 13

*Smartrend Mfg. Grp., Inc. v. Opti-Luxx, Inc.*,
No. 21-cv-1009, 2024 WL 747744 (W.D. Mich. Feb. 23, 2024) ................... 30

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
254 F. Supp. 3d 680 (D. Del. 2017), *aff'd in part and vacated in part*, 930 F.3d
1295 (Fed. Cir. 2019) ............................................................................. 36

*State Indus., Inc. v. A.O. Smith Corp.*,
751 F.2d 1226 (Fed. Cir. 1985) ................................................................. 6

*Stryker Corp. v. Zimmer, Inc.*,
No. 10-cv-1223, 2017 WL 4286412 (W.D. Mich. July 12, 2017) ................... 32

*Tinnus Enters., LLC v. Telebrands Corp.*,
    369 F. Supp. 3d 704 (E.D. Tex. 2019) ............................................................................. 25

*TruePosition Inc. v. Andrew Corp.*,
    611 F. Supp. 2d 400 (D. Del. 2009), *aff'd*, 389 F. App'x 1000 (Fed. Cir. 2010) ............ 44

*VB Assets, LLC v. Amazon.com Servs. LLC*,
    No. 19-cv-1410-MN, --- F.Supp.3d ----, 2024 WL 4347300 (D. Del. Sept. 30,
    2024) ...................................................................................................................... passim

*Vectura Ltd. v. GlaxoSmithKline LLC*,
    No. 16-cv-638-RGA, 2019 WL 4346502 (D. Del. Sept. 12, 2019) ...................... 34, 36, 38

*WCM Indus., Inc. v. IPS Corp.*,
    721 Fed. Appx. 959 (Fed. Cir. 2018) ................................................................................. 5

*XY, LLC v. Trans Ova Genetics, L.C.*,
    890 F.3d 1282 (Fed. Cir. 2018) ........................................................................................ 35

**Statutes**

35 U.S.C. § 298 .......................................................................................................................... 10

**Other Authorities**

ABA Comm. on Ethics & Pro. Resp., Formal Op. 402 (1996) ................................................... 18

DSBA Committee on Pro. Ethics Op. 2003-3 ........................................................................... 18

TABLE OF ABBREVIATIONS

| Abbreviation | Description | Ref. |
|---|---|---|
| '080 patent | United States Patent Number 11,541,080 | JTX-6 |
| '309 patent | United States Patent Number 10,675,309 | JTX-4 |
| **bold and italicized** | Emphasis added unless otherwise indicated | |
| Borody patents | The '080 patent and the '309 patent | JTX-6, JTX-4 |
| D.I. 503, Ex. __ | Refers to an exhibit attached to the Declaration of Ingrid Petersen in Support of Post-Trial Motion, for Enhanced Damages, Supplemental Damages, Ongoing Royalty, and Pre- and Post-Judgment Interest Pursuant to Order on D.I. 490 | D.I. 503 |
| Ex. __ | Refers to an exhibit attached to the accompanying Declaration of Daniel M. Attaway, Esq. in support of Ferring's Responsive Brief in Opposition to Finch/UMN's Post-Trial Motion for Enhanced Damages, Supplemental Damages, Ongoing Royalty, and Pre- and Post-Judgment Interest, filed concurrently | |
| Ferring | Ferring Pharma and Rebiotix | |
| Ferring Pharma | Ferring Pharmaceuticals, Inc. | |
| Finch | Finch Therapeutics Group, Inc., Finch Therapeutics, Inc., and Finch Therapeutics Holdings, LLC | |
| Finch/UMN | Finch and UMN | |
| Finch/UMN's brief | UMN and Finch's Brief in Support of Post-Trial Motion, for Enhanced Damages, Supplemental Damages, Ongoing Royalty, and Pre- and Post-Judgment Interest Pursuant to Order on D.I. 490 | D. I. 501 |
| FMT | Fecal microbiota transplantation | |
| FTO | Freedom to operate | |

| Abbreviation | Description | Ref. |
|---|---|---|
| Hamilton 2012 | Hamilton et al., *Standardized Frozen Preparation for Transplantation of Fecal Microbiota for Recurrent Clostridium difficile Infection*, AM. J. GASTROENTEROLOGY 1-12 (2012) | |
| JTX-__, PTX-__, or TX-__ | Refers to exhibits admitted during the jury trial held in the above-captioned matter | |
| K&E | Kirkland & Ellis | |
| patents in suit | The '080 patent, the '309 patent, and the UMN patent | JTX-6, JTX-4, JTX-1 |
| Rule 50(b) motion | Ferring/Rebiotix's Renewed Motion for Judgment as a Matter of Law and Ferring's Opening Brief in support of Its Motion for Judgment as a Matter of Law Under Fed. R. Civ. P. 50(b) | D.I. 497 D.I. 502 |
| Tr. | Refers to the final trial transcript from the jury trial held in the above-captioned matter | |
| UMN | The Regents of the University of Minnesota | |
| UMN patent | United States Patent Number 10,251,914 | JTX-1 |

Ferring hereby responds to Finch/UMN's opening brief in support of their post-trial motion for enhanced damages, supplemental damages, ongoing royalty, and pre- and post-judgment interest. *See* D.I. 501.

## I.    SUMMARY OF THE ARGUMENT

Lacking real support to treble the damages award against Ferring, Finch/UMN instead resort to unfounded allegations of a "decade-long conspiracy" by Ferring to obtain a "first mover advantage" by "copying" Finch/UMN's . . . what exactly—product? patents? other documents? It's never made clear. It certainly cannot be a product; the only product developed by Finch or UMN that was mentioned at trial, Finch's CP101, was an oral capsule, whereas REBYOTA is an enema. Nor could it be the inventions described in the asserted claims themselves—none of which issued until well after REBYOTA's development was completed. And while Example 4 of the UMN patent describes methods of preparing an FMT product, all evidence presented at trial shows that Ferring uses a very different process to manufacture REBYOTA. At most, Finch/UMN have shown only that Ms. Jones retained possession of certain UMN documents, most of which did not contain any confidential and/or technical information, and that Ferring kept track of Finch/UMN's efforts to obtain patents related to FMT. Such evidence is insufficient to prove copying.

Similarly, Finch/UMN's arguments about the closeness of this case and whether Ferring had a good faith belief that it did not infringe any valid claim of Finch/UMN's patents do not stand up to scrutiny. The fact is that after Finch/UMN finally relented on the eve of trial and narrowed their laundry list of asserted claims to their five (presumably best) claims, two of those five claims were invalidated by the jury. As shown in Ferring's JMOL briefing and motion for reconsideration regarding 35 U.S.C. § 101, the remaining three claims should be invalidated or found not infringed. But even if the Court does nothing with those three claims, the jury's

1

invalidation of claim 9 of the '080 patent and claim 21 of the '309 patent (findings that remain uncontested by Finch/UMN) demonstrates that the scope of any alleged improvements of the claimed inventions over the prior art was dramatically narrower than suggested by Finch/UMN.

Moreover, if—as alleged by Finch/UMN—Ferring did not have a good faith belief that it did not infringe any valid claim, it begs the question: why would ***Ferring*** have initiated this lawsuit by seeking a declaration that the then-existing claims of the Borody patents were invalid and/or not infringed by REBYOTA? In the same vein, Finch/UMN cannot credibly claim that Ferring sought to "conceal" its alleged infringement when (i) Finch was aware of REBYOTA before Finch even began development of its own FMT product, (ii) Finch kept tabs on Ferring's attempts to secure regulatory approval throughout development, and (iii) Finch specifically crafted patent claims seeking to cover REBYOTA during the course of this litigation.

Finch/UMN also spend a disproportionate amount of their brief complaining about conduct related to attempts to secure the testimony of Dr. Borody. As explained in more detail below, Ferring does not believe that anything related to this issue rises to the level of sanctionable behavior, and Finch/UMN engaged in similar behavior in unsuccessfully attempting to secure competing testimony from other witnesses. Trebling of the entire damages award certainly is not a proper remedy here, especially where the balance of the behavior complained of by Finch/UMN was not out of the ordinary during a contentious litigation. Because several of the *Read* factors are, at most, neutral, and none weigh in favor of enhancement, the Court should not enhance the jury's damages award.

With respect to Finch/UMN's calculation of pre- and post-judgment interest, Ferring has corrected certain mistakes in Mr. Malackowski's calculations. But on a more fundamental level, neither measure should be used for punitive purposes, and therefore, neither calculation should

account for enhancements to the damages award, if any. Similarly, Finch/UMN rely almost entirely on their arguments for enhancing the damages award in seeking to treble the jury's royalty rate for ongoing infringement. This should be rejected for the same reasons that the damages award itself should not be enhanced. Further, Finch/UMN fail to take into account the changed circumstances attendant to a hypothetical negotiation after the jury verdict—most notably the disproportionate and unsustainable nature of the jury's award in light of the REBYOTA's continued underperformance. Under these circumstances, the new hypothetical negotiation would result in a lowering of the 5.5% royalty rate assessed by the jury to a range between 3-4.5%, or at most, in maintaining the 5.5% rate.

## II.    ENHANCED DAMAGES UNDER 35 U.S.C. § 284 ARE NOT WARRANTED IN THIS CASE.

### A.    If the Court grants Ferring's Rule 50(b) motion on willfulness, Finch/UMN's motion for enhanced damages must be denied.

As Ferring's Rule 50(b) motion explains, the jury's willfulness verdict should not stand. *See* D.I. 502 at 24-33. A finding of willfulness is a necessary prerequisite for a finding of enhanced damages. *VB Assets, LLC v. Amazon.com Servs. LLC*, No. 19-cv-1410-MN, ---F.Supp.3d ----, 2024 WL 4347300, at *14 (D. Del. Sept. 30, 2024). Therefore, if the Court grants Ferring's Rule 50(b) motion with respect to willfulness, Finch/UMN's request for enhanced damages must be denied.

### B.    Enhanced damages are inappropriate under *Halo*.

Even if the jury's verdict on willfulness is maintained, a finding of willfulness does not compel an award of enhanced damages. *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017); *MHL Custom, Inc. v. Waydoo USA, Inc.*, No. 21-cv-0091-RGA, 2023 WL 5805889, at *8-*10 (D. Del. Sept. 7, 2023). Enhanced damages under Section 284 are discretionary and are generally reserved for egregious conduct that is "willful, wanton,

malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04 (2016). As explained further below, Ferring's behavior during this litigation does not amount to egregious litigation misconduct. The behavior of which Finch/UMN complain is either inaccurately portrayed or, at most, zealous advocacy that was not egregious when put in context.

