```
               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE



FERRING PHARMACEUTICALS)   Volume V
INC., et al.,          )
                       )
          Plaintiffs,  )   C.A. No. 21-1694-JLH
                       )
v.                     )
                       )
FINCH THERAPEUTICS     )
GROUP, INC.,           )
                       )
            Defendant. )



               Friday, August 9, 2024
               8:47 a.m.



               844 King Street
               Wilmington, Delaware




BEFORE:  THE HONORABLE JENNIFER L. HALL
     United States District Court Judge



APPEARANCES:

        WOMBLE, BOND, DICKENSON, LLP
        BY:  MARY W. BOURKE, ESQ.

        -and-

        MORRISON & FOERSTER, LLP
        BY:  DARALYN DURIE, ESQ.
        BY:  MATTHEW A. CHIVVIS, ESQ.
        BY:  WHITNEY O'BYRNE, ESQ.
        BY:  RAMSEY FISHER, ESQ.

                       Counsel for the Plaintiff
```

1    APPEARANCES CONTINUED:

2

3            RICHARDS, LAYTON & FINGER, P.A.
             BY:  KELLY E. FARNAN, ESQ.
             BY:  SARA METZLER, ESQ.

4
                        -and-
5

6            KIRKLAND & ELLIS, LLP
             BY:  LESLIE M. SCHMIDT, ESQ.
             BY:  ADAM R. ALPER, ESQ.
7            BY:  MICHAEL DeVRIES, ESQ.
             BY:  SHARRE LOTFOLLAHI, ESQ.
8            BY:  PATRICIA CARSON, ESQ.
             BY:  ASHLEY ROSS, ESQ.
9            BY:  ASHLEY CADE, ESQ.
             BY:  SAMUEL BLAKE, ESQ.

10
                        Counsel for the Defendant
11

12
             ----------------------------
13

14

08:47:05 15           COURT CLERK:  All rise.

08:47:10 16           THE COURT:  Hi.  Good morning, everyone.  Please

08:47:12 17    be seated.

08:47:13 18           So I understand there's a lingering issue about

08:47:17 19    whether or not the REBYOTA will go in.  No?

08:47:25 20           MS. DURIE:  We have resolved that, I believe.

08:47:25 21    By agreement, it did come in.

08:47:26 22           THE COURT:  Okay.  It's going to go back to the

08:47:28 23    jury room?

08:47:29 24           MS. DURIE:  Yes.

08:47:30 25           THE COURT:  Do we have any language that the

08:47:32  1    Court is supposed to read?

08:47:34  2                MS. DURIE:  No, I'm happy -- I mean, I'm

08:47:35  3    happy -- I think  we're happy to send it back.

08:47:37  4                THE COURT:  Ok.  I just wanted to  put it on the

08:47:38  5    record that everybody is in agreement.  Okay.  Great.

08:47:40  6                MS. DURIE:  There is one thing I wanted to do.

08:47:43  7    There is one exhibit, that by agreement, I wanted to move

08:47:44  8    into the record.  It's PTX-938.

08:47:47  9                THE COURT:  Okay.

08:47:48  10               MS. DURIE:  And it is a duplicate of an exhibit

08:47:51  11   that's already in the record, but it got referred to by this

08:47:54  12   exhibit number.  So we wanted to move it in by that exhibit

08:47:58  13   number as well.

08:48:00  14               THE COURT:  Okay.  Any objection?

08:48:00  15               MS. LOTFOLLAHI:  No objection.

          16               (PTX Exhibit No. 938 was admitted into

08:48:02  17   evidence.)

08:48:02  18               THE COURT:  All right.  We'll put it into

          19   evidence.

08:48:02  20               We had some exhibits moved in yesterday, and

08:48:04  21   then this one today, outside the hearing of jury.  Does

08:48:07  22   anyone have a concern with that?  It's going to be in a

08:48:10  23   binder that goes back to the jury room.

08:48:12  24               MS. DURIE:  I do not have a concern.

08:48:16  25               MR. DE VRIES:  We do not, Your Honor.

08:48:17  1                    THE COURT:  All right.  Very good.

08:48:17  2              I understand that the jurors are all here.

08:48:19  3              Are you all ready to get started?

08:48:26  4              MR. DE VRIES:  We are, Your Honor.

08:48:48  5              THE COURT:  Okay.  Let's just get started then.

08:48:48  6              (Jury enters.)

08:49:49  7              THE COURT:  All right.  Please be seated.

08:49:53  8              I'm going to ask my courtroom deputy to please

08:49:56  9     hand out copies of the final jury instructions.

08:50:16 10              All right.  Ladies and gentlemen of the jury.

08:50:19 11     I'm starting on page 1, which is after the table of

08:50:25 12     contents.

08:50:25 13              1, General Instructions.

08:50:27 14              1.1, Introduction.

08:50:29 15              Members of the jury, now it is time for me to

08:50:31 16     instruct you on the law that you must follow in deciding

08:50:34 17     this case.  I will start by explaining your duties and the

08:50:37 18     general rules that apply in every civil case.  Then, I will

08:50:41 19     explain some rules that you must use in evaluating testimony

08:50:44 20     and evidence.  Then, I will explain the positions of the

08:50:48 21     parties and the law you will apply in this case.  Finally, I

08:50:52 22     will explain the rules that you must follow during your

08:50:55 23     deliberations in the jury room and the possible verdicts

08:50:58 24     that you may return.  Please listen carefully to everything

08:51:01 25     I say.  I will provide you with a copy of these

08:51:05  1    instructions.

08:51:06  2         You have two main duties as jurors.  The first

08:51:09  3    is to decide what the facts are from the evidence that you

08:51:13  4    saw and heard in court.  Deciding what the facts are is your

08:51:16  5    job, not mine, and nothing that I have said or done during

08:51:19  6    this trial was meant to influence your decision about the

08:51:22  7    facts in any way.  Your second duty is to take the law that

08:51:26  8    I give you, apply it to the facts, and decide which party

08:51:29  9    should prevail on the issues presented.

08:51:32 10         I will instruct you about the burden of proof

08:51:35 11    shortly.  It is my job to instruct you on the law and you

08:51:38 12    are bound by the oath you took at the beginning of the trial

08:51:40 13    to follow the instructions that I give you, even if you

08:51:44 14    personally disagree with them.  This includes the

08:51:46 15    instructions that Judge Fallon gave you before the trial and

08:51:49 16    the instructions that I've given during the trial, and these

08:51:52 17    final instructions.  All the instructions are important and

08:51:56 18    you should consider them together as a whole.

08:51:59 19         Perform these duties fairly.  Do not let any

08:52:01 20    bias, sympathy or prejudice you may feel toward one side or

08:52:05 21    the other influence your decision in any way.

08:52:08 22         Two, Evidence.

08:52:10 23         2.1, Evidence Defined.

08:52:14 24         You must make your decision based only on the

08:52:19 25    evidence that you saw and heard here in the courtroom.  Do

08:52:22  1    not let rumors, suspicion or anything else that you may have

08:52:25  2    seen or heard outside of court influence your decision in

08:52:28  3    any way.  The evidence in this case includes only what the

08:52:31  4    witnesses said while they were testifying under oath,

08:52:34  5    including deposition testimony that has been played by

08:52:38  6    video, the exhibits that I allowed into evidence, and any

08:52:40  7    facts that the parties agreed to by stipulation.  Nothing

08:52:43  8    else is evidence.

08:52:44  9             The lawyers' statements, arguments, questions

08:52:47 10    and objections are not evidence.  None of my legal rulings,

08:52:52 11    comments, or questions are evidence.  Demonstrative exhibits

08:52:56 12    are not evidence.  Certain charts and graphics have been

08:52:59 13    used to illustrate testimony from the witnesses.  Unless I

08:53:02 14    have specifically admitted them into evidence, these charts

08:53:05 15    and graphics are not themselves evidence, even if they refer

08:53:10 16    to, identify, or summarize evidence.

08:53:12 17             During the trial, I may not have let you hear

08:53:16 18    the answers to some of the questions that the lawyers asked.

08:53:19 19    I also may have ruled that you could not see some of the

08:53:22 20    exhibits that the lawyers wanted you to see, and sometimes I

08:53:25 21    may have ordered you to disregard things that you saw or

08:53:28 22    heard.  You must completely ignore all these things.  Do not

08:53:31 23    speculate about what a witness might have said or what an

08:53:36 24    exhibit might have shown.  These things are not evidence and

08:53:38 25    you are bound by your oath not to let them influence your

08:53:41 1    decision in any way.  Do not consider my rulings on whether

08:53:44 2    you could hear certain testimony or see certain exhibits as

08:53:47 3    any indication of my opinions of the case or what your

08:53:50 4    verdict should be.

08:53:52 5            2.2, Direct and Circumstantial Evidence.

08:53:56 6            Some of you may have heard the terms "direct

08:53:59 7    evidence" and "circumstantial evidence."  Direct evidence is

08:54:02 8    simply evidence like the testimony of an eyewitness, which,

08:54:06 9    if you believe it, directly proves a fact.  If the witness

08:54:10 10   testified he saw it raining outside and you believed him,

08:54:13 11   that would be direct evidence that it was raining.

08:54:18 12           Circumstantial evidence is simply a chain of

08:54:20 13   circumstances that indirectly proves a fact.  If someone

08:54:23 14   walked into the courtroom wearing a raincoat, covered with

08:54:27 15   drops of water and carrying a wet umbrella, that would be

08:54:31 16   circumstantial evidence from which you could conclude that

08:54:34 17   it was raining.

08:54:35 18           It is your job to decide how much weight to give

08:54:40 19   the direct and circumstantial evidence.  The law makes no

08:54:43 20   distinction as to the weight that you should give to either

08:54:46 21   type of evidence, nor does it say that one is any better

08:54:51 22   evidence than the other.  You should consider all the

08:54:54 23   evidence, both direct and circumstantial, and give it

08:54:57 24   whatever weight you believe it deserves.

08:54:59 25           2.3, Consideration of Evidence.

08:55:05  1          You should use your common sense in weighing the

08:55:07  2  evidence.  Consider it in light of your every day experience

08:55:11  3  with people and events, and give it whatever weight you

08:55:13  4  believe it deserves.  If your experience tells you that

08:55:16  5  certain evidence reasonably leads to a conclusion, you are

08:55:19  6  free to reach that conclusion.

08:55:23  7          3, Use of Notes.

08:55:24  8          You may use notes taken during the trial to

08:55:27  9  assist your memory.  Remember that your notes are for your

08:55:32 10  personal use.  They may not be given or read to anyone else.

08:55:34 11  Do not use your notes or any other jurors' notes as

08:55:38 12  authority to persuade fellow jurors.  Your notes are not

08:55:43 13  evidence and they are by no means a complete outline of the

08:55:46 14  proceedings or a list of the highlights of the trial.  Some

08:55:49 15  testimony that is considered unimportant at the time

08:55:52 16  presented and, thus, not written down may take on greater

08:55:56 17  importance later in the trial considering all the evidence

08:55:59 18  presented.  Your notes are valuable only to refresh your

08:56:02 19  memory.  Your memory is what you should be relying on when

08:56:05 20  it comes time to deliberate and render your verdict in this

08:56:09 21  case.

08:56:09 22          4, Witnesses.

08:56:11 23          4.1.  Credibility of Witnesses.

08:56:15 24          You, the jurors, are the sole judges of the

08:56:18 25  credibility or the believability of the witnesses you have

08:56:20  1    seen during the trial and the weight their testimony

08:56:24  2    deserves.  You should carefully scrutinize all the testimony

08:56:28  3    each witness has given and every matter of evidence that

08:56:31  4    tends to show whether he or she is worthy of belief.

08:56:36  5           Consider each witness's intelligence, motive and

08:56:40  6    state of mind, as well as his or her demeanor while on the

08:56:44  7    stand.  Consider the witness's ability to observe the

08:56:46  8    matters as to which he or she has testified and whether he

08:56:50  9    or she impresses you as having an accurate recollection of

08:56:54 10    these matters.

08:56:55 11           Also, consider any relation each witness may

08:56:58 12    bear to each side of the case, the manner in which each

08:57:01 13    witness might be affected by the verdict, the witness --

08:57:05 14    excuse me -- the interest any witness may have in the

08:57:08 15    verdict and the extent to which, if at all, each witness is

08:57:13 16    either supported or contradicted by other evidence in the

08:57:18 17    case.

08:57:18 18           Discrepancies in the testimony of different

08:57:22 19    witnesses may or may not cause you to discredit such

08:57:25 20    testimony.  Two or more persons witnessing an incident or

08:57:30 21    transaction may see or hear it differently.  Likewise, in

08:57:36 22    determining the weight to give to the testimony of a

08:57:38 23    witness, you should ask yourself whether there was evidence

08:57:40 24    tending to prove that the witness testified falsely about

08:57:43 25    some important fact or whether there was evidence that at

08:57:46  1    some other time the witness said or did something or failed

08:57:49  2    to say or do something that was different or inconsistent

08:57:53  3    from the testimony that he or she gave during the trial.

08:57:57  4         It is the province of the jury to determine

08:57:59  5    whether a false statement or a prior inconsistent statement

08:58:04  6    discredits the witness's testimony.  You should remember

08:58:07  7    that a simple mistake by a witness does not mean that the

08:58:10  8    witness was not telling the truth.  People may tend to

08:58:14  9    forget some things or remember other things inaccurately.

08:58:16 10    If a witness has made a misstatement, you must consider

08:58:19 11    whether it was simply an innocent lapse of memory or an

08:58:22 12    intentional falsehood, and that may depend on whether it

08:58:26 13    concerns an important fact or an unimportant detail.

08:58:29 14         4.2, Expert Witnesses.  When knowledge of

08:58:33 15    subject matter requiring special skill or knowledge in some

08:58:36 16    science, profession or business that is not common to the

08:58:39 17    average person might be helpful to the jury, a person who

08:58:43 18    has special training or experience in that field, he or she

08:58:47 19    is called an expert witness, is permitted to state his or

08:58:50 20    her opinion on these matters.

08:58:52 21         However, you are not required to accept that

08:58:55 22    opinion.  As with any other witness, it is up to you to

08:58:59 23    judge the credentials and credibility of the expert witness

08:59:06 24    and decide whether to rely upon his or her testimony.

08:59:09 25         You should consider each expert opinion received

08:59:10 1    in evidence in this case and give it such weight as you

08:59:13 2    think it deserves.  If you decide that the opinion of an

08:59:17 3    expert witness is not based upon sufficient education and

08:59:21 4    experience or if you conclude that the reasons given in

08:59:25 5    support of the opinion are not sound or if you feel that the

08:59:27 6    opinion is outweighed by other evidence, you may disregard

08:59:30 7    the opinion in whole or in part.

08:59:35 8         4.3, Deposition Testimony.  During the trial,

08:59:41 9    certain testimony was presented to you through depositions

08:59:43 10   that were read into evidence or electronically played.  This

08:59:46 11   testimony must be given the same considerations you would

08:59:49 12   give it had the witness personally appeared in court.  Like

08:59:51 13   the testimony of a live witness, the statements made in a

08:59:56 14   deposition are made under oath and are considered evidence

08:59:59 15   that may be used to prove particular facts.

09:00:02 16        5, The Parties and Their Contentions.  I will

09:00:08 17   now review for you the parties in this action and the

09:00:12 18   positions of the parties that you will have to consider in

09:00:14 19   reaching your verdict.

09:00:16 20        UMN and Finch allege that Ferring and Rebiotix,

09:00:19 21   which I will refer collectively as "Ferring," infringes

09:00:24 22   certain claims have three patents, specifically the '914

09:00:28 23   patent, which I may refer to as the "UMN patent," and the

09:00:34 24   '309 and '080 patents.  I will refer to all these patents

09:00:39 25   collectively as the asserted patents.  I may sometimes refer

09:00:44 1    to REBYOTA as the "accused product."  UMN and Finch contend

09:00:51 2    that this infringement is willful.  UMN and Finch seek

09:00:56 3    damages in the form of a reasonable royalty for this

09:00:59 4    infringement.  In response to Finch and UMN's contentions,

09:01:05 5    Ferring contends it has not directly infringed or induced or

09:01:09 6    contributed to infringement.  Ferring also argues that the

09:01:14 7    asserted claims are invalid.  Because Ferring contends that

09:01:17 8    it has not infringed a valid claim, Ferring further contends

09:01:22 9    that Finch and UMN are not entitled to damages.

09:01:26 10        5.1, Burdens of Proof.  In any legal action,

09:01:32 11   facts must be proven by a required standard of evidence

09:01:34 12   known as the burden of proof.  In a patent case, such as

09:01:38 13   this, there are two different burdens of proof that are

09:01:42 14   used, the first is called preponderance of the evidence; the

09:01:46 15   second is called clear and convincing evidence.

09:01:48 16        UMN and Finch must prove their claims of patent

09:01:53 17   infringement by a preponderance of the evidence.  That means

09:01:56 18   that UMN and Finch have to prove to you, in light of all the

09:02:01 19   evidence, that what they claim is more likely so than not.

09:02:04 20        To say it differently, if you were to put the

09:02:08 21   evidence favorable to UMN and Finch and the evidence

09:02:13 22   favorable to Ferring on opposite sides of the scale, UMN and

09:02:16 23   Finch would have to make the scale tip somewhat on its side.

09:02:19 24        If you find after considering all of the

09:02:22 25   evidence that a claim or a fact is more likely so than not

09:02:26  1    so, then the claim or fact has been proven by a

09:02:30  2    preponderance of the evidence.  UMN and Finch have alleged

09:02:35  3    that Ferring infringes or has infringed the asserted patents

09:02:39  4    that Ferring's infringement of any valid claim was willful

09:02:42  5    and that it is entitled to damages to compensate it for any

09:02:48  6    infringement.

09:02:48  7          UMN and Finch have the burden of proposing these

09:02:52  8    allegations by a preponderance of the evidence.  Ferring has

09:02:55  9    alleged defenses and has also brought claims for relief

09:02:59 10    against UMN and Finch called counterclaims.  On these

09:03:03 11    defenses and counterclaims, Ferring has a different burden

09:03:06 12    of proof that is called clear and convincing evidence.

09:03:10 13          Clear and convincing evidence is evidence that

09:03:12 14    produces in your mind a firm belief or conviction that the

09:03:16 15    allegations sought to be proved by the evidence are true.

09:03:21 16          Clear and convincing evidence involves a higher

09:03:24 17    degree of persuasion than is necessary to meet the

09:03:27 18    preponderance of the evidence standard.

09:03:29 19          Ferring has alleged that the asserted claims are

09:03:31 20    invalid.  Ferring has the burden of proving these

09:03:35 21    allegations by clear and convincing evidence.  In

09:03:38 22    determining whether any fact has been proven in the case,

09:03:41 23    you may, unless otherwise instructed, consider the testimony

09:03:45 24    of all witnesses, regardless of which party may have called

09:03:48 25    them and all exhibits received in evidence, regardless of

09:03:51 1    which party may have produced them.  You may have heard the

09:03:55 2    phrase "proof beyond a reasonable doubt."  That is a

09:03:58 3    stricter standard of proof and it applies only in criminal

09:04:02 4    cases.  It does not apply to civil cases such as this one.

09:04:05 5    You should, therefore, put it out of your mind.

09:04:10 6              6, The Claims of a Patent.  Before you can

09:04:12 7    decide the issues in the case, you need to understand the

09:04:15 8    role of patent claims.  The patent claims are numbered

09:04:18 9    sentences at the end of the patent.  The claims are

09:04:21 10   important because the words of a claim define the scope of

09:04:25 11   the patent right.  The figures and text in the rest of the

09:04:29 12   patent provide a description and/or examples of the

09:04:32 13   invention and provide a context for the claims but the

09:04:35 14   claims define the extent of the patent's coverage.  Each

09:04:39 15   claim may cover more or less than another claim, therefore,

09:04:42 16   what a patent covers depends in turn on what each of its

09:04:48 17   claims covers.

09:04:48 18             The patent claims involved here are Claim 7 of

09:04:52 19   the '914 patent, Claims 16 and 21 of the '309 patent and

09:04:58 20   Claims 2 and 9 of the '080 patent.

09:05:04 21             6.1, Independent and Dependent Claims.  Claims

09:05:10 22   can be stated in two different ways in a patent.  The first

09:05:13 23   way the patent claim can be stated is in the form of an

09:05:17 24   independent claim.

09:05:18 25             An independent claim sets forth all the

09:05:20  1    requirements that must be met in order for an accused

09:05:22  2    product to be covered by that claim and thus, infringe that

09:05:26  3    claim.  An independent claim is read alone to determine its

09:05:30  4    scope.

09:05:30  5            The second way a claim can be stated is in the

09:05:34  6    form of a dependent claim.  A dependent claim does not

09:05:38  7    itself recite all the requirements of the claim but instead

09:05:42  8    incorporates the requirements of another claim or claims and

09:05:46  9    adds its own additional requirements.  In this way, the

09:05:49 10    claim depends on another claim or claims.

09:05:53 11            To determine what a dependent claim covers, it

09:05:57 12    is necessary to look at both the dependent claim and any

09:06:00 13    other claims from which it depends.

09:06:03 14            In this case, Claim 7 of the '914 patent, Claims

09:06:08 15    16 and 21 of the '309 patent and Claims 2 and 9 of the '080

09:06:13 16    patent are dependent claims.

09:06:17 17            6.2, Construction of Claims.  The law says that

09:06:21 18    it is the Court's duty to define the terms of patent claims.

09:06:26 19    I have already defined the meaning of some of the words of

09:06:29 20    the patent claims that you are considering in this case.

09:06:32 21    You must accept my definition of these words in the patent

09:06:36 22    claims as correct.  You must use the definitions I give you

09:06:40 23    for each claim to make your decisions as to whether the

09:06:44 24    claim is infringed or invalid.

09:06:46 25            You must ignore any different definitions used

09:06:49 1    by the witnesses or the attorneys.  You should not take my

09:06:53 2    definition of the language of the patent claims as an

09:06:56 3    indication that I have a view regarding how you should

09:07:00 4    decide the infringement or invalidity issues that you are

09:07:03 5    being asked to decide.  These issues are yours to decide.

09:07:09 6            The terms with specific definitions are listed

09:07:12 7    below.  The definitions for these terms were also provided

09:07:16 8    separately in your juror notebooks.  When I have not defined

09:07:19 9    a term, you should give it its ordinary meaning as the term

09:07:23 10   would have been understood by a person of ordinary skill in

09:07:26 11   the art.

09:07:28 12           Rough particulate matter, '309 patent.  Rough

09:07:34 13   macroscopic nonliving matter, separated from rough

09:07:40 14   particulate matter, '309 patent.  Separated from rough

09:07:44 15   macroscopic nonliving matter.  Effective amount, '914

09:07:50 16   patent, a sufficient amount to provide the desired effect.

09:07:56 17   Amount effective, '309 patent.  A sufficient amount to

09:08:01 18   provide the desired effect.  At least six different classes

09:08:08 19   of bacteria selected from the group consisting of

09:08:13 20   Actinobacteria, Bacteroidia, Bacilli, Clostridia,

09:08:27 21   Erysipelotrichia, Alphaproteobacteria, Betaproteobacteria,

09:08:35 22   Gammaproteobacteria, Mollicutes and Verrucomicrobia.  '914

09:08:43 23   patent a Markush group for which no construction is

09:08:47 24   necessary.

09:08:48 25           Extract, '914 patent, a substance obtained from

09:08:53  1    a material mixture, organisms or part of an organisms by

09:08:58  2    some chemical and/or physical process.  Fecal preparation,

09:09:04  3    '914 patent, plain and ordinary meaning.

09:09:09  4              7, Infringement.

09:09:12  5              7.1, Generally.  A person, any person or

09:09:18  6    business entity that makes, uses, sells, offers for sale or

09:09:23  7    imports the patented invention in the United States during

09:09:28  8    the term of the patent without the patent owner's

09:09:32  9    permission, infringes the patent.  I will now instruct you

09:09:35 10    how to decide whether or not UMN and Finch have proven that

09:09:40 11    Ferring had infringed the asserted patent through its

        12    REBYOTA product.

09:09:45 13              Infringement is assessed on a claim-by-claim

09:09:47 14    basis, therefore, there may be infringement as to one claim,

09:09:50 15    but no infringement as to another.  In this case, there are

09:09:55 16    three possible ways that a claim may be infringed.  The

09:09:59 17    three types of infringement are called, one, direct

09:10:01 18    infringement; two, active inducement; and three,

09:10:08 19    contributory infringement.

09:10:10 20              Active inducement and contributory infringement

09:10:12 21    are referred to as indirect infringement.  There cannot be

09:10:15 22    indirect infringement without someone else engaging in

09:10:19 23    direct infringement.  In this case, UMN and Finch have

09:10:24 24    alleged that Ferring directly infringes Claims 16 and 21 of

09:10:29 25    the '309 patent and Claims 2 and 9 of the '080 patent.  In

09:10:36 1    addition, UMN and Finch have alleged that healthcare

09:10:40 2    providers directly infringe Claim 7 of the '914 patent and

09:10:44 3    Ferring is liable for actively inducing or contributing to

09:10:48 4    that direct infringement by healthcare providers.

09:10:52 5        In order to prove infringement, UMN and Finch

09:10:56 6    must prove that the requirements for one or more types of

09:10:59 7    these infringements are met by a preponderance of the

09:11:02 8    evidence.  That is, that it is more likely than not that all

09:11:07 9    of the requirements for one or more of each of these types

09:11:10 10   of infringement have been proved.

09:11:12 11       Having one's own patent or patent application is

09:11:15 12   not a defense to infringing another's patent.  Accordingly,

09:11:20 13   whether Ferring has patents or patent applications and

09:11:23 14   whether any of these patents or patent applications cover

09:11:26 15   REBYOTA, should not be considered in your determination of

09:11:29 16   whether Ferring infringes the asserted patents.

09:11:33 17       I will now explain each of the types of

09:11:35 18   infringement in more detail.

09:11:38 19       7.2, Direct Infringement by Literal

09:11:42 20   Infringement.  There are two types of direct infringement.

09:11:49 21   One, literal infringement; and two, infringement under the

09:11:53 22   doctrine of equivalents.  In order to prove direct

09:11:57 23   infringement by literal infringement, UMN and Finch must

09:12:01 24   prove by a preponderance of the evidence, i.e., that it is

09:12:04 25   more likely than not that Ferring made, used, sold, offered

09:12:10  1    for sale within or imported into the United States, a

09:12:12  2    product or method that meets all of the requirements of a

09:12:16  3    claim and did so without the permission of Finch during the

09:12:20  4    time the patent was enforced.  You must compare the product

09:12:24  5    or method with each and every one of the requirements of a

09:12:27  6    claim to determine whether all of the requirements of that

09:12:30  7    claim are met.  You must determine separately for each

09:12:33  8    asserted claim whether or not there is infringement.

09:12:37  9           For dependent claims, if you find that a claim

09:12:39 10    to which a dependent claim refers is not infringed, there

09:12:44 11    cannot be infringement of that dependent claim.  On the

09:12:48 12    other hand, if you find that an independent claim has been

09:12:50 13    infringed, you must still decide separately whether the

09:12:55 14    product or method meets the additional requirements of any

09:12:58 15    claims that depend from the independent claim to determine

09:13:01 16    whether those dependent claims have also been infringed.

09:13:05 17           A dependent claim includes all the requirements

09:13:09 18    of any of the claims to which it refers, plus additional

09:13:12 19    requirements of its own.  The relevant comparison for

09:13:15 20    infringement is between Ferring's product and UMN and

09:13:19 21    Finch's patent claims, not with any product of UMN or Finch.

09:13:25 22    A party can directly infringe a patent without knowing of

09:13:28 23    the patent or without knowing that what the party is doing

09:13:31 24    is patent infringement.

09:13:33 25           7.3, Direct Infringement by Doctrine of

09:13:39 1    Equivalents.  If a person makes, uses, sells, offers to sell

09:13:44 2    within or imports into the United States, a method that does

09:13:48 3    not literally meet all of the elements of a claim and thus

09:13:51 4    does not literally infringe that claim, there can still be

09:13:55 5    direct infringement if that method satisfies the claim

09:13:58 6    elements under the doctrine of equivalents.

09:14:04 7            Under the doctrine of equivalents, a method

09:14:07 8    infringes a claim if the accused method has steps that

09:14:11 9    literally meet or are equivalent to each and every element

09:14:16 10   of the claim.  You may find that an element or step is

09:14:20 11   equivalent to an element of a claim that is not met

09:14:22 12   literally if a person having ordinary skill in the field of

09:14:24 13   technology of the patent would have considered the

09:14:27 14   differences between them to be insubstantial or would have

09:14:32 15   found that the element used in the accused method, one

09:14:36 16   performs substantially the same function; and two, works in

09:14:39 17   substantially the same way; three, to achieve substantially

09:14:43 18   the same result as the element of the claim.

09:14:47 19           In order to prove infringement by equivalents,

09:14:51 20   UMN and Finch must prove the equivalency of the element used

09:14:57 21   in the accused method to the claim elements by a

09:15:00 22   preponderance of the evidence.  Thus, each element of a

09:15:02 23   claim must be met by the method either literally or under

09:15:07 24   the doctrine of equivalents for you to find infringement.

09:15:11 25           7.4, Infringement of Comprising Claims.

09:15:23 1          The preamble to the asserted claims used the

09:15:26 2   phrase "comprising."  The word "comprising" means including

09:15:30 3   the following, but not excluding others.  If you find that

09:15:35 4   the accused product or method includes all the elements or

09:15:38 5   method steps in an asserted claim, even if the accused

09:15:42 6   product or method includes additional components or method

09:15:46 7   steps, then the accused product or method literally

09:15:49 8   infringes that claim.

09:15:51 9          7.5, Actively Inducing Patent Infringement.

09:16:00 10          UMN and Finch allege that Ferring is liable for

09:16:02 11   infringement by actively inducing healthcare providers to

09:16:06 12   directly infringe Claim 7 of the '914 patent, either

09:16:10 13   literally or under the doctrine of equivalents.

09:16:14 14          To establish that Ferring actively induced

09:16:17 15   infringement, UMN and Finch must prove by a preponderance of

09:16:21 16   the evidence that, A, a single actor, here, a healthcare

09:16:26 17   provider is responsible for direct infringement, namely, all

09:16:29 18   of the method steps of Claim 7 of the '914 patent and, B,

09:16:34 19   Ferring actively induced these acts of infringement by

09:16:38 20   healthcare providers.

09:16:41 21          To prove active inducement, UMN and Finch must

09:16:44 22   establish that it is more likely than not that:

09:16:47 23          1, Ferring aided instructed or otherwise acted

09:16:54 24   with the intent to cause acts by healthcare providers that

09:16:56 25   would constitute direct infringement of the patent.

09:16:59  1          2, Ferring knew of the patent or showed willful

09:17:03  2    blindness to the existence of the patent at that time.

09:17:06  3          3, Ferring knew or showed willful blindness that

09:17:10  4    the actions of the healthcare providers would infringe Claim

09:17:14  5    7 of the '914 patent.

09:17:15  6          4, Healthcare providers infringe Claim 7 of the

09:17:21  7    '914 patent.

09:17:22  8          UMN and Finch must prove all four elements to

09:17:25  9    establish infringement.  To find willful blindness, 1,

09:17:31 10    Ferring must have subjectively believed that there was a

09:17:36 11    high probability that a fact existed and, 2, Ferring must

09:17:40 12    have taken deliberate actions to avoid learning of that

09:17:44 13    fact.

09:17:44 14          In order to find Ferring liable for induced

09:17:47 15    infringement of an asserted claim, you must find direct

09:17:50 16    infringement of that claim by another.  If there is no

09:17:53 17    direct infringement by anyone, there can be no induced

09:17:57 18    infringement.  However, in order to establish active

09:18:00 19    inducement of infringement, it is not sufficient that

09:18:03 20    another directly infringes the claim, nor is it sufficient

09:18:07 21    that Ferring was aware of the acts by others that allegedly

09:18:12 22    constitute the direct infringement.

