# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FERRING PHARMACEUTICALS INC., REBIOTIX INC. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., and FINCH THERAPEUTICS HOLDINGS, LLC. | ) ) ) ) |
| Defendants. | ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and REGENTS OF THE UNIVERSITY OF MINNESOTA | ) ) ) ) ) ) |
| Counterclaim-Plaintiffs/Reply Defendants, | ) ) |
| v. | ) ) ) |
| FERRING PHARMACEUTICALS INC., and REBIOTIX, INC. | ) ) ) |
| Counterclaim-Defendants/Reply Plaintiffs. | ) |

**REDACTED**
**PUBLIC VERSION**

C.A. No. 21-1694-JLH

## UMN AND FINCH'S REPLY BRIEF IN SUPPORT OF THEIR POST-TRIAL MOTION FOR ENHANCED DAMAGES, SUPPLEMENTAL DAMAGES, ONGOING ROYALTY, AND PRE- AND POST-JUDGMENT INTEREST PURSUANT TO ORDER ON D.I. 490

OF COUNSEL:

KIRKLAND & ELLIS LLP

Michael W. De Vries
Ingrid Petersen
555 South Flower Street, Suite 3700
Los Angeles, CA 90071

Adam R. Alper
555 California Street, 27th Floor
San Francisco, CA 94104

Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
metzler@rlf.com

*Attorneys for Finch Therapeutics Group, Inc., Finch Therapeutics, Inc., and Finch Therapeutics Holdings, LLC, and the Regents of the University of Minnesota*

Patricia A. Carson
Ashley L.B. Ross
Leslie M. Schmidt
N. Kaye Horstman
601 Lexington Avenue
New York, NY 10022

Alina Afinogenova
200 Clarendon Street, 47th floor
Boston, MA 02116

Ashley Cade
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

Dated: November 26, 2024

## TABLE OF CONTENTS

I.    **Ferring's Egregious, Willful Infringement Warrants Trebling** ................................... 1

    A.    Ferring's Approach To The Enhancement Legal Requirements Is Wrong ........... 1

    B.    *Read* Factor 1: Ferring Deliberately Copied ............................................. 3

    C.    *Read* Factor 2: Ferring Has No "Good Faith" Defense ......................... 6

    D.    *Read* Factor 3: Ferring's Conduct Was Egregious ................................ 9

        1.    Ferring's Improper Conduct Regarding Dr. Borody.................................. 9

        2.    Ferring's Meritless Motion to Amend ...................................... 13

        3.    Ferring Flagrantly Exploited Finch's Financial Circumstances ............... 14

        4.    Ferring Flouted the Court's Orders and Rulings.................................... 14

        5.    Ferring Sandbagged UMN/Finch............................................... 14

    E.    *Read* Factor 4: Ferring Can Pay Enhanced Damages ......................... 15

    F.    *Read* Factor 5: This Case Was Not Close .......................................... 15

    G.    *Read* Factor 6: Ferring's Misconduct Has Continued Unabated For Years ......... 16

    H.    *Read* Factor 7: Ferring Took No Remedial Steps ................................ 17

    I.    *Read* Factor 8: Ferring Intended to Harm Finch and UMN................... 17

    J.    *Read* Factor 9: Ferring Concealed Its Infringement ........................... 18

II.    **Ferring Agrees To Supplemental Damages and Pre- and Post-judgment Interest** ............................................................................................ 19

III.    **The Ongoing Royalty Should Be Enhanced** ....................................... 19

    A.    Willfulness And Enhancement Of The Jury Award Are Considerations ........... 19

    B.    Changed Circumstances Confirm The Ongoing Royalty Should Be Enhanced ............................................................................. 20

C.    A Lower Royalty Would Be Inequitable And Promote Willful Infringement ......................................................................................... 22

**IV.    Conclusion** ............................................................................................. **22**

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*Advanced Med. Optics Inc. v. Alcon Laboratories, Inc.*,
    2005 WL 3454283 (D. Del. Dec. 16, 2005)....................................................................2, 19

*Affinity Labs of Texas, LLC v. BMW N. Am., LLC*,
    783 F. Supp. 2d 891 (E.D. Tex. 2011)........................................................................21, 22

*Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*,
    2018 WL 6190604 (C.D. Cal. Nov. 4, 2018)...............................................................17, 18

*Apple Inc. v. Samsung Electronics Co., Ltd.*,
    258 F. Supp. 3d 1013 (N.D. Cal. 2017) ............................................................................4

*Aqua Shield v. Inter Pool Cover Team*,
    774 F.3d 766 (Fed. Cir. 2014)........................................................................................22

*Archer DX, LLC v. Qiagen Scis., LLC*,
    2022 WL 4597877 (D. Del. Sept. 30, 2022)..........................................................3, 4, 16

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.,,*
    2017 WL 7732873 (S.D. Fla. Jan. 3, 2017) .....................................................19, 20, 22

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*
    876 F.3d 1350 (Fed. Cir. 2017)......................................................................................19

*Barry v. Medtronic, Inc.*,
    250 F. Supp. 3d 107 (E.D. Tex. 2017) ..........................................................................3, 6

*Bioverativ Inc. v. CSL Behring LLC*,
    2020 WL 1332921 (D. Del. Mar. 23, 2020) .....................................................................4

*Boston Sci. Corp. v. Cordis Corp.*,
    838 F. Supp. 2d 259 (D. Del. 2012)......................................................................2, 19, 20

*C R Bard Inc. v. AngioDynamics, Inc.*,
    979 F.3d 1372 (Fed. Cir. 2020).........................................................................................4

*Dasso Int'l, Inc. v. Moso N. Am., Inc.*,
    2023 WL 5349374 (D. Del. Aug. 21, 2023) .................................................................1, 17

*Douglas Dyn. LLC v. Buyers Prods. Corp.*,
    717 F.3d 1336 (Fed. Cir. 2013).......................................................................................22

*EagleView Techs., Inc. v. Xactware Sols., Inc.*,
    522 F. Supp. 3d 40 (D.N.J. 2021) ...................................................................7, 8, 17, 19

*Eaton Corp. v. Parker-Hannifin Corp.*,
    292 F. Supp. 2d 555 (D. Del. 2003)......................................................................6

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
    2017 WL 3034655 (E.D. Tex. July 18, 2017) .....................................................20

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
    2018 WL 2149736 (E.D. Tex. May 10, 2018)......................................................16

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*
    955 F.3d 1317 (Fed. Cir. 2020).........................................................................16

*Finjan Software, Ltd. v. Secure Computing Corp.*,
    2009 WL 2524495 (D. Del. Aug. 18, 2009) ..........................................................2

*Finjan Software, Ltd. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2010).............................................................................2

*Goldstein v. Exxon Res. and Eng'g Co.*,
    1997 WL 580599 (D.N.J. Feb. 28, 1997) ............................................................12

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    579 U.S. 93 (2016).................................................................................................2

*i4i Ltd. P'ship v. Microsoft Corp.*,
    670 F. Supp. 2d 568 (E.D. Tex. 2009) .................................................................14

*IMX Inc. v. LendingTree, LLC*,
    469 F. Supp. 2d 203 (D. Del. 2007)................................................................2, 15

*Ironburg Inventions Ltd. v. Valve Corp.*,
    64 F.4th 1274 (Fed. Cir. 2023) .............................................................................8

*John Bean Tech. Corp. v. Morris & Assocs.*,
    988 F.3d 1334 (Fed. Cir. 2021).........................................................................20

*Johns Hopkins Univ. v. CellPro*,
    978 F. Supp. 184 (D. Del. 1997)....................................................................2, 19

*Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*,
    2009 WL 512156 (D.N.J. Feb. 27, 2009) .......................................................18, 21

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
    2020 WL 2844410 (C.D. Cal. Apr. 2, 2020) ...................................................17, 18

*Kaufman Co., Inc. v. Lantech, Inc.*,,
    807 F.2d 970 (Fed. Cir. 1986)...............................................................................8

*Medtroinc, Inc. v. Teleflex Innovations S.A.R.L.*,
    70 F.4th 1331 (Fed. Cir. 2023) ................................................................................6

*Med-El Elektromedizinische Gerate GmBH v. Advanced Bionics, LLC*,
    2024 WL 4371292 (D. Del. Oct. 2, 2024) ........................................................3, 16

*MHL Custom, Inc. v. Waydoo USA, Inc.*,
    2023 WL 5805889 (D. Del. Sept. 7, 2023) ..............................................................3

*Milwaukee Elec. Tool Co. v. Snap-On Inc.*,
    288 F. Supp. 3d 872 (E.D. Wis. 2017) ...................................................................8

*nCUBE Corp. v. SeaChange Int'l, Inc.*,
    313 F. Supp. 2d 361 (D. Del. 2004) .......................................................................2

*Novozymes A/S v. Genencor Int'l, Inc.*,
    474 F. Supp. 2d 592 (D. Del. 2007) .......................................................................2

*Nox Med. Ehf v. Natus Neurology Inc.*,
    2018 WL 4062626 (D. Del. Aug. 27, 2018) ..........................................................14

*Paice LLC v. Toyota Motor Corp.*,
    609 F. Supp. 2d 620 (E.D. Tex. 2009) ..................................................................21

*Power Integrations, Inc. v. Fairchild Semi. Int'l, Inc.*,
    762 F. Supp. 2d 710 (D. Del. 2011) .......................................................................2

*Power Integrations, Inc. v. Fairchild Semi. Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013)...............................................................................2

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    875 F.3d 1369 (Fed. Cir. 2017)...............................................................................3

*Provisur Tech., Inc. v. Weber, Inc.*,
    119 F.4th 948 (Fed. Cir. 2024) ...............................................................................8

*Purewick Corp. v. Sage Prod., LLC*,
    666 F. Supp. 3d 419 (D. Del. 2023)................................................................20, 21

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992)....................................................................... *passim*

*Rocheux Int'l of New Jersey v. U.S. Merchants Fin. Grp., Inc.*,
    2009 WL 3246837 (D.N.J. Oct. 5, 2009)...............................................................12

*SiOnyx LLC v. Hamamatsu Photonics K.K.*,
    981 F.3d 1339 (Fed. Cir. 2020)...............................................................................7

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*,
  254 F. Supp. 3d 680 (D. Del. 2017)......................................................................20, 22

*State Indus. Inc. v. A.O. Smith Corp.*,
  751 F.2d 1226 (Fed. Cir. 1985)......................................................................................4

*State of N.Y. v. Solvent Chem. Co. Inc.*,
  166 F.R.D. 284 (W.D.N.Y. 1996)................................................................................12

*Stryker Corp. v. Zimmer, Inc.*,
  2017 WL 4286412 (W.D. Mich. July 12, 2017)......................................................16, 18, 19

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
  2014 WL 1457797 (D. Del. Apr. 14, 2014)..................................................................19

*Tinnus Enters., LLC v. Telebrands Corp.*,
  369 F. Supp. 3d 704 (E.D. Tex. 2019)..........................................................................14

*TruePosition Inc. v. Andrew Corp.*,
  568 F. Supp. 2d 500 (D. Del. 2008)................................................................................2

*VB Assets, LLC v. Amazon Serv., LLC*,
  2024 WL 4347300 (D. Del. Sept. 30, 2024).................................................... *passim*

*Vectura Ltd.v. GlaxoSmithKline, LLC*,
  2019 WL 4346502 (D. Del. Sept. 12, 2019)............................................................15, 20

*WBIP LLC. v. Kohler Co.*,
  2014 WL 585854 (D. Mass. Feb. 12, 2014)....................................................................8

*WBIP LLC. v. Kohler Co.*,
  829 F.3d 1317 (Fed. Cir. 2016)............................................................................2, 6, 16

*Wirtgen Am., Inc. Caterpillar, Inc.*,
  2024 WL 4216057 (D. Del. Sept. 17, 2024)............................................................1, 2, 4, 6

**Statutes**

35 U.S.C.
  §101............................................................................................................................16
  §112..............................................................................................................................1

If ever there was a case for enhancement, it is this one. The University and Finch's victory at trial was a landslide, and there were no close calls: Ferring presented no prior art invalidity defenses for the UMN patents (despite pursuing numerous such arguments throughout the litigation), presented no anticipation defenses for the Borody patents, clung to legally incorrect § 112 and non-infringement arguments that it already lost or conceded at trial, and failed to justify its intentional infringement. And Ferring's litigation misconduct could not be more striking, with the Court explaining that "[t]o say the Court is ***troubled*** by the occurrences to date would be an ***extreme understatement***." D.I. 433 ¶ 4. Consistent with the disregard it has exhibited throughout, however, Ferring remains unrepentant: instead of taking responsibility for its misconduct, it again attempts to atomize every issue to avoid Finch's meritorious claims, ignores the evidence of its years-long plan to violate UMN/Finch's rights to achieve a lucrative "first to market" position, and continues to push the limits of the Court's rules and fair play until irreparably broken. This misconduct shattered Finch and caused inexcusable harm to UMN. Maximum enhancement of the verdict and imposition of an ongoing royalty is not only appropriate, but is necessary to fully address this situation and to ensure that the extreme disregard of the patent system and of the integrity of the judicial system that occurred here does not become commonplace.

## I.    Ferring's Egregious, Willful Infringement Warrants Trebling

### A.    Ferring's Approach To The Enhancement Legal Requirements Is Wrong

Ferring's approach to enhancement is legally incorrect for at least two reasons. ***First***, to avoid responsibility, Ferring overstates the requirements. There is no dispute that the Court has discretion "to determine whether the conduct is sufficiently egregious to warrant enhanced damages," after a finding of willfulness. *Dasso v. Moso*, 2023 WL 5349374, at *25 (D. Del. Aug. 21, 2023). But that is not as high a bar as Ferring alleges because entitlement to enhanced damages need be proven only by a preponderance of the evidence. *Wirtgen Am. v. Caterpillar*, 2024 WL

1

4216057, at *16 (D. Del. Sept. 17, 2024). Moreover, courts in this District regularly award enhancement based on a subset of the *Read* factors. *See, e.g.*, *id.* at *17-20 (increase by 50% because of factors 1, 2, 6, and 7); *Power Integrations v. Fairchild*, 762 F. Supp. 2d 710, 721-25 (D. Del. 2011) (doubling because of factors 1, 2, 4, 5, and 8), *aff'd in part, rev'd in part on other grounds*, 711 F.3d 1348 (Fed. Cir. 2013); *Finjan Software v. Secure Computing*, 2009 WL 2524495, at *15-16 (D. Del. Aug. 18, 2009) (50% increase because of factors 1, 2, 4, 6, and 7), *aff'd in part, rev'd in part on other grounds*, 626 F.3d 1197 (Fed. Cir. 2010); *Advanced Med. Optics v. Alcon Lab'ys*, 2005 WL 3454283, at *9-10 (D. Del. Dec. 16, 2005) (trebling because of factors 1, 2, and 4); *nCUBE v. SeaChange Int'l*, 313 F. Supp. 2d 361, 387-91 (D. Del. 2004) (doubling because of factors 1, 2, 4, 5, 7, and 8); *Johns Hopkins Univ. v. CellPro*, 978 F. Supp. 184, 193-96 (D. Del. 1997) (trebling because of factors 1-5 and 8); *Boston Sci. v. Cordis*, 838 F. Supp. 2d 259, 279-81 (D. Del. 2012) (doubling because of factors 2-5, 7, and 8). And this District has awarded enhancement even without copying evidence or litigation misconduct—both of which are present here. *See, e.g.*, *Novozymes v. Genencor Int'l*, 474 F. Supp. 2d 592, 610-11 (D. Del. 2007) (doubling because of factors 2 and 7); *IMX v. LendingTree*, 469 F. Supp. 2d 203, 220-23 (D. Del. 2007) (50% increase because of factors 2, 4, and 7); *TruePosition v. Andrew*, 568 F. Supp. 2d 500, 527-29 (D. Del. 2008) (25% increase because of factors 2, 4, and 6-8).

