**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FERRING PHARMACEUTICALS INC. and REBIOTIX INC., | ) ) ) |
| Plaintiffs/Counterclaim-Defendants, | ) ) |
| v. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC. and FINCH THERAPEUTICS HOLDINGS, LLC., | ) ) ) ) |
| Defendants/Counterclaim-Plaintiffs. | ) ) |
| FINCH THERAPEUTICS GROUP, INC., FINCH THERAPEUTICS, INC., FINCH THERAPEUTICS HOLDINGS, LLC, and THE REGENTS OF THE UNIVERSITY OF MINNESOTA, | ) ) ) ) ) ) |
| Defendants/Counterclaim-Plaintiffs, | ) ) |
| v. | ) ) |
| FERRING PHARMACEUTICALS INC. and REBIOTIX INC., | ) ) ) |
| Plaintiffs/Counterclaim-Defendants. | ) |

C.A. No. 21-1694-JLH

**<u>MEMORANDUM OPINION</u>**

Mary W. Bourke, Dana K. Severance, Daniel M. Attaway, Zachary Murphy, Alexander P. Wharton, WOMBLE BOND DICKINSON (US) LLP, Wilmington, Delaware. John B. Bourke, WOMBLE BOND DICKINSON (US) LLP, San Francisco, California. Joshua P. Davis, WOMBLE BOND DICKINSON (US) LLP, Houston, Texas. Daralyn J. Durie, Matthew Chivvis, Rachel Dolphin, Ramsey Fisher, Clinton W. Ewell, MORRISON & FOERSTER LLP, San Francisco, California. Whitney O'Byrne, Sara Doudar, MORRISON & FOERSTER LLP, Los Angeles, California. Sarah E. Brickey, MORRISON & FOERSTER LLP, Denver, Colorado.

*Counsel for Plaintiffs/Counterclaim-Defendants.*

Jeffrey L. Moyer, Kelly E. Farnan, Sara M. Metzler, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware. Michael W. De Vries, Ingrid Petersen, KIRKLAND & ELLIS LLP, Los

Angeles, California.  Adam R. Alper, KIRKLAND & ELLIS LLP, San Francisco, California.  Patricia A. Carson, Leslie M. Schmidt, Ashley L.B. Ross, N. Kaye Horstman, KIRKLAND & ELLIS LLP, New York, New York.  Alina Afinogenova, KIRKLAND & ELLIS LLP, Boston, Massachusetts. Ashley Cade, KIRKLAND & ELLIS LLP, Washington, District of Columbia.  Sharre Lotfollahi, KIRKLAND & ELLIS LLP, Los Angeles, California.

*Counsel for Defendants/Counterclaim Plaintiffs.*

Wilmington, Delaware
June 10, 2026

**JENNIFER L. HALL, U.S. DISTRICT JUDGE**

This is a patent case. On one side is Finch Therapeutics Group, Inc., Finch Therapeutics, Inc., and Finch Therapeutics Holdings, LLC (collectively, "Finch") and the Regents of the University of Minnesota ("UMN") (together, "UMN/Finch"). On the other side is Ferring Pharmaceuticals Inc. and Rebiotix Inc. (collectively, "Ferring"). UMN/Finch accuse Ferring of patent infringement.

The Court presided over a five-day jury trial in August 2024. (D.I. 519–523 ("Tr.").) The jury made several findings. The jury found that UMN/Finch proved by a preponderance of the evidence that Ferring infringed claim 7 of U.S. Patent No. 10,251,914 ("'914 patent"), claims 16 and 21 of U.S. Patent No. 10,675,309 ("'309 patent"), and claims 2 and 9 of U.S. Patent No. 11,541,080 ("'080 patent"). (D.I. 480 at 2.) The jury found that Ferring's infringement of those claims was willful. (*Id.* at 3.) The jury also found that Ferring proved by clear and convincing evidence that claim 21 of the '309 patent and claim 9 of the '080 patent were invalid as obvious but had not proven that claim 16 of the '309 patent or claim 2 of the '080 patent was obvious. (*Id.* at 4.) The jury also found that Ferring had not proven by clear and convincing evidence that claim 7 of the '914 patent or claim 2 or 9 of the '080 patent was invalid for lack of an adequate written description. (*Id.*) The jury awarded damages "through the date of trial" in the amount of $25,815,061, consisting of a $25 million "upfront payment" and $815,061 in "running royalt[ies]." (*Id.* at 5.)

Presently before the Court are post-trial motions from both sides. From Ferring are renewed motions for judgment as a matter of law ("JMOL") on the issues of infringement, validity (written description and obviousness), willfulness, and damages. (D.I. 497.) From Finch are motions seeking enhanced damages, ongoing royalties, pre- and post-judgment interest, and

2

"supplemental" damages. (D.I. 496.) The motions have been fully briefed. For the reasons below, the Court will DENY Ferring's requests for JMOL; DENY Finch's request for enhanced damages; GRANT Finch's request for ongoing royalties; and GRANT Finch's requests for pre- and post-judgment interest and "supplemental" damages.

## I.    BACKGROUND

The asserted claims relate to methods and systems for fecal microbiota transplantations ("FMT"). Ferring sells REBYOTA, a FMT therapy indicated for the prevention of recurrent *C. difficile* infection ("rCDI"). (*See, e.g.*, PTX-325.)