Furthermore, the jury instructions with respect to willfulness also support the notion that the jury's finding of willfulness alone cannot support enhanced damages. *See* D.I. 482 at 26. Specifically, the jury instructions did not require that the jury find that Ferring's actions were "willful, wanton, malicious, . . . or—indeed—characteristic of a pirate." *Halo*, 579 U.S. at 103-04. In fact, the jury instructions on willfulness never mention copying, D.I. 482 at 26, so the Court cannot presume that the jury concluded that copying occurred. *See Med-El Elektromedizinische Gerate Ges.M.B.H. v. Advanced Bionics, LLC*, No. 18-cv-1530-JDW, 2024 WL 4371292, at *11 (D. Del. Oct. 2, 2024) (finding that, even where copying was listed as one of the factors to consider for willfulness, it was inappropriate to conclude that the jury found copying). Rather, the jury instructions only required that Ferring's behavior was "deliberate or intentional" such that "Ferring engaged in additional conduct evidencing deliberate or reckless disregard of UMN and Finch's patent rights." D.I. 482 at 26. While deliberate or reckless disregard may support a finding of willfulness, it does not support enhanced damages. *See Halo*, 579 U.S. at 109; *see also ArcherDX, LLC v. Qiagen Scis., LLC*, No. 18-cv-1009-MN, 2022 WL 4597877, at *16 (D. Del. Sept. 30, 2022).

Accordingly, and as shown further below with respect to the *Read* factors, enhancement is not warranted here.

### C.    The *Read* factors confirm that enhanced damages are inappropriate.

Although not mandatory, courts use the *Read* factors to assist "in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages at all, and if so, by how much the damages should be increased." *VB Assets*, 2024 WL 4347300, at *15 (quoting *WCM Indus., Inc. v. IPS Corp.*, 721 Fed. Appx. 959, 972 (Fed. Cir. 2018)); *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992). As discussed below, on balance, the *Read* factors do not support enhanced damages.

#### 1.    *Read* factor 1: Copying

Finch/UMN argue that "Ferring deliberately copied UMN's patented methods of FMT treatment and Finch's patented FMT products." D.I. 501 at 10. But Finch/UMN never specifically identify what Ferring supposedly copied.[1] To the extent that what was "copied" was the idea of FMT, it is undisputed that FMT had long been known in the prior art. Tr. at 329:24-331:5, 147:25-148:12. If, instead, what was "copied" was the "patented" methods and products, none of the asserted claims of the patents in suit had issued (or even been filed) at the time Rebiotix began and completed its development. *Compare* Tr. at 738:8-14 *with* JTX-1.0002; JTX-4.0002; JTX-6.0002. And where, as here, the evidence is unclear as to what allegedly was

---

[1] Finch/UMN's reliance on conversations between Edwin Hlavka and Drs. Khoruts and Sadowsky in support of copying from UMN, D.I. 501 at 11, ignores reality. While Mr. Hlavka reached out to Drs. Khoruts and Sadowsky before filing his provisional patent application, there is no evidence that he spoke to them before filing; rather, the evidence cited by Finch/UMN makes clear that he did not speak to them until after the original provisional application was filed. *See* D.I. 501 at 11 (citing and quoting TX-3166.0001-2 and Tr. at 559:1-6). And even then, the discussion involved the use of cryoprotectants, Tr. 196:25-197:7, which the jury found to be obvious in invalidating claim 9 of the '080 patent and claim 21 of the '309 patent, Tr. at 1255:22-1256:3; *see Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1344 (Fed. Cir. 2009) ("A broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness.").

copied, this factor does not support enhancement. *MHL*, 2023 WL 5805889, at *8; *see also*

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 900-01 (E.D. Wis. 2017).

Regardless and as explained in Ferring's Rule 50(b) motion, D.I. 502 at 29-33, and further

below, there is no evidence that Ferring copied anything from either Finch or UMN.

### a)    The Borody patents

There is no evidence to prove that Ferring "deliberately copied . . . Finch's patented FMT

products," D.I. 501 at 10. The evidence Finch/UMN cite shows nothing more than awareness of

various patent applications and patents related to the Borody patents. With respect to the patent

applications, knowledge of a patent application is insufficient to establish willful infringement.

*State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("To willfully

infringe *a patent*, the patent must exist" and "[w]hat the scope of claims in patents that do issue

will be is something totally unforeseeable.") (emphasis in original). Finch/UMN utterly fail (i) to

identify anything from the patent applications that was copied, (ii) to explain how the allegedly

copied material was used during the development of REBYOTA, or (iii) to tie the allegedly

copied material to what was eventually claimed in the asserted claims. Moreover, the asserted

claims of the Borody patents issued years after the REBYOTA formulation and manufacturing

process were developed and thus cannot serve as a basis for copying. *Compare* Tr. at 738:8-10

*with* JTX-4.0002 and JTX-6.0002.

Finch/UMN rely on (i) the deposition testimony of Rebiotix's Greg Fluet that he had

reviewed patents assigned to Crestovo, D.I. 501 at 10 (citing Tr. at 288:7-15, 289:3-6), and (ii)

an August 2014 email from Lee Jones regarding CIPAC winding down, D.I. 501 at 13 (citing

PTX-208.0001). But both occurred after Rebiotix had completed development of REBYOTA,

Tr. at 738:8-10, and thus cannot support copying. Moreover, monitoring a competitor's patent

filings (as discussed in Mr. Fluet's testimony) and business development (Lee Jones's email) is

common and a good business practice. *Bioverativ Inc. v. CSL Behring LLC*, No. 17-cv-914-RGA, 2020 WL 1332921, at *3 (D. Del. Mar. 23, 2020) (distinguishing competitive intelligence gathering from copying). It is not evidence of copying, nor is it evidence of some nefarious conduct by Ferring Pharma or Rebiotix.

As there is no evidence of copying (or even evidence from which copying could reasonably be inferred), this factor weighs against enhancement as to the Borody patents. *ArcherDX*, 2022 WL 4597877, at *16.

### b)     *The UMN patent*

Finch/UMN assert that Lee Jones used a "position of trust as a CEO in residence at UMN to access confidential information about the UMN inventions, including the UMN provisional patent application," which she then "disseminated . . . to other Rebiotix founders, consultants and researchers to copy and implement into Rebiotix's product." D.I. 501 at 5, 12. But the record does not support this assertion. First, the alleged confidential information (some of which cannot be considered confidential) was freely provided to Ms. Jones by the Office of Technology Commercialization, and some was sent to her nonconfidential AOL email address. Tr. at 645:22-646:8. Second, there is no evidence that any researcher, consultant, or anyone at Rebiotix ever used any of the information. Third, even if Finch/UMN had shown that certain information was used for REBYOTA (they have not), Finch/UMN fail to tie such information to the asserted claim of the UMN patent.

The story Finch/UMN tell to support their copying allegations is unsubstantiated by the documents they cite and the testimony introduced at trial. Finch/UMN reference Ms. Jones sending a PowerPoint presentation from the Carlson Business School to a consultant, Ms. Nelson. D.I. 501 at 12 (citing PTX-42). But the PowerPoint presentation does not contain any information on how to make an FMT product and notes that the claims for the UMN patent

family are "around a composition comprising of several families of bacteria" where differentiation "lies in 'composition comprises of no greater than 0.1% non-living fecal materials.'" PTX-42.0010. The document contains no technical information, and Finch/UMN do not tie any information from the PowerPoint to Rebiotix's development of REBYOTA or to the subject matter of the asserted claim.

Finch/UMN also reference a stage gate document, PTX-403, and a provisional patent application, PTX-422, that allegedly contain "technical information describing the invention to be patented and used by UMN," D.I. 501 at 11, but Finch/UMN do not identify what technical information allegedly was copied, much less how it allegedly was used. Further, the only quasi-technical information in the stage gate document is the description of a manufacturing process, but the document notes that the inventors are still working to "develop a process by which to create a 'clean' product devoid of fecal matter," which was accomplished by "creat[ing] a protocol by which the donor material is 'cleaned', 'purified' and modified for long term storage." PTX-403.0005. Similarly, the provisional application generally discusses the UMN manufacturing process (Example 3), and the claims are directed to ensuring that the final product is at least 99.9% free of non-living fecal material or to claiming certain phyla and classes of bacteria (different from those in the asserted claim of the UMN patent).[2] PTX-422.0020. But as described in Ferring's Rule 50(b) motion, the testimony at trial makes clear that the REBYOTA

---

[2] Finch/UMN also rely on a series of emails between Mike Berman and Judy Berman discussing the UMN patent application. D.I. 501 at 11-12. At most, these show access, not copying. Importantly, Finch/UMN selectively quote from a portion of Mike Berman's email that says, "Yes. I have not seen it. Lee has and thought it was very sciency." PTX-170.0001. But they leave out the next sentence, which states: "Not very helpful in building a business." PTX-170.0001. This begs the question of why Rebiotix would set out to copy something that was not helpful to build their business and is further evidence that Rebiotix did not copy anything from UMN.

process is different. D.I. 502 at 30-33; Tr. at 654:16-659:21; 684:22-685:9; 732:10-734:2; 736:13-24; 793:20-794:25. Thus, neither document supports Finch/UMN's copying story.

Similarly, Finch/UMN's arguments based on the Hamilton paper, D.I. 501 at 12 (citing PTX-48), are inapposite. Hamilton 2012 ultimately became Example 4 of the UMN patent[3], but it only discusses the UMN manufacturing process and clinical outcomes for forty-three patients. PTX-48.0001. There is no discussion of changes in the gut bacterial composition of the patients (as required by the asserted claim of the UMN patent), and the paper specifically includes a disclaimer that more research is needed to "characterize the microbial composition of donor material and recipients' fecal samples collected over time . . . ." PTX-48.0004-06; *see also* JTX-1 at Ex. 4. Only the UMN manufacturing process could have been used from Hamilton 2012, which both parties agree differs from the Ferring process.[4] D.I. 501 at 26; Tr. at 654:16-659:21; 684:22-685:9; 732:10-734:4; 736:13-24; 793:20-794:25.

Additionally, at trial and in their brief, Finch/UMN mischaracterize Rebiotix's response to an RFP from Advanced Bioscience Laboratories, Inc. PTX-266; PTX-268. Specifically, Finch/UMN repeatedly quote a portion of the document stating that the "manufacturing process for RBX2660 . . . was derived from the Hamilton procedure," D.I. 501 at 13 (quoting PTX-266.0005), but leave out the rest of the sentence—"and additional landmark papers including Brandt, Borody, van Nood, and Khoruts," PTX-266.0005-0006. And again, Finch/UMN fail to identify anything from the Hamilton procedure that allegedly was copied during REBYOTA's development, or to tie any such information to the claimed invention.

---

[3] Example 4 was not included in the provisional application to which Lee Jones had access. Rather, it was added when the provisional application was converted.

[4] In fact, despite being evidence against copying, Finch/UMN argue that comparing the UMN process and the REBYOTA process was litigation misconduct by Ferring. D.I. 501 at 25-26.

Finally, with respect to Finch/UMN's argument regarding Lee Jones changing her business plan, D.I. 501 at 13 (citing PTX-37), Lee Jones explained the removal of Drs. Khoruts and Sadowsky from later iterations. Specifically, she noted that the earlier version, PTX-37, was submitted to the Minnesota Cup competition (sponsored by UMN), and she wanted to give them credit with their colleagues. Tr. at 643:5-11. In later iterations, the reference was removed because Dr. Khoruts and Sadowsky were not going to be a part of Rebiotix and thus were not relevant. Tr. at 643:15-644:14. This is not evidence of copying, especially given that Rebiotix did not hide its development program. *See Read* factor 9.