09:18:14 23          If you find that Ferring was aware of the patent

09:18:17 24    but believe that the acts it encouraged did not infringe

09:18:20 25    that patent, Ferring cannot be liable for inducement.  The

09:18:24  1    mere fact, if true, that Ferring knew or should have known

09:18:27  2    that there was a substantial risk that the healthcare

09:18:30  3    providers' acts would infringe the '914 patent would not be

09:18:34  4    sufficient to support a finding of active inducement of

09:18:39  5    infringement.

09:18:39  6              7.6, Contributory Infringement.

09:18:43  7              UMN and Finch also assert that Ferring has

09:18:45  8    contributed to infringement of Claim 7 of the '914, by

09:18:52  9    another person by selling, offering for sale or importing

09:18:55 10    into the United States, a component for use in an infringing

09:18:59 11    method.  To establish contributory infringement, UMN and

09:19:03 12    Finch must prove that it is more likely than not that

09:19:06 13    Ferring had knowledge of both the patent and direct

09:19:10 14    infringement of that patent.

09:19:11 15              UMN and Finch must also prove that each of the

09:19:14 16    following is more likely than not:

09:19:17 17              1.  Others infringed the asserted claims,

09:19:20 18    namely, others performed in the United States all of the

09:19:24 19    steps of the asserted claims.

09:19:27 20              2.  Ferring sold, offered for sale or imported

09:19:31 21    within the United States, a component for use in the

09:19:33 22    infringing method.

09:19:35 23              3.  The component is not a staple article or

09:19:39 24    commodity of commerce capable of substantial non-infringing

09:19:44 25    use.

09:19:44 1          4.  The component constitutes a material part of

09:19:47 2     the claimed invention.

09:19:48 3          And, 5.  Ferring knew or was willfully blind to

09:19:52 4     the fact that the component was especially made or adapted

09:19:57 5     for use in an infringing method.

09:20:00 6          A staple article or commodity of commerce

09:20:03 7     capable of substantial non-infringing use is something that

09:20:06 8     has uses other than as part or component of the patented

09:20:11 9     product or in the patented method and those other uses are

09:20:14 10    not occasional, far-fetched, impractical, experimental or

09:20:18 11    hypothetical.

09:20:21 12         Ferring's knowledge that the component was

09:20:23 13    especially made or adapted for use in an infringing product

09:20:27 14    or method may be shown with evidence of willful blindness.

09:20:31 15    As with inducement, to find willful blindness, you must find

09:20:36 16    that Ferring subjectively believed there was a high

09:20:38 17    probability that a fact existed and Ferring took deliberate

09:20:41 18    actions to avoid learning of that fact.

09:20:44 19         8, Willful Infringement.

09:20:47 20         To prove willful infringement, UMN and Finch

09:20:50 21    must first persuade you by a preponderance of the evidence

09:20:54 22    that Ferring infringed a valid claim of the asserted

09:20:57 23    patents.  The requirements for proving such infringement

09:21:01 24    were discussed earlier in my instructions.

09:21:02 25         In addition, to prove willful infringement of a

09:21:04  1    claim, UMN and Finch must persuade you that it is more

09:21:08  2    likely true than not true that Ferring knew of the asserted

09:21:11  3    patents and intentionally infringed at least one asserted

09:21:16  4    claim of the patent.

09:21:17  5         For example, you may consider whether Ferring's

09:21:19  6    behavior was deliberate or intentional.  However, you may

09:21:23  7    not find that Ferring's infringement was willful, merely

09:21:26  8    because Ferring knew about the patents without more.

09:21:29  9    Rather, to show willfulness, you must find that Ferring

09:21:33 10    engaged in additional conduct evidencing deliberate or

09:21:36 11    reckless disregard of UMN and Finch's patent rights.

09:21:41 12         In determining whether UMN and Finch have proven

09:21:44 13    that Ferring's infringement was willful, you must consider

09:21:46 14    all of the circumstances and assess Ferring's knowledge at

09:21:49 15    the time the challenged conduct occurred.  Willfulness can

09:21:53 16    be established by circumstantial evidence.  If you determine

09:21:55 17    that any infringement was willful, you may not allow that

09:21:58 18    decision to affect the amount of any damages award you give

09:22:02 19    for infringement.

09:22:04 20         9, Invalidity.

09:22:07 21         Ferring contends that all of the asserted claims

09:22:10 22    of the asserted patents are invalid.  Ferring must prove by

09:22:13 23    clear and convincing evidence that each asserted claim is

09:22:16 24    invalid.  Ferring contends that the asserted claims are

09:22:18 25    invalid for the following reasons.

09:22:21  1          Ferring contends that Claim 16 and 21 of the

09:22:25  2    '309 patent and Claims 2 and 9 of the '080 patent are

09:22:29  3    invalid as obvious in view of the prior art.  Ferring

09:22:33  4    contends that Claim 7 of the '914 patent and Claims 2 and 9

09:22:40  5    of the '080 patent are invalid because the specification of

09:22:44  6    the patent does not contain an adequate written description

09:22:48  7    of the claimed invention.

09:22:49  8          I will explain the legal concepts of invalidity

09:22:52  9    in a moment.  In making your determination, you must

09:22:57 10    consider each of the patent claims separately and

09:23:00 11    individually.  Even if you find one patent claim invalid,

09:23:04 12    other claims of the same patent may still be valid.

09:23:09 13          9.1, Prior Art.

09:23:11 14          Under the patent laws, a person is granted a

09:23:14 15    patent only if the invention claimed in the patent is new

09:23:20 16    and not obvious in light of what came before.  Prior art is

09:23:25 17    a legal term used to describe what others had done in the

09:23:28 18    field before the invention was made.  It is not necessary

09:23:30 19    that the prior art has been available to every member of the

09:23:33 20    public, but it must have been available without restriction

09:23:36 21    to that segment of the public most likely to avail itself of

09:23:41 22    the prior art contents.

09:23:42 23          Prior art includes any of the following items

09:23:44 24    received into evidence during trial:

09:23:46 25          1.  Any product that was in public use or on

09:23:51  1   sale in the United States before the invention was made.

09:23:54  2          2.  Any patents that issued more than one year

09:23:57  3   before the filing date of the patent or before the invention

09:24:00  4   was made.

09:24:01  5          3.  Any publications having a date more than one

09:24:05  6   year before the filing date of the patent or publicly

09:24:09  7   accessible in the United States before the invention was

09:24:12  8   made.

09:24:12  9          4.  Any product that was in public use or on

09:24:16 10   sale in the United States more than one year before the

09:24:19 11   patent was filed.

09:24:20 12          Or, 5.  Any product described in an issued

09:24:25 13   United States patent filed by another person before the

09:24:28 14   invention of the patents.

09:24:30 15          If the patent office considered a reference, it

09:24:33 16   may be more difficult for Ferring to meet its burden to

09:24:36 17   prove invalidity based on that reference.  If the patent

09:24:39 18   office did not have all material facts before it, Ferring's

09:24:42 19   burden to prove invalidity by clear and convincing evidence

09:24:46 20   may be easier to sustain.

09:24:47 21          9.2, Validity of the Independent and Dependent

09:24:52 22   Claims.

09:24:52 23          You must evaluate the invalidity of each

09:24:55 24   asserted claim separately.  Even if an independent claim is

09:24:58 25   invalid, this does not mean that the dependent claims that

09:25:02 1    depend from it are automatically invalid.  However, if you

09:25:06 2    find that a dependent claim is invalid, then you must find

09:25:09 3    that the independent claim from which it depends is also

09:25:13 4    invalid.

09:25:15 5          9.3, Person of Ordinary Skill.

09:25:19 6          The question of invalidity of a patent claim is

09:25:23 7    determined from the perspective of a person of ordinary

09:25:26 8    skill in the art, also referred to as a POSA in the field of

09:25:32 9    the claimed invention as of the effective filing date.  When

09:25:35 10   determining the level of ordinary skill in the art, you

09:25:38 11   should consider all the evidence submitted by the parties

09:25:41 12   including evidence of:

09:25:42 13         1.  The level of education and experience of

09:25:45 14   persons actively working in the field as of the time of the

09:25:49 15   invention.

09:25:49 16         2.  The types of problems encountered in the

09:25:54 17   field.

09:25:54 18         3.  Prior art solutions to those problems.

09:25:57 19         4.  Rapidity with which innovations were made in

09:26:03 20   the art at the time.

09:26:04 21         And, 5.  The sophistication of the technology.

09:26:09 22         9.4, Obviousness.

09:26:11 23         As I explained previously, under the patent laws

09:26:14 24   a person is granted a patent only if the invention claimed

09:26:18 25   in the patent is both new and not obvious in light of what

09:26:23  1    came before.  Even though an invention may not have been

09:26:26  2    identically disclosed or described before it was made by an

09:26:30  3    inventor, in order to be patentable, an invention must not

09:26:35  4    have been obvious to a person of ordinary skill in the art

09:26:37  5    at the time the invention was made.  Obviousness may be

09:26:40  6    shown by considering one or more than one item of prior art.

09:26:46  7           In this case, Ferring contends that Claims 16

09:26:52  8    and 21 of the '309 patent and Claims 2 and 9 of the '080

09:26:56  9    patent are invalid as obvious over the prior art and the

09:27:01 10    knowledge of a person of skill in the art.  Ferring must

09:27:05 11    prove by clear and convincing evidence that the asserted

09:27:08 12    claims of the patents would have been obvious to a person of

09:27:13 13    ordinary skill in the art at the time the invention was

09:27:15 14    made.  The issue is not whether the asserted claims would

09:27:19 15    have been obvious to you as a layperson, to me as the judge

09:27:21 16    or to a genius in the field of microbiology, but whether it

09:27:26 17    would have been obvious to one of ordinary skill in the art

09:27:29 18    at the time the invention was made.

09:27:31 19           In determining whether an asserted claim would

09:27:34 20    have been obvious, you must avoid using hindsight.  That is,

09:27:38 21    you should not consider what is known today or what was

09:27:40 22    learned from the teachings of the asserted patents.  You

09:27:45 23    should not use the patent as a road map for selecting and

09:27:48 24    combining items of prior art.  You must put yourself in the

09:27:53 25    place of a person of ordinary skill in the art at the time

09:27:55  1   the invention was made.

09:27:56  2           In determining whether an asserted claim would

09:28:00  3   have been obvious, you must consider:

09:28:01  4           1.  The scope and content of the prior art.

09:28:05  5           2.  The differences, if any, between the claimed

09:28:09  6   invention and the prior art.

09:28:11  7           3.  The level of ordinary skill in the art at

09:28:15  8   the time of the invention.

09:28:16  9           And, 4.  Additional considerations, if any, that

09:28:19 10   indicated that the invention was obvious or not obvious.

09:28:23 11           To determine the scope and content of the prior

09:28:27 12   art, you must determine what prior art is reasonably

09:28:30 13   pertinent to the particular problems the inventors faced.

09:28:33 14   The person of ordinary skill in the art is presumed to be

09:28:37 15   aware of all the pertinent prior art.

09:28:41 16           I have already instructed you how you are to

09:28:44 17   determine the level of ordinary skill in the art.  Once you

09:28:48 18   have made that determination, you are to apply it in your

09:28:52 19   determination of whether the asserted claims would have been

09:28:55 20   obvious.

09:28:56 21           The next factor that you must consider is the

09:28:59 22   differences between the prior art and the asserted claims.

09:29:05 23   Importantly, a claim is not proved obvious merely by

09:29:10 24   demonstrating that each of the claim requirements was

09:29:13 25   independently known in the prior art.  Most, if not all,

09:29:16  1   inventions rely on building blocks of prior art and claims

09:29:21  2   discovery almost of necessity will likely be combinations of

09:29:22  3   what is already known.

09:29:24  4          Therefore, you should consider whether a reason

09:29:27  5   existed at the time of the invention that would have

09:29:30  6   prompted a person of ordinary skill in the art to combine

09:29:33  7   the known elements in the way the asserted claims do.  The

09:29:38  8   reason could come from the prior art, the background

09:29:41  9   knowledge of one of ordinary skill in the art, the nature of

09:29:45 10   any problem or need to be addressed, market demand or common

09:29:50 11   sense.

09:29:50 12          If you find that a reason existed at the time of

09:29:53 13   the invention to combine the elements of the prior art to

09:29:56 14   arrive at the claimed invention and there would have been a

09:29:59 15   reasonable expectation of success for doing so, this

09:30:03 16   evidence would make it more likely that the claimed

09:30:06 17   invention was obvious.

09:30:08 18          9.5, Objective Evidence of Non-Obviousness.

09:30:15 19          Before deciding the issue of obviousness or

09:30:18 20   non-obviousness for Claims 16 and 21 of the '309 patent, in

09:30:23 21   Claims 2 and 9 of the '080 patent, you must also consider

09:30:29 22   certain real world factors which if established, may

09:30:32 23   indicate that the invention would not have been obvious.  No

09:30:36 24   factor alone is dispositive and you must consider the

09:30:40 25   obviousness or non-obviousness of the invention as a whole.

09:30:46 1    Certain of these factors include:

09:30:48 2         1.  Were products covered by the claim

09:30:51 3    commercially successful due to the merits of the claimed

09:30:54 4    invention rather than due to advertising, promotion,

09:30:58 5    salesmanship or features of the product, other than those

09:31:01 6    found in the claim?

09:31:03 7         2.  Was there a long-felt need for a solution to

09:31:05 8    the problem facing the inventors, which was satisfied by the

09:31:09 9    claimed invention?

09:31:12 10        3.  Did others try but fail to solve the problem

09:31:15 11   solved by the claimed invention?

09:31:19 12        4.  Did others copy the claimed invention of the

09:31:22 13   asserted claims of the '309 and '080 patents?

09:31:28 14        5.  Did the claimed invention achieve

09:31:29 15   unexpectedly superior results over the closest prior art?

09:31:34 16        6.  Did others in the field or Ferring praise

09:31:37 17   the claimed invention or express surprise at the making of

09:31:42 18   the claimed invention?

09:31:44 19        7.  Did others accept licenses under the

09:31:45 20   asserted patents because of the merits of the claimed

09:31:49 21   invention?

09:31:50 22        Answering all or some of these questions "yes"

09:31:52 23   may suggest that the claim was not obvious.  These factors

09:31:56 24   are relevant only if there is a connection or nexus between

09:31:59 25   the factor and the invention covered by the claim.  Even if

09:32:03  1    you conclude that some of the above factors have been

09:32:06  2    established, those factors should be considered along with

09:32:09  3    all the other evidence in the case in determining whether

09:32:12  4    Ferring has proven that the claimed invention would have

09:32:16  5    been obvious.

09:32:17  6            9.6, Written Description.

09:32:20  7            The patent law contains certain requirements for

09:32:25  8    the part of the patent called the specification.  Ferring

09:32:27  9    contends that Claims 2 and 9 of the '080 patent and Claim 7

09:32:32  10   of the '914 patent are invalid because the specification of

09:32:35  11   the patent does not contain an adequate written description

09:32:39  12   of the claimed invention.  Ferring must prove by clear and

09:32:43  13   convincing evidence that the claim did not satisfy the

09:32:45  14   written description requirement.  A patent must contain a

09:32:49  15   written description of the claimed invention.  The written

09:32:52  16   description requirement helps to ensure that the patent

09:32:55  17   applicant actually invented the full scope of the claimed

09:32:58  18   subject matter.  To satisfy the written description

09:33:00  19   requirement, the patent specification must describe every

09:33:05  20   limitation of a patent claim in sufficient detail, although

09:33:08  21   the exact words found in the claim need not be used.

09:33:12  22           When determining whether the specification

09:33:14  23   discloses the invention, the claim must be viewed as a whole

09:33:18  24   from the viewpoint of a person having ordinary skill in the

09:33:21  25   field of technology of the patent.  The written description

09:33:25 1    requirement is satisfied if a person having ordinary skill

09:33:28 2    in the art, reading the original patent application, would

09:33:32 3    have recognized that the specification describes the full

09:33:35 4    scope of the claimed invention as it is finally claimed in

09:33:39 5    the issued patent and that the inventor possessed the

09:33:41 6    subject matter finally claimed in the patent on or before

09:33:44 7    the effective filing date.  The specification must describe

09:33:47 8    the full scope of the claimed invention, including each

09:33:51 9    element thereof, either expressly or inherently.

09:33:55 10          A claimed element is disclosed inherently if a

09:33:58 11   person having ordinary skill in the field, as of the

09:34:01 12   effective filing date, would have understood that the

09:34:03 13   element is necessarily present in what the specification

09:34:08 14   discloses.  That a person having ordinary skill in the art

09:34:12 15   could have envisioned the claim invention does not satisfy

09:34:15 16   the written description requirement.

09:34:18 17          It is unnecessary to spell out every detail of

09:34:21 18   the invention in the specification and specific examples are

09:34:25 19   not required, only enough must be included in the

09:34:28 20   specification to convince persons of ordinary skill in the

09:34:31 21   art that the inventor possessed the full scope of the

09:34:35 22   invention.

09:34:35 23          In evaluating whether the specification has

09:34:39 24   provided an adequate written description, you may consider

09:34:41 25   factors such as:  The nature and scope of the patent claims;

09:34:45 1    the complexity, predictability and maturity of the

09:34:50 2    technology at issue; the existing knowledge in the relevant

09:34:53 3    field; and the scope and content of the prior art.

09:34:58 4          The issue of written description is decided on a

09:35:00 5    claim-by-claim basis, not as to the entire patent or groups

09:35:06 6    of claims.  If you find that Ferring has proven by clear and

09:35:09 7    convincing evidence that the '914 patent does not contain

09:35:13 8    adequate written description for Claim 7 or that the

09:35:17 9    '080 patent does not contain adequate written description

09:35:19 10   for Claims 2 or 9, then you must find that those claims are

09:35:24 11   invalid.

09:35:26 12         10, Damages.

09:35:28 13         10.1, Damages Generally, Introduction.

09:35:34 14         If you find that Ferring infringed any of the

09:35:37 15   asserted claims and that Ferring has failed to show that

09:35:40 16   those asserted claims are invalid, you must then consider

09:35:43 17   what amount of damages to award to UMN and Finch.

09:35:49 18         I will now instruct you about the measure of

09:35:54 19   damages.  If you find that Ferring has not infringed any

09:35:57 20   valid claim of the asserted patents, then UMN and Finch are

09:36:00 21   not entitled to any damages.  By instructing you on damages,

09:36:04 22   I am not suggesting which party should win this case on any

09:36:08 23   issue.  The damages you award must be adequate to compensate

09:36:12 24   UMN and Finch for any infringement you determine to have

09:36:16 25   occurred.  They are not meant to punish an infringer.

09:36:20 1          Your damages award, if you reach this issue,

09:36:23 2 should put UMN and Finch in approximately the same financial

09:36:28 3 position that they would have been in if the parties had

09:36:31 4 reached agreement for Ferring to license the asserted

09:36:33 5 patents before the infringement began.

09:36:36 6          Specifically, the patent laws provide that

09:36:39 7 damages for infringement may not be less than a reasonable

09:36:43 8 royalty.  You may not add anything to the amount of damages

09:36:46 9 to punish an accused infringer or to set an example.  You

09:36:50 10 also may not add anything to the amount of damages for

09:36:53 11 interest.

09:36:54 12          UMN and Finch have the burden to prove the

09:36:58 13 amount of their damages by a preponderance of the evidence.

09:37:01 14 While UMN and Finch are not required to prove the amount of

09:37:05 15 their damages with mathematical precision, they must prove

09:37:09 16 them with reasonable certainty.  You may not award damages

09:37:11 17 that are speculative, damages that are only possible, or

09:37:15 18 damages that are based on guesswork.

09:37:19 19          10.2, Notice Date For Damages.

09:37:23 20          If infringement is found, the date of the

09:37:26 21 hypothetical negotiation would be November 30th, 2022, the

09:37:30 22 date that REBYOTA was approved by the FDA.  If infringement

09:37:35 23 is found, damages would begin on the date that Ferring first

09:37:39 24 infringed.

09:37:41 25          10.3, Reasonable Royalty as a Measure of

Damages.

If you find that a patent claim is both infringed and not invalid, then you must consider the issue of a reasonable royalty for sales that infringed a claim of a valid patent.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in the hypothetical negotiation, taking place at a time prior to when the allegedly infringing conduct first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believe the patent was valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty either party would have preferred.

In determining the reasonable royalty, you may consider the following nonexclusive list of factors, in

09:39:06 1  addition to any other evidence presented by the parties on

09:39:08 2  the economic value of the patent:

09:39:10 3          1.  The royalty, if any, received by UMN and

09:39:16 4  Finch for the licensing of the asserted patents providing or

09:39:20 5  intending to prove an established royalty rate.

09:39:25 6          2.  The rates paid by Ferring to license other

09:39:27 7  patents comparable to the asserted patents.

09:39:30 8          3.  The nature and scope of the license as

09:39:33 9  exclusive or nonexclusive or as restricted or nonrestricted

09:39:37 10 in terms of its territory or with respect to whom the

09:39:41 11 manufactured product may be sold.

09:39:42 12         4.  UMN and Finch's established policy and

09:39:49 13 program to maintain its right to exclude others from using

09:39:53 14 the patented invention by not licensing others to use the

09:39:57 15 invention or by granting licenses under special conditions

09:39:59 16 to preserve that exclusivity.

09:40:05 17         5.  The commercial relationship between the

09:40:07 18 parties, such as whether or not they are competitors in the

09:40:09 19 same territory, in the same line of business, or whether

09:40:14 20 they are inventor and promotor.

09:40:17 21         6.  The duration of the asserted patents and the

09:40:20 22 term of the license.

09:40:21 23         7.  The established profitability of the product

09:40:24 24 made under the asserted patents, its commercial success, and

09:40:27 25 its popularity.

09:40:30 1          8.   The utility and advantages of a patented

09:40:33 2     invention over the old modes or devices, if any, that had

09:40:37 3     been used for achieving similar results.

09:40:40 4          9.   The nature of the patented invention, the

09:40:43 5     character of the commercial embodiment of it as owned and

09:40:48 6     produced by or for UMN and Finch at the time of the

09:40:52 7     hypothetical negotiation and the benefits to those who have

09:40:57 8     used the invention.

09:40:58 9          10.  The extent to which Ferring has made use of

09:41:03 10    the invention and any evidence that showed the value of that

09:41:06 11    use.

09:41:07 12         11.  The portion of the profit or of the selling

09:41:12 13    price that may be customary in a particular business or in

09:41:15 14    comparable businesses to allow for the use of the invention

09:41:18 15    or analogous inventions.

09:41:21 16         12.  The portion of the realizable profits that

09:41:24 17    should be credited to the invention as distinguished from

09:41:27 18    non-patented elements, such as the manufacturing process,

09:41:30 19    business risks, or significant features or improvements

09:41:34 20    added by Ferring.

09:41:36 21         13.  The opinion testimony of qualified experts.

09:41:40 22         14.  The amount that a licensor, such as UMN and

09:41:47 23    Finch, and a licensee, such as Ferring, would have agreed

09:41:50 24    upon at the time the infringement began if both sides had

09:41:54 25    been reasonably and voluntarily trying to reach an

| | |
|---|---|
| 09:41:57 | 1 |
| 09:42:02 | 2 |
| 09:42:06 | 3 |
| 09:42:10 | 4 |
| 09:42:12 | 5 |
| 09:42:18 | 6 |
| 09:42:20 | 7 |

1  agreement, that is, the amount which a prudent licensee who,

2  as desired as a business proposition to obtain a license to

3  manufacturer and sell a particular article embodying the

4  patented invention, would have been willing to pay as a

5  royalty and yet be able to make a reasonable profit and

6  which amount would have been acceptable by a patentee who

7  was willing to grant a license.

8       15.  Any other economic factor that a normally

9  prudent businessperson would, under similar circumstances,

10  take into consideration in negotiating the hypothetical

11  license.

12       No one factor is dispositive and you can and

13  should consider the evidence that has been presented to you

14  in this case, as well as any other factors, which would have

15  increased or decreased the royalty that Ferring would have

16  been willing to pay and UMN and Finch would have been

17  willing to accept acting as normally prudent business

18  people.

19       10.4, Reasonable Royalty, Comparable Agreements.

20       Comparable license agreements are one factor

21  that may inform your decision as to the proper amount and

22  form of the reasonable royalty award.  A license agreement

23  need not be perfectly comparable to a hypothetical license

24  that would be negotiated between the parties in order for

25  you to consider it.  However, if you choose to rely upon

09:43:20  1    evidence from any other license agreements, you must account

09:43:23  2    for economic and technological differences between those

09:43:27  3    licenses and the hypothetically negotiated license between

09:43:31  4    the parties.

09:43:34  5            10.5, Reasonable Royalty, Apportionment.

09:43:40  6            A damages award must reflect the portion of the

09:43:44  7    royalty attributable to the patented compositions or methods

09:43:47  8    in the asserted claims.  In other words, your damages award

09:43:50  9    must reflect the value you find attributable to the asserted

09:43:54 10    claims.  UMN and Finch must give evidence tending to

09:43:57 11    separate or apportion UMN and Finch's damages between the

09:44:01 12    patented features and the unpatented features and such

09:44:04 13    evidence must be reliable and tangible, not conjectural or

09:44:09 14    speculative.

09:44:11 15            You may award damages based only on royalties

09:44:14 16    that are directly attributable to the value of the patented

09:44:18 17    technology.  You may not award damages based on a royalty

09:44:21 18    attributable to the unpatented features of the accused

09:44:25 19    product.  UMN and Finch bear the burden to establish the

09:44:28 20    amounts directly attributable to the patented features.

09:44:34 21            11, Deliberations and Verdict.

09:44:37 22            11.1, Introduction.

09:44:40 23            I have completed my instructions on the law.

09:44:42 24    All the instructions I gave you previously about the rules

09:44:48 25    for deliberations still apply and you will have a copy of

09:44:51 1    them with you.  I will remind you that once you start

09:44:54 2    deliberating, do not talk to the jury officer or to me or to

09:44:58 3    anyone else, except each other, about the case.

09:45:02 4         If you have any questions or messages, you must

09:45:04 5    write them down on a piece of paper, sign them and then give

09:45:10 6    them to the jury officer.  The officer will give them to me

09:45:13 7    and I will respond as soon as I can.  I may have to talk to

09:45:18 8    the lawyers about what you have asked, so it may take me

09:45:22 9    some time to get back to you.  Any questions or messages

09:45:25 10   normally should be sent to me through your foreperson.  One

09:45:30 11   more thing about messages.  Do not ever write down or tell

09:45:34 12   anyone how you stand on your votes.

09:45:36 13        For example, do not write down or tell anyone

09:45:38 14   that you are split 4 to 4 or 6 to 2 or whatever your vote

09:45:43 15   happens to be.  That should stay secret until you are

09:45:47 16   finished.

09:45:48 17        11.2, Unanimous Verdict.  Your verdict must

09:45:53 18   represent the considered judgment of each juror.  In order

09:45:57 19   for you as a jury to return a verdict, it is necessary that

09:46:01 20   each juror agree to the verdict.  Your verdict must be

09:46:04 21   unanimous.  It is your duty as jurors to consult with one

09:46:09 22   another and to deliberate with a view towards reaching

09:46:11 23   agreement, if you can do so consistent with your individual

09:46:14 24   judgment.  Each of you must decide the case for yourself,

09:46:18 25   but do so only after an impartial consideration of the

09:46:22  1    evidence with your fellow jurors.

09:46:24  2            In the course of your deliberations, do not

09:46:27  3    hesitate to reexamine your own views and change your opinion

09:46:31  4    if convinced it is erroneous.  But do not surrender your

09:46:35  5    honest conviction as to the weight or effect of evidence

09:46:40  6    solely because of the opinion of your fellow jurors or for

09:46:45  7    the purpose of returning a verdict.

09:46:47  8            Remember at all times that you are not

09:46:50  9    partisans, you are judges of the facts, your sole interest

09:46:52 10    is to seek the truth from the evidence in the case.  A

09:46:55 11    verdict form has been prepared for you.  The verdict form

09:46:58 12    asked you a series of questions about the parties'

09:47:02 13    contentions.  You will take this form to the jury room and

09:47:05 14    when you have reached unanimous agreement as to your

09:47:10 15    verdict, you will have your foreperson fill in, date and

09:47:14 16    sign the form.  You will then return to the courtroom and

09:47:19 17    your foreperson will give your verdict.  Unless you are

09:47:22 18    directed otherwise in the verdict form, you must answer all

09:47:25 19    of the questions posed and you must all agree on each

09:47:29 20    answer.

09:47:29 21            Before I continue, may I please see counsel at

09:47:33 22    sidebar briefly.

09:47:38 23            (Sidebar discussion.)

09:48:10 24            THE COURT:  So there were just a couple of

09:48:12 25    things I wanted to raise.  The first was to find out from

09:48:15  1    the parties if there were any objections in the manner in

09:48:17  2    which I read the juror instructions?

09:48:20  3                    MS. DURIE:  No.

09:48:20  4                    MR. DE VRIES:  No, Your Honor.

09:48:21  5                    THE COURT:  The second was, as I was reading 7.3

09:48:24  6    out loud, I noticed that it talked about 7.3, the parties

09:48:30  7    edited it to take out instruction and just referred to

09:48:33  8    method because, of course, the only claim that is being

09:48:36  9    alleged to be infringed by DOE is a method, but it left in

09:48:40  10   the language about selling a method.  That's not right in

09:48:43  11   the law, but thinking about it, I don't think it could

09:48:46  12   possibly affect anything in this case, because we tell the

09:48:50  13   jury that they're only looking at indirect infringement for

09:48:53  14   the method claims.  Does everybody agree on that?

09:48:56  15                   MS. DURIE:  Yes.

09:48:56  16                   MR. DE VRIES:  Yes, Your Honor.

09:48:57  17                   THE COURT:  Okay.  Great.  The second thing I

09:48:59  18   wanted to ask you about is that we have been going for about

09:49:03  19   an hour and it would be preferable, I think, to everybody,

09:49:06  20   if we were able to roll through all the closing arguments

09:49:09  21   without a break in between.  And so one possibility is to

09:49:12  22   give the jury their morning break right now.

09:49:17  23                   MR. DE VRIES:  That's no problem.

09:49:18  24                   THE COURT:  UMN and Finch, do you have a sense

09:49:20  25   of how long yours is going to be?

09:49:22  1                    MR. DE VRIES:  Yes, about an hour.  We'd like to

09:49:24  2    reserve 15 minutes for rebuttal, so one hour --

09:49:27  3                    THE COURT:  And 15.

09:49:28  4                    MR. DE VRIES:  Yes.

09:49:30  5                    THE COURT:  Do you want to resolve --

09:49:32  6                    MS. DURIE:  No, it's fine.

          7                    THE COURT:  How long do you anticipate for

          8    closing?

09:49:34  9                    MS. DURIE:  It's probably about 90 minutes.

09:49:35 10    Maybe a little longer.

09:49:35 11                    THE COURT:  Yeah, so I think it could be a

09:49:39 12    little longer.

09:49:40 13                    I want to get the case to them so they could

09:49:43 14    deliberate over lunch.  I don't want them to have lunch

09:49:47 15    between the closings either.

09:49:48 16                    All right.  In light of that, I think we should

09:49:56 17    do closings for UMN and Finch now, take the break and

09:50:02 18    then --

09:50:03 19                    MR. DE VRIES:  Yes, Your Honor, that's no

09:50:04 20    problem.

09:50:06 21                    THE COURT:  Okay, great.

09:50:20 22                    (Sidebar discussion concluded.)

09:50:20 23                    THE COURT:  We'll now hear closing arguments.

09:50:23 24                    MR. DE VRIES:  And would the Court like a copy

09:50:26 25    of my closing presentation?

09:50:26  1            THE COURT:  No.

09:50:28  2            MR. DE VRIES:  Okay.  Thank you.  I will just

09:50:30  3    get started.

09:50:35  4            Good morning, ladies and gentlemen of the jury.

09:50:38  5    I want to start where I started at the beginning of the week

09:50:42  6    and that is to thank you all for your service on this jury.

09:50:46  7    We know that this is a sacrifice for you all to have to take

09:50:51  8    so much time out of your lives and on the behalf of the

09:50:55  9    University of Minnesota and Finch and the whole team of

09:50:58 10    lawyers that I'm just one member of, I'd like to say thank

09:51:02 11    you.