***Second***, Ferring attempts to excuse its misconduct based on what it suggests are reasonable litigation defenses, *e.g.*, its "0.5 mm" noninfringement defense, its "treatment" argument, and many others. Opp. 11-12, 29. Such arguments—about what, purportedly, the record ***plausibly*** shows—do not shield Ferring's misconduct, as "[p]roof of an objectively reasonable litigation-inspired defense to infringement is no longer a defense to willful infringement." *WBIP v. Kohler*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) (citing *Halo Elecs. v. Pulse Elecs.*, 579 U.S. 93, 105 (2016)).

Ferring's cases are simply inapposite: none requires more than sufficiently egregious deliberate or reckless conduct to award enhancement, none involved copying, and many concluded most of the *Read* factors weighed against enhancement. *See, e.g.*, *VB v. Amazon*, 2024 WL 4347300, at *15-17 (D. Del. Sept. 30, 2024) (five factors not supporting enhancement); *MHL v. Waydoo*, 2023 WL 5805889, at *8-10 (D. Del. Sept. 7, 2023) (factors 1 and 8 did not support enhancement; factor 2, 4, 6, 7 weighed in favor of enhancement; factor 3, 5, 9 weighed against enhancement); *ArcherDX v. Qiagen*, 2022 WL 4597877, at *16-17 (D. Del. Sept. 30, 2022) (six factors against enhancement); *Med-El v. Advanced Bionics*, 2024 WL 4371292, at *11-12 (D. Del. Oct. 2, 2024) (no factor supported enhancement); *Presidio v. Am. Tech.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017) ("garden variety" case where reexamination certificate issued six years after defendant released product). In this case, the *Read* Factors weigh heavily in favor of enhanced damages.

### B.    *Read* Factor 1: Ferring Deliberately Copied

Although the jury instructions did not require the jury to find copying, "[t]he copying inquiry under *Read* focuses ***not*** on whether [the infringer] copied [the inventor's] patent" or "commercial embodiment," "but ***whether it copied 'the ideas or design of another***,' regardless of when [the] patents might have issued." *Barry v. Medtronic*, 250 F. Supp. 3d 107, 112 (E.D. Tex. 2017) (emphasis added) (quoting *Read*, 970 F.2d at 827). Although Ferring feigns ignorance as to what was copied, Opp. 5, that confirms not refutes that damages should be enhanced.

***Borody Patents.*** Significant evidence proves that Ferring deliberately copied the Borody patents' ideas (Mot. 10-15), and Ferring's arguments merely rehash its JMOL motion (Opp. 6). Ferring ***admitted*** that it was aware of the '080 and '309 patents' parent application "at least as early as November 19, 2012" (Tr. 344:18-22), before Rebiotix finalized REBOYTA in "late 2013" (*id.* 738:8-14). And Ferring indisputably knew of the '309 patent when it issued before this lawsuit on June 9, 2020, and of the '080 patent when it issued on during this lawsuit on January 3, 2023

(Tr. 344:23-345:2), all of which occurred before Ferring's market release of REBYOTA in January 2023. But, despite that knowledge, Ferring did nothing to change REBYOTA, because doing so would have required a redo of its clinical work (Tr. 718:14-22), which in turn would have naturally jeopardized the "first to market" approach that Ferring valued (PTX-341.6). The motive was present: Rebiotix's founders stood to make $175 million in their sale to Ferring (Tr. 574:8-17) and Ferring forecast over $1 billion in earnings (PTX-858; PTX-341.6).

Contrary to Ferring's assertions, "[a] patent need not have issued before the ideas of that inventor can be copied in bad faith." *Wirtgen*, 2024 WL 4216057, at *17. Ferring's copying before patent issuance and continuing sales after, *see Apple v. Samsung*, 258 F. Supp. 3d 1013, 1024-25, 1030-31 (N.D. Cal. 2017), along with its clear awareness of the parent patent applications, the issuance of the patents, and the importance of Dr. Borody's IP, *see C R Bard v. AngioDynamics*, 979 F.3d 1372, 1380 (Fed. Cir. 2020), strongly supports enhancement. *See* Mot. 10-14. Indeed, this is not a case where Ferring was "in the dark" about "prosecution" and knew "nothing" about the patent "until it was sued." *State Indus. v. A.O. Smith*, 751 F.2d 1226, 1236 (Fed. Cir. 1985). Nor is this like *ArcherDX.*, 2022 WL 4597877, at *16, where the circumstantial evidence "merely show[ed] that Defendants had the opportunity to copy." Here, Ferring believed it needed to license the Borody patents. PTX-208.1; PTX-56.248. And, unlike *Bioverativ v. CSL*, 2020 WL 1332921, at *3 (D. Del. Mar. 23, 2020), where the defendant launched their product *before* patent issuance, Ferring began selling REBYOTA after or at the same time the Borody patents had issued. Tr. 344:18-345:2, 717:20-22; JTX-4.1; JTX-6.1.

**UMN Patent.** Significant evidence also proves that Ferring deliberately copied the UMN patent's inventions (Mot. 10-15), and Ferring again rehashes its JMOL motion (Opp. 7-10). Ferring admitted that it was aware of the UMN patent when it issued in 2019. Tr. 344:16-17. But Ferring

4

was aware of the UMN inventions long before. Specifically, on March 29, 2011, Lee Jones received the UMN inventors' confidential fecal sample processing protocol, which became the UMN patent's Example 3. Tr. 381:14-22; PTX-400.1; PTX-401.1. Then on April 12, 2011, Lee Jones received the confidential UMN provisional patent application, which (except for Example 4) contains the whole UMN patent specification—including Example 1's changes in gut material composition. PTX-406.1-21. On February 9, 2012, Lee Jones circulated the UMN inventors' Hamilton 2012 paper at Rebiotix. PTX.48.1. The Hamilton 2012 paper contains the UMN patent's Example 4 embodiment. *Compare* JTX-1 at 20:21-29:3, *with* PTX-1717.2-6. As Dr. Sadowsky explained, that paper's steps produced claim 7's 10% reduction of phylum Protobacteria. Tr. 194:15-24. Thus, while Rebiotix (naturally) began working on REBYOTA's formulation before it was finalized in 2013, Ferring had ***the entire patent specification*** from which claim 7 is derived as a guide. That is the tip of the iceberg; as shown at trial, Rebiotix had been studying the UMN inventions in many other ways as well. *See* Mot. 10-14.