### A.    The '914 Patent

The '914 patent (also referred to by the parties as the "UMN patent") is titled "Compositions and Methods for Transplantation of Colon Microbiota." (JTX-1.) Asserted claim 7 is dependent on claim 4:

> 4. A method of decreasing the relative abundance of one or more members of the phylum Proteobacteria in a patient in need thereof, the method comprising:
>> administering to said patient an effective amount of a pharmaceutical composition comprising a fecal extract or preparation comprising a fecal donor's intestinal microbiota comprising at least 6 different classes of bacteria selected from the group consisting of Actinobacteria, Bacteroidia, Bacilli, Clostridia, Erysipelotrichi, Alphaproteobacteria, Betaproteo-bacteria, Gammaproteobacteria, Mollicutes, and Verrucomicrobiae, wherein said fecal extract or preparation is capable of passing through a 0.5 mm sieve and further comprises a pharmaceutically acceptable carrier,
> wherein the relative abundance of one or more members of the phylum Proteobacteria is reduced by at least 10% following administration of said pharmaceutical composition.
>
>         . . .

3

7.    The method of claim 4, wherein said method also increases the fecal microbiota diversity in said patient.

**B.    The '309 and '080 Patents**

The '309 and '080 patents (also referred to by the parties as the "Borody patents") are both titled "Compositions for Fecal Floral Transplantation and Methods for Making and Using Them and Devices for Delivering Them."  (JTX-4; JTX-6.)  Asserted claim 16 of the '309 patent is dependent on claim 12:

12.    An enema product configured for transporting to a remote facility, the enema product comprising flexible tubing, a sealed bag, and a pharmaceutical composition within the bag, wherein the pharmaceutical composition is formulated for enema delivery from the bag, wherein the pharmaceutical composition comprises saline, a cryoprotectant and a suspension of viable non-pathogenic fecal bacteria, wherein the fecal bacteria are from a stool of a human donor, wherein the fecal bacteria are separated from rough particulate matter and are not cultured, and wherein the pharmaceutical composition is in an amount effective for treating recurrence of *C. difficile* infection.

. . .

16.    The enema product of claim 12, wherein the cryoprotectant comprises polyethylene glycol.

Asserted claim 2 of the '080 patent is dependent on claim 1:

1.  An enema delivery system configured for transporting to a remote facility,
the enema delivery system comprising a sealed container, a tubing equipment, and a pharmaceutical composition within the sealed container,
wherein the pharmaceutical composition is formulated for enema delivery from the sealed container via the tubing equipment,
wherein the pharmaceutical composition comprises a microbiota suspension comprising a cryoprotectant and viable uncultured non-pathogenic fecal bacteria from a stool of a human donor that has been prescreened for infectious agents, and

4

wherein the pharmaceutical composition is stable during long term storage of the sealed container when frozen.

2. The enema delivery system of claim 1, wherein the system protects the fecal bacteria within the pharmaceutical composition from destruction when the sealed container is frozen or exposed to air.

## II.   LEGAL STANDARDS

JMOL may be entered against a non-moving party if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a)(1). JMOL is appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

For issues on which the moving party had the burden of proof at trial, entry of JMOL after a jury verdict "is rare[] [and] reserved for extreme circumstances." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976). To grant JMOL in favor of a party with the burden of proof, the court "must be able to say not only that there is sufficient evidence to support the finding [sought by the moving party] . . . but additionally that there is insufficient evidence for permitting any different finding." *Id.* (quoting 9 Wigmore on Evidence § 2495 at 306 (3d ed. 1940)); *see also Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019) ("[W]here the movant b[ears] the burden of proof on an issue, JMOL is only granted where 'there is insufficient evidence for permitting any different finding.'" (quoting *Fireman's Fund*, 540 F.2d at 1177)).

## III.    FERRING'S POST-TRIAL MOTIONS

The Court assesses Ferring's arguments in the same order presented by the parties.

### A.    Ferring's request for JMOL that claim 7 of the '914 patent is invalid for lack of an adequate written description

To comply with the written description requirement of 35 U.S.C. § 112(a), a patent specification "must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, *i.e.*, that the patentee invented what is claimed." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005); *see also Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351–54 (Fed. Cir. 2010) (en banc).    "[T]he written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement." *Ariad*, 598 F.3d at 1352.    But "a description that merely renders the invention obvious does not satisfy the requirement." *Id.*    Whether a specification satisfies the written description requirement is a question of fact.    *See GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 729 (Fed. Cir. 2014).    As a result, "determining whether a patent complies with the written description requirement will necessarily vary depending on the context." *Ariad*, 598 F.3d at 1351.    Invalidity for lack of an adequate written description must be proven by clear and convincing evidence. *Id.* at 1354.

The jury found that Ferring failed to prove by clear and convincing evidence that claim 7 of the '914 patent was invalid for lack of an adequate written description.    (D.I. 480 at 4.)    Ferring makes several arguments in support of its request for JMOL of invalidity for lack of adequate written description.    The Court is not persuaded that this is one of those rare cases for which it is appropriate to grant JMOL to the party with the burden of proof.