There is no evidence of copying (or even evidence from which copying reasonably could be inferred) for either the Borody patents or the UMN patent, and therefore, this factor does not support enhancement. *ArcherDX*, 2022 WL 4597877, at *16.

### 2.    *Read* factor 2: Diligence and good-faith belief of invalidity or noninfringement

*Read* factor 2 does not weigh in favor of enhancement. First, Finch/UMN's argument that "Ferring presented no evidence of any belief it did not infringe th[e] claims [of the asserted patents], and does not have an advice of counsel defense," ignores the very text of the document it cites in support. *See* D.I. 501 at 15 (citing D.I. 503, Ex. 2 at 16). Finch/UMN cite to a single page of Ferring's response to Interrogatory No. 3 (directed to willfulness), but they ignore the rest of the response. And while the cited page confirms that Ferring was not relying on advice of counsel, 35 U.S.C. § 298 specifically provides that failure to assert an advice of counsel defense cannot be used to show willfulness, and, thus, cannot be used to support enhanced damages. *Provisur Techs. Inc. v. Weber, Inc.*, No. 23-1438, --- F.4th ----, 2024 WL 4363502, at *4 (Fed. Cir. Oct. 2, 2024).

Further, the next nine pages of Ferring's response provide a detailed explanation as to why Ferring had a good-faith belief of invalidity and/or noninfringement. D.I. 503, Ex. 2 at 17-25. Without restating the entire response, Ferring generally explained that FTO searches were performed as part of the due diligence for the 2018 Ferring Pharma/Rebiotix merger and discussed patent applications/predecessor patents in the Borody and UMN patent families. D.I. 503, Ex. 2 at 19-21. As relevant to the UMN patent, testing done in March 2018 on the particle size of REBYOTA demonstrated that particles would not "go through [a] 600 micron screen." D.I. 503, Ex. 2 at 21 (citing TX-3768 at 2). Indeed, TX-3768, cited therein, specifically states:

> Allowed claim 43 requires a human fecal extract that is capable of passing through a 0.5 mm sieve. Rebiotix has conducted testing of RBX2660 and found that this product does contain particles having a size greater than 0.5 mm, actually greater than 0.6mm (600 micron). Because of this, RBX2660 would contain particles that are not capable of passing through a 0.5 mm sieve.

TX-3768 at 3. "Allowed claim 43" included the same term as asserted claim 7 of the UMN patent—"wherein said fecal extract or preparation is capable of passing through a 0.5 mm sieve." *Compare* TX-3768 at 3 *with* JTX-1 at cl. (4)7. That same email goes on to explain that the properties of the strainer bag make it very different from a sieve. TX-3768 at 3-4. With respect to the Borody patent family, Ferring detailed how it initiated this declaratory judgment action, and the complaint included, *inter alia*, allegations that the claims of the '309 patent were obvious over prior art references, including Hlavka. D.I. 503, Ex. 2 at 23-25 (citing D.I. 1 at ¶ 86). This confirms that Ferring had a good faith belief that it was not infringing any valid claim.

Finch/UMN claim that Ferring's pore size testing "was just optics," pointing to an email from Ms. Jones urging the use of the term "approximately" in front of "0.5 mm" when discussing the pore size of the strainer bags used to manufacture REBYOTA to avoid "patent infringement issues." D.I. 501 at 15 (citing PTX-298). This is incorrect. The specification for the pores in the

11

strainer bag is nominally 0.5 mm, but, according to the manufacturer, the actual pore size can range from 0.5-0.6 mm—a difference of 20%. Tr. at 369:8-19 (noting that the pores have a range of 0.5-0.6 mm); Ex. A (not admitted) (noting a pore size of "approx 0.5mm"), Ex. B (not admitted) ("Microfiltered, 0.5-0.6mm pore size"). Indeed, a visual inspection of the strainer bags in evidence shows that the pores are not uniformly sized, even to the naked eye. TX-4332. While the jury may not have found this difference sufficient to avoid infringement (perhaps because they misunderstood what is required for literal infringement), it was not a frivolous position. Nor was it unreasonable for Ferring to believe that the strainer bag is different from a metal sieve. TX-3768.0003 ("The strainer bag is not considered to be a sieve (e.g., due to its size, material, flexibility, etc.) and would not be sufficient to remove materials as precisely as a sieve.").

Finch/UMN further argue that the cost-sharing provision in the Merger Agreement demonstrates the weakness of Ferring's pore size testing. D.I. 501 at 16 (citing PTX-56.0020-21). Not so. The Merger Agreement and contemporaneous documents show that Ferring Pharma and Rebiotix conducted a thorough due diligence and formed a good-faith belief that REBYOTA would not infringe, but also that Finch would aggressively seek to enforce its patents. For example, in section 3.9(b) of the Merger Agreement, Rebiotix specifically represented that:

> To the Company's Knowledge [i.e., Rebiotix's knowledge], there is no Intellectual Property owned by any third party that (i) the Company in good faith believes is valid and enforceable, (ii) is required by the Company to conduct its business as currently conducted and (iii) the Company is not currently authorized to use.

PTX-56.0027. This understanding of the Merger Agreement is further supported by the due diligence report (TX-3960) and board briefing notes on that report (PTX-341) that were contemporaneously prepared by Ferring Pharma as part of the due diligence for the merger. For example, the due diligence report (dated December 2017) notes that both Ferring Pharma and

12

Rebiotix had conducted FTO searches as part of the due diligence. TX-3960.0075; Tr. at 678:4-14. Further, the due diligence briefing notes to the Ferring Pharma Board (dated March 14, 2018), specifically state that:

> With respect to FTO, a number of recently granted or published competitor patents and patent applications have been identified that could potentially be relevant to RBX2660 and/or RBX7455; and a detailed evaluation is in progress. ***One of the competitors in this area has taken aggressive positions on building a patent portfolio, with recent success. Our expectation is that they would take a similarly aggressive position to litigate any patents they believed relevant.***

PTX-341.0004. In other words, Ferring Pharma's main concern was that Finch would aggressively litigate its patents, regardless of whether REBYOTA infringed. *Id*.

Finally, Ferring's initiation and conduct of this case shows that Ferring was confident in its noninfringement and invalidity positions. Ferring's declaratory judgment complaint in this action provided noninfringement and invalidity positions for the '309 patent, D.I. 1 at counts 1, 2, which Finch/UMN did not contest were objectively or subjectively baseless. Nor was infringement or validity so clear that Finch/UMN saw fit to seek summary judgment on those issues prior to trial. *SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020). Indeed, Ferring invalidated two of the five asserted claims, and had plausible invalidity positions for the remaining claims that Finch/UMN did not rebut, even if the jury did not ultimately accept them.

### 3.    *Read* factor 3: Ferring's behavior as a party to this litigation

Finch/UMN accuse Ferring of taking a "scorched earth, indefensible approach" to this litigation and "'unduly burdening the Court with unnecessary matters and prolonging the litigation.'" D.I. 501 at 16 (quoting *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am.*, 707 F.Supp.2d 737, 752 (N.D. Ohio 2010)). Not true. Ferring's behavior was neither malicious nor

egregious, and the "[e]nhancement analysis is not an opportunity for this court to penalize a zealous trial team that engaged in hard-fought battles but ultimately lost the war." *Barry v. Medtronic, Inc.*, 250 F.Supp.3d 107, 117 (E.D. Tex. 2017).

> ### a) Ferring's conduct with respect to Dr. Borody did not rise to the level of malicious behavior required to support an award of enhanced damages.

> #### (1) Ferring's standing motion was not unreasonable.

Dr. Borody is the sole named inventor of the Borody patents. Recognizing that Dr. Borody is an Australian citizen, Ferring first began discussing discovery from Dr. Borody with K&E on April 12, 2022. Ex. C. After months of discussions regarding Dr. Borody's participation in this litigation (including Ferring repeatedly noting that Dr. Borody appeared to be contractually obligated to cooperate), Ex. D, K&E indicated it could accept service of a subpoena to testify in December 2022 Ex. E. After months of additional fighting to schedule his deposition, the parties agreed that Dr. Borody would be deposed in Sydney, Australia on June 6, 2023, the eve of the close of fact discovery. Ex. F; D.I. 193 at 2 (moving the close of fact discovery to June 7, 2023). The deposition never occurred.

Unbeknownst to Ferring at the time, on May 18, 2023, Dr. Borody's personal attorney in Australia, Marcus Connor,[5] notified Finch that ████████████████████████████ ████████████, Ex. G, and on June 2, 2023, Dr. Borody ███████████████████████ ██████████████████████████████, Ex. H. ██████████████████████████████. Ex. I. Meanwhile, on May 20, 2023, Ferring's counsel received an email directly from Dr. Borody (not copying his counsel at K&E) stating he was not well enough to sit for his deposition. Ex. J at FER_RBX03012831. Ferring's counsel responded, copying K&E and

---

[5] Mr. Connor has no affiliation with Ferring and does not represent Ferring.

agreeing to postpone the deposition. *Id.* at FER_RBX_03012830.

Only after repeated emails to K&E seeking an explanation as to when Finch learned of Dr. Borody's health issues was Ferring informed of ███████████████████████████ ███████████████████. Ex. K. On a subsequent June 8, 2023 meet and confer, Finch/UMN invited Ferring to investigate ██████████████████████████, which Ferring did. Ex. L at 21:15-22:1 ("And so [Finch/UMN] cautioned us to investigate seriously the issues that they raised in there, including the 2013 assignment and the[] other issues that they raised. And we went back to the well and we went back to the production.").

Four weeks later, on July 6, 2023, Ferring brought a motion to dismiss the counts directed to infringement of all of the then-asserted patents listing Dr. Borody as an inventor, including the Borody patents, for lack of standing. D.I. 208. Finch/UMN are correct that, at that time, "Ferring did not pursue a deposition of Dr. Borody." D.I. 501 at 17. Ferring's motion was premised on the documents produced by K&E from Dr. Borody, which evidenced a lack of chain of title from Dr. Borody to Finch. *See, e.g.,* D.I. 209 at 8 ("Based on a close analysis of the relevant documents, and in view of Borody's assertions that he was never paid and that the transactions with Finch's predecessor were never consummated, ***the documents*** in the record fail to establish that Finch has standing to assert the Borody patents."); *see also* D.I. 232 at 3; Ex. L at 35:13-36:8.

On May 17, 2024, this Court determined that the standing issue would go to trial, not—as Finch/UMN suggest—that Ferring "los[t] that motion." *Compare* D.I. 501 at 17 *with* D.I. 341 ("Because the resolution of the ownership dispute turns on a dispute of fact, the case will proceed to trial where the parties can present evidence on the ownership issue."). It was not until sometime in 2024 that Ferring began considering whether it could obtain Dr. Borody's testimony at trial—a concept that was reinforced by the Court's May 17, 2024 Order that the ownership

issue would proceed to trial.[6] D.I. 341; *see* Ex. M at 82:9-16, 84:12-19. Ferring needed a witness to authenticate and admit the relevant standing documents, and the logical person to do that was Dr. Borody.[7] On June 4, 2024, Ferring reached a consulting agreement with Dr. Borody that indicated, *inter alia*, Dr. Borody may provide testimony in the litigation, Ex. Q at FER_RBX03012812, and the next day Ferring produced the documents it had received from Dr. Borody, Ex. R, many of which Finch already had from its collection and production of Dr. Borody's documents, Ex. O at 132:24-133:6.