09:51:02 12            We're almost to the time where the case is going

09:51:05 13    to be with you for deliberations and the outcome of this

09:51:10 14    case will be, is and always has been your decision.

09:51:15 15            I'd like to take some time to explain to you

09:51:18 16    what we think the evidence that was presented to you in this

09:51:22 17    trial showed and why we are confident that we have proven

09:51:27 18    our case that Ferring Pharmaceuticals, the defendant in this

09:51:31 19    case, has infringed the patents, that patent infringement

09:51:37 20    was willful, the patents are valid and damages are owed.

09:51:43 21            And I'd like to start back with where I began my

09:51:47 22    opening presentation and that is with what brings us here

09:51:52 23    today.

09:51:53 24            Again, in November of 2022, the FDA announced

09:51:57 25    the approval of REBYOTA.  And a couple of months later, it

09:52:05  1   was launched to the market.  And as I explained to you at

09:52:08  2   opening, there was one thing that the FDA didn't know and

09:52:12  3   that that was that REBYOTA was based on the University of

09:52:19  4   Minnesota and our client's patented inventions.

09:52:24  5          And at the trial, you were able to meet some of

09:52:28  6   the founders of Rebiotix and hear their testimony and one of

09:52:33  7   the founders explained when asked:

09:52:37  8          "Did the University have any intellectual

09:52:39  9   property that concerned you?"

09:52:41 10          "No."

09:52:42 11          "Why were you not concerned?"  And the testimony

09:52:44 12   was, "We didn't use any of it."

09:52:49 13          And I think the evidence very clearly showed

09:52:54 14   that that is not true.

09:52:55 15          Now, I'm showing you an exhibit.  It is PTX-266

09:53:01 16   and PTX-265.  The reason I'm saying those numbers is, you'll

09:53:08 17   have all of these exhibits back in the jury deliberation

09:53:11 18   room and if you'd like to look at any of them, you can.

09:53:16 19   This exhibit explains, as I've showed here, that RBX was

09:53:23 20   derived from the Hamilton procedure.  That's what Rebiotix

09:53:27 21   said in its technical proposal in 2015 before this

09:53:34 22   litigation was started.

09:53:35 23          And I would submit to you that it is very

09:53:38 24   important to look to see what the parties were saying before

09:53:41 25   the lawsuit as very important evidence of what happened.

09:53:46  1    And the Hamilton paper that's referred to, as you can see,

09:53:51  2    is Hamilton 2012.  Hamilton 2012 was the seminal paper that

09:54:02  3    was authored by Dr. Khoruts and Dr. Sadowsky, the University

09:54:07  4    inventors who you heard testify in this case and has been

09:54:12  5    explained, I think, by multiple witnesses, including

09:54:15  6    Dr. Benson.  This paper contains Example 4 from the '914

09:54:24  7    patent.  So the paper that they admit that REBYOTA was

09:54:28  8    derived from contains Example 4 from the patent.

09:54:35  9         And it's not surprising that in a 2015 technical

09:54:40  10   document, Rebiotix admitted something that's different than

09:54:47  11   they're telling you now, and that's because the evidence

09:54:50  12   that you've seen and I'm going to quickly summarize it, is

09:54:54  13   very clear, that the people that were making and founding

09:55:00  14   Rebiotix were looking at information about the University's

09:55:06  15   invention, passing it amongst themselves and studying it for

09:55:12  16   years.  So it's no surprise that in their technical

09:55:16  17   proposal, they admitted that REBYOTA is derived from

09:55:22  18   Hamilton, the University's patented invention.  And you can

09:55:26  19   see that here in PTX-47.

09:55:30  20        These are the founders of Rebiotix.  You'll

09:55:34  21   remember Mike Berman, you saw him on the stand testify.  You

09:55:39  22   may recall, he was their first witness, we called him out of

09:55:43  23   order so he could get to another engagement, but he, along

09:55:46  24   with Lee Jones and someone named Erwin Kelen, were talking

09:55:52  25   in 2012, in this e-mail months and months after Rebiotix was

09:55:57  1    founded and they're talking about Hamilton 2012, the same

09:56:03  2    paper I'm talking about.

09:56:05  3            And it says, "See attached complete paper from

09:56:07  4    the U, very helpful to us."  And when I asked Ms. Jones who

09:56:12  5    "us" means, you'll recall, she said, "us" means Rebiotix.

09:56:17  6            Taking information from the University and

09:56:21  7    sharing it amongst the people who founded Rebiotix had

09:56:25  8    actually started much earlier than what I just showed you

09:56:28  9    and I wanted to highlight that.

09:56:29 10            So again, Mr. Berman, who you saw testify as

09:56:34 11    their first witness, he is married to somebody named Judith

09:56:39 12    Berman, Dr. Berman, and as you heard at the time, she was a

09:56:44 13    professor at the University of Minnesota along with

09:56:46 14    Dr. Khoruts and Dr. Sadowsky.  And Mr. Berman, as he

09:56:51 15    testified, was getting interested in this kind of a thing

09:56:57 16    and Dr. Berman sent Mike Berman some information in 2010.

09:57:02 17    So this is two years before the e-mail I just showed you.

09:57:07 18            And Dr. Berman tells Mike Berman about

09:57:12 19    Dr. Khoruts and Dr. Sadowsky and refers him to a link to an

09:57:18 20    abstract for a paper and that paper was written by

09:57:23 21    Dr. Khoruts about the technology that's at issue in this

09:57:27 22    case.  And that flow of information from the University to

09:57:32 23    Mike Berman about the technology at issue in this case, it

09:57:37 24    continued.  And so here is an example where Dr. Berman is

09:57:41 25    sending Mike Berman, in 2012, right after that e-mail where

09:57:47 1    Mike is looking at the 2012 Hamilton paper, some information

09:57:52 2    about a presentation that Dr. Khoruts was going to be

09:57:57 3    giving.

09:57:57 4                And you also saw that the other -- another one

09:58:03 5    of the Rebiotix cofounders, Lee Jones, was also circulating

09:58:08 6    within Rebiotix information about the University's patented

09:58:14 7    invention at issue in this case.  So this is in September of

09:58:19 8    2011, several months after Rebiotix started.  And Ms. Jones

09:58:24 9    is sending to Barbara Nelson, who is both a consultant and

09:58:28 10   the chief technology and commercialization officer for

09:58:32 11   Rebiotix at the time, a presentation.  This presentation is

09:58:39 12   about intellectual property, including the patent that's at

09:58:43 13   issue in this case, the Dr. Khoruts and Sadowsky

09:58:46 14   presentation and patent.

09:58:49 15               And you may recall that Ms. Jones admitted that

09:58:52 16   she sent this to Dr. Nelson, not surprisingly because it

09:58:58 17   might be useful to her.  And then I asked, "Are you denying

09:59:02 18   to the jury that you were sending these University materials

09:59:06 19   to Dr. Nelson in connection with the work she was doing

09:59:09 20   related to C. diff for MicrobEX," which was the original

09:59:14 21   name for Rebiotix, and Ms. Jones said, "No, I'm not denying

09:59:19 22   that."  And that's a pretty critical moment, I think, in

09:59:24 23   this trial, I would respectfully submit.

09:59:28 24               And you'll recall that the way that Ms. Jones

09:59:31 25   obtained some of this information was because she was

09:59:34  1    working as a CEO-in-Residence at the Venture Center and she

09:59:39  2    explained and agreed that she was there to assist the

09:59:42  3    University.  That was the role that she had in working with

09:59:47  4    the Venture Center.

09:59:50  5              Fast-forward to about, a little under a year

09:59:55  6    after Ms. Jones left the Venture Center.  She's working with

09:59:59  7    Mr. Berman and others at Rebiotix.  As you can see in

10:00:01  8    February of 2012, Ms. Jones is forwarding something to

10:00:07  9    Ms. Guthertz.  Ms. Guthertz was a consultant for Rebiotix at

10:00:13 10    the time, and she's sending what she calls an earlier

10:00:16 11    incarnation of one of the papers.  And what she's forwarding

10:00:19 12    is an e-mail from almost a year earlier from May of 2011

10:00:25 13    from Dr. Khoruts that she had received while at the Venture

10:00:28 14    Center with a manuscript from Drs. Khoruts and Sadowsky on

10:00:35 15    fecal microbiota transplantation.

10:00:37 16              There was additional information that was

10:00:39 17    provided to the Rebiotix founders as well.  You'll recall

10:00:42 18    that Ms. Jones received the UMN patent application and also

10:00:49 19    the invention disclosure document in April of 2011 while she

10:00:54 20    was a CEO-in-Residence.  And it's marked confidential only

10:00:58 21    because it had not yet been published at the time.  So when

10:01:03 22    that document was received, it had this confidential mark on

10:01:07 23    it, but eventually, it became public.

10:01:10 24              What we've learned in this litigation and I

10:01:15 25    think you saw at the trial was this same patent application,

10:01:19  1    the one that led to Dr. Khoruts' patent was still in

10:01:24  2    Ferring's computers in 2022.  I asked whether this number

10:01:30  3    indicates that this document, the same document, was

10:01:34  4    produced out of Ferring's files in this litigation.  And

10:01:36  5    there's a page at the end that I showed Ms. Jones that's

10:01:40  6    called a metadata slip sheet.  It provides some information

10:01:44  7    about the electronic record of the document.  And what it

10:01:49  8    shows is that it was on a file path at the bottom that says,

10:01:53  9    "Lee Jones, U drive documents, Lee Jones documents, newco

10:02:00  10   ideas."  And that was on Ferring's computers.

10:02:03  11           And the evidence showed that that wasn't the

10:02:07  12   only UMN document that was on Ferring's computer still in

10:02:12  13   2022.  It also included Dr. Khoruts' and Sadowsky's

10:02:17  14   invention disclosure and that same patent presentation that

10:02:20  15   we had seen Dr. Nelson receive almost 10 years earlier.

10:02:25  16           And as you can see from PTX-423, which is

10:02:28  17   another one of the documents that we found on Ferring's

10:02:31  18   computers, newco ideas, that folder where these had been

10:02:37  19   stored at Ferring had a subfolder called MicrobEX, and as

10:02:42  20   Ms. Jones explained, MicrobEX is one of the names that had

10:02:47  21   been used for Rebiotix early in what occurred.

10:02:52  22           This is another really critical document because

10:02:57  23   here in PTX-170, you can see -- Mike Berman, again, their

10:03:05  24   first witness, Rebiotix's founder, acknowledging that the

10:03:08  25   founders of Rebiotix not only knew about the patent, the

10:03:13  1    University patent, they were actively studying it.

10:03:18  2              So Dr. Berman, professor at the University, she

10:03:21  3    asked Mike Berman, "Do they," referring to Dr. Khoruts,

10:03:25  4    "have a patent application in?"  They're already thinking

10:03:31  5    about -- that they had patent problems.  This is in 2012.

10:03:34  6              And Mike Berman says, "I have not seen it.  Lee

10:03:37  7    has" -- that's Lee Jones, of course -- "and thought it was

10:03:42  8    very sciencey."  And so they're acknowledging in an e-mail

10:03:47  9    that they're actually looking at, studying and talking about

10:03:51 10    Mike Berman and Lee Jones, the patent application that led

10:03:54 11    to the patent that's in this lawsuit.

10:03:57 12              And I think there's really no question that

10:04:02 13    Rebiotix, that ultimately was acquired by Ferring, had its

10:04:07 14    inspiration from the University of Minnesota.  I asked

10:04:10 15    Ms. Jones, "Is it true that Rebiotix got its original

10:04:13 16    inspiration from the University of Minnesota?"  The answer

10:04:16 17    was yes.  And the documents confirmed this.  So this was a

10:04:21 18    business plan about -- named Symbiome at the time.  You'll

10:04:26 19    remember the name of Rebiotix sort of kept changing.

10:04:30 20              Ms. Jones agreed that she's referred to Symbiome

10:04:32 21    as a predecessor to Rebiotix.  And the document explains

10:04:36 22    that the company's founder was inspired by the works of

10:04:42 23    Drs. Khoruts and Sadowsky and acknowledges that they created

10:04:44 24    a simple solution to a terrible problem.

10:04:49 25              And there's no question that having known about

10:04:53  1    these patents and the issue and the information that they

10:04:58  2    were seeing about the University's technology, that Ferring

10:05:02  3    knew it had a problem.

10:05:05  4         So this is 2020.  This is a few years before

10:05:10  5    REBYOTA was even launched.  This document is PTX-298, and

10:05:17  6    one of the people working within Ferring says, "One

10:05:21  7    additional point that Lee reminded me of is that use of the

10:05:25  8    terminology highlighted below in yellow is important to

10:05:28  9    avoid potential patent infringement issues."  And so in

10:05:34 10    2020, Ms. Jones is telling -- talking with people in Ferring

10:05:40 11    about potential patent infringement issues.

10:05:44 12         And there's no question that the founders of

10:05:50 13    Rebiotix, Mike Berman, as you can see at the top, and then

10:05:54 14    Lee Jones, they knew not only about Drs. Khoruts' and

10:06:01 15    Sadowsky's patent, they knew about all of the patents that

10:06:04 16    were going to be owned and licensed by my other client,

10:06:12 17    Finch.  This is from 2014.  This is PTX-208.

10:06:15 18         And they're talking about CIPAC, which you'll

10:06:18 19    remember was the name of the company that eventually became

10:06:22 20    Finch and that CIPAC had some IP and it related to Dr. Tom

10:06:31 21    Borody, who Lee Jones calls the pioneer of FMT.  And in

10:06:38 22    2014, they talked about picking it up, picking up the IP

10:06:43 23    that's at issue in this case, this intellectual property it

10:06:47 24    refers to and includes in the patents.  And then this is a

10:06:51 25    really important document, because although they, I think in

10:06:56  1    this case, have claimed that they didn't really think there

10:06:59  2    was a problem and maybe it wasn't an issue, when Ferring

10:07:04  3    bought Rebiotix in 2018 from the shareholders, the parties

10:07:11  4    included this provision in it that specifically talks about

10:07:16  5    the patents in this case, and it says that the sellers of

10:07:22  6    Rebiotix have to be obligated to split paying for the

10:07:26  7    patents in this case because Ferring was so worried about

10:07:29  8    them that it wasn't going to buy Rebiotix and face the risk

10:07:34  9    of this lawsuit on its own.

10:07:36 10            Now, two things:  One is that as you heard from

10:07:43 11    Ms. Jones, the original sellers of Rebiotix, they actually

10:07:46 12    reached an agreement with Ferring, so they're no longer on

10:07:49 13    the hook here.  They're sort of out of the picture at this

10:07:53 14    point.  But what I think this leaves no doubt about is that

10:07:56 15    Ferring was worried.  They knew there was a problem.

10:08:03 16            So what did they do?  They bought the company

10:08:06 17    anyway, they paid $175 million for Rebiotix, and then

10:08:14 18    despite hearing all of these warnings and knowing everything

10:08:19 19    they knew, in January of last year, they went ahead and

10:08:22 20    started selling REBYOTA.

10:08:26 21            Why did they do it?  The reason that so many

10:08:31 22    people do things that aren't great.  Money.  And a lot of

10:08:37 23    it.  This is the sales forecast from August of 2022, where

10:08:43 24    they anticipated revenue by 2031 of $2.1 billion and peak

10:08:51 25    revenues of $300 million, and this comes out of a sales

10:08:55  1   forecast that the evidence showed they have never amended to

10:08:59  2   this day.  And I'm going to come back to that.

10:09:02  3            Now, what about our clients, the University of

10:09:06  4   Minnesota and Finch?  I think you've seen a lot of this.  So

10:09:10  5   I can move through it, I think, relatively quickly.

10:09:14  6   Everyone agrees that C. diff is a huge problem when it

10:09:17  7   becomes recurrent, leads to death, leads to problems.

10:09:22  8   There's no question about that.  And there's really no

10:09:25  9   question that Dr. Khoruts, who was profiled in the *New York*

10:09:28 10   *Times* as this technology was emerging is the key innovator,

10:09:33 11   along with Dr. Sadowsky, for the technology to address this.

10:09:37 12            You heard them describe it in detail.  They came

10:09:40 13   up with an invention that could be used to transplant

10:09:45 14   healthy gut microbiomes in a way that was ready to use and

10:09:50 15   could be provided to many, many different patients to

10:09:55 16   restore their gut microbiome.  And they were awarded a

10:10:00 17   patent for that work, as you know.  That's why we're here.

10:10:04 18            And more than that, their work has led to super

10:10:09 19   significant benefits to humanity.  This has been

10:10:14 20   Dr. Khoruts' life work, and it's really important.  He has

10:10:18 21   personally treated a thousand people, but he's personally

10:10:22 22   worked on over a hundred thousand treatments for people.

10:10:24 23   And you saw those statistics about how many people can die

10:10:28 24   here.  And so this isn't just about money, although money is

10:10:34 25   always important when you're talking about investment and

10:10:37 1    research.  It's about saving lives.

10:10:41 2            The University of Minnesota, I want to be really

10:10:44 3    clear.  We, they are a party to this litigation.  The

10:10:48 4    University of Minnesota is here because of the values that

10:10:52 5    the University, a public University has that they want to

10:10:55 6    protect.  Their values are research, education, service to

10:11:02 7    community and humanity, and the University licenses its

10:11:07 8    patents for societal impact and also for royalties because

10:11:11 9    it takes those royalties -- it's not a profit company -- and

10:11:14 10   it puts them back into research to create more of the kind

10:11:18 11   of research that Dr. Khoruts has created.

10:11:22 12           That brings us to Finch.  Finch Therapeutics.

10:11:25 13   Finch Therapeutics did the right thing.  It wanted to

10:11:29 14   develop a product based on the University's technology.  And

10:11:33 15   it took a license from the University to do that.  And it

10:11:37 16   continues to hold that license today.  Why do I say it did

10:11:41 17   the right thing, because that's in huge contrast to Ferring

10:11:48 18   which did not get a license, did not ask for a license, did

10:11:51 19   not pay for a license even though -- you saw the evidence --

10:11:53 20   they knew full well that this was a major problem and they

10:11:57 21   went forward anyway.

10:11:59 22           As Dr. Khoruts explained, the University and

10:12:02 23   Finch, they have a partnership.  That's how they view it.

10:12:06 24   And it's a partnership that started in 2012 at the infancy

10:12:11 25   of much of the work that was going to be done.  And Finch

10:12:16 1    invested a tremendous amount of time, years, hundreds of

10:12:23 2    scientists, tens of millions of dollars, the number that

10:12:28 3    Mr. Burgess explained was $92.9 million they invested in

10:12:33 4    bringing the CP101 drug, the C. difficile drug to market.

10:12:39 5            What about Ferring?  I was pretty startled by

10:12:42 6    this.  Yesterday, their final witness was a damages expert

10:12:45 7    talking about how much money they should have to pay if you

10:12:48 8    find that they're liable for infringement.  And what he

10:12:52 9    said, you might ask -- he was asked on his direct -- this

10:12:55 10   was not a cross-examination question -- how much did Ferring

10:12:59 11   invest in developing REBYOTA?  I was not able to get a

10:13:03 12   precise answer.  I wasn't able to get a complete number.

10:13:06 13           Of course, Ferring has the information about how

10:13:09 14   much they spent developing this drug.  Ferring

10:13:14 15   Pharmaceuticals company has many drugs.  And I think a fair

10:13:18 16   inference is it's obviously, for all the reasons that we're

10:13:24 17   here, less than the $92 million that Finch spent which

10:13:28 18   doesn't even account for what the University has invested.

10:13:31 19           And Finch also brought to the table those

10:13:34 20   Dr. Borody patents that we talked about.  This is the same

10:13:38 21   e-mail that I referred to earlier, so I won't belabor it,

10:13:41 22   but they understood that those patents were really

10:13:45 23   important.  Lee Jones refers to Tom Borody as the pioneer of

10:13:50 24   FMT, and she's referring very specifically to intellectual

10:13:54 25   property because it's important.

10:13:56  1    And the impact of the infringement on the

10:14:00  2    University and on Finch is real, and it's significant.

10:14:06  3    Dr. Khoruts explained the harm that Ferring's infringement

10:14:10  4    has had on the University.  And Kevin Anderson did too.  He

10:14:18  5    explained that they've lost out on the consideration for

10:14:22  6    what they would get from this litigation, and the

10:14:26  7    acknowledgment for their inventions that he explained is

10:14:29  8    very helpful to the University's licensing.

10:14:33  9    And then what about Finch?  Finch spent, as

10:14:36  10   you've heard, $92 million.  It was on the last trial before

10:14:41  11   FDA approval when it ran out of money.  Now, we are not

10:14:45  12   saying that Ferring's infringement is the only reason that

10:14:50  13   Finch ran out of money.  There's a number of different

10:14:53  14   factors that you have heard about.  COVID was happening,

10:14:55  15   markets were in a particular place, but there is no question

10:14:58  16   that Ferring's launch of an infringing drug right before

10:15:03  17   Finch was hoping to get approval was a very detrimental

10:15:09  18   factor and ultimately, Finch had to shut down its drug

10:15:13  19   development program.

10:15:15  20   I think it's important to remember what their

10:15:19  21   witnesses said about what they did and didn't do to deal

10:15:22  22   with these issues.  One is that Mike Berman, Lee Jones, they

10:15:28  23   both explained that there were no changes made to REBYOTA to

10:15:33  24   avoid infringing or in response to these patents.  They

10:15:38  25   didn't make any changes.  And they didn't make any payments.

10:15:42  1    They didn't offer to pay anything.  That's what Kevin

10:15:46  2    Anderson said.  That's what Mike Berman said.  "I'm not

10:15:49  3    aware of Finch paying anything."

10:15:52  4            And, of course, as I thought yesterday, their

10:15:56  5    damages expert, Ferring's damages expert put it, he was

10:16:00  6    asked, "Rebiotix didn't end up taking a license?"  And he

10:16:03  7    said, "That's why we're sitting here."  And that is exactly

10:16:07  8    right.  That is why we're sitting here.  So at the beginning

10:16:11  9    of my opening statement, I said that we've heard a

10:16:14 10    hodgepodge of shifting excuses, and I wasn't entirely sure

10:16:19 11    which ones we were going to hear at trial so I want to walk

10:16:23 12    you through those.

10:16:24 13            Sorry, let me back up.

10:16:27 14            I'm going to start with "treat" and then I'm

10:16:31 15    going to come back to approximately .5.  So treat, for this

10:16:36 16    whole case, going into this trial, their argument was that

10:16:39 17    they didn't infringe the '309 patent because they said that

10:16:43 18    REBYOTA didn't treat recurrence of C. diff.  They said it

10:16:48 19    prevented recurrence of C. diff.  You'll remember me saying

10:16:53 20    that.  And we put on testimony at trial -- or I'm sorry -- a

10:16:57 21    transcript, which is in evidence, from their global clinical

10:17:01 22    operations head that used the word "treat."  And then even

10:17:07 23    their technical expert, Dr. Johnson, was asked:

10:17:10 24            "And that's the point of REBYOTA, is to treat

10:17:12 25            C. diff, right?

10:17:13  1              "ANSWER:  That's correct."

10:17:15  2              And so that -- what I characterize as a word

10:17:20  3    game, and I stand by that characterization, that defense

10:17:24  4    seems to have gone and is no longer here.

10:17:28  5              You'll remember I also explained that I

10:17:30  6    predicted that we'd hear an awful lot about somebody named

10:17:34  7    Hlavka.  Never came, never provided any testimony, but we

10:17:40  8    got to hear some information about Mr. Hlavka from the other

10:17:44  9    witnesses.

10:17:45  10             So, Mike Berman, who you heard a lot from, he

10:17:49  11   explained the following, and I think this is really

10:17:51  12   important:  On January 18th of 2010, Ed Hlavka had received,

10:18:00  13   as you can see here, an article that was written by

10:18:06  14   Drs. Khoruts and Sadowsky and he says it's some of the first

10:18:10  15   objective evidence for the mode of action for fecal

10:18:12  16   transplant and he filed his first patent application two

10:18:19  17   weeks later.  Two weeks after he's talking to Drs. Khoruts

10:18:24  18   and Sadowsky about their work, he files a patent

10:18:28  19   application.

10:18:29  20             And as Mr. Berman admitted on cross-examination,

10:18:35  21   Hlavka had not performed any fecal transfers, he had not --

10:18:40  22   Mr. Berman wasn't aware of any lab research, of any clinical

10:18:45  23   ideas.  He couldn't recall any ideas that Mr. Hlavka had

10:18:48  24   come up with and he couldn't think of any actual work that

10:18:53  25   Mr. Hlavka did to develop a process for treating stool for

10:18:56 1    purposes of FMT.

10:19:01 2              And when you get down to brass tacks with

10:19:04 3    patents, as Her Honor has instructed, you have to look at

10:19:08 4    the claims.  The actual claims of the patents that are in

10:19:12 5    the case.  And you may recall that I asked their expert, who

10:19:15 6    has said, well, I think the patent office got it wrong and I

10:19:18 7    think all of these claims are obvious, the Dr. Borody

10:19:22 8    patents.  He was never talking about Dr. Khoruts' patents.

10:19:25 9              And I showed him, well, look, the claims say

10:19:31 10   antioxidant and its protection from exposure to air.  And he

10:19:34 11   had to admit on cross-examination, Hlavka did not disclose

10:19:37 12   an antioxidant.  Full stop, end of story.

10:19:40 13             There's one more claim, I'm not forgetting about

10:19:43 14   it.  It's the one that talks about polyethylene glycol.  You

10:19:46 15   probably remember that, it's a poison.  And he had to admit

10:19:51 16   that what he was pointing to in this Hlavka patent

10:19:54 17   application, filed two weeks after Hlavka got Dr. Khoruts'

10:19:59 18   article, doesn't say polyethylene glycol.  And I'll come

10:20:04 19   back to that, too.

10:20:06 20             So then we've got their last excuse that I had

10:20:10 21   predicted that they would come forward with, that's the

10:20:14 22   0.5 millimeter approximately.  I'm going to address this in

10:20:17 23   some detail, but this is a document that came into evidence

10:20:21 24   at trial; and it's PTX-298, this is the potential patent

10:20:27 25   infringement one.  Look at the sequence.

10:20:30  1          The beginning says the pore size is

10:20:35  2    0.5 millimeters, the same in the claim.  Then it refers to

10:20:40  3    approximately 0.5 millimeters and that's the language where

10:20:46  4    he says that Lee reminded him it's important to use because

10:20:51  5    of potential patent infringement issues.  And Courtney

10:20:55  6    Jones, who came to testify, she explained this very clearly

10:20:59  7    on the stand, that -- when asked what the pore size of the

10:21:02  8    filter bags is for REBYOTA, she says we documented it,

10:21:09  9    0.5 millimeters.

10:21:10 10          Now, there was a new argument that I'm somewhat

10:21:14 11    surprised that they made, but as I said, you know, couldn't

10:21:16 12    tell for sure what -- what would be argued, and that is that

10:21:20 13    they say for Dr. Khoruts' patent, that he didn't -- and he

10:21:23 14    and Dr. Sadowsky didn't put enough description of their work

10:21:27 15    in the patent.  And the implication from their opening

10:21:30 16    was -- and perhaps, I don't know if they'll say it now or

10:21:34 17    not, but that they didn't actually do the work.  They didn't

10:21:37 18    actually do the work.  They also said that there was a

10:21:40 19    problem with a figure, that it was sort of blurry and it

10:21:43 20    should have been in color.

10:21:47 21          Drs. Khoruts and Sadowsky did the work.  It

10:21:49 22    was -- they were asked -- originally, it was suggested they

10:21:52 23    had a single patient, right?  But, no.  If you look at the

10:21:55 24    patent, which you'll have, just look at it, there's an

10:21:58 25    Example 4, it refers to 43 consecutive patients and a

10:22:05 1    table -- tables of data from that, that work was done, no

10:22:09 2    one is making anything up, and the suggestion is, frankly,

10:22:11 3    offensive.

10:22:12 4          There are some other things that they've said

10:22:16 5    that are clearly not excuses for their infringement, but

10:22:20 6    I -- they've come up so often, I feel like I need to address

10:22:23 7    them.

10:22:24 8          One is OpenBiome.  They talked about OpenBiome a

10:22:27 9    lot.  There's even some questioning about whether OpenBiome

10:22:31 10   some years ago and it -- how it was approaching its

10:22:34 11   regulatory work.

10:22:35 12         OpenBiome is not a party to this case and that's

10:22:39 13   going to be a pretty important theme, I think, as you can

10:22:42 14   see some of these other excuses that they've made at trial.

10:22:46 15   It's a nonprofit company.  James Burgess explained that.  He

10:22:50 16   was one of the cofounders, he left and he joined Finch and

10:22:54 17   Finch is not associated with OpenBiome at this point.  And

10:22:57 18   Lee Jones explained that, too.  They're out there in a

10:23:00 19   nonprofit way trying to get this technology out into the

10:23:03 20   world and nothing about OpenBiome is at issue in this case.

10:23:06 21   You will not be asked any questions about that.

10:23:08 22         There's also been a repeated implication that

10:23:12 23   Finch is somehow at fault for Ferring Pharmaceutical's

10:23:19 24   infringement, that Finch could have done better, that they

10:23:22 25   were -- they wanted to -- they were dreaming big and they

10:23:26  1    tried to do a lot, and they wanted to -- you know, they had

10:23:29  2    flashy partnerships is how Ferring put it in the opening

10:23:34  3    statement and they were working on Crohn's disease and they

10:23:36  4    were working on autism things, and that they dreamed too big

10:23:40  5    and it didn't work out.

10:23:42  6            Well, a couple of things.  One is Finch invested

10:23:45  7    a tremendous amount of time.  It's an inaccurate picture to

10:23:49  8    try to paint Finch as a failure.  Finch spent a tremendous

10:23:53  9    amount of money.  But as Dr. Khoruts, I think, put it really

10:23:56 10    clearly, they were just one trial short when this all went

10:24:03 11    down.  But more importantly, none of this is an excuse for

10:24:09 12    patent infringement, this does not mean you get to use the

10:24:12 13    University and Finch's patents for free.  It doesn't work

10:24:15 14    that way.

10:24:16 15            Along the same lines of sort of excuses that

10:24:21 16    aren't really excuses, Ferring has tried to blame the

10:24:25 17    University or suggest that maybe nothing wrong happened

10:24:29 18    because Ferring -- I'm sorry -- the University didn't do

10:24:31 19    something earlier.

10:24:32 20            So you saw a lot of testimony that said -- that

10:24:37 21    referred to this concept, that the people at the University

10:24:41 22    were nice to the people at Rebiotix, congratulated them,

10:24:45 23    were happy for them.  That's the normal thing to do.  And

10:24:48 24    then there was a suggestion, this is what was said in

10:24:51 25    opening, this is not what you say to the burglar who broke

10:24:55  1    into your house.

10:24:56  2           A couple things about that that I think are

10:24:59  3    really important.  One is when did the evidence that you had

10:25:03  4    the chance to see in this case come to light publicly?  It

10:25:09  5    was on Monday.  The reason is that the files that we got

10:25:13  6    from Ferring that were provided in this litigation, which

10:25:16  7    was filed in December of 2021, so after that, and they're

10:25:22  8    kept confidential until the trial, until everybody can see.

10:25:27  9           But more importantly, I think, this isn't a case

10:25:33 10    about burglary or theft.  In opening, that's how Ferring

10:25:37 11    characterized what I had said.  I actually never said any of

10:25:40 12    those words at all because it's not a case about that.  It's

10:25:43 13    a case about patents and whether Ferring Pharmaceutical

10:25:47 14    infringed patents.

10:25:48 15           Ms. Jones, when I asked her about that, she

10:25:51 16    agreed that's what this case is about and she agreed, you

10:25:55 17    can copy a patent even if it's public.  This isn't about

10:26:01 18    confidential versus not confidential.  This is a patent

10:26:04 19    case.