Ferring suggests that Finch/UMN failed to identify what was copied, but that is not the case. The evidence shows that Ferring copied everything, including the "0.5 mm" portion of the claim Ferring unsuccessfully disputed. Indeed, Ferring's FDA submission stated that REBYOTA uses a 0.5mm sieve. PTX-217.26. Courtney Jones also testified that the pore size of the filter bags that REBYOTA uses are 0.5mm. Tr. 286:22-287:11. Indeed, the website for that stomacher bag states that the pore size is 0.5mm. PTX-940. This was obviously important to Ferring, as it knew about the UMN 0.5mm requirement, but nonetheless used the 0.5 mm stomacher bag.[1] And Lee Jones's January 26, 2015 Rebiotix technical proposal stated that REBYOTA's manufacturing process was "***derived from***" the Hamilton 2012 paper (PTX-266.5) (emphasis added)—a

---

[1]    Ferring's own expert's tests confirmed that element was met. *See supra* Section I.C.

straightforward admission that leaves no doubt that copying occurred. But such strong copying evidence is not even legally required, as the focus is on "substantial similarity" and access, both of which are clearly present here. *Medtronic*, 70 F.4th 1331, 1340 (Fed. Cir. 2023); *Wirtgen*, 2024 WL 4216057, at *17 (copying found where defendant's studied plaintiff's product prior to issuance of patents). Contrary to Ferring's assertions, an "exact copy" is not a prerequisite. *Eaton v. Parker-Hannifin.*, 292 F. Supp. 2d 555, 569-70 (D. Del. 2003). Any purported differences Ferring relies on here are clearly "not so significant as to preclude substantial similarity and the corresponding inference that [Ferring] copied." *Medtronic*, 70 F.4th at 1341. And, even if Ferring now claims to have an "objectively reasonable" basis for these facts, that is not a defense when the subjective facts show Ferring intended to copy. *WBIP*, 829 F.3d at 1341-42.

### C.    *Read* Factor 2: Ferring Has No "Good Faith" Defense

Ferring attempts to assemble evidence it insists reflects a good faith belief in its non-liability, but it is far from sufficient. Ferring suggests its FTO searches—including its merger-diligence email, TX-3768—"confirm[] that Ferring had a good faith belief that it was not infringing any valid claim." Opp. 11. That is incorrect. For the Borody patents, Ferring provides no evidence of actual analysis or diligence that it performed. *Id.* 10-12. Such conclusory say-so is not sufficient for showing good faith, and "'[t]he absence of evidence of an adequate investigation' means that [Ferring] likely did not have a reasonable belief of noninfringement" and invalidity. *Wirtgen*, 2024 WL 4216057, at *18 ("specific or direct evidence" is necessary to show good faith belief prior to litigation's commencement) (citation omitted).

Ferring's UMN patent arguments are no better. Ferring contends that a single March 2018 email (TX-3768) allegedly shows that it believed there was no infringement when it attempted to pour REBYOTA through a 0.6 mm sieve. Opp. 11-12. But the picture of the test results clearly shows REBYOTA ***could*** pass through the sieve, with only traces of material remaining (*id.* at 2).

6

Ferring's trial expert performed this same test using a 0.5mm sieve, and once again, REBYOTA passed through the 0.5mm sieve, and similarly found only trace amounts of material remaining on the screen. TX-4273.53, 57. Moreover, Ferring's expert admitted that the claims are still satisfied where there are "minimal particles retained on the sieve surface," as his tests and the 2018 Ferring test showed. Tr. 798:11-18. And, as Finch's expert described, even those trace remaining particles are capable of passing through the 0.5 mm sieve when reoriented. *Id.* 373:14-374:3 ("if that particle falls straight onto the surface of this sieve … the particle will not be able to pass through the sieve because it's larger than the diameter or larger than the width of the pores. If we now reorient that particle just by changing it or turning it 90 degrees, that particle now is capable of going through the filter"). Ferring's expert had no credible response to Finch's demonstrative sieve, which showed how particles that are capable of passing through the sieve can remain on the sieve due to the orientation in which they fall on the sieve. Tr. 813:19-818:7. Ferring clearly recognizes this defense lacks merit, having abandoned it on JMOL.

Ferring's attempt to rely on similarly-conclusory statements in its Merger Agreement and related board documents is likewise far from sufficient.[2] Once again, Ferring provides no evidence of any actual analysis it performed or who performed it, let alone whether Ferring could rely on that in good faith. *EagleView v. Xactware*, 522 F. Supp. 3d 40, 49 (D.N.J. 2021) (holding good-faith was not proven when the court was "unable to evaluate the scope of that defense, or more precisely, Defendants' bald statement"). And, despite those conclusory statements, Ferring still required Rebiotix's founders to be on the hook for liability due to litigation over UMN and Finch's

---

[2]  Contrary to Ferring's assertions (Opp. 13), **Finch's** decision not to burden the Court with numerous summary judgment motions—does not provide **Ferring** with a good faith belief. Nor does Finch's decision to let the jury decide validity without putting on a rebuttal case (which only reflects the weakness of Ferring's arguments). And in *SiOnyx*, 981 F.3d at 1355, page limits were not at issue. Here, Finch had to decide what to pursue within the page limits.

patents, contradicting the suggestion that Ferring concluded there was no liability. PTX-757.24; PTX-56.20-21, 248. While Ferring claims it insisted on a cost-sharing provision merely because it believed Finch would aggressively litigate its patents and not out of fear of liability (Opp. 12-13), that does not explain why Ferring required the Rebiotix founders to be liable for "consideration" paid to UMN or Finch including for "royalty payments, milestone payments" and "settlements," which confirms that Ferring knew there was risk it would be liable for infringement of valid patents and owe damages. PTX-56.20. Likewise, Ferring's declaratory judgment filing is irrelevant. *Kaufman v. Lantech*, 807 F.2d 970, 979 (Fed. Cir. 1986) (affirming 2X enhancement where "[t]he mere fact that Kaufman brought suit is not evidence that there was such a reasonable basis.").

Ferring's failure to obtain advice of counsel also favors enhancement, and Ferring cites no contrary authority.[3] *See Milwaukee Elec. Tool v. Snap-On*, 288 F. Supp. 3d 872, 901 (E.D. Wis. 2017); *WBIP v. Kohler*, 2014 WL 585854, at *5-8 (D. Mass. Feb. 12, 2014), *aff'd*, 829 F.3d 1317, 1341-42 (Fed. Cir. 2016). Moreover, Ferring used privilege to shield discovery into its alleged diligence. In fact, Ferring's privilege claims extended to the very email providing ***a cursory, one-sentence summary*** of testing that Ferring now attempts to rely on to show its good faith: the response of Ferring's in-house patent counsel (Jesse Fecker) to this summary is ***entirely*** redacted. *See* TX-3768.1, 4. And Ferring has produced neither internal Rebiotix documents concerning the sieve testing, nor internal Ferring documents concerning Ferring's analysis of that testing. Ferring cannot use privilege to shield discovery into these facts and attempt to rely on them now to prove good-faith. *EagleView*, 522 F. Supp. 3d at 50 ("[t]he attorney-client privilege … cannot be used as a shield and a sword"); *Ironburg v. Valve*, 64 F.4th 1274, 1294 (Fed. Cir. 2023) (same). If

---

[3]    *Provisur v. Weber* is limited to willfulness and does not address enhancement. 119 F.4th 948, 955-56 (Fed. Cir. 2024).

anything, Ferring's attempt to rely on undisclosed materials *confirms* its bad faith.

**D.    *Read* Factor 3: Ferring's Conduct Was Egregious**

Ferring's repeated refusal to recognize its wrongdoing is itself further evidence of its bad faith. As the Court stated regarding Ferring's conduct relating to Dr. Borody, "[t]o say that the Court is troubled by the occurrences to date would be an *extreme understatement.*" D.I. 433 ¶ 4 (emphasis added); *see also* July 31, 2024 Tr. at 125:20-126:12 ("I'm troubled by a lot of what I heard today"). When excluding Ferring's proffered written statements from Dr. Borody (TX-3453 and TX-3581), the Court determined "counsel offered *no persuasive explanation* as to why they weren't disclosed earlier; the failure to produce these particular documents earlier prejudices Finch in a way that cannot be remedied at this late stage." D.I. 440 (emphasis added). Indeed, the Court contemplated issuing serious sanctions just before Ferring withdrew Dr. Borody as a witness and its entire standing defense. *Id.* Ferring's opposition fails to address these serious issues, instead selectively focusing on partial facts while ignoring its overall improper plan.