6

Ferring first argues that it is entitled to JMOL because (i) claim 7 requires the presence of "at least 6 different classes" of bacteria (selected from an identified list of 10 classes); (ii) each of the listed "classes" has a lot of species in it; and (iii) according to Ferring, the specification does not disclose "a representative number of species" or "structural features common to the members of the genus." (D.I. 502 at 5–6 (quoting *Wyeth LLC v. AstraZeneca Pharms. LP*, No. 21-1338, 2024 WL 3823006, at *15–16 (D. Del. Aug. 14, 2024)).) But I don't think that a reasonable jury was required to conclude—in the context of this invention—that Ferring proved lack of written description. Each of the claimed classes is listed by name in the specification. Each class is listed in the claim by name. The specification describes how to obtain fecal extract from a donor and how to screen it to see what classes it contains (and, thus, whether it has the claimed classes). The jury heard evidence that healthy fecal microbiota, processed according to the patent's instructions—including by passing it through the claimed "0.5 mm sieve"—would always contain at least the required 6 of the 10 listed classes. (Tr. 188:24–189:9 ("As I previously mentioned, if you start with a healthy human donor and purify the microorganisms as we instructed, both in the paper and the patent, you will always obtain at least six and usually more than those classes."); *id.* at 96:8–17, 97:25–99:16, 191:14–192:13.) And while Ferring introduced testimony that gut microbiome composition is variable, Ferring's expert testified on cross-examination that he conducted a study that found 95% of healthy human guts contain at least 6 of the 10 claimed classes of bacteria. (Tr. 852:11–16, *id.* at 856:1–11.) The jury was entitled to rely on that evidence when concluding that the inventors had possession of the claimed method.

Ferring next argues that JMOL should be granted because the patent contains insufficient "taxonomic data" to assess whether the inventors had possession of an invention comprising the "at least 6 different classes" limitation and the limitation requiring the "relative abundance . . . of

7

the phylum Proteobacteria [to be] reduced by at least 10%." I disagree that the evidence presented at trial required the jury to find that claim 7 was invalid. Finch/UMN presented evidence suggesting that administering a composition containing 6 of the 10 claimed classes of bacteria resulted in a 10% decrease in the relative abundance of the phylum Proteobacteria. As noted above, the jury heard evidence that a healthy donor extract prepared as described in the patent would contain at least 6 of the claimed 10 classes of bacteria. Example 4 in the '914 patent describes a study evidencing a 95% cure rate in 43 patients suffering from recurrent *C. difficile* infection after being treated by the method described. ('914 patent, 19:64–28:55.) The named inventors who conducted this study testified at trial that "the fact that these patients were cured indicates they no longer have an unhealthy gut, so Proteobacteria would be reduced to normal levels, which are really small amounts in an adult system." (Tr. 194:15–22.) And that this reduction in the relative abundance of the phylum Proteobacteria was "[a]bsolutely" by at least 10%. (*Id*. at 194:23–24.) The jury also heard evidence that a person of skill in the art would read Figures 1 and 2 of the '914 patent (which depict the changes in relative abundance seen in the gut of a FMT recipient), along with the text of Example 1 (which explains that before transplantation greater than 40% of the sequences obtained from the recipient's sample belong to Mollicutes or Gammaproteobacteria, whereas after transplantations, the samples were dominated by Firmicutes) to understand that the inventors showed at least a 10% reduction in the relative abundance of Protobacteria. ('914 patent, 2:54–62, 6:39–46, 17:21–29; Tr. 156:18–158:12.) The jury was free to credit that testimony and conclude that Ferring failed to meet its burden of proof. Ferring's request for JMOL of invalidity of claim 7 of the '914 patent for lack of adequate written description will be denied.

8

**B.      Ferring's request for JMOL that claim 7 of the '914 patent is not infringed**

"To prove infringement, the patentee must show that an accused product embodies all limitations of the claim either literally or by the doctrine of equivalents." *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013); 35 U.S.C. § 271(a). "A two-step analysis is employed in making an infringement determination." *Intell. Ventures I, LLC v. Canon Inc.*, 104 F. Supp. 3d 629, 637–38 (D. Del. 2015) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)). "First, the court must construe the asserted claims to ascertain their meaning and scope." *Id.* at 638. Second, the trier of fact must "compare the properly construed claims with the accused infringing product" to determine whether the product embodies the claims as construed. *Id.* "This second step is a question of fact." *Id.* (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)). The burden of proof is on the patentee to prove by a preponderance of the evidence that the accused product satisfies every limitation of the patent claims. *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "A finding of inducement requires establishing 'that the defendant possessed specific intent to encourage another's infringement.'" *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1327 (Fed. Cir. 2021) (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part)). "This requires a plaintiff to show 'that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements.'" *Id.* (quoting *DSU Med.*, 471 F.3d at 1306). "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice." *DSU Med.*, 471 F.3d at 1306 (internal quotation marks omitted).

9

"Under 35 U.S.C. § 271(c), a party is liable for infringement if he 'offers to sell or sells within the United States or imports into the United States . . . a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.'" *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009). "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012) (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009)).

At trial, Finch/UMN presented two theories of indirect infringement of claim 7 of the '914 patent: induced infringement and contributory infringement. The jury found that Ferring infringed. (D.I. 480 at 2.) Ferring argues that the record lacks substantial evidence for a reasonable jury to find either induced or contributory infringement. I disagree.

Regarding induced infringement, Ferring argues that Finch/UMN did not present sufficient evidence that Ferring "specifically intended to encourage healthcare providers to administer REBYOTA so as to satisfy the relative abundance limitation."[1] (D.I. 502 at 12.) I disagree. The record contains evidence that healthcare providers administering REBYOTA directly infringe claim 7. (*See* Tr. 354:9–379:2.) The record also contains evidence sufficient for a jury to find that Ferring intends and directs health care providers to use REBYOTA to treat recurrent *C. difficile*

---

[1] For the first time in their post-trial motions, the parties raise a dispute about whether the preamble—"A method of decreasing the relative abundance of one or more members of the phylum Proteobacteria in a patient in need thereof"—is "limiting." The parties didn't ask the Court to tell the jury anything about whether the preamble was limiting. So I didn't, and any argument that I should have is forfeited.