Finch/UMN take issue with the fact that Ferring did not disclose its consulting agreement with Dr. Borody or related correspondence as part of its June 5, 2024 production or at the July 23, 2024 pretrial conference. D.I. 501 at 18. However, at the time, whether Dr. Borody would appear at trial was uncertain. At the pretrial conference, Ferring explained that it did not have the ability to control Dr. Borody. *See, e.g.*, Ex. O at 140:11-16 ("Now, with respect to Dr. Borody, is Dr. Borody going to show up at trial? I have no idea. He's in Australia. He's their inventor, but I think one of the few things I think everybody in this room can agree on, he's an unusual guy. I

---

[6] Finch/UMN accuse Ferring of "falsely claim[ing] they were not talking to [Dr. Borody]." D.I. 501 at 17. Not true. In correspondence with Finch/UMN's counsel, counsel for Ferring made it clear that counsel had spoken to Dr. Borody's counsel (Mr. Connor) about the standing motion but had had no contact with Dr. Borody himself and were not talking to either Mr. Connor or Dr. Borody about Dr. Borody testifying. Ex. N at 3-4. So counsel for Finch/UMN's statements at the July 2024 hearing in front of this Court, Ex. M at 81:3-19, were unfounded.

[7] Given Dr. Borody's unpredictability, as evidenced earlier in the litigation in his dealings with K&E and his deposition, Ferring sought a back-up plan to authenticate and admit certain of the standing documents. Ferring listed K&E attorney Ashley Ross as a may call witness as she communicated directly with Dr. Borody regarding ownership. *See* D.I. 377, Ex. 17.5.1 at 3 ("If Dr. Borody does not willingly testify at trial, Ms. Ross is the only percipient witness available to authenticate these documents."). Ms. Ross's inclusion as a may call witness was in no way malicious or intended to disrupt Finch/UMN's counsel's trial preparation. Further, Ferring did not lack candor in its representations to the Court regarding Ms. Ross. *See, e.g.*, Ex. O at 139:18-140:7; *see also* Ex. P at 2.

don't know if he's going to show up. He might, he might not."); *id.* at 141:14-16 ("We don't represent him, we don't control him. I don't know that anybody controls him, to be candid, but certainly we do not.").[8] These representations were accurate. Indeed, Dr. Borody's testimony at the subsequent July 31, 2024 hearing confirmed Dr. Borody's unpredictability, including as related to his appearance at trial. *See* Ex. M at 73:24-74:8 (The Court: "But you knew a couple weeks before you booked the ticket that you were coming?" Dr. Borody: "Yes. But then there was a lot of maybe, maybe not, maybe may. And then I had to say, 'Look, are we - - am I going over or what, right?'" The Court: "So you were waiting to hear from counsel?" Dr. Borody: "From Marcus."[9]).

As Ferring further explained at the July 31, 2024 hearing, Ferring believed that the existence of the consulting agreement would only become ripe once it was confirmed that Dr. Borody would in fact appear at trial, as its relevance would be limited to potential impeachment. Ex. M at 16:19-23 ("I think coming into the pretrial conference, in the absence of knowing whether he was going to testify, it had not been our view that that issue was yet [ripe]. The Court may disagree, but it was not yet our view that that issue was [ripe]."[10]); *id.* at 24:12-25:4. In Ferring's view, the obligation to inform the other side of such communication would only arise once someone was going to be a witness. Ex. M at 16:24-17:15; *see also* Ex. N (reflecting the parties' discussions regarding production of communications with third parties after the close of fact discovery). Once Ferring had confirmed Dr. Borody definitely was coming to the United

---

[8] Finch/UMN, too, grappled with their inability to control a witness beyond the Court's subpoena power (Mark Smith) in the months leading up to trial. Ex. O at 77:7-10, 83:15-18.

[9] Again, Marcus Connor is Dr. Borody's personal attorney. He is not an attorney for Ferring.

[10] While the transcript indicates that Ferring's counsel said the issue "was yet right" and "was right," there was a transcription error, and it should instead state "was yet ripe" and "was ripe."

States to testify, Ferring produced the consulting agreement and related documents on July 26, 2024. Ex. S. This was not an attempt to hide the ball; a party cannot be punished for playing its cards close to the chest within the bounds of the Federal Rules of Civil Procedure. This is especially true here when compared to Finch/UMN's own behavior, as Finch also was contacting third-party witnesses and was not keeping Ferring informed of the status of those communications. Ex. M at 16:24-17:15; *see also* Ex. N at 1, 3. When put in context, Ferring's positions as to Dr. Borody may have been hard fought, but they were not malicious or in bad faith. *Purewick Corp. v. Sage Prod., LLC*, 666 F. Supp. 3d 419, 447-48 (D. Del. 2023).

>    **(2)    *The terms upon which Ferring agreed to compensate Dr. Borody for his lost income opportunity were not excessive.***

Finch/UMN further wrongly insinuate that the terms upon which Ferring agreed to compensate Dr. Borody—30,000 AU$/day—were "excessive" and therefore inappropriate. D.I. 501 at 3, 22. However, it is not improper to compensate testifying consultants for their lost income opportunity. DSBA Committee on Pro. Ethics Op. 2003-3; *see also* ABA Comm. on Ethics & Pro. Resp., Formal Op. 402 (1996). Here, the consulting agreement states: "The Company will compensate Consultant AU$ 30,000 per day for each day Consultant is required to suspend his activities in his surgery in order to meet in-person with attorneys for the Company. Consultant will be paid his regular hourly rate of AU$ 500 per hour for any remote phone or video calls." Ex. T at 2. At the July 31, 2024 hearing, Dr. Borody confirmed that 30,000 AU$/day was an "underestimated" opportunity cost for lost days at his surgery practice. Ex. M at 56:22-23, 57:3-16. Further, counsel for Ferring represented to the Court, as corroborated by Dr. Borody, that Dr. Borody was receiving no additional compensation of any form, other than those allowed by the Rules of Professional Conduct. *Id.* at 59:1-6, 78:19-79:19. Ferring conducted no wrongdoing in compensating Dr. Borody.

18

### (3) *Ferring's motion in limine for an adverse inference was not inappropriate, nor was there any bad faith with respect to the Borody issues generally.*

Finch/UMN next allege that Ferring's conduct was "vexatious" in seeking a motion *in limine* for an adverse inference with respect to Dr. Borody's deposition. D.I. 501 at 19-20. Not so. At the time Ferring submitted its motion *in limine* (June 27, 2024), and again at the pretrial conference (July 23, 2024), it was Ferring's view that, despite pursuing Dr. Borody's deposition for over a year during fact discovery, Finch repeatedly delayed, and, after Dr. Borody told Finch his testimony would be contrary to its interests, Finch allowed Dr. Borody to unilaterally cancel his deposition. D.I. 377, Ex. 18-5 at 1. Ferring therefore sought an adverse inference that Dr. Borody's testimony would have been unfavorable to Finch and the admission of documents that could have been authenticated through Dr. Borody's deposition testimony. D.I. 377, Ex. 18-5 at 1. As Ferring explained to the Court at the July 31, 2024 hearing, an adverse inference instruction—based on a proffer, if necessary, in the form of Dr. Borody's declaration—was the only way to admit certain documents relevant to standing without Dr. Borody having sat for a deposition or appearing at trial. Ex. M at 12:10-15.

Finch/UMN point to a video of a conversation between Dr. Borody, his Australian counsel, and a Ferring affiliate indicating that Dr. Borody and his Australian counsel made the decision to withdraw from the June 2023 deposition, D.I. 466. D.I. 501 at 19. However, given the full context of the parties' interactions with Dr. Borody and attempts to schedule his deposition, Ferring did not act maliciously in bringing its motion. Moreover, Ferring subsequently agreed to drop its standing defense prior to trial, D.I. 454, and did not call Dr. Borody as a witness at trial, D.I. 448. Those actions put Finch/UMN in a better position than it had been prior to the pretrial conference. There is no need for further punitive action.

**(4)      *Ferring's conduct in securing a contingent declaration from Dr. Borody was not malicious or in bad faith.***

Finch/UMN further complain about the existence and disclosure of Dr. Borody's declaration. However, as Ferring explained to the Court at the July 31, 2024 hearing, the declaration was prepared as a contingency in case the Court needed a proffer in the context of Ferring's motion *in limine* for an adverse inference. Ex. M at 11:16-23, 13:10-15. The declaration was a "hedge" knowing Dr. Borody's unpredictability; it was not an attempt to disrupt trial preparation or procedure. *Id.* at 15:13-21. This was good practice given Dr. Borody's unpredictability; "[t]he 'behavior' [Finch] complains of may be inconvenient, but it is not out of the ordinary during a contentious litigation." *VB Assets,* 2024 WL 4347300, at *15 (finding no litigation misconduct under *Read* factor 3).

**b)      *Ferring's attempt to amend its Reply was not meritless.***

On April 15, 2024, Ferring sought leave to amend its reply to Finch/UMN's second amended counterclaims to add a counterclaim of infringement of a newly issued Hlavka patent, or in the alternative, an affirmative defense of unclean hands. D.I. 316. Contrary to Finch/UMN's allegation, Ferring's infringement claims were not meritless nor did Ferring seek to misuse it patent. *See* D.I. 501 at 22-23. Rather, the motion arose from (i) the April 2, 2024 issuance of United States Patent Number 11,944,654 (Hlavka) to Ferring and (ii) the arguments presented by Finch/UMN's experts in response to Ferring's obviousness challenges to the patents in suit. D.I. 317 at 1.

Specifically, the subject matter of the '654 patent was already central to this case: the applications giving rise to the '654 patent were asserted by Ferring as primary invalidating prior art to claims of the Borody patents, and Finch/UMN had asserted that a UMN product, MTP-101-LR, was a commercially successful embodiment of the patents in suit. *Id.* at 1. Ferring's

20

draft amended reply was premised on the argument that Finch/UMN already had admitted that MTP-101-LR infringes the '654 patent when their experts opined that MTP-101-LR was an embodiment of the patents in suit. *See id.* at 14-15. Ferring thus argued, "It would be inequitable to permit Finch/UMN to seek damages and an injunction predicated in part on the purported commercial success of MTP-101-LR, without accounting for the fact that those sales themselves infringe." *Id.* at 1-2. Ferring went on to explain:

> The concern here is acute because UMN is being coy about whether it will assert sovereign immunity as a defense to an infringement action. If it does, the only way for Ferring to obtain at least partial relief for UMN's infringement is via an equitable defense in this action. That is why Ferring is moving at this stage to either add an infringement allegation or, in the alternative, an equitable defense of unclean hands. . ..