10:26:04 20           There was another one that I think maybe even

10:26:07 21    kind of went one level -- kind of one rung down in relevancy

10:26:12 22    and that was that the University is somehow out to

10:26:16 23    assassinate the character of Lee Jones.  That is absolutely

10:26:23 24    false.  And I'll submit to you that's an effort at

10:26:27 25    misdirection.  It's an effort to take the focus off who the

10:26:31 1    defendant in this case is, Ferring Pharmaceuticals; and

10:26:34 2    Ms. Jones explained that.  She's not a party to this

10:26:39 3    litigation, Ferring is the party.  They're the ones accused

10:26:44 4    of patent infringement.  She's not liable for that patent

10:26:47 5    infringement, whether it's willful or not.  This is a case

10:26:51 6    about Ferring.  And let's, you know, be real, if I can put

10:26:55 7    it that way.  Ms. Jones sounded the alarms to Ferring.  She

10:27:00 8    wasn't even there when they launched REBYOTA.  Okay.  And in

10:27:04 9    2020, she's talking about patent infringement issues.  And

10:27:08 10   you know what Ferring did, they just went ahead anyway.  She

10:27:13 11   was gone, everybody who was one of the founders was gone,

10:27:17 12   and they started selling.

10:27:19 13        And this brings me to their final excuse.  And

10:27:23 14   that is that I think they've tried to suggest that, well,

10:27:27 15   they haven't made a lot of money and I guess the implication

10:27:30 16   is, well, even if we took it and even if we shouldn't have,

10:27:34 17   you shouldn't really make us pay a lot.  And they've never

10:27:37 18   said that the product is a failure, but I -- I believe that

10:27:40 19   that was the very strong implication.  And it's absolutely

10:27:47 20   not true.

10:27:49 21        There were -- this product launched last year,

10:27:52 22   okay.  The very first sales were in 2023 and I'm showing you

10:27:57 23   the analysis that our damages expert showed of the real data

10:28:03 24   of what they were selling.  And was the launch a little bit

10:28:07 25   below their initial estimates?  Sure it was.  But to the

10:28:11  1    extent that they're suggesting that something is wildly off

10:28:14  2    track, I wanted to show you with data that that was

10:28:17  3    absolutely not correct.

10:28:20  4          Take their actual sales between 2023 and 2024,

10:28:24  5    they increased 64%, if you just take the sales that we have

10:28:29  6    from this year for seven months and assume that they'll be

10:28:33  7    average for this year.  And you'll recall that

10:28:37  8    Mr. Malackowski explained that, he explained that the sales

10:28:41  9    have been increasing by about 50% or so, a little more.

10:28:46 10          If you apply that same level of increase, look

10:28:49 11    at how quickly you get up to the numbers that are shown

10:28:52 12    here.  By 2027, 53 million.  2028, 82 million.  And so on.

10:29:01 13    And of course, this drug isn't a failure, that is exactly

10:29:04 14    why we're here.

10:29:06 15          And, you know, finally, before I want to take

10:29:09 16    you through the jury verdict form and share some comments

10:29:13 17    that I hope will be helpful in your deliberations.  It

10:29:17 18    wasn't just the excuses that they've leveled.  It's actually

10:29:20 19    kind of one step more and you heard Dr. Khoruts explain

10:29:24 20    this.  In the months leading up to this trial, instead of

10:29:28 21    offering to pay for the patents or seeking permission to try

10:29:31 22    to get together, instead they threatened a public University

10:29:37 23    for patent infringement.  That claim is not in this case.

10:29:40 24    It's not in any case.  But look at -- look at that, he

10:29:46 25    described it as bullying, threatening.  He had a clinical

10:29:50  1    program.  They were basically sending jitters through the

10:29:54  2    institution.  That's what happened instead of paying for the

10:29:58  3    patents.

10:29:59  4         So now I'd like to walk you through the jury

10:30:03  5    verdict that you're going to see.  You're going to be asked

10:30:06  6    questions, infringement, willful infringement, validity and

10:30:10  7    damages.  And I've talked about much of this, but I hope

10:30:13  8    that I can put this in a framework that will be helpful to

10:30:16  9    you.

10:30:17 10         There are three patents in this case, the

10:30:19 11    University patent on the left and the two Finch patents from

10:30:22 12    Dr. Borody on the right.  As I predicted, there was no

10:30:26 13    dispute that they infringed the '080 patent.  They brought

10:30:31 14    no expert to come and explain that they don't infringe it

10:30:35 15    and we did the opposite.  And after we put on Dr. Stollman,

10:30:41 16    Dr. Benson, Dr. Park, they only challenged one of the parts

10:30:49 17    of the claim from the UMN patent and that's that

10:30:53 18    .5 millimeter sieve, capable of passing through.

10:30:58 19         Now, throughout this trial, you've heard a lot

10:31:01 20    about things that don't matter when it comes to

10:31:04 21    infringement.  This was the opening slide and there was a

10:31:07 22    suggestion in the slide that Rebiotix or REBYOTA doesn't use

10:31:14 23    a blender, doesn't use four sieves, it doesn't do everything

10:31:18 24    in the same way as this one protocol that was provided, one

10:31:24 25    of the early examples from the University.

10:31:27 1          But that's not the analysis and Her Honor just

10:31:31 2   instructed against that very type of argument.  She said the

10:31:35 3   relevant comparison for infringement is between Ferring's

10:31:37 4   product and the claims, not any product of UMN or Finch.

10:31:43 5   And so what they've, I think, most heavily relied on is a

10:31:48 6   legally improper argument and their expert, Dr. Johnson,

10:31:52 7   admitted it.

10:31:54 8          Do the claims require centrifuge?  No.

10:31:58 9          Do the claims require metal sieves, multiple

10:32:03 10  sieves?  No.

10:32:04 11         Do the claims require a blender or a Waring

10:32:08 12  blender?  No.

10:32:09 13         How about a Stomacher?  No.

10:32:14 14         And so all of that comparison is completely

10:32:18 15  irrelevant to what you're being asked to decide, which is

10:32:22 16  whether they infringe the claims in the case.

10:32:24 17         And so that brings us to the only issue, which

10:32:29 18  is:  Is the REBYOTA extract capable of passing through a

10:32:35 19  0.5 millimeter sieve?  And, again, this is probably one of

10:32:38 20  the examples where you have to most look at what did they

10:32:41 21  say before the litigation was filed because what does the

10:32:47 22  manufacturer say?  It says 0.5 millimeters.  It doesn't say

10:32:50 23  approximately, it says 0.5.

10:32:54 24         Dr. Johnson agreed it was important to be

10:32:56 25  precise.  And of course, Rebiotix, when it's talking about

10:33:02  1    this to the FDA, do they use some of the wiggle language
10:33:06  2    that they use here?  No.  You don't get to get away with
10:33:10  3    that in the FDA.  They say 500 micron pore size.  It's down
10:33:14  4    at the micron level.  That's .5 millimeter.  They don't say
10:33:18  5    499 microns or gee, sometimes it's different.  500 microns,
10:33:23  6    .5 millimeters.  That's what they told the FDA and everyone
10:33:28  7    knows that that is a critical importance.
10:33:34  8            They tried to suggest, that well, maybe those
10:33:37  9    pores get stretched out a little bit.  Maybe that happens.
10:33:41 10    It doesn't.  How do you know?  Well, my colleague showed
10:33:48 11    Dr. Johnson what it looks like.  And I think passed it
10:33:51 12    around to you all too when those pores get stretched out.
10:33:55 13    And you know what happens?  They stay stretched out, they
10:33:59 14    don't go back, which I think is sort of what had been
10:34:02 15    suggested.  And how do you know -- I'm sorry for the graphic
10:34:06 16    nature of this, but this is the test that our expert,
10:34:10 17    Dr. Benson did where he replicated the REBYOTA process and
10:34:15 18    you can see after that, the actual process that's used, the
10:34:22 19    pore sizes are the same, there's no change.  And so the
10:34:24 20    suggestion that well, maybe they stretched out, is not
10:34:30 21    right.
10:34:30 22            So what did they do?  They brought an expert to
10:34:33 23    this trial that they hired to do a test.  And he showed
10:34:39 24    you -- and I want to be really clear about this, he did a
10:34:43 25    test right here.  It got put away before we were even

10:34:46 1    allowed to ask him about it.  And he used prunes, okay.  He

10:34:50 2    admitted this but I want to be really clear.  That is not

10:34:54 3    REBYOTA.  And what he showed you is nothing at all like what

10:34:57 4    his test looked like when he did REBYOTA.

10:35:01 5            And why do you think he used prunes?  I mean, I

10:35:04 6    guess we'll leave it to you to decide but just that is not

10:35:08 7    REBYOTA and whatever he showed you is not what's going on in

10:35:11 8    this case.  What he -- what he did, though, look at the

10:35:18 9    test, he used these, like, metal .5 millimeter sieves.

10:35:23 10   Pretty small and you heard that the surface area on those

10:35:26 11   things imposes some pressure on the particles and then he

10:35:30 12   didn't use a Stomacher bag or Stomacher and a bag that they

10:35:34 13   actually do in REBYOTA, he sort of put it in that thing and

10:35:37 14   I think he said he sort of moved it around gently.

10:35:42 15           But this is critical, the claims says capable of

10:35:45 16   passing through a 0.5 millimeter sieve.  Here, REBYOTA

10:35:50 17   obviously, because it's passed through these .5 millimeter

10:35:55 18   pores.  What Dr. Johnson said is, he understands what this

10:35:59 19   claims means, that you could have minimal particles that are

10:36:01 20   left on the surface, okay, that's what he said.  That's not

10:36:04 21   our expert, that's what Dr. Johnson said.  Our expert

10:36:07 22   agreed, you could have minimal particles.

10:36:12 23           Even with the metal sieves and the not using the

10:36:14 24   Stomacher and sort of swirling it around gently, what did he

10:36:18 25   show?  Well, he said that there was some amount of REBYOTA

10:36:22  1    that was left on the sieve in his test, okay.  He's already

10:36:29  2    explained that this claim allows for having a minimal amount

10:36:33  3    of particles on the sieve.  So we're done.  But I just

10:36:37  4    wanted to highlight this because it came up and to me, it

10:36:41  5    was very important.  There are tens of millions of particles

10:36:47  6    in the REBYOTA bag and what he's showing there on the right,

10:36:52  7    that he said, oh, well, that was sort of left on top of the

10:36:56  8    little metal sieve I used, is absolutely minimal in

10:36:59  9    comparison to the tens of millions of particles in the bag.

10:37:02 10    So even under his experiment, we're done.  There's

10:37:05 11    infringement.

10:37:07 12          And... but even that picture I just showed you

10:37:09 13    is actually unfair against us, because it doesn't show what

10:37:14 14    really happened next.  And that is, he washed those

10:37:18 15    particles that were there and I think he tried to suggest on

10:37:23 16    the stand that maybe he didn't wash all of them, but my

10:37:27 17    colleague had to point out that when he described in his

10:37:30 18    report, he said, any particles were then recovered, "any,"

10:37:36 19    that's what he said before the trial.  And you can see,

10:37:39 20    there are virtually none of them.  You know, minimal at

10:37:45 21    best.

10:37:47 22          And I think this, though, is also equally

10:37:52 23    important.  And that is that Dr. Johnson is not here to say

10:37:57 24    that because you saw some minimal number of particles that

10:38:01 25    were left on the sieve in his experiment that didn't even

10:38:04  1    replicate what REBYOTA does, that that matters.  In fact, he

10:38:07  2    definitively does not have that opinion.  He says, "I can't

10:38:13  3    say anything about the efficacy of that product after the

10:38:18  4    particles are removed."  So he showed, "Oh, look, here's a

10:38:21  5    few minimal particles that are left and I can't even tell

10:38:24  6    you if it matters."

10:38:26  7            Now, why, in his experiment may there have been

10:38:29  8    some particles left on the sieve when it made it through the

10:38:32  9    .5 millimeter pores to begin with, right?

10:38:36 10            Why is that?

10:38:39 11            My colleague walked him through it but it's

10:38:43 12    because when you take a look at the particles that he

10:38:45 13    actually was pulling off and then looking at under a

10:38:48 14    microscope, that they have different shapes.  I think

10:38:51 15    everybody agrees about that.  And when you do it the way

10:38:54 16    that he did, they can clump together, they can get in a

10:38:59 17    place that they're not at when they're in a solution, right,

10:39:02 18    when the particles are separated and in water, which is how

10:39:06 19    it's actually done in REBYOTA.

10:39:08 20            And so when you've got certain sizes and some of

10:39:10 21    them clump together, then there are circumstances where a

10:39:16 22    couple of these particles, all of which are capable of going

10:39:20 23    through a .5 millimeters sieve might not go through on a

10:39:24 24    particular time.  And at first, I think before he understood

10:39:31 25    where this was going, Dr. Johnson admitted that.  I don't

10:39:36  1    think he kind of fully appreciated where this was going to

10:39:40  2    land, and so he said, my colleague asked, "This particle is

10:39:43  3    capable of passing through this sieve, right?"  He showed

10:39:47  4    right here, he put it down and up.  And Dr. Johnson said,

          5    "Yes."

10:39:51  6              And then, though, it was sort of the end of the

10:39:53  7    demonstration, he said, "You'd agree that every single one

10:39:57  8    of these particles is capable of passing through the sieve?"

10:39:59  9    And then he changed his testimony and he said, "No."

10:40:02 10              As I keep saying, sieving is a single pass, and

10:40:05 11    he's sort of suggesting something pretty simple and wrong,

10:40:11 12    and that is that for something to be capable of passing

10:40:14 13    through a sieve, it has to do it every single time on every

10:40:19 14    pass.  That is the opposite of what the language capable of

10:40:23 15    means and is obviously wrong.

10:40:26 16              And so for these reasons, the UMN patent is

10:40:29 17    clearly infringed and we think, as I'll show you in a

10:40:33 18    moment, that the evidence supports you checking "yes" for

10:40:38 19    infringement, literally.

10:40:39 20              But there's something more that you heard about

10:40:42 21    and I want to touch on it briefly.  That's the doctrine of

10:40:46 22    equivalents.  And so the law says, even if someone -- even

10:40:50 23    if something is not exactly the same as in the claims, but

10:40:55 24    the differences are insubstantial or -- and I'm

10:41:02 25    paraphrasing, you've been read, the whole amount would have

10:41:06  1    substantially the same function, work in substantially the

10:41:10  2    same way and achieve substantially the same result, then

10:41:14  3    there's infringement anyway.

10:41:17  4            And I think, as I've already shown, it's crystal

10:41:21  5    clear from Dr. Johnson's testimony where he admitted, he

10:41:24  6    doesn't know if this impacts the efficacy of the product,

10:41:28  7    does it matter that there's some minimal particles out here?

10:41:33  8    And so the super small number of particles and the very

10:41:36  9    small size of those particles, there's no substantial

10:41:39 10    difference.  And you've heard extensive explanation about

10:41:43 11    that from our expert, Dr. Benson, who explained why that is.

10:41:48 12            And Dr. Johnson, you may remember in his direct

10:41:51 13    testimony, he didn't say anything about this issue, he

10:41:55 14    didn't mention the doctrine of equivalents or those legal

10:41:58 15    tests that I talked about, not even once.  And so on the

10:42:01 16    very last question of the very last part of his redirect so

10:42:06 17    they get to come up again, he was asked, "Do you consider

10:42:09 18    the strainer bag to be equivalent?"  And he said "No," with

10:42:13 19    no explanation.

10:42:14 20            But what he missed was any explanation that any

10:42:18 21    distinction, we don't think there is one, that between what

10:42:21 22    they do and what's in the claim matters and he's

10:42:24 23    affirmatively said it does not.

10:42:27 24            And then finally on this point, you know, I said

10:42:31 25    this at the beginning and I think it feels even more true by

10:42:34  1    the end of the week.  This is another word game.  It's a .5

10:42:43  2    millimeter pore that they use.  Putting in the word

10:42:46  3    "approximately" is very obviously an attempt to avoid paying

10:42:49  4    the University for its patents.  And it's not right under

10:42:53  5    the law for all of the reasons I explained and we would

10:42:56  6    respectfully submit -- you will be the judges, you will

10:42:59  7    decide what you think the evidence shows but we submit that

10:43:02  8    the evidence is very clear.

10:43:04  9            The only other non-infringement argument that

10:43:07 10    they offered didn't apply to the '080 patent, the first of

10:43:13 11    the Finch patents, it did apply to the second of the Finch

10:43:16 12    patents so that's the '309.  After Dr. Stollman, Benson and

10:43:22 13    Park testified, they didn't challenge any of the limitations

10:43:25 14    in any of the claims except for the one in yellow, which is

10:43:28 15    whether the bacteria are separated from rough particulate

10:43:32 16    matter.

10:43:32 17            Again, you've seen this before, but this is that

10:43:36 18    somewhat unpleasant or very unpleasant picture.  It's clear

10:43:43 19    that the bacteria that are in the REBYOTA mixture are

10:43:46 20    separated from rough particulate matter.  How do you know?

10:43:50 21            Well, that's exactly what Dr. Benson's

10:43:55 22    experiment shows, that it's separated from the rough

10:43:58 23    particulate matter and Dr. Johnson agreed that what was

10:44:02 24    separated was rough particulate matter.  And the reality is

10:44:09 25    that you have to look at what the Court said about what that

10:44:13  1    term means.  And what Her Honor explained, is that this

10:44:18  2    claim term, when it refers to rough particulate matter,

10:44:21  3    refers to rough macroscopic nonliving matter.  That's what

10:44:27  4    you see on the left inside the bag that REBYOTA uses.  There

10:44:32  5    is no rough macroscopic nonliving matter on the right.

10:44:37  6              And how do you know?  Well, he had to use a

10:44:42  7    magnifier to even look to see what he was talking about

10:44:47  8    here, a magnification of 40 times.  And so I think there's

10:44:51  9    no real question that in REBYOTA that liquid that goes

10:44:54 10    through the strainer bag and ends up in the enema bag, has

10:44:58 11    been separated from rough particulate matter.  So for that

10:45:02 12    reason, we believe -- and again, this is your choice, that

10:45:07 13    you'll be asked in Question 1, did we prove by a

10:45:11 14    preponderance of the evidence that all of these claims, the

10:45:16 15    University claim is first, the '914, then the '309 patent

10:45:20 16    and then the '080 patent.  The '080 is the one where they

10:45:25 17    have no non-infringement arguments.  And we would

10:45:28 18    respectfully submit that we believe the evidence supports

10:45:31 19    checking "yes" for all of those.

10:45:34 20              There's a Question 2 and the instructions will

10:45:37 21    tell you, you don't have to answer this question if you've

10:45:42 22    already checked "yes" to infringement for the UMN patent on

10:45:46 23    the earlier question.  But if you don't, then you'll be

10:45:52 24    asked whether alternatively, we approved that that claim of

10:45:57 25    the University patent is infringed under the doctrine of

10:46:01  1    equivalents.  And I think for all the reasons that I

10:46:04  2    mentioned, if you're at that question, the answer is clearly

10:46:07  3    "yes."

10:46:11  4            The next question -- it will be Question 3, will

10:46:14  5    be, did they willfully infringe, did Ferring

10:46:16  6    Pharmaceuticals, not someone else, did Ferring

10:46:19  7    Pharmaceuticals willfully infringe?  You were given some

10:46:22  8    instructions from the Court about what that means and you

10:46:25  9    should remember and look at all of them.  One of the things

10:46:28 10    they referred to is deliberate or reckless disregard of

10:46:32 11    UMN's patent rights and I've talked a lot about this, so

10:46:35 12    I'll be brief.

10:46:36 13            Clearly, they have.  They've admitted that they

10:46:40 14    knew about the patents as of their issuance.  They knew

10:46:44 15    about the applications before.  They reviewed the patents,

10:46:48 16    including the ones that list Dr. Khoruts, you saw the

10:46:52 17    e-mails where they are talking about the patent application.

10:46:56 18            Mr. Berman admitted that Rebiotix was aware of

10:47:00 19    the Finch and University of Minnesota patents while it was

10:47:03 20    developing its products.  And then as I said before,

10:47:07 21    Ms. Jones would sound the alarm within Ferring, before she

10:47:11 22    left, that there were patent infringement issues.  Ferring

10:47:15 23    knew, that's why they put this provision in the merger

10:47:19 24    agreement as part of the deal.

10:47:22 25            And so for all of those reasons, we submit to

10:47:26  1   you that the evidence is very clear, that the infringement

10:47:29  2   here was willful.  And if you agree with us, then on a

10:47:37  3   per-patent basis, you don't have claims on this one, we

10:47:40  4   would suggest that the appropriate answer is to check "yes"

10:47:43  5   for all three patents.

10:47:47  6          Okay.  Almost done.  They have raised something

10:47:50  7   called validity defenses.  They say the patent office

10:47:54  8   screwed up and that all of the patents in this case are

10:47:56  9   invalid.  And you heard this from Your Honor but I'd like to

10:48:02 10   pause for a moment to emphasize this.  They bear a different

10:48:06 11   burden of proof than we do in our case to prove this

10:48:10 12   defense.  It's called clear and convincing evidence as --

10:48:14 13   and as Her Honor explained, that means that Ferring

10:48:19 14   Pharmaceuticals in this defense has a higher degree of

10:48:22 15   persuasion that is necessary to meet the preponderance of

10:48:26 16   the evidence standard that applies to our claims.  So they

10:48:32 17   have two arguments, they're different by patent and I want

10:48:35 18   to go through them.

10:48:38 19          The first is they argue obviousness.  And I'm

10:48:43 20   going to paraphrase.  You've heard all of this, but you have

10:48:48 21   been cautioned that when you're thinking about whether a

10:48:51 22   patent that was invented 10 years ago is obvious or not,

10:48:56 23   it's really important -- well, what it specifically says is

10:49:00 24   you must avoid using hindsight.  That is, you should not

10:49:03 25   consider what is known today or what was learned from the

10:49:07 1    teachings of the asserted patents.  You have to put yourself

10:49:10 2    back in time to decide if these patents are obvious.

10:49:15 3            And as I previewed at the beginning of this

10:49:19 4    case, this argument does not apply to the University

10:49:23 5    patents.  They concede that the University patents were new,

10:49:28 6    that they were not obvious, and they are not going to ask

10:49:31 7    you to decide otherwise.  And I'm not surprised.

10:49:34 8            They are going to ask you to decide -- you heard

10:49:38 9    me questioning Wednesday afternoon, I was questioning

10:49:43 10   Dr. Britton, and he said in a pretty truncated way that he

10:49:45 11   looked at the patents and Hlavka and he thought that it was

10:49:49 12   probably -- and he thought it was obvious and said it was

10:49:52 13   invalid, said he thought it was obvious.  Now, as I asked

10:49:57 14   him and he agreed, the same Hlavka that they're saying

10:50:03 15   renders them obvious, the Patent Office considered that

10:50:07 16   reference.  They showed you parts where they're talking --

10:50:10 17   where the Patent Office is talking about Hlavka, and they

10:50:15 18   issued the patent anyway.  And the opinion is that the

10:50:19 19   Patent Office got it wrong for four different claims across

10:50:24 20   two different patents that issued three years apart.

10:50:27 21           And we would submit that that's just not

10:50:30 22   plausible.  But more than that, you have to look at the

10:50:34 23   claims again.  And the claims that are at issue in this case

10:50:37 24   require antioxidants.  Dr. Britton admitted that they

10:50:41 25   didn't -- that Hlavka didn't have an antioxidant or disclose

10:50:49 1    one.  And I asked him if he had any other prior art

10:50:53 2    reference that talked about it that he showed you all, and

10:50:55 3    he said no.  He didn't show any of those either.  So he

10:50:59 4    showed you no prior art references that talk about

10:51:01 5    antioxidants.  He just asked you to take it on faith that he

10:51:03 6    thinks it would have been obvious to just put in an

10:51:06 7    antioxidant even though he showed you no document that

10:51:08 8    actually said that.

10:51:11 9            And the same is true for exposed to air.  He

10:51:13 10   actually didn't even try to explain how it was that that

10:51:16 11   part was shown by Hlavka, and he talked instead about a

10:51:20 12   sealed container, so he didn't even try there.

10:51:23 13           Now, what about PEG?  That's the last one of the

10:51:32 14   claims that requires polyethylene glycol.  And a couple of

10:51:36 15   things, when Hlavka talks about that word "glycol," that is

10:51:41 16   not the same as polyethylene glycol.  There are hundreds of

10:51:46 17   glycols, and polyethylene glycol is a very specific one and

10:51:49 18   it is not disclosed in Hlavka.  And the experts agree about

10:51:54 19   that.  It's also a poison, so the idea of putting a poison

10:52:00 20   into something that could be used with the human body is

10:52:06 21   something that would only be undertaken in the most careful

10:52:09 22   of circumstances.

10:52:10 23           And then this is so critical, and you've got to

10:52:13 24   think about this when they're arguing that the claims are

10:52:17 25   obvious.  Years later, Rebiotix in PTX-979, told the Patent

10:52:24  1    Office that polyethylene glycol would not be obvious to

10:52:29  2    combine as a substance that functions as a laxative to a

10:52:36  3    microbiota restoration therapy composition.  They made

10:52:39  4    literally the opposite argument that they're making here.

10:52:44  5         You also have to, as you've heard, consider real

10:52:47  6    world factors.  There was evidence of copying, and,

10:52:52  7    importantly, what they were copying was the University

10:52:56  8    patent, not Hlavka.  And, of course, there was evidence of

10:53:02  9    licensing, that there was licensing that Finch entered into

10:53:05 10    for these same patents and why would someone pay for a

10:53:08 11    patent if it was obvious.  And so we would respectfully

10:53:13 12    submit on question 4 that the answer to all four questions

10:53:16 13    is no.

10:53:19 14         That brings us to the written description

10:53:21 15    argument, the suggestion that Dr. Khoruts and Sadowsky

10:53:25 16    didn't actually invent what they say that they invented.

10:53:29 17    I've shown you before that what Ferring said in opening

10:53:32 18    statement is it's just one patent, and there's a figure that

10:53:36 19    nobody can read.  But it wasn't just one patent -- or

10:53:41 20    patient.  As Dr. Khoruts explained, there were 43 patients.

10:53:45 21    They actually performed this treatment on them, they

10:53:48 22    actually collected data and they actually put the data into

10:53:53 23    the patent.

10:53:53 24         And so then they say, "Well, the patent has this

10:53:56 25    figure, and you can't read it."  They're only talking about

10:53:59  1    one of multiple figures and tables of data in the patent.

10:54:03  2    You'll see the instructions said you don't even need

10:54:06  3    examples in the patent.  But we include -- you know, the

10:54:07  4    patentee included them anyway.  Dr. Khoruts could read it

10:54:11  5    especially when you look at the text that accompanies the

10:54:14  6    patent.  And Dr. Sadowsky explained that they had determined

10:54:19  7    that these changes in the microbiota were occurring and that

10:54:25  8    they were seeing that in their patients.

10:54:30  9            So they had an expert, Dr. Treangen.  He came up

10:54:35 10    and he said that he couldn't read the figure very well.  And

10:54:40 11    one of his complaints was it was black and white, but we

10:54:45 12    pointed out in the Patent Office, you use black and white

10:54:48 13    and it's not typical to use color in a patent.

10:54:52 14            Dr. Treangen, as we showed also, he uses the

10:54:55 15    very same kind of figures, and as you can see from just

10:54:59 16    looking, his figures are no more readable or not readable

10:55:04 17    than the figure in the patent, so it's obviously a double

10:55:07 18    standard.  But more importantly, because what is this

10:55:10 19    defense really about?  It's an accusation that Dr. Khoruts

10:55:14 20    and Dr. Sadowsky didn't invent what they claimed to have

10:55:18 21    invented, and that is false.

10:55:23 22            And even Dr. Treangen, who they had hired as a

10:55:26 23    consultant in this case, he couldn't say otherwise.  He

10:55:29 24    said, "I did not claim anyone did not do the work."  And for

10:55:32 25    the kinds of figures he was complaining about, he admitted,

10:55:36  1    "They're standard.  We present them all the time."  And when

10:55:40  2    shown the exact figure that they're complaining about in the

10:55:44  3    patent, he said, "They're -- to create a figure like that,

10:55:47  4    they are based on underlying tables of data and numbers."

10:55:51  5    Okay.  No one thinks that Dr. Khoruts and Sadowsky have

10:55:57  6    pulled a -- have faked this.  It is simply not true, and

10:56:01  7    even their expert doesn't say otherwise.

10:56:06  8            The verdict form is going to also ask you about

10:56:09  9    the '080 patent.  I didn't hear any of their experts talk

10:56:13 10    about the '080 patent and written description at all.  And

10:56:17 11    the '080 patent contains tons and tons of disclosures about

10:56:22 12    stabilizing agents and lots of different things, and they

10:56:26 13    have not presented any evidence, let alone clear and

10:56:28 14    convincing evidence, that the '080 patent is invalid.  And

10:56:32 15    so we would suggest that for question 5, the answer to the

10:56:39 16    questions is no, that they have not proven by clear and

10:56:43 17    convincing evidence invalidity based on written description.

10:56:47 18            Last question, damages.  So the experts are

10:56:53 19    looking at some license agreements.  One of them was between

10:56:57 20    UMN and Finch that started 10 years ago before Finch

10:57:01 21    invested $92 million and ten years of efforts and the

10:57:05 22    University said, "We're here to stand behind Finch."  Their

10:57:10 23    expert says that that agreement is a lot more relevant than

10:57:15 24    the Nestlé agreement.  We think that's wrong for a number of

10:57:18 25    reasons.

10:57:19  1          One, the agreement between Finch and the

10:57:21  2  University is clearly -- they're partnering together to go

10:57:24  3  invest a lot of money to develop a product.  And the

10:57:27  4  hypothetical negotiation here is, as you've heard, after

10:57:30  5  they've already received approval and they're two months

10:57:33  6  away from selling a product.  They've already made the

10:57:36  7  investment.  So there's a completely different type of

10:57:39  8  license.

10:57:39  9          And that Nestlé license was at almost exactly

10:57:43 10  the same time period as that hypothetical negotiation.  For

10:57:48 11  a recurrent C. difficile product, it is the closest in time,

10:57:53 12  and it is the closest to the way that this kind of

10:57:56 13  negotiation would go -- where Finch, on the verge of getting

10:58:00 14  to sell its own product, is licensing its patent rights to a

10:58:04 15  primary competitor.  Both of these licenses include upfront

10:58:09 16  payments and, interestingly, even the one that they're

10:58:14 17  relying on.  Yet, they still don't include an upfront

10:58:17 18  payment.

10:58:18 19          And the evidence is really clear that in this

10:58:21 20  technology space, upfront payments are included all the

10:58:24 21  time.  75% in one of the reports that Mr. Kidder talked

10:58:28 22  about did.  You saw this slide.  The hypothetical

10:58:33 23  negotiation here is actually around group 3, right before

10:58:38 24  precommercialization.  And you look at the maximum in this

10:58:43 25  study was 650 million and the median was 12 million.  And so

10:58:50  1    upfront payments are here.  They have not given you another

10:58:54  2    number, a different number.  They didn't provide one.

10:58:56  3            Mr. Malackowski did.  He took the 175 million.

10:59:00  4    He made a number of deductions to account for a number of

10:59:04  5    things that he explained, and that's how he got to 50

10:59:07  6    million.

10:59:08  7            What about the percentage royalty?

10:59:12  8    Mr. Malackowski said 30%.  He started with the Nestlé

10:59:18  9    agreement that had a 50% royalty.  You probably remember

10:59:22 10    because it was just yesterday.  Their expert said, "Well,

10:59:25 11    that's not a royalty rate."  That is 100% false.  If you

10:59:29 12    look at the license, which is PTX-366 -- you can go look at

10:59:33 13    it yourself -- what it says is that it is a royalty of 50%.

10:59:38 14    I've shown it right there.  And that's where they're at to

10:59:42 15    try to avoid this evidence.

10:59:45 16            And when they do their reasonable check, they

10:59:48 17    omit this, they don't put it on as a result of that

10:59:52 18    argument.  They show a bunch of other agreements instead,

10:59:56 19    but each of those agreements is totally different.  There

11:00:00 20    was nonprofit.  There was a partnership.  In one case, it

11:00:01 21    had $350 million of milestones that they're just ignoring.

11:00:04 22    So that's wrong.

11:00:05 23            And so you will be asked to determine if you've

11:00:12 24    answered the questions before in a way that would lead you

11:00:14 25    to this question, what damages should be.  We respectfully

11:00:18  1    submit that the running royalty should be 4.43 million.