**1.    Ferring's Improper Conduct Regarding Dr. Borody**

***Ferring's Standing Motion.*** Although Ferring's first argument is labeled "Ferring's standing motion was not unreasonable," it does not address that subject; instead, Ferring attempts to explain why its failure to disclose its communications and consultation agreement with Dr. Borody was proper. Opp. 14-18. But it was not. Ferring repeatedly concealed and misrepresented critical evidence concerning those subjects, as part of its attempt to press its meritless standing defense and corresponding sanctions motion. From the outset Ferring played hide the ball, telling Finch on July 27, ***2023***, that it "ha[d] not been in contact with Dr. Borody" [4] (D.I. 377, Ex. 17.5 at

---

[4]    Ferring's assertion it was not speaking with Dr. Borody directly because it was speaking to his counsel is not an excuse, particularly since Mr. Connor was clearly passing communications.

Ex. 3 at 3). That was false: on July 5, 2023, Dr. Borody and his counsel Mr. Connor met with a senior Ferring representative, where Mr. Connor stated (in a recorded video) he had several discussions with Ferring's counsel to provide helpful information and emphasized that Dr. Borody would like to enter a deal with Ferring to help collapse Finch's case. D.I. 466 at 13:00-14:00 min.

Similarly, at the July 23, 2024 pre-trial conference, Ferring repeatedly suggested it was only loosely in touch with Dr. Borody, and that it did not know if he would testify at trial.[5] PTC Tr. 140:11-13 ("[I]s Dr. Borody going to show up at trial? *I have no idea*."), 141:11-15 ("[Dr. Borody] knows when the trial is. *I'm not aware of him having a ticket.*"), 141:18-25 ("*I would not say that we have prepped him for trial.* We have - in a strong sense, we have spoken to him about the subject matter that he might be able to testify to … *So I don't want to parse words with the Court,* I just want to be clear about what happened."). In reality, Ferring's counsel had multiple meetings with Dr. Borody including at least one in Delaware at its counsel's office, where it created a declaration for him to sign in which Dr. Borody suggested his own patents are invalid. D.I. 467, Ex. C. Disturbingly, at his deposition, Dr. Borody "disagreed" that his patents are invalid—strongly suggesting that the declaration procured by counsel—and proffered by Ferring as evidence in this case—did not contain his own words. Mot., Ex. 4 at 158:20-23, 159:19-160:1. Moreover, Dr. Borody *had* purchased a ticket for trial weeks earlier, undermining counsel's suggestion that he was merely a "maybe" for trial. July 31 Tr. at 71:23-72:5. Compounding the impropriety, Ferring made these misleading statements to increase its chances of winning its sanctions motion against its adversaries. It was only after the Court ordered Ferring at the pretrial conference to make Dr. Borody available for deposition that Ferring finally produced its

---

[5]   Ferring's contention that it needed Ms. Ross on its trial witness list to have her authenticate Dr. Borody's documents ignores that Finch and UMN agreed to stipulate to authenticity on June 14, 2024. Ex. 14.

consultation agreement and communications with Dr. Borody.

Ferring attempts to excuse its late production of the consultation agreement by asserting that it "would only become ripe once it was confirmed that Dr. Borody would in fact appear at trial" and insisting "a party cannot be punished for playing its cards close to the chest within the bounds of the Federal Rules of Civil Procedure." Opp. 17-18. Ferring is wrong: Finch served requests two years prior to the trial requiring disclosure of Ferring's communications with inventors, a fact the Court recognized at the hearing on this issue. July 31 Tr. at 23:6-25:20. Ferring's assertion that "Finch/UMN, too, grappled with their inability to control a witness" and that "Finch also was contacting third-party witnesses and was not keeping Ferring informed" show that Ferring still refuses to take any responsibility for its actions. Mot. 17-18. Not every contact with a third party violates the Federal Rules; but extensive undisclosed (even when asked) conduct while seeking sanctions is so obviously beyond the pale. The Court has already rejected Ferring's finger pointing (July 31 Tr. at 16:24-25:20), and unlike Ferring, Finch and UMN were upfront with the Court (and Ferring) about their relationship with the witnesses.

***Compensation Agreement.*** Ferring's sole defense of Dr. Borody's excessive compensation is that Dr. Borody told them it was an underestimate of his opportunity cost, but that does not come close to withstanding scrutiny. Mr. Connor told Ferring that Dr. Borody wanted more than money: "We are looking to Ferring for help to restore Tom's ownership of his FMT patents. Tom, for his part, will fully co-operate with Ferring, Mary and you." D.I. 431, Ex. D. And Dr. Borody's lawyer sent comments on the consulting agreement and a "side letter" containing indemnification language and an obligation for Ferring to "assist [Dr. Borody] to have his name reinstated … as the owner" of the patents in this litigation. D.I. 431, Ex. E. Ferring also dangled the potential that it would license Dr. Borody's patents. D.I. 431, Ex. F. Dr. Borody viewed this agreement as a

11

payday; he charged Ferring over 300,000 AUD for his work. D.I. 431, Ex. H. Although a subsequently issued invoice was reduced (D.I. 431, Ex. I), that came only at Ferring's request after Finch raised concerns about Dr. Borody's compensation to the Court. D.I. 431, Ex. I. Although Ferring claims Dr. Borody accepted this reduction, that is not what Dr. Borody testified at the hearing. July 31 Tr. at 60:20-62:6. Ferring was willing to, and did, throw anything at Dr. Borody—AU $30,000 per day, indemnity, and promises of patent ownership and licensing revenue—to induce him to testify, which is not lawful and violates the ABA Model Rules. *See also Rocheux v. U.S. Merchants*, 2009 WL 3246837, at *4 (D.N.J. Oct. 5, 2009) (payment for fact witness' communication with counsel was improper); *Goldstein v. Exxon*, 1997 WL 580599, at *3 (D.N.J. Feb. 28, 1997) ("the agreement to compensate [the fact witness] for his time spent preparing to testify is improper"); *State of N.Y. v. Solvent Chem.*, 166 F.R.D. 284, 289-90 (W.D.N.Y. 1996) ("in providing [the witness] with protection from liability in [another] litigation, and in this action, as a means of obtaining his cooperation as a fact witness, [the defendants] went too far").

*Ferring's Adverse Inference Motion.* Ferring does not dispute that, when it moved for sanctions against Finch in June 27, 2024, Ferring *knew* that the premise of its motion (that K&E and Finch were complicit in Dr. Borody's deposition cancellation) was false. During a video recorded meeting between Dr. Borody, Dr. Borody's personal attorney (Mr. Connor), and a Ferring representative on July 5, 2023, Mr. Connor said *he* had told Dr. Borody to not sit for the deposition. D.I. 466 at 5:30-6:00. And while Ferring's counsel attempted to retreat at the July 31 hearing on this issue by stating that they "relied on the written record" and it was Dr. Borody' personal attorney who communicated with Finch and K&E (July 31 Tr. at 114:4-115:5), that is no excuse. In response to a direct question from the Court, Ferring's counsel admitted that it never asked Dr. Borody if K&E or anyone at Finch told him to cancel his deposition, despite being in close

12

communication with him (*id.* at 114:4-24). Ferring's suggestion that its misconduct put UMN/Finch in a better position is not an excuse, nor does it make Ferring's misconduct any less egregious. To the contrary, UMN/Finch wasted time and resources fighting Ferring's baseless theories, including until just days before trial started. While Ferring contends that its sanctions motion was the only way to admit certain documents (Opp. 19), that is incorrect, including because Ferring did have the ability to procure Dr. Borody's attendance at trial. July 31 Tr. at 12:1-20.