As explained below, even if the preamble were limiting, the record contains enough evidence for a reasonable jury to find infringement.

infection.  (Tr. 318:8–321:10, 325:16–327:19, 807:7–9, 290:11–293:2; PTX-117.9; PTX-118.3; PTX-136.16; PTX-376.3; PTX-604.6; PTX-1690.2; PTX-1632 at 1:25:55–1:26:16.)   And the record contains evidence that treatment with REBYOTA reduces the relative abundance of protobacteria, and that Ferring knew that.  (Tr. 354:9–385:13; PTX136.66; PTX 922.12.)

Ferring appears to suggest that, to establish its specific intent, the REBYOTA label needs to specifically mention reducing the relative abundance of Protobacteria.  (D.I. 502 at 13; D.I. 524 at 8.)  But evidence that directions in the product labeling will inevitably lead some physicians to infringe can suffice to demonstrate the requisite intent.  *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1369 (Fed. Cir. 2017); *Minn. Mining & Mfr. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002) ("The record indicates that Chemque was aware of the 3M patents and supplied the infringing products . . . with instructions on how they were to be used, which, when followed, would lead to infringement.").  What's more, Finch/UMN presented substantial evidence that Ferring knew administering REBYOTA as instructed would reduce the relative abundance of the phylum Proteobacteria and encouraged health care providers to administer REBYOTA precisely because it would have that effect.  (*See, e.g.*, Tr. 321:11–327:19, 359:16– 363:4, 318:8–16; PTX-136.66; PTX-922.12; PTX-142.138–139.)  That is enough to support a jury finding of inducement.

Regarding contributory infringement, Ferring argues that the "administration of REBYOTA does not meet the relative abundance limitation in more than 15% of patients, which confirms that there are substantial noninfringing uses for REBYOTA."  (D.I. 502 at 15.)  If Ferring's argument is that REBYOTA has a substantial noninfringing use because it doesn't work on every patient, I reject that argument.  The jury heard evidence that REBYOTA is only indicated to treat recurrent *C. difficile* infection, and that when it is effectively treated, the patient's

11

Proteobacteria decreases by at least 10%. (Tr. 318:17–327:24, 352:12–353:19.) The mere fact that REBYOTA fails to achieve its intended benefit in some cases does not mean that the jury needed to find the existence of a substantial noninfringing use. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

Ferring's request for JMOL of noninfringement of claim 7 of the '914 patent will be denied.

**C.    Ferring's request for JMOL that claim 16 of the '309 patent and claim 2 of the '080 patent are invalid as obvious**

"A patent is invalid for obviousness 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010) (quoting 35 U.S.C. § 103(a)). "Obviousness is a question of law based on underlying findings of fact." *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1373–74 (Fed. Cir. 2018) (quoting *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009)). "The underlying factual inquiries include: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." *Wyers*, 616 F.3d at 1237 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).

The jury found that Ferring failed to prove by clear and convincing evidence that claim 16 of the '309 patent or claim 2 of the '080 patent is invalid as obvious. (D.I. 480 at 4.) Ferring argues that the Court should grant JMOL that both claims are obvious in view of certain patent applications filed by Hlavka (TX-3150; TX-3164; TX-3330 (collectively, "Hlavka")) combined with the knowledge of a person skilled in the art. Once again, the Court is not persuaded that this

is one of those rare cases for which it is appropriate to grant JMOL to the party with the burden of proof.

As for claim 16 of the '309 patent, a jury could reasonably conclude that Ferring failed to meet its burden of proof. Claim 16 requires, among other things, an enema product that contains "polyethylene glycol." Although Hlavka discloses using a "glycol" as a cryoprotectant (TX-3330 at 18:27–28), it does not specifically disclose the claimed "polyethylene glycol." The jury heard evidence that there are "hundreds of glycols." (Tr. 899:6–10.) The jury also heard evidence that it would not have been an obvious choice to include polyethylene glycol in an enema-delivered pharmaceutical composition to treat recurrent *C. difficile* infection—of which a hallmark symptom is diarrhea—because polyethylene glycol is a known laxative. (Tr. 86:6–87:1, 92:1–11, 629:6–24, 900:14–905:6; PTX-113.2; PTX-979.535.) The jury was entitled to rely on this evidence to conclude that Ferring had not met its burden to demonstrate obviousness.

While a closer case, the jury was also free to conclude that Ferring failed to meet its burden of proof to demonstrate the obviousness of claim 2 of the '080 patent. Dependent claim 2 requires that "the system protects the fecal bacteria within the pharmaceutical composition from destruction when the sealed container is frozen or exposed to air." Neither side asked the Court to construe the limitation in dependent claim 2. Ferring's trial expert told the jury that Hlavka disclosed the limitation in claim 2. (Tr. 883:3–9.) But the jury was not required to credit that testimony. The jury could have found that Ferring failed to meet its burden of proof to show that Hlavka disclosed or otherwise suggested the requirements set forth in claim 2. I cannot say this is one of the "rare[]" and "extreme" circumstances where there was insufficient trial evidence permitting "any different finding" besides invalidity. *See Fireman's Fund*, 540 F.2d at 1177.

13

The law requires the Court to consider the evidence of secondary considerations of non-obviousness. The Court has. (*See* Tr. 315:3–18, 353:20–354:8, 480:1–17, 486:16–489:5, 491:19–492:5, 496:1–498:4; PTX-208.1, PTX-365, PTX-805, PTX-817.) But even if the jury believed all that evidence (which it was not required to do), such evidence would not have required the jury to find that Ferring met its burden to show obviousness by clear and convincing evidence.