*Id.* at 2. These facts formed a reasonable predicate to bring Ferring's motion for leave.[11] To suggest that a party to a hard-fought litigation would turn a blind eye to blatant infringement of its own patent is incredulous, and Finch/UMN's suggestion that Ferring's attempt to enforce a Constitutionally protected right is egregious or malicious is even more so. In fact, the Court described Ferring's "they shouldn't be able to enjoin us if we can't enjoin them" argument to be "a great argument." Ex. O at 72:23-73:3. Further, the Court could have dismissed Ferring's motion outright at the pretrial conference, but it did not do so, instead reserving its decision on the issue. *Id.* at 76:7-11. Instead, Ferring's motion ultimately became moot as, due to time constraints, Ferring elected not to argue obviousness of the UMN patent at trial and Finch/UMN

---

[11] Ferring attempted to resolve or narrow the issue before filing, but UMN refused to say whether UMN would assert its sovereign immunity defense. D.I. 317 at 7-8. Only after Ferring filed the motion did UMN finally commit to its sovereign immunity defense. D.I. 324 at 17-18. Ferring then made clear it would seek only to add the unclean hands defense, not amend the complaint. D.I. 331 at 1.

presented no rebuttal validity case. Thus, commercial success was not at issue at trial.

Moreover, Ferring's attempt to serve supplemental expert reports on a topic that only ripened in April 2024, although rejected by the Court, *see* D.I. 501 at 23 (citing D.I. 342), was neither malicious nor egregious.

### c)     *Ferring did not attempt to exploit Finch's financial circumstances.*

Finch additionally falls back on its supposed "precarious financial circumstances," D.I. 501 at 23, to villainize almost every action that Ferring took in this case. Finch, without any evidence whatsoever, claims Ferring sought to exploit Finch's position, including an audacious citation to Ferring's motion for continuance because its damages expert was ████████ ████████. *Id.* (citing D.I. 348 at 1, 4-5). In fact, the Court initially sided with Ferring on that issue. Ex. U at 11:15-20. The Court thereafter invited briefing from both parties about availability for a slightly delayed trial date, *id.* at 15:14-16, which Finch inappropriately cites as an attempt by Ferring to unnecessarily delay trial, *see* D.I. 501 at 23 (citing D.I. 358). If anything, Ferring is the party that ultimately suffered from these circumstances as Finch protested an extension based on purported conflicts, D.I. 370, and the trial date did not move, D.I. 360.

Similarly, with respect to the stay request on the issue of standing, D.I. 501 at 23 (citing D.I. 212), Ferring noted during the hearing with Judge Andrews that there was slack in the schedule, and Judge Andrews agreed. Ex. L at 36:9-17. Ferring also argued that the stay may simplify issues which would save both parties money in the long run, and Judge Andrews agreed. *Id.* at 38:21-39:6, 40:3-7 (The Court: "I don't really see any clear tactical advantage to the movant if I were to grant the stay. So I think things are fairly balanced here.").

Additionally, Finch's "financially-precarious" defense and unsubstantiated assertion that Ferring sought to push Finch to the brink of extinction cannot be reconciled with its own actions in this litigation. Finch/UMN asserted infringement of 116 claims from 8 different patents during this case. Ex. V at 4. This was narrowed (marginally) to 40 different claims from 8 different patents in their final infringement contentions. Ex. W at 5. But 15 claims from 6 different patents still remained at the summary judgment stage. D.I. 258 at 1-2. On July 16, 2024, less than one month until trial, Finch/UMN still asserted 15 claims from 6 different patents. D.I. 376 at 3. Finch served 1,236 pages of expert reports on Ferring and entered appearances from no fewer than 20 attorneys in this case, many of whom attended every hearing. This, coupled with Finch's SEC filings indicating that it had $25 million in cash, as Ferring pointed out to the Court, Ex. U at 9:17-23, does not paint the picture of Finch being in a "financially-precarious" situation. *See Nox Med. Ehf v. Natus Neurology Inc.,* No. 15-cv-709-RGA, 2018 WL 4062626, at *4 (D. Del. Aug. 27, 2018), *on reconsideration*, No. 1:15-cv-00709-RGA, 2018 WL 6427686 (D. Del. Dec. 7, 2018) (finding *Read* factor 3 did not support enhancement despite Defendant's alleged tactics as a "campaign to spend [Plaintiff] under the table.").

### d)    *Ferring did not flout the Court's orders and rulings.*

Contrary to Finch/UMN's allegations, D.I. 501 at 23-25, Ferring did not flout the Court's rulings. As much as Finch/UMN would like the law to state advocacy is litigation misconduct, it is not. Finch/UMN's discussion of Ferring's motion *in limine* no. 1 (which pertains to not referencing the declaratory judgment filing) demonstrates just how far Finch/UMN are reaching. *Id.* at 24. Excluded from Finch/UMN's brief is the full context of the discussion before Day 2 of the jury trial, where the Court states as follows with respect to Ferring's opening statement and the testimony of Kevin Anderson:

23

> So I already talked about the MIL and I concluded that ***it didn't violate the Court's ruling*** on that. I've also considered now whether or not what happened violated the parties agreement and I've concluded that at least the testimony part of it ***didn't violate the agreement.*** With respect to the statement that was made during opening, that came very, very close to the line and I do have a lingering concern that the jury is not going to understand the difference between suing somebody and initiating a lawsuit. That said, I also did tell the jury that opening statements aren't evidence and so I think that is helpful. I also don't want to hear that again during closing and we talked about that ***and so I think that should be enough to resolve that***.

Tr. at 308:16-309:4. As warned by the Court, and in credence to that warning, no similar statements were made, demonstrating an obedience to, not a flouting of, the Court's orders.

Similarly, Finch/UMN's discussion of its motion *in limine* no. 4, D.I. 501 at 24-25, shows Ferring did not violate the Court's order. Notably, at no point in the trial did Finch/UMN object to any behavior as violating the order, nor did Finch/UMN ask for a curative instruction, despite the Court having indicated that it would "be amenable to a request from Finch for a curative instruction should anything like that or something similar to that happen." Ex. O at 123:24-124:1. The Court's order also explicitly permitted evidence that the Lee Jones patents existed, *id.* at 123:10-12, which is exactly what Finch has cherry-picked from the trial transcript.

The two cases relied on by Finch/UMN, *see* D.I. 501 at 25, further confirm that Ferring's conduct does not rise to the level of litigation misconduct. In *i4i*, the district court instructed counsel on a side bar during voir dire that he was misstating the law and requested that he "clean that up." *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 595-56 (E.D. Tex.), *aff'd as modified*, 589 F.3d 1246 (Fed. Cir. 2009), *opinion withdrawn and superseded on reh'g*, 598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). Instead, counsel misstated the law again during opening argument (resulting in a curative instruction) and then again during closing argument. *Id.* It was this "defiance of the court's repeated admonitions" that was considered "litigation

misconduct," and that was considered "only after finding that the other *Read* factors favored enhanced damages." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). As for *Tinnus*, the district court's decision rested on a litany of poor conduct throughout the entire litigation, including a violation of a motion *in limine* prohibiting mention of PTAB proceedings. *Tinnus Enters., LLC v. Telebrands Corp.*, 369 F. Supp. 3d 704, 721 (E.D. Tex. 2019). This was ignored during examination of the first witness, which was followed by a warning; raised again during examination of a later witness, which was followed by a sustained objection by Plaintiffs; and was raised four more times thereafter, each followed by a sustained objection. *Id.* Nothing alleged by Finch/UMN comes close to this type of conduct.

### e)    *Ferring did not introduce new arguments or theories at trial or otherwise try to sandbag Finch/UMN.*

The balance of issues complained of by Finch/UMN in connection with *Read* factor 3 are either not supported by the facts or amount to nothing more than standard fare in highly contested litigation, behavior that ***both*** sides engaged in throughout this case. For example, Finch/UMN complain that Ferring raised a number of defenses in this case and did not drop certain defenses until shortly before trial. *See, e.g.*, D.I. 501 at 25. There is nothing atypical about this—after all, Finch/UMN initially asserted 116 claims from 8 patents, 15 of which were still asserted less than one month from trial, but only went to trial on 5 of those claims. *See supra*, Section II(C)(3)(c).

Similarly, Finch/UMN complain of Ferring's decision not to call two witnesses at trial, suggesting that this led to Ferring having "nearly two hours of time for its lengthy closing argument, compared to over an hour for Finch." D.I. 501 at 25-26. This "imbalance" had nothing to do with Ferring though; in fact, Ferring's decision not to call Mr. Karst or Mr. Blischak should have freed up more time for Finch/UMN, not the inverse, as suggested by Finch/UMN. Further,

the two hours that Ferring had for closing argument was largely attributable to Finch/UMN's equally last-minute decision not to call Drs. Benson and Schloss, despite its prior indications to the Court and Ferring that it would do so. *Compare* Tr. at 911:17-21 *with* Tr. at 916:18-25. Finch/UMN cannot credibly suggest such decisions amount to misconduct.

Additionally, several of Finch/UMN's allegations are contradicted by the facts and without merit. For example, Finch/UMN attempt to reargue a dispute they lost during discovery by suggesting "Ferring never disclosed which prior art combinations Dr. Britton would present regarding the Finch patents." D.I. 501 at 25. But the Court already found that Dr. Britton did in fact lay out his obviousness opinions in his report, despite "[deposition] questions [that] were intended to trick him a little bit for a sound bite." *See generally* Ex. X at 18:20-20:25. Similarly, contrary to Finch/UMN's allegations, Ferring maintained its "treating" non-infringement position. *See* D.I. 502 at 23 (moving for JMOL of noninfringement of claims 16 and 21 based on the "treating" limitation).

Finch/UMN's argument that Ferring "also attempted to raise new arguments for the first time at trial," D.I. 501 at 26, also is without merit. First, as discussed above with *Read* factor 1, Ferring's comparisons between REBYOTA's manufacturing process and what was disclosed in the materials from UMN did not go to infringement, as Finch/UMN suggest, but to copying. The only technical details identified by Finch/UMN that Ferring could have copied involved the manufacturing process, and thus a comparison of the two protocols was necessary to rebut Finch/UMN's copying allegations. Regarding Dr. Johnson's demonstration, which Finch/UMN deem the "worst of all," D.I. 501 at 26, Dr. Johnson explicitly stated that the prune mixture was used for illustrative purposes only. Tr. at 774:3-7 (Q: "And are you representing that the prune mixture that's in that bag is at all similar to the product REBYOTA?" A: "No, no. I'm just using

it as an example so that the jury can see what the straining process - - what the homogenization process looks like."). With respect to Dr. Britton's testimony regarding PEG, D.I. 501 at 26-27, Dr. Britton responded directly to Dr. Park's testimony (which he was present for in the courtroom to hear). Tr. at 884:4-12 (Q: "And we saw earlier that Hlavka talked about glycols. Does anything you heard from the testimony of Dr. Park effect your view on whether Hlavka renders the Claim Number 9 obvious?" A: "Yeah, so Dr. Park testified that the polyethylene glycol formulation that they have is -- serves as an antioxidant. So that would say that Hlavka also specified using glycols for preserving the bacteria from freezing, that antioxidant property, then, I presume would be there."). This was a proper responsive argument, which the jury appears to have credited, since it invalidated to the two claims with antioxidant limitations.