11:00:21  2    That's 30% of their sales and an upfront payment of $50

11:00:27  3    million.

11:00:27  4              Thank you.  I'll have a chance to come back and

11:00:30  5    very briefly talk to you at the end.  Thank you.

11:00:33  6              THE COURT:  Thank you very much.  Ladies and

11:00:35  7    gentlemen, we'll take our morning break right now.  We'll be

11:00:38  8    back at 11:15.

11:01:12  9              (Jury exits.)

11:01:12 10              MS. DURIE:  Your Honor, there is one issue I

11:01:14 11    would like to raise with the Court with respect to the

11:01:17 12    closing argument.  We just heard an argument with respect to

11:01:21 13    the obviousness of the Borody patents, that there was

11:01:23 14    evidence of secondary considerations of copying that was

11:01:26 15    pertinent to the obviousness of those patents.  That is, I

11:01:30 16    think, contrary to the Court's instructions, which

11:01:36 17    provide -- and this is in Instruction 9.5 as read to the

11:01:39 18    jury -- that the factors include whether others copied the

11:01:43 19    claimed invention of the asserted claims of the '309 and

11:01:47 20    '080 patents, not whether there has been copying of an

11:01:51 21    entirely different patent.

11:01:54 22              And so we would request a curative instruction

11:01:56 23    on that point because there is no evidence of copying in the

11:02:02 24    record with respect to the '309 and '080 patents, and the

11:02:07 25    suggestion that the jury could rely on evidence of copying

11:02:10 1    with respect to the University of Minnesota patent is

11:02:14 2    legally erroneous.

11:02:16 3             THE COURT:  All right.  Why don't you meet and

11:02:17 4    confer about that.  We'll take our break, and we'll hear

11:02:20 5    from the parties.

11:02:23 6             MS. DURIE:  All right.  Thank you.

11:02:25 7             COURT CLERK:  All rise.

11:15:50 8             (A brief recess was taken.)

11:20:20 9             COURT CLERK:  All rise.

11:20:26 10            THE COURT:  All right.  Please be seated.

11:20:30 11            MS. DURIE:  Thank you, Your Honor.  We did meet

11:20:33 12   and confer.  The plaintiffs' view is that they were

11:20:38 13   arguing -- and I will let them speak on this if they want

11:20:42 14   to -- but that they were endeavoring to argue with respect

11:20:47 15   to the evidence of Borody copying and that the reference to

11:20:51 16   the Hamilton paper was to make the argument that we were not

11:20:54 17   copying Hlavka.  I'm not sure that I follow that.  I did not

11:21:00 18   write down precisely that was said, but I will say that the

11:21:06 19   folks on my side of the table saw what was put up with

11:21:10 20   respect to an e-mail that purports to be about copying the

11:21:14 21   Hamilton paper and heard it presented that way.

11:21:17 22            Our request -- and we discussed this -- was for

11:21:20 23   an instruction that simply would say, "Evidence of any

11:21:23 24   copying of the University of Minnesota patent is not

11:21:27 25   relevant to the obviousness of the Borody patents."  The

11:21:31 1    request from Finch's position is that I can argue it with

11:21:35 2    reference to the jury instruction.  Obviously, I can.  I do

11:21:38 3    think their argument was inconsistent with the jury

11:21:40 4    instruction.

11:21:41 5           I do think the curative instruction would be

11:21:44 6    appropriate.  I am fine with proceeding with my closing at

11:21:48 7    this point and taking the issue up at the end.  And I'm

11:21:53 8    happy to sort of see how that goes.  But I do have a concern

11:21:57 9    that what was presented is not consistent with the law.

11:22:01 10           THE COURT:  All right.  Let's proceed with how

11:22:03 11   you propose.  We have some access to what was said.

11:22:12 12           MS. DURIE:  I thought that that -- that we --

11:22:16 13           THE COURT:  And so I don't think it came across

11:22:18 14   the way that you might be worried, but I understand the

11:22:20 15   concern and we'll review that and we'll reserve and decide

11:22:24 16   after your closing.

11:22:25 17           MS. DURIE:  That's perfect.

11:22:29 18           MR. DE VRIES:  I would just like to note I

11:22:31 19   disagree with the characterization.  I'm happy to describe

11:22:35 20   that whenever Your Honor would like.

11:22:39 21           THE COURT:  All right.  Thank you.

11:22:40 22           Are we ready?

11:22:42 23           MS. DURIE:  Yes.

11:22:44 24           (Jury enters.)

11:23:29 25           THE COURT:  Welcome back.  Please be seated.

11:23:32 1    And now, we'll hear closings from Ferring.

11:23:35 2                    MS. DURIE:  Thank you, Your Honor.

11:23:37 3                    And, ladies and gentlemen, good morning.

11:23:39 4                    So as we just heard, this is a patent case and

11:23:44 5    so I want to start by talking about patents because in a

11:23:51 6    patent case, one of the things that's really important is

11:23:55 7    who was first.  And this is an unusual patent case in some

11:24:01 8    ways because I think the evidence on that point is not in

11:24:05 9    dispute and the evidence on that point is that with respect

11:24:10 10   to the invention at issue in this case, which is to say,

11:24:17 11   this stool bank concept in Mr. Borody's patents, we were

11:24:25 12   first.

11:24:27 13                   You've heard now about the Hlavka patent, which

11:24:32 14   we filed for on February 1st of 2010.  And there's no

11:24:37 15   dispute that that's before any of the other patents that are

11:24:40 16   at issue.  You will have a copy of the exhibit, as counsel

11:24:46 17   said.  And I've tried to write in pretty big numbers, the

11:24:51 18   trial exhibit numbers, so that if you want to take notes,

11:24:54 19   you can write that down.

11:24:55 20                   The Hlavka packet application is 3350, and if

11:25:00 21   you look through it, you'll see that what he was talking

11:25:03 22   about was this bacteriotherapy bank.  Now, as you've all

11:25:10 23   heard, FMT, fecal transplants, were old.  Nobody was going

11:25:15 24   to get a patent on the basis of how to do FMT in 2010 or in

11:25:22 25   2011 because that had been done for a long time.  But the

11:25:26  1    idea here was how do we take this old process and turn it

11:25:33  2    into something that can be made into an FDA-regulated

11:25:39  3    commercial thing.  That's what Mr. Hlavka's patent was

11:25:46  4    about.

11:25:46  5            Now, you heard Dr. Khoruts say when asked if

11:25:52  6    someone were to say that Mr. Hlavka invented standardized

11:25:56  7    FMT treatments, what would you say in response?  And his

11:26:00  8    answer was that's ridiculous.  But the patent office did not

11:26:04  9    agree with that assessment because the patent office issued

11:26:09 10    a patent, more than one patent, based on that February 1,

11:26:16 11    2010 application.

11:26:19 12            This is the Hlavka '208 patent, it's in evidence

11:26:23 13    at 3680, and you'll see it talks about a lot of the concepts

11:26:29 14    that you've heard about over the course of this trial, about

11:26:33 15    cryoprotectants and filtering and glycol and having a

11:26:37 16    storage bank and using an enema because those were all

11:26:42 17    concepts that he was working on back in 2009, in thinking

11:26:48 18    about how do we take this old technology and turn it into a

11:26:54 19    product.

11:26:55 20            Now, back in the day, Dr. Khoruts and

11:27:01 21    Dr. Sadowsky, I think, agreed that we were the first with

11:27:04 22    respect to these ideas.  And one thing that I agree with

11:27:09 23    Finch's counsel on is that you should really look carefully

11:27:13 24    at what people said back then, right, not just what people

11:27:17 25    are saying today.

11:27:18  1              And back then, in May of 2012, when Dr. Khoruts

11:27:24  2      and Dr. Borody and Dr. Sadowsky first learned about what

11:27:29  3      REBYOTA was doing, this was actually when they first heard

11:27:32  4      about some of Rebiotix's success, they said, "I believe

11:27:36  5      these are the people from MicrobEX, they're certainly

11:27:40  6      familiar with our work, although I believe they were

11:27:42  7      thinking about these matters before ever meeting us."

11:27:45  8              That's what Dr. Khoruts said, that's what

11:27:50  9      Dr. Sadowsky said back in the day, as well, and that's

11:27:53 10      absolutely correct.

11:27:56 11              And, in fact, in 2013, when Debra Peattie,

11:28:01 12      remember she was the person associated with NuQure from whom

11:28:07 13      they -- with whom they originally entered into an agreement.

11:28:09 14      When she raised a concern about this Hlavka patent and says

11:28:14 15      it has a priority date of 1 February 2010, she said, one,

11:28:20 16      you should start compiling records that document that you

11:28:23 17      and Mike were first to invent.  And I will note, you have

11:28:27 18      not seen any records that they made these inventions before

11:28:32 19      February 1, 2010.

11:28:35 20              And two, as you think about interactions with

11:28:37 21      Lee Jones, it's worth focusing on what happened in 2009 that

11:28:43 22      could have culminated in the filing on 1 February 2010.  And

11:28:48 23      of course, you all know, there were no interactions with Lee

11:28:51 24      Jones in 2009 because she didn't start talking to folks at

11:28:55 25      the University about this until March of 2011.

11:29:03  1          Now, what was going on back in 2009?  What was

11:29:07  2  going on back in 2009 is that Mr. Hlavka and Mr. Berman were

11:29:11  3  working on this idea and that resulted in this business plan

11:29:15  4  that was presented to their board on January 14th of 2010.

11:29:19  5  And it has a lot of -- again, a lot of these concepts we've

11:29:24  6  been talking about -- an enema, having a healthy stool bank,

11:29:28  7  freezing the stool so that you would be able to preserve it

11:29:31  8  in that bank.

11:29:34  9          Now, on January 18th of 2010, Mr. Hlavka reached

11:29:39 10  out to Dr. Khoruts -- and we just saw this e-mail in Finch's

11:29:43 11  presentation -- and he reached out.  He said that he was

11:29:45 12  being introduced by Judy Berman, that this article had been

11:29:49 13  brought to his attention and he said, "The article was very

11:29:52 14  interesting and I was surprised to note that this represents

11:29:55 15  some of the first objective evidence for the mode of action

11:29:59 16  for fecal transplant."

11:30:00 17          And we heard a suggestion earlier in the

11:30:03 18  testimony that this was an acknowledgment that the

11:30:06 19  University of Minnesota folks were first.

11:30:09 20          And I want to be very clear about who was doing

11:30:13 21  what and who was the first to do what because I'm not

11:30:16 22  claiming that we were the first to do everything.  I am

11:30:20 23  saying that we were the first to come up with this idea of a

11:30:24 24  stool bank and some of the processing steps that you would

11:30:26 25  want to take, if that's what you were doing.

11:30:29  1          But in terms of doing the work that Dr. Khoruts

11:30:33  2    presented that he had done back in 2008 on that first

11:30:38  3    patient, Nancy, that was important for the patient, that was

11:30:41  4    an important advance, and I want to be very clear that we

11:30:45  5    are giving full credit for that.  Dr. Khoruts was also very

11:30:49  6    clear, though, that when he treated that first patient,

11:30:51  7    Nancy, he did so having read the ways that people had done

11:30:56  8    it before and following those old methods.

11:31:01  9          You may remember he said he borrowed a blender

11:31:04  10   from Dr. Sadowsky, whizzed it up, gave it to her and it was

11:31:09  11   so smelly that the nurses had to run around with -- you

11:31:12  12   know, try to deodorize afterwards and he had to shut down

11:31:16  13   the whole surgery center.  Those were the old methods.

11:31:19  14   That's not the invention that the University of Minnesota is

11:31:21  15   saying they made in this case.  That was old school FMT.

11:31:25  16   And he wrote about it and he wrote about understanding

11:31:29  17   specifically what had happened with her and her treatment.

11:31:33  18   That's what Dr. -- that's what Mr. Hlavka read about.  He

11:31:39  19   said it was some of the first objective evidence for the

11:31:42  20   mode of action for fecal transplant, the details of how

11:31:47  21   fecal transplant works.  We're not saying we invented that.

11:31:50  22   Also, I don't think that's what any of the patents in this

11:31:52  23   case were about.  And then he said, "I am exploring the

11:31:55  24   business commercial viability of fecal transplantation

11:31:59  25   and/or bacteria therapy, I'm interested in talking to you."

11:32:00  1          Now, Dr. Khoruts response to that outreach was,

11:32:04  2   "I'm not sure we need an outside person to explore the

11:32:07  3   business commercial viability of poop," and I think it's

11:32:11  4   fair to say that at this point in time that's not something

11:32:14  5   that was foremost in their mind.

11:32:16  6          Now, they did go on to have more discussions

11:32:19  7   with Mr. Hlavka and Mr. Berman.  In June of 2010, Mr. Hlavka

11:32:23  8   and Mr. Berman sent Mike Sadowsky their business plan and

11:32:27  9   they talked about it, but they didn't move forward together.

11:32:31 10   And from Mr. Berman and Mr. Hlavka's perspective that sort

11:32:36 11   of was that.

11:32:37 12          It is clear though that at some point

11:32:41 13   Dr. Khoruts and Dr. Sadowsky got interested in this idea

11:32:44 14   that maybe there could be a business, maybe there was

11:32:47 15   something here that you could turn into a commercial product

11:32:51 16   because by the time they met Lee Jones, they were already,

11:32:54 17   as you heard, talking to the folks at NuQure, talking to the

11:32:58 18   venture capital folks about maybe trying to do something on

11:33:02 19   the business side.

11:33:03 20          Now, you heard that Lee Jones has a very long

11:33:09 21   history with the University of Minnesota and she took the

11:33:11 22   position as CEO-in-Residence and I think she explained to

11:33:15 23   you she absolutely thought her job was to try to help the

11:33:18 24   University and to do so by talking to the scientists there,

11:33:22 25   exploring was there a business opportunity, and if so,

11:33:25 1    potentially working with them to start a company based on

11:33:30 2    that technology.

11:33:31 3            And I would submit to you that's exactly what

11:33:34 4    she did.  She met with them, she introduced them to

11:33:38 5    consultants to help them understand the regulatory

11:33:41 6    landscape.  And after doing her due diligence, she said I

11:33:45 7    really want to do this and she made a proposal for them to

11:33:51 8    work together.  Now, this wasn't a take it or leave it

11:33:54 9    offer.  She asked them to contribute and to suggest how they

11:33:59 10   would like this relationship to work, but she made a

11:34:02 11   reasonably detailed proposal and I would suggest to you this

11:34:05 12   was a pretty fair proposal.

11:34:10 13           Now, one of the terms was a license of existing

11:34:14 14   technology from the University of Minnesota and the transfer

11:34:17 15   of technology from MicrobEX lab to newco for manufacture,

11:34:21 16   and there was some suggestion that during the trial that --

11:34:25 17   because she said here, one of the terms would be a license,

11:34:28 18   that she understood back in 2011 that she would need a

11:34:32 19   license.

11:34:33 20           Now, I want to be clear.  She was proposing a

11:34:35 21   transfer of technology from Dr. Sadowsky's lab to the new

11:34:41 22   company for manufacturing.  So, if you're going to use the

11:34:44 23   University of Minnesota's technology and transfer it, of

11:34:47 24   course you need a license.  That doesn't mean you need a

11:34:50 25   license if you're going to go do something different.  And

11:34:54  1    of course, that license would have been for the University

11:34:59  2    of Minnesota process, which at the time, as you heard

11:35:02  3    described, was this process that used a blender, used the

11:35:06  4    sequential sieve, spun it, and then suspended it.  That's

11:35:09  5    what she would have been taking a license to and had she

11:35:11  6    followed -- had they followed through with this proposal,

11:35:16  7    that technology, presumably, would have been the starting

11:35:18  8    point.

11:35:19  9            Now, she also proposed a consulting relationship

11:35:22 10    with both Dr. Sadowsky and Dr. Khoruts and you heard

11:35:26 11    Dr. Khoruts say, essentially, this was a nonstarter from his

11:35:29 12    point of view, that his whole career doesn't point in this

11:35:32 13    commercial drug direction, that's not who I was.  But you

11:35:36 14    also heard that in connection with their relationship with

11:35:41 15    NuQure, the folks that they were talking to, both

11:35:44 16    Dr. Khoruts and Dr. Sadowsky asked to enter into consulting

11:35:49 17    agreements.  So the fact that consulting agreements were

11:35:54 18    proposed as part of the deal, I think it's pretty clearly

11:35:58 19    not the reason it didn't happen.  The reason it didn't

11:36:00 20    happen, and I think Dr. Khoruts admitted this, is that they

11:36:05 21    turned down Lee Jones because they had already made a

11:36:09 22    commitment to and were already working with NuQure.  Now,

11:36:14 23    that's fine.

11:36:16 24            As Lee Jones said, they didn't have an

11:36:19 25    obligation to work with her.  She didn't have an obligation

11:36:22  1    to work with them.  But having made a fair proposal and

11:36:27  2    being turned down, she then decided this is too important.

11:36:31  3    And you heard her say that, this is too important for me not

11:36:34  4    to try to take this public FMT technology and bring it to

11:36:40  5    patients.  And that's what she did, working with Mike Berman

11:36:44  6    and Ed Hlavka and relying on the intellectual property that

11:36:50  7    had been developed back -- and filed for back in February of

11:36:54  8    2010, well before the patents that are at issue in this

11:36:59  9    case.  And they moved forward, using as a foundation, that

11:37:05 10    intellectual property from Hlavka, which resulted in this

11:37:08 11    issued patent, as well as making additional innovations that

11:37:14 12    resulted in additional patents, including this patent that

11:37:16 13    was issued to Lee Jones and Courtney Jones and a couple of

11:37:20 14    the other folks who worked at Rebiotix.

11:37:24 15             Now, you heard that the University of Minnesota

11:37:31 16    has, as recently as 2021, recognized and celebrated Lee

11:37:41 17    Jones's accomplishments as the president and CEO of

11:37:46 18    Rebiotix.  And what you've heard now is, well, we didn't

11:37:49 19    know in 2021 that she had done anything wrong, we only

11:37:54 20    learned about that on the first day of trial.

11:37:58 21             But I want you to consider that you have heard,

11:38:02 22    I think over and over, and, in fact, just now, the

11:38:06 23    suggestion that she did do something wrong by working with

11:38:11 24    the inventors from the University of Minnesota in 2011 and

11:38:16 25    then going out and starting her own company.  And you have

11:38:19  1    heard over and over from witnesses on the plaintiffs' side

11:38:22  2    in this case that in their view, there is no way to have a

11:38:26  3    successful commercial product without using their

11:38:33  4    inventions.

11:38:33  5            Now, if those things are true, those are

11:38:36  6    certainly things they knew in 2021.  And yet as you're going

11:38:40  7    to see over and over, they acknowledged the ways in which

11:38:44  8    she had made contributions and they never called into

11:38:49  9    question the work that she had done starting Rebiotix.  And

11:38:54 10    I think that may be why in the opening statement in this

11:38:59 11    case, things took a pretty sharp turn.

11:39:04 12            You will remember, I think this opening

11:39:07 13    demonstrative that was shown to you with Ferring climbing --

11:39:11 14    the sort of dark figure climbing over the fence to break

11:39:16 15    into the, you know, place that's got the two nice, white

11:39:19 16    houses in it.  And I don't think there's any way to read

11:39:23 17    that other than as a suggestion that Ms. Jones did something

11:39:29 18    wrong by pursuing this opportunity.

11:39:33 19            I did characterize that image as a burglary and

11:39:36 20    I will say, that's what it looks like to me.  Obviously, you

11:39:40 21    can draw your own conclusions.  But I think the reason that

11:39:44 22    we are talking so much in this case about things that are

11:39:49 23    not about patent infringement is because they want you to

11:39:55 24    believe this.  And they are relying on this to try to

11:40:01 25    influence your perception of the patent case.  So I want to

11:40:06  1    talk about this.

11:40:09  2            Because the first thing is that they made a deal

11:40:12  3    about the fact that Ms. Jones had documents on her computer

11:40:16  4    from when she was doing this work with the University of

11:40:19  5    Minnesota people.  She did.  She explained she was surprised

11:40:22  6    by that, but she did.  But I want you to bear in mind, there

11:40:26  7    was nothing wrong with that.  The NDA that she signed

11:40:30  8    allowed her to keep a copy of the documents, they sent them

11:40:33  9    to her Gmail.  She was using her home computer.  She never

11:40:38 10    purged them, she never had any obligation to.  So they tried

11:40:41 11    to suggest that there was something really sinister and

11:40:44 12    wrong about these documents.  And you may remember this

11:40:47 13    slide from opening, this was sort of presented, I think, as

11:40:51 14    being the smoking gun, very red, very -- and Rebiotix found

11:40:56 15    or disseminated UMN's evaluation of patented invention to

11:41:01 16    Rebiotix team.  And this was an UMN analysis of invention

11:41:06 17    document.  And they made that sound pretty bad.

11:41:08 18            I think what you heard over the course of the

11:41:10 19    trial is what this actually was, was a presentation put

11:41:13 20    together by a group of students -- that Lee Jones helps them

11:41:18 21    put that together, student mentoring is part of what she

11:41:23 22    does at the University and that this was publicly presented,

11:41:27 23    which I think is pretty different from the way that it was

11:41:31 24    initially presented to you.

11:41:33 25            One of the other documents that we've heard a

11:41:35  1    lot about is this Hamilton 2012 paper.  And it's true, folks

11:41:41  2    were looking at and studying that paper and they did think

11:41:44  3    that it was helpful to learn more about FMT.  And I would

11:41:49  4    suggest to you, that's how science works.  This is a pretty

11:41:54  5    small community, everyone reads everyone's papers.  That's

11:41:56  6    actually why you publish papers, the reason you publish

11:42:00  7    papers is so that other people will read them.  This was

11:42:02  8    public.  There is nothing wrong at looking at somebody

11:42:07  9    else's published paper in order to understand what they were

11:42:11 10    doing.

11:42:11 11           Now, there were four documents that were

11:42:14 12    presented to you that Lee Jones had in her file; two of them

11:42:17 13    were public and two of them were documents about the patent

11:42:20 14    application.  There was the patent application itself and

11:42:23 15    then there was this sort of stage-gate document that

11:42:26 16    describes what they were going to file for a patent.  And at

11:42:31 17    the end of the day, the only thing they've pointed you to in

11:42:35 18    those documents, that they're saying, this was the

11:42:37 19    confidential secret sauce thing that she was aware of, was

11:42:40 20    the University of Minnesota protocol.  And that University

11:42:45 21    of Minnesota protocol was this.

11:42:49 22           Now, the only thing in that protocol that she

11:42:54 23    actually wound up using the same thing as, was starting with

11:42:59 24    50 grams of donor feces.  They did that, and she did that.

11:43:03 25    And you heard Dr. Khoruts say, he came up with that in part

11:43:07  1    from reading the literature and in part because that's how

11:43:11  2    much a person can produce.  That's not their secret sauce

11:43:15  3    information.  Every single other thing that's in that

11:43:20  4    protocol is something that we do differently.  Everything.

11:43:26  5    The buffered saline, the Waring blender, the nitrogen, the

11:43:31  6    series of four sieves, the centrifuging, the glycerol, the

11:43:35  7    suspension, it's all different.

11:43:39  8         Now, we showed you in the opening, this

11:43:41  9    demonstrative to illustrate that that process that they're

11:43:44 10    saying we had access to is completely different from the

11:43:48 11    process that we developed.

11:43:50 12         Now, I just heard a criticism that we were

11:43:52 13    making a comparison and suggesting that somehow we shouldn't

11:43:56 14    be comparing our process to the University of Minnesota

11:43:59 15    processes.  I want to say, I agree.  That's not the patent

11:44:03 16    infringement question, but that is the question about the

11:44:07 17    information that she had access to and whether she copied it

11:44:16 18    and the answer to that question is very clearly no, because

11:44:19 19    what she wound up doing and what the people at Rebiotix

11:44:22 20    wound up doing was completely different from the process

11:44:24 21    that the University of Minnesota inventors had developed.

11:44:29 22         She used, by way of example, a Stomacher and you

11:44:32 23    heard Courtney Jones explain, they did testing and why it is

11:44:36 24    they wound up deciding that a Stomacher was the right piece

11:44:40 25    of instrumentation to use as a part of this process rather

11:44:44  1    than a blender and sieves.  And there was some suggestion, I

11:44:46  2    think in the testimony that may be there was a reference to

11:44:49  3    the Stomacher in the patent.  I just want to be clear,

11:44:51  4    there's not.

11:44:52  5           You'll have the patent, you can look through it

11:44:54  6    yourself, it does not say anything about the possibility of

11:45:00  7    using a Stomacher as part of the process.

11:45:03  8           Now, you also heard just now -- and I think it

11:45:07  9    was actually one of the first exhibits they showed you, a

11:45:09 10    reference to this e-mail from Mark Anderson, that he says,

11:45:12 11    "The current manufacturing process is CGMP compliant and was

11:45:18 12    derived from the Hamilton procedure described in Appendix 4

11:45:21 13    of the RFP and additional landmark papers including Brandt,

11:45:28 14    Borody, Van Nood and Khoruts," so that is a citation to a

11:45:30 15    number of papers, many of which were in the prior art,

11:45:32 16    dating back even before the work that Dr. Khoruts had done

11:45:36 17    that set forth the basis of FMT.  And it is true that we do

11:45:41 18    not say that we invented FMT but then -- it then goes on to

11:45:46 19    say, "these were combined with the process development

11:45:49 20    completed by Rebiotix" and it talks about the resulting

11:45:52 21    manufacturing process.

11:45:53 22           It cites the Hamilton paper as one of the

11:45:55 23    references, but I would suggest that when you actually look

11:45:58 24    at the record of what is the process that we developed, you

11:46:05 25    know that it is very different from that process in the

11:46:08  1    Hamilton paper.  As I said, the only thing it has in common

11:46:13  2    is the starting point of 50 grams of donor feces.  And there

11:46:18  3    was no hiding the ball here.  I want to be clear that when

11:46:22  4    Lee Jones filed her patent application, she cited all of

11:46:27  5    Dr. Khoruts' work, all of Matt Hamilton's work, all of that

11:46:32  6    was cited to the patent office.  There was no hiding the

11:46:35  7    ball about any of that.  And that brings me to the question

11:46:40  8    of infringement.

11:46:42  9            So you heard that infringement requires you to

11:46:47 10    compare what's in the claims with the product.  And in doing

11:46:52 11    that, you have to compare the product or method with every

11:46:56 12    requirement that's in the claims.  And this is a really

11:47:00 13    important point, because close enough isn't good enough.  In

11:47:06 14    order to have literal infringement, every single thing has

11:47:12 15    to be met.

11:47:12 16            So in the patent, let's imagine that you have a

11:47:15 17    patent on a chocolate chip cookies, so chocolate chip cookie

11:47:20 18    and let's say that your claim says, I have invented a

11:47:23 19    chocolate chip cookie that has flour, sugar, butter and

11:47:27 20    chocolate chips in it and someone else comes along and they

11:47:31 21    made the cookie and the cookie has flour, sugar, butter and

11:47:33 22    nuts.  How do you decide if it's infringing?  You go through

11:47:38 23    and you compare the nut cookie with the claim, it has flour,

11:47:43 24    it has sugar, it has butter but it has nuts instead of

11:47:47 25    chocolate chips.  That means you don't infringe.  And that

11:47:50  1    means you don't infringe even though they both have flour,

11:47:54  2    they both have sugar, they both have butter.

11:47:59  3              So in order to find infringement, you have to

11:48:01  4    find that every single thing is there.

11:48:04  5              The other important point about infringement is

11:48:09  6    that it is Finch's burden of proof.  So Finch is the one

11:48:13  7    that has to come in and prove to you, prove to your

11:48:18  8    satisfaction that we infringe.  So what is the fight about?

11:48:24  9    What do we disagree about?

11:48:28  10             The issue is whether REBYOTA -- and you're going

11:48:32  11   to have this in the jury room because you get the evidence,

11:48:36  12   and you can ask to look at and inspect and see the evidence.

11:48:40  13   And I encourage you to do that, but you're going to have --

11:48:43  14   you're going to have two packages of REBYOTA.  The question

11:48:47  15   is whether this thing is capable of passing through a .5

11:48:53  16   millimeter sieve.  And if it doesn't, we don't infringe.

11:48:59  17   So, remember, it's Finch's burden of proof.  Did Finch prove

11:49:03  18   that that thing, REBYOTA, is capable of passing through a .5

11:49:09  19   p.m. sieve?

11:49:09  20             So what does it mean to meet the burden of

11:49:13  21   proof?  First, you have to have proof, then you put it on

11:49:15  22   the table and you show why that proof is enough to prove the

11:49:19  23   point that you're trying to make.  So what did they come in

11:49:24  24   with?  Dr. Benson came in and gave his opinion about whether

11:49:29  25   REBYOTA is capable of passing through a .5 millimeter sieve

11:49:33  1    and what he said is, REBYOTA is manufactured in such a way

11:49:37  2    that it is filtered through a .5 millimeter filter and

11:49:40  3    indeed, it is capable of passing through .5 millimeters.

11:49:45  4    That was the evidence that they presented to you, so

11:49:49  5    basically what he was saying was, well, this is a bag, this

11:49:53  6    is the bag that goes in the Stomacher, it is specified as

11:49:58  7    having .5 millimeter pores, that means whatever comes out of

11:50:03  8    here, must be capable of passing through this.  And I would

11:50:07  9    suggest to you, that's just not right.

11:50:10 10             You'll have both of these things too.  You can

11:50:14 11    test it for yourself, but you can try putting this paperclip

11:50:18 12    through one of these pores, you can do it.  You can try

11:50:20 13    putting this paperclip through the .5 millimeter sieve, it

11:50:25 14    doesn't go through.  The fact that something came out of

11:50:28 15    here does not mean that it can go through here.  Because

11:50:32 16    this is rigid and this is flexible.  And the thing about

11:50:37 17    this that's important, by the way, it's not that the pore

11:50:40 18    size is approximately 5(sic) millimeters but that it's

11:50:42 19    flexible and those pores can stretch.  And you can check

11:50:46 20    that out for yourself too and see what that looks like.

11:50:51 21             Now, Dr. Benson said it must be right.  He

11:50:57 22    didn't do any actual testing to see whether his assumption

11:51:02 23    that if something came out of this Stomacher bag, it must be

11:51:06 24    able to go through this, was correct.  And you heard him say

11:51:09 25    over and over, "Well, I didn't need to.  I didn't need to, I

11:51:13  1    just assumed basically that this had to be right."

11:51:16  2           So I want to talk about that prune demonstration

11:51:20  3    and what the point of that was.  The point was absolutely

11:51:23  4    not to suggest that REBYOTA is prunes, but it was to show

11:51:28  5    you how this works, because what you saw is that when that

11:51:32  6    prune baby food was mushed up in the Stomacher and it came

11:51:36  7    out through these pores, and you then put it on top of the

11:51:42  8    sieves, it didn't all go through.

11:51:45  9           And what that tells you is that going through

11:51:47 10    these pores and going through this sieve are different.

11:51:52 11    Coming out of here doesn't mean it's going through here.

11:51:57 12    That was the assumption that Dr. Benson made, that

11:52:00 13    assumption was just as a factual matter wrong.  That means

11:52:07 14    that Finch presented to you no proof, because they never

11:52:11 15    actually did the experiment themselves to see whether or not

11:52:17 16    REBYOTA, the material that comes out, is capable of passing

11:52:22 17    through this sieve.

11:52:23 18           Now, you could be done at that point with

11:52:26 19    respect to the infringement question.  But we did come

11:52:31 20    present evidence to you because we wanted you to have that

11:52:35 21    evidence of what happens when you actually do the testing.

11:52:38 22    And what you saw -- when Dr. Johnson did the testing and

11:52:42 23    took half of this volume of REBYOTA and powered it through

11:52:46 24    this .5 millimeter sieve, is that there were a bunch of

11:52:51 25    stuff that clogged up the pores and stuck on top of the

11:52:57  1    filter, on top of the sieve.  It does not -- REBYOTA is not

11:53:00  2    capable of passing through a .5 millimeter sieve, because it

11:53:04  3    didn't when he did the tests.