### 2.    Ferring's Meritless Motion to Amend

The timing of Ferring's assertion of its '654 patent clearly confirms it was using it for three improper purposes: to (1) intimidate UMN into dropping its claims; (2) delay the trial of Finch/UMN's claims against it; and (3) bring its own patents and unclean hands defense before the jury.[6] Ferring conspicuously does not address those points. Opp. 20-22. Ferring does not disagree that UMN has sovereign immunity, making Ferring's infringement arguments regarding its '654 patent entirely meritless. *Id.* As for Ferring's unclean hands defense, the only court to consider such a request previously rejected it as "bogus." D.I. 324 at 2. While the Court stated that "they shouldn't be able to enjoin us if we can't enjoin them" is "a great argument" for "the balance of equities" when the Court "would be determining an injunction," Ferring ignores that after the Court excluded the defense from the jury proceedings, Ferring never pursued it again, underscoring Ferring's bad faith. PTC Tr. at 72:20-73:19. And regardless, if Ferring were serious about pursuing its claims against UMN, it could have filed a new action. But Ferring did not.[7]

---

[6]   Ferring argues that UMN kept Ferring in the dark regarding whether UMN would assert sovereign immunity. Opp. at 21 n.11. But Ferring itself admitted that UMN disclosed to Ferring earlier in the action it would rely on sovereign immunity in this case. D.I. 318, Ex. 3.

[7]   Ferring argues supplemental expert reports were not ripe until April 2024, but Judge Fallon rejected that argument. D.I. 342.

### 3.    Ferring Flagrantly Exploited Finch's Financial Circumstances

Ferring argues that Finch had endless funds to pursue litigation. Opp. at 23. That argument ignores that Finch publicly stated that its remaining $20.8 million would last for at least twelve months, but there was "substantial doubt" about its ability "continue as a going concern" (Ex. 15 at 5)—a fact Ferring repeatedly attempted to capitalize on by seeking to expand and delay the case at least five times. Ferring's reliance on *Nox Med. v. Natus*, 2018 WL 4062626, at *4 (D. Del. Aug. 27, 2018), is misplaced: there, the defendant offered reasonable explanations for its conduct and was not caught in misstatements to the court. As to Mr. Putnam, Finch/UMN did not oppose Ferring's request to offer a new expert, but it did oppose Ferring providing new, undisclosed theories and using them to delay the trial. D.I. 352 at 1.

### 4.    Ferring Flouted the Court's Orders and Rulings

Ferring offers no defense of its violation of MIL 4 (relying on its own patent to argue no willfulness) in closing, and instead blames UMN/Finch for not objecting. But it is not up to UMN/Finch to police Ferring's compliance with Court orders. To make matters worse, Ferring violated MIL 4 ***after*** the Court gave a warning about complying with its orders when Ferring "came very, very close" to violating the Court's MIL 1 ruling excluding reference to Ferring's declaratory judgment filing. Tr. 308:15-309:9. That the Court did not find an outright violation of MIL 1 does not justify Ferring's decision to all but call Finch a patent troll in its opening argument. *Id.* 78:5-14. Like in *i4i v. Microsoft*, 670 F. Supp. 2d 568, 595-56 (E.D. Tex. 2009), and *Tinnus v. Telebrands*, 369 F. Supp. 3d 704, 721 (E.D. Tex. 2019), Ferring was warned to not violate the Court's MIL orders, but Ferring chose to ignore another MIL ruling in closing argument.

### 5.    Ferring Sandbagged UMN/Finch

Ferring asserts that it did not hide the ball during trial (Opp. 25-27), but that cannot be squared with Ferring's conduct. First, Ferring blames UMN/Finch for maintaining infringement

assertions for 15 claims, but UMN/Finch informed Ferring of the final claims it would pursue *before* trial. Mot. 25. Second, Ferring attempts to equate its decision to not call Kurt Karst and Matthew P. Blischak (Finch's CEO) with UMN/Finch's decision to not call Drs. Benson and Schloss in rebuttal, but those are not remotely the same. Ferring's insistence that it was calling additional witnesses even after Finch rested its case—at a time when Ferring certainly knew whether it needed those witnesses—forced Finch to reserve time for handling them, skewing its cross-examination time. By contrast, Finch could not have decided its rebuttal case until Ferring's final technical witness testified. Third, Ferring does not dispute it refused to identify Dr. Britton's final trial opinions. Ferring also does not deny that Dr. Britton provided a new, undisclosed theory (that PEG is an antioxidant, so Hlavka purportedly disclosed an antioxidant (Tr. 884:4-12, 886:5-16)) that his deposition testimony contradicted (*id.* at 897:7-20). Fourth, nor does Ferring disagree that comparing REBYOTA to CP101 (to show differences) and prune mixture (a staged, undisclosed noninfringement demonstration) was misleading. Fifth, Ferring cannot explain why it forced Finch to take trial time to address its "treatment" defense when it planned to concede that REBYOTA is "an FDA-approved safe and effective *treatment* for C. diff." Trial Tr. at 1248:1-3.

###### E.    *Read* Factor 4: Ferring Can Pay Enhanced Damages

Ferring does not dispute that it can continue its business with an enhancement or that a 3X enhancement is just 3% its annual revenues. Opp. 27-28. Ferring is left to argue that Factor 4 only ever weighs against enhancement. That is wrong: "courts in this district have weighed this factor in favor of enhancement" in cases like this, where the defendant unquestionably could pay. *Vectura v. GlaxoSmithKline*, 2019 WL 4346502, at *4 (D. Del. Sept. 12, 2019). None of Ferring's cited cases hold otherwise, as the circumstances in those cases did not make levying punishment appropriate. *See VB Assets,* 2024 WL 4347300, at *16; *IMX*, 469 F. Supp. 2d at 222.

###### F.    *Read* Factor 5: This Case Was Not Close

Although Ferring claims that this case was close, Opp. 28-30, it was a decisive win in Finch's favor: the jury found infringement of every asserted claim, awarded $25 million more in damages than Ferring argued was warranted, found Ferring's conduct was willful, and rejected Ferring's invalidity arguments for all but two claims. D.I. 480. That Ferring believes it "***advanced valid arguments***" (Opp. at 28 (emphasis added)) is not the standard.[8] *See WBIP*, 829 F.3d at 1341-42. Ferring's disagreement with the Court's and jury's rejection of its arguments—that the remaining Borody patents' claims are not novel, that Ferring does not infringe the UMN patent, and that the Borody patents are not eligible under §101—does not make this case close. Moreover, it does not matter that UMN/Finch did not move for summary judgment, and neither *ArcherDX*, 2022 WL 4597877, at *17, nor *VB Assets*, 2024 WL 4347300, at *16, hold otherwise. Although the jury concluded two claims were invalid, Finch succeeded on every other issue. *Stryker v. Zimmer*, 2017 WL 4286412, at *5 (W.D. Mich. July 12, 2017) ("[t]he objective reasonableness the Federal Circuit found for a handful of Zimmer's litigation positions in no way detracts from the lopsided victory Stryker garnered on the core issues"); *Ericsson v. TCL*, 2018 WL 2149736, at *11 (E.D. Tex. May 10, 2018) (same), *vacated on other grounds*, 955 F.3d 1317 (Fed. Cir. 2020).