**D.      Ferring's request for JMOL that claims 16 and 21 of the '309 patent are not infringed**

The jury found that Ferring infringes claims 16 and 21 of the '309 patent. Those claims require, among other things, an enema product "effective for treating recurrence of *C. difficile* infection." (JTX-4 at 31:57–58.) Ferring argues that the Court should grant JMOL of no infringement because REBYOTA *prevents*—but does not *treat*—the recurrence of *C. difficile* infection. I disagree. The record contains evidence sufficient for a jury to find that REBYOTA treats recurrent *C. difficile* infection. (Tr. 318:8–321:10, 325:16–327:19, 807:7–9, 290:11–293:2; PTX-117.9; PTX-118.3; PTX-136.16; PTX-376.3; PTX-604.6; PTX-1690.2; PTX-1632 at 1:25:55–1:26:16.) Ferring's argument goes to the weight and credibility of the evidence, which are the province of the jury. Ferring's request for JMOL that claims 16 and 21 of the '309 patent are not infringed will be denied.

**E.      Ferring's request for JMOL of no willful infringement**

The jury found that Finch/UMN proved by a preponderance of the evidence that Ferring's infringement of each of the '914, '309, and '080 patents was "willful." (D.I. 480 at 3.) A finding of "willful infringement" requires a showing that the defendant knew of the patent and then engaged in "deliberate or intentional infringement." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1296 (Fed. Cir. 2023) (citation omitted).

14

Technically speaking, "willful infringement" is not an independent claim for relief; it is a factual finding that may support a court's decision to increase infringement damages under 35 U.S.C. § 284. *Id.* ("[T]he court may increase the damages up to three times the amount found or assessed."); *see also Ironburg*, 64 F.4th at 1295. For the reasons explained below, the Court will exercise its discretion not to enhance damages. That said, Federal Circuit precedent requires district courts to "provide[] a ruling" on a party's request for JMOL that any infringement was not willful, even when the court does not increase damages. *Ironburg*, 64 F.4th at 1295.

Substantial evidence supports the jury's finding that Ferring's infringement of the '309 and '080 patents was willful. There is no dispute that Ferring was aware of the '309 patent upon its issuance (Tr. 344:23–24) and that Ferring became aware of the '080 patent when it issued during this litigation (D.I. 502 at 25). The jury heard evidence that Defendant Rebiotix monitored patent applications in the field (D.I. 502 at 27–28) and contacted the inventor of the '309 and '080 patents back in 2014 (before they issued) to discuss licensing the technology. (PTX-49; PTX-50; Tr. 271:24–272:22, 275:8–9; PTX-208.) And the jury heard evidence that Ferring made no attempt to design around the patent claims after they issued. (Tr. 717:23–718:22.)

Ferring points out that knowledge of a patent, without more, is insufficient to find willful infringement. That is correct. And that is why I instructed the jury that they "may not find that Ferring's infringement was willful merely because Ferring knew about the patents, without more," and that they must "consider all of the circumstances" and assess Ferring's conduct at the time it occurred in determining whether it intentionally infringed. (D.I. 482 at 26.) Yet the jury had a right to infer, based on all the evidence presented at trial, that Ferring acted with the requisite intentional state of mind after the patents issued.

15

Substantial evidence also supports the jury's finding of willful infringement of the '914 patent. There is no dispute that Ferring was also aware of the '914 patent when it issued. (Tr. 344:15–17.) The jury also heard evidence that Ferring and Rebiotix deliberately copied the disclosures of the application leading to the '914 patent to develop REBYOTA, without making any effort to design around after the patent ultimately issued. (Tr. 344:15–17, 379:14–381:22, 385:6–13, 572:15–19, 749:4–23, 269:13–21, 691:22–692:1, 701:20–23, 703:15–17, 705:18–707:15, 711:17–712:25, 717:23–718:22; PTX-266.5; PTX-268.26–27; PTX-402.1; PTX-1717.) Here, again, while knowledge of a patent is insufficient to find willful infringement, the jury could infer based on the totality of the circumstances that Ferring acted with the requisite intentional state of mind after the patent issued.

For the above reasons, Ferring's request for JMOL of no willful infringement will be denied.

## F.    Ferring's request for "JMOL Regarding Damages"

Under the Patent Act, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. A "reasonable royalty" award "must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). "Where the accused product incorporates components beyond the patented technology, damages expert opinions must apportion, or separate, 'the value of the allegedly infringing features from the value of all other features.'" *Willis Elec. Co., Ltd. v. Polygroup Ltd.*, 166 F.4th 1363, 1376 (Fed. Cir. 2026) (quoting *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015)).

One method for establishing the amount of a reasonable royalty is the "hypothetical negotiation" method: it requires the fact finder to determine the royalty that would have been

16

agreed to in a hypothetical negotiation between a willing licensee and a willing licensor at the time infringement began. *Id.* at 1374. Federal Circuit precedent provides guidance for making this determination in the form of the so-called *Georgia-Pacific* factors, which are a "structured framework for evaluating economic and commercial considerations relevant to the [hypothetical] negotiation." *Id.* at 1374–75 (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). The amount of damages for patent infringement—whether those damages are based on lost profits or a reasonable royalty—is an issue of fact to be decided by the jury. *See Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017).