When Ferring's conduct throughout this entire litigation is considered in context, nothing about Ferring's behavior stands out or would justify increasing the damages award. Thus, this factor does not support enhancement. *Nox Med.*, 2018 WL 4062626, at *4; *Purewick,* 666 F. Supp. 3d at 447 (finding this factor neutral where "[f]or each of the issues, Defendant ha[d] a response, and for at least some of the issues, Defendant's position r[a]ng[] true to the Court.").

### 4. *Read* factor 4: Size and financial condition

Finch/UMN argue that Ferring "deliberately leveraged its size—including by launching REBYOTA . . . to harm UMN/Finch" and that Finch is a "much smaller company" whose "cash flow will only last into 2025." D.I. 501 at 28. Much like the "financially precarious" defense addressed above, these allegations are unsubstantiated. Finch/UMN point to no evidence that suggests Ferring launched REBYOTA out of spite or ill-will, or for any reason other than to serve an important and unmet medical need in helping patients prevent rCDI.

Moreover, Finch/UMN misunderstand the use of this factor in an enhanced damages analysis. Courts generally look to an accused infringer's size and financial condition to

27

determine whether this factor would weigh *against* enhancing damages—not whether it would support enhancing damages. *VB Assets,* 2024 WL 4347300, at *16 (quoting *Idenix Pharms. LLC v. Gilead Scis., Inc.*, 271 F.Supp.3d 694, 701 (D. Del. 2017) and citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 762 F.Supp.2d 710, 722 (D. Del. 2011)). The cases Finch/UMN cite suggest the same. For example, *IMX, Inc. v. LendingTree, LLC* indicates that this factor does not weigh against enhancement because the defendant would not be "materially impacted." 469 F.Supp.2d 203, 222 (D. Del. Jan. 10, 2007). The cases cited generally hold only that enhancement is not mitigated for a large defendant with sufficient resources. *Id.* (collecting cases). The general consensus is not that an accused infringer's size and financial position should serve as a basis for enhancement, but rather that it could weigh against enhancing damages if doing so would drive the accused infringer out of business. Accordingly, this factor is neutral.

### 5.    *Read* factor 5: Closeness of the case

Contrary to Finch/UMN's assertion, D.I. 501 at 29, this case was close, as evidenced by the jury invalidating two of the five asserted claims (a verdict that Finch/UMN do not seek to overturn) and awarding only half of the upfront payment requested by Finch/UMN, *compare* Tr. at 1256:15 *with* Tr. at 506:3-6, and Ferring's proposed royalty rate (which was less than 1/5[th] the rate Finch/UMN proposed), *compare* Tr. at 1256:14 *with* Tr. at 505:7-20, 920:20-25. Ferring advanced valid arguments for both noninfringement and invalidity at trial, and Finch/UMN did not seek summary judgment on any of those positions. *ArcherDX,* 2022 WL 4597877, at *17; *VB Assets*, 2024 WL 4347300, at *16 (finding the closeness of the case didn't weigh in favor of enhancing damages where "the issues were not so clear cut that the Court was able to rule in Plaintiff's favor on summary judgment.").

Finch/UMN's criticisms of Ferring's positions on the Borody patents are unfounded. Fundamentally, the jury's invalidation of two of the four asserted claims of these patents—and

28

the narrow scope of novelty, if any, on which the other two claims survived, *see* D.I. 502 at 15-22—demonstrates the closeness of this issue. Moreover, regarding the '309 patent, as explained above, Ferring maintained its position regarding the "treatment" limitation, moving for JMOL of noninfringement based on insufficient evidence. *See* D.I. 502 at 23-24. Also, Finch/UMN's suggestion that "even Dr. Johnson's testimony" showed that REBYOTA was "separated from rough particulate matter," is inapposite as his testimony does not even address the term. D.I. 501 at 29-30 (citing Tr. at 807:7-9). Similarly, the lack of a non-infringement testimony as to the '080 patent was not misconduct. Finch/UMN had the burden of proof on that patent, even in the absence of a responsive expert position, as the Court found at the pretrial hearing. Ex. O at 186:25-187:9. Requiring Finch/UMN to meet their burden cannot amount to misconduct. *See Med-El*, 2024 WL 4371292, at *12. Tellingly, Finch/UMN put in no rebuttal case on validity *at all*. Finally, Ferring has sought reconsideration of its motion for summary judgment that the Borody patents claim ineligible subject matter. D.I. 485.

Regarding the UMN patent, as explained in connection with *Read* factor 2, Ferring had a good faith belief that REBYOTA did not infringe the "capable of passing through a 0.5 mm sieve" limitation, and the evidence at trial made clear that this was a close question. That the jury ultimately decided against Ferring is not evidence that the case was not close, nor is Ferring's decision to streamline the issues it presented to the jury based on the time allotted to it at trial. Parties often streamline their case during trial, especially when there are time constraints. *Med-El*, 2024 WL 4371292, at *12.

With respect to the length of time the jury deliberated, courts in this District have determined this should not be considered when determining the closeness of the case (either for or against). *VB Assets,* 2024 WL 4347300, at *16 (collecting cases); *see also Smartrend Mfg.*

*Grp., Inc. v. Opti-Luxx, Inc.*, No. 1:21-cv-1009, 2024 WL 747744, at *12 (W.D. Mich. Feb. 23, 2024) (regarding closeness of the case, "[t]he length of the jury's deliberation is less important than the fact that the jury had to deliberate in the first place.").

Accordingly, this factor does not weigh in favor of enhancement.

### 6. *Read* factors 6 and 7: Duration of the alleged infringement and remedial action

With respect to the duration of Ferring's alleged infringement, Finch/UMN allege that Ferring's "misconduct" "goes back over a decade." D.I. 501 at 32. Not true. The UMN patent issued in 2019, the '309 patent issued in 2020, and the '080 patent was not filed until six months after this litigation began and did not issue until January 2023. JTX-1.0002, JTX-4.0002, JTX-6.0002. Ferring did not begin selling REBYOTA until January 2023—less than two years ago. Tr. at 969:19-23. Thus, Finch/UMN's assertion that "Ferring 'began willfully infringing the [asserted patents] . . . the[] day the[y] issued, and continued doing so for years" is, at best, misleading. *See* D.I. 501 at 32 (second alteration in original). Seemingly recognizing the weakness of their argument, Finch/UMN primarily fall back on their arguments in *Read* factors 1, 2, and 3. D.I. 501 at 32. As explained above, none of those factors support enhancing damages.

Regarding factor 7, Ferring had the subjective belief that it did not infringe any valid claim of the asserted patents, and so its decision not to take remedial action is of no moment. *Dasso,* 2023 WL 5349374, at *26 ("The fact that [the infringer] continued to sell [its product] and did not take remedial action is not particularly meaningful, as it had plausible defenses.") Further, it is undisputed that thousands of individuals in the United States suffer from *C. difficile* infections each year, Tr. at 28:5-7, and reformulating REBYOTA to potentially not infringe would have required pulling REBYOTA (a first-in-class product, and still the only enema

available to prevent rCDI) from the market while Ferring conducted expensive and time-consuming clinical trials to show that any reformulated REBYOTA was safe and effective.

Accordingly, these two factors, taken together, are neutral.

### 7.    *Read* factor 8: Ferring's motivation to harm Finch/UMN

Finch/UMN argue that this factor favors enhancement because Ferring has engaged "in infringing conduct to gain an edge over the patentee in a competitive market." D.I. 501 at 33 (citing *Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*, No. 07-cv-8108-FMO, 2018 WL 6190604, at *32 (C.D. Cal. Nov. 4, 2018)). Finch/UMN's evidence of "harm" is based on the loss of "first-mover" advantage. D.I. 501 at 33-34. But Finch/UMN ignore that even absent Ferring or this lawsuit, Finch never was going to be the first to market an FDA-approved FMT product. Outside the context of this litigation, Finch has always recognized that Ferring (through Rebiotix) and another company, Seres, were the first movers in this area. TX-3746.0005 (noting that Seres and Rebiotix entered the field in 2010 and 2011, respectively). And the reality is that Seres launched VOWST in April 2023, approximately six months after REBYOTA was approved and four months after Ferring launched REBYOTA. Tr. at 975:4-16; TX-4357. Even without the launch of REBYOTA, VOWST would have launched prior to Finch's proposed CP-101 and would have been a significant competitor given its similarities in formulation (both are oral capsules). Tr. at 458:24-460:6, 667:22-669:3, 975:4-16; TX-3814 at 17 ("SER-109 launch would likely have a greater impact on CP-101 market share compared to RBX-2660.").

Further, the evidence shows that Finch's failure was the result of multiple unrelated factors such as an FDA clinical hold, Takeda's decision to pull out of its collaboration with Finch, and, as set forth in Finch's own SEC filings, the "outlook for securing additional capital or partnerships to help fund [its research], slower than anticipated enrollment in [its clinical

trials], . . . and broader sector trends." PTX-816.0001; TX-4038 at 1; Tr. at 589:11-590:6. None of these issues can be tied to Ferring or this litigation.

The cases relied on by Finch/UMN cite only serve to underscore that this factor does not favor enhancement in this case. For example, in *Cochlear*, the infringer had been selling a copied product for over a decade, and the patentee was able to show that its sales dropped from 90% of the market to 35.5% as a result of the infringement. *Alfred E. Mann Found.,* 2018 WL 6190604, at *32. Similarly, in *Stryker Corporation v. Zimmer, Inc.*, the plaintiff and defendant were the only two major competitors in the marketplace, which is not the case here. No. 10-cv-1223, 2017 WL 4286412, at *6 (W.D. Mich. July 12, 2017). And in *Joyal Products, Inc. v. Johnson Electric North America, Inc.*, the Court found that this factor was neutral when any market harm to the patentee was inconsequential to the accused infringer. No. 04-cv-5172-JAP, 2009 WL 512156, at *8 (D.N.J. Feb. 27, 2009). Notably, Finch did not consider Ferring a significant competitor, especially compared to Seres. TX-3814 at 23-24 ("RBX-2660 does ***not represent a significant competitor***") (emphasis in original); TX-3742 at 2.

Accordingly, this factor weighs against enhancement.

### 8.    *Read* factor 9: Attempts to conceal misconduct

Finch/UMN argue that "Ferring consistently tried to conceal its infringement" based on two points: (i) Ms. Jones' suggestion to use the word "approximately" to describe the pore size of the stomacher bag in FDA filings and (ii) Ferring's change to its website mid-litigation from "treatment of CDI" to "prevention of recurrence of CDI." D.I. 501 at 35. Neither support Finch/UMN's position.

With respect to the first point, as described above, the use of the word "approximate" was to accurately describe the pore size which is "not absolute [during mixing] due to the flexibility of the filter material." PTX-298.0002; *see supra,* Section II(C)(2). This was further

32

independently confirmed at trial through the testimony of Courtney Jones and Dr. Johnson. Tr. at 771:15-772:16, 735:11-25. With respect to the second point, the change in the website was necessary after FDA approval to accurately reflect what the FDA determined was the appropriate indication for REBYOTA based on its review of the clinical trials. Ex. Y at 29; *see also* Ex. Z at ¶ 64. It was not litigation driven or an effort to conceal anything.