11:53:07  4            And he explained why, "because it's got these

11:53:10  5    big chunks in it that are bigger than the size of the

11:53:14  6    sieve."  Now, there was a sort of suggestion here that,

11:53:17  7    because this is blown up 40 times, these are not macroscopic

11:53:22  8    particles.  Macroscopic just means you can see them, you

11:53:25  9    don't need a microscope to see them and Dr. Johnson told you

11:53:29 10    he could see the particles with his naked eye, he needed a

11:53:32 11    microscope to be able to take pictures that would allow him

11:53:35 12    to measure them.  That's a different question.  But I would

11:53:38 13    also say, again, you're going to have REBYOTA in the room

11:53:42 14    with you, you can look at it yourself if you've got any

11:53:45 15    questions about what this looks like.  And you can make your

11:53:49 16    own judgment, but it has particles bigger than .5

11:53:52 17    millimeters in it.

11:53:53 18            And again, what does Finch have in response to

11:53:59 19    this?  Nothing.  They didn't do their own tests to see how

11:54:03 20    many particles there are, they didn't do their own tests to

11:54:06 21    see whether it would go through the sieves.  In fact,

11:54:10 22    Dr. Benson testified that he didn't dispute Dr. Johnson's

11:54:14 23    testimony.  He didn't think if he did testing, it would come

11:54:17 24    out any differently.  And instead what they did is come in

11:54:21 25    with this demonstrative of the grates and the pieces of

11:54:26  1    cardboard and said well, if I took each individual particle

11:54:30  2    and I reoriented it, maybe I would be able to sort of push

11:54:34  3    each individual particle through.

11:54:36  4            Now, there's a couple of problems with this.

11:54:38  5    The first problem is, they didn't actually do that testing.

11:54:42  6    Where is the evidence that those particles, if you

11:54:44  7    reoriented them, would actually be able to go through this?

11:54:48  8    There isn't any.

11:54:49  9            He didn't pull out the particles.  He didn't do

11:54:51 10    some testing to see whether individual particles would all

11:54:55 11    be able to go through them, and there's no way to tell from

11:54:59 12    a 2D image, a photo of a particle, what the dimension is of

11:55:04 13    that particle are in all directions and whether it would, as

11:55:07 14    an individual particle, be able to pass through here.

11:55:10 15            But there is a second problem with this, which

11:55:13 16    is it's not the right question.  The question is not whether

11:55:15 17    every individual particle individually is capable of passing

11:55:19 18    through a .5 millimeter sieve.  You're not supposed to go in

11:55:23 19    here and somehow pluck out every particle and put it on a

11:55:28 20    sieve and see whether each individual particles goes

11:55:33 21    through.

11:55:33 22            The question, what the claim says is, is the

11:55:37 23    fecal extract or preparation capable of passing through a .5

11:55:41 24    millimeter sieve.  That's it.  You take this thing.  You

11:55:44 25    pour it over the sieve.  And Dr. Johnson said sieving is a

11:55:49  1   one-pass operation.  It is.  You pour it over the sieve and

11:55:51  2   you look to see whether it is capable of passing through.

11:55:54  3        Now, there was a comment made in Finch's opening

11:55:58  4   that Dr. Johnson's test was somehow improper because he

11:56:02  5   didn't use a Stomacher.  I don't understand that comment.

11:56:09  6   He took this product.  This product is made using a

11:56:14  7   Stomacher.  And then he took this product.  This is the

11:56:18  8   fecal extract or preparation that's at issue in the claim,

11:56:21  9   and he tested whether this product is capable of passing

11:56:25 10   through a .5 millimeter sieve.  That's the requirement in

11:56:30 11   the claim, and that's the thing that he showed is not met.

11:56:36 12        So because REBYOTA is not capable of passing

11:56:39 13   through a .5 millimeter sieve, the answer to this question

11:56:45 14   of whether the University and Finch have proven by a

11:56:49 15   preponderance of the evidence, whether they have proven that

11:56:51 16   we literally infringe is no.

11:56:54 17        Now I want to turn to this other doctrine that

11:56:57 18   we're talking about, just for this claim, that is called the

11:57:01 19   doctrine of equivalents.  And you heard the jury

11:57:04 20   instruction, but basically, you can find infringement under

11:57:07 21   the doctrine of equivalents.  If the differences between

11:57:10 22   what's claimed and the product are insubstantial or if they

11:57:15 23   perform substantially the same function and work in

11:57:19 24   substantially the same way to achieve substantially the same

11:57:23 25   result.

11:57:23  1        So you can think about this and again at a high
11:57:26  2    level.  Let's say you had our patent on a cookie.  And
11:57:29  3    somebody else had a nut cookie.  Well, is a nut cookie
11:57:33  4    insubstantially different from a chocolate chip cookie?  I
11:57:37  5    would say no especially not if you have a nut allergy but
11:57:40  6    just in general, no.
11:57:41  7        But let's say somebody had a chocolate chunk
11:57:44  8    cookie.  Maybe you would say, "Okay, I don't think there's
11:57:47  9    really a significant difference.  That's basically the same
11:57:50 10    thing."  In that case, there would be infringement under the
11:57:53 11    doctrine of equivalents.
11:57:54 12        So what is the evidence with respect to whether
11:57:56 13    REBYOTA would be substantially the same?  If it didn't have
11:58:01 14    those larger particles in there and if it could, in fact,
11:58:05 15    all flow through, all pass through this .5 millimeter sieve,
11:58:10 16    does that make a difference to the product?  What is the
11:58:13 17    evidence on that question?
11:58:15 18        From Finch's side of the table, there's none.
11:58:19 19    They didn't offer any evidence of that.  What would happen?
11:58:23 20    Would it make a difference to how it works?  Did they test
11:58:26 21    it?  Did they run it through and take the product after all
11:58:30 22    that material had been filtered out and see whether it works
11:58:33 23    the same way?  No.  There's no proof of that.
11:58:39 24        Their expert got up there and said, "There's,
11:58:42 25    like, you know, lots and lots of millions of particles in

11:58:45  1    it," but he didn't do any work to see whether that makes a

11:58:48  2    difference and whether the big particles matter relevant to

11:58:51  3    the little ones.

11:58:53  4             There is one person in this case from their side

11:58:56  5    of the table who talked about that.  That person was

11:59:00  6    Dr. Khoruts.  And he admitted that they matter.  What he

11:59:05  7    said, talking about this, is you can have the globs of

11:59:11  8    stuff, and he said the globs are not irrelevant.  They

11:59:14  9    actually can matter.  And I think that's exactly right.

11:59:18 10             Now, why do they matter?  Well, one reason they

11:59:22 11    may matter, because bacteria stick to them.  So it's

11:59:26 12    important to have them in there for the bacteria.  We don't

11:59:29 13    know all the reasons they might matter because Finch

11:59:35 14    presented no evidence on that and they have the burden.

11:59:37 15             But we do know one very important thing that is

11:59:38 16    different between what they say they invented and REBYOTA

11:59:41 17    because what they say they invented is something that is

11:59:45 18    nearly odorless.  They say in the patent -- and this is at

11:59:49 19    column 13, you can go look at it and read this -- "The use

11:59:53 20    of sieves to extract biological material from fecal material

11:59:57 21    unexpectedly resulted in a composition, which was nearly

12:00:02 22    odorless."  And they said this was not expected because

12:00:06 23    feces normally have a distinctive odor.  We all know that's

12:00:11 24    true.  And this was surprising to be removed by the minimal

12:00:15 25    manipulation used.  This is a significant advantage over the

12:00:17  1    Takeda method that is unaesthetic and so distasteful that

12:00:20  2    some patients and staff refuse to take part and changes it

12:00:23  3    into a method that's easily practiced in a clinical setting

         4    or at home.

12:00:30  5           So they said, "That's the benefit of our

12:00:31  6    patented process," and that actually makes sense because in

12:00:35  7    that document that we were looking at where they were

12:00:38  8    talking about their invention, they said that their

12:00:41  9    researchers had created a protocol by which the donor

12:00:44 10    material is cleaned, purified and modified for long-term

12:00:47 11    storage.  Their ultimate goal is to create a freeze-dried

12:00:51 12    product that can be delivered by an enteric release capsule.

12:00:54 13    And obviously, if you're putting something in a capsule,

12:00:58 14    it's probably really, really important that it doesn't smell

12:01:00 15    like poop because that would be pretty gross.

12:01:03 16           So what about REBYOTA?  Well, you heard it from

12:01:06 17    Dr. Johnson.  When he was working with it, smells like poop.

12:01:10 18    And they don't disagree.  I mean, we asked Dr. Benson,

12:01:13 19    "You'd expect that REBYOTA actually does have an odor?"  And

12:01:18 20    he said, "Yeah."  And when you look at it, test for

12:01:24 21    yourself, but when you look at it, it's not surprising

12:01:27 22    because it's basically mushed up poop.  It smells like poop.

12:01:33 23    That's a different result than the result that they were

12:01:38 24    saying was the benefit of using their invention.

12:01:42 25           And for that reason when you're asked whether

12:01:45  1    Finch and the University of Minnesota have proven by a

12:01:49  2    preponderance of the evidence that we infringe Claim 7 under

12:01:52  3    the doctrine of equivalents, they're not equivalent.  And

12:01:55  4    for that reason we submit the correct answer to that

12:01:58  5    question is no.

12:02:00  6            Now, there's one more infringement issue.  And

12:02:04  7    that has to do with the '309 patent, which was a requirement

12:02:08  8    that in some ways is similar, that the fecal bacteria is

12:02:13  9    separated from rough particulate matter.  And as you heard,

12:02:16 10    the Court has said that means rough macroscopic, which means

12:02:21 11    you can see it with the naked eye, nonliving matter.

12:02:24 12            So what's the evidence?  Well, again, to start

12:02:27 13    with, you'll have the product.  You can look at it, and I

12:02:30 14    think you'll see when you look at it there's stuff in there

12:02:33 15    you can see.  There's, like, little bits of chunky stuff,

12:02:37 16    but, again, Dr. Johnson tested it.  He looked at it.  He saw

12:02:42 17    that there are these particles that are big.  He said he

12:02:45 18    could see them with the naked eye, and when he looked at

12:02:48 19    them under the microscope, they are not living matter.  It's

12:02:51 20    plant matter, undigested plant matter, basically.

12:02:55 21            And this is in REBYOTA, in here where we also

12:03:00 22    have all of the bacteria.  So in REBYOTA -- and that's the

12:03:04 23    question, right?  The claim is, in REBYOTA, are the bacteria

12:03:08 24    separated from rough particulate matter, in here.  And the

12:03:12 25    answer is no because in here, there's bacteria, and in here,

12:03:15  1    there's rough particulate matter.  And so in here, they are

12:03:19  2    not separated from each other.  They are all together in

12:03:24  3    there happily with the bacteria eating up that little rough

12:03:29  4    particulate matter as time goes on.

12:03:32  5            Dr. Johnson explained that in his testimony,

12:03:35  6    that he clearly saw rough particulate matter.  And I think

12:03:39  7    this is basically undisputed.  This is undisputed.  I don't

12:03:42  8    think there's really a serious argument that if you look in

12:03:46  9    here, you're not going to be able to see particles that are

12:03:49 10    visible to the naked eye.  And I certainly don't think it's

12:03:52 11    disputed that there's bacteria in here.  That's the

12:03:55 12    infringement question.

12:03:56 13            Now, what Dr. Benson did is come in and say,

12:03:58 14    well, there's some separation that's occurring.  So what is

12:04:02 15    he talking about?  So I want you to imagine that the blue

12:04:12 16    ones are rough, macroscopic particulate matter and that the

12:04:17 17    orange ones are bacteria.  So you start off by putting the

12:04:22 18    fecal sample and some water inside the inner bag, right?

12:04:25 19    And so inside the inner bag, I've got both red and blue

12:04:29 20    M&M's, and then we go through the Stomacher process.  It all

12:04:34 21    gets mushed and squeezed through the inner pores.  And what

12:04:37 22    do we wind up with?

12:04:39 23            We wind up with a few blue things, some rough

12:04:43 24    macroscopic material that's still inside the bag.  That was

12:04:46 25    the point of the one experiment that Dr. Benson did do to

12:04:50  1    show that there's some stuff still inside the bag.  That's

12:04:53  2    true.  We don't disagree with that.

12:04:54  3             The thing that's important though is that

12:04:57  4    outside the bag, which is the thing that becomes REBYOTA,

12:05:00  5    there's both orange and blue.  There's both rough

12:05:04  6    macroscopic material and bacteria.  So have the orange M&M's

12:05:08  7    been separated from the blue M&M's?

12:05:12  8             The answer to that question is no because they

12:05:14  9    are all here together.  They're not separated from each

12:05:17 10    other, and they are certainly not separated from each other

12:05:21 11    when they get put into this package and when this thing gets

12:05:26 12    sold as REBYOTA because both the rough macroscopic material

12:05:32 13    and the bacteria are all mixed together in there.

12:05:35 14             So with respect to infringement of the two

12:05:39 15    claims of the '309 patent, both of which have that

12:05:42 16    requirement, the answer to that question is no.

12:05:45 17             Now, I'm not going to talk about infringement of

12:05:49 18    the '080 patent.  We think the '080 patent is invalid, and

12:05:55 19    I'm going to talk to you about why we think that is and why

12:05:58 20    we think there's not any difference between what Dr. Borody

12:06:03 21    said he invented in March of 2011 and what Mr. Hlavka

12:06:07 22    already had invented in February of 2010.  And if we're

12:06:12 23    right about that, whether we infringe or not doesn't matter,

12:06:16 24    because you can't trample on rights that somebody doesn't

12:06:21 25    have.  If the patent is invalid, it's invalid.  But I'm not

12:06:25 1    going to argue with you about infringement for '080.  I'm

12:06:29 2    only going to talk to you about invalidity.

12:06:32 3           So let me talk to you about invalidity.  So what

12:06:35 4    does this mean?  It's a defense in an infringement lawsuit

12:06:38 5    that the patent is invalid.  I think it's a very normal

12:06:41 6    reaction to think to yourself, well, the Patent Office

12:06:44 7    issued it.  What does that even mean to be invalid?  But

12:06:48 8    what you heard in the patent video is that this is a very

12:06:51 9    important part of this jury trial process.  This is why

12:06:55 10   we're here.  You guys are the ones that get to decide the

12:07:00 11   invalidity question.

12:07:02 12          And that's because we recognize that sometimes

12:07:05 13   the government gets it wrong.  We recognize that patent

12:07:10 14   examiners can make mistakes.  That's actually in the patent

12:07:14 15   video.  Mistakes can happen.  No process is perfect.  It's

12:07:18 16   also because this is the first time that we get to tell our

12:07:21 17   side of the story.

12:07:22 18          So if you think about how the examination

12:07:25 19   process works, the applicant, Finch, files their patent

12:07:28 20   application, the examiner looks at it, and they go back and

12:07:32 21   forth and they talk to each other about whether the claims

12:07:35 22   should issue.  And Finch gets to plead its case and we're

12:07:38 23   going to see here how they did plead their case to the

12:07:41 24   Patent Office.  But we're not there.  We don't get to say

12:07:45 25   actually we don't think that's right.

12:07:47   1          So the patent examiner is in a little bit like

12:07:49   2   the position you were in at the very beginning of the trial

12:07:51   3   when you had heard their opening statement and you hadn't

12:07:54   4   heard ours.  And if you think back to what your state of

12:07:57   5   mind was at that point in time, it probably sounded like

12:08:00   6   they had a really good case because you hadn't heard our

12:08:03   7   side of the story.

12:08:04   8          That's the position the examiner is in, and

12:08:07   9   that's why the system recognizes you should get to hear both

12:08:10  10   sides of the story, and then you are the ones ultimately who

12:08:14  11   make that decision about whether the patent is valid or not.

12:08:18  12          We have the burden of proof, and we have the

12:08:21  13   burden of proof on that question by clear and convincing

12:08:25  14   evidence.  So we need to present evidence to you that you

12:08:27  15   think is clear and that you think is convincing, and it is

12:08:31  16   then your job to decide whether we have done it and whether

12:08:34  17   you accept that evidence.

12:08:35  18          And we presented to you testimony from two

12:08:38  19   experts on this matter.  Dr. Treangen talked about the

12:08:41  20   University of Minnesota patent, and Dr. Britton talked about

12:08:45  21   the Borody patents.  And they explained to you and walked

12:08:50  22   you through why we think there was a mistake made with

12:08:54  23   respect to issuing both of those sets of patents.

12:08:58  24          Now, we have experts.  Finch has experts.  And

12:09:05  25   you heard -- you heard from Dr. Benson.  He was their

12:09:08  1   validity expert on the Borody patents as well as their

12:09:11  2   expert on infringement.  And there was Dr. Schloss, who you

12:09:15  3   heard reference to.  They were both here Monday, they were

12:09:20  4   here Tuesday, they were here Wednesday.  They heard the

12:09:23  5   testimony from our experts, and they left.  Neither of them

12:09:31  6   took the stand to testify and say that anything that our

12:09:38  7   experts had said was wrong.

12:09:42  8        So I want you to really think about that because

12:09:46  9   that's pretty important.  Neither of them took the stand and

12:09:51 10   said when Dr. Treangen just said that, that was wrong.  When

12:09:55 11   Dr. Britton said that, I disagree.  There was no contrary

12:10:03 12   expert testimony on validity at all.

12:10:08 13        So I want to start with the University of

12:10:11 14   Minnesota patent.  And the question for you is whether the

12:10:16 15   inventors had possession of the invention when they filed

12:10:21 16   for the patent.  You're going to get a jury instruction on

12:10:25 17   this.  In fact, you heard one read to you, and that's what

12:10:28 18   it says.  We have to show -- the question is whether the

12:10:30 19   inventor possessed the subject matter finally claimed in the

12:10:34 20   patent on or before the effective filing date.

12:10:37 21        So why are we worried about this?  What's up

12:10:40 22   with this possession?  So sort of an interesting thing about

12:10:45 23   patents, but the way the system works, you file your patent

12:10:49 24   application and you include all of this text, right?  So

12:10:53 25   there's a lot of references considered, and then there's the

12:10:56  1    figure and there's description and you talk in words about

12:10:59  2    what you think your invention is.  And you submit all of

12:11:02  3    that when you file the patent.  Then, you have this back and

12:11:06  4    forth process with the examiner, which can go on for years

12:11:09  5    and years and years and years because you'll see in the case

12:11:13  6    of these patents, they were filed for here in 2011.  This

12:11:20  7    patent, which is the '080 patent, it issued on January 3rd

12:11:26  8    of 2023.  So there was a lot of time that went by.

12:11:31  9             And over the course of that time, Finch gets to

12:11:34 10    keep presenting new claims and say, all right, maybe you

12:11:38 11    don't like this claim, how about this one?  You don't like

12:11:42 12    that one, how about this one?

12:11:44 13             So you can be proposing a claim years after you

12:11:48 14    filed for the patent and years after you say that you made

12:11:51 15    the invention, and that timing is really important because

12:11:53 16    in patents, who's first really is the critical question.  So

12:11:59 17    the reason this requirement exists is to make sure that you

12:12:02 18    don't come along later and claim something that is broader

12:12:09 19    than what you actually taught in the patent application when

12:12:14 20    you filed back when you say you made your invention.

12:12:19 21             So how does that apply here?  So this claim

12:12:23 22    requires a couple of things that are important to this

12:12:25 23    discussion.  It requires that you have this fecal extract

12:12:29 24    that passes through a .5 millimeter sieve and it requires

12:12:34 25    that this method results in having the relative abundance of

12:12:42  1    members of the phylum's Proteobacteria be reduced by at

12:12:47  2    least 10% following the administration of that composition

12:12:50  3    made using that method.

12:12:52  4            Now, I want to be really clear here, this claim

12:12:55  5    is not about whether FMT works.  FMT had been known to work

12:12:59  6    for a very long time.  This claim is about that specific

12:13:05  7    requirement of reducing Proteobacteria by at least 10%,

12:13:09  8    right, that's the new thing here.  Does that actually

12:13:13  9    happen?

12:13:13  10            This is important because you heard reference to

12:13:16  11    the fact that in the patent they talk about 43 patients who

12:13:19  12    were treated with FMT and they say the patients were treated

12:13:22  13    with FMT and they got better.  Absolutely, they did.  But

12:13:27  14    that's -- that's what we knew before, right.

12:13:31  15            Dr. Khoruts and Dr. Sadowsky didn't invent the

12:13:33  16    idea that using FMT would make people better, that had been

12:13:37  17    known for a very long time, right.  We saw published reports

12:13:42  18    of that from the '50s through the '80s.  What they were

12:13:46  19    saying they invented here was we've got the process that

12:13:48  20    uses a .5 millimeter sieve and you can use that process and

12:13:52  21    make this particular change in the percentage of

12:13:56  22    Proteobacteria that you've got relative to other things.

12:14:00  23    That's our invention.

12:14:01  24            And the question is did they really have support

12:14:04  25    for that back when they filed their patent application?

12:14:07  1    Now, this thing, reducing the Proteobacteria by 10%,

12:14:12  2    Dr. Khoruts agreed that's referred to as taxonomic data.

12:14:16  3    That Proteobacteria is the taxonomy of the bacteria.  So we

12:14:21  4    call that taxonomic data.  This figure, what you're going to

12:14:27  5    see in the patent, there's figure 1 and figure 2 are the

12:14:30  6    taxonomic data in the patent that talks about or tries to

12:14:36  7    talk about or show percentages of different things,

12:14:42  8    Firmicutes, Proteobacteria, fusobacteria, et cetera,

12:14:47  9    et cetera.

12:14:48  10          There are a bunch of problems with this chart.

12:14:52  11   The first problem is you can't read it.  Dr. Hamilton tried

12:14:56  12   to read it.  He had a color copy; he couldn't read it.  He

12:14:59  13   said it was extremely difficult in black and white and then

12:15:02  14   I think he got a color copy.  He still couldn't read it.

12:15:06  15          Dr. Treangen can't read it.  It doesn't have a

12:15:10  16   supporting table.  What's that about?  What Dr. Treangen

12:15:14  17   explained is that normally in the literature when you have

12:15:17  18   that kind of a figure, you've got a table that gives all of

12:15:21  19   the underlying data and says what all the percentage changes

12:15:24  20   were.  So you can eyeball the thing but you have actually

12:15:27  21   got the numbers right next to it, or online where you can

12:15:30  22   access it.  That's what you normally do; the inventors

12:15:34  23   didn't do that.  So none of that data is actually in the

12:15:37  24   patent.  So that's why Dr. Treangen was saying, "I can't

12:15:40  25   really tell that much just from eyeballing it."

12:15:43  1          Now, he got asked a question about Dr. Schloss.

12:15:46  2    He said, "I don't whether Dr. Schloss could read it.  I

12:15:49  3    couldn't, I don't know whether he can."  That's interesting.

12:15:52  4    We don't know either because Dr. Schloss didn't come and

12:15:56  5    take the stand and tell you whether he could read it or not,

12:16:00  6    right?  Draw your own conclusions.

12:16:04  7          What else is the problem with the table?  The

12:16:07  8    underlying data doesn't exist anymore.  There's no way now

12:16:10  9    to go back and check because the data is not in the patent

12:16:14 10    and we know from Dr. Treangen that the data was destroyed.

12:16:19 11    There is no way to go back and check and look at that data

12:16:22 12    and see what it actually said.

12:16:25 13          There's another problem, all of the data in that

12:16:30 14    table comes from one patient, just one.  They did treat

12:16:34 15    43 patients and 43 patients or some percentage, I don't

12:16:40 16    remember what, got better.  But in terms of actually

12:16:44 17    understanding what was happening to their Proteobacteria,

12:16:47 18    it's one.

12:16:48 19          And this is not in dispute.  Dr. Khoruts agrees

12:16:50 20    with this.  I asked him, "We can agree the only taxonomic

12:16:53 21    data in your patent about specific changes to specific

12:16:56 22    bacteria in the gut microbiome was one patient?"  Agreed.

12:17:01 23          Another way to say that is the sample size is N

12:17:04 24    of 1, right?  Correct.

12:17:06 25          There's no dispute about that.  There is data,

12:17:08  1    taxonomic data, in the patent for one patient and that's a

12:17:14  2    problem.  Back in the day, back before we had this dispute,

12:17:19  3    Dr. Khoruts agreed, right, N of 1 is not science and there's

12:17:24  4    good reason for that because as you heard, there is no such

12:17:28  5    thing as one healthy gut microbiome.  Mine is different from

12:17:32  6    yourself, right?  How my gut is going to respond to milk or

12:17:37  7    gluten or whatever is not necessarily the same as yours and

12:17:40  8    so what happens in one patient with respect to how their

12:17:45  9    Proteobacteria changed and whether it did change by 10%,

12:17:49 10    that doesn't tell you what's going to happen to everyone

12:17:51 11    else.  You've got to do a study.  You've got to give it to a

12:17:55 12    bunch of people and see what happens and then analyze those

12:17:59 13    results.  And what you heard is that they didn't do that

12:18:05 14    work before they filed the patent.  They only have results

12:18:09 15    for a single patient.  So that's the only thing that's in

12:18:12 16    there.

12:18:12 17            There's another problem.  That one patient that

12:18:15 18    they had results for, didn't even get the patented method.

12:18:19 19    She was treated the old way.  She was treated the same way

12:18:24 20    that Nancy was treated.  You get the poop, you whiz it up in

12:18:28 21    a blender, you put it through, like, a tea strainer and up

12:18:32 22    it goes.  That's what the patent says.  It says figure 1

12:18:36 23    comes from the patient who got the thing in example 1.  I

12:18:40 24    asked Dr. Khoruts about example 1 and he agreed this was

12:18:45 25    just -- he got the poop from her son, remember this was a

12:18:49  1    patient-identified donor, whizzed it up and gave it to her.

12:18:52  2          So, even if it tells you something about the

12:18:55  3    change in Proteobacteria for that one patient, although you

12:18:58  4    can't read the table to really tell what that change was, it

12:19:02  5    doesn't tell you anything about using the patented method

12:19:06  6    because they didn't use the patented method on that patient.

12:19:10  7          So what really happened here is that in filing

12:19:15  8    the patent application, the University of Minnesota jumped

12:19:18  9    the gun.  I'm not casting any aspersions on Dr. Khoruts'

12:19:22 10    work, he did good and important work, but in terms of when

12:19:25 11    they filed the patent application, I would submit to you

12:19:28 12    they were rushing to get it on file.  They had data from one

12:19:31 13    patient, not with the patented method, they put that in and

12:19:35 14    they were like, let's get it on file and they jumped the

12:19:38 15    gun.

12:19:38 16          And when you look at the patent, I think you're

12:19:41 17    going to see this.  They hadn't even really identified 10%

12:19:45 18    as being a special number.  It just says 10%, 20%, 30%, 40%.

12:19:51 19    And they actually say in the patent that they don't yet have

         20    all of the results.

12:19:59 21          What do they say?  "The complexity of donor

         22    material preparation -- this is column 28, you can read

12:20:05 23    it -- technical inability to culture most of the contained

         24    microbial constituents by classic lab techniques," that

12:20:11 25    means it's really hard to grow the bacteria, which you need

12:20:14 1     to be able to do in order to figure out what they are and
12:20:16 2     what percentage of them you have; we're having a problem
12:20:20 3     doing that -- "and our ignorance as to the identity of
12:20:24 4     species that are therapeutically most important" -- we're
12:20:28 5     not even sure which of these bacteria we care about --
12:20:31 6     "precluded simple tests of donor material prior to FMT that
12:20:35 7     could predict its efficacy.  However, we are currently
12:20:39 8     working to characterize the microbial composition of donor
12:20:43 9     material and recipient fecal samples collected over time.
12:20:47 10    Results of these experiments should provide some means to
12:20:50 11    compare different donor preparations and we are working to
12:20:53 12    develop practical laboratory tests."
12:20:57 13            So, look, you don't get a patent simply because
12:21:01 14    you're working on something.  You get a patent because you
12:21:04 15    proved that it works.  They were working on characterizing
12:21:10 16    the microbial composition that would ultimately tell them
12:21:16 17    whether their method when they tested it in patients
12:21:19 18    resulted in this 10% change.  But they hadn't done that work
12:21:25 19    yet and that means this isn't something they can claim to
12:21:29 20    have invented back when they filed the patent application
12:21:33 21    because the data is not in their to support what they
12:21:37 22    ultimately claimed.  And that is why this requirement that
12:21:42 23    first -- and that's why this requirement that you have that
12:21:46 24    10% change in Proteobacteria using this method is not set
12:21:52 25    forth in the patent.  They don't have the data.

12:21:57  1          Now, there's another problem.  It says it's got

12:22:00  2    to be capable of passing through .5 millimeter sieve.  So

12:22:04  3    why .5, right?  Why that very specific requirement?  Take a

12:22:08  4    look at the patent.  They didn't say you should use .5.

12:22:15  5    They said use a filter and basically listed -- or use a

12:22:21  6    sieve and basically listed every single size of sieve

12:22:26  7    imaginable.  And then, when they actually did the

12:22:28  8    experimental work in the patent, did they stop at .5?  No.

12:22:34  9    Every single time they talk about the specific work that

12:22:36 10    they did and what their protocol is, it stops as .25.  It

12:22:40 11    doesn't stop at .5.

12:22:42 12          Now, you heard some testimony that said, oh, you

12:22:45 13    know, at some point, we did some work and we decided to

12:22:48 14    start stopping at .5.  That's not in the patent and we have

12:22:53 15    no way of knowing when that happened.

12:22:57 16          Now, Dr. Sadowsky agrees, nowhere in the patent

12:23:01 17    does it describe stopping at .5, right?  It doesn't.  He did

12:23:07 18    document and Dr. Khoruts did document the experimental work

12:23:11 19    that they did.  Those experiments were documented in

12:23:14 20    notebooks that were maintained by Dr. Sadowsky.

12:23:18 21          Now, I want to be clear.  Scientists keep

12:23:21 22    notebooks, lab notebooks.  This is like one of the basic

12:23:24 23    things that scientists do.  You do experiments, you write it

12:23:27 24    down in your lab notebook.  As you heard, often the lab

12:23:31 25    notebook pages will be signed, witnessed, and dated so you

12:23:35 1    know when particular things happened.  If there's ever a

12:23:38 2    dispute about who did something first, you've got -- you've

12:23:41 3    got the evidence and that is good laboratory practice.  You

12:23:43 4    heard that from Dr. Johnson.  Dr. Sadowsky didn't disagree,

12:23:47 5    right?  He understands that lab notebooks are very important

12:23:50 6    and that he would document in those lab notebooks work that

12:23:54 7    he did with various sizes of sieves.  So it would be

12:23:57 8    interesting to go back, right, and know at this time what

12:24:01 9    were the experiments that you were doing.  Did you ever do

12:24:04 10   an experiment just with a .5 sieve?  What happened?  Did you

12:24:07 11   think that worked?  Did you think it didn't work?  Did you

12:24:10 12   think there was a reason that you always needed to go down

12:24:13 13   to .25?  We're not going to know.

12:24:17 14          Dr. Sadowsky had all of his lab notebooks before

12:24:20 15   he retired.  You keep them as a scientist, so he had kept

12:24:23 16   all of them.  Remember he said he had 100.  He had the lab

12:24:27 17   notebooks documenting his entire career.  And then what

12:24:31 18   happened?  I asked him, "What you did is threw them away?"

12:24:34 19   He said, "I put them into the recycling bin."

12:24:38 20          Now, he agreed he could have gotten a dolly and

12:24:41 21   gotten some boxes and taken those lab notebooks over to

12:24:44 22   Dr. Khoruts, also worked at the University.  They were going

12:24:48 23   to continue working on the project together.  This included

12:24:52 24   Dr. Hamilton's lab notebooks, too.  All of them.  All of

12:24:56 25   them got recycled.  So we don't have any way of knowing what

12:25:03  1    the actual work back in the day was and, critically, we

12:25:08  2    don't have any way of knowing when it was that they decided

12:25:12  3    that .5 was a special number.

12:25:17  4            So has Ferring proven by clear and convincing

12:25:20  5    evidence that Claim 7 of the University of Minnesota patent

12:25:23  6    is invalid for lack of written description?  I think we

12:25:27  7    have.