## G.    *Read* Factor 6: Ferring's Misconduct Has Continued Unabated For Years

Ferring asks the Court to ignore its conduct leading up to the patents' issuance and the launch of REBYOTA and to conclude that this factor weighs against enhancement because it has "only" infringed since January 2023. Ferring's pre-issuance conduct is relevant because it illustrates that Ferring has had no intention of altering its long-standing plan to use the copied, patented technology. "Continuing to sell infringing products after receiving notice of infringement,

---

[8]    Ferring attempts to insert its good faith belief under this factor and relies on *Med-El*, 2024 WL 4371292, at *12, to do so. That case discussed good faith under *Read* Factor 3.

during the course of the litigation and/or after a finding of infringement supports an enhancement of damages." *Alfred E. Mann Found. v. Cochlear*, 2018 WL 6190604, at *30 (C.D. Cal. Nov. 4, 2018); *Juno v. Kite*, 2020 WL 2844410, at *13 (C.D. Cal. Apr. 2, 2020) (two years of sales post FDA approval weighed in favor of enhancement). That is what happened here.

### H.    *Read* Factor 7: Ferring Took No Remedial Steps

Ferring admits it took no remedial action, which should end the inquiry. Opp. 30. But Ferring claims remedial steps were not necessary because it subjectively believed it did not infringe. *Id.* 30-31. As discussed above, Ferring's subjective belief is not properly supported (*infra* Section I.C). And the jury concluded that Ferring's alleged subjective belief was not a defense to its willful conduct. D.I. 482 at 26; D.I. 480 at 3. Ferring still has not taken remedial actions, nor does it intend to, which particularly warrants enhancement because Ferring lacked any legitimate noninfringement defenses, as explained in *Read* Factor 2, making *Dasso*, 2023 WL 5349374, at *26 (where the defendant had "plausible defenses"), distinguishable. Moreover, a good-faith subjective belief is not enough. *See EagleView*, 522 F. Supp. 3d at 53-54 (rejecting argument that defendants "were under no obligation to take remedial action until after the jury verdict because they maintained a subjective, good-faith belief that their actions were non-infringing").

### I.    *Read* Factor 8: Ferring Intended to Harm Finch and UMN

The evidence conclusively showed—and Ferring never contests—that Ferring's goal was to get to market before Finch, which Ferring knew would provide it an enormous competitive advantage. Mot. 33. Ferring, however, claims this is irrelevant because it believes Finch would have failed anyway. Opp. 31-32. While Finch faced some issues during its development of CP-101, it was one trial away from FDA approval when REBYOTA launched, and Ferring was unable to secure the necessary funding because of Ferring's infringement. Tr. 431:11-432:5. The fact that Finch ultimately did not obtain FDA approval or that Seres has entered the market does not absolve

17

Ferring since "[a]ny first-mover advantage to [Ferring] would create reciprocal harm to [Finch/UMN]," as they would have been "direct competitors in a relatively small market." *Juno*, 2020 WL 2844410, at *13-14 (factor 8 favored enhancement due to first mover advantage even where patentee lacked product on the market). Nor are *Stryker*, 2017 WL 4286412, at *6, and *Alfred E. Mann*, 2018 WL 6190604, at *32, distinguishable—like in those cases, Ferring and Finch were two of a few competitors in a small market racing for FDA approval. And unlike in *Joyal v. Johnson Elec.*, 2009 WL 512156, at *8 (D.N.J. Feb. 27, 2009), Ferring's conduct was not inconsequential to Finch; it was the nail in the coffin, forcing Finch to discontinue its product, and Lee Jones violated UMN's trust, which ultimately harmed UMN's commercialization efforts.

## J.    *Read* Factor 9: Ferring Concealed Its Infringement

Ferring argues that Lee Jones instructed employees to use "approximately" to describe the REBYOTA's 0.5mm pore size because that was factually accurate. Opp. 32-33. Ms. Jones' reason for the change, however, was "***to avoid potential patent infringement issues***," as discussed above. PTX-298.1-2 (emphasis added). Ferring also argues that it changed its website to refer to "prevention" instead of "treatment" around July 1, 2023 to reflect the FDA's determination regarding the proper indication for REBYOTA. Opp. 33. But that timing does not add up: after the FDA approved REBYOTA on November 30, 2022—meaning ***after*** the FDA had already made its regulatory decision regarding the label's language—Ferring's website said that REBYOTA is used "to treat recurrent C. difficile infection" PTX-604.0001, 3, 6. Ferring did not change its website until July 2023, when this lawsuit was well underway, to say that REBYOTA is used "for the prevention of recurrence." PTX-325.0003-4. Ferring further argues that it openly developed REBYOTA and that a Finch presentation identifies "***Potentially*** Relevant Finch Patents" (Ex. AA at 10) for Rebiotix; but complete information related to REBYOTA's composition and manufacturing method was not publicly available. And UMN learned Rebiotix had copies of

UMN's technology **during this litigation, not before**. *See* Tr. 118:3-10, 119:16-120:2.

\* \* \* \* \*

All nine *Read* factors and the jury's willful infringement finding heavily favor a significant enhancement. *See, e.g.*, *EagleView*, 522 F. Supp. 3d at 56 (trebling where all factors favored); *Stryker*, 2017 WL 4286412, at \*3 (same). And even if the Court were to conclude that only some of the factors support enhancement, under these facts, the most appropriate result is to treble the jury's award. *See Advanced Med.*, 2005 WL 3454283, at \*9; *Johns Hopkins*, 978 F. Supp. at 196.

## II.    Ferring Agrees To Supplemental Damages and Pre- and Post-judgment Interest

Ferring does not dispute supplemental damages and pre- and post-judgment interest are warranted. Opp. 34, 42-44. To narrow the issues, UMN/Finch will accept Ferring's calculations, and supplemental damages should be enhanced. *See infra* Section III; Mot. 36.

## III.    The Ongoing Royalty Should Be Enhanced

Ferring does not dispute an ongoing royalty is proper, but claims the Court should not enhance the ongoing royalty, and instead should lower it below 5.5%. Both arguments lack merit; the ongoing royalty should be 16.5%, as discussed in UMN/Finch's opening brief and below.

### A.    Willfulness And Enhancement Of The Jury Award Are Considerations

"[J]ustice would not be served if [Ferring] was afforded an ongoing royalty under the same favorable terms as a voluntary licensee." *Telcordia v. Cisco*, 2014 WL 1457797, at \*5 (D. Del. Apr. 14, 2014) (enhancing ongoing royalty, in part, because of willfulness). Here, the verdict of $25,815,061 did not include Ferring's willful infringement. And awarding an ongoing royalty at the jury's award (5.5%) would allow Ferring to owe less for its post-verdict infringement than its pre-verdict infringement. *See Bos. Sci.*, 838 F. Supp. 2d at 275-76 (declining "to allow … an adjudicated willful infringer, to effectively owe less for its post-verdict infringement"); *Arctic Cat v. Bombardier*, 2017 WL 7732873, at \*1-4 (S.D. Fla. Jan. 3, 2017), *aff'd*, 876 F.3d 1350 (Fed. Cir.

2017) (doubling for willfulness). UMN/Finch are not arguing that willfulness and enhancement of a jury's award require an enhanced ongoing royalty in all circumstances, but courts have recognized that those are important considerations.[9] Ferring's attempts to distinguish *Boston Scientific* and *Arctic Cat* are unavailing. In *Boston Scientific*, the court considered that the defendant was "an adjudicated willful infringer" when increasing the ongoing royalty rate. 838 F. Supp. 2d at 276. And Ferring admits that, in *Arctic Cat*, the "court did consider willfulness in connection with its ultimate determination to increase the jury's royalty rate." Opp. 37.