The jury found that the reasonable royalty was an "upfront payment" of $25 million and a running royalty of $815,061. (D.I. 480 at 5.) Ferring takes issue with the jury's finding that a reasonable royalty would include a $25 million upfront payment.

This case, like most patent cases tried in this district court, "is a classic example of competing experts." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003). At trial, both sides' damages experts had the opportunity to present their theories. Finch/UMN's expert, James Malackowski, explained that he had applied the hypothetical negotiation method to his assessment of a reasonable royalty, and he opined that Finch/UMN were entitled to a reasonable royalty in the form of a $50 million upfront payment and a running royalty rate of 30% of sales (totaling $4.43 million for sales before trial), for a total of $54.43 million. (Tr. 470–507.) Ferring's counsel cross-examined Mr. Malackowski about his opinions. (Tr. 507–530.) Ferring also put on its own contrary evidence. Ferring's expert, Douglas Kidder, opined that a reasonable royalty rate was 5.5% of sales, for a total of $815,061 for the sales before trial. (Tr. 920–939.)

At the end of the day, each side's expert supported his opinions "with an analysis of relevant factors based on his client's view of the disputed facts." *Micro Chem.*, 317 F.3d at 1394.

17

For my part, I instructed the jury on the legal standard governing the award of a reasonable royalty—including the *Georgia-Pacific* factors for assessing the hypothetical negotiation, the requirement that the jury account for economic and technological differences between evidence of other license agreements and the hypothetical license, and the requirement for apportionment. (D.I. 482 at 36–42.)  Ultimately, the jury's damages award "depended to a large extent upon which predicate facts the jury believed, and then on which expert's analysis they believed." *Micro Chem.*, 317 F.3d at 1394.  The jury credited Mr. Malackowski's opinion that a reasonable royalty would include an upfront payment and a running royalty.  But the jury only awarded $25 million of the $50 million upfront payment suggested by Mr. Malackowski.  The jury also awarded only $815,061 (5.5%) in running royalties instead of the $4.43 million (30%) suggested by Mr. Malackowski.

Ferring contends that "[t]here is no substantial evidence that the allegedly novel aspects of the claimed inventions provide value to REBYOTA." (D.I. 502 at 33.)  I understand Ferring to be making an argument about apportionment.  But if Ferring's position is that Mr. Malackowski was required to identify and put a separate number on only the "novel" aspects of the claimed pharmaceutical invention, that is not the law.  *See AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1339 (Fed. Cir. 2015) ("It is not the case that the value of all conventional elements must be subtracted from the value of the patented invention as a whole when assessing damages.").  Mr. Malackowski explained that his analysis took into account the requirement to apportion the royalty to reflect the value attributable to the asserted claims.  He explained how he assessed the *Georgia-Pacific* factors.  And the jury was instructed on the *Georgia-Pacific* factors, including factors nine, ten, and thirteen which "bear directly on this issue." *Id.* at 1338.  Ferring may disagree with Mr. Malackowski's opinions, but the jury heard them at trial and was entitled to credit them.

18

Ferring also argues that Mr. Malackowski's royalty assessment inappropriately relied on another agreement, referred to by the parties as the "Seres/Nestle agreement."    But Mr. Malackowski explained that his analysis took into account the differences between the Seres/Nestle agreement and the hypothetical license.  Here, again, Ferring may disagree with Mr. Malackowski's opinion on the relevance of the Seres/Nestle agreement, but the jury heard his opinion at trial and was entitled to credit it.  *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372–76 (Fed. Cir. 2020) (concluding degree of comparability "was appropriately left for the jury to decide," and separately concluding the jury's damages award was supported by substantial evidence); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the . . . license agreements . . . are factual issues."); *Micro Chem.*, 317 F.3d at 1394.

Mr. Malackowski's testimony is substantial evidence supporting the jury's finding on what royalty is reasonable.[2]  Ferring's request for JMOL will be denied.

---

[2] The thrust of Ferring's post-trial challenge to the reasonable royalty award really seems to be that I should not have allowed the jury to hear Mr. Malackowski's opinions about a reasonable royalty.  But that is a separate question from whether substantial evidence supported the jury's determination of what royalty was reasonable.  *Cf. Willis Elec.*, 166 F.4th 1372–77. Ferring filed a *Daubert* motion before trial to exclude certain of Mr. Malackowski's opinions, which the Court denied. (D.I. 421 at 3–4.)  Underlying my ruling was my finding under Rule 702 that Finch/UMN had demonstrated by a preponderance of the evidence (a) that Mr. Malackowski had specialized knowledge that would help the jury determine what royalty was reasonable; (b) that his opinions relevant to the "hypothetical negotiation" (an "inherently counterfactual" determination) were based on sufficient facts; (c) that his testimony was the product of reliable methods, as he attempted both to apportion and to account for differences between the Seres/Nestle agreement and the hypothetical negotiation; and (d) his expert opinions (as stated in his reports) reflected a reliable application of the principles and methods to the facts of the case. *Willis Elec.*, 166 F.4th at 1373–74 (citing Fed. R. Evid. 702).
  Estimating a reasonable royalty "necessarily involves an element of approximation and uncertainty," *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1340 (Fed. Cir. 2025) (en banc), and I concluded that Ferring's criticisms of Mr. Malackowski's expert opinions relevant to the question of what royalty was reasonable could be addressed through cross-examination and the

### G.     Ferring's request for remittitur

Ferring requests that the Court grant "remittitur of the upfront payment award" on the basis that it is "intrinsically excessive." (D.I. 502 at 43 (quoting *Boyce v. Edis Co.*, 224 F. Supp. 2d 814, 817 (D. Del. 2002)).)   I am unpersuaded that the jury's reasonable royalty determination is "intrinsically excessive."   And, as explained above, substantial evidence supports the jury's reasonable royalty determination.   Ferring's request for remittitur will be denied.