Regardless, Finch/UMN do not (and indeed cannot) plausibly argue that Ferring's development of REBYOTA was not done openly or without Finch/UMN's knowledge. Finch's corporate witness admitted that Finch monitored Ferring's progress in developing REBYOTA, even if it did not consider REBYOTA a competitor. Tr. at 442:9-24, 459:18-22; TX-3977 at 1. █

████████████████████████████████████████████████████████████████████

█ Similarly, the record evidence makes clear that UMN was aware of Rebiotix's development program and efforts to secure approval of REBYOTA. Tr. 724:5-16. This included UMN's evaluation of Ms. Jones's initial business plan for the Minnesota Cup (sponsored by UMN), Tr. at 640:5-18, 641:2-23; PTX-415, outreach from individuals in the Office of Technology Commercialization to Ms. Jones about Rebiotix, TX-3654; TX-3979, collaboration between the Carlson School at UMN and Rebiotix, Tr. at 644:18-645:3, and UMN honoring Lee Jones as the UMN Entrepreneur of the Year specifically for her work at Rebiotix and developing REBYOTA, TX-4350; Tr. 674:17-22. Further, Lee Jones made numerous efforts after RBX-2660 was finalized to reach out and potentially collaborate with Dr. Khoruts and UMN. *See, e.g.,* TX-3638; TX-3577 (inviting Dr. Khoruts to Rebiotix advisory board meeting); Tr. at 669:4-671:23. These facts belie any concealment argument, and this factor weighs against enhancement.

Accordingly, for the reasons discussed above, the *Read* factors, on balance, do not support enhancement. When considering the fiercely fought litigation by both sides, Ferring's

conduct does not involve the egregious conduct contemplated by the Supreme Court in *Halo*.

*Halo*, 579 U.S. at 103-04.

**III.    SUPPLEMENTAL DAMAGES THROUGH AUGUST 15, IF AWARDED, SHOULD BE BASED ON ACTUAL SALES.**

If the Court grants Ferring's Rule 50(b) motions on liability and willfulness or its motion for reconsideration regarding 35 U.S.C. § 101, D.I. 485, D.I. 502, it may moot Finch/UMN's request for supplemental damages. However, if the Court reaches this issue, the Court should award Finch/UMN damages based on actual rather than projected sales. *See, e.g.*, *Vectura Ltd. v. GlaxoSmithKline LLC*, No. 16-cv-638-RGA, 2019 WL 4346502, at *2 (D. Del. Sept. 12, 2019); *Purewick*, 666 F. Supp. 3d at 450. Actual sales from August 6 through August 15 were ███████ and applying the same royalty rate used by the jury (5.5%) to these sales yields supplemental damages in the amount of ██████. Kidder Decl. ¶¶ 7-9, Ex. 4. Additionally, for the same reasons provided above and in Ferring's JMOL of no willful infringement, there should be no enhancement of this award.

**IV.    ENHANCING THE ONGOING ROYALTY RATE IS NOT WARRANTED.**

Finch/UMN have failed to carry their burden to show that an ongoing royalty rate should be higher than that awarded by the jury at trial. In fact, when the current realities concerning sales of REBYOTA are considered—particularly the effect of the jury's award of a significant upfront payment in light of the lower-than-expected sales of REBYOTA—the rate should be lower, in the range of 3% to 4.5% rather than the jury's awarded rate of 5.5%. At most, the Court should maintain the jury's 5.5% royalty rate for future sales.

"[A]n ongoing royalty is not automatic." *Purewick*, 666 F. Supp. 3d at 448. Rather, "because 'a patentee bears the burden of proving its damages by a preponderance of the evidence,' the patentee must present relevant post-verdict factors which would frame the new,

hypothetical negotiation." *VB Assets*, 2024 WL 4347300, at *18 (quoting *EMC Corp. v. Zerto, Inc.*, No. 12-cv-956-GMS, 2017 WL 3434212, at *1 (D. Del. Aug. 10, 2017)). And although the jury verdict is generally considered the starting point for evaluating ongoing royalties, the Court ***must*** consider:

> (i) the "change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability";
>
> (ii) "changed economic circumstances, such as changes related to the market for the patented products"; and
>
> (iii) any other "post-verdict factor" that would impact "what a hypothetical negotiation would look like after the prior infringement verdict."

*Purewick*, 666 F. Supp. 3d at 449 (quoting *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1297 (Fed. Cir. 2018)). The Court also ***may*** consider the *Georgia Pacific* factors when considering what a hypothetical negotiation would look like ***after*** the infringement verdict. *Purewick*, 666 F. Supp. 3d at 449.

### A.   The jury's willfulness determination is insufficient to treble ongoing royalties.

Finch/UMN give lip service to the above-listed factors but seek to justify their request for an enormous 16.5% ongoing royalty rate—three times that found by the jury—primarily on the grounds that the jury found Ferring liable for willful infringement. As an initial matter, if the Court grants Ferring's Rule 50(b) motion on liability and/or willfulness, it may moot much of Finch/UMN's request to treble ongoing royalties. Further, courts in this district have recognized that there is a fundamental misapprehension in suggesting that pre-verdict and post-verdict damages should be treated differently based solely on a determination of infringement, noting that "the rationale behind this view is unclear given that the jury is required to award a rate

negotiated by willing licensors and licensees who considered the patent(s) to be valid and infringed." *Purewick*, 666 F. Supp. 3d at 449 n.23 (compiling sources).

Similarly, post-verdict, all adjudged infringers would be "willful" infringers for the duration of the relevant patent(s). Thus, if being a "willful" infringer were sufficient to treble a jury's royalty rate for ongoing infringement, then such relief would be granted as a matter of course. Not only is that incorrect, but also courts in this District generally do not increase a jury's royalty rate for ongoing infringement even after a finding of willful infringement absent some evidence of changed circumstance. *Id.* at 449 (no increase in post-verdict royalty rate despite finding of willful infringement); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d 680, 723 (D. Del. 2017), *aff'd in part and vacated in part*, 930 F.3d 1295 (Fed. Cir. 2019) (same); *see also VB Assets,* 2024 WL 4347300, at *17-18 (despite finding of willful infringement, district court determining insufficient evidence to assess whether or not even the ***same*** royalty rate would be appropriate for ongoing infringement).

Moreover, "willfulness is not an appropriate ground to enhance an ongoing royalty rate where the plaintiff is a non-competitor who benefits from the defendant's ongoing infringement." *Vectura*, 2019 WL 4346502, at *8 (adopting rationale of *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-cv-1202-WCB, 2017 WL 3034655, at *9 (E.D. Tex. July 18, 2017)). In the context of a post-verdict hypothetical negotiation, Finch has discontinued development of CP-101 and so cannot be considered a competitor with respect to REBYOTA—rather it is in an inventor-promoter negotiating position with respect to any potential royalty payments related to REBYOTA. Kidder Decl. ¶ 15. Similarly, it would be "improper to use willfulness as a basis to enhance the ongoing royalty in a situation in which the equities would

not even permit the issuance of an injunction in the first place." *UroPep*, 2017 WL 3034655, at *9. Finch/UMN has not even sought an injunction here.

The cases relied on by Finch/UMN do not stand for the broad proposition articulated by Finch/UMN. For example, *Boston Scientific Corp. v. Cordis Corp.*—the sole District of Delaware case relied on by Finch/UMN for this issue—does ***not*** suggest that a finding of willful infringement is sufficient to treble a jury's royalty rate for ongoing infringement. 838 F. Supp. 2d 259, 275-276 (D. Del. 2012). Rather, the district court noted that "courts have been reluctant to issue injunctions in stent cases" (BSC's preferred remedy) and assessed an ongoing reasonable royalty equivalent to "the effective damages rate that reflect[ed] all of Cordis's infringing sales [] based on the jury's total damages verdict, including both reasonable royalty and lost profits damages." *Id.* In other words, even in the face of a case that otherwise might have merited an injunction, the district court simply maintained the ***same*** "effective damages rate" related to infringing sales—i.e., the equivalent of maintaining the jury's 5.5% running royalty rate here. Similarly, in *Joyal*, the court did not increase the ongoing royalty due to a finding of willfulness; rather, it found that an injunction was warranted and therefore assessed an ongoing royalty ***equal to the infringer's operating profit*** from the date of judgment to the issuance of the injunction to ensure the infringer did not profit from the delay in issuing the injunction. 2009 WL 512156, at *13-14. As noted above, Finch/UMN has not even requested an injunction in this case, which itself weighs against increasing the jury's royalty rate. *UroPep*, 2017 WL 3034655, at *9. Finally, in *Arctic Cat Inc. v. Bombardier Recreational Products, Inc.*, although the court did consider willfulness in connection with its ultimate determination to increase the jury's royalty rate for ongoing sales, it never suggested that a finding of willfulness alone would be sufficient to do so. No. 14-62369, 2017 WL 7732873 (S.D. Fl. Jan. 3, 2017).

Thus, contrary to Finch/UMN's representations, the jury's finding of willfulness is not sufficient to support a trebling of the ongoing royalty rate. *Vectura*, 2019 WL 4346502, at *8.

**B.      Finch/UMN fails to identify any post-verdict changes in the parties' bargaining positions that would justify increasing the ongoing royalty rate.**

The only evidence that Finch/UMN cite as alleged support for their assertion that "there is no longer any uncertainty about [Ferring's] use, value, profitability, and commercial success" of REBYOTA is that REBYOTA has an ██████ average profit margin. *See* D.I. 501 at 40. However, this figure fails to account for the jury's $25 million upfront payment, which is almost ██████ the amount of ***actual*** sales to date (██████████). Kidder Decl. Ex. 4; Tr. at 970:15-971:13 (estimating sales through trial at $14.8 million). If Ferring is forced to provide the upfront payment and even a 5.5% royalty to Finch/UMN, REBYOTA likely will not be profitable.[12] Kidder Decl. ¶ 18. ████████████████████████████████████████ ████████████████████████████ Kidder Decl. ¶¶ 16, 18. Further saddling sales of REBYOTA by increasing any ongoing royalty obligations ████████████████████ ████████████████████████████████████ ██████ Kidder Decl. ¶ 20.

Regardless, REBYOTA's profit margin cannot be considered under the guise of changed circumstances after the jury's verdict because Finch/UMN relied on the profit margin of REBYOTA at trial. Tr. at 498:9-17, 517:5-8. Thus, this information was considered by the jury in arriving at the 5.5% royalty rate. Similarly, all of the other evidence Finch/UMN suggests

---

[12] ████████████████████████, Finch/UMN's citation to *Joyal* to suggest that increasing a jury's royalty rate based on an accused product's profit margin, D.I. 501 at 39, is misleading at best. As explained above, the district court in that case awarded the entirety of the infringer's operating profit as an ongoing royalty to account for the lag between final judgment and issuance of an injunction, which is not at issue here. 2009 WL 512156, at *13-14.

would affect the *Georgia-Pacific* factors differently in the context of a ***post-verdict*** hypothetical negotiation—the alleged centrality of the claimed invention, Ferring's 2023 Annual Report, and the lack of noninfringing alternatives, *see* D.I. 501 at 41—all were presented to the jury. Tr. at 480:1-20, 511:12-20, 968:6-13. Thus, none can justify increasing the jury's 5.5% rate for ongoing infringement.