12:25:27  8            We've presented expert testimony to you,

12:25:30  9    Dr. Treangen explained to you why he believed that to be

12:25:35 10    true.  Their expert sat there and listened to it and had

12:25:41 11    nothing to say in response, and we think that is clear and

12:25:47 12    convincing evidence that you can rely on in finding that

12:25:50 13    claim to be invalid.

12:25:51 14            That brings us to the two Borody patents, both

12:25:56 15    of which date back to March 7th of 2011, which is a little

12:26:00 16    over a year after Mr. Hlavka filed his patent application.

12:26:05 17    And here, the issue I want to talk to you about is

12:26:08 18    obviousness because under the patent laws, you can't get a

12:26:13 19    valid patent on something that is obvious.  And if you think

12:26:17 20    about it, that makes sense because when you get a patent on

12:26:20 21    something, you're taking it out of the public domain, right?

12:26:24 22            Nobody else can use the thing that you patented.

12:26:27 23    And if something is obvious, it's not your invention.

12:26:32 24    Everyone should be free to use something that is obvious

12:26:37 25    because you didn't invent it, and that's why this is a

12:26:42 1   requirement of a valid patent.  It has to be not obvious in

12:26:45 2   light of what came before it.

12:26:47 3           So how do you figure that out?  There are some

12:26:50 4   things you look at.  I want to be clear this is not all of

12:26:53 5   them, this is only -- there is four of them, this is just

12:26:55 6   three.  But the one I want to talk about is two.  It's the

12:26:58 7   differences between the claimed invention and the prior art,

12:27:01 8   that is one of those things that you're supposed to look at.

12:27:05 9   What came before, what's in the prior art, what are they

12:27:08 10  claiming to have invented, what's the difference?  And then

12:27:11 11  you look at that difference and you decide, was that

12:27:14 12  difference obvious.

12:27:17 13          So here's the basic timeline, right.  We know

12:27:20 14  that Hlavka filed his patent applications, there's actually

12:27:24 15  two of them, before Dr. Borody and we know that people had

12:27:28 16  been doing FMT for a really long time, right.  So whatever

12:27:31 17  it is that Dr. Borody invented in 2011, it's not FMT, right.

12:27:37 18  It has to be something over and above that and critically,

12:27:40 19  it has to be something over and above what Mr. Hlavka filed

12:27:46 20  his patent application on.  So let's take a look.  What did

12:27:49 21  Dr. Borody invent?

12:27:50 22          I thought that was really interesting, because

12:27:54 23  Mark Smith was asked this question at his deposition.

12:27:57 24  Remember, he was the guy who is the former CEO of Finch and

12:28:01 25  what he said is, the Borody discoveries that you can sort

12:28:07  1    of -- "use sort of a centralized donor system in order to

12:28:09  2    dramatically expedite that process really enabled the field

12:28:13  3    to move forward."  So part of that is true, the idea that a

12:28:18  4    centralized donor system dramatically expedited a process

12:28:22  5    and really enabled the field to move forward, that's true,

12:28:27  6    we agree with that, but that's not Dr. Borody's invention,

12:28:31  7    because that's what the Hlavka patent is about.

12:28:33  8         It is about having this centralized

12:28:38  9    Bacteriotherapy bank in order to have a pool of anonymous

12:28:46 10    prescreened donors and stock frozen stool for subsequent

12:28:48 11    use, these procedures and processes for how you're going to

12:28:49 12    do it, that was his invention.  So whatever it is that

12:28:52 13    Dr. Borody invented in 2011, can't be that, because that was

12:28:56 14    already out there.  And it's not just that Mr. Hlavka

12:28:59 15    applied for that, the patent office gave him a patent that

12:29:02 16    included, among other things, a temperature-controlled

12:29:05 17    storage bank as well as all of these other requirements.

12:29:08 18         And that patent, like the patents at issue in

12:29:10 19    this case is presumed to be valid, right.  Unless you show

12:29:13 20    otherwise, we presume, that is a valid patent.  So I want to

12:29:18 21    explain to you why it is that we think that the '080 patent

12:29:23 22    doesn't add anything to Hlavka, why it's obvious over

12:29:28 23    Hlavka, that there's not any invention there over and above

12:29:32 24    what Mr. Hlavka had already done.  So I want to start by

12:29:35 25    saying that's where the patent office started.  When claims

12:29:38  1    were initially presented to the patent office for the '080,

12:29:42  2    the examiner rejected them as being obvious over Hlavka.

12:29:45  3    That was the starting point.  So that was the examiner's

12:29:48  4    initial view when looking at the claims.

12:29:53  5            But remember, I said Finch gets to go in and

12:29:56  6    plead its case, right.  And that's what they did.  So they

12:29:59  7    said, look, there's two things that are not in Hlavka.  They

12:30:04  8    said the office hasn't shown that it has uncultured

12:30:08  9    nonpathogenic bacteria, and it hasn't shown that the

12:30:11 10    compositions is stable during long-term storage when frozen

12:30:15 11    and that means at least 12 months.  They didn't fight about

12:30:20 12    other things, right, but they said those two things are

12:30:23 13    missing.  So let's look at those two things.

12:30:26 14            Uncultured, nonpathogenic bacteria and the

12:30:28 15    examiner agreed, that was what the examiner said, Finch went

12:30:31 16    in, Finch pled its case, Finch said those things are new and

12:30:37 17    the examiner said, okay, and issued that.  And said, this is

12:30:37 18    why I'm doing it.  Hlavka doesn't teach the fecal bacteria

12:30:41 19    are uncultured and that the bacteria cryoprotectant mixture

12:30:44 20    is stable during long -term storage.  So the fecal bacteria

12:30:48 21    are uncultured, what does that mean?

12:30:51 22            Culturing the bacteria basically means growing

12:30:54 23    them up.  It means growing them up so you've got a lot more

12:30:58 24    bacteria than you started with.  So if the fecal bacteria is

12:31:01 25    uncultured, that basically means you've just got poop as

12:31:05  1    opposed to trying to extract the bacteria and grow up the

12:31:09  2    bacteria so you've got a higher percentage of it.  So

12:31:13  3    basically what the examiner accepted was Finch's argument

12:31:16  4    that Hlavka doesn't teach using just basic poop.

12:31:20  5            Well, as you heard from Dr. Britton, using basic

12:31:25  6    poop was not an invention.  That's what people had been

12:31:29  7    doing the entire time from the 1950s, was using uncultured

12:31:35  8    poop rather than trying to extract out and culture the

12:31:39  9    bacteria that are in it.  Nobody was culturing the bacteria

12:31:43 10    at the time.  So that was the state of the art, was to use

12:31:46 11    uncultured nonpathogenic material.  Nonpathogenic just means

12:31:50 12    it doesn't have pathogens.  You saw there was a reference in

12:31:54 13    Hlavka's screening, that's what you would do, you would

12:31:57 14    screen the pathogens.

12:31:58 15            So Dr. Britton said that can't be an invention,

12:32:01 16    that's obvious because that's what everybody had been doing

12:32:05 17    and what did Dr. Benson say in response to that?  Did he

12:32:08 18    come in and tell you that Dr. Britton was wrong about that?

12:32:11 19    He didn't.  He could have come and taken the witness stand

12:32:15 20    and said, I don't agree that people were using uncultured

12:32:19 21    stool for a long time, but he didn't come out and say that

12:32:23 22    and you can draw your open conclusions about why not.  It's

12:32:28 23    a pretty common sense point.  So that's just wrong.

12:32:31 24            And the next thing the examiner said is well,

12:32:35 25    this bacteria cryoprotectant mixture is stable during

12:32:38  1    long-term storage under freezing conditions.  And remember,

12:32:41  2    Finch had argued that means you got to be able to keep it

12:32:45  3    for 12 months, so is that an invention, was that something

12:32:48  4    that deserves a patent?

12:32:49  5                Remember, again, they had said that implies

12:32:55  6    storing it for at least 12 months.  And they said Hlavka is

12:32:58  7    silent regarding any time frame for storage.  So they said

12:33:03  8    Hlavka tells you to freeze it but it doesn't tell you that

12:33:06  9    you can keep it frozen for 12 months.  Well, again, you

12:33:10 10    heard Dr. Britton come in and testify to you about this.

12:33:14 11    And what he explained is Hlavka says you should add a

12:33:19 12    cryoprotectant and you should freeze it and the entire point

12:33:23 13    of having a cryoprotectant is to keep it stable during

12:33:26 14    long-term storage.  The reason you've got a cryoprotectant

12:33:28 15    in there is that a cryoprotectant protects from damage from

12:33:31 16    freezing.  Cryo is very cold.  That's what it means.  So

12:33:34 17    that's the whole point of having a cryoprotectant and he

12:33:37 18    said so that -- that's why it's there, you know, remember he

12:33:42 19    said, you have these things stored in your freezer for like

12:33:45 20    years, that's why you've got the cryoprotectant there.  But

12:33:48 21    there's actually another problem.

12:33:49 22                This is what Hlavka says.  Hlavka, remember,

12:33:52 23    earlier said, you add a cryoprotectant, you store it, you

12:33:56 24    freeze it and it specifies the particular in order to

12:34:01 25    maintain viability of the biota.  The biota are the

12:34:05 1    bacteria, so you're freezing it to keep all of the little

12:34:10 2    bacteria -- where did my REBYOTA go -- there, all the little

12:34:15 3    bacteria in here sort of happy, you freeze it and it tells

12:34:19 4    you what cryoprotectants you might want to use, glycol,

12:34:24 5    glycerol, etc.

12:34:25 6         So did Borody make an invention that says okay,

12:34:28 7    maybe Mr. Hlavka knew you froze it, maybe Mr. Hlavka knew

12:34:32 8    you could have cryoprotectant in there, but he didn't tell

12:34:34 9    you that you could store it for 12 months.  Did he make that

12:34:39 10   invention?  So let's go look at what Dr. Borody says.  It's

12:34:43 11   not in there.  All Dr. Borody says is, "You can add

12:34:49 12   stabilizing agents like glycerol and in one embodiment, the

12:34:52 13   stool is frozen."  If anything Dr. Borody says less about

12:34:56 14   freezing than Mr. Hlavka did.  So they can't have it both

12:35:03 15   ways, right.

12:35:04 16        If the invention requires that it be stable for

12:35:08 17   12 months and if this disclosure of freezing it and adding a

12:35:14 18   cryoprotectant isn't good enough to tell you that's going to

12:35:17 19   happen, if it's not good enough in Hlavka, it's not good

12:35:21 20   enough in Borody either.  If you need to say, you can keep

12:35:26 21   it frozen for 12 months, and Dr. Borody didn't disclose that

12:35:32 22   and he doesn't have support for that in his patent

12:35:36 23   application, and it's invalid.  And it's actually -- the 12

12:35:39 24   months isn't so important and if you can assume that once

12:35:42 25   you add a stabilizing agent like glycerol and you freeze it,

12:35:48  1    you're going to be able to store it for 12 months, well,

12:35:53  2    then, it's obvious.  If you would know that you can store

12:35:57  3    it, that a prolonged period of time is 12 months, then it's

12:36:03  4    obvious.  They can't have it both ways.  There is nothing

12:36:06  5    there in what Dr. Borody wrote that is an invention over and

12:36:13  6    above what Mr. Hlavka had already patented.  And that's why

12:36:18  7    we think this patent is invalid.

12:36:21  8            And the examiner made a mistake in accepting

12:36:24  9    Finch's argument, because Dr. Borody didn't add anything to

12:36:28 10    the state of the art.  And what you heard in that patent

12:36:31 11    video that started off this trial, is that's what you get

12:36:35 12    inventions for, you get inventions for things that move

12:36:38 13    science forward, you get inventions for things that add to

12:36:42 14    the state of the art and there is nothing in here that does

12:36:45 15    that over and above what we had already done.

12:36:48 16            What did Dr. Benson have to say about this?  Did

12:36:52 17    he come in and tell you, oh, no, wait, I see something in

12:36:56 18    Borody that's different from what's in Hlavka?  No.  He

12:37:00 19    listened to Dr. Britton's testimony, sat through it, left,

12:37:06 20    hasn't come back.  So I think that tells you something about

12:37:12 21    whether that testimony that we presented to you from

12:37:15 22    Dr. Borody was clear and convincing, because we think it

12:37:21 23    was.  And if it was, that means that claim is invalid.

12:37:27 24    Means the examiner made a mistake in accepting Finch's

12:37:31 25    arguments and if you believe that is true, it is your duty

```
12:37:35  1    as jurors, following the law, to then find that claim to be
12:37:40  2    invalid.
12:37:41  3            Now, there are a couple of additional
12:37:45  4    requirements in some of these claims that we call dependent
12:37:49  5    claims.  One of them is that the system protects the fecal
12:37:53  6    bacteria from destruction when the sealed container is
12:37:57  7    frozen.  That's the point of having a cryoprotectant.
12:38:02  8    Hlavka talks about that.  Dr. Britton explained that in his
12:38:06  9    testimony.  That's the point of having the cryoprotectant,
12:38:09 10    it protects it.  Their expert didn't come in and say that
12:38:14 11    was wrong.  Could have, but he didn't.  That makes that
12:38:17 12    claim invalid.
12:38:18 13            One of the claims has this requirement that
12:38:20 14    there's an antioxidant and you heard it doesn't say the word
12:38:26 15    antioxidant in Hlavka, that's true, but what it does say in
12:38:30 16    Hlavka is, the gut microbiota is anaerobic.  Anaerobic means
12:38:35 17    it dies when it's exposed to oxygen.
12:38:39 18            And you heard Dr. Britton say well, look, when
12:38:43 19    you're dealing with the gut microbiota and organisms that
12:38:45 20    can die with exposure to air, it's not an inventive leap to
12:38:50 21    think that you're going to use an antioxidant, because the
12:38:54 22    purpose of an antioxidant is to protect from exposure to
12:38:57 23    air.  He came in and explained that, he said that's
12:39:00 24    something you would want to do, that's obvious, of course,
12:39:03 25    you would know how to do that if you were someone that
```

12:39:06  1    worked in the field.  That's not an invention.

12:39:08  2            Did their expert come in and say that's wrong?

12:39:12  3    He didn't.  Again, you can draw your own conclusions.  But

12:39:16  4    we think that claim also is invalid because it doesn't add

12:39:21  5    anything to the work that we had already done.  So for each

12:39:25  6    of those claims for the '080 patent, we think the correct

12:39:30  7    answer is "yes," Ferring has proven by clear and convincing

12:39:35  8    evidence that the claims are invalid as obvious.

12:39:39  9            Now, I want to talk about the '309, it's very

12:39:41 10    similar, mercifully, it's very similar.  So why the '309

12:39:50 11    issue?  The patent examiner gave her reasons for allowance

12:39:53 12    and it said there were three things.  They said it was free

12:39:56 13    of rough particulate matter, it had the requirement of a

12:40:00 14    cryoprotectant and it's in a sealed container with flexible

12:40:03 15    tubing, which is to say it's in an enema bag.  Those were

12:40:07 16    the things that the examiner thought were new and might be

12:40:09 17    an invention.  So let's start with the sealed container

12:40:12 18    having a flexible tubing, right.

12:40:14 19            We know that's old, enema bags have been around

12:40:17 20    for decades.  They're sealed containers, they have flexible

12:40:20 21    tubing.  So whatever Dr. Borody invented in March of 2011,

12:40:25 22    it was not using an enema bag and you saw that the Hlavka

12:40:29 23    patent specifically talked about NMP anemic route of

12:40:32 24    administration, about using enemas.  So that can't be the

12:40:36 25    invention.

12:40:37  1        What about a cryoprotectant?  That's in Hlavka

12:40:39  2   too, right, Hlavka specifically talks about a cryoprotectant

12:40:43  3   so, again, whatever Dr. Borody invented, it can't be a

12:40:47  4   cryoprotectant.  So what's left?  Being free of rough

12:40:49  5   particulate matter.

12:40:50  6        So this is interesting, because if what it means

12:40:54  7   to be free of rough particulate matter is that you actually

12:40:59  8   separate out all of the bacteria from all of the rough

12:41:05  9   particulate matter.  If I get rid of -- I think I'm actually

12:41:11 10   supposed to get rid of the orange things but whatever.  If I

12:41:14 11   got rid of all of the orange things and the only thing that

12:41:18 12   was left were the blue things and if I had in here a

12:41:21 13   composition that was just bacteria and had no rough

12:41:24 14   particulate matter, sure, I'm not aware of anyone who did

12:41:30 15   that before 2011, that would be fair and I think that would

12:41:34 16   be a valid patent if that's what that means.

12:41:39 17        But Finch is in here telling you, well, free of

12:41:44 18   rough particulate matter doesn't actually mean free of rough

12:41:48 19   particulate matter, it just means we've taken out a little

12:41:51 20   bit of it.  That was definitely not an invention, because

12:41:55 21   people had been doing that for a long time.

12:41:59 22        Do you remember how people did FMT back in the

12:42:03 23   '50s, '60s, '70s, '80s, they used a blender and then they

12:42:07 24   used a tea strainer or a coffee strainer.  You know what

12:42:11 25   happens if you put stuff in a coffee filter, right, you get

12:42:14  1    your coffee and chunky stuff stays behind.  So the idea of

12:42:18  2    getting rid of some of the chunky stuff, that was not new,

12:42:22  3    that was not Dr. Borody's invention.  If he actually was

12:42:26  4    talking about true separation, fine, don't invalidate his

12:42:29  5    patent, that's fair.  But if you were to accept Finch's

12:42:35  6    position, that that patent only requires that you get rid of

12:42:38  7    a little bit of the chunky stuff, some of it, that was not

12:42:42  8    the invention because people had been doing that forever.

12:42:45  9          And that's what Dr. Britton explained.  He said,

12:42:48 10    "Hlavka recognizes samples are homogenized.  They are

12:42:51 11    filtered."  It's in Hlavka.  They are filtered.  Why do you

12:42:55 12    filter?  You do it to get rid of solid chunks that would

12:42:58 13    clog the enema bags.  So if that's enough, if that's all the

12:43:02 14    patent is talking about, that was absolutely in the prior

12:43:05 15    art.  It was in our earlier patent.  Getting rid of big,

12:43:10 16    chunky stuff can't be the invention here.

12:43:14 17          So they can't have it both ways, right?  They

12:43:17 18    can't say on the one hand, "Oh, we invented something that

12:43:21 19    just requires getting rid of big, chunky stuff," but on the

12:43:25 20    other hand, "Oh, no, no, no, you know, you infringe because

12:43:27 21    you've got these macroscopic particles even though we have

12:43:30 22    these macroscopic particles in here along with the

12:43:35 23    bacteria."  They can't have it both ways.

12:43:40 24          So that is why, if you accept their position on

12:43:45 25    infringement, if you say it's good enough to get rid of a

12:43:50  1    few things, even if there's a lot of macroscopic matter that

12:43:54  2    remains behind, they didn't make new inventions.  People

12:44:00  3    were using coffee filters in, like, the 1980s, if not the

12:44:06  4    1950s.  So I want you to hold them to their position.  They

12:44:12  5    need to be consistent in what they are saying this patent is

12:44:15  6    about because the idea of straining, that's all that is

12:44:22  7    required.  That was already in our patent, and that would

12:44:25  8    make the '309 patent invalid.

12:44:27  9            Now, there's a couple of additional

12:44:30 10    requirements.  One of them is PEG, polyethylene glycol.  The

12:44:36 11    patent talks about glycol.  You've heard from Dr. Park.  PEG

12:44:41 12    is a glycol.  That means it discloses it.  It discloses

12:44:45 13    glycols.  It says it.  So that can't be the invention.  That

12:44:50 14    would be invalid.

12:44:50 15            And note, the patent examiner, they didn't point

12:44:53 16    you to the examiner saying, "Oh, the invention is, you know,

12:44:57 17    PEG," or, "The invention is an antioxidant."  The examiner

12:45:00 18    thought the invention was separated, truly separated, not

12:45:05 19    that kind of separating, but, you know the full, actual

12:45:08 20    separating that we don't do.  But it didn't say these things

12:45:11 21    were inventive, and that makes a lot of sense because as

12:45:14 22    we've seen, having an antioxidant is the most obvious thing

12:45:18 23    if you're dealing with something that is going to perish in

12:45:22 24    the presence of oxygen.

12:45:23 25            Again, Dr. Britton explained this.  He walked

12:45:26 1  through those claims.  He explained that they were invalid

12:45:30 2  as obvious in view of these disclosures in Hlavka.  And,

12:45:34 3  once again, what did their expert have to say in response?

12:45:38 4  Did he come in and say, "Oh, no, there really is an

12:45:41 5  invention here about about separating.  The examiner got it

12:45:44 6  right.  These other things are important"?  He didn't come

12:45:46 7  in and say any of those things.

12:45:49 8          So, again, we met our burden of proof.  We

12:45:53 9  brought you our proof in the form of our experts.  We put it

12:45:57 10 on the table.  They testified about it.  We explained why we

12:46:01 11 think it's clear and convincing evidence.  And their experts

12:46:05 12 did not come in here and tell you that that was wrong.

12:46:10 13         So for both questions for the '309 patent as

12:46:14 14 well, we think the correct answer is that they are also

12:46:18 15 invalid.

12:46:20 16         That brings me to this question of willfulness,

12:46:23 17 of willful infringement.  So this is only a relevant

12:46:26 18 question if we infringe.  If we don't infringe and if the

12:46:29 19 patents are invalid, you get to stop relative to this.  You

12:46:32 20 can ignore everything that I'm about to say because it

12:46:35 21 doesn't matter to your decision, but I want to talk about it

12:46:39 22 because there's a couple things that I think are really

12:46:41 23 important because it's been suggested somehow that Lee

12:46:44 24 Jones, you know, blew the whistle, that she was there

12:46:47 25 saying, "Oh, my God, we infringed."

12:46:49 1        There is no evidence of that.  You heard her

12:46:52 2   testify.  She didn't say, "Oh, I was worried that we were

12:46:55 3   infringing."  She testified the opposite.  She said she was

12:46:57 4   confident that there was not a problem.  And, in fact, you

12:47:00 5   heard that when Ferring acquired Rebiotix, it is true the

12:47:04 6   question of these patents came up because everyone in this

12:47:07 7   field is reading each other's patents.  That's what you do

12:47:11 8   and figuring out and looking at what other people are doing

12:47:13 9   and they wanted to make sure there was not a problem.

12:47:17 10        So what do we do?  This is TX-3768.  You can

12:47:21 11   read it.  You're going to have it, but they did testing.

12:47:25 12   They got a bag of RBX-2660.  That was what REBYOTA was

12:47:30 13   called at the time.  They ran it through a sieve.  They did

12:47:33 14   the experiment that Dr. Johnson did.  And they said the

12:47:37 15   particles wouldn't go through even a 600 micron screen.  And

16   you got pictures of the testing they did.  They talked about

17   it.

12:47:42 18        This was the claim.  It needs to comprise no

12:47:46 19   particle having a size of greater than .5 millimeters.

12:47:47 20   We've done testing.  That's what the claim was at the time.

12:47:50 21   We found this product does contain particles.  They're

12:47:53 22   bigger, they're here, they're sitting on the filter, they

12:47:56 23   did the experiment at the time to satisfy themselves that

12:47:58 24   they did not have an infringement problem.

12:48:02 25        Now, I want to note, you're stuck with the

12:48:04  1    claims based on what you understand them to be at the time,

12:48:07  2    right?  And I told you claims change over time.  So you can

12:48:11  3    only look at the disclosure of the patents as it exists, and

12:48:15  4    it's sort of an interesting story in the context of this

12:48:19  5    case.

12:48:19  6                And I just want to give you one example.  So

12:48:21  7    Ms. Jones filed her provisional application in June of 2013.

12:48:25  8    You're going to have all these patents, and you can look at

12:48:28  9    them.  And you'll see on the first page here, if you want to

12:48:32 10    sort of check what the dates are, it's got the title, it's

12:48:36 11    got the applicant, the inventor, and then here, it says --

12:48:40 12    it gives you related U.S. applications here and it gives you

12:48:45 13    prior publication data and it tells you when the thing was

12:48:50 14    filed.  And you can look and you can see what the

12:48:55 15    original -- here's the chain of application -- data was,

12:48:58 16    what the first filing date was.  And here on the example of

12:49:02 17    this patent -- this is the '080 -- it's down here, and it

12:49:04 18    says, "Provisional application filed March 7th, 2011."  So

12:49:09 19    that earliest date, that becomes what we call their priority

12:49:12 20    date.  That's the earliest they can go in saying they made

12:49:15 21    the invention.

12:49:16 22                So Ms. Jones -- you'll be able to check this

12:49:18 23    yourself -- she files her provisional on June 2013.  Finch

12:49:22 24    is then incorporated in November of 2014.  Her patent

12:49:25 25    application then publishes.  They become -- you heard that

12:49:28  1    patent applications become public, and that's part of the

12:49:32  2    patent bargain, right?  Part of the patent bargain is you

12:49:35  3    have to tell the world about your invention so people can

12:49:35  4    learn from it.  There's nothing wrong with reading patents,

12:49:38  5    learning from them.  That's the point.

12:49:40  6          And so one of the things it talked about was

12:49:43  7    storing the REBYOTA at minus 80 for more than 12 months and

12:49:48  8    that it was stable during this long-term storage.  That

12:49:51  9    became public.  Finch then saw the results of Rebiotix in

12:49:56 10    terms of the trials and things we were doing.  In 2016, our

12:49:59 11    patent issued.  And then in May of 2022, Finch files this

12:50:07 12    patent application that results in the '080 patent.

12:50:10 13          Now, I want to be clear.  It's a little

12:50:13 14    confusing because you're thinking to yourself, well, wait a

12:50:16 15    minute, didn't they file it back in 2011?  They filed a

12:50:20 16    provisional here.  They then filed a patent application, but

12:50:22 17    then you keep being able to file what are called

12:50:24 18    continuations, all of which go back and get the benefit of

12:50:29 19    this date.  So you basically keep making new filings with

12:50:34 20    the Patent Office, got the same disclosure, but it's in a

12:50:37 21    new filing.  When you make a filing, you have to pay new

12:50:40 22    fees.  That's probably why you have to keep making new

23    filings, right, to keep getting fees.

12:50:41 24          But they make a new filing.  So they make a

12:50:44 25    filing in May of 2022 based off of this 2011 disclosure, and

12:50:50  1   what do they do?  They now seek claims for the first time to

12:50:55  2   something that is stable during long-term storage when

12:51:00  3   frozen.

12:51:02  4          So if you're thinking about whether you've got a

12:51:06  5   problem from a willfulness point of view, you're probably

12:51:10  6   not thinking that it is going to be a problem with respect

12:51:13  7   to storage, long-term storage at minus 80 degrees if you're

12:51:18  8   thinking about this problem in 2014, 2015, 2016 or 2017.  So

12:51:23  9   I think it's important to understand the timing.  When you

12:51:27 10   think about people's state of mind and what was the evidence

12:51:30 11   that was in the record that was actually in front of them

12:51:32 12   that they could look at for what people had claimed to have

        13   invented.

12:51:38 14          So for a lot of reasons, I think the answer to

12:51:42 15   this question -- and I hope you don't get to this question.

12:51:42 16   I don't think you should, but if you were to get to this

12:51:45 17   question, I think that the answer to this question ought to

12:51:47 18   be no because Ms. Jones and her colleagues at Rebiotix and

12:51:54 19   the people had Ferring acted in good faith.  They did the

12:51:57 20   tests, they looked at the patents and they believed exactly

12:52:00 21   what I am telling you here today, which is there is no

12:52:04 22   infringement of any valid claim because we don't infringe

12:52:07 23   the University of Minnesota patent and because this Borody

12:52:11 24   disclosure is not any different from the work that

12:52:14 25   Mr. Hlavka already had done and we were relying on.

12:52:18  1          Now, I want to touch very briefly on this
12:52:21  2   question of damages.  And, again, I am hoping that you can
12:52:24  3   ignore everything that I'm about to say because it's not
12:52:27  4   going to matter.  But I do want to respond to it because
12:52:30  5   they are asking for a lot of money.  And I've got to talk
12:52:36  6   about that.
12:52:37  7          So what do you get if you infringe a patent?
12:52:40  8   You get a reasonable royalty.  That's what you've heard.
12:52:43  9   And you've heard that it's what someone would pay in a
12:52:46 10   hypothetical negotiation for a license to the patent.
12:52:51 11          So you heard Mr. Kidder.  He explained how this
12:52:54 12   works.  And the experts agree on the basic paradigm about
12:53:00 13   how you do the analysis.  You start with a comparable.  He
12:53:03 14   thought the best comparable is University of Minnesota
12:53:05 15   agreement.  I'll talk about why.  And it was at 3%, and he
12:53:09 16   made adjustments, adjusting upwards for reasons that he
12:53:13 17   explained, University license, among other reasons, and he
12:53:16 18   said a reasonable royalty would be 5.5% of our sales.
         19          Why did he start with the University of
12:53:21 20   Minnesota license as a license for these patents?  It was a
12:53:24 21   number that the University of Minnesota agreed to.  They're
12:53:27 22   one of the plaintiffs, and the best evidence is what
12:53:30 23   somebody -- of what somebody would charge for something is
12:53:32 24   what they did charge for something.  Right?  That's the best
12:53:35 25   evidence of what that thing is actually worth.

12:53:37  1        And then he did a reasonableness check, and he

12:53:41  2    said, "All right.  How does that compare to the University

12:53:44  3    of Minnesota, and how does that compare to every other

12:53:46  4    finance agreement that Finch has entered into?"

12:53:48  5        Now, there were a couple licenses with

12:53:51  6    OpenBiome.  Sure.  It's a nonprofit, but still, Finch was

12:53:55  7    willing to license, you know, a company to make an

12:53:58  8    enema-based product at a rate.

12:54:01  9        There was the collaboration with Takeda to be

12:54:04 10    sure.  It had the potential for big milestones because it

12:54:08 11    was a product development agreement, the royalty rate for

12:54:12 12    patents of 3%, and a University of Arizona license agreement

12:54:16 13    and said, "This looks pretty reasonable."  And if you apply

12:54:20 14    that percentage to our total sales to date, all of the money

12:54:23 15    that Ferring has made from selling REBYOTA, that's $815,000.

12:54:28 16        Now, you heard that the University of Minnesota

12:54:30 17    license agreement has an upfront payment of $145,000, and it

12:54:35 18    does.  And you also heard Mr. Kidder say he doesn't think

12:54:40 19    here there would have been any upfront payment because, in

12:54:43 20    the case of that license agreement, the University of

12:54:46 21    Minnesota didn't know it was going to make anything because

12:54:48 22    a product was years and years and years away.

12:54:50 23        And you heard most products fail.  So odds are

12:54:54 24    they were going to license these patents and get nothing in

12:55:00 25    terms of running royalties because you only get those

12:55:02 1    royalties if there's a sale.  If there's no product, there's

12:55:05 2    no sale.  If there's no sale, there's no royalty.  So it was

12:55:08 3    entirely likely that $145,000 was going to be it.  Whereas

12:55:13 4    in the negotiation, this hypothetical negotiation between us

12:55:16 5    and Finch, we're about to start selling REBYOTA.  So they

12:55:20 6    know they're going to get something because there's actually

12:55:22 7    a product to sell.

12:55:26 8           So our expert, using the University of Minnesota

12:55:28 9    license, said $815,000.  Obviously, the experts came in here

12:55:33 10   and presented to you wildly differing views about what the

12:55:38 11   number should be.  We think Mr. Malackowski's number is just

12:55:44 12   fundamentally wrong here.  And we think that's true for a

12:55:48 13   bunch of reasons.

12:55:50 14          Reason number 1, he didn't start off with a

12:55:53 15   patent license.  He essentially ignored the patent license

12:55:57 16   to the actual patents-at-issue in this case.  And instead,

12:56:00 17   he relied on a product license to a product that had been

12:56:05 18   developed.

12:56:07 19          Now, what were the patent -- well, were patents

12:56:10 20   included as part of that bundle?  They were.  We know

12:56:14 21   nothing about those patents because all the information

12:56:16 22   about those patents was redacted.  It was whited out from

12:56:20 23   the agreement.  So if you wanted to compare how those

12:56:23 24   patents compare to Dr. Borody's patents or the University of

12:56:27 25   Minnesota patents, good luck.  There's nothing to rely on.