Moreover, Ferring is wrong that the parties must be competitors or that an injunction must be possible for an enhanced ongoing royalty to be on the table. Imposing such a gating requirement would be antithetical to the flexible nature of equitable relief (*John Bean v. Morris*, 988 F.3d 1334, 1339 (Fed. Cir. 2021)), and enhanced ongoing royalties are regularly awarded in cases between competitors and non-competitors alike. *See Erfindergemeinschaft UroPep GbR v. Eli Lilly*, 2017 WL 3034655, at *9, *13 (E.D. Tex. July 18, 2017) (ongoing royalty rate 2X jury award despite parties not being competitors). As to *Vectura*, 2019 WL 4346502, at *8, the Court did not enhance the ongoing royalty where the *Read* factors did not support such a result.

### B.    Changed Circumstances Confirm The Ongoing Royalty Should Be Enhanced

Ferring contends no changed circumstances justify an enhanced ongoing royalty. Not so. Ferring is now an adjudicated willful infringer. Moreover, unlike at the November 2022 hypothetical negotiation, Ferring has made clear that it has no desire to design around the asserted patents; and VOWST is on the market, meaning there is an alternative option. Ferring attempts to

---

[9]    Ferring's cited authorities do not hold otherwise: *Purewick v. Sage*, 666 F. Supp. 3d 419, 448 (D. Del. 2023) (not enhancing pre-verdict damages for willfulness); *SRI v. Cisco*, 254 F. Supp. 3d 680, 724 (D. Del. 2017) (defendant's request to lower royalty was only question before the court); *VB Assets*, 2024 WL 4347300, at *18 (requiring additional briefing on the issue).

argue its lack of alternatives is not a changed circumstance because UMN/Finch made that argument at trial. Ferring, however, has now confirmed post-verdict in its opposition that its only options were continuing to offer REBYOTA or leave the market. That unquestionably favors increasing the ongoing royalty to 16.5%. *Affinity v. BMW*, 783 F. Supp. 2d 891, 905 (E.D. Tex. 2011) (enhancement of ongoing royalty "will adequately account for the willful nature of the ongoing infringement"); *Paice v. Toyota*, 609 F. Supp. 2d 620, 631 (E.D. Tex. 2009) (similar)

Ferring suggests that the Court should ignore Ferring's profit margins and comparable licenses because they were presented to the jury, but it cites no case countenancing this approach and does not consistently apply its own logic. For example, Ferring contends that its profit margins should be disregarded, but then relies on its profit margins to argue that REBYOTA is not profitable in view of the jury's damages award—an argument Ferring presented at trial. Tr. 1242:18-25. Moreover, REBYOTA's significant gross profit margins are relevant to the appropriateness of enhancement, an issue the jury was not asked to consider. *Paice*, 609 F. Supp. 2d at 630-31 (accounting for defendant's "profit margin" in enhancing ongoing royalty); *Joyal*, 2009 WL 512156, at *13-*14 (basing enhanced ongoing royalty on defendant's "net operating profit rate"). With respect to the OpenBiome and Takeda licenses and the Ironwood offer letter, the jury was not asked to award a tiered royalty. The tiered royalties in those licenses and offers, however, are relevant because licensees recognized that increasing the royalty rate is appropriate if circumstances change. Ferring's cited cases are inapplicable or inapposite. In both *Purewick*, 666 F. Supp. 3d at 449, and *VB Assets*, 2024 WL 4347300, at *18, the court did not enhance the ongoing royalty rate because the plaintiff did not point to changed circumstances. UMN/Finch have demonstrated numerous changed circumstances: (1) Ferring is an adjudicated willful infringer; (2) Ferring has taken no measures to eliminate infringement; (3) Ferring has high

21

profitability; and (4) the comparable licenses contemplate higher royalties as more products are sold. And in *SRI v. Cisco*, 254 F. Supp. 3d 680, 720-21 (D. Del. 2017), the court only considered whether to allow supplementation of the record; it did not discuss the merits. Here, as explained in this brief and UMN/Finch's opening brief, changed circumstances favor enhancement.

### C.    A Lower Royalty Would Be Inequitable And Promote Willful Infringement

Ferring argues that the ongoing royalty rate should be 3% or 4.5%. Opp. § IV.D. But that counters an ongoing royalty's intended result: "[t]he purpose of an ongoing royalty is precisely to reduce the incentive to infringe." *Arctic Cat*, 2017 WL 7732873, at *3; *Affinity*, 783 F. Supp. 2d at 899 (same). Ferring claims that ██████████████████████████████ ███████████████████████████ (Opp. 38), but its only support is conclusory expert assertions (D.I. 512 ¶ 18). REBOYTA's sales are steady, despite competition from VOWST, D.I. 512, Ex. 7, and a royalty is owed only if Ferring makes sales. ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████████ Malackowski Reply Decl. ¶ 6. Regardless, an infringer's profits are not a cap, and Ferring can increase its price to maintain its desired profit margin. *Aqua Shield v. Inter Pool*, 774 F.3d 766, 772 (Fed. Cir. 2014); *Douglas v. Buyers Prods.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013) (same). Mr. Kidder's attempt to change his opinion now is part and parcel of Ferring's say-anything strategy to deprive Finch of the appropriate remedies, and he fails to justify lowering the royalty to reward Ferring's willful infringement. This unreliable, conclusory evidence should be rejected.

### IV.    Conclusion

UMN/Finch respectfully request that the Court award enhanced damages, an ongoing enhanced royalty, supplemental damages, and pre- and post-judgment interest.

OF COUNSEL:

KIRKLAND & ELLIS LLP

Michael W. De Vries
Ingrid Petersen
555 South Flower Street, Suite 3700
Los Angeles, CA 90071

Adam R. Alper
555 California Street, 27th Floor
San Francisco, CA 94104

Patricia A. Carson
Leslie M. Schmidt
Ashley L.B. Ross
N. Kaye Horstman
601 Lexington Avenue
New York, NY 10022

Alina Afinogenova
200 Clarendon Street, 47th floor
Boston, MA 02116

Ashley Cade
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

Sharre Lotfollahi, P.C.
Kirkland & Ellis LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067

Dated: November 26, 2024

/s/ Kelly E. Farnan
Jeffrey L. Moyer (#3309)
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
farnan@rlf.com
metzler@rlf.com

*Attorneys for Defendants Finch Therapeutics Group, Inc., Finch Therapeutics, Inc., and Finch Therapeutics Holdings, LLC, and Counterclaim Plaintiff the Regents of the University of Minnesota*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 26, 2024, true and correct copies of the foregoing

document were caused to be served on the following counsel of record as indicated:

**BY E-MAIL**
Mary W. Bourke
Dana K. Severance
Daniel M. Attaway
Zachary Murphy
1313 North Market Street, Suite 1200
Wilmington, DE 19801
**BY E-MAIL**
Daralyn J. Durie
Matthew Chivvis
Rachel Dolphin
Ramsey Fisher
Clinton W. Ewell
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

**BY E-MAIL**
Sarah E. Brickey
Morrison & Foerster LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202

**BY E-MAIL**
Joshua P. Davis
Womble Bond Dickinson (US) LLP
811 Main Street
Suite 3130
Houston, TX 77002

**BY E-MMAIL**
Whitney O'Byrne
Sara Doudar
Morrison & Foerster LLP
701 Wilshire Boulevard
Los Angeles, CA 90017

*/s/ Sara M. Metzler*
Sara M. Metzler (#6509)
metzler@rlf.com

24