## IV.     FINCH/UMN'S POST-TRIAL MOTIONS

The Court assesses Finch/UMN's arguments in the same order presented by the parties.

### A.     Finch/UMN's request for enhanced damages under 35 U.S.C. § 284

Finch/UMN asks the Court to award enhanced damages under 35 U.S.C. § 284.   Whether to award enhanced damages is a matter committed to the discretion of the district judge.   *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016).   The Supreme Court has explained that "[a]wards of enhanced damages under the Patent Act . . . are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Id.* at 103–04 (explaining that enhanced damages "are generally reserved for egregious cases of culpable behavior").   "A district court is not required to analyze the *Read* factors in making an enhancement determination," but the Federal Circuit has explained that the *Read* factors are nevertheless "an appropriate method of weighing the particular circumstances of the case to determine whether the relevant conduct is sufficiently egregious to warrant enhanced damages." *Trs. of Colum. Univ. in City of N.Y. v. Gen Digit. Inc.*, 169 F.4th 1320, 1340 (Fed. Cir.

---

presentation of contrary evidence. (D.I. 421 at 3–4.) *See EcoFactor*, 137 F.4th at 1340 ("Indeed, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (cleaned up) (quoting *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015))).

2026) (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992)).  The *Read* factors are: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) closeness of the case; (6) duration of the infringer's misconduct; (7) remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *Read*, 970 F.2d at 827.

The *Read* factors do not support enhancing damages in this case.  I'll assume—for the sake of argument only—that factors one, four, and seven support enhanced damages.  The rest of the factors do not.  For *Read* factor two, Finch/UMN argues that "Ferring presented no evidence of any belief it did not infringe [the asserted] claims, and does not have an advice of counsel defense." (D.I. 501 at 15.)  Ferring responds, in part, by pointing to evidence that it conducted FTO searches on the asserted patents and developed a good-faith belief REBYOTA did not infringe any valid claims before it launched in 2023 (during the pendency of this litigation).  (TX-3960.0075.)  The Court notes that, while objectively unreasonable conduct by the accused infringer is neither necessary nor sufficient to award enhanced damages, *Halo Elecs.*, 579 U.S. 93 at 106, the record is insufficient to support any finding that Ferring acted in an objectively unreasonable manner by launching during the pendency of this litigation—especially since it ultimately succeeded in proving that two of the five asserted claims were invalid.  To the extent that *Read* factor two is still

relevant after the enactment of 35 U.S.C. § 298,[3] the Court is unpersuaded that it supports enhancing damages under the circumstances of this case.

For *Read* factor three, Finch/UMN argues that Ferring "took a scorched earth, indefensible approach" to this litigation. (D.I. 501 at 16.)  While the Court was certainly troubled by Ferring's counsel's approach with respect to Ferring's Motion in Limine No. 5 and Finch's Motion in Limine No. 5 (*see, e.g.*, D.I. 433 at 2–3; D.I. 440; D.I. 449; D.I. 472), the remainder of Ferring's approach to this litigation was more consistent with zealous advocacy than bad faith.  This factor does not support enhancing damages.

*Read* factor five favors Ferring and weighs strongly against enhancing damages.  The case was close.  Ferring presented reasonable non-infringement and invalidity theories at trial and proved invalidity for two claims.

For *Read* factor six, Finch/UMN argues that Ferring's misconduct "goes back over a decade." (D.I. 501 at 31–32.)  But it is undisputed that the earliest patent asserted in this case did not issue until 2019 and Ferring did not launch REBYOTA until 2023, during the pendency of this litigation—a litigation initiated by Ferring to clarify its legal rights.  This factor does not support enhancing damages.

For *Read* factors eight and nine, Finch/UMN argues that Ferring deliberately infringed to gain a competitive edge and then concealed its misconduct. (D.I. 501 at 33–35.)  On this record, the Court is not persuaded that Ferring's behavior was egregious or malicious or that Ferring concealed its misconduct.  These factors do not support enhancing damages.

---

[3] Section 298 provides that "[t]he failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent."

Finally, UMN/Finch have not pointed to any evidence of "egregious" conduct by Ferring that would support an award of enhanced damages.  The Court will exercise its discretion not to enhance damages under § 284.

**B.      Finch/UMN's request for pre- and post-judgment interest and supplemental damages**

Ferring does not dispute that Finch/UMN is entitled to pre- and post-judgment interest and so-called "supplemental damages" for the sales made after August 5, 2024 (date of trial) but before August 15, 2024 (date Court entered judgment).  (D.I. 511 at 34, 42.)  The parties agree on Ferring's calculations of those amounts.  (D.I. 511 at 42–44; D.I. 526 at 19.)  Accordingly, the Court will grant Finch/UMN's requests in the agreed-upon amounts.

**C.      Finch/UMN's request for an ongoing royalty**

Finch/UMN requests that the Court impose an ongoing royalty of 16.5% through the life of the patents.  Ferring does not dispute that it would be appropriate for the Court to set the ongoing royalty rate.  Ferring does take issue with the amount requested by Finch/UMN.  Ferring contends that the Court should impose "at most" a rate of 5.5%.  (D.I. 511 at 34, 42.)