Similarly, evidence regarding each of the OpenBiome-Finch license, Takeda-Finch license, and Ironwood offer letter were presented to the jury and cannot constitute "new" evidence regarding changed circumstances. Tr. at 434:17-435:9, 436:25-438:2, 486:13-489:5, 491:19-492:19, 504:10-18, 932:4-934:13. Regardless, Finch/UMN's reliance on the "tiered" structures of these agreements makes no sense as Finch/UMN neither proposes a "tiered" structure (rather a 16.5% ongoing royalty regardless of sales volume) nor accounts for the fact that ***total*** sales of REBYOTA over an approximately 20-months period (just over ████████ from January 2023 through mid-August 2024, Kidder Decl. Ex. 4) comes nowhere close to the level justifying increased royalty rates in any of the cited agreements. *See* PTX-805.0012-13 (increasing from 5% to 7.5% for ***annual*** sales in excess of ***$50 million***); PTX-365.0039 (increasing from 6% to 7% for ***annual*** sales in excess of ***$1 billion***). As for the Ironwood offer letter, the amount of annual sales justifying increased royalty rates is not defined because the Ironwood letter is an offer, not an agreement. PTX-817.0002; *see also* Tr. at 491:19-492:5. More fundamentally, the Ironwood offer letter was for rights to commercialize CP101, not a bare patent license. Tr. at 436:25-438:2. Therefore, Finch/UMN's—and Mr. Malackowski's—explicit reliance on that offer letter in trying to rationalize "reasonable damages" for Ferring's ongoing infringement, *see* D.I. 501 at 41 ("[t]his figure is also in line with the Ironwood Letter") (relying on Malackowski Decl. ¶ 19 (D.I. 504)), only serves to underscore the error in the jury's damages

award. *See* D.I. 502 at 41-42 (explaining error associated with Mr. Malackowski conflating product licenses with patent licenses).

Moreover, any post-verdict hypothetical negotiation must take into account the double-whammy of a vastly underperforming product (sales in June 2024 were less than 10% of projections, TX-4355) and already having invested over $300 million on REBYOTA if the jury's exorbitant $25 million upfront payment is allowed to stand. Kidder Decl. ¶ 18. And a post-verdict negotiation would consider the unfettered competition that REBYOTA now faces from Seres's VOWST product. Kidder Decl. ¶ 19. In particular, despite the fact that Finch/UMN specifically drafted patent claims to cover VOWST (as it did REBYOTA), Ex. AA (not admitted) at 10 (explaining Finch's strategy "to actively pursue claims encompassing the different approaches of competitor companies" and suggesting "Finch has been very successful in covering competitor technologies with its portfolio," including both VOWST (Seres) and REBYOTA (Rebiotix)), Finch/UMN has not sued Seres, Tr. at 460:15-17. In light of these circumstances, Finch/UMN would not be in a bargaining position to demand an even higher royalty rate from Ferring. Kidder Decl. ¶¶ 20, 22.

### C. Changed economic circumstances favor lowering the ongoing royalty rate.

Finch/UMN fail to account in any way for the changed economic circumstances between the pre- and post-verdict hypothetical negotiations. In particular, as noted above, the profitability of REBYOTA is hampered by ████████████████████████ in light of the more than $300 million invested to bring REBYOTA to market. Kidder Decl. ¶ 18. ████████████



████████ *See* Kidder Decl. ¶ 16.; *see also* TX-4356. ████████████████

████████████████████████████████████████ Kidder Decl. ¶¶ 16-17. Therefore, any post-verdict

hypothetical negotiation must take into account this reality, including relatively modest sales and, if the $25 million upfront payment to Finch/UMN is upheld, more than $300 million invested in bringing REBYOTA to market. Kidder Decl. ¶ 18.; *see also* Tr. at 974:10-19. Under these circumstances, if faced with a further demand to increase the royalty rate for ongoing sales to 16.5%, ████████████████████████████████████████. Kidder Decl. ¶ 20. To that end, taking into account the changed economic circumstances as compared to a hypothetical negotiation in November 2022 would put downward pressure on the royalty rate so ████████████████████████. Kidder Decl. ¶¶ 14-22. This is particularly true where, as here, Finch now relies on royalties based on REBYOTA, ████████████████████ ████████████. Kidder Decl. ¶¶ 15, 18.

**D.    Other post-verdict factors favor lowering the ongoing royalty rate.**

Finally, other post-verdict factors favor lowering, or at least maintaining, the jury's 5.5% royalty rate. In particular, in light of the upfront payment, prelaunch marketing, payments related to the Rebiotix merger, and operating costs, ████████████████████████████ ████████████████████ Kidder Decl. ¶ 18. Even if the royalty rate remains at 5.5%, the prospect of ████████████████; REBYOTA will need to generate approximately ████ ████  ████████████████████████████████████ ████████ Kidder Decl. ¶ 18. Through almost two years of sales, REBYOTA has thus far generated just over ████████ in total sales. Kidder Decl. Ex. 4. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████. Kidder Decl. ¶ 20. REBYOTA was a first in class product and remains the only FDA-approved enema product available to prevent the recurrence of *C. difficile* infection, which is particularly important for that segment of the patient population that cannot swallow pills. Tr. 480:18-23, 667:22-668:24. Thus, it is important to arrive at a

reasonable royalty rate that would █████████████████████████████████

████████████

\*     \*     \*

For all the above reasons and ████████████████████████████████

██████, Ferring respectfully requests that the Court lower the ongoing royalty rate to a range

from 3% to 4.5%, which represents the amount that reasonable parties would arrive at during a

hypothetical negotiation following the jury verdict in light of the parties' post-verdict bargaining

positions, changed economic circumstances, and other post-verdict factors. Kidder Decl. ¶ 22.[13]

At most, Ferring respectfully respects that the Court maintain the 5.5% royalty rate determined

by the jury. This is in accord with other instances where courts in this district have refused to

increase a jury's royalty rate despite a finding of willful infringement. *See, e.g., Purewick*, 666 F.

Supp. 3d at 449.

## V.     PRE- AND POST-JUDGMENT INTEREST

Ferring does not contest whether pre- and post-judgment interest should apply, nor does

Ferring contest the use of the prime rate, compounded quarterly, for prejudgment interest nor the

statutorily determined rate for post-judgment interest. Ferring also does not contest the

calculation of prejudgment interest on the 5.5% running royalty awarded by the jury as sales

accrue on a quarterly basis. However, Mr. Malackowski's prejudgment interest calculation

includes errors related to calculating the compound quarterly interest rates, using the incorrect

---

[13] With respect to Finch/UMN's request for quarterly payments, paid within 14 days of the end of the quarter, along with detailed financials and a right to audit Ferring's finances, Ferring respectfully suggests that Finch/UMN have provided no justification or rationale for this request. Moreover, Finch/UMN's request would put undue strain on Ferring and prove impractical. Rather, Ferring respectfully requests that the Court order the parties to negotiate on a mutually agreeable payment schedule, if necessary, and that the parties seek further intervention from the Court only if agreement becomes unworkable.

royalty rate, and assuming payment for the running royalties in the middle of each quarter instead of at the end (as requested by Finch/UMN). Kidder Decl. ¶ 5. Adjusting for these errors, pre-judgment interest totals $█████ through August 15, 2024, and total damages prior to judgment amount to $█████ (the $25,815,061 jury award, plus supplemental damages of $████ for the period from August 6 through August 15 and █████ in prejudgment interest). Kidder Decl. ¶ 8. The daily rate of post-judgment interest on this amount is ████. Kidder Decl. ¶ 11. To the extent the Court grants Ferring's JMOL and/or motion for reconsideration, these totals will need to be updated accordingly.

Separately, Finch/UMN purports to seek leave to file supplemental papers in support of increasing prejudgment interest regarding any enhanced damages or as a result of the court determining that this is an "exceptional" case under 35 U.S.C. § 285. D.I. 501 at 44 n.9. But "[p]rejudgment interest is awarded to restore a plaintiff to the position it would have been in had there been no wrongdoing." *Purewick*, 666 F.Supp.3d at 450 (citing *Gen. Motors Corp. v. Deevez Corp.*, 461 U.S. 648, 655-56 (1983)). "Because prejudgment interest has no punitive purpose, it must be applied only to the compensatory damages, not enhanced or other punitive damages." *Humanscale Corp. v. CompX Int'l, Inc.*, No. 3:09-cv-86, 2010 WL 3397455, at *1 (E.D. Va. Aug. 23, 2010); *see also Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1580-81 (Fed. Cir. 1991) ("[P]rejudgment interest may be based only on the compensatory portion of the damages award . . . and not on the enhanced additional damages"); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983) ("[W]here, as here, the damages were increased to punish [infringer] for its willful infringement, prejudgment interest cannot be assessed on the increased or punitive portion of the damage

award."). Therefore, prejudgment interest should not be applied to any enhanced damages or further award under § 285.

Similarly, Finch/UMN contends that post-judgment interest should be applied to any monetary award from the date of the judgment quantifying that award, including any enhanced damages and/or attorneys' fees awarded by the Court. D.I. 501 at 45. But "[t]he purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 828 (1990) (citation omitted). Thus, "28 U.S.C. § 1961 permits, but does not compel, the application of post-judgment interest on punitive damages," and "[b]ecause the enhancement is not designed to compensate plaintiff for its injuries, plaintiff bears no loss for any delay in defendant's satisfying the judgment." *TruePosition Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400, 413 n.15 (D. Del. 2009), *aff'd*, 389 F. App'x 1000 (Fed. Cir. 2010). Accordingly, should the Court grant enhanced and/or other punitive damages, the Court should refuse to apply post-judgment interest to such damages.

Dated: November 4, 2024

*Of Counsel:*
Joshua P. Davis
WOMBLE BOND DICKINSON (US) LLP
811 Main Street
Suite 3130
Houston, TX 77002
Telephone: (346) 998-7801
Joshua.P.Davis@wbd-us.com

Daralyn J. Durie
Matthew Chivvis
Rachel Dolphin
Ramsey Fisher
Clinton W. Ewell
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415-268-6055
ddurie@mofo.com
mchivvis@mofo.com
rdolphin@mofo.com
rfisher@mofo.com
cewell@mofo.com

Whitney O'Byrne
Sara Doudar
MORRISON & FOERSTER LLP
701 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: 213-892-4345
wobyrne@mofo.com
sdoudar@mofo.com

Sarah E. Brickey
MORRISON & FOERSTER LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202-5638
Telephone: (303) 592-2267
sbrickey@mofo.com

WOMBLE BOND DICKINSON (US) LLP

*/s/ Mary W. Bourke*
Mary W. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
Zachary Murphy (#6881)
Alexander P. Wharton (#7304)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Mary.Bourke@wbd-us.com
Dana.Severance@wbd-us.com
Daniel.Attaway@wbd-us.com
Zachary.Murphy@wbd-us.com
Alexander.Wharton@wbd-us.com

John B. Bourke (#6534)
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, CA 94111
Telephone: (415) 765-6267
Ben.Bourke@wbd-us.com

*Attorneys for Ferring Pharmaceuticals Inc. and Rebiotix Inc.*