12:56:29  1    There's literally no way to make that comparison because we

12:56:33  2    don't know what they are.

12:56:34  3            And Mr. Malackowski himself agreed that a

12:56:38  4    collaboration agreement and a bare patent license are

12:56:42  5    fundamentally different agreements.  You may wonder why he

12:56:46  6    was willing to agree to that because he said it before, but

12:56:49  7    he agreed to that, right?  They are fundamentally different

12:56:52  8    agreements.  And that's because they are because you heard

12:56:57  9    Mr. Kidder explain a product sale is like the sale of an

12:57:02 10    apartment building.  You are buying a product with all of

12:57:06 11    the rights that go with it, right, the product itself.

12:57:09 12            And a patent license is like renting an

12:57:14 13    apartment inside that apartment building.  No big surprise

12:57:17 14    that the economics of buying an apartment building and the

12:57:21 15    economics of renting an apartment are very different.  And

12:57:26 16    Mr. Malackowski admitted that none of the licenses that he

12:57:29 17    relies on are just patent licenses.  Every single license he

12:57:34 18    relied on was a product transaction.  And if you ask

12:57:39 19    yourself, it makes sense because they are so different, he

12:57:48 20    didn't want to include a patent license because they would

12:57:52 21    mess up his numbers because they are a lot less.

12:57:54 22            Now, the Court has instructed you that

12:57:56 23    damages -- the damages reward has to reflect the portion of

12:58:00 24    the royalty attributable to the patented compositions or

12:58:03 25    methods.  In other words, your damages award must reflect

12:58:08  1    the value you find attributable to the asserted claims.  In

12:58:11  2    other words, the thing that you're trying to do and that the

12:58:14  3    damages experts are supposed to do is figure out how much

12:58:18  4    are these claims worth, right?  How much are these specific

12:58:21  5    claims worth?

12:58:22  6            Dr. Malackowski -- or Mr. Malackowski, sorry, he

12:58:25  7    didn't do that.  He didn't even try to do that.  Now, he

12:58:28  8    admitted that is the test, that's the test.  You're valuing

12:58:33  9    the incremental value that patented invention has over the

12:58:37  10   prior art.  What does that mean?  Take Borody, how much does

12:58:41  11   Borody add to what Hlavka did?  That's what you're trying to

12:58:45  12   put a value on and a number on.

12:58:47  13           What's the difference?  He didn't try to do that

12:58:50  14   because he was making an assumption.  This is really

12:58:55  15   important.  I asked Mr. Malackowski about something that he

12:59:00  16   was told by Dr. Benson.  I said, in fact, what Dr. Benson

12:59:07  17   told you -- remember, Dr. Benson is their technical expert,

12:59:09  18   was that in view of Finch's patent portfolio, it would be

12:59:13  19   impossible to develop a product using fecal transplant

12:59:19  20   technology directed to C. diff.  Words to that effect?  Yes.

12:59:24  21   A remarkable, precise answer from Mr. Malackowski.  Yes.

12:59:26  22           So what is he saying?  Dr. Benson told him there

12:59:29  23   is no way to have an FMT product directed to C. diff without

12:59:33  24   using these inventions.  It's not that surprising, I think,

12:59:39  25   that Dr. Benson said that is not what I said, right?

12:59:42  1    Because he was asked, are you telling me it would be

12:59:46  2    impossible to develop any product in this field without

12:59:48  3    using the asserted patents?  No, no.

12:59:50  4            And you didn't tell that to Finch's expert,

12:59:52  5    Malackowski, right?  I don't believe so, no.

12:59:54  6            I mean, no surprise that Dr. Benson said that

12:59:57  7    because that's nuts, right?  FMT has been around since at

13:00:01  8    least the 1950s.  You don't need 2011 technology to do FMT.

13:00:08  9    It's been around forever, that can't be right.  But that was

13:00:12 10    the cornerstone assumption that Mr. Malackowski made and the

13:00:17 11    reason that he was able to say, I don't need to look at the

13:00:20 12    prior art and stuff because these patents are so

13:00:23 13    foundational and fundamental to FMT that you can't have a

13:00:27 14    product without them.  That was just wrong and it is

13:00:30 15    inconsistent with the Court's jury instructions because the

13:00:33 16    Court has said that you can award damages based only on

13:00:36 17    royalties that are directly attributable to the value of the

13:00:39 18    patented technology, not what people had done before.

13:00:42 19            You can't charge for the fact that FMT works.

13:00:45 20    You can't charge for Hlavka.  You can't charge for other

13:00:49 21    prior art.  You can only charge for what this added and

13:00:56 22    Finch has no evidence, no proof.  Again, this is something

13:01:00 23    on which they bear the burden of proof of Mr. Malackowski's

13:01:04 24    assumption.  It was contradicted by Dr. Benson.  There is no

13:01:08 25    evidence that PEG is some critical thing that you have to

13:01:12 1  have.  There's no evidence that being able to have an FMT

13:01:16 2  product depends on having a .5 millimeter sieve, that you

13:01:20 3  can't have a product without it.  There's no evidence that

13:01:22 4  you have to have an antioxidant or you have to separate

13:01:25 5  rough particulate matter, and that all of those are

13:01:28 6  essential ingredients in a successful product.  There's no

13:01:32 7  reason to think that and that means that Mr. Malackowski's

13:01:36 8  whole opinion collapses because that was the foundation on

13:01:39 9  which he was testifying.

13:01:42 10        Mr. Malackowski's third mistake, relying on

13:01:45 11 projections rather than sales when he had the actual numbers

13:01:48 12 and he just ignored them.  Now, you just heard an effort to

13:01:51 13 say, well, maybe sales were off to a slightly slower start

13:01:55 14 than they were expecting, but it's not really that big a

13:01:58 15 deal.  The numbers show it is a real big deal.

13:02:01 16        These are what the projections were through

13:02:03 17 August of 2024.  Those are the actual sales.  There is a

13:02:08 18 huge discrepancy.  So if we get to damages, we're supposed

13:02:11 19 to be talking about what we owe for the infringement that

13:02:13 20 has happened, not what might happen in the future.  You pay

13:02:17 21 for that in the future.  But the infringement that has

13:02:20 22 happened.

13:02:20 23        The infringement that has happened is

13:02:23 24 $14 million worth of sales.  They're trying to keep talking

13:02:26 25 about billions and hundreds of millions of really large

13:02:29  1    numbers in the hopes that, you know, if you talk about

13:02:31  2    really large numbers often enough, then you think that

13:02:35  3    really large numbers are appropriate.  But the reality is

13:02:37  4    $14 million in actual sales.

13:02:40  5            If you have the actuals and you're

13:02:43  6    Mr. Malackowski, why don't you use them, right?  I want you

13:02:49  7    to think about that.

13:02:51  8            Mr. Malackowski's next mistake, he didn't do any

13:02:55  9    reasonableness check.  He didn't really sit here and say,

13:02:59 10    oh, why would it be a 30% royalty if the University of

13:03:03 11    Minnesota license agreement is only 3.  Now, you just heard,

13:03:05 12    well, it looks reasonable in light of the Nestlé-Seres

13:03:09 13    agreement at 50%.  That's not a 50% royalty, that is a 50%

13:03:16 14    profit split.  That is two companies who are getting

13:03:18 15    together as commercial partners to sell a product and

13:03:21 16    they're saying we're going to split the profits of that

13:03:24 17    product 50/50.  That has nothing to do with what you would

13:03:27 18    pay for a license to any patent, let alone these.  And that

13:03:31 19    is how Mr. Malackowski is able to say, even though we have

13:03:34 20    only sold $14.8 million of product, you should pay

13:03:41 21    $55 million in fees to them.

13:03:45 22            In other words, that we should pay almost four

13:03:48 23    times as much as we have made total in royalty fees, right?

13:03:52 24    That's like you get a paycheck and you get asked for, like,

13:03:57 25    4x.  That's insane and that is not how patent damages work.

13:04:04  1          Now, I'll note I asked Mr. Malackowski's some
13:04:07  2    questions about his testimony in a prior case because the
13:04:10  3    fact that it's insane is reflected in his opinion in this
13:04:14  4    other case.  Here, he's on the plaintiff's side, he says
13:04:17  5    $14.8 million in sales, $54 million in damage.  When he was
13:04:21  6    a defense expert for the $377 million worth of sales in a
13:04:26  7    pharmaceutical case about a melanoma, a cancer drug, he said
13:04:31  8    a reasonable royalty was $2 million.  That's a lot more in
13:04:35  9    line with reality than what he's proposing here.

13:04:40 10          Now, how does Mr. Malackowski try to justify
13:04:43 11    this?  You've heard this theme running throughout Finch's
13:04:47 12    case that they failed and they were so close and that it was
13:04:50 13    at least in part somehow our fault.  So let's just look at
13:04:56 14    the -- take a look at the evidence that came in about why
13:04:59 15    Finch actually failed.  I guess we can parse words, but I
13:05:04 16    would call several hundred million dollars an investment and
13:05:07 17    no product at the end of it, a failure.  I don't mean that
13:05:10 18    to cast aspersions.  I think the guys who founded Finch were
         19    good guys who were trying to do good things, but I don't
13:05:15 20    think that there is any universe where you can call that a
13:05:16 21    success.

13:05:18 22          So why, right?  Well, Mr. Burgess gave some
13:05:22 23    answers.  Startups are risky, most companies don't make it,
13:05:26 24    most drugs aren't approved by the FDA.  It's a really big
13:05:30 25    deal to develop a drug that actually gets approval by the

13:05:33  1    Food and Drug Administration.  You heard that most of them

13:05:36  2    fail, most of them don't.  Big investment, big risks.  Big

13:05:42  3    reward if you're successful, that's true.  But big

13:05:44  4    investment and big risk, and most companies are not

13:05:47  5    successful.

13:05:47  6            And Finch was founded after Seres and Rebiotix

13:05:52  7    had already entered the field in 2010 and 2011,

13:05:55  8    respectively.  In fact, they didn't even start OpenBiome

13:05:59  9    until after that.  So they were coming in already behind.

13:06:03 10    Finch is incorporated in 2014 and you'll remember, it starts

13:06:06 11    out life as a software company and then they decide they're

13:06:11 12    going to pivot and try to make a drug.  They do that after

13:06:14 13    they learned that REBYOTA's was trying to develop a drug.

13:06:17 14    So, again they know they're behind, they know Rebiotix is

13:06:20 15    out in front.  They weren't worried about it.  They weren't

13:06:23 16    worried about it because they thought that Rebiotix's enema

13:06:27 17    product was fundamentally challenged given difficulties in

13:06:31 18    targeting product delivery and ensuring retention.  They

         19    thought enema is a bad idea, so they decided to develop a

13:06:35 20    pill and they weren't worried about competition from an

13:06:38 21    enema product because they thought it was going to fail and

13:06:40 22    that's why they said internally it's not a significant

13:06:43 23    competitor to CP101, that was their pill product, given its

13:06:47 24    enema route of administration.  And, in fact, when they saw

13:06:52 25    our data, they thought it was great.  They thought it was an

13:06:55 1    ideal outcome, validation for the field because it was

13:06:59 2    showing generally that you had had an FMT product, but great

13:07:00 3    for them because they were differentiated, they had a

13:07:05 4    different product because they had a pill, and they thought

13:07:08 5    their product was better.  That's in May of 2021.

13:07:11 6            Now, again, I want to note, their pill product

13:07:16 7    to treat C. diff was not the only product they had that

13:07:19 8    failed.  They tried to go after a lot of different things at

13:07:24 9    the same time.  They spread their effort and their attention

13:07:28 10   and their money around.  They all failed.  They had a

13:07:31 11   partnership with Takeda, that failed.

13:07:34 12           Rebiotix tried to do one thing and one thing

13:07:37 13   only, make this.  This was it.  Every person at the company,

13:07:42 14   all of the money, all of the effort was this, and that was

13:07:46 15   it.  These guys tried to do a whole bunch of stuff and

13:07:51 16   ultimately, it turned out that none of it was successful.

13:07:55 17   They also ran into some challenges with the FDA.

13:08:00 18           Interacting with FDA is hard.  It's complicated,

13:08:04 19   it is hard, it is a difficult regulatory environment.  You

13:08:08 20   need to know what you're doing, you need to get stuff right.

13:08:11 21   That's why one of the first things that Lee Jones did at the

13:08:13 22   University of Minnesota was introduce Dr. Khoruts and Dr.

13:08:16 23   Sadowsky to experts in FDA regulatory approval.  It's really

13:08:20 24   hard.

13:08:20 25           Finch had a lot of problems.  There was an

13:08:23  1    issue, and you heard testimony about this, where two

13:08:26  2    patients died after using OpenBiome materials, clinical

13:08:30  3    holds got put in place in March of 2020 -- it was COVID --

13:08:35  4    for both of their products.  Finch kept using OpenBiome

13:08:39  5    materials.  They said that they were operationally

13:08:39  6    constrained, they were burning cash.  They, then, got put on

13:08:43  7    another clinical hold by the FDA for their CP101 pill

13:08:47  8    product.  That led them to having to reduce their work

13:08:51  9    force.  Takeda canceled their agreement for the other

13:08:54 10    indications and just having invested money, just pulled the

13:08:57 11    plug on the whole thing.  They started dosing for CP101 in

13:09:00 12    October of 2022, then they discontinued one of their other

13:09:05 13    products and then in January of 2023, they discontinued

13:09:08 14    CP101.  I would suggest to you it's not that hard to figure

13:09:12 15    out what happened and it wasn't our fault.

13:09:19 16              And brings me back to Lee Jones and the

13:09:22 17    University of Minnesota and her long relationship with the

13:09:28 18    University.  You heard she went to college there, she got

13:09:31 19    her MBA there.  She's been involved with the University both

13:09:36 20    before, with the Diabetes Institute and since.  And when

13:09:43 21    Rebiotix got sold to Ferring, it was big news in Minnesota.

13:09:46 22    That was a big deal.  You've got a company that's getting

13:09:49 23    acquired.

13:09:50 24              What did the University say then?  Did they say

13:09:53 25    you did something wrong in starting this company?  No.  Did

13:09:57  1    they say you've got a product, you must be infringing our

13:10:00  2    patents?  No.  They said, "Congratulations on the exit.  I'm

13:10:05  3    sure this is great news to all involved in the company, it

13:10:09  4    is also great news for the community," the community of

13:10:11  5    which the University of Minnesota and Lee Jones are both a

13:10:14  6    part.  And I would suggest to you that that was true.

13:10:16  7            And, in fact, Russ Straate in May of 2021 asked

13:10:22  8    Ms. Jones to come in and lead out a new company to be

13:10:27  9    founded on University of Minnesota technology and to serve

13:10:31 10    as the CEO.  And then in 2020, the University of Minnesota

13:10:40 11    gave her an award as entrepreneur of the year to recognize

13:10:48 12    her entrepreneurial success and to recognize her

13:10:50 13    significance contributions to the University.  And I want to

13:10:51 14    read this, "You would be hard pressed to find anyone that

13:10:54 15    has been more involved in supporting the entrepreneurial

13:10:58 16    community at the University of Minnesota.  Lee is the

13:11:01 17    consummate role model for our students and alumni.  While

13:11:02 18    building two highly successful healthcare companies, she has

13:11:06 19    continuously given back by inspiring and supporting the next

13:11:10 20    generation of entrepreneurs."

13:11:13 21            And I would suggest to you that is not an easy

13:11:16 22    thing to do.  Finch got a lot of money.  They were not able

13:11:21 23    to do it.  She pulled together a small group of investors,

13:11:26 24    she started a company, she hired the first employees, they

13:11:29 25    developed a new and different process, and that led to the

13:11:35  1    first FDA approval of this entire category of drugs.  This

13:11:45  2    new product that, for the first time, gave patients an

13:11:49  3    FDA-approved safe and effective treatment for C. diff.

13:11:55  4    That's hard to do, most companies can't do it, and she and

13:12:02  5    this group of people did.

13:12:04  6              She doesn't work for Ferring anymore.  Courtney

13:12:08  7    Jones doesn't work for Ferring anymore.  But they came here

13:12:13  8    to testify because this is important to them and she wants

13:12:17  9    to clear her name because I would suggest to you that her

13:12:21 10    name has been dragged through the mud and this is important

13:12:24 11    to her.

13:12:26 12              So I would ask you in this case to do just that

13:12:32 13    and we would ask you to render a verdict for the defense.

13:12:36 14              And I want to thank you very much for the time

13:12:40 15    and attention and thoughtfulness with which you have

13:12:48 16    approached this case.  Thank you.

13:12:51 17              THE COURT:  Thank you, counsel.

13:12:52 18              Could I see counsel at sidebar briefly?

13:13:14 19              (Sidebar discussion.)

13:13:14 20              THE COURT:  Well, the first question I had

13:13:15 21    was -- I wanted to address the curative instruction.

13:13:18 22              Are we withdrawing that?

13:13:20 23              MS. DURIE:  Yeah.  I'll withdraw the question.

13:13:21 24              THE COURT:  The second thing I wanted to address

13:13:23 25    is that Finch has five minutes, exactly, left.

13:13:28  1                    MR. DE VRIES:  That's what I was going to say,

13:13:31  2      too.  Just wanted to confirm.

13:13:33  3                    THE COURT:  Yeah.

13:13:49  4                    (Sidebar discussion concluded.)

13:13:49  5                    MR. DE VRIES:  Your Honor, may I proceed?

          6                    THE COURT:  Yes.

13:13:50  7                    MR. DE VRIES:  Thank you.

13:13:51  8            I'm not going to have time to respond to most of

13:13:54  9      what you heard over the last hour and 50 minutes, you're

13:13:57 10      going to have to rely on your evidence and your common

13:14:00 11      sense.  I'd like to address a few points.

13:14:03 12            Could I get slide 4.

13:14:04 13            They don't have an answer for this.  This

13:14:06 14      doesn't say we reviewed Hamilton 2012 and we thought about

13:14:10 15      some other things and went in a different direction.  It

13:14:13 16      says the manufacturing process for RBX-2660 was derived from

13:14:18 17      Hamilton 2012.

13:14:20 18            Slide 15.  They didn't address this at all

13:14:23 19      during their presentation.  This is Mike Berman talking

13:14:26 20      about reviewing the University patent application with Lee

13:14:31 21      Jones when they were founding Rebiotix.  They have no

13:14:36 22      answer.

13:14:36 23            Slide 91.  They suggested that Dr. Benson didn't

13:14:40 24      do any testing.  That's not true.  He did.  He showed it to

13:14:45 25      you.  He also analyzed their testing.  He explained why

13:14:49  1    under all the testing, there was infringement that clearly

13:14:54  2    established that REBYOTA meets the claims and nothing about

13:14:59  3    a bag of REBYOTA that's been sitting out of the refrigerator

13:15:03  4    for hours and has been handled, it is going to change that,

13:15:07  5    even if the microscopic particles that went through the .5

13:15:12  6    millimeter pores have clumped together after all of that

13:15:16  7    handling and sitting around.  Kind of like the prune

13:15:20  8    experiment, it's not relevant.

13:15:22  9            Slide 128, please.  They spent a lot of time

13:15:26 10    talking about, that we didn't bring experts to respond to

13:15:31 11    their invalidity arguments.  And I think what that argument

13:15:34 12    is intended to suggest is that although they acknowledged

13:15:40 13    they have a clear and convincing burden in taking away the

13:15:44 14    patents from the University and from Finch, that because we

13:15:49 15    didn't have experts come and bring Dr. Benson back for

13:15:52 16    another round of examination, that there was some problem

13:15:55 17    with that, that means we agree.  It is the opposite.  I

13:16:00 18    showed you this during my opening presentation.  Their own

13:16:04 19    experts under the -- being subjected to our

13:16:07 20    cross-examination, admitted key things that are

13:16:11 21    fundamentally contradictory to their invalidity arguments.

13:16:16 22            They admitted, Dr. Treangen admitted that

13:16:19 23    their -- that when he sees this figure, he knows that

13:16:23 24    they're based on underlying tables of data and numbers.

13:16:26 25    With that admission, we had no need to take any more of your

13:16:31  1    time to bring Dr. Benson back or anyone else.  They had

13:16:34  2    failed their burden of proof and that was it.

13:16:38  3            If you go to slide 109, it's the same for

13:16:42  4    Dr. Britton.  I asked him a number of questions.  He

13:16:45  5    admitted, Hlavka doesn't teach antioxidant.  He didn't show

13:16:48  6    any other prior art reference that does.  Hlavka doesn't say

13:16:52  7    polyethylene glycol.  When their invalidity case is over,

13:16:58  8    then there's no need to take up more of your time.  We've

13:17:02  9    taken up enough of your time and now it's time for you all

13:17:06 10    to have the opportunity to decide what you think of all the

13:17:09 11    evidence.  This will be your decision, it is your choice,

13:17:13 12    not the lawyers.

13:17:15 13            Could I please get slide 161?  As I expected

13:17:22 14    might happen, we heard even new arguments during the course

13:17:26 15    of the closing arguments that we never really saw, even

13:17:29 16    during the trial, I never heard anyone talking about this

13:17:31 17    and there was a lot of new information that you've never

13:17:35 18    seen provided about Lee Jones' patents and the Hlavka

13:17:38 19    patent.  Her Honor has instructed you, that whether Ferring

13:17:41 20    has patents or patent applications and whether any of them

13:17:46 21    cover REBYOTA, should not be considered in your

13:17:49 22    determination of whether Ferring infringes, it's irrelevant.

13:17:52 23            Slide 143, let me end here.  Got one more

13:17:56 24    minute.  Ferring Pharmaceuticals, they didn't bring anyone

13:18:00 25    who currently works at the company, not one person to answer

```
13:18:03  1    our questions live under oath about why they launched
13:18:06  2    REBYOTA in January of 2023.
13:18:09  3              Next slide.  They've tried to suggest that we're
13:18:12  4    attacking Lee Jones.  That is not true.  They're the
13:18:16  5    defendant.  They didn't bring anyone to come for you to see
13:18:23  6    live and answer questions.
13:18:24  7              Next slide, please.  The witnesses that they
13:18:26  8    brought haven't been affiliated with them for years.  Mike
13:18:29  9    Berman, no involvement after 2018, Lee Jones stopped working
13:18:33 10    for Ferring in 2022, Courtney Jones, she was laid off.  No
13:18:38 11    one from the company who's the actual defendant is here and
13:18:40 12    the misdirection about Lee Jones means nothing in terms of
13:18:44 13    whether they infringed.
13:18:46 14              Next slide.  The last thing I'll say is, so just
13:18:51 15    to remind you that instead of coming to face you all live,
13:18:55 16    what did they do instead?  Did they ask for a royalty?  Did
13:18:58 17    they pay anything?  No.  They threatened and bullied a
13:19:02 18    public University.
13:19:02 19              With that, I'm done.  I wish you the best of
13:19:05 20    luck in your deliberation and I thank you again on behalf of
13:19:10 21    our clients.
13:19:10 22              THE COURT:  Thank you, Counsel.
13:19:12 23              Ladies and gentlemen, we'll finish with the last
13:19:14 24    jury instruction, it's 11.3.  Duty to deliberate.
13:19:18 25              Now that all the evidence is in and the
```

13:19:19  1    arguments are completed, you are free to talk about the case

13:19:23  2    in the jury room.  In fact, it is your duty to talk with

13:19:26  3    each other about the evidence and to make every reasonable

13:19:30  4    effort you can to reach unanimous agreement.

13:19:32  5            Talk with each other, listen carefully and

13:19:35  6    respectfully to each other's views and keep an open mind as

13:19:39  7    you listen to what your fellow jurors have to say.  Try your

13:19:43  8    best to work out your differences.  Do not hesitate to

13:19:47  9    change your mind if you're convinced that the other jurors

13:19:50 10    are right and that your original position was wrong but do

13:19:54 11    not ever change your mind just because other jurors see

13:19:58 12    things differently or just to get the case over with.

13:20:01 13            In the end, your vote must be exactly that, your

13:20:04 14    own vote.  It is important for you to reach unanimous

13:20:07 15    agreement but only if you can do so honestly and in good

13:20:11 16    conscience.  No one will be allowed to hear your discussions

13:20:15 17    in the jury room and no record will be made of what you say.

13:20:18 18    So you should all feel free to speak your mind.  Listen

13:20:22 19    carefully to what the other jurors have to say and then

         20    decide for yourself.

13:20:26 21            And at this time, I am going to ask my courtroom

13:20:26 22    deputy to hand out the verdict forms.  Thank you and I'll

13:20:46 23    ask the Court security officer to come forward.

13:20:58 24            COURT CLERK:  Please raise your right hand.

13:21:01 25            COURT SECURITY OFFICER, having been duly sworn,

1    was examined and testified as follows:

13:21:15  2                    COURT SECURITY OFFICER:  I do.

13:21:15  3                    COURT CLERK:  Thank you.

13:21:19  4                    THE COURT:  All right.  Mr. Kohler, let's take

13:21:33  5    the jury back to the jury room.

13:21:37  6                    (Jury exits.)

13:21:57  7                    THE COURT:  All right.  Please be seated.  All

13:22:04  8    right.  I'd like to ask each side to make sure that we have

13:22:09  9    cell phone numbers where we can reach you in case the jury

13:22:12 10    has a question or we get a verdict.

13:22:15 11                    Is there anything else we need before we recess?

13:22:18 12                    MR. DE VRIES:  Not for the University or Finch.

13:22:21 13                    MS. DURIE:  No, Your Honor.

13:22:22 14                    THE COURT:  All right.  Thanks very much,

13:22:24 15    everyone.  We'll be in recess.

16:16:00 16                    (A brief recess was taken.)

16:21:05 17                    COURT CLERK:  All rise.

16:21:10 18                    THE COURT:  Please be seated.  I understand that

16:21:13 19    we have a verdict.  I'll ask my courtroom deputy to bring

16:21:19 20    out the jury.

16:21:25 21                    (Jury enters.)

16:22:19 22                    THE COURT:  Please be seated.  All right.

16:22:26 23    Ladies and gentlemen of the jury, I understand that you have

16:22:28 24    a verdict.  Can the foreperson indicate whether or not

16:22:31 25    that's correct?

16:22:33  1              JURY FOREPERSON:  Yes.

16:22:36  2              THE COURT:  Okay.  I'll ask my courtroom deputy

16:22:39  3      to take the verdict from the foreperson.

16:22:51  4              Mr. Kohler, could you please read the verdict.

16:23:27  5              COURT CLERK:  Yes.

16:23:28  6              Question 1.  Do you find that UMN/Finch has

16:23:31  7      proven by the preponderance of the evidence that Ferring

16:23:33  8      literally infringed the following claims of the following

16:23:36  9      patents:

16:23:37 10              '914 patent, Claim 7?  Yes.

16:23:40 11              '309 patent, Claim 16?  Yes.

16:23:43 12              '309 patent, Claim 21?  Yes.

16:23:47 13              '080 patent, Claim 2?  Yes.

16:23:51 14              '080 patent, Claim 9?  Yes.

16:23:55 15              Question 3.  Do you find that UMN/Finch has

16:23:58 16      proven pie a preponderance of the evidence that any

16:24:01 17      infringement by Ferring of the following patents was

16:24:03 18      willful?

16:24:04 19              '914 patent?  Yes.

16:24:08 20              '309 patent?  Yes.

16:24:10 21              '080 patent?  Yes.

16:24:13 22              Question 4.  Do you find that Ferring has proven

16:24:17 23      by clear and convincing evidence that the following claims

16:24:20 24      of the following patents are invalid as obvious:

16:24:22 25              '309 patent, Claim 16?  No.

16:24:26  1          '309 patent, Claim 21?  Yes.

16:24:30  2          '080 patent, Claim 2?  No.

16:24:34  3          '080 patent, Claim 9?  Yes.

16:24:36  4          Question 5.  Do you find that Ferring has proven

16:24:40  5  by clear and convincing evidence that the following claims

16:24:43  6  of the following patents are invalid for lack of written

          7  description:

16:24:46  8          '914 patent, Claim 7?  No.

16:24:49  9          '080 patent, Claim 2?  No.

16:24:53 10          '080 patent, Claim 9?  No.

16:24:55 11          Question 6.  What dollar amount do you determine

16:24:58 12  to be a reasonable royalty to compensate UMN and Finch for

16:25:02 13  Ferring's infringement through the date of the trial?

16:25:04 14          Running royalty, if any:  $815,061.

16:25:08 15          Upfront payment:  $25 million.

16:25:16 16          THE COURT:  Do we have any requests to poll the

16:25:19 17  jury?

16:25:19 18          MR. DE VRIES:  No, Your Honor.

16:25:21 19          MS. DURIE:  Can we please poll the jury?

16:25:25 20          COURT CLERK:  Members of the jury, is this the

16:25:27 21  verdict you have agreed upon?

16:25:28 22          Juror #1, is this the verdict you have agreed

16:25:32 23  upon?

16:25:32 24          A JUROR:  Yes.

16:25:33 25          COURT CLERK:  Juror #2, is the verdict you have

```
1          agreed upon?

16:25:34  2                    A JUROR:  Yes.

          3                    COURT CLERK:  Juror #3, is this the verdict you

          4          have agreed upon?

16:25:35  5                    A JUROR:  Yes.

16:25:36  6                    COURT CLERK:  Juror #4, is this the verdict you

          7          have agreed upon?

16:25:39  8                    A JUROR:  Yes.

16:25:39  9                    COURT CLERK:  Juror #5, is the verdict you have

         10          agreed upon?

16:25:42 11                    A JUROR:  Yes.

16:25:42 12                    COURT CLERK:  Juror #6, is this the verdict you

16:25:46 13          have agreed upon?

16:25:46 14                    A JUROR:  Yes.

16:25:47 15                    COURT CLERK:  Juror #7, is this the verdict you

         16          have agreed upon?

16:25:48 17                    A JUROR:  Yes.

16:25:48 18                    COURT CLERK:  Juror #8, is this the verdict you

16:25:50 19          have agreed upon?

16:25:53 20                    A JUROR:  Yes.

16:25:55 21                    THE COURT:  All right.  Thank you very much,

16:25:56 22          Mr. Kohler.

16:25:58 23                    Ladies and gentlemen, the parties here had a

16:26:00 24          dispute that they needed your help to resolve and I

16:26:05 25          appreciate your help.  And so on behalf of the Court and the
```

16:26:08  1    parties, I want to thank you for your service as jurors in

16:26:12  2    this case.  I know everybody has busy lives with work and

16:26:15  3    family and that you all took time away from important things

16:26:19  4    to be here, but we can't have our system of justice without

16:26:24  5    people like yourselves willing to serve.

16:26:27  6            You are now released.  If you want to hang out

16:26:29  7    in the jury room for a minute, I just have one brief thing

16:26:34  8    to discuss with the parties, but I'd to thank you personally

16:26:38  9    for your service if you're interesting in hanging out, but

16:26:42 10    you are now free to go.

16:26:44 11            Mr. Kohler.

16:26:50 12            (Jury exits.)

16:27:01 13            THE COURT:  All right.  Please be seated.  Is

16:27:06 14    there anything else we need to address today?

16:27:10 15            MR. DE VRIES:  Not on behalf of our clients,

16:27:12 16    Your Honor.

16:27:13 17            MS. DURIE:  Not today.  We'll need to discuss

16:27:16 18    the schedule obviously for post-trial motions.

16:27:20 19            THE COURT:  Absolutely.  So why don't you shoot

16:27:22 20    to get me a proposal within two weeks.  If you need

16:27:25 21    additional time, that's find.  And of course I need you to

16:27:28 22    follow the instructions in the pretrial order for getting

16:27:32 23    any corrections to the transcript to the court reporter.

16:27:37 24            MS. DURIE:  Understood.  Thank you.

16:27:40 25            THE COURT:  Thank you very much.  It was a

16:27:42  1    pleasure to preside over this trial.

16:27:45  2                    COURT CLERK:  All rise.

16:27:53  3                    (Court adjourned at 4:27 p.m.)

          4

          5                 ---------------------------------

          6

          7

          8         I hereby certify the foregoing is a true and
               accurate transcript from my stenographic notes in the
          9    proceedings.

         10                            /s/ Stacy M. Ingram, RPR
                                        Official Court Reporter
         11                              U.S. District Court

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25