I decline to defer determination of the ongoing royalty rate.  Determining the ongoing royalty rate now without instructing the parties to negotiate a license is within my discretion, *see Paice LLC*, 504 F.3d at 1315, and delaying would delay the entry of final judgment, *see Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 515 F. App'x 882, 882 (Fed. Cir. 2012).  The parties certified before trial that they had made good faith efforts to resolve the case through settlement (D.I. 376 at 23), and they have not settled the case in the many months since the trial.  I find that the parties are unlikely to agree to an ongoing royalty rate, and so I will exercise my discretion to determine that rate now.

The Federal Circuit has held that "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement," "because different economic factors are involved." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361–62 (Fed. Cir. 2008) (citing *Paice*, 504 F.3d at 1315, 1317). But consistent with the views of other courts, I am not sure what those different factors would be, given that the jury was instructed to assume that the parties to the hypothetical negotiation understood that the patent was valid and infringed and were willing to enter into a license. (Tr. 1124:13–20.) *See Vectura Ltd. v. GlaxoSmithKline LLC*, No. 16-638, 2019 WL 4346502, at *7 n.10 (D. Del. Sept. 12, 2019); *Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 449 n.23 (D. Del. 2023); *see also* Mark A. Lemley, *The Ongoing Confusion over Ongoing Royalties*, 76 MO. L. REV. 695, 704 (2011).

In any event, the Federal Circuit suggests that I consider, relevant here: (1) "the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability," *Amado*, 517 F.3d at 1362; (2) "changed economic circumstances, such as changes related to the market for the patented products," *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018); (3) "post-verdict factors" that would impact "what a hypothetical negotiation would look like *after* the prior infringement verdict," *id.*; and (4) the *Georgia-Pacific* factors, *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017) (citing *Georgia-Pac.*, 318 F. Supp. at 1120).

Considering all those factors, I exercise my discretion to set the ongoing royalty rate as 5.5%. The Federal Circuit has explained that the jury's damages award is "a starting point for evaluating ongoing royalties." *Vectura*, 2019 WL 4346502, at *7 (quoting *Apple, Inc. v. Samsung Elecs. Co. Ltd.*, No. 12-630, 2014 WL 6687122, at *14 (N.D. Cal. Nov. 25, 2014)). And the parties do not dispute that the jury's award of a "running royalty" of $815,061 for sales made through the

24

trial date equates to a 5.5% royalty rate. (D.I. 480 at 5; D.I. 501 at 37; D.I. 511 at 34.) This case is unique, however, because the jury determined that the "reasonable royalty" included a $25 million lump-sum payment *plus* a running royalty of 5.5%. The jury's award reflects its determination that the appropriate royalty structure should be frontloaded, with a large upfront payment and a smaller running royalty. Under these circumstances—where the accused infringer will already be required to make a large upfront payment as part of its total reasonable royalty obligations (as a result of the jury's award)—it is hard to understand why it would be appropriate for this Court to now assume a second, post-judgment hypothetical negotiation involving "different economic factors" to set the ongoing royalty rate.

Regardless, I'm not persuaded that the arguments and evidence presented by Finch/UMN justify a rate above 5.5%. Finch/UMN points to 35 U.S.C. § 284—which permits treble damages—as a reason for tripling the jury's running royalty rate (D.I. 501 at 39; D.I. 480 at 5), but the Court has determined that enhanced damages are not appropriate here, for the reasons explained above. And "[a]lthough [Finch/UMN] may be in a stronger bargaining position post-verdict, [Finch/UMN] points to no other circumstances that indicate it would be able to negotiate a rate higher than the rate determined by the jury." *Purewick*, 666 F. Supp. 3d at 449–50. The jury's award included an upfront payment, which, by definition, includes compensation for some of Ferring's post-verdict infringement. Indeed, the $25 million upfront payment award was almost double the amount of Ferring's actual sales through the time of trial. (D.I. 512, Ex. 4.) Finch/UMN presented and relied on REBYOTA's current profit margin at trial, and the jury determined that 5.5% was appropriate given that profit margin. Finch/UMN have no competing product on the market. They have not sought a post-trial injunction (nor is it likely that the Court would have

25

granted one under these circumstances).  There are no changed circumstances that would cause the Court to weigh the *Georgia-Pacific* factors any differently than the jury did.[4]

Accordingly, the Court will grant Finch/UMN's request for an ongoing royalty, and the Court will set the rate at 5.5%.  The parties will be directed to meet and confer and submit a proposed Judgment and/or Order governing the payment of ongoing royalties.

## V.    CONCLUSION

For the reasons above, Ferring's Renewed Motion for Judgment as a Matter of Law (D.I. 497) is DENIED.  Finch/UMN's Post-Trial Motion for Enhanced Damages, Ongoing Royalty, and Pre- and Post-Judgment Interest (D.I. 496) is GRANTED-IN-PART and DENIED-IN-PART. Finch/UMN's request for enhanced damages will be DENIED.  Finch/UMN's requests for pre- and post-judgment interest, supplemental damages, and an ongoing royalty are GRANTED.

An appropriate order will follow.

---

[4] I am equally unpersuaded that changed economic circumstances warrant a lower ongoing royalty rate than the one set by the jury.  In setting the ongoing royalty rate at 5.5%, I am mindful of cases in this district that caution against allowing "an adjudicated willful infringer, to effectively owe less for its post-verdict infringement than the jury found for its pre-verdict infringement." *Bos. Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 276 (D. Del. 2012), *aff'd*, 497 F. App'x 69 (Fed. Cir. 